# EXHIBIT 19

# Declaration of Matthew Bromberg Ph.D

### December 1, 2020

Pursuant to 28 U.S.C Section 1746, I, Matthew Bromberg, make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

2. Matthew Bromberg has a Ph.D in Electrical Engineering from the University of California at Davis and a Masters degree in Mathematics from the University of California at Berkeley. I have been employed, for over 28 years, in the signal processing and wireless signal processing domain, with an emphasis on statistical signal processing. I have published numerous journal and conference articles. Additionally, I have held Top Secret and SAP clearances and I am an inventor of nearly 30 patents, one of which has over 1000 citations in the field of MIMO communications (Multiple Input Multiple Output).

3. I reside at 4303 West Eaglerock Pl., Wenatchee WA, 98801.

4. Given the data sources referenced in this document, I assert that in Georgia, Pennsylvania and the city of Milwaukee, a simple statistical model of vote fraud is a better fit to the sudden jump in Biden vote percentages among absentee ballots received later in the counting process of the 2020 presidential election. It is also a better fit when constrained to a single large Metropolitan area such as Milwaukee..

5. Given the same data sources, I also assert that Milwaukee precincts exhibit statistical anomalies that are not normally present in fair elections.. The fraud model hypothesis in Milwaukee has a posterior probability of 100% to machine precision. This model predicts 105,639 fraudulent Biden ballots in Milwaukee.

6. I assert that the data suggests aberrant statistical anomalies in the vote counts in Michigan, when observed as a function of time.

7. I assert that the data implies statistical anomalies supportive of vote switching in Maricopa county Arizona.

Signature:

---

Supporting evidence for the assertions in (4) and 5 is provided in the following pages.

# 1 Impact of Fraud on the Election

In the analysis that follows, it is possible to obtain rough estimates on how vote fraud could possibly have effected the election. In Georgia, there is evidence that votes were actually switched from Trump to Biden. As many as 51,110 Biden votes were fraudulent and as many as 51,110 votes could be added to Trump. An audit to determine vote switching will be more difficult, since it is likely the Trump ballots have been destroyed in Georgia, based on reports of ballots being shredded there. If instead we presume that Bidens fraudulent votes were simply added to the totals, then we estimate that 104,107 ballots should be removed from Biden's totals.

In Pennsylvania, from just one batch of absentee ballots, approximately 72668 of them are estimated to be fraudulent Biden votes. Our analysis of Milwaukee shows that 105,639 Biden ballots could be fraudulent. Moreover there is evidence of vote switching here, which might give as many as 42365 additional ballots to Trump, and remove the same from Biden.

Michigan yields an estimate of 237,140 fraudulent Biden votes added to the total, using conservative estimates of the Biden percentage among the new ballots.

# 2 Statistical Model

The simplest statistical model for computing the probabilities for an election outcome is a binomial distribution, which assigns a probability $p$ for a given person within the population to select a candidate. If we assume that each person chooses their candidate independently, then we obtain the Binomial distribution in the form,

$$P(k|N) \equiv {}_N C_k p^k (1-p)^{N-k}, \tag{1}$$

where $P(k|N)$ is the probability that you observe $k$ votes for a candidate in a population of $N$ voters, and where ${}_N C_k$ is the number of ways to choose $k$ people out of a group of $N$ people.

For larger $N$, the binomial distribution can be approximated by a Gaussian distribution, which is used in the election fraud analysis in [1]. The chief reason for this is the difficulty of computing $P(k|N)$ for large $N$ and $k$. However this problem can be overcome by computing the probabilities in the log domain and using the log beta function to compute ${}_N C_k$.

For this analysis it is more useful to compute the probabilities as a function of $f$ the observed fraction of the candidate's votes. In this formulation we have $k = Nf$, and $N - k = N(1 - f)$, and therefore we define the fractional probability as,

$$B_N(f) \equiv {}_N C_{Nf} p^{Nf} (1-p)^{N(1-f)}. \tag{2}$$

## 2.1 Fraud Model

To model voting fraud we assume a fixed fraction $\alpha$ of votes are given to the cheater. The pool of available voters who actually voted is now $N(1-\alpha)$. The fraction who actually voted for the cheater is given by $f - \alpha$. The probability that the fraction $f$ voters reported for the cheater, with the fraction $\alpha$ stolen, can therefore be written as,

$$C_{N,\alpha}(f) \equiv B_{N(1-\alpha)}(f - \alpha). \tag{3}$$

This is similar to the fraud model used in the election fraud analysis given in [1]. We use the Binomial distribution directly, rather than the Gaussian distribution, since it should be more accurate for small $N, k$ or $f$.

## 2.2 Posterior Probability of Fraud Model

A hypothesis test can now be set up between the standard voting statistics of (2) vs the statistics of the fraud model (3). If we use Bayesian inference we can compute an estimate of the posterior probability of the fraud model. This can be written as,

$$P(F|f) = \frac{C_{N,\alpha}(f)p_F}{C_{N,\alpha}(f)p_F + B_N(f)(1 - p_F)},$$



Figure 1: Reported Biden Fraction In Illinois vs Time

where $p_F$ is the prior probability of fraud. In our investigation we assume fraud is unlikely and set $p_F = 0.01$.

# 3   Analysis of Absentee Ballots in the 2020 Election

For this analysis we extracted data from the all_states_timeseries.csv file, which can be found at the internet url: **https://wiki.audittheelection.com/index.php/Datasets**. We look at the absentee ballot results near the beginning of the time series and then compare it to the end or the middle of the period, after a sufficient enough ballots were added.

For the models in Section 2 we assign the probability $p$ of a Biden vote using the final data. This assumption is actually more favorable to the cheater. As mentioned earlier we set the prior probability of fraud to $p_F = 0.01$, and the cheating fraction, $\alpha$, is set to $\alpha = f - p$, where $f$ is the observed Biden fraction in the newly added ballots. This isolates the statistics of the added ballots from the final observed statistics.

We focus on the absentee ballots, because they are dominated by large democratic cities and there is no obvious reason why those statistics should change appreciably over time. Furthermore it should be noted that the start time for this data, mid day Nov. 4., was well after some of the larger absentee ballot dumps occured.

## 3.1   Control Case Illinois

We choose Illinois as a control case, since it has a significant number of absentee ballots that were counted later and provides a fairly clean baseline. The reported Biden fraction vs time is given in Figure 1.



Figure 2: Before and Added Biden Fraction

As we can see there is not much change in the Biden statistics from the initial 601,714 absentee ballots when compared with the 54,117 ballots that were added. This is further shown by the bar chart in Figure 2.

Using our formula for the posterior probability of fraud in (3) we obtain the probability that the fraud model is correct of 6.5%. This lends good support to the idea that the Illinois absentee ballots were counted fairly.

## 3.2   Analysis of Georgia Absentee Ballots

The Georgia absentee ballot count started at 3,701,005 and 303,988 ballots were added. The Biden fraction among absentee ballots as a function of time is shown in Figure (3). This plot shows a statistical abnormality in that the Biden fraction appears to always be increasing. This is statistically unlikely and is not typically seen in fair elections. Normally you would see a mixture of votes of Biden and his opponents, and would see random deviation around the asymptote.

We investigate this phenomenon more fully in Figure (4). The added ballots have a Biden percentage of around 70%, while the initial statitics were at 50%. This is a very large jump for such a large sample size and seems very unlikely. Indeed the probability that the fraud model is correct is 100%, up to the precision of double floating point arithmetic.

Assuming that the prior absentee ballot distribution is the correct one, we can form a simple prediction for how many of Biden's ballots were fraudulent. Let $N_1 = 303,988$, the number of ballots added, and let $B = 189,497$ be the number of Biden votes in this new batch. If the fraction of Biden votes should actually be $f = 0.509$. Let $x$ be the proposed number of fraudulent Biden votes, then we



Figure 3: Georgia Absentee Ballots vs Time: (Biden Fraction)

have,

$$\frac{B-x}{N_1-x} = f$$
$$x = \frac{B-N_1 f}{1-f}. \tag{4}$$

In the case that votes were actually switched from Trump to Biden, then the formula becomes,

$$\frac{B-x}{N_1} = f$$
$$x = B - N_1 f$$

This would suggest that 104,107 ballots were fraudulently manufactured for Biden. If we presume that actually those ballots were switched from Trump to Biden then as many as 19% of the new absentee ballots for Biden were fraudulent, which totals around 51,110 ballots that should be removed from Biden's totals and added to Trump. We shall see in Section 6, that there is substantial evidence that some Trump votes were actually switched to Biden votes.

## 3.3   Analysis of Pennsylvania Absentee Ballots

The Pennsylvania absentee ballot count started at 785,473 and 319,741 ballots were added at 39 hours after the start of the data record. The Biden fraction among absentee ballots as a function of time is shown in Figure (5). This plot shows some oddities in that the Biden fraction fluctuates with large deviations.

In Figure (6) we see the initial Biden percentage compared with the Biden percentage of the added ballots over the first 39 hours. The added ballots have a Biden percentage of around 83%, while the

5



Figure 4: Before and After Biden Fraction in Georgia

initial statistics were at 78%. This is a very large jump for such a large sample size and seems very unlikely. Indeed the probability that the fraud model is correct is 100%, up to the precision of double floating point arithmetic.

If we just examine the initial large batch of votes among the absentee ballots, we see an unexplained jump of 5% for Biden. Although it is likely that most of the fraud, if any, occurred earlier in the vote count, just this batch of ballots suggests that approximately 72668 Biden ballots are fraudulent. If we presume that the votes were stolen from Trumps votes, then 15987 Biden ballots are fraudulent and should be added to Trump's total.

# 4    Analysis of Milwaukee County in Wisconsin

We now switch our analysis to a data set that contains precinct data for Milwaukee county. The data was obtained from the twitter account of @shylockh, who derived his sources from the New York Times and in some cases from the unofficial precinct reports from the Wisconsin elections commision website. We examine vote percentages for ballots added between Wednesday morning, 11/04/2020 and Thursday night 11/05/2020.

This data set gives the total vote count by party affiliation. Because the data set is confined to Milwaukee, we can assume that the statistics should not be time varying. The voting pool here is highly partisan in favor of democrats and we don't expect any significant difference in the voting percentage, especially since a large number of absentee ballots were already counted by Wednesday morning.



Figure 5: Pennsylvania Absentee Ballots vs Time: (Biden Fraction)



Figure 6: Before and After Biden Fraction in Pennsylvania

## 4.1   Analysis of Milwaukee County Democrat results

The percentage of democrat voters increases by 15% among the ballots added on Wednesday and Thursday. On Wednesday morning Milwaukee had received 165,776 ballots. By Thursday evening 458,935 ballots were received, adding 293,159 ballots.

In Figure 7 we see the large deviation in democrat percentage between the Wednesday morning and those added by Thursday evening. This too causes the posterior probability of the fraud model to be 100% to machine precision.



Figure 7: Before and After Democrat Fraction in Milwaukee

Assuming that there was fraud, we estimate that 105,639 fraudulent Biden ballots were added between Wednesday and Thursday of 11/05/2020 in Milwaukee alone. However as we shall see below, many of these votes may well have been switched from Trump to Biden, which would also give Trump an additional 42365 votes and remove 42365 votes from Biden.

## 4.2   Candidate Percentages Sorted by Ward Size

Another useful tool for evaluating fraud is to look at the cumulative vote percentages sorted by an independent input factor. An easy factor to use is ward or precinct size. This concept was used throughout the report on voter irregularities in [2]. In that report there was an anomalous dependency on precinct size in many of the 2016 primary elections. The larger precincts had introduced the use of voting machines. But one could also theorize the opportunity for cheaters to cheat in small precincts, where there may be less oversight.

Normally we would expect the cumulative vote percentage to converge to an asymptote, and bounce around the mean until convergence. An example of this can be found from the 2000 Florida Democratic presidential primary between Gore and Bradley. This is shown in Figure 8, and is taken from [2].

However when one sorts the Milwaukee, Thursday night data, by precinct size, you will see trend-lines that do not converge to an asymptote, as shown in Figure 9. It appears that smaller precincts

8



Figure 8: Baseline Cumulative Fractions Sorted by Precinct Size

almost uniformly have higher Democrat percentages. There is no obvious reason for this. It was certainly not seen in the control case in Figure 8. Furthermore the third party percentages quickly converge to their asymptote as would be expected in a fair election. One possible model for this would be vote switching from Trump to Biden, which would show up more strongly in the smaller precincts.

# 5   Analysis of Third Party Vote Count

Third party voters offer another way to examine a possible fraud mechanism. Votes could either be switched from third party candidates to the cheater, or fraudulent ballots that are added to benefit the cheater, may not include third party choices. For the control example, we look at absentee ballots in the state of Massachusetts. In Massachusetts the initial absentee ballot count was 117,618, and the number of added absentee ballots is 10,281.

The reported 3rd party percentage of absentee ballots vs time in Massachusetts is shown in Figure 10 and the comparison of the inital and added 3rd party ballots in MA is shown in Figure 11. There is only a small change in party preference, relative to the size of the added ballots. Therefore the probability of the fraud model is only 22%.



Figure 9:  Milwaukee Democrat Ballots Percentage vs Ward Size



Figure 11:  MA 3rd Party Percentage Initial and Added

When we look at the total 3rd party percentages in Milwaukee, between Wednesday morning and Thursday night, we see a significant drop from 1.9 percent to 1.4% for the newly added ballots. But this is among 293,159 added ballots. This is illustrated in Figure 12. Again in this case the fraud model has a posterior probability of 100% to machine precision.



Figure 10: MA 3rd Party Absentee Votes vs Time



Figure 12: Milwaukee 3rd Party Percentages between Wednesday and Added

# 6    Analysis of Fulton and DeKalb Counties in Georgia

We perform a precinct level analysis of Fulton and DeKalb counties in Georgia based on an aggregate data set likely culled from the New York Times. The Fulton data was collected on 11/08/2020 and the DeKalb data was collected on 11/09/2020. As in Milwaukee we look at the cumulative vote percentages as a function of precinct size. A plot of this for DeKalb county is shown in Figure 13.

Although there are somewhat concerning trendlines in the beginning, after the size 600 precinct mark, thereafter the overall picture is what one would expect of an election where the voter preferences are not dependent on precinct size. Both DeKalb and Fulton counties are in predominantly urban Atlanta, neighbor one another, and have similar voting preferences across precincts. DeKalb county is still suspect, however, due to the irregularites observed prior to the Ward 600 mark.



Figure 13: Dekalb County Absentee Ballots: Percentages vs Precinct Size

A different story emerges when we plot the absentee vote percentages for Fulton county as a function of precinct size, as can be seen in Figure 14. Here the trendlines for the Democrat and Republican percentages are quite pronounced, amounting to a difference of 8 percent from the halfway mark.

We divide the Fulton county data into a group of smaller precincts and larger precincts. One group has precincts less than 308 and another larger than 308. The total absentee ballots for the small group is 24,575, and the large group is 120,029. The small group has a Democrat percentage of 85% and the large group has a percentage of 77%, for a change of 8%. The fraud model is preferred in this scenario again with probability of 100% to machine precision.

One might presume that small precincts generally favor Democrats over large precincts, biasing the results. However take a closer look at the Libertarian party results in Fulton county in Figure 15. The percentages are exactly what we would expect if there were no bias in precinct size. The percentages bounce around a mean, not trending in any direction.

So if there were a bias favoring the democrats in small precincts, we would expect that to effect both the Republican and Libertarian totals. However it appears to only effect Republican totals, as if the Republican ballots were switched over to Democrat in a higher percentage in the smaller precincts. Indeed if a fixed number of ballots are switched in each district, it would have a larger effect in the smaller districts and then show up as trend lines in these percentage plots. At a minimum the data suggests a statistical anomaly that is not normally present in a fair election.

# 7    Michigan Analysis

We now due a time series analysis for Michigan. The data was culled from Edison Research. We first show, Trump, Biden and 3rd party voting percentages vs hours after the start of the election in Figure 16. The third party votes shows the proper convergence to an asymptote that we would expect from



Figure 14: Fulton County Absentee Ballots: Percentages vs Precinct Size

Figure 15: Fulton County Absentee Ballots: Libertarian Percentage vs Precinct Size

the law of large numbers. However the Trump and Biden percentages are vastly different You can see large discrete jumps in the percentages as very large Biden ballot dumps occur over time. You also see that the Biden percentages are mostly always increasing after hour 27, which is statistically unlikely in a fair election.

Note also that almost a million of the ballots are received by hour 27, and we use this as our starting point. At that point we have a total of 970,119 votes cast. At the end of 167 hours we have 5,531,222 votes cast. At our initial point the Biden percentage is 38%, but the new ballots have a Biden percentage totaling 53% as seen in Figure 17. The fraud model has posterior likelihood of 100% to machine precision.



Figure 16: Michigan Vote Percentage vs Time



Figure 17: Biden Percentage Before and Added

For Michigan we compute the estimated amount of fraudulent Biden ballots conservatively, assuming that the 50.5 percent seen at the end of the count should have been the correct percentage among the newly added ballots. From this and (4) we obtain an estimate of 237,140 fraudulent votes added for Biden.

## 8   Maricopa Precinct Analysis

We apply a similiar analysis to Maricopa county in Arizona. The data was obtained from the Maricopa county recorder website at `https://recorder.maricopa.gov/media/ArizonaExportByPrecinct_110320.txt`. Precincts are sorted by size and the cumulative vote percentages are tallied. It should rapidly approach an asymptote, but again in Figure 18 we see an anomaly. The Biden percentage is higher in the smaller precincts, primarily at the expense of Trump, again suggesting vote switching, since the 3rd party percentages immediately approach it's asymptote.

14



Figure 18: Maricopa County Arizona Percentage vs Precinct Size

In Figure 19 we focus on the third party percentages, which we see are indeed independent of precinct size and converge quickly to it's asymptote. This is about what we would expect if the third party candidates were counted fairly. It is in sharp contrast to the precinct size dependency and slow convergence of the Trump and Biden percentages.



Figure 19: Third Party Percentages vs Size in Maricopa County

# References

[1] Peter Klimek, Yuri Yegorov, Rudolf Hanel, and Stefan Thurner. Statistical detection of systematic election irregularities. 2, 2.1

[2] lulu Fries'dat and Anselmo Sampietro. An electoral system in crisis. http://www.electoralsystemincrisis.org/. 4.2

15

# Declaration of Matthew Bromberg Ph.D

### December 1, 2020

Pursuant to 28 U.S.C Section 1746, I, Matthew Bromberg, make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

2. Matthew Bromberg has a Ph.D in Electrical Engineering from the University of California at Davis and a Masters degree in Mathematics from the University of California at Berkeley. I have been employed, for over 28 years, in the signal processing and wireless signal processing domain, with an emphasis on statistical signal processing. I have published numerous journal and conference articles. Additionally, I have held Top Secret and SAP clearances and I am an inventor of nearly 30 patents, one of which has over 1000 citations in the field of MIMO communications (Multiple Input Multiple Output).

3. I reside at 4303 West Eaglerock Pl., Wenatchee WA, 98801.

4. Given the data sources referenced in this document, I assert that in Georgia, Pennsylvania and the city of Milwaukee, a simple statistical model of vote fraud is a better fit to the sudden jump in Biden vote percentages among absentee ballots received later in the counting process of the 2020 presidential election. It is also a better fit when constrained to a single large Metropolitan area such as Milwaukee..

5. Given the same data sources, I also assert that Milwaukee precincts exhibit statistical anomalies that are not normally present in fair elections.. The fraud model hypothesis in Milwaukee has a posterior probability of 100% to machine precision. This model predicts 105,639 fraudulent Biden ballots in Milwaukee.

6. I assert that the data suggests aberrant statistical anomalies in the vote counts in Michigan, when observed as a function of time.

7. I assert that the data implies statististical anomalies supportive of vote switching in Maricopa county Arizona.

Signature:

Supporting evidence for the assertions in (4) and 5 is provided in the following pages.

# EXHIBIT 20

## DECLARATION

I make this Declaration of my own personal knowledge, and I am competent to testify to the matters contained herein.

1. I served as an official legal observer of the 2020 general election. I observed at the following location: 510 S. Third Ave Phoenix AZ 85003 on Sunday(s) 10-25-2020, 11-01-2020 and Thursday 11-05-2020.

2. While serving as an observer, I personally witnessed the following:

3. On Sunday October 25, 2020, I arrived to serve from 7:15 am to 4:30 pm and was provided a complete tour of the facility from opening of mail-in ballots, *elevated* signature verification and the adjudication process.  I was not shown the normal signature verification process, if there was one.

4. There was no ballot counting/tabulation on Sunday, October 25, 2020.

5. I was told that approximately 12% of all mail in / early ballots were in need of adjudication, for reasons including but limited to mis-marking *bubbles* and *write-in* candidates, in order to establish *voter intent*.

6. After watching the adjudication process, I was satisfied the "one Republican and one Democrat" process was being accomplished in a very diligent, straightforward and honest manner.

7. I was concerned and did voice my complaint that the two Maricopa County *referees*, who are called upon to settle any unresolved disputes between the adjudicators, were registered "Independent Party" members. I was told that this *set up* was laid out per Arizona Statute.

8. I asked one referee about her bias and how she voted for President and a very wide grin appeared on the upper cheeks and eyes on that referee's

masked face and after 10 seconds or so, she said: "I cannot say" (I regret not having this county employee's name, but can easily identify her from a photo or in person).

9.  During my October 25, 2020 tour of duty, I was able to ask questions and received feedback from every county employee I engaged at the tabulation center.

10. I engaged *BRUCE* who was the Dominion "Master of Ceremonies" employee who was in sole charge of operating the Dominion server and software, as a Maricopa County contractor.  To my knowledge, *BRUCE* was the sole Dominion representative working in the Maricopa County Recorder Ballot Tabulation Center, while I was observing during 10-25-20 (11-01-20 & 11-05-20).  To this moment, I deeply regret not having obtained his last name and have been working to obtain it. *BRUCE* is approximately 5'10 180lbs "Ginger" Red/Blond hair. I can easily identify him from a photo or in person

11. I spoke, one on one, with *BRUCE* twice on Sunday October 25, 2020 about the safety and security of the digital data, that he alone was collecting and storing into the Dominion system.  When I told him that I grew up watching the 1966 original Mission Impossible and that I had just watched a Tom Cruise "Mission Impossible" movie, where "Tom" was able to access the ultra-secure space portrayed in the movie via HVAC ductwork, *BRUCE* (with a very amused look on his face the entire time) kept physically pointing to the the heavy duty glass/plexiglass server space and carefully pointed out how every

wire, cable and power supply cord were hung in a "basket" path suspended from the ceiling, to and from the server and to all counting/tabulation equipment.  He assured me that nothing in that room was connected to the internet.

12. When I continued to pitch my position that "a savvy 14 year old could somehow hack into the data and change the outcome of the results," *BRUCE* replied; "there must be *trust* in the process" and ended our final exchange on 10-25-20, with a smile, saying that he was a registered Republican.

13. As no ballot counting/tabulation of ballots was to occur that day, at or about 2:30 pm Sunday October 25, 2020 I ended my assigned shift and I departed the Maricopa County Recorder Ballot Tabulation Center.

14. On 11-01-2020, I served from 7:15 am to 4:30 pm at the Maricopa County Recorder Ballot Tabulation Center.

15. While waiting for ballot tabulation activity to commence, Mr. Greg Wodynski, a fellow Republican observer assigned that day, arrived. I was relieved to learn that Greg Wodynski had far more than a general working knowledge of computer programming and had experience in that field for decades.

16. Given my inability to satisfy myself about the security of the data during my 10-25-20 experience, I was hopeful that Greg Wodynski would be able to ask questions that would illuminate in a manner in which I could trust the Dominion data collection and storage system and process.

17. When there was a problem with the operation of one of the older, smaller tabulation devices *BRUCE* was called into action and Greg Wodynski and I sprung to our feet to observe the problem and to watch how it would be resolved.

18. Given my limited knowledge of software and programming, I was truly an observer, seeking to understand what was being done with or to the data.

19. I observed *BRUCE* and his laptop interfacing the broken/stalled tabulation device and handling folders full of data.

20. Greg Wodynski was following closely and understood precisely what it was that *BRUCE* was doing with the data on his laptop, given their exchanges.

21. I came to understand "when a file becomes too full of data, a *subset* folder had to be created." I am unsure if that *subset* folder was a copy of the original file, a brand new separate file thereby deleting the original file or how that data was handled exactly and did not understand fully, how the broken/stalled tabulation device was returned to service. Greg Wodynski will know, exactly what took place.

22. When Greg Wodynski and I asked how the data was stored as a backup, in case the building burned down, Maricopa County Vendor Dominion employee *BRUCE* admitted that he took a complete copy of the voter files, being stored in the Dominion system out of the building with him every night as a form of a "back up" copy (When the Dominion "Master of Ceremonies" takes the entire voter files into his sole possession while

unobserved off county property with him every night, it does not matter that the system, the County bought into, is purposefully not attached to the internet).

23. On Thursday 11-05-2020 I was assigned to stand a post at 2:30 pm at the Maricopa County Recorder Ballot Tabulation Center. On that day and time the only activity in the tabulation room was the processing of Overseas ballots.  These Overseas ballots were being electronically generated by a two person team, consisting of differing political party members.   The aforementioned "Independent" county referee was teamed up with a republican.

24. There were about 20 teams of two who were inputting votes made by Overseas voters from stacks of printed .pdf sheets of paper having hand written serial numbers, in red ink.

25. I voiced my concern to the lead county worker, about the fact that the "Independent" county worker may not be as dutiful as a Republican or Democrat would be to the process of creating electronic ballots that were to be counted by Dominion machines and software. I do not have the name of the "lead county worker, but can identify her from a picture or in person.

26. About 20 minutes later I asked the lead county worker "where the hand written serial numbered printed .pdf documents were generated?"

27. At that moment, my phone rang and the lead county worker told me to "take that call outside." I instantly muted the ringer, while continuing to press her for answers about "where the secured portal was, who was

responsible for hand writing serial numbers on each *.pdf* and most importantly, who was observing that process?"

28. I was told "the secure portal was *offsite* and that there was no oversight."

29. At that point the lead county worker turned and walked away with her assistants, who seem to be serving as witnesses.

30. About 10 minutes later, while observing another set of folks who were "adjudicating" damaged *.pdf* ballots, unsupervised, I took my phone out and saw two text messages from AZ State Director of Election Day Operations Gina Swoboda at 3:45 "Hi mark. You have been removed by maricopa elections. Please leave. Thank you." & "I am sending another observer" It was Ms. Swoboda's call I muted as she left me a voicemail stating what she texted when she didn't reach me by voice. I departed the Maricopa County Recorder Ballot Tabulation Center at approximately 4:00 pm Thursday 11-05-2020.


I declare under penalty of perjury under the laws of the State of Arizona that I have read the above Declaration, am familiar with its contents, and know the same to be true and correct of my own personal knowledge.

November 24, 2020.

Signature: _____

Mark Paul Low

# EXHIBIT 21

## DECLARATION

I make this Declaration of my own personal knowledge, and I am competent to testify to the matters contained herein.

1.  I served as an official legal observer of the 2020 general election. I observed at the following location(s): _Oct 17, 2020 and Oct 21, 2020 at the Maricopa County Tabulation and Election Center in Phoenix, AZ.  I also observed at the Happy Trails Voting location, Surprise, AZ on October 28, 2020_____.


2.  While serving as an observer, I personally witnessed the following: At the MCTEC site I observed in 2 different locations: signature verification and ballot processing.  In the signature verification room on October 17 I was told to remain at a card table which was at least 10' – 12' from where all of the computer monitors/screens were turned away from me and I was unable to see any of the signatures during the process.  On Oct 21 there were more screeners in the room and I was able to turn my chair to observe 2 screens approximately 6 – 8' from me.  In this area of the room there were 3-5 screeners looking at "Low Confidence" signatures for the entire afternoon until there was a power outage for approximately 15 – 20 minutes.   The "Low Confidence" signatures were indicated at the bottom of the screen with a bright yellow banner.  I asked the woman who we were allowed to speak with (Celia) what happened to these signatures and were these votes counted.   She informed me that they were counted and that the "Low Confidence" indicator was a new program that they were testing. Following

the brief power outage a quiet discussion among the 3-5 screeners that I could see were looking at Low Confidence signatures was that at least one of them that I could see was now looking at High Confidence signatures. Since I was able to see the Low Confidence signatures earlier I was disturbed that; 1. there were so many screeners looking at the Low Confidence for an entire afternoon  2. that the signatures were not even close to the signatures that they were "comparing" the ballot signature to and 3.  I was told by Celia that these signatures were counted  I communicated this with Gina Swoboda, who was my contact for observing. In the ballot processing room there were 75 -90 processing tables with, I was told, one Republican and one Democrat on each side of the table.  I was told to remain in a yellow taped area which was at least 15' from any of the tables.  I couldn't see anything that they were doing other than removing ballots and comparing the number on the ballot to the number on the envelope and then separating the ballot from the envelope.  It appeared that they were only to record information with a red pen and the process seemed appropriate.  The room was the size of a gymnasium and I really couldn't observe anything specific, although I tried to observe when individuals had questions and when they were filling out there 'reports.' When the press arrived on October 21 in the morning I found it interesting that the women who had been in a supervisory capacity when I observed on Oct 17 were now at a table "closer" to me and processing ballots for about an hour and a half while several press people with photographers filed in and out.

3. October 28 I observed voting at the Happy Trails site in Surprise, AZ. Immediately after voting started it became evident that the glue on the envelope in which people placed their ballots was not going to stick and the envelopes would not remained closed. People did not want to lick the envelopes or take their masks off to do so.  The poll workers used masking tape on these ballots.  I called the contact person on my ID and reported this to them.  There were many, if not most, of the ballots throughout the day that had masking tape used to close the envelope. I was very concerned that these ballots would not be counted.  One of the supervisors at the site went to the election depot to get something to assist in sealing the envelopes.  He came back with a small container which they put water in and sealing envelopes continued to be a problem throughout the day.  The supervisor didn't seemed at all concerned about doing this.  I was told to not ask questions or talk to anybody at that point.

4.

5.

I declare under penalty of perjury under the laws of the State of Arizona that I have read the above Declaration, am familiar with its contents, and know the same to be true and correct of my own personal knowledge.

Dated November _16_, 2020.

Signature: _Judith E. Burns_

Printed Name:_Judith E.Burns

# EXHIBIT 22

# DECLARATION

Monday November 23rd 2020

I make this Declaration of my own personal knowledge, and I am competent to testify to the matters contained herein .

1. I served as an official legally approved GOP observer of the 2020 general election. I observed at the following location: MCTEC (Maricopa County Tabulation Election Center) 510 S. Third Ave Phoenix AZ 85003.

2. On Saturday 10-24-2020 & Sunday 11-01-2020 I observed for approximately 8-9 hour daytime 8-5 shift in the tabulation intake room. My signature is on visitor logs kept by staff.

3. In this tabulation and adjudication work area was the Dominion computer system computer hardware on what I observed to be racked Dell branded computer hardware, 5-6 Canon scanners on work are tables and two larger free standing (presumably Dominion) bulk ballot scanners.

4. I interacted with several supervisors including Celia (a lead person at MTEC who granted me access), Rene a supervisor in tabulation area, and Mary C. Connor another lead person – in and outside the tabulation room.

5. I spoke to Bruce who identified himself as Dominion employee on contract to Maricopa County for this election and observed another Dominion employee named John. Bruce and John appeared to have shared Dominion **system administration roles and demonstrated and acknowledged systems administration access to the voting computer systems.** Other recorder's office employees and supervisors worked with Bruce and John closely.

6.  All the mentioned scanners were optically reading the mail-in ballots, converting the paper ballots into electronic images and discerning voter tabulation data into electronic format (data "votes tabulated" and scanned ballots in an image format – think jpeg format for example) and all stored in the computer systems files on hard drives.

7. On Thursday Nov 5th. I spent time in a signature verification room. I interacted with several supervisors including Celia (a lead authority person at MTEC) and Mary C. Connor a supervisor who escorted me to the signature working area room.

8.   On Sunday Nov 1st in the adjudication and tabulation scanning room area, and in witness with another GOP Observer named Mark, I spoke to Bruce from Dominion and asked questions on the computer system contained in that room and connected to the ballot scanners. All mail in ballots were in theory feeding the data into this Dominion computer system.

9.   Staff supervisors and Dominion employees stated that about 12% of mail in ballots were being rejected in the ballot readers and needed human intervention in the adjudication process. This amounted to tens of thousands of ballots that required intervention on the two shifts and days I observed adjudication and ballot tabulation.

10.  On Sunday 11-01-2020 I asked Bruce how the tabulation data and scanned images were being stored and backed up. It is common IT practice to do regular data (disk drive) backup in the event of some system failure. Bruce stated that he would perform a manual daily system backup to an external hard drive attached to and in the secured computer bay "glass cage" within the larger adjudication/tabulation room. The hard drive was in a rubberized orange case and was easily visible, he pointed and identified it. I asked what software program he was using to perform automated backup ups. He stated he was not using an automated backup, and inferred he was doing a simple manual data copy to that "orange disk". Bruce stated that he took a second copy of the daily backup the orange external backup up target hard drive. Bruce reached for a new boxed hard drive on a nearby desk where he administered the systems at then pointed to a shelf with a box filled with spare and new empty hard drives.

11.  **Bruce stated he made a daily second disk backup to a new spare hard drives daily. I asked him where the second daily disk drive backup data copy was being stored. Bruce stated the daily external disk copies were being physically moved off site to another location outside the MTEC building. I asked Bruce to what facility and by whom the disks were being relocated and he provided a vague answer that the were being carried to another building somewhere uptown. I then inquired if there was chain of custody of this daily data hard drive copy being moved outside the MTEC building and outside**

the tabulation room. **He stated there was NO CHAIN OF CUSTODY on data backup up hard drives leaving the MTEC facility on a daily basis for an undisclosed location.**

12. Sunday 11-01-2020 I observed Bruce discussing (and then explaining to me when I inquired) on specifics of a process where he was manually manipulating stored scanner tabulation data files. The purpose of this manual manipulation was due to what he described as a processing issue at the numerous adjudication computer workstations.

13. Bruce described having to take the scanned mail in ballot tabulation data files from a ever-growing large data file in the Dominion system storage devices and creating smaller subsets (data directories) containing scanned ballot files; presumably so that adjudication work stations staff could more effectively access and perform adjudication operations. This manual file operation performed by Dominion employee Bruce entailed taking ballot files from one large file directory and placing into many smaller file directories. Then performing a human driven and manual file quantity count  - post the worker driving adjudication processing. This post count was to determine that the total number of files adjudicated in smaller batches equaled the total files (ballots) needing adjudication in the original source files. **This manual administrator operation at the file and directory level on the tabulation system storage was of concern to me. It was a human intervention process and therefore creating a potential for intention or non-intentional errors or lost ballot files.**


I declare under penalty of perjury that I have read the above Declaration, am familiar with its contents, and know the same to be true and correct of my own personal knowledge.



Dated November 23, 2020

Signature: _Gregory Wodynski_

Printed Name: Gregory Wodynski

# EXHIBIT 23

DECLARATION

DECEMBER 1, 2020


My name is Linda Brickman.  Thank you for allowing me to come forward and speak with all of you.

Effective November 12, 2020, as the 1st Vice-Chair of the Maricopa County Republican Committee (MCRC), by operation of law upon the resignation of the Chairman, I took over the performance of all the Chairman's duties.

I was notified by Rey Valenzuela, Director of Elections, that the Logic & Accuracy (L&A) Certification of the Dominion voting systems would take place on November 23rd. With limited notice, I was later notified the date was moved to November 18, 2020 at 10:00 AM.

There will be around eleven (11) issues that I need to share with you.  Starting with a little background first please.

I arrived at the Maricopa County Tabulations and Election Center (MCTEC) prior to 10:00 AM, for what was supposed to be a morning turn around inspection of the Dominion Software and equipment; however, it took some eight (8) hours before the two formal L&A Certifications were completed, with mixed results.

We began in the BCC or Tabulation room, where the Dominion Software/machines were set up ready for actual testing.

There were about eight or 9 regular (vs high speed) machines set to tabulate all the numbers from test ballots (pictures already sent to you) selected by staff from the Secretary of State's (SOS) Elections office as part of the SOS L&A Certification, and one main frame

computer behind glass-like walls plugged into the wall, and a computer technicians work station with a desktop computer to transfer results from the individual tabulators and into the server. This main frame machine that I observed was to calculate all the test ballots and add up the "0's" to give a grand total of all 8 or 9 machine total ballots counted, equaling "0."

Problems occurred almost from the start with the SOS certification. For example, a number of the ballots could not be read by the tabulator machines; at least one or more of the tabulators broke down and portions had to be replaced; incorrect information had been inputted into each tabulator earlier that morning; the "wrong files" were loaded up into the main frame by the computer technician; and neither SOS staff nor the computer technician were able to quickly resolve the problems. Instead, we were alerted it might take an hour or more to work things out, so we adjourned until 2:00 PM, after lunch.

At approximately 2:00 PM I asked if the problem was resolved, and what had happened. Instead, I was informed that the machines were not calculating correctly, and all the machines were shut down during the break and reset; and they were going to start a brand, new test.

About an hour plus later, the ballots were run into the tabulators and printouts of the results in the form of a "cashier's tape" were reviewed by me and others. Then, the memory sticks from each tabulator were removed and handed to the computer technician for loading into the server along with other relevant files we were told.

Printouts were generated by the Dominion server, and County Chairs from the 3 County Political Parties, as well as other observers, began comparing the individual voting totals tabulated for accuracy. Once completed, the County Chairs were asked to fill out

and sign the "Certification" for the SOS L&A.  And per Rey Valenzuela, Director of Elections, other observers could sign if they insisted, but only in an "Observer Capacity" and not in an official party capacity.

Then came time to sign the Certification.

Based on the issues described above with the SOS L&A test, and my familiarity with reports from other State Secretary of States (for example, Texas), the December 2019 Democratic US Senators written investigation into Dominion including irregularities in earlier elections, as well as reports from forensic experts including local Arizona ones, I denied certification, writing on the form:  "CERTIFICATION DENIED – LINDA BRICKMAN – MC [Maricopa County] CHAIRMAN."

We then began the 2nd L&A test, but this one was conducted by Maricopa County Elections Staff and on separate Dominion voting tabulator machines.  This was a similar process with results going to the server and reports printed out.  But whatever problems or irregularities surfaced during the first SOS test, they did not manifest this time.

And for the same reasons noted above, I denied certification, writing on the Maricopa County form: "CERTIFICATION DENIED – LINDA BRICKMAN – MC [Maricopa County] CHAIRMAN."

I also have copies of each of those ballots counted, with copies available upon request.  Again, my reasons as noted above were my first-hand observations of the flaws and irregularities in the SOS L&A tabulating and calculating of the Dominion software, the unexplained turning off the computer system and doing a reset versus a correction, and the over 5 hours for the SOS test and results review, plus my lack of faith in the 2nd L&A

test – we could see the machines, but could not see or observe the software behind the machine to confirm what had gone on.

As a veteran County Elections Worker who actually worked the election both during the August Primary, and the General from 10/19/20 to 11/11/20 working in the Signature Verifications room, Duplication room, Adjudication room, ABC Room, and Hand Count Audit, let me share just about 6 irregularities I PERSONALLY OBSERVED:

(1) Signature verification standards were constantly being lowered by Supervisors in order to more quickly process that higher amount of early and mail-in ballots (from approx. 15 points of similarities, to a minimum of 3, lowered to 1, and ultimately to none – "Just pass each signature verification through")  "There are too many rejection of ballots each day, so push them through.".

(2) Challenged signatures on envelopes where the signature was a completely different person than the name of the listed voter, was let through and approved by supervisors.

(3) Challenged runs or batches of envelopes for signature verification observed by me to be the exact same handwriting on the affidavit envelopes on numerous envelopes. When I asked if the County Attorney would be alerted for possible ballot fraud, I was told no, but supervisors would take care of it (I can supply one of the batches with book numbers that I texted in case I needed it).

(4) In the Duplication room, I observed with my Democratic partner the preparation of a new ballot since the original may have been soiled, damaged, or ripped, and wouldn't go through the tabulator.  I read her a Trump/Republican ballot and as soon as she entered it into the system the ballot defaulted on the screen to a

4

Biden/Democratic ballot. We reported this to supervisors, and others in the room commented that they had witnessed the same manipulation.  We were never told what, if any, corrective action was taken.

(5) **Election Office Observers** – when it became apparent that more and more early and mail-in ballots would need to be processed, I mentioned that the current rule of the number of observers per party was not adequate (1 per party, unless all parties agreed to more).  And since the Governor refused to call the Legislature into session for any reason, and little incentive for the Democrats to agree to a higher adequate number, there was no way 1 observer per Party, forced to the back of a room, or behind a see-through wall, had a legitimate opportunity to see what elections workers were seeing in real time and doing, especially where up to 20 or more workers processing tasks, sometimes in 10 seconds or less!  And I personally observed most observers acting "clueless", and do not believe any of them even realized the challenges I made and referenced above.

(6) **And lastly, one of the most egregious incidents in both the Duplication and Adjudication rooms which I worked, I observed the problem of Trump votes with voters checking the bubble for a vote for Trump, but ALSO, writing in the name "Donald Trump" and checking the bubble next to his hand written name again, as a duplicated vote, counting as an "OVERVOTE," which means – no vote was counted at all, despite the policy having been changed to allow these overvotes.  Supervisors contradicted their own policies where the intent was clear.  Ray Valenzuela, Director of Elections, told me openly at the morning of the Dominion Certification (November 18, 2020), that this was incorrect, the Supervisors were terribly mistaken**

and as an Adjudicator, I was instructed incorrectly, and these many votes SHOULD HAVE BEEN COUNTED AND NOT TURNED AWAY AS AN OVERVOTE.

The next day, I was called outside the room where I was working and reprimanded for causing trouble over the weekend and was told to stop saying that there were wrong doings going on in other rooms, so I was suppressed from speaking the truth for fear of retaliation or pressure of being let go.  So, the supervisor kept me working ALONE in my corner of the room, not to circulate with others.

Chairman Finchem, Legislators, and Mayor, I am here today not as an expert in the Dominion software, but as a voter in Maricopa County, who wants to hear the truth and speak the truth and not feel suppressed to speak before you now.

There should be integrity in our voting electorate.  Voting is not a right; voting is not a privilege; voting is not an option.  Voting is an obligation of every legal American Citizen.

Thank you.

God Bless America – and God Bless Donald Trump!


Linda Brickman

Maricopa County Republican Committee Chairman (MCRC)

Signed:  *Linda S Brickman*

Dated:  December 1, 2020