# Exhibit 1

**Response to Report of Dr. William Briggs**

**Stephen Ansolabehere**

**December 4, 2020**

**Statement of Inquiry**

1.   I have been asked to evaluate the report of Dr. William Briggs.  I am compensated at the rate of $550 an hour.

2.   A brief summary of my high-level opinions and conclusions is below; however, overall, based on my review, I find the estimates and analyses in Dr. Briggs' report to be unreliable and the analysis not up to scientific standards of survey research, data science, or election analysis.  There are substantial errors in the design of the survey and errors and inconsistencies in the data used in the analysis that are of sufficient magnitude to invalidate any calculations or estimates based on these data.  The extremely low response rate, the high break off rate, and the inconsistencies in data spreadsheets lead me to conclude that the survey should not be assumed to be representative of the population studied, and the data should not be assumed to be accurate.  The interpretation of the data does not account for obvious and important features of absentee voting, including permanent absentee voters who do not need to request ballots to receive them, as well as late, rejected, invalid, and spoiled absentee ballots. The errors in design, analysis, and interpretation of the data are so massive that there is no foundation for drawing any conclusions or inferences from Dr. Briggs' report.

**Summary Assessment**

3.   In his report, Dr. Briggs evaluates survey data that was provided to him by a third party and assumes that "the respondents [to the survey] are representative and the data are accurate."[1] There is no indication in his report that he conducted any analysis of the data or that those who provided the data to him did anything to verify its correctness and integrity.  Nor is

---

[1] William M. Briggs, "An Analysis of Surveys Regarding Absentee Ballots Across Several States," November 23, 2020, page 1.

1

there any showing that he or anyone else analyzed the quality of the survey or the representativeness of the sample on which he based his analysis.  It is standard scientific practice in the field of survey research to give careful scrutiny to data before conducting any statistical analyses, including understanding the structure and wording of the survey questions, the sampling method and response rate, and the characteristics of the sample, such as demographic and behavioral indicators.

4.  In his report, Dr. Briggs defines two types of purported errors.  The first is that people received an absentee ballot even though, according to the survey, they did not request one (Alleged Error #1). The second is that people allegedly returned absentee ballots that election offices did not record (Alleged Error #2).  These two alleged errors, Dr. Briggs asserts, combine to create a category of "troublesome ballots." The estimates of Alleged Error #1 and Alleged Error #2 that he presents are deeply flawed because of defects in the design of the survey, fatal data errors evident in the survey toplines, calculation errors, and errors in the interpretation of the data.  It is my professional judgment that none of the estimates and projections in his report are valid.

5.  The design of the survey contaminates the data and any estimates, rendering them invalid.  Specifically, in Question 1 of the survey the surveyor asks to speak to a specific person. Some of the respondents are flagged as "Reached Target," while others are flagged as "Uncertain" or "What is this about?"  Both groups of people (Reached Target and Uncertain) are then asked Question 2, "Did you request an absentee ballot?"  This is a serious survey design error, because some or perhaps all of the people flagged as "Uncertain" are not the target of the interview.  As a result, the structure of the very beginning of the survey allows people who were

not the target to be treated as if they were in the remaining questions.  This leads to the contamination of all estimates.

6.   The survey also suffers from ambiguously worded questions, which introduces measurement errors in any estimates.  Question 2 asks respondents whether they requested an absentee ballot.  The question does not follow up and clarify different ways that people obtain absentee ballots, especially, whether the voter did not need to request a ballot in order to receive one because they are permanent absentee voters.  According to data reported by county election offices in the State of Arizona to the U.S. Election Assistance Commission, there were 2,545,198 million permanent absentee or early voters (PEVs) in the state out of 2,672,384 absentee voters in the 2018 election. The data are from 2018 because the 2020 data have not yet been reported. **In other words, 95 percent of all absentee voters in the state were automatically sent an absentee ballot without needing to request one for a specific election.** Dr. Briggs is apparently unaware of this critical fact, which completely undermines his analysis.

7.   The wording of Question 3 also is very problematic.  First, the survey does not ascertain whether a ballot was in fact received. According to figures from the U.S. Election Assistance Commission, there were 102,896 undeliverable absentee ballots.  Neither Question 2 nor Question 3 screens out people who did not receive a ballot.  Second, Question 3 does not ascertain whether the ballot was mailed back in a timely manner so as to be included in the record of ballots cast. Third, Question 3 asks whether someone voted. As is well known among political scientists and survey researchers, survey questions asking whether someone voted are subject to substantial social desirability biases that lead to inflation in the estimated number of voters.

3

8.   There are also errors and inconsistencies in the survey data.  Appended to Dr. Briggs' report is a series of tables, called Topline Tables ("toplines"), for the State of Arizona.  Toplines for other states are not disclosed.  The toplines provide the basic statistics about the survey reported for each question, as well as the questions themselves and the response categories for each question. There are errors in the spreadsheet of toplines indicating data inconsistencies. For example, in Arizona, there are more respondents to Question 2 than the survey instructions indicate should have been asked Question 2.  Generally, such errors indicate fundamental problems with the management of the survey and the databases generated by the survey.  It is standard practice in survey research and analysis of survey data to conduct integrity checks to ensure that there are not mistakes in the data.  The presence of substantial discrepancies in these topline tables, such as shown here, indicates flaws in the data.  Dr. Briggs' report makes no mention of these inconsistencies and errors and assumes that the underlying data are accurate. These errors and inconsistencies reveal that the data are not accurate.

9.   In addition, the survey has extremely low response rates.  Of the 518,560 absentee voters who were the target of the study, 2,489 were asked and 2,129 people (one-half of one percent) ultimately provided answers to Question 2.  High non-response rates generally create biases in survey because the samples are rarely representative of the population under study. Surveys with such a low response rate are not accepted in scientific publications, except on rare occasions and with proper analyses that ensure that the respondents are in fact representative. When researchers have low response rates, they must offer affirmative proof of representativeness or attempt to correct for biases.  Neither is done here.

11.   The interpretation of the data as evidence of "errors" and "troublesome ballots" fails to account for the rules and realities of absentee voting.  First, Dr. Briggs calls Alleged Error #1

4

absentee ballots that were received by voters but were not "requested." This interpretation fails to consider that 95 percent of absentee ballots sent by election offices are sent to permanent absentee voters, who receive ballots without requesting them.  All five states in his report allow for permanent absentee voting for some or all registrants.  Second, Dr. Briggs calls Alleged Error #2 ballots that were sent by voters but not recorded at the county election offices.  This interpretation fails to account for late, undeliverable, rejected, and spoiled ballots.  Most jurisdictions, for example, do not record late ballots in the tally of returned absentee ballots.  The results in his analysis, if they are real, are likely the consequence of the normal practice of absentee voting.

## II.  Qualifications

12.  I am the Frank G. Thompson Professor of Government in the Department of Government at Harvard University in Cambridge, MA.  Formerly, I was an Assistant Professor at the University of California, Los Angeles, and I was Professor of Political Science at the Massachusetts Institute of Technology, where I held the Elting Morison Chair and served as Associate Head of the Department of Political Science.  I am the Principal Investigator of the Cooperative Congressional Election Study (CCES), a survey research consortium of over 250 faculty and student researchers at more than 50 universities, directed the Caltech/MIT Voting Technology Project from its inception in 2000 through 2004, and served on the Board of Overseers of the American National Election Study from 1999 to 2013.  I am an election analyst for and consultant to CBS News' Election Night Decision Desk.  I am a member of the American Academy of Arts and Sciences (inducted in 2007).   My curriculum vitae is attached to this report as Appendix B.

13.  I have worked as a consultant to the Brennan Center in the case of *McConnell v. FEC*, 540 U.S. 93 (2003).  I have testified before the U.S. Senate Committee on Rules, the U.S. Senate Committee on Commerce, the U.S. House Committee on Science, Space, and Technology, the U.S. House Committee on House Administration, and the Congressional Black Caucus on matters of election administration in the United States.  I filed an amicus brief with Professors Nathaniel Persily and Charles Stewart on behalf of neither party to the U.S. Supreme Court in the case of *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009) and an amicus brief with Professor Nathaniel Persily and others in the case of *Evenwel v. Abbott*, 138 S. Ct. 1120 (2015).  I have served as a testifying expert for the Gonzales intervenors in *State of Texas v. United States* before the U.S. District Court in the District of Columbia (No. 1:11-cv-01303); the Rodriguez plaintiffs in *Perez v. Perry*, before the U.S. District Court in the Western District of Texas (No. 5:11-cv-00360); for the San Antonio Water District intervenor in *LULAC v. Edwards Aquifer Authority* in the U.S. District Court for the Western District of Texas, San Antonio Division (No. 5:12cv620-OLG); for the Department of Justice in *State of Texas v. Holder*, before the U.S. District Court in the District of Columbia (No. 1:12-cv-00128); for the Guy plaintiffs in *Guy v. Miller* in the U.S. District Court for Nevada (No. 11-OC-00042-1B); for the Florida Democratic Party in *In re Senate Joint Resolution of Legislative Apportionment* in the Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490); for the Romo plaintiffs in *Romo v. Detzner* in the Circuit Court of the Second Judicial Circuit in Florida (No. 2012 CA 412); for the Department of Justice in *Veasey v. Perry*, before the U.S. District  Court for the Southern District of Texas, Corpus Christi Division (No. 2:13cv00193); for the Harris plaintiffs in *Harris v. McCrory* in the U.S. District Court for the Middle District of North Carolina (No. 1:2013cv00949); for the Bethune-Hill plaintiffs in *Bethune-Hill  v. Virginia*

*State Board of Elections* in the U.S. District Court for the Eastern District of Virginia (No. 3: 2014cv00852); for the Fish plaintiffs in *Fish v. Kobach* in the U.S. District Court for the District of Kansas ( No. 2:16-cv-02105-JAR); and for intervenors in *Voto Latino, et al. v. Hobbs*, in the U.S. District Court for the District of Arizona (No. 2:19-cv-05685-DWL). I served as an expert witness and filed an affidavit in the North Carolina State Board of Elections hearings regarding absentee ballot fraud in the 2018 election for Congressional District 9 in North Carolina.

14.   My areas of expertise include American government, with particular expertise in electoral politics, representation, and public opinion, as well as statistical methods in social sciences and survey research methods.  I have authored numerous scholarly works on voting behavior and elections, the application of statistical methods in social sciences, legislative politics and representation, and distributive politics.  This scholarship includes articles in such academic journals as the Journal of the Royal Statistical Society, American Political Science Review, American Economic Review, the American Journal of Political Science, Legislative Studies Quarterly, Quarterly Journal of Political Science, Electoral Studies, and Political Analysis.  I have published articles on issues of election law in the Harvard Law Review, Texas Law Review, Columbia Law Review, New York University Annual Survey of Law, and Election Law Journal, for which I am a member of the editorial board.  I am associate editor of the Harvard Data Science Review, and have served as associate editor of the Public Opinion Quarterly.  I have coauthored three scholarly books on electoral politics in the United States, The End of Inequality:  Baker v. Carr and the Transformation of American Politics, Going Negative: How Political Advertising Shrinks and Polarizes the Electorate, and The Media Game: American Politics in the Media Age.  I am coauthor with Benjamin Ginsberg and Ken Shepsle of American Government:  Power and Purpose.

### III.  Sources

15.  I have relied on the report of Dr. William Briggs in this case.

16.  I have relied on the Election Assistance Commission, "Election Administration and Voting Survey (EAVS)" for 2018:  https://www.eac.gov/research-and-data/studies-and-reports. I present data from 2018 because it is the most recent federal election for which data on absentee and permanent absentee voting is available.  The 2018 data are instructive about the magnitude of permanent absentee voters and the magnitude of unreturned, late, rejected, and spoiled absentee ballots.  The 2020 data are not yet reported.

17.  I have relied on the report of Mr. Matthew Braynard in a pending lawsuit in Fulton County, Georgia, Superior Court, *Wood v. Raffensperger*, 2020CV342959.

18.  I have relied on the report of Dr. William Briggs in *King v. Whitmer* in the District Court in the Eastern District of Michigan (No. 2:20-cv-13134).

### IV.  Findings

19.  In my professional judgment, there are fundamental flaws in the design of the survey design and the survey data on which Dr. Briggs relied.  These flaws created biases in the estimates and analyses that are sufficiently large to completely explain the results that Dr. Briggs presents as nothing more than errors in the data collection process.  Perhaps most troubling, the survey is likely highly unrepresentative because it has a response rate less than 1 percent; the survey data are contaminated by respondents who should not have been included in the survey, and the basic data in the Topline summaries of the data do not add up, indicating fatal flaws in the implementation of the survey.

20.  The interpretations of the estimates in the survey as errors and troublesome ballots fail to take into account the realities of absentee voting in the State of Arizona.  Almost all absentee voters in the State receive absentee ballots for each election without having to request ballots for that election because they are Permanent Absentee and Early Voters (PEVs).  In addition, there are large numbers of undeliverable and late absentee ballots, which are typically not recorded as received by the election offices.

**A.  Critique of Interpretation**

   **i.  The survey data and its interpretation do not account for PEVs.**

21.  The analysis of Question 2 is used to estimate the number of people who received but did not request an absentee ballot.  Dr. Briggs calls this Alleged Error #1.

22.  The interpretation of these data as an error in balloting does not account for the presence of a large number of Permanent Absentee and Early Voters (PEVs) in Arizona, Michigan, Pennsylvania, and Wisconsin.   Georgia automatically mails ballots for voters who qualify for "rollover" ballots – people over 65, disabled, or in the military who sign up annually to have ballots automatically sent to them.  I consider rollover ballots to be a form of PEV, but the voter does need to sign up each year.

23.  PEVs are automatically sent their absentee ballots.  They do not need to request that a ballot be sent for a particular election.

24.  In the State of Arizona, nearly all absentee ballots sent are sent to PEVs.  In 2018, PEVs were 95 percent of absentee ballots sent by election offices to registered voters.   In other words, nearly all voters who received absentee ballots in the State did so without having to request that one be sent to them.

25.  In the other states covered in Dr. Briggs' report, there are substantial numbers of PEVs.  Table 1 presents data from the number of absentee ballots sent in 2018 and the number of permanent absentee ballots sent to voters in Arizona, Georgia (rollover absentee voters), Michigan, Pennsylvania, and Wisconsin.  The number of permanent absentee ballots sent in Arizona, Michigan, and Wisconsin far exceeds the estimated Alleged Error #1 in the first table in Dr. Briggs' report.  The EAC reports no data on permanent absentee ballots for Georgia in 2018.  Those data cover 2018 and are presented to indicate the likely magnitude of PEVs in the states in 2020.  Preliminary reports from some of these states show very high numbers of PEVs and rollover absentee voters. There were at least 582,000 "rollover" ballots in Georgia in 2020.[2]

26.  Based on the toplines, Mr. Braynard's survey does not identify PEVS or distinguish them from other absentee voters.

| Table 1.  Permanent Absentee Voters in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin in 2018 | | | |
|---|---|---|---|
| | Total Absentee Ballots Sent | Permanent Absentee Ballots Sent (i.e., ballots sent automatically without a specific ballot request) | Permanent Absentee Ballots as a Percent of Total |
| Arizona | 2,672,384 | 2,545,198 | 95.2% |
| Georgia | 281,490 | * | * |
| Michigan | 1,123,415 | 549,894 | 48.9% |
| Pennsylvania | 216,575 | 6,340 | 2.9% |
| Wisconsin | 168,788 | 54,113 | 32.1% |
| Source: U.S. Election Assistance Commission, Election Administration and Voting Survey, 2018. Note: * no data reported. | | | |

---

[2] Stephen Fowler, "Nearly 800,000 Georgians Have Already Requested Absentee Ballots for November" GA Today gpb.org, September 2, 2020. https://www.gpb.org/news/2020/09/02/nearly-800000-georgians-have-already-requested-absentee-ballots-for-november

### ii.  The interpretation of Question 3 fails to account for the proper handling of late, invalid, and spoiled absentee ballots by Local Election Offices.

27. The analysis of Question 3 of Mr. Braynard's survey is used to estimate the number of people who stated that they returned an absentee ballot but for whom no vote was recorded. Dr. Briggs calls this Alleged Error #2.

28. The interpretation of such cases as errors does not account for absentee ballots that are in fact not received or counted by election officers because the ballots are not returned by the postal system, are returned late by the voter, are spoiled by the voter, or are rejected.  Such ballots are the obvious explanation for the data observed.  No effort in the survey or the analysis is made to ascertain the likelihood that a voter cast a late or invalid absentee ballot.

29. The number of absentee ballots that are not received or valid is substantial. Table 2 presents counts of rejected, late, undelivered, and voided absentee ballots in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin for 2018, the most recent federal election for which systematic data on absentee voting are available.  An undeliverable absentee ballot is one that was returned to the election office as not being deliverable to the address on the voter registration lists.  The final column presents the number of sent absentee ballots for which the status of a ballot sent by the election office to a voter was not received and its status is not known.  These are likely ballots that simply were not returned by voters or were lost or delayed in the US Postal System.  Delays in the postal system were a particular concern in 2020, as there were widespread reports of staffing problems during COVID for USPS, delays in mail delivery, and declines in the rate of on-time delivery.[3]  Late, undelivered, rejected, and spoiled ballots are not counted

---

[3] Hailey Fuchs, "Some Regions Still Experience Slow Delivery of Mail Ballots," New York Times, November 3, 2020, Section A, Page 23.  https://www.nytimes.com/2020/11/02/us/politics/mail-ballot-usps.html.

under law, and they are comparable in magnitude to the estimates of the Alleged Error #2 reported by Dr. Briggs for each state.

30.  Arizona election officials reported to EAC a total of 2,515 late absentee ballots, 27,804 void or spoiled ballots, 8,567 rejected ballots, and 102,896 ballots that were undeliverable in the 2018 election. These figures are not definitive of the numbers for the 2020 election, which have not yet been reported.  Rather, they are demonstrative of the fact that there are sound, documented administrative reasons that returned absentee ballots are not recorded as having been voted, especially tardiness, spoilage, and rejection for lack of signatures, valid envelopes, and the like.

| Table 2.  Rejected, Undelivered, Voided, and Late Absentees in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin in 2018 | | | | | |
|---|---|---|---|---|---|
| | Rejected Absentee Ballots | Undeliverable Absentee Ballots | Spoiled/Voided Absentee Ballots | Late Absentee Ballots | Status Unknown |
| Arizona | 8,567 | 102,896 | 27,804 | 2,515 | 642,210 |
| Georgia | 7,512 | 2,322 | 252 | 3,525 | 36,255 |
| Michigan | 6,013 | 791 | 19,679 | 2,207 | 41,120 |
| Pennsylvania | 8,714 | * | * | 8,162 | 20,622 |
| Wisconsin | 2,517 | 1,718 | 2,794 | 1,445 | 12,407 |
| Source: EAC, EAVS 2018. Note: * no data reported. | | | | | |

## B.  Critique of Survey Design

31.  Dr. Briggs offers no assessment of the design of the survey that generated the data that he presents.  Rather, he assumes that the data are accurate.

32.  It is my understanding that Matthew Braynard designed and conducted these surveys. There is no report of the survey design, questionnaire, or response rates, beyond the information embedded in the topline table appended to Dr. Briggs' report.

### i. The survey has an unacceptably high non-response rate.

33.  The response rate to the survey is measured as the number of people who answered the first substantive question (Q2) in the survey divided by the number of people who the surveyor sought to contact. The response rate to the survey conducted by Mr. Braynard in the State of Arizona is one-half of one percent.  That is, of the 518,560 people who the survey research project set out to interview, 99.5 percent of them could not be contacted or refused to participate.  That is an extremely low response rate, and it creates substantial doubt about drawing any reliable inferences from the data.

34.  Dr. Briggs offered no calculation of a response rate to the surveys in his report.

35.  My calculation of the response rate is offered in Table 1.  For each phase of the survey, I calculate the percent of people originally sought to be studied who remain in the survey or are asked a given question.  The initial phase of the survey consists of matching phone numbers to the registration list and contacting those numbers.  The number of cases for which an interview could commence was 5,604, of the original 518,560 registration records (or 1 percent). These 5,604 cases consist of all records for which a message was left, there was an early hang up or refusal at some point during the survey (2,975), and cases that made it to the end of the survey (684).

36. Once the survey commences, there is first a screener question to determine whether the person interviewed should continue with the interview.  That is Question 1.  Question 2 is the first question of interest in Dr. Briggs' analysis.  It asks, "Did you request an Absentee Ballot in the State of  <state name>?"  People could answer "Yes", "No", some other answer, Refuse to answer, or Hang up.

37.  The response rate to the survey items of interest is the percent of people who were asked Question 2.  2,489 of the original 518,560 were asked Question 2, and 2,129 provided an answer to the question.  That is a response rate of 0.4 percent.

38. This is an extremely low response rate.  In most disciplines of study that I am familiar with, these would not be scientifically acceptable or reliable samples.  For example, I am associate editor of the *Harvard Data Sciences Review*, which broadly covers fields of statistics and data sciences, and specialty fields such as political science, public opinion, survey methodology, and economics. Papers with such high non-responses are rejected on their face for this publication as not plausibly valid studies.

39.  In my work as an expert witness for the Department of Justice, courts in which I have testified exclude as evidence phone surveys based on registration lists because they have response rates of 2 percent.  Specifically, in *Texas v. Holder*, Professor Daron Shaw offered evidence based on phone surveys of registration lists.  These surveys had response rates of 2 percent, and the court rejected the data because of serious questions about the representativeness of samples in which 98 percent of respondents could not be contacted or would not respond, and the effects of very low response rates on accuracy and reliability of estimates using surveys with very low response rates.  See *Texas v. Holder* in the United States District Court for the District of Columbia No. 12-cv-128 (see pages 30 and 31). In evaluating the surveys conducted by Mr. Maynard and reported by Dr. Briggs, I use the 2 percent threshold as a standard for an unacceptably low response rate.

40. Dr. Briggs' assumption that those who responded to the question are representative of the relevant population under study (i.e., the other 99 percent of people who could not or would not participate in the survey) is highly unlikely to be correct.  When surveys have high non-

response rates, it is standard practice to analyze information about the sample and the target population, such as demographic characteristics or behavioral and attitudinal statistics, to confirm that the assumption of representativeness of a sample can be maintained.  When the response rates are very low, such an analysis is a necessity in order to determine whether there is any scientific value to the survey.  No such analysis is offered here.

| Table 3. Phone Survey Targets, Attempts and Completes in Mr. Braynard's survey of Arizona registered voters for whom records show no returned ballots | | |
|---|---|---|
| | Number of Cases | Percent of Targets for Survey Remaining in the Survey Process |
| People the Survey Sought to Reach (all Unreturned Ballots) [Targets for Survey] | 518,560 | 100% |
| Data Loads (Phone Numbers Loaded into the Survey System) | 81,780 | 15.77% |
| | | |
| "Completes" | | |
| No Answer | 74,437 | |
| Numbers/Language | 1,663 | |
| VM Message Left | 1,945 | |
| Early Hang Up/Refused | 2,975 | |
| Q4 = 01* | 684 | |
| Subtotal:  "Completes" | 5,604 | 1.08% |
| | | |
| Completes Eligible for Survey (Q5 or Early Hang Up/Refused) | 3,695 | 0.71% |
| Asked Q1 | 4,525 | 0.87% |
| Asked Q2 | 2,489 | 0.41% |
| Asked Q3 | 2,129 | 0.41% |
| Completed Entire Survey (Q5) | 684 | 0.13% |
| | | |
| Source:  William Briggs' report | | |
| *Note:  This number is as reported.  In table for Q4, 678 cases are Q4 = 01, and 684 is the Sum of All Responses for Q5. | | |

### ii. The screening question improperly allows people to take the survey who should not.

41.   A second substantial flaw in the survey is that the design of the questionnaire allows people who are not affirmatively determined to be the correct person to take the survey.

42.   Past research has documented that phone surveys using registered voter lists are often answered by someone other than the person who was listed on the registered voter file. The two most common problems are that the wrong number was matched to the voter list and that someone other than the person the research sought to speak with answered the phone.  The latter occurs most often with landlines.[4]

43.  Question 1 (Q1) of the survey asks, "May I please speak to <lead on screen>?" "Lead on screen" is the name from the voter registration list that is linked to the phone number that the survey has dialed.  Responses to Q1 are listed as reached target, other/uncertain, refused, and hang up.  In the survey toplines for Arizona, the response categories for Question 1 do not specifically describe the branching.  I examined the toplines for other states as reported in the appendix to Dr. Briggs' report in *King v. Whitmer*.  The other states show that the second response category for Question 1 is assigned to Question 2.  For example, in the first table (Georgia), the responses are "Reached Target [Go to Q2]" and "[Go to Q2]," without further explanation.  Importantly, both those respondents classified as "Reached Target" and as "Uncertain" in Question 1 are instructed to "Go to Q2."

44.  This is an error in the branching design of the survey.  People who are not affirmatively identified as the correct person for the interview are allowed to answer the remaining questions in the survey.  For example, Reponses to Questions 2 and 3 show evidence

---

[4] Pew Research Center, "Comparing Survey Sampling Strategies:  Random-Digit Dialing vs. Voter Files," 2018. https://www.pewresearch.org/methods/2018/10/09/comparing-survey-sampling-strategies-random-digit-dial-vs-voter-files/,  see pages 25-26.

that spouses and other family members are asked Questions 2 and 3, even though they were not the person whose absentee voting records are in question.

45. A significant percent and number of respondents who are listed as not giving an affirmative answer to Question 1 are in fact kept in the survey and asked Question 2. In the Arizona survey, 335 respondents answered Uncertain, but were then asked Question 2. These 335 cases are 15.6 percent of cases who answered Question 1 and were then assigned to Question 2 (i.e., 335/(335+1,812)). These respondents enter the pool for Questions 2 and 3 and contaminate all estimates using these data.

46. Questions 2 and 3 exhibit evidence of these cases. The response categories labeled "Member" correspond to family members. Again, there is no codebook for deciphering the response categories. I relied on the toplines for other states in Dr. Briggs' report in *King v. Whitmer* to clarify these categories. Family members answering on behalf of someone indicates that the survey interviewers did not always speak with the specific person listed on the registration list. The number of family members listed is a small percentage of all of the cases with "Uncertainty" in the sample.

47. I inspected the toplines for other states and discovered similar errors in the branching in all of the states. People whose identity was not clearly identified in Question 1 are asked Question 2. At this point in the branching protocol, my conclusion is that the data are not an accurate reflection of the Target group (i.e., those people who are affirmatively identified as the person whose name appears on the registration list).

### iii.   Question 3 is subject to memory errors and social desirability bias.

48. Question 3 asks people whether they voted.  Specifically, it asks people who said that they requested an absentee ballot whether they returned an absentee ballot; that is, whether they voted that ballot.

49.  It has long been understood in political science that respondents to surveys over-report voting in elections.  Typically, the overstatement is approximately 10 to 20 percentage points.  That is, if 65 percent of people in a sample actually voted, the reported vote rates in surveys are usually around 75 to 85 percent.  The most commonly identified sorts of biases are memory errors and social desirability bias in questions asking people whether they voted.[5] When asked whether they voted or cast a ballot, people say "yes" either because they feel that is the socially acceptable answer or because they forgot whether they actually voted in a given election.  Questions that ask people whether they voted or cast a ballot will overstate voting and should not be taken on face value as ground truth.  The particular form of Question 3 is likely to lead to people saying that they voted a ballot when in fact they had not.

50. There are alternative ways to ask about voting in order to reduce social desirability bias.[6]  Those other ways of asking the question are in line with social science practice in research in order to avoid social desirability biases.  Question 3 should have been asked a different way so as to avoid over-reporting of voting.  As it is, it is of the form of survey question regarding voting that is well known to lead to over-reporting.

---

[5] See for example, Allyson L. Holbrook and Jon A. Krosnick, "Social Desirability Bias in Voter Turnout Reports: Test Using the Item Count Technique," *Public Opinion Quarterly* 74 (2010): 37-67. See also Stephen Ansolabehere and Eitan Hersh, "Validation:  What Big Data Reveal About Survey Misreporting and the Real Electorate," *Political Analysis* 20 (2012): 437-459
[6] See, for example, Holbrook and Krosnick, op cit., and Michael J. Hanmer, Antoine J. Banks, and Ismail K. White, "Experiments to Reduce the Over-Reporting of Voting:  A Pipeline to the Truth," *Political Analysis* 22 (2014):  130-141.

### C.  Critique of the Survey Databases and Data Analyses

51. There are obvious data errors and inconsistencies revealed in the toplines that are appended to Dr. Briggs' report.  Dr. Briggs states that he assumes that "the data is accurate." A routine analysis to check the consistency and integrity of data reported in the toplines is standard practice in the survey research field.  Such checks allow researchers to determine whether the survey data and spreadsheet program are producing sensible numbers and, thus, working correctly.  Failures in even a small number of integrity checks indicate problems with the survey systems and software, and raise deep concerns about data accuracy generally.  I routinely perform such checks on surveys that I conduct and supervise.  I have performed such a check, and it reveals that the data lack integrity.  They should not be assumed to be accurate.

52. The data integrity checks that I implemented were of two sorts.  First, I added up the number of cases in each response category to verify that they sum to the number of cases reported for each question in the row labeled "Sum of Responses."  Second, I added up the number of cases at each phase of the survey that are indicated as cases to be asked the next question.  For example, I add up the cases in Question 1 that have the flag [Go to Q2] and then check whether that number equals the number of cases for Question 2 in "Sum of Responses."  I performed these integrity checks for the Arizona survey toplines appended to Dr. Briggs' report in this case and to the toplines for the surveys that Mr. Braynard conducted in other states and that are appended to Dr. Briggs' report in *King v. Whitmer*.

53. The toplines for one of the surveys (Wisconsin) failed the first integrity check.  The response categories for Question 1 in that survey had 2,261 people listed as "A-Reached Target + B-What Is This About?/Uncertain" and 1,677 cases listed as "X=Refused."  These numbers sum to 3,938.  However, the number of cases that the survey system reported under "Sum of All

19

Responses" to Question 1 is 3,495.  There is a discrepancy of 443 cases that are unaccounted for at the outset of that survey.  This indicates to me an error in the program that generated the survey data.  This finding means none of the Wisconsin data should be assumed to be reliable and accurate.

54.  The integrity checks failed for the Arizona data when I performed the second sort of integrity check.  The accounting for the second sort of integrity check is presented in Table 4.  The first panel of Table 4 (marked with lower case numerals) reproduces the accounting for "Completes" shown in the toplines appended to Dr. Briggs' report.  The second panel reports the number of cases in the Completes, including people who hung up or refused, that should have been asked Question 1 (denoted "A") and the number of cases who were asked Question 1 (denoted "B").  The third set of rows is the number of cases in Question 1 who were assigned to Question 2 (denoted "C") and the number of cases who were asked Question 2 (denoted "D").  The fourth set of rows is the number of cases in Question 2 who were assigned to Question 3 (denoted "E") and the number of cases who were asked Question 3 (denoted "F").

55.  The first integrity check in this table is whether the subtotal of Completes equals the number of cases in which calls reached a response (even if an answering machine or refusal).  That is, do rows (i), (ii), and (iii) sum to row (iv)?  They do.  The difference between rows (i)+(ii)+(iii) and row (iv) is zero.

56.  The second integrity check in this table is whether the subtotal of Completes eligible for Question 1 equals the number of people asked Question 1.  That is, does Row A equal Row B?  They are not equal.  Row A minus Row B is -866, meaning there are 866 more respondents who were asked Question 2 than were indicated to be calls commenced in the survey.  I attempted to resolve this discrepancy by removing various categories, such as Refusals to

Question or Hang ups at the Complete stage.  I found no way to account for the excess number of cases who were asked Question 1 but were not accounted for in the Completes portion of the toplines.  These respondents mysteriously show up in the interviews and are not accounted for.

57.  The third integrity check in this table is whether the number of people who were assigned in Question 1 to [Go to Q2] equals the number of people who answered Question 2. That is, does Row C equal Row D?  They are not equal.  Row C minus Row D is -342, meaning there are 342 more respondents in Question 2 than were assigned to Question 2 at the Question 1 stage.  This is a second failure of the integrity checks.

58.  The fourth integrity check in this table is whether the number of people who were assigned in Question 2 to [Go to Q3] equals the number of people who answered Question 3. That is, does Row E equal Row F?  They are equal.  Row E and Row F equal 2,129 each.

59.  Inspection of the toplines for Arizona exposes failures of the integrity checks.  The number of cases affected by these failures is substantial:  1,208 (866+342).  To put these spreadsheet failures into perspective, the total number of cases in the survey that are listed as either Error #1 or Error #2 is 1,229 (i.e., 885 Question 2 = No and 344 Question 3  = Yes).  The presence of integrity check failures leads me to conclude that there are errors in either the program that generated the survey data or the spreadsheets and analysis used to analyze the data. The number of errors is of a sufficiently large magnitude that there can be no confidence in any estimates made using these data.

60.  I performed integrity checks for the other states using the toplines appended to Dr. Briggs' report in *King v. Whitmer*.  I found similar sorts of spreadsheet inconsistencies and failures in integrity checks in other states.

61. In my experience running, designing, and analyzing large scale surveys through the Cooperative Congressional Election Study and serving on the board of the American National Election Study, errors such as these usually have two sources.  They are indicative of either:  (i) errors in the program that that assigns questions to people, or (ii) errors in the program that generates the spreadsheet.  Either sort of error is catastrophic for this analysis, and they render the estimates, projections, and inferences in Dr. Briggs' report entirely unreliable.

| Table 4. Data Integrity Checks for Mr. Braynard's survey of Arizona registered voters | | |
|---|---|---|
| | Number of Cases | Integrity Checks |
| "Completes" | | |
| (i)   VM Message Left | 1,945 | |
| (ii)  Early Hang Up/Refused | 2,975 | |
| (iii) Q4 = 01* | 684 | |
| (iv) Subtotal:  "Completes" | 5,604 | (iv) – ((i) + (ii) + (iii)) = 0 |
| | | |
| A:  Completes Eligible for Survey (Q5 or Early Hang Up/Refused) | 3,659 | |
| B:  Asked Q1 (Sum of All Responses) | 4,525 | A – B = -866 |
| | | |
| C:  Completed Q1 [Go to Q2]* | 2,147 | |
| D:  Asked Q2 (Sum of All Responses) | 2,489 | C – D = -342 |
| | | |
| E:  Offered a Response to Q2 (without hanging up or refusing) [Go to Q3] | 2,129 | |
| F:  Asked Q3 (Sum of All Resonses) | 2,129 | E – F = 0 |
| | | |
| Source:  William Briggs' report  *  Based on Dr. Briggs' report in *Wood v. Raffensperger*, the survey branching in other states asks Question 2 of respondents who are identified as "Reached Target" or "Uncertain" in Question 1. I assume that the branching is the same in the Arizona survey. | | |

### D. Conclusion

62. The estimates and projections presented by Dr. Briggs are based on survey data collected in Arizona and four other states (Georgia, Michigan, Pennsylvania, and Wisconsin). My overall assessment of these surveys is that they were not properly designed.  Specifically, they have unacceptably low response rates, poorly designed questions that are known to over-report voting, and errors in assigning cases to questions that allow people who should not have been included in the survey to nonetheless answer the questions. These survey design and implementation failures mean that, in hundreds of cases, the wrong people are allowed to answer the surveys, and that the statistician must make implausible assumptions about the representativeness of a sample with a .4 percent response rate in order to extrapolate to a half million people.  These survey design and implementation flaws are of sufficient magnitude and severity as to make the estimates completely unreliable and uninformative.

63. The data are not accurate.  The Topline summaries of the survey data appended to Dr. Briggs' report reveal fatal accounting errors in the data.  No sound estimates or inferences can be drawn based on these data.  Dr. Briggs assumed at the outset that the respondents to the surveys are representative and the data are accurate.  Neither assumption is correct.

64. The interpretation of the survey responses ignores the realities of absentee voting in the State of Arizona.  In Arizona, 95 percent of people are permanent absentee and early voters and are sent a ballot automatically without requesting one for a given election.  Dr. Briggs considers as errors all instances in which a voter who was sent an absentee ballot did not request one.  These occurrences are not errors, but instead are the normal workings of Arizona's absentee voting system.  Also, ballots that voters say they returned but are not recorded are not definitive evidence of "errors."  Arizona also has a substantial number of absentee ballots that

are late, undeliverable, spoiled, or invalid.  The evidence presented is not evidence of errors in the election but of errors in the survey data presented by Dr. Briggs.

Signed at Boston, Massachusetts, on the date below.
Date:  December 3, 2020

_____
Stephen Ansolabehere

**STEPHEN  DANIEL  ANSOLABEHERE**

**Department of Government
Harvard University
1737 Cambridge Street
Cambridge, MA 02138**
**sda@gov.harvard.edu**

## EDUCATION

| | | |
|---|---|---|
| Harvard University | Ph.D., Political Science | 1989 |
| University of Minnesota | B.A., Political Science | 1984 |
| | B.S., Economics | |

## PROFESSIONAL  EXPERIENCE

### ACADEMIC  POSITIONS

| | |
|---|---|
| 2016-present | Frank G. Thompson Professor of Government, Harvard University |
| 2008-present | Professor, Department of Government, Harvard University |
| 2015-present | Director, Center for American Politics, Harvard University |
| 1998-2009 | Elting Morison Professor, Department of Political Science, MIT (Associate Head, 2001-2005) |
| 1995-1998 | Associate Professor, Department of Political Science, MIT |
| 1993-1994 | National Fellow, The Hoover Institution |
| 1989-1993 | Assistant Professor, Department of Political Science, University of California, Los Angeles |

### FELLOWSHIPS AND HONORS

| | |
|---|---|
| American Academy of Arts and Sciences | 2007 |
| Carnegie Scholar | 2000-02 |
| National Fellow, The Hoover Institution | 1993-94 |
| Harry S. Truman Fellowship | 1982-86 |

# PUBLICATIONS

## Books

2019        *American Government*, 15th edition.  With Ted Lowi, Benjamin Ginsberg
            and Kenneth Shepsle.  W.W. Norton.

2014        *Cheap and Clean:  How Americans Think About Energy in the Age of Global
            Warming*.  With David Konisky.  MIT Press.
            Recipient of the Donald K. Price book award.

2008        *The End of Inequality:  One Person, One Vote and the Transformation of
            American Politics*.  With James M. Snyder, Jr.,  W. W. Norton.

1996        *Going Negative:  How Political Advertising Divides and Shrinks the American
            Electorate*.   With Shanto Iyengar.  The Free Press.  Recipient of the Goldsmith
            book award.

1993        *Media Game:  American Politics in the Television Age*.  With Roy Behr and
            Shanto Iyengar.  Macmillan.


## Journal Articles

2021        "The CPS Voting and Registration Supplement Overstates Turnout" *Journal of
            Politics* Forthcoming (with Bernard Fraga and Brian Schaffner)

2021        "Congressional Representation: Accountability from the Constituent's Perspective,"
            *American Journal of Political Science* forthcoming (with Shiro Kuriwaki)

2020        "Proximity, NIMBYism, and Public Support for Energy Infrastructure"
            *Public Opinion Quarterly* (with David Konisky and Sanya Carley)
            https://doi.org/10.1093/poq/nfaa025

2020        "Understanding Exponential Growth Amid a Pandemic: An Internal Perspective,"
            *Harvard Data Science Review* 2 (October) (with Ray Duch, Kevin DeLuca,
            Alexander Podkul, Liberty Vittert)

2020        "Unilateral Action and Presidential Accountability,"  *Presidential Studies Quarterly*
            50 (March):  129-145. (with Jon Rogowski)

2019        "Backyard Voices: How Sense of Place Shapes Views of Large-Scale Energy

2

Transmission Infrastructure" *Energy Research & Social Science* forthcoming(with Parrish Bergquist, Carley Sanya, and David Konisky)

2019   "Are All Electrons the Same? Evaluating support for local transmission lines through an experiment" *PLOS ONE*  14 (7): e0219066 (with Carley Sanya and David Konisky) https://doi.org/10.1371/journal.pone.0219066

2018   "Learning from Recounts" Election Law Journal 17: 100-116 (with Barry C. Burden, Kenneth R. Mayer, and Charles Stewart III) https://doi.org/10.1089/elj.2017.0440

2018   "Policy, Politics, and Public Attitudes Toward the Supreme Court" *American Politics Research* (with Ariel White and Nathaniel Persily). https://doi.org/10.1177/1532673X18765189

2018   "Measuring Issue-Salience in Voters' Preferences" *Electoral Studies* (with Maria Socorro Puy) 51 (February):  103-114.

2018   "Divided Government and Significant Legislation:  A History of Congress," *Social Science History* (with Maxwell Palmer and Benjamin Schneer).42 (1).

2017    "ADGN:   An Algorithm for Record Linkage Using Address, Date of Birth Gender and Name,"  *Statistics and Public Policy*  (with Eitan Hersh)

2017   "Identity Politics" (with Socorro Puy) *Public Choice*. 168:  1-19. DOI 10.1007/s11127-016-0371-2

2016   "A 200-Year Statistical History of the Gerrymander" (with Maxwell Palmer) *The Ohio State University Law Journal*

2016   "Do Americans Prefer Co-Ethnic Representation?  The Impact of Race on House Incumbent Evaluations" (with Bernard Fraga)  *Stanford University Law Review* 68:  1553-1594

2016   Revisiting Public Opinion on Voter Identification and Voter Fraud in an Era of Increasing Partisan Polarization*"* (with Nathaniel Persily) *Stanford Law Review* 68:  1455-1489

2015   "The Perils of Cherry Picking Low Frequency Events in Large Sample Surveys" (with Brian Schaffner and Samantha Luks)  *Electoral Studies* 40 (December): 409-410.

2015   "Testing *Shaw v. Reno*:  Do Majority-Minority Districts Cause Expressive Harms?" (with Nathaniel Persily)  *New York University Law Review* 90

3

2015        "A Brief Yet Practical Guide to Reforming U.S. Voter Registration, *Election Law Journal*, (with Daron Shaw and Charles Stewart) 14:  26-31.

2015        "Waiting to Vote," *Election Law Journal*, (with Charles Stewart) 14:  47-53.

2014        "Mecro-economic Voting:  Local Information and Micro-Perceptions of the Macro-Economy" (With Marc Meredith and Erik Snowberg), *Economics and Politics* 26 (November):  380-410.

2014        "Does Survey Mode Still Matter?"  *Political Analysis* (with Brian Schaffner) 22: 285-303

2013        "Race, Gender, Age, and Voting" *Politics and Governance*, vol. 1, issue 2. (with Eitan Hersh)
             http://www.librelloph.com/politicsandgovernance/article/view/PaG-1.2.132

2013        "Regional Differences in Racially Polarized Voting: Implications for the Constitutionality of Section 5 of the Voting Rights Act" (with Nathaniel Persily and Charles Stewart) 126 *Harvard Law Review* F 205 (2013)
             http://www.harvardlawreview.org/issues/126/april13/forum_1005.php

2013        "Cooperative Survey Research" *Annual Review of Political Science* (with Douglas Rivers)

2013        "Social Sciences and the Alternative Energy Future" *Daedalus* (with Bob Fri)

2013        "The Effects of Redistricting on Incumbents," *Election Law Journal* (with James Snyder)

2012        "Asking About Numbers:  How and Why" *Political Analysis* (with Erik Snowberg and Marc Meredith). doi:10.1093/pan/mps031

2012         "Movers, Stayers, and Registration" *Quarterly Journal of Political Science* (with Eitan Hersh and Ken Shepsle)

2012        "Validation:   What Big Data Reveals About Survey Misreporting and the Real Electorate" *Political Analysis* (with Eitan Hersh)

2012        "Arizona Free Enterprise v. Bennett and the Problem of Campaign Finance" *Supreme Court Review* 2011(1):39-79

2012        "The American Public's Energy Choice" *Daedalus* (with David Konisky)

2012        "Challenges for Technology Change" *Daedalus* (with Robert Fri)

2011        "When Parties Are Not Teams:  Party positions in single-member district and proportional representation systems" *Economic Theory* 49 (March) DOI: 10.1007/s00199-011-0610-1  (with James M. Snyder Jr. and William Leblanc)

2011        "Profiling Originalism" *Columbia Law Review* (with Jamal Greene and Nathaniel Persily).

2010        "Partisanship, Public Opinion, and Redistricting" *Election Law Journal* (with Joshua Fougere and Nathaniel Persily).

2010        "Primary Elections and Party Polarization" *Quarterly Journal of Political Science* (with Shigeo Hirano, James Snyder, and Mark Hansen)

2010        "Constituents' Responses to Congressional Roll Call Voting," *American Journal of Political Science*  (with Phil Jones)

2010        "Race, Region, and Vote Choice in the 2008 Election: Implications for the Future of the Voting Rights Act" *Harvard Law Review* April, 2010.  (with Nathaniel Persily, and Charles H. Stewart III)

2010        "Residential Mobility and the Cell Only Population," *Public Opinion Quarterly* (with Brian Schaffner)

2009        "Explaining Attitudes Toward Power Plant Location,"  *Public Opinion Quarterly* (with David Konisky)

2009        "Public risk perspectives on the geologic storage of carbon dioxide," *International Journal of Greenhouse Gas Control* (with Gregory Singleton and Howard Herzog) 3(1):  100-107.

2008        "A Spatial Model of the Relationship Between Seats and Votes"  (with William Leblanc) *Mathematical and Computer Modeling* (November).

2008        "The Strength of Issues:  Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting"  (with Jonathan Rodden and James M. Snyder, Jr.)  *American Political Science Review* (May).

2008        "Access versus Integrity in Voter Identification Requirements." *New York University Annual Survey of American Law,* vol 63.

2008        "Voter Fraud in the Eye of the Beholder" (with Nathaniel Persily) *Harvard Law Review* (May)

2007        "Incumbency Advantages in U. S. Primary Elections," (with John Mark Hansen, Shigeo Hirano, and James M. Snyder, Jr.)  *Electoral Studies* (September)

2007          "Television and the Incumbency Advantage"  (with Erik C. Snowberg and
              James M. Snyder, Jr).  *Legislative Studies Quarterly*.

2006          "The Political Orientation of Newspaper Endorsements" (with Rebecca
              Lessem and James M. Snyder, Jr.).  *Quarterly Journal of Political Science* vol. 1,
              issue 3.

2006          "Voting Cues and the Incumbency Advantage:  A Critical Test" (with Shigeo
              Hirano, James M. Snyder, Jr., and Michiko Ueda) *Quarterly Journal of
              Political Science* vol. 1, issue 2.

2006          "American Exceptionalism?  Similarities and Differences in National Attitudes
              Toward Energy Policies and Global Warming" (with David Reiner, Howard
              Herzog, K. Itaoka, M. Odenberger, and Fillip Johanssen)  *Environmental Science
              and Technology* (February 22, 2006),
              http://pubs3.acs.org/acs/journals/doilookup?in_doi=10.1021/es052010b

2006          "Purple America"  (with Jonathan Rodden and James M. Snyder, Jr.)  *Journal
              of Economic Perspectives* (Winter).

2005          "Did the Introduction of Voter Registration Decrease Turnout?" (with David
              Konisky). *Political Analysis*.

2005          "Statistical Bias in Newspaper Reporting:  The Case of Campaign Finance"
              *Public Opinion Quarterly* (with James M. Snyder, Jr., and Erik Snowberg).

2005          "Studying Elections"  *Policy Studies Journal* (with Charles H. Stewart III and R.
              Michael Alvarez).

2005          "Legislative Bargaining under Weighted Voting" *American Economic Review*
              (with James M. Snyder, Jr., and Michael Ting)

2005          "Voting Weights and Formateur Advantages in Coalition Formation:  Evidence
              from Parliamentary Coalitions, 1946 to 2002" (with James M. Snyder, Jr., Aaron
              B. Strauss, and Michael M. Ting) *American Journal of Political Science*.

2005          "Reapportionment and Party Realignment in the American States"  *Pennsylvania
              Law Review* (with James M. Snyder, Jr.)

2004          "Residual Votes Attributable to Voting Technologies" (with Charles Stewart)
              *Journal of Politics*

2004          "Using Term Limits to Estimate Incumbency Advantages When Office Holders
              Retire Strategically" (with James M. Snyder, Jr.).  *Legislative Studies Quarterly*
              vol. 29, November 2004, pages 487-516.

2004        "Did Firms Profit From Soft Money?" (with James M. Snyder, Jr., and Michiko
            Ueda)  *Election Law Journal* vol. 3, April 2004.

2003        "Bargaining in Bicameral Legislatures" (with James M. Snyder, Jr. and Mike
            Ting)  *American Political Science Review,* August, 2003.

2003        "Why Is There So Little Money in U.S. Politics?" (with James M. Snyder, Jr.)
            *Journal of Economic Perspectives*, Winter, 2003.

2002        "Equal Votes, Equal Money:  Court-Ordered Redistricting and the Public
            Spending in the American States" (with Alan Gerber and James M. Snyder, Jr.)
            *American Political Science Review*, December, 2002.
            Paper awarded the Heinz Eulau award for the best paper in the American Political
            Science Review.

2002        "Are PAC Contributions and Lobbying Linked?" (with James M. Snyder, Jr. and
            Micky Tripathi) *Business and Politics* 4, no. 2.

2002        "The Incumbency Advantage in U.S. Elections:  An Analysis of State and Federal
            Offices, 1942-2000"  (with James Snyder)  *Election Law Journal,* 1, no. 3.

2001        "Voting Machines, Race, and Equal Protection."  *Election Law Journal*, vol. 1,
            no. 1

2001        "Models, assumptions, and model checking in ecological regressions" (with
            Andrew Gelman, David Park, Phillip Price, and Larraine Minnite) *Journal of
            the Royal Statistical Society,* series A, 164:  101-118.

2001        "The Effects of Party and Preferences on Congressional Roll Call Voting."
            (with James Snyder and Charles Stewart)  *Legislative Studies Quarterly*
            (forthcoming).
            Paper awarded the *Jewell-Lowenberg Award* for the best paper published on
            legislative politics in 2001.  Paper awarded the *Jack Walker Award* for the best
            paper published on party politics in 2001.

2001        "Candidate Positions in Congressional Elections," (with James Snyder and
            Charles Stewart). *American Journal of Political Science* 45 (November).

2000        "Old Voters, New Voters, and the Personal Vote," (with James Snyder and
            Charles Stewart) *American Journal of Political Science* 44 (February).

2000        "Soft Money, Hard Money, Strong Parties," (with James Snyder)  *Columbia Law
            Review* 100 (April):598 - 619.

2000        "Campaign War Chests and Congressional Elections," (with James Snyder)

*Business and Politics*. 2 (April): 9-34.

1999    "Replicating Experiments Using Surveys and Aggregate Data: The Case of
        Negative Advertising." (with Shanto Iyengar and Adam Simon) *American
        Political Science Review* 93 (December).

1999    "Valence Politics and Equilibrium in Spatial Models," (with James Snyder),
        *Public Choice.*

1999    "Money and Institutional Power," (with James Snyder), *Texas Law Review* 77
        (June, 1999): 1673-1704.

1997    "Incumbency Advantage and the Persistence of Legislative Majorities," (with
        Alan Gerber), *Legislative Studies Quarterly* 22 (May 1997).

1996    "The Effects of Ballot Access Rules on U.S. House Elections," (with Alan
        Gerber), *Legislative Studies Quarterly* 21 (May 1996).

1994    "Riding the Wave and Issue Ownership: The Importance of Issues in Political
        Advertising and News," (with Shanto Iyengar) *Public Opinion Quarterly* 58:
        335-357.

1994    "Horseshoes and Horseraces: Experimental Evidence of the Effects of Polls on
        Campaigns," (with Shanto Iyengar) *Political Communications* 11/4 (October-
        December): 413-429.

1994    "Does Attack Advertising Demobilize the Electorate?" (with Shanto Iyengar),
        *American Political Science Review* 89 (December).

1994    "The Mismeasure of Campaign Spending: Evidence from the 1990 U.S. House
        Elections," (with Alan Gerber) *Journal of Politics* 56 (September).

1993    "Poll Faulting," (with Thomas R. Belin) *Chance* 6 (Winter): 22-28.

1991    "The Vanishing Marginals and Electoral Responsiveness," (with David Brady and
        Morris Fiorina) *British Journal of Political Science* 22 (November): 21-38.

1991    "Mass Media and Elections: An Overview," (with Roy Behr and Shanto Iyengar)
        *American Politics Quarterly* 19/1 (January): 109-139.

1990    "The Limits of Unraveling in Interest Groups," *Rationality and Society* 2:
        394-400.

1990    "Measuring the Consequences of Delegate Selection Rules in Presidential
        Nominations," (with Gary King) *Journal of Politics* 52: 609-621.

1989          "The Nature of Utility Functions in Mass Publics," (with Henry Brady) *American Political Science Review* 83: 143-164.

## Special Reports and Policy Studies

2010          *The Future of Nuclear Power*, Revised.

2006          *The Future of Coal.* MIT Press.  Continued reliance on coal as a primary power source will lead to very high concentrations of carbon dioxide in the atmosphere, resulting in global warming.  This cross-disciplinary study – drawing on faculty from Physics, Economics, Chemistry, Nuclear Engineering, and Political Science – develop a road map for technology research and development policy in order to address the challenges of carbon emissions from expanding use of coal for electricity and heating throughout the world.

2003          *The Future of Nuclear Power*.  MIT Press.  This cross-disciplinary study – drawing on faculty from Physics, Economics, Chemistry, Nuclear Engineering, and Political Science – examines the what contribution nuclear power can make to meet growing electricity demand, especially in a world with increasing carbon dioxide emissions from fossil fuel power plants.

2002          "Election Day Registration." A report prepared for DEMOS.  This report analyzes the possible effects of Proposition 52 in California based on the experiences of 6 states with election day registration.

2001          *Voting:  What Is, What Could Be.*  A report of the Caltech/MIT Voting Technology Project.  This report examines the voting system, especially technologies for casting and counting votes, registration systems, and polling place operations, in the United States.  It was widely used by state and national governments in formulating election  reforms following the 2000 election.

2001          "An Assessment of the Reliability of Voting Technologies."  A report of the Caltech/MIT Voting Technology Project.  This report provided the first nationwide assessment of voting equipment performance in the United States.  It was prepared for the Governor's Select Task Force on Election Reform in Florida.

## Chapters in Edited Volumes

2016          "Taking the Study of Public Opinion Online"  (with Brian Schaffner) *Oxford Handbook of Public Opinion*, R. Michael Alvarez, ed. Oxford University Press: New York, NY.

2014          "Voter Registration:  The Process and Quality of Lists*" The Measure of*

9

*American Elections*, Barry Burden, ed..

2012      "Using Recounts to Measure the Accuracy of Vote Tabulations: Evidence from New Hampshire Elections, 1946-2002" in Confirming Elections, R. Michael Alvarez, Lonna Atkeson, and Thad Hall, eds. New York: Palgrave, Macmillan.

2010      "Dyadic Representation" in Oxford Handbook on Congress, Eric Schickler, ed., Oxford University Press.

2008      "Voting Technology and Election Law" in *America Votes!,* Benjamin Griffith, editor, Washington, DC: American Bar Association.

2007      "What Did the Direct Primary Do to Party Loyalty in Congress" (with Shigeo Hirano and James M. Snyder Jr.) in *Process, Party and Policy Making: Further New Perspectives on the History of Congress*, David Brady and Matthew D. McCubbins (eds.), Stanford University Press, 2007.

2007      "Election Administration and Voting Rights" in *Renewal of the Voting Rights Act*, David Epstein and Sharyn O'Hallaran, eds. Russell Sage Foundation.

2006      "The Decline of Competition in Primary Elections," (with John Mark Hansen, Shigeo Hirano, and James M. Snyder, Jr.) *The Marketplace of Democracy*, Michael P. McDonald and John Samples, eds. Washington, DC: Brookings.

2005      "Voters, Candidates and Parties" in *Handbook of Political Economy*, Barry Weingast and Donald Wittman, eds. New York: Oxford University Press.

2003      "Baker v. Carr in Context, 1946 – 1964" (with Samuel Isaacharoff) in *Constitutional Cases in Contex*t, Michael Dorf, editor. New York: Foundation Press.

2002      "Corruption and the Growth of Campaign Spending"(with Alan Gerber and James Snyder). *A User's Guide to Campaign Finance*, Jerry Lubenow, editor. Rowman and Littlefield.

2001      "The Paradox of Minimal Effects," in Henry Brady and Richard Johnston, eds., *Do Campaigns Matter*? University of Michigan Press.

2001      "Campaigns as Experiments," in Henry Brady and Richard Johnson, eds., Do *Campaigns Matter*? University of Michigan Press.

2000      "Money and Office," (with James Snyder) in David Brady and John Cogan, eds., *Congressional Elections: Continuity and Change*. Stanford University Press.

1996      "The Science of Political Advertising," (with Shanto Iyengar) in *Political Persuasion and Attitude Change*, Richard Brody, Diana Mutz, and Paul

Sniderman, eds.  Ann Arbor, MI:  University of Michigan Press.

1995        "Evolving Perspectives on the Effects of Campaign Communication," in Philo
            Warburn, ed., *Research in Political Sociology*, vol. 7, JAI.

1995        "The Effectiveness of Campaign Advertising: It's All in the Context," (with
            Shanto Iyengar) in *Campaigns and Elections American Style*, Candice Nelson and
            James A. Thurber, eds.  Westview Press.

1993        "Information and Electoral Attitudes:  A Case of Judgment Under Uncertainty,"
            (with Shanto Iyengar), in *Explorations in Political Psychology*, Shanto Iyengar
            and William McGuire, eds.  Durham:  Duke University Press.

## *Working Papers*

2009        "Sociotropic Voting and the Media" (with Marc Meredith and Erik Snowberg),
            American National Election Study Pilot Study Reports, John Aldrich editor.

2007        "Public Attitudes Toward America's Energy Options:  Report of the 2007 MIT
            Energy Survey" CEEPR Working Paper 07-002 and CANES working paper.

2006        "Constituents' Policy Perceptions and Approval of Members' of Congress"  CCES
            Working Paper 06-01 (with Phil Jones).

2004        "Using Recounts to Measure the Accuracy of Vote Tabulations:  Evidence from
            New Hampshire Elections, 1946 to 2002"  (with Andrew Reeves).

2002        "Evidence of Virtual Representation:  Reapportionment in California,"  (with
            Ruimin He and James M. Snyder).

1999        "Why did a majority of Californians vote to lower their own power?" (with James
            Snyder and Jonathan Woon).  Paper presented at the annual meeting of the
            American Political Science Association, Atlanta, GA, September, 1999.
            Paper received the award for the best paper on Representation at the 1999 Annual
            Meeting  of the APSA.

1999        "Has Television Increased the Cost of Campaigns?" (with Alan Gerber and James
            Snyder).

1996        "Money, Elections, and Candidate Quality,"  (with James Snyder).

1996        "Party Platform Choice - Single- Member District and Party-List Systems,"(with
            James Snyder).

1995        "Messages Forgotten"  (with Shanto Iyengar).

1994   "Consumer Contributors and the Returns to Fundraising:  A Microeconomic Analysis," (with Alan Gerber), presented at the Annual Meeting of the American Political Science Association, September.

1992   "Biases in Ecological Regression," (with R. Douglas Rivers) August, (revised February 1994).  Presented at the Midwest Political Science Association Meetings, April 1994, Chicago, IL.

1992   "Using Aggregate Data to Correct Nonresponse and Misreporting in Surveys" (with R. Douglas Rivers).  Presented at the annual meeting of the Political Methodology Group, Cambridge, Massachusetts, July.

1991   "The Electoral Effects of Issues and Attacks in Campaign Advertising" (with Shanto Iyengar).  Presented at the Annual Meeting of the American Political Science Association, Washington, DC.

1991   "Television Advertising as Campaign Strategy:  Some Experimental Evidence" (with Shanto Iyengar).  Presented at the Annual Meeting of the American Association for Public Opinion Research, Phoenix.

1991   "Why Candidates Attack:  Effects of Televised Advertising in the 1990 California Gubernatorial Campaign," (with Shanto Iyengar).  Presented at the Annual Meeting of the Western Political Science Association, Seattle, March.

1990   "Winning is Easy, But It Sure Ain't Cheap."  Working Paper #90-4, Center for the American Politics and Public Policy, UCLA.  Presented at the Political Science Departments at Rochester University and the University of Chicago.

### *Research Grants*

1989-1990  Markle Foundation.  "A Study of the Effects of Advertising in the 1990 California Gubernatorial Campaign."  Amount: $50,000

1991-1993  Markle Foundation.  "An Experimental Study of the Effects of Campaign Advertising."  Amount: $150,000

1991-1993  NSF.  "An Experimental Study of the Effects of Advertising in the 1992 California Senate Electoral."  Amount: $100,000

1994-1995  MIT Provost Fund.  "Money in Elections:  A Study of the Effects of Money on Electoral Competition."  Amount: $40,000

1996-1997  National Science Foundation. "Campaign Finance and Political Representation."  Amount: $50,000

| | |
|---|---|
| 1997 | National Science Foundation.  "Party Platforms:  A Theoretical Investigation of Party Competition Through Platform Choice."  Amount: $40,000 |
| 1997-1998 | National Science Foundation.  "The Legislative Connection in Congressional Campaign Finance.   Amount: $150,000 |
| 1999-2000 | MIT Provost Fund.  "Districting and Representation."  Amount:  $20,000. |
| 1999-2002 | Sloan Foundation.  "Congressional Staff Seminar." Amount:  $156,000. |
| 2000-2001 | Carnegie Corporation. "The Caltech/MIT Voting Technology Project."  Amount:  $253,000. |
| 2001-2002 | Carnegie Corporation.  "Dissemination of Voting Technology Information."  Amount:  $200,000. |
| 2003-2005 | National Science Foundation. "State Elections Data Project."  Amount:  $256,000. |
| 2003-2004 | Carnegie Corporation.  "Internet Voting."  Amount:  $279,000. |
| 2003-2005 | Knight Foundation.  "Accessibility and Security of Voting Systems."  Amount: $450,000. |
| 2006-2008 | National Science Foundation, "Primary Election Data Project,"  $186,000 |
| 2008-2009 | Pew/JEHT.  "Measuring Voting Problems in Primary Elections, A National Survey."  Amount: $300,000 |
| 2008-2009 | Pew/JEHT. "Comprehensive Assessment of the Quality of Voter Registration Lists in the United States:  A pilot study proposal"  (with Alan Gerber).  Amount:  $100,000. |
| 2010-2011 | National Science Foundation, "Cooperative Congressional Election Study,"  $360,000 |
| 2010-2012 | Sloan Foundation, "Precinct-Level U. S. Election Data," $240,000. |
| 2012-2014 | National Science Foundation, "Cooperative Congressional Election Study, 2010-2012 Panel Study" $425,000 |
| 2012-2014 | National Science Foundation, "2012 Cooperative Congressional Election Study," $475,000 |
| 2014-2016 | National Science Foundation, "Cooperative Congressional Election Study, |

13

|           | 2010-2014 Panel Study" $510,000 |
|-----------|----------|
| 2014-2016 | National Science Foundation, "2014 Cooperative Congressional Election Study," $400,000 |
| 2016-2018 | National Science Foundation, "2016 Cooperative Congressional Election Study," $485,000 |
| 2018-2020 | National Science Foundation, "2018 Cooperative Congressional Election Study,"  $844,784. |
| 2019-2022 | National Science Foundation, RIDIR:  "Collaborative Research:  Analytic Tool for Poststratification and small-area estimation for survey data." $942,607 |

*Professional Boards*

Editor, Cambridge University Press Book Series, Political Economy of Institutions and Decisions, 2006-2016

Member, Board of the Reuters International School of Journalism, Oxford University, 2007 to present.

Member, Academic Advisory Board, Electoral Integrity Project, 2012 to present.

Contributing Editor, *Boston Review*, The State of the Nation.

Member, Board of Overseers, American National Election Studies, 1999 - 2013.

Associate Editor, Public Opinion Quarterly, 2012 to 2013.

Editorial Board of Harvard Data Science Review, 2018 to present.
Editorial Board of American Journal of Political Science, 2005 to 2009.
Editorial Board of Legislative Studies Quarterly, 2005 to 2010.
Editorial Board of Public Opinion Quarterly, 2006 to present.
Editorial Board of the Election Law Journal, 2002 to present.
Editorial Board of the Harvard International Journal of Press/Politics, 1996 to 2008.
Editorial Board of Business and Politics, 2002 to 2008.
Scientific Advisory Board, Polimetrix, 2004 to 2006.

*Special Projects and Task Forces*

Principal Investigator, Cooperative Congressional Election Study, 2005 – present.

CBS News Election Decision Desk, 2006-present

Co-Director, Caltech/MIT Voting Technology Project, 2000-2004.

Co-Organizer, MIT Seminar for Senior Congressional and Executive Staff, 1996-2007.

MIT Energy Innovation Study, 2009-2010.
MIT Energy Initiative, Steering Council, 2007-2008
MIT Coal Study, 2004-2006.
MIT Energy Research Council, 2005-2006.
MIT Nuclear Study, 2002-2004.
Harvard University Center on the Environment, Council, 2009-present


**Expert Witness, Consultation, and Testimony**

| | |
|---|---|
| 2001 | Testimony on Election Administration, U. S. Senate Committee on Commerce. |
| 2001 | Testimony on Voting Equipment, U.S. House Committee on Science, Space, and Technology |
| 2001 | Testimony on Voting Equipment, U.S. House Committee on House Administration |
| 2001 | Testimony on Voting Equipment, Congressional Black Caucus |
| 2002-2003 | *McConnell v. FEC*, 540 U.S. 93 (2003), consultant to the Brennan Center. |
| 2009 | Amicus curiae brief with Professors Nathaniel Persily and Charles Stewart on behalf of neither party to the U.S. Supreme Court in the case of *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009). |
| 2009 | Testimony on Voter Registration, U. S. Senate Committee on Rules. |
| 2011-2015 | *Perez v. Perry*, U. S. District Court in the Western District of Texas (No. 5:11-cv-00360).   Exert witness on behalf of Rodriguez intervenors. |
| 2011-2013 | *State of Texas v. United States,* the U.S. District Court in the District of Columbia (No. 1:11-cv-01303), expert witness on behalf of the Gonzales intervenors. |
| 2012-2013 | *State of Texas v. Holder*, U.S. District Court in the District of Columbia (No. 1:12-cv-00128), expert witness on behalf of the United States. |
| 2011-2012 | *Guy v. Miller* in U.S. District Court for Nevada (No. 11-OC-00042-1B), expert witness on behalf of the Guy plaintiffs. |
| 2012 | *In re Senate Joint Resolution of Legislative Apportionment*,  Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490), consultant for the Florida Democratic Party. |
| 2012-2014 | *Romo v. Detzner*, Circuit Court of the Second Judicial Circuit in Florida (No. 2012 CA 412), expert witness on behalf of Romo plaintiffs. |
| 2013-2014 | *LULAC v. Edwards Aquifer Authority*, U.S. District Court for the Western District of Texas, San Antonio Division (No. 5:12cv620-OLG,), consultant and expert witness on behalf of the City of San Antonio and San Antonio Water District |
| 2013-2014 | *Veasey v. Perry*, U. S. District Court for the Southern District of Texas, Corpus |

|           | Christi Division (No. 2:13-cv-00193), consultant and expert witness on behalf of the United States Department of Justice. |
|-----------|---|
| 2013-2015 | *Harris v. McCrory,* U. S. District Court for the Middle District of North Carolina (No. 1:2013cv00949), consultant and expert witness on behalf of the Harris plaintiffs.  (later named *Cooper v. Harris*) |
| 2014      | Amicus curiae brief, on behalf of neither party, Supreme Court of the United States, *Alabama Democratic Conference v. State of Alabama*. |
| 2014- 2016 | *Bethune-Hill v. Virginia State Board of Elections*, U. S. District Court for the Eastern District of Virginia (No. 3:2014cv00852), consultant and expert on behalf of the Bethune-Hill plaintiffs. |
| 2015      | Amicus curiae brief in support of Appellees, Supreme Court of the United States, *Evenwell v. Abbott* |
| 2016-2017 | *Perez v. Abbott*, U. S. District Court in the Western District of Texas (No. 5:11-cv-00360).   Exert witness on behalf of Rodriguez intervenors. |
| 2017-2018 | Fish v. Kobach, U. S. District Court in the District of Kansas (No. 2:16-cv-02105-JAR).  Expert witness of behalf of the Fish plaintiffs. |