# Exhibit 2

December 4, 2020


*Bowyer v. Ducey,* Case No. 2:20-cv-02321-DJH

United States District Court for the District of Arizona

Expert Report of Jonathan Rodden, PhD

737 Mayfield Avenue
Stanford, CA 94305


_____
Jonathan Rodden, PhD

## I.      INTRODUCTION AND SUMMARY

Yesterday evening, December 3, 2020, I received three declarations, each of which makes rather strong claims to have demonstrated "anomalies" or "irregularities" in the results of the presidential election in Arizona on November 3, 2020. I have been asked by Counsel to assess the validity of their claims. Unfortunately, these reports do not meet basic standards for scientific inquiry. For the most part, they are not based on discernable logical arguments, and they are completely divorced from any existing social science literature. Without any citations to relevant scientific literature about statistics or elections, the authors identify common and easily explained patterns in the 2020 election results, and without explanation, assert that they are somehow "anomalous." Each of these reports lacks even a basic level of clarity or transparency about research methods that would be expected in a scientific communication. As detailed below, each of these reports is based on puzzling but serious mistakes and misunderstandings about how to analyze election data.

## II. QUALIFICATIONS

I am currently a tenured Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab ("the Lab")—a center for research and teaching with a focus on the analysis of geo-spatial

data in the social sciences. In my affiliation with the Lab, I am engaged in a variety of research projects involving large, fine-grained geo-spatial data sets including ballots and election results at the level of polling places, individual records of registered voters, census data, and survey responses. I am also a senior fellow at the Stanford Institute for Economic Policy Research and the Hoover Institution. Prior to my employment at Stanford, I was the Ford Professor of Political Science at the Massachusetts Institute of Technology. I received my Ph.D. from Yale University and my B.A. from the University of Michigan, Ann Arbor, both in political science. A copy of my current C.V. is included as an Appendix to this report.

In my current academic work, I conduct research on the relationship between the patterns of political representation, geographic location of demographic and partisan groups, and the drawing of electoral districts. I have published papers using statistical methods to assess political geography, balloting, and representation in a variety of academic journals including *Statistics and Public Policy*, *Proceedings of the National Academy of Science*, *American Economic Review Papers and Proceedings*, the *Journal of Economic Perspectives*, the *Virginia Law Review*, the *American Journal of Political Science*, the *British Journal of Political Science*, the *Annual Review of Political Science*, and the *Journal of Politics.* One of these papers was recently selected by the American Political Science Association as the winner of the Michael Wallerstein Award for the best paper on political economy published

in the last year, and another received an award from the American Political Science Association section on social networks.

I have recently written a series of papers, along with my co-authors, using automated redistricting algorithms to assess partisan gerrymandering. This work has been published in the *Quarterly Journal of Political Science*, *Election Law Journal*, and *Political Analysis*, and it has been featured in more popular publications like the *Wall Street Journal*, the *New York Times*, and *Boston Review*. I have recently completed a book, published by *Basic Books* in June of 2019, on the relationship between political districts, the residential geography of social groups, and their political representation in the United States and other countries that use winner-take-all electoral districts. The book was reviewed in *The New York Times*, *The New York Review of Books*, *Wall Street Journal*, *The Economist*, and *The Atlantic*, among others.

I have expertise in the use of large data sets and geographic information systems (GIS), and conduct research and teaching in the area of applied statistics related to elections. My PhD students frequently take academic and private sector jobs as statisticians and data scientists. I frequently work with geo-coded voter files and other large administrative data sets, including in recent papers published in the *Annals of Internal Medicine* and *The New England Journal of Medicine.* I have developed a national data set of geo-coded precinct-level election results that has

4

been used extensively in policy-oriented research related to redistricting and representation.[1]

I have been accepted and testified as an expert witness in six recent election law cases: *Romo v. Detzner*, No. 2012-CA-000412 (Fla. Cir. Ct. 2012); *Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*, No. 4:2014-CV-02077 (E.D. Mo. 2014); *Lee v. Va. State Bd. of Elections*, No. 3:15-CV-00357 (E.D. Va. 2015); *Democratic Nat'l Committee et al. v. Hobbs et al.*, No. 16-1065-PHX-DLR (D. Ariz. 2016); *Bethune-Hill v. Virginia State Board of Elections*, No. 3:14-cv-00852-REP-AWA-BMK (E.D. Va. 2014); and *Jacobson et al. v. Lee*, No. 4:18-cv-00262 (N.D. Fla. 2018). I also worked with a coalition of academics to file Amicus Briefs in the Supreme Court in *Gill v. Whitford*, No. 16-1161, and *Rucho v. Common Cause*, No. 18-422. Much of the testimony in these cases had to do with geography, voting, ballots, and election administration. I am being compensated at the rate of $500/hour for my work in this case. My compensation is not dependent upon my conclusions in any way.

### III.   DATA SOURCES

I have collected county-level data on presidential elections for each year from 1974 to 2020 from the Arizona Secretary of State, along with yearly county-level data on registration by party in Arizona. I also consulted precinct-level election

---

[1] The dataset can be downloaded at http://projects.iq.harvard.edu/eda/home.

results from Maricopa and Pima counties. I created a national county-level dataset on election results using information assembled from county election administrators by the New York Times and Associated Press, along with demographic data from the 2014-2018 American Community Survey (ACS), as well as the September 2020 county-level unemployment rate from the Bureau of Labor Statistics, and as described in detail below, data on voting technologies used in each U.S. jurisdiction collected by Verified Voting. I have also collected yearly county-level population estimates for Arizona from the U.S. Census Department.

## IV.     DO "DOMINION" COUNTIES PRODUCE ANOMALOUS ELECTION RESULTS?

I received a report without a named author that purports to provide empirical analysis suggesting that Joseph Biden received higher vote shares in counties that use voting machines made by the manufacturer Dominion. The language of the report indicates that the author posits a *causal* relationship, whereby certain types of machines are responsible for boosting the Democratic vote share. The data, research design, and analysis are not adequately explained. To the extent the research is explained at all, the design and analyses are flawed in several crucial respects. First, the author relies on idiosyncratic, non-standard statistical techniques that are not suited for the analysis the author wishes to accomplish, and more importantly, the

author appears to rely on a correlation that is driven primarily by cross-state variation, and makes no effort to address a serious causal inference problem.

To demonstrate these problems and conduct a more appropriate analysis, I have created my own dataset of county-level votes from 2008 to 2020, merged with county demographic data from the 2014-2018 American Community Survey (ACS),[2] September 2020 county-level unemployment rate from the Bureau of Labor Statistics, and data on voting technologies used in each jurisdiction collected by Verified Voting.[3] Verified Voting is a "non-partisan organization focused exclusively on the critical role technology plays in election administration" that has developed "the most comprehensive publicly-accessible database of voting systems used around the country."[4] I accessed a dataset showing the various voting systems that were in place for each jurisdiction in 2012, 2016, and 2020.

The report mentions a Chi-Squared Automatic Interaction Detection approach, but provides no details about the analysis or the dataset, and provides no output. This is not a standard technique used in the analysis of election data, and the author provides no explanation of why this unusual approach was selected. The

---

[2] Demographic variables from the ACS include: the age distribution, sex distribution, percent Black, percent Latino, the percent of renters, median household income, percent of the county with a college degree, and percent under the poverty line.

[3] In preparing this this data set and conducting the analysis set forth in this section of the report, I received assitance from William Marble—a advanced PhD candidate in political science at Stanford University. Mr. Marble has worked with me in a similar capacity in the past and it is standard to utilize such assistants in my field of expertise.

[4] https://verifiedvoting.org/about/

author presents a scatterplot that seems to be based on a prediction from some kind of statistical model, but the author does not explain anything about the model. The author goes on to mention, in a single sentence, some type of matching analysis. The author provides no details about how the matching analysis was set up, which variables were used, whether the analysis relied on within-state or cross-state variation, and crucially, whether or not it was possible to achieve adequate balance on all of the selected matching variables.

For each of these approaches, the author breezily mentions having conducted some analysis without providing even the slightest details. The normal approach in a scientific communication would be to provide readers with details on what type of empirical model had been chosen and why, which variables were included, how the model performed, and so on. The author also typically provides output for readers to assess, and discusses a variety of robustness checks and sensitivity analyses, so that readers can form judgments about whether the results are sensible, credible, and meaningful.

Since the author provides very few hints about research design, analysis, or data, it is not possible to reconstruct the analysis. Nevertheless, since the relevant data are available, it is worthwhile to assess the author's claim that the introduction of certain types of voting technology, via some unspecified form of fraud, actually has a causal impact on vote shares. We would like to answer the following question:

if there are two counties that are otherwise identical in every respect, including their initial type of voting technology, and one switches from some other voting technology to Dominion and the other stays the same, does the switching county exhibit a change in voting behavior relative to the "control" county that stayed the same? In the ideal world, we would conduct an experiment, much like a drug trial, randomly assigning some counties but not others to either the "treatment condition"—the use of Dominion software—or the control condition—the maintenance of the existing system. By randomizing a sufficiently large number of counties to the treatment and control condition, a researcher would be able to anticipate that there are no systematic differences between the treatment and control counties. Above all, we would hope that this randomization would achieve a balance between the two groups, such that prior Democratic or Republican voting would be similar in the two groups, as would other correlates of voting behavior, such as income, race, and education. We would then be able to isolate any possible impact of voting equipment.

Unfortunately, this type of experiment is unavailable to us. Counties and states have adopted voting technology in a way that is far from random. Counties that adopted Dominion systems between 2016 and 2020 are quite different from those that did not. Counties that switched to Dominion systems between 2016 and 2020 have larger shares of female residents, Latino residents, and college-educated

9

residents, and have lower median incomes. All of these variables are correlated with political attitudes. Moreover, they are likely correlated with *unobservable* variables that also correlate with political attitudes and partisanship.

Even worse, it is clearly the case that Democratic counties have been more likely to adopt Dominion machines than Republican counties. This is demonstrated in Figure 1. The left-hand panel considers all counties in the country, and shows that counties won by Clinton in 2016 were far more likely than counties won by Trump to make use of Dominion technology in 2020. The right-hand panel focuses on counties that were not yet using Dominion technology in 2016, and shows that counties won by Clinton were significantly more likely than counties won by Trump to adopt Dominion technology.

**Figure 1: Voting Technology Use in 2020 by County Partisanship**



Seven states have adopted Dominion technology across all of their counties, and 20 states have not adopted Dominion technology in any of their counties. The former counties are predominately Democratic, and the latter lean Republican. This can be seen in Figure 2, which plots Hillary Clinton's 2016 statewide vote share on the horizontal axis, and the share of counties using Dominion software in 2020 on the vertical axis. It shows that Dominion software was mostly prominently in use in 2020 in states that were already relatively Democratic in 2016.

**Figure 2: Clinton 2016 Vote Share and 2020 Voting Technology**



By now it should be clear why the author of the report on Dominion software faces a vexing causal inference problem. If extremely Democratic counties in states like those in New England adopted a certain software in the past, and one examined

a contemporary correlation between voting behavior and the use of that technology, that correlation could not plausibly be interpreted as evidence that the technology *caused* the voting outcomes, even if one attempted to control for potential observable confounders like race and income. It is simply not plausible that Connecticut is more Democratic than Wyoming because of its voting technology.

### State Fixed Effects Model

The author ignores these complexities altogether, but unfortunately, there is no easy solution to this causal inference problem. At a minimum, we can try to draw inferences from *within* the states where there is variation across counties in voting technology, attempting to control for observable county-level confounders. This can be achieved by estimating a model with "fixed effects" for states. Inclusion of state-level fixed effects allows us to control for a variety of common factors within states that cause there to be a correlation in counties' outcomes within the same state. This does not "solve" the causal inference problem, but at least it allows for more valid comparisons. For this reason, inclusion of fixed effects is standard practice in social science research for this type of study.[5]

---

[5] For example, see Angrist, J., and Pischke, S., *Mostly Harmless Econometrics*. 2009. Princeton, NJ: Princeton University Press.

I estimate a county-level model in which the dependent variable is the 2020 Democratic vote share, and the main independent variable of interest is a binary variable indicating whether the state used Dominion technology in 2020. The model includes a set of demographic control variables, past election results, and state-level fixed effects. The full results are presented in Appendix Table A1. The coefficient capturing the impact of the use of Dominion technology is statistically indistinguishable from zero.

### Placebo Test Using Bordering Counties

In sum, when we rely on comparisons of counties within states, there is no evidence that election technology has an impact on vote shares. As mentioned, the author provides no regression output or details about the analysis, but he or she seems to have estimated some sort of regression model. The author makes no mention of having included fixed effects. As one can see in Figure 2 above, it is clear that a naïve empirical model without fixed effects for states would generate the illusion of a relationship between voting technology and election outcomes, simply because Democratic states have been somewhat more likely to purchase Dominion equipment.

A good way to see this is to conduct a "placebo" test in which we examine Biden's vote share in counties that *did not* use Dominion systems, but border a

county that *did* use Dominion. If there is an impact of voting software on election outcomes via fraud, it should most certainly not be detected in counties that border the Dominion counties but use some other election technology system. If we see that those counties have elevated Democratic vote shares mimicking the supposed "effect" of Dominion software—what is known as a "placebo" effect—we should be very skeptical about claims that use of the software is associated with increased Democratic voting. Rather, we would understand that the correlation reported by the report's author is driven by some features of the types of regions where Dominion software has been adopted—not the software itself.

The result of this analysis is shown in Appendix Table A2. It shows results of a linear regression of Biden vote share on an indicator variable for whether a county borders a Dominion county. This regression is estimated among counties that did not use Dominion systems, and includes a set of demographic control variables. It shows that Biden received a higher vote share, of about .86 of a percentage point, in counties that border a Dominion county than in those that do not. It would be implausible to claim that voting technology in bordering counties has a causal impact on Biden's vote share. A more plausible interpretation is that there are some common features of politics in the regions that have adopted the software, and the type of research design that appears to have been used in the report is likely to turn up spurious results.

14

***Placebo Test Using Prior Election Results***

A research strategy designed to estimate the effect of one variable on another variable can be evaluated by its tendency to detect an effect when an effect *does* exist, and its tendency *not* to detect an effect when an effect *does not* exist. When a research design detects an effect when none exists, we say it returned a *false positive*. Designs with a high false positive rate are not very informative: an effect could be detected by the research design due to the existence of a real effect, or it could be a false positive.

We can make a further evaluation of the propensity of the research design the author appears to have used in his or her report to return false positives by seeing whether it detects that *future* events have an "effect" on *past* outcomes. Of course, this is logically impossible — we know that events happening in the future cannot affect past outcomes. Thus, any effect detected on past outcomes is necessarily a false positive.

In Appendix Table A3, I replicate the basic research design that I believe lies behind the claims in the report. It uses linear regression models, without state fixed effects, to predict Democratic vote share as a function of whether a county used Dominion voting technology in 2020, along with county-level demographic and economic control variables. Except, instead of predicting *2020* vote share, I predict

*2012* and *2016* vote share. I exclude counties that used Dominion systems at the time of the election being analyzed.

The results indicate that in 2012, in counties that did not use Dominion in 2012 but did use them in 2020, Obama received about 5 to 6 percentage points higher vote share, compared to counties that did not use Dominion machines in either 2012 or 2020. The next column shows a similar pattern for 2016. Future use of Dominion predicts higher Clinton vote share in 2016, even in counties that did not use Dominion in 2016.

These results are false positives: there is no logical way that future use of Dominion voting machines could have affected past outcomes. Instead, these results are due to the fact that counties that used Dominion voting systems in 2020 are politically different than counties that did not, even after controlling for demographic and economic variables. This test shows that the simple type of research design that was breezily described in the report is ill-equipped to detect differences in vote shares that are *caused* by use of particular voting systems. As such, the statistical analysis mentioned in the report provides no evidence of fraud due to use of Dominion voting machines.

## V. RAMSLAND REPORT

This report begins with some unsubstantiated claims about Antrim County, Michigan and Dallas County, Texas. These claims are difficult to understand, and

they do not seem to include any type of evidence. Next, Mr. Ramsland contends that turnout figures in Pima County and Maricopa County, Arizona are a "red flag," evidently because Mr. Ramsland believes they are too high. Without explanation or citations from the academic literature, he contends that any turnout number above 80 percent is suspicious.

Quite simply, high turnout is not a "red flag" indicating fraud. Turnout was high around the United States in the 2020 election. It was especially high in suburbs and rural areas. The numbers in Arizona are not atypical. In Figure 3 below, I present data on turnout in each presidential election over the last decade in Arizona as a whole, as well as in Maricopa and Pima counties.

**Figure 3: Turnout in Arizona as a Whole, and in Maricopa and Pima Counties**



Turnout was indeed higher in Arizona as a whole in 2020, reaching 79.9 percent. This was driven, of course, by Maricopa County, which accounts for the lion's share of the Arizona electorate. As can be seen in Figure 3, Pima County typically has higher turnout than Maricopa, or Arizona as a whole. Turnout in Pima County in 2020 was comparable to that in 2004. In short, there is nothing anomalous or suspicious about turnout in Arizona in 2020, or in the two counties mentioned by Mr. Ramsland.

He goes on to list a series of high-turnout suburban and rural precincts. Many of the rural precincts listed by Mr. Ramsland provided strong support to President Trump, while the suburban precincts were, for the most part, hotly contested but leaned toward Joseph Biden. A similar group of rural and suburban precincts with very high turnout can be found in every state around the United States. It is not clear what this might possibly have to do with election fraud.

Mr. Ramsland then goes on to claim that instead of counting votes in the traditional way, code was activated to use ranked choice voting to tally votes in Arizona's 2020 presidential election. From this discussion, it seems likely that Mr. Ramsland is not familiar with ranked choice voting. It involves a different type of ballot, in which voters rank their preferences among candidates. This type of ballot was not used in Arizona. Even if all of the ballots in Arizona were somehow counted or processed using ranked choice voting, but using ballots that only allowed voters

to select one candidate, the result would be the same. Ranked choice voting is a system where in the first round of counting, if one candidate has a majority, the process is over, and no votes are redistributed. If there were multiple candidates and voters' choices were ranked, there would then be a second round, where the lowest-ranked candidate would be dropped, and those voters who ranked that candidate first would then have their second-choice votes tallied. But clearly, nothing of the sort happened in Arizona. Jo Jorgensen, the Libertarian candidate, received a significant number of votes, as did candidates from other parties and write-in candidates.

Finally, Mr. Ramsland concludes with some ideas about votes being "injected" at various times during the counting process. It appears that while watching election returns as they were released by a polling firm called Edison Research, Mr. Ramsland became concerned that votes were reported in bunches throughout the evening. It is not clear how the timing of data releases by Edison Research might be related to election fraud.

## VI.      KESHEL REPORT

Like Mr. Ramsland, Mr. Keshel also takes issue with Arizona's election result. He characterizes the result as a "substantial deviance from statistical norms and results regarding voting patterns in Arizona" (paragraph 4). He does not explain what "statistical norms" he considers, and cites no literature about how one might

go about identifying such a thing. Mr. Keshel's concern, evidently, is that Mr. Biden's gains were too high. To the extent that he identifies a method of analysis, he appears to claim that if a party has won frequently in a geographic place in the past, as the Republican Party has in Maricopa County, it is suspicious if that party loses support. Evidently Mr. Keshel would be suspicious about a number of outcomes in U.S. election, including the increase in support for the Republican Party in the industrial Midwest in 2016, or the rather striking increase in votes for President Trump in several Hispanic counties in Florida and Texas in 2020. Especially in the presence of a controversial incumbent, changing political fortunes for a party in a particular geographic area are quite normal, and are not viewed by election analysts as evidence of fraud.

Another claim made by Mr. Keshel is that a party should show "proper progression in keeping with historic party registration trends" (paragraph 15). He does not explain his method for empirically measuring this "proper progression," but in Arizona, party registration numbers are not remotely useful for this purpose. Figure 4 helps explain why. It plots Democrats as a share of total registrants (in blue), as well as Republicans as a share of total registrants (in red).

**Figure 4: Party Registration Over Time in Maricopa County, AZ**



Democrats and Republicans are both falling dramatically as a share of total registrants, as increasing numbers of voters decline to register with one of the two major parties. But the two major parties continue to virtually monopolize votes for president and other offices. In other words, neither party is "in keeping with historic party registration trends." Much of the battle in Maricopa County is over the large number of voters who are not registered with either party.

In any case, as with turnout, it is difficult to characterize Arizona's 2020 election result, or that of Maricopa County in particular, as anomalous. Figure 5 simply plots Democratic and Republican votes over time in Maricopa County.

**Figure 5: Votes for Democratic and Republican Presidential Candidates Over Time, Maricopa County, AZ**



The rapid growth in votes cast for both parties is a function of Maricopa County's rapid growth, fueled by in-migration from other states. Cross-state migrants to places like Maricopa County are typically college-educated young people—a group that has in recent years become a core constituency of the Democratic Party. As a result, the most rapidly growing counties in the United States are also quickly becoming more Democratic.[6] As Maricopa County has become more educated and diverse, the growth in the blue line has caught up with the growth of the red line in Figure 5. Much of the gap had already been closed by 2016, and it is not surprising that, through the continuation of the trend of in-migration and strong turnout, the blue line finally surpassed the red line in 2020.

---

[6] Jonathan Rodden, 2019, *Why Cities Lose: The Deep Roots of the Urban-Rural Divide*. New York: Basic Books.

Finally, Mr. Keshel believes that Maricopa County is an outlier in the extent to which it has experienced the above-mentioned combination of increased population and increased Democratic voting. This is not the case. Let us examine other states where in-migration of educated young people to sprawling suburbs is changing the political complexion of the state: Texas, Georgia, and North Carolina.

In Figure 6, I plot the change in Trump vote margin from 2016 to 2020 on the vertical axis, so that a positive number indicates that Trump's performance *improved*, and a negative number indicates that it *declined*. On the horizontal axis is average yearly net in-migration, calculated by the census department, from the years 2010 to 2019. The observations are counties. I include identical graphs for Arizona, Texas, Georgia, and North Carolina—all states that have thriving, growing metro areas with strong labor markets and affordable suburbs that are attracting migrants from around the United States. Note that the only thing different about the graphs for each state is the horizontal axis. It goes all the way beyond 40,000 for Arizona. For Texas, the scale stops at 20,0000, and the other states at even lower values. If I did not allow the horizontal axis to vary for Arizona, it would be literally off the charts. This graph clarifies that the population growth of Maricopa County, driven by in-migration, is very unique. According to census estimates, Maricopa County gained 63,000 residents in 2019 alone.



**Figure 6: Net Migration and Change in Presidential Voting Behavior, 2016 to 2020, Counties of Arizona, Texas, Georgia, and North Carolina**



As we can see on the graph, in every one of these states, rapidly growing counties like Maricopa moved toward the Democratic presidential candidate from 2016 to 2020. Every single county that experienced substantial growth can be found in the lower right-hand corner of the graph for its state, where Biden out-performed Clinton—often by a wide margin. In fact, given its extreme level of growth, Maricopa is something of an outlier in that it did not swing *further* toward the Democratic presidential candidate. Note that most of the high-growth counties in Texas and Georgia moved further in a Democratic direction than did Maricopa.

24

It is also useful to note that Trump experienced large increases in vote share in many of the counties where population growth is either stagnant or where out-migration is occurring (on the left side of the graph). In some cases, these vote shifts are substantial. In fact, in order to make the data fit on the graphs, some of the declining, majority-Latino counties in Texas where Trump made extremely large gains had to be left off. If one adopts Mr. Keshel's faulty logic—whereby large vote gains are indicative of fraud—one would need to look at some of these declining rural counties, where in several states, the shift in voting was more dramatic than in the growing suburban counties. But to be clear, this argument is flawed: voting can and does shift among social groups in response to policies and behavior or incumbents as well as platforms of candidates.

In sum, Mr. Keshel has provided no evidence whatsoever that would be indicative, or even suggestive, of fraud in Arizona.

## VII.    CONCLUSION

In conclusion, these reports do not take a scientific approach to the questions they address. They are completely disconnected from the wealth of knowledge about elections and statistics that has been accumulated in the scholarly literature. They feature vague and illogical stories about "anomalies" that, upon basic confrontation with context, logic, and data, turn out not to be anomalies at all, but mere descriptions

of patterns of historical and contemporary election results that are already well known to scholars and pundits alike. They contain no evidence of fraud or irregularities in the election results of 2020 in Arizona or anywhere else.

# Appendix

## Table A1: Fixed Effects Model, County-Level Democratic Vote Share in 2020

|                       | Dem vote share, 2020 |
|-----------------------|----------------------|
| Dominion 2020         | 0.031                |
|                       | (0.25)               |
| Hart 2020             | -0.014               |
|                       | (0.08)               |
| female                | -0.003               |
|                       | (0.18)               |
| Black                 | 0.022                |
|                       | (2.57)*              |
| Latino                | -0.078               |
|                       | (9.43)**             |
| College               | 0.086                |
|                       | (7.31)**             |
| Age 25-34             | 0.014                |
|                       | (0.52)               |
| Age 35-44             | 0.074                |
|                       | (2.56)*              |
| Age 45-54             | -0.028               |
|                       | (0.85)               |
| Age 55-64             | 0.123                |
|                       | (4.16)**             |
| Age 65 and over       | -0.030               |
|                       | (1.63)               |
| Median income         | -0.016               |
|                       | (1.79)               |
| Poverty rate          | -0.003               |
|                       | (0.16)               |
| Unemployment rate     | -0.140               |
|                       | (3.73)**             |
| Renter share          | -0.011               |
|                       | (0.88)               |
| Share urban           | 0.019                |
|                       | (7.81)**             |
| Log population density| 0.240                |
|                       | (3.54)**             |
| Dem. vote share 2016  | 1.047                |
|                       | (51.38)**            |
| Dem. vote share 2012  | -0.093               |
|                       | (3.76)**             |
| Dem. vote share 2008  | -0.026               |
|                       | (1.43)               |
| Constant              | 0.465                |
|                       | (0.26)               |
| $R^2$                 | 0.99                 |

| $N$ | 3,110 |
|---|---|

* $p<0.05$; ** $p<0.01$

## Table A2: Border Placebo Analysis

|  | Dem vote share, 2020 |
| --- | --- |
| Dominion 2020 | 0.855* |
|  | (1.96) |
| Hart 2020 | -3.860 |
|  | (6.97)** |
| female | 0.067 |
|  | (0.60) |
| Black | 0.389 |
|  | (16.44)** |
| Latino | 0.148 |
|  | (5.00)** |
| College | 0.746 |
|  | (13.81)** |
| Age 25-34 | -0.238 |
|  | (1.53) |
| Age 35-44 | -0.504 |
|  | (3.03)** |
| Age 45-54 | 0.060 |
|  | (0.33) |
| Age 55-64 | 0.738 |
|  | (3.70)** |
| Age 65 and over | -0.231 |
|  | (2.43)* |
| Median income | 0.156 |
|  | (3.05)** |
| Poverty rate | 0.564 |
|  | (5.58)** |
| Unemployment rate | 0.901 |
|  | (6.10)** |
| Renter share | 0.274 |
|  | (4.56)** |
| Share urban | 0.014 |
|  | (1.04) |
| Log population density | 1.812 |
|  | (7.04)** |
| Constant | -25.082 |
|  | (2.43)* |
| $R^2$ | 0.68 |
| $N$ | 1,846 |

* $p<0.05$; ** $p<0.01$

29

## Table A3: Previous Election Placebo Analysis

|  | 2012 Dem vote share | 2016 Dem vote share |
|---|---|---|
| 2020 Dominion | 5.605 (1.241)** | 3.310 (1.358)* |
| female | 0.400 (0.131)** | 0.198 (0.113) |
| Black | 0.352 (0.024)** | 0.466 (0.021)** |
| Latino | 0.143 (0.034)** | 0.258 (0.031)** |
| College | 0.331 (0.061)** | 0.660 (0.054)** |
| Age 25-34 | -0.411 (0.177)* | -0.254 (0.153) |
| Age 35-44 | -0.799 (0.194)** | -0.576 (0.168)** |
| Age 45-54 | 0.272 (0.225) | 0.269 (0.198) |
| Age 55-64 | 0.842 (0.235)** | 0.850 (0.206)** |
| Age 65 and over | -0.117 (0.120) | -0.033 (0.100) |
| Median income | 0.152 (0.061)* | 0.150 (0.050)** |
| Poverty rate | 0.656 (0.108)** | 0.671 (0.098)** |
| Renter share | 0.325 (0.077)** | 0.337 (0.068)** |
| Share urban | 0.008 (0.016) | 0.006 (0.013) |
| Log population density | 2.444 (0.276)** | 2.387 (0.246)** |
| Constant | -29.495 (12.358)* | -41.937 (10.381)** |
| $R^2$ | 0.39 | 0.61 |
| $N$ | 1,946 | 2,097 |

* $p<0.05$; ** $p<0.01$

# Jonathan Rodden

Stanford University
Department of Political Science
Encina Hall Central
616 Serra Street
Stanford, CA 94305

Phone:   (650) 723-5219
Fax:        (650) 723-1808
Email:    jrodden@stanford.edu

## Personal

Born on August 18. 1971, St. Louis, MO.

United States Citizen.

## Education

Ph.D. Political Science, Yale University, 2000.

Fulbright Scholar, University of Leipzig, Germany, 1993–1994.

B.A., Political Science, University of Michigan, 1993.

## Academic Positions

Professor, Department of Political Science, Stanford University, 2012–present.

Senior Fellow, Hoover Institution, Stanford University, 2012–present.

Senior Fellow, Stanford Institute for Economic Policy Research, 2020–present.

Director, Spatial Social Science Lab, Stanford University, 2012–present.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, 2010–2012.

Associate Professor, Department of Political Science, Stanford University, 2007–2012.

Fellow, Center for Advanced Study in the Behavioral Sciences, Palo Alto, CA, 2006–2007.

Ford Career Development Associate Professor of Political Science, MIT, 2003–2006.

Visiting Scholar, Center for Basic Research in the Social Sciences, Harvard University, 2004.

Assistant Professor of Political Science, MIT, 1999–2003.

Instructor, Department of Political Science and School of Management, Yale University, 1997–1999.

# Publications

## Books

*Why Cities Lose: The Deep Roots of the Urban-Rural Divide*. Basic Books, 2019.

*Decentralized Governance and Accountability: Academic Research and the Future of Donor Programming*. Co-edited with Erik Wibbels, Cambridge University Press, 2019.

*Hamilton's Paradox: The Promise and Peril of Fiscal Federalism*, Cambridge University Press, 2006. Winner, Gregory Luebbert Award for Best Book in Comparative Politics, 2007.

*Fiscal Decentralization and the Challenge of Hard Budget Constraints*, MIT Press, 2003. Co-edited with Gunnar Eskeland and Jennie Litvack.

## Peer Reviewed Journal Articles

Partisan Dislocation: A Precinct-Level Measure of Representation and Gerrymandering, 2020, *Political Analysis* forthcoming (with Daryl DeFord Nick Eubank).

Who is my Neighbor? The Spatial Efficiency of Partisanship, 2020, *Statistics and Public Policy* (with Nick Eubank).

Handgun Ownership and Suicide in California, 2020, *New England Journal of Medicine* 382:2220-2229 (with David M. Studdert, Yifan Zhang, Sonja A. Swanson, Lea Prince, Erin E. Holsinger, Matthew J. Spittal, Garen J. Wintemute, and Matthew Miller).

Viral Voting: Social Networks and Political Participation, 2020, *Quarterly Journal of Political Science* (with Nick Eubank, Guy Grossman, and Melina Platas).

It Takes a Village: Peer Effects and Externalities in Technology Adoption, 2020, *American Journal of Political Science* (with Romain Ferrali, Guy Grossman, and Melina Platas). Winner, 2020 Best Conference Paper Award, American Political Science Association Network Section.

Assembly of the LongSHOT Cohort: Public Record Linkage on a Grand Scale, 2019, *Injury Prevention* (with Yifan Zhang, Erin Holsinger, Lea Prince, Sonja Swanson, Matthew Miller, Garen Wintemute, and David Studdert).

Crowdsourcing Accountability: ICT for Service Delivery, 2018, *World Development* 112: 74-87 (with Guy Grossman and Melina Platas).

Geography, Uncertainty, and Polarization, 2018, *Political Science Research and Methods* doi:10.1017/psrm.2018.12 (with Nolan McCarty, Boris Shor, Chris Tausanovitch, and Chris Warshaw).

Handgun Acquisitions in California after Two Mass Shootings, 2017, *Annals of Internal Medicine* 166(10):698-706. (with David Studdert, Yifan Zhang, Rob Hyndman, and Garen Wintemute).

Cutting Through the Thicket: Redistricting Simulations and the Detection of Partisan Gerrymanders, 2015, *Election Law Journal* 14,4:1-15 (with Jowei Chen).

The Achilles Heel of Plurality Systems: Geography and Representation in Multi-Party Democracies, 2015, *American Journal of Political Science* 59,4: 789-805 (with Ernesto Calvo). Winner, Michael Wallerstein Award for best paper in political economy, American Political Science Association.

Why has U.S. Policy Uncertainty Risen Since 1960?, 2014, *American Economic Review: Papers and Proceedings* May 2014 (with Nicholas Bloom, Brandice Canes-Wrone, Scott Baker, and Steven Davis).

Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures, 2013, *Quarterly Journal of Political Science* 8: 239-269 (with Jowei Chen).

How Should We Measure District-Level Public Opinion on Individual Issues?, 2012, *Journal of Politics* 74, 1: 203-219 (with Chris Warshaw).

Representation and Redistribution in Federations, 2011, *Proceedings of the National Academy of Sciences* 108, 21:8601-8604 (with Tiberiu Dragu).

Dual Accountability and the Nationalization of Party Competition: Evidence from Four Federatons, 2011, *Party Politics* 17, 5: 629-653 (with Erik Wibbels).

The Geographic Distribution of Political Preferences, 2010, *Annual Review of Political Science* 13: 297–340.

Fiscal Decentralization and the Business Cycle: An Empirical Study of Seven Federations, 2009, *Economics and Politics* 22,1: 37–67 (with Erik Wibbels).

Getting into the Game: Legislative Bargaining, Distributive Politics, and EU Enlargement, 2009, *Public Finance and Management* 9, 4 (with Deniz Aksoy).

The Strength of Issues: Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting, 2008. *American Political Science Review* 102, 2: 215–232 (with Stephen Ansolabehere and James Snyder).

Does Religion Distract the Poor? Income and Issue Voting Around the World, 2008, *Comparative Political Studies* 41, 4: 437–476 (with Ana Lorena De La O).

Purple America, 2006, *Journal of Economic Perspectives* 20,2 (Spring): 97–118 (with Stephen Ansolabehere and James Snyder).

Economic Geography and Economic Voting: Evidence from the U.S. States, 2006, *British Journal of Political Science* 36, 3: 527–47 (with Michael Ebeid).

Distributive Politics in a Federation: Electoral Strategies, Legislative Bargaining, and Government Coalitions, 2004, *Dados* 47, 3 (with Marta Arretche, in Portuguese).

Comparative Federalism and Decentralization: On Meaning and Measurement, 2004, *Comparative Politics* 36, 4: 481-500. (Portuguese version, 2005, in *Revista de Sociologia e Politica* 25).

Reviving Leviathan: Fiscal Federalism and the Growth of Government, 2003, *International Organization* 57 (Fall), 695–729.

Beyond the Fiction of Federalism: Macroeconomic Management in Multi-tiered Systems, 2003, *World Politics* 54, 4 (July): 494–531 (with Erik Wibbels).

The Dilemma of Fiscal Federalism: Grants and Fiscal Performance around the World, 2002, *American Journal of Political Science* 46(3): 670–687.

Strength in Numbers: Representation and Redistribution in the European Union, 2002, *European Union Politics* 3, 2: 151–175.

Does Federalism Preserve Markets? *Virginia Law Review* 83, 7 (with Susan Rose-Ackerman). Spanish version, 1999, in *Quorum* 68.

*Working Papers*

Federalism and Inter-regional Redistribution, Working Paper 2009/3, Institut d'Economia de Barcelona.

Representation and Regional Redistribution in Federations, Working Paper 2010/16, Institut d'Economia de Barcelona (with Tiberiu Dragu).

*Chapters in Books*

Political Geography and Representation: A Case Study of Districting in Pennsylvania (with Thomas Weighill), forthcoming 2021.

Decentralized Rule and Revenue, 2019, in Jonathan Rodden and Erik Wibbels, eds., *Decentralized Governance and Accountability*, Cambridge University Press.

Geography and Gridlock in the United States, 2014, in Nathaniel Persily, ed. *Solutions to Political Polarization in America*, Cambridge University Press.

Can Market Discipline Survive in the U.S. Federation?, 2013, in Daniel Nadler and Paul Peterson, eds, *The Global Debt Crisis: Haunting U.S. and European Federalism*, Brookings Press.

Market Discipline and U.S. Federalism, 2012, in Peter Conti-Brown and David A. Skeel, Jr., eds, *When States Go Broke: The Origins, Context, and Solutions for the American States in Fiscal Crisis*, Cambridge University Press.

Federalism and Inter-Regional Redistribution, 2010, in Nuria Bosch, Marta Espasa, and Albert Sole Olle, eds., *The Political Economy of Inter-Regional Fiscal Flows*, Edward Elgar.

Back to the Future: Endogenous Institutions and Comparative Politics, 2009, in Mark Lichbach and Alan Zuckerman, eds., *Comparative Politics: Rationality, Culture, and Structure* (Second Edition), Cambridge University Press.

The Political Economy of Federalism, 2006, in Barry Weingast and Donald Wittman, eds., *Oxford Handbook of Political Economy*, Oxford University Press.

Fiscal Discipline in Federations: Germany and the EMU, 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

The Political Economy of Pro-cyclical Decentralised Finance (with Erik Wibbels), 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

Globalization and Fiscal Decentralization, (with Geoffrey Garrett), 2003, in Miles Kahler and David Lake, eds., *Governance in a Global Economy: Political Authority in Transition*, Princeton University Press: 87-109. (Updated version, 2007, in David Cameron, Gustav Ranis, and Annalisa Zinn, eds., *Globalization and Self-Determination: Is the Nation-State under Siege?* Routledge.)

Introduction and Overview (Chapter 1), 2003, in Rodden et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Soft Budget Constraints and German Federalism (Chapter 5), 2003, in Rodden, et al, *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Federalism and Bailouts in Brazil (Chapter 7), 2003, in Rodden, et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Lessons and Conclusions (Chapter 13), 2003, in Rodden, et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

4

*Online Interactive Visualization*

Stanford Election Atlas, 2012 (collaboration with Stephen Ansolabehere at Harvard and Jim Herries at ESRI)

*Other Publications*

How America's Urban-Rural Divide has Shaped the Pandemic, 2020, *Foreign Affairs*, April 20, 2020.

An Evolutionary Path for the European Monetary Fund? A Comparative Perspective, 2017, Briefing paper for the Economic and Financial Affairs Committee of the European Parliament.

Representation and Regional Redistribution in Federations: A Research Report, 2009, in *World Report on Fiscal Federalism*, Institut d'Economia de Barcelona.

On the Migration of Fiscal Sovereignty, 2004, *PS: Political Science and Politics* July, 2004: 427–431.

Decentralization and the Challenge of Hard Budget Constraints, *PREM Note* 41, Poverty Reduction and Economic Management Unit, World Bank, Washington, D.C. (July).

Decentralization and Hard Budget Constraints, *APSA-CP* (Newsletter of the Organized Section in Comparative Politics, American Political Science Association) 11:1 (with Jennie Litvack).

Book Review of *The Government of Money* by Peter Johnson, *Comparative Political Studies 32,7: 897-900*.

## Fellowships and Honors

Fund for a Safer Future, Longitudinal Study of Handgun Ownership and Transfer (LongSHOT), GA004696, 2017-2018.

Stanford Institute for Innovation in Developing Economies, Innovation and Entrepreneurship research grant, 2015.

Michael Wallerstein Award for best paper in political economy, American Political Science Association, 2016.

Common Cause Gerrymandering Standard Writing Competition, 2015.

General support grant from the Hewlett Foundation for Spatial Social Science Lab, 2014.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2012.

Sloan Foundation, grant for assembly of geo-referenced precinct-level electoral data set (with Stephen Ansolabehere and James Snyder), 2009-2011.

Hoagland Award Fund for Innovations in Undergraduate Teaching, Stanford University, 2009.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, beginning Fall 2010.

Research Grant on Fiscal Federalism, Institut d'Economia de Barcelona, 2009.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2008.

United Postal Service Foundation grant for study of the spatial distribution of income in cities, 2008.

Gregory Luebbert Award for Best Book in Comparative Politics, 2007.

Fellow, Center for Advanced Study in the Behavioral Sciences, 2006-2007.

National Science Foundation grant for assembly of cross-national provincial-level dataset on elections, public finance, and government composition, 2003-2004 (with Erik Wibbels).

MIT Dean's Fund and School of Humanities, Arts, and Social Sciences Research Funds.

Funding from DAAD (German Academic Exchange Service), MIT, and Harvard EU Center to organize the conference, "European Fiscal Federalism in Comparative Perspective," held at Harvard University, November 4, 2000.

Canadian Studies Fellowship (Canadian Federal Government), 1996-1997.

Prize Teaching Fellowship, Yale University, 1998-1999.

Fulbright Grant, University of Leipzig, Germany, 1993-1994.

Michigan Association of Governing Boards Award, one of two top graduating students at the University of Michigan, 1993.

W. J. Bryan Prize, top graduating senior in political science department at the University of Michigan, 1993.

## Other Professional Activities

International Advisory Committee, Center for Metropolitan Studies, Sao Paulo, Brazil, 2006–2010.

Selection committee, Mancur Olson Prize awarded by the American Political Science Association Political Economy Section for the best dissertation in the field of political economy.

Selection committee, Gregory Luebbert Best Book Award.

Selection committee, William Anderson Prize, awarded by the American Political Science Association for the best dissertation in the field of federalism and intergovernmental relations.

## Courses

*Undergraduate*

Politics, Economics, and Democracy

Introduction to Comparative Politics

Introduction to Political Science

Political Science Scope and Methods

Institutional Economics

Spatial Approaches to Social Science

*Graduate*

Political Economy of Institutions

Federalism and Fiscal Decentralization

Politics and Geography

# Consulting

2017. Economic and Financial Affairs Committee of the European Parliament.

2016. Briefing paper for the World Bank on fiscal federalism in Brazil.

2013-2018: Principal Investigator, SMS for Better Governance (a collaborative project involving USAID, Social Impact, and UNICEF in Arua, Uganda).

2019: Written expert testimony in *McLemore, Holmes, Robinson, and Woullard v. Hosemann*, United States District Court, Mississippi.

2019: Expert witness in *Nancy Corola Jacobson v. Detzner*, United States District Court, Florida.

2018: Written expert testimony in *League of Women Voters of Florida v. Detzner* No. 4:18-cv-002510, United States District Court, Florida.

2018: Written expert testimony in *College Democrats of the University of Michigan, et al. v. Johnson, et al.*, United States District Court for the Eastern District of Michigan.

2017: Expert witness in *Bethune-Hill v. Virginia Board of Elections*, No. 3:14-CV-00852, United States District Court for the Eastern District of Virginia.

2017: Expert witness in *Arizona Democratic Party, et al. v. Reagan, et al.*, No. 2:16-CV-01065, United States District Court for Arizona.

2016: Expert witness in *Lee v. Virginia Board of Elections*, 3:15-cv-357, United States District Court for the Eastern District of Virginia, Richmond Division.

2016: Expert witness in *Missouri NAACP v. Ferguson-Florissant School District*, United States District Court for the Eastern District of Missouri, Eastern Division.

2014-2015: Written expert testimony in *League of Women Voters of Florida et al. v. Detzner, et al.*, 2012-CA-002842 in Florida Circuit Court, Leon County (Florida Senate redistricting case).

2013-2014: Expert witness in *Romo v Detzner*, 2012-CA-000412 in Florida Curcuit Court, Leon County (Florida Congressional redistricting case).

2011-2014: Consultation with investment groups and hedge funds on European debt crisis.

2011-2014: Lead Outcome Expert, Democracy and Governance, USAID and Social Impact.

2010: USAID, Review of USAID analysis of decentralization in Africa.

2006–2009: World Bank, Independent Evaluations Group. Undertook evaluations of World Bank decentralization and safety net programs.

2008–2011: International Monetary Fund Institute. Designed and taught course on fiscal federalism.

1998–2003: World Bank, Poverty Reduction and Economic Management Unit. Consultant for *World Development Report*, lecturer for training courses, participant in working group for assembly of decentralization data, director of multi-country study of fiscal discipline in decentralized countries, collaborator on review of subnational adjustment lending.

Last updated: October 19, 2020