# Exhibit 3

# A   Overview

**1**   I have been engaged by Defendant-Intervenors' Counsel *Perkins Coie LLP* to write an expert report in the matter of *Bowyer et al. v. Ducey et al.*  Counsel requested that I evaluate the contention in "Declaration of Matthew Bromberg Ph.D" (hereinafter, the Bromberg Declaration, dated December 1, 2020 and filed on December 2, 2020) that there was "vote switching" in Maricopa County, Arizona, in the 2020 presidential election that favored Democratic candidate for president Joe Biden at the expense of Republican candidate Donald Trump. Counsel requested as well that I offer a brief evaluation of the claims in the Bromberg Declaration about fraudulent votes cast in the 2020 presidential election beyond Arizona, namely, in Georgia, Pennsylvania, and Milwaukee, Wisconsin.

**2**   The 2020 General Election took place on November 3, 2020.  In the race in Arizona for the office of President of the United States, the Arizona Secretary of State has certified that Democratic candidate Joe Biden received 1,672,143 votes and Republican candidate Donald Trump, 1,661,686 votes. This constitutes a margin of 10,457 votes.[1]

**3**   As of the writing of this expert report, Matthew Bromberg, the author of the Bromberg Declaration, has to the best of my knowledge disclosed neither the data not the computer code he used in the process of producing his declaration. I accordingly reserve the right to supplement this report in light of any disclosures that he puts forward in the future.

# B   Summary of conclusions

   I.   The Bromberg Declaration offers no evidence of voter fraud—and in particular vote switching from Donald Trump to Joe Biden—in Maricopa County, Arizona during the 2020 presidential election.

---

[1]See "President of the United States," *Arizona Secretary of State*, available at `https://results.arizona.vote/#/featured/18/0` (last accessed December 4, 2020).

II.     There is no basis for the key theory in the Bromberg Declaration that voting precincts in Maricopa County with relatively few voters were more susceptible to voter fraud than precincts with greater numbers of voters.  This theory does not appear in the literature on voter fraud and there is no evidence presented in the Bromberg Declaration in support of it. Lacking this theory, the Bromberg Declaration cannot say anything about voter fraud in Maricopa County in the 2020 election.

III.    The Bromberg Declaration misunderstands how in-person voters in Maricopa County cast their ballots in the 2020 election.  In this election, the county used voting centers on Election Day.  Each eligible voter in Maricopa County could use any of the county's 175 centers to cast an in-person ballot.  Maricopa County's in-person voters in this election, that is, were *not* restricted to voting in the polling places associated with their precincts, of which there were 744.  The total number of presidential votes cast by the voters who belong to any given precinct in Maricopa County thus has no implication for how many ballots were physically cast in it on November 3, 2020.  Therefore, the theory putatively offered in the Bromberg Declaration about the susceptibility to voter fraud of Maricopa County precincts with relatively few voters is of absolutely no relevance to the 2020 presidential race in the county and in fact to any races contested in the 2020 election.

IV.    When voters in Maricopa County are aggregated at the precinct level (which ignores the matter of *where* these individuals cast their ballots in the 2020 election), the results of the presidential race bear strong similarity to the results of the race for a seat in the United States Senate.  The precincts in which Joe Biden did well are also precincts in which Mark Kelly, Democratic candidate for Senate, did well, and vice versa.  This implies that the pattern in Maricopa County precincts that was noted in the Bromberg Declaration—whereby precincts with smaller numbers of voters tended to have more Biden votes than Trump votes—reflects established political preferences in Maricopa County, not illegal vote switching.

V.     Voter fraud is rare in the United States.  Nonetheless, the Bromberg Declaration presents

a model that purports to discover significant voter in Georgia, Pennsylvania, and Milwaukee, Wisconsin. The model assumes that when a ballot is counted is uncorrelated with the presidential vote on it. This is known not to be the case. Thus, the claims in the Bromberg Declaration about voter fraud beyond Arizona do not follow from the arguments made in it.

## C   Organization of this report

**4**    In the next section of this report, I present my qualifications.

**5**    I then summarize literature on voter fraud in American elections.

**6**    Next, I evaluate the analysis of Maricopa County presented in the Bromberg Declaration.

**7**    Finally, I briefly discuss claims about voter fraud made in the Bromberg Declaration that extend beyond Arizona.

## D   Qualifications

**8**    I am the William Clinton Story Remsen 1943 Professor of Government at Dartmouth College in Hanover, New Hampshire and from 2015 to 2020 was Chair of the Program in Quantitative Social Science. I have taught at Dartmouth since 2003 and previously was on the faculty of Northwestern University. I have served as a visiting professor at Harvard University (July 2008–January 2009), the University of Rochester (September 2006–December 2006), and the Hertie School of Governance in Berlin (August 2011–August 2012). I have also served as a visiting scholar at the Hertie School of Governance (August 2016–July 2017).

**9**    In January 1998, I received a doctorate in the field of Political Economy from the Graduate School of Business at Stanford University. I also have a master's degree in statistics from

Stanford University (June 1995), a master's degree in political science from the University of Dayton (August 1992), and a bachelor's degree in mathematics and economics from Carnegie-Mellon University (May 1989).

**10**      I have published many scholarly articles on election administration and American elections, three such articles in 2019 and two in 2018.  Among other subjects, I have written on the effects of ballot formats, patterns in invalid votes, the availability of early voting, and polling place congestion.  My articles rely on statistical analyses, and my ongoing research agenda focuses heavily on issues in election administration.

**11**      I have published over 20 articles in peer-reviewed political science journals, including in the field's top general journals (*American Political Science Review*, *American Journal of Political Science*, and *Journal of Politics*).  I have published in specialty journals as well (*Election Law Journal*, *American Politics Research*, and *Legislative Studies Quarterly*).

**12**      I have published two articles on voter fraud in American elections.  Cottrell, Herron and Westwood (2018) is a statistical study of the allegations made by Donald Trump about voter fraud in the period surrounding the 2016 General Election.  It concludes that there is no evidence in support of these allegations.  Herron (2019) is an analysis of allegations made after a 2018 election in North Carolina's 9th Congressional District.  It concludes that patterns in absentee votes cast in this district were consistent with allegations of absentee ballot fraud.

**13**      I was a testifying expert for defendants in *Law et al. v. Whitmer et al.*  (Case No.:  20 OC 00163 1B) and in *Jennings v. Elections Canvassing Commission of the state of Florida* (2006 WL 4404531 (Fla.Cir.Ct.)) and a testifying expert for plaintiffs in *Alliance for Retired American et al. v. Matthew Dunlap et al.*  (DKT NO. CV-20-95), *Michigan Alliance for Retired Americans et al. v. Jocelyn Benson et al.*  (Civil Action No. 2020-000108-MM), *League of Women Voters of New Hampshire et al. v. William M. Gardner et al.*  (226-2017-CV-433), and *Veasey et al. v. Abbott et al.*

(265 F. Supp. 3d 684 (S.D. Tex. 2017)).  In addition, I have written expert reports in approximately 12 other cases relating to aspects of election law and election administration.

**14**    My written and oral testimony was credited by courts in their written opinions in *Law et al. v. Whitmer et al.*, *Donald J. Trump for President, Inc. v. Stephen Bullock et al.*  (Case No.: 6:20-cv-00066-DLC), *League of Women Voters of New Hampshire et al. v. William M. Gardner et al.*, and in *Veasey et al. v. Abbott et al..*  My opinions and testimony have never been found by a court to be unreliable.

**15**    At the request of counsel working on the litigation "Investigation of Election Irregularities Affecting Counties Within the 9th Congressional District," I submitted a draft of a working paper on North Carolina's 9th Congressional District to the North Carolina State Board of Elections. As to the paper's comparison of absentee ballot candidate support rates in Bladen County, North Carolina, in 2018 to absentee ballot candidate support rates in other counties in North Carolina, in three other states, and in elections that dated back to 2012, the Board wrote, "We find this information credible."[2] My paper on North Carolina's 9th Congressional District appears in *Election Law Journal*, a peer-reviewed publication (Herron, 2019).

**16**    My *curriculum vitae* is attached as Appendix A.

**17**    I am being paid at a rate of $550/hour for work in this litigation.  My compensation is contingent neither on the results of the analyses described herein nor on the contents of this report.

# E   Voter fraud in the United States

**18**    To provide context for the breadth of the Bromberg Declaration's claims about fraud, I offer a definition of voter fraud and then review the extensive academic literature on this subject, which

---

[2]The Board's decision, which invalidated the 2018 election in the 9th Congressional District, can be found at `https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Congressional_District_9_Portal/Order_03132019.pdf` (last accessed November 13, 2020).

the Contest ignores.

## E.1   Defining voter fraud

**19**      The study of voter fraud in the United States is part of the field of election administration.

**20**      For the purposes of this report, I define an instance of voter fraud as *an intentional act of deception aimed at subverting electoral processes*.[3]  Instances of voter fraud can include, but are not necessarily limited to, the following behaviors:

*Absentee or mail ballot fraud*:  improperly acquiring and then submitting an absentee or mail ballot or ballots.

*Double voting*:  voting more than once in an election in which this is not permitted.

*Election official fraud*:  improper actions taken by election officials, actions intended to change validly cast votes, or actions taken to affect voter registration records.

*Non-citizen voting*:  participating in a federal election when one is not a citizen of the United States.

*Voter impersonation*:  voting in-person (as opposed to via mail) on an election day in someone else's name, either in the name of a properly registered voter or using the registration records of a fictional individual.

---

[3]The North Carolina State Board of Elections (NCSBE) is responsible for managing elections in North Carolina. Since 2015, it has published a breakdown of voting irregularities that raise questions about election integrity. Referring to instances of potential voter fraud in the 2016 General Election, the NCSBE wrote that, "[Voter] [f]raud, in most cases, is an intent crime that requires prosecutors to show that the voter knowingly committed a crime." See p. 7 of "Post-Election Audit Report," *North Carolina State Board of Elections*, April 21, 2017, available at `https://s3.amazonaws.com/dl.ncsbe.gov/sboe/Post-Election%20Audit%20Report_2016%20General%20Election/Post-Election_Audit_Report.pdf` (last accessed November 15, 2020).

**21**     The above types of voter fraud can in principle be combined.  A non-citizen of the United States could during the course of participating in a federal election impersonate a properly registered voter.  Or, an individual could vote twice in an election, once using the individual's own (and proper) registration and the second time using a fictional registration.

**22**     Moreover, each entry in the above list of behaviors should be understood as encompassing a broad range of behaviors.  An individual could, hypothetically, execute a double voting fraud by voting twice in one state.  Or, such an individual could, hypothetically, vote in more than one state.

**23**     This list above is neither exclusive nor exhaustive.

**24**     I list the above types of behaviors because they describe the sorts of actions that, based on my experience with academic literature on the subject, could in principle be characterized as voter fraud.  What a court in any state determines is illegal depends, however, on that state's particular laws.

**25**     It is my general understanding that, for an action to be denoted fraud, it must involve an intent to deceive.  In this report, I treat allegations of voter fraud as actual fraud even where I cannot determine if there was an intent to deceive.  To that extent that I do this, my report is over-inclusive with respect to instances of voter fraud and thus conservative.[4]

**26**     Elections are regulated affairs subject to state laws and potentially local laws as well.  A voter can behave in a way that is illegal in his or her state but not intentionally deceptive and thus not fraudulent.

---

[4]Fraudulent actions of voters or intended voters are similar to what the United States Election Assistance Commission (EAC) might call "acts of deception."  The EAC, a federal body established in the aftermath of the contested 2000 presidential election, published a report, "Election Crimes: An Initial Review and Recommendations for Future Study," in December 2006, that categorizes in detail a variety of election-related crimes.  The report is available at https://www.eac.gov/sites/default/files/eac_assets/1/6/Initial_Review_and_Recommendations_for_Further_Study.pdf (last accessed November 22, 2020).

**27**     The examples of voter fraud I have offered above are hypothetical.  Later in this report I describe research that seeks to estimate the rates at which various forms of voter fraud have occurred in recent American elections.

**28**     In my experience, most scholars of American election administration broadly consider voter fraud to consist of fraudulent actions taken by voters themselves and not by the individuals who supervise elections.  Henceforth, when I refer to voter fraud, I mean actions involving voters or intended voters themselves. In contrast, when in this report a particular example of fraud is associated with an election official or a poll worker, I am explicit about this so that there is no confusion over the type of person, official or voter, who perpetrated an alleged fraud.

## E.2    Evidence of voter fraud in the United States

**29**     The literature on the prevalence of voter fraud in American elections incorporates a variety of research methodologies.  This exemplifies triangulation, wherein multiple research approaches are brought to bear on a single problem.  If voter fraud in the United States is widespread, one would expect at least one of the methodologies in the literature to have detected evidence of it.

**30**     One methodology used in the study of voter fraud systematically tracks cases of alleged voter fraud in media reports and in official government documents. Examples of this methodology are Minnite and Callahan (2003), Minnite (2007), Levitt (2007), Minnite (2010), and Levitt (2014).

**31**     These studies conclude that rates of voter fraud in American elections are very low.

**32**     An illustrative example from Levitt (2014) is as follows.  Between the years 2000 and 2014, during which Levitt estimates that over one billion ballots were cast across general and primary elections in the United States, there were approximately 31 documented "incidents" involving voter fraud.[5]  The ratio of 31 to one billion is minuscule.

---

[5]Levitt defines "incident" very broadly, and thus conservatively.  A voter fraud incident is not necessarily a conviction for voter fraud. Levitt writes: "Some of these 31 incidents have been thoroughly investigated (including some

**33**     Minnite (2010) is likewise instructive in its coverage of voter fraud cases at the federal level (Chapter 3) and its analyses (Chapter 4) of fraud in four states (California, Minnesota, New Hampshire, and Oregon), among other things.  As noted above, Oregon's elections are effectively all-mail operations.

**34**     Using data from the United States Department of Justice (DOJ), Minnite finds very little evidence of voter fraud.  A September 2014 report published by the United States Government Accountability Office similarly concluded that, "[T]here were no apparent cases of in-person voter impersonation charged by DOJ's Criminal Division or by U.S. Attorney's offices anywhere in the United States, from 2004 through July 3, 2014" (p. 70).[6]

**35**     With respect to California, which is the most populous state in the country, Minnite draws a variety of conclusions.  One is that state officials investigate claims of voter fraud when they present themselves. While perhaps not surprising, this conclusion implies that findings of a lack of fraud across California elections are meaningful and do not simply reflect state elections officials' lack of interest in voter fraud.

**36**     Minnite concludes as well that approximately one-third of fraud allegations in California in her period of study did not lead to charges because they lacked evidence or suspects could not be identified; a second third of these allegations were dropped because no legal violation was found or a suspect was determined to lack criminal intent; and, of allegations that produced legal violations, the majority did not lead to criminal penalties, and only one-third of individuals determined to have committed a violation were actually found guilty of a crime. The modal voter fraud Minnite identified in California was fraudulent registration—as opposed to fraudulent voting of any type, either in-person voting or absentee voting.

---

prosecutions). But many have not. Based on how other claims have turned out, I'd bet that some of the 31 will end up debunked: a problem with matching people from one big computer list to another, or a data entry error, or confusion between two different people with the same name, or someone signing in on the wrong line of a pollbook."

   [6]See "Issues Related to State Voter Identification Laws," *United States Government Accountability Office*, September 2014, available at `https://www.gao.gov/assets/670/665966.pdf` (last accessed November 15, 2020).

**37**     Minnite studied Oregon as well, which is notable insofar as this state relies heavily on mail-in ballots. Based on her analysis, Minnite concludes that, "The evidence of voter fraud since Oregon adopted vote-by-mail, however, is practically non existent."

**38**     Another methodology in the study of fraud involves surveying election officials.  In the aftermath of the 2016 General Election, Famighetti, Keith and Pérez (2017) "interviewed a total of 44 administrators representing 42 jurisdictions in 12 states" (p. 1), inquiring about the prevalence of non-citizen voting. Famighetti, Keith and Pérez write that 40 jurisdictions reported "no known incidents of noncitizen voting in 2016" (p. 1). Moreover, they state that,

> "In the jurisdictions we studied, very few noncitizens voted in the 2016 election. Across 42 jurisdictions, election officials who oversaw the tabulation of 23.5 million votes in the 2016 general election referred only an estimated 30 incidents of suspected noncitizen voting for further investigation or prosecution.  In other words, improper noncitizen votes accounted for 0.0001 percent of the 2016 votes in those jurisdictions" (p. 1).

**39**     The "30 incidents" noted above represent an upper bound on the number of times that noncitizen voter fraud was committed in the jurisdictions studied by Famighetti, Keith and Pérez. These incidents, according to the researchers, do not represent voter fraud convictions. They represent only referrals.

**40**     Famighetti, Keith and Pérez write as well that, "In California, Virginia and New Hampshire – the states where [United States President Donald] Trump claimed the problem of noncitizen voting was especially acute – no official we spoke with identified an incident of noncitizen voting in 2016" (p. 2).

**41**     The study of voter fraud by Famighetti, Keith and Pérez is notable because it focused solely on the 2016 General Election.  Compared to preceding elections, it is well known that

the 2016 election and its aftermath were awash in fraud allegations. By focusing on such an election, Famighetti, Keith and Pérez's study biases itself toward finding evidence of voter fraud. Scientifically speaking, this is not what one would call a conservative bias; rather, the bias in Famighetti, Keith and Pérez's work pushes the study in the direction of finding evidence of a phenomenon of interest, here, voter fraud. Despite this bias, the rate of potential voter fraud described by Famighetti, Keith and Pérez is very small.

**42**     Huefner et al. (2007) constitutes another example of a study that involved efforts to reach out to election officials. This wide-ranging study details the electoral environments of five states (Illinois, Michigan, Minnesota, Ohio, and Wisconsin), and the authors write as follows:

> "On the whole, voting fraud is exceedingly rare. Although allegations of voting fraud have been widely publicized in the media, most all of these have evaporated upon closer investigation" (p. 120).

**43**     Still another approach in the voter fraud literature uses statistical tools in efforts to determine if patterns in election returns and voting records are consistent with public claims about the prevalence of voter fraud (Christensen and Schultz, 2014; Goel et al., 2020). Goel et al. is a study of double voting, and their analysis relies on an extensive database that contains approximately 104 million vote records. The particular question of interest to Goel et al. is whether the records show evidence of duplicates, i.e., of people who voted more than once in the 2012 General Election. This question is complicated because, when one has a database of millions of individuals, there will with virtual certainty be many cases of people with the same names and birthdates.[7]

**44**     Goel et al. conclude that, "[D]ouble voting is not currently carried out in such a systematic way that it presents a threat to the integrity of American elections" (p. 467). Goel et al. conclude

---

[7]Such a duplicate name problem arose in the 2016 General Election in North Carolina. Four individuals in the state were accused of having voted illegally, only to be exonerated when it was discovered that they had the same names as incarcerated felons. This example illustrates how innocuous coincidences can present themselves as voter fraud. See "Republicans claim 43 voters are ineligible felons. Many of them aren't," *The News & Observer*, November 23, 2016, available at `http://www.newsobserver.com/news/politics-government/election/article116789083.html` (last accessed November 15, 2020).

as well that measurement error in official election data could explain "a significant portion, if not all" of the cases of double voting that they identify.

45    By "measurement error," Goel et al. are referring to inaccuracies in turnout records. These inaccuracies can be the result of human recording errors, for example, in which a voting jurisdiction's record of one individual is mistakenly associated with the record of another.

46    With two academics, I published an article on voter fraud in the 2016 General Election. This article—Cottrell, Herron and Westwood (2018)—appears in *Electoral Studies*, a peer-reviewed, academic journal that focuses on elections. The article assesses the voter fraud allegations promulgated by Donald Trump and individuals associated with him.

47    My co-authors and I twice described some of our results in *The Washington Post*.[8] The first time was on December 2, 2016, and the second, on February 28, 2017.

48    In our article, my colleagues and I used statistical techniques to search for evidence of three types of fraud. In particular, we looked for:

I.    Evidence of widespread non-citizen voter fraud across counties in the United States.

II.   Evidence that election officials in the United States conspired against Donald Trump.

III.  Evidence that the 2016 General Election in New Hampshire was contaminated by residents of Massachusetts who, allegedly, traveled north on November 8, 2016, in order to cast illegal votes.

---

[8]Our short articles in *The Washington Post* are available at `https://www.washingtonpost.com/news/monkey-cage/wp/2016/12/02/we-checked-trumps-allegations-of-voter-fraud-we-found-no-evidence-at-all` and at `https://www.washingtonpost.com/news/monkey-cage/wp/2017/02/28/we-cant-find-any-evidence-of-voting-fraud-in-new-hampshire` (last accessed November 15, 2020).

**49**     With respect to the first two points above, my co-authors and I uncovered no evidence of widespread non-citizen voter fraud and no evidence that election officials in the United States conspired against Trump.  Our county-level consideration of three states mentioned post-election by Donald Trump—California, New Hampshire, and Virginia—also did not turn up evidence of widespread fraud (these states were also examined by the aforementioned Famighetti, Keith and Pérez (2017)).  With respect to the third point above, my co-authors and I found no evidence of illegal voting in New Hampshire.

**50**     My research project on voter fraud was initiated during the summer of 2016, months before the presidential election.  My co-authors and I are cognizant of the fact that establishing a negative is challenging, and we do not argue that our failure to uncover evidence of fraud surrounding the 2016 General Election conclusively proves that there was not voter fraud in that election.  Rather, what one can infer from my co-authored study on voter fraud is that its attempts to uncover evidence of widespread and systematic fraud were not successful.

**51**     The literature on voter fraud reviewed here is peer-reviewed, in most cases in publicly accessible journals and books, and in some cases is available online.  It incorporates a variety of different research designs and data sources.  Despite these differences, the contributions to the literature share a common finding: voter fraud in American elections is rare.[9]  While election scholars do not assert that the fraud rate in American elections is literally zero, no credible scholars working in this literature have concluded that voter fraud poses a threat to election integrity in the United States.

---

[9]One exception to the scholarly consensus about a lack of widespread voter fraud in the United States is Richman, Chattha and Earnest (2014), who derive estimates of non-citizen voting rates from the 2008 and 2010 waves of the Internet-based survey known as the Cooperative Congressional Election Study (CCES). Some CCES survey respondents indicated that, although they were non-citizens, they had voted in the 2008 General Election or in the 2010 Midterm Election.

Richman, Chattha and Earnest's (2014) claims about non-citizen voting would be dramatic if valid, and they would contradict effectively all of the studies on voter fraud discussed in this report. However, Ansolabehere, Luks and Schaffner (2015) show that it is virtually certain that Richman, Chattha and Earnest's results on non-citizen voting reflect survey measurement error, in particular, the incorrect classification of citizen CCES respondents as non-citizen respondents.

**52**     No evidence contradicting this finding was produced by a presidential commission on voter fraud established in the aftermath of the 2016 General Election and shut down on January 3, 2018. No official reports of widespread and systematic voter fraud have come to light based on the commission's work.[10]   Recently, Benjamin Ginsberg, a co-chair of the 2013 Presidential Commission on Election Administration, commented on the work of this commission, noting that, "[A]fter decades of looking for illegal voting, there's no proof of widespread fraud.  At most, there are isolated incidents – by both Democrats and Republicans."[11]

## E.3   Voter fraud and mail voting

**53**     There is no evidence that voter fraud rates associated with mail-in voting are systematically higher than voter fraud rates associated with other forms of voting and with other aspects of election administration.

**54**     Drawing on recent entries in a database of potential election irregularities developed by *The Heritage Foundation*, a study released by *The Brookings Institution* considers the prevalence of voter fraud specifically in the country's five all-mail states.[12]   The authors of this report identify 29 "fraudulent votes attempted by mail" out of 49,917,586 general election votes cast in the period under review.  The number 29 is approximately 0.000058 percent of 49,917,586.[13]

---

[10]On the origins and end of the presidential voter fraud commission, which offered no evidence that widespread fraud affected the 2016 General Election, see "Trump Closes Voter Fraud Panel That Bickered More Than It Revealed," *The New York Times*, January 4, 2018, available at https://www.nytimes.com/2018/01/04/us/voting-fraud-commission.html (last accessed November 15, 2020).

[11]For Mr. Ginsburg's comments on the lack of evidence about voter fraud in the United States, see "Republicans have insufficient evidence to call elections 'rigged' and 'fraudulent'," *The Washington Post*, September 8, 2020, available at https://www.washingtonpost.com/opinions/2020/09/08/republicans-have-insufficient-evidence-call-elections-rigged-fraudulent/ (last accessed November 15, 2020).  The 2013 Presidential Commission on Election Administration, on which Mr. Ginsburg served, is described at https://bipartisanpolicy.org/the-presidential-commission-on-election-administration/ (last accessed November 15, 2020).

[12]For the Heritage Foundation's database, see https://www.heritage.org/voterfraud (last accessed November 14, 2020).  My referencing this database should be not considered an endorsement of it.  I note it here because the database is the source for the cited *Brookings Institution* report.

[13]"Low rates of fraud in vote-by-mail states show the benefits outweigh the risks," *The Brookings Institution*, June 2, 2020, available at https://www.brookings.edu/blog/fixgov/2020/06/02/low-rates-of-fraud-in-vote-by-mail-states-show-the-benefits-outweigh-the-risks/ (last accessed November 12, 2020).

# F   Allegations in the Bromberg Declaration of voter fraud in Maricopa County

**55**     The allegations in the Bromberg Declaration about Maricopa County appear on pp. 14-15, in the Declaration's section titled "Maricopa Precinct Analysis."

## F.1   Precinct size and support for Joe Biden

**56**     In its analysis of Maricopa County, the Bromberg Declaration contains two figures, both of which plot candidate vote shares (in percentages) against precinct size. These figures constitute the entirety of the Declaration's evidence of fraud in Maricopa County.  In particular, Figure 18 in the Bromberg Declaration plots the vote percentages of Joe Biden, Donald Trump, and third party presidential candidates against precinct size, and Figure 19 is similar except it focuses only on aggregate third party presidential candidates.

**57**     Based on its Figure 18, the Bromberg Declaration asserts that, "The Biden percentage is higher in the smaller precincts, primarily at the expense of Trump. . . " (p. 14). As shown below, I do not dispute this rough characterization.

**58**     The Bromberg Declaration goes on to posit that the existence of this relationship "suggest[s] vote switching" (p. 14) and refers to the relationship between precinct size and Biden support as "an anomaly." By "vote switching," the Bromberg Declaration appears to mean a process in which legal votes for Donald Trump were switched to Joe Biden.  The Bromberg Declaration implicitly claims that this happened in Maricopa County precincts with relatively few voters.

## F.2   The Bromberg Declaration's theory about precinct size

**59**     The basis in the Bromberg Declaration for the claim that a relationship between precinct size and Biden support is evidence of vote switching can be found on p. 8: "But one could also

theorize the opportunity for cheaters to cheat in small precincts, where there may be less oversight." In other words, the Bromberg Declaration offers the theory that small precincts "may" have less oversight and that "cheaters" take advantage of this.

60      There is no evidence in Bromberg Declaration that Maricopa County precincts with fewer voters do in fact have less oversight; no evidence that election official staffing levels per voter are lower in smaller precincts than they are in larger precincts; no evidence that the physical layout of small precincts is different than the physical layout of large precincts; and in fact no evidence that small precincts in Maricopa County differ in any way whatsoever from the county's large precincts except for the fact that the former have fewer voters.

61      There is no evidence in the academic literature on voter fraud reviewed earlier in favor of the Bromberg Declaration's "theory" that small precincts are susceptible to voter fraud. Moreover, there are no citations in the Bromberg Declaration to peer-reviewed studies of the relationship between precinct size and voter fraud.

62      It is well known that the political affiliations of voters are not uniformly distributed across jurisdictions like counties. Some areas of counties (in particular, urban areas) have more Democratic voters, and other areas (those less urban), more Republican voters (e.g., Rodden, 2019). If precinct size measured by numbers of voters is correlated geographically with political preferences, this will induce a *spurious* relationship between precinct size and candidate vote shares within precincts. Spurious relationships are not evidence of voter fraud.

63      In its discussion of precinct size and the "theory" that small precincts are relatively prone to fraud, the Bromberg Declaration cites "An Electoral System in Crisis," a webpage dating to 2016 that claims to be an analysis of the Wisconsin recount that took place four years ago. The authors of this webpage argue that a relationship between precinct size and candidate vote totals indicates the presence of "irregularities" but provide no evidence at all in favor of this assertion outside of an

offhand comment that such a relationship is a "complete violation of the Law of Large Numbers."

**64** This assertion is nonsensical. The Law of Large Numbers in its standard form is a result in probability theory which states that independent samples from a common population converge to true population parameters as the number of observations increases. It is not clear in the Wisconsin recount webpage what units are being sampled and whether these units are drawn from the same population. The webpage's invocation of the Law of Large Numbers does not make any sense. The webpage does not provide any calculation that support its "complete violation" allegation – just rhetoric.

**65** In short, Bromberg Declaration asserts that a relationship between precinct size and Biden vote share is indicative of fraud, but there is no reason whatsoever to believe this and no evidence to support such a "theory."

## F.3 Whether small precincts are fraud-prone is irrelevant because Maricopa County used voting centers in the 2020 election

**66** Regardless of whether there is any evidence behind it, the "theory" in the Bromberg Declaration about precinct size and voter fraud is applicable to the study of Maricopa County in the 2020 election only to the extent that in-person voters in the county actually voted in their precincts. In fact, they did not do this.

**67** In the 2020 election, Maricopa County offered in-person voting at what are known as *voting centers*. A voting center is a location at which any eligible voter in the county may cast an in-person ballot. In particular, there were 175 voting centers in Maricopa County for the purposes of in-person voting during the 2020 General Election.[14]

---

[14]I downloaded the set of Maricopa County voting centers from `http://web.archive.org/web/20201104002036/https://recorder.maricopa.gov/pollingplacefiles/VotingSitesSchedule.xlsx` (last accessed December 4, 2020).

**68** The Maricopa County elections department informed the county's voters that, "There are **no** assigned locations" (bold in original) for voting in the 2020 election. See Appendix B, which displays text from the Maricopa County elections office webpage.

**69** Consequently, the author of the Bromberg Declaration has literally no idea where any of the ballots attributed to the county's precincts were actually cast. To make matters worse, the author appears not even to distinguish between in-person votes and ballots mailed in or submitted via drop boxes (and this distinction is in principle important insofar as the "theory" of voter fraud in the Bromberg Declaration that connects precinct size and fraud does not make sense when applied to votes not cast in-person).[15] In short, the number of votes associated with any given precinct in Maricopa County—and this is what is displayed in Figures 18 and 19 in the Bromberg Declaration—has no implications for how many ballots were actually cast in said precinct and thus, per the "theory" in the Bromberg Declaration, were ostensibly vulnerable to fraud.

**70** I downloaded precinct returns for the 2020 General Election from the Maricopa County elections department webpage.[16] There were 744 unique precinct names used in the 2020 election. Insofar as there were in this election 175 voting centers in Maricopa County, I know for certain that there is not a one-to-one match between the precincts and voting centers (not to mention the fact that the county's webpage was explicit that voters could cast in-person ballots in any voting center that they wished).

## F.4 Precinct size and support for Democratic candidates

**71** Figure 1 displays the relationship between precinct size (horizontal axis) and support for Democratic candidates (vertical axis). Each point in the figure denotes a single precinct in Maricopa County. The figure's left panel is for the United States presidential contest, and in this panel

[15] Because the author of Bromberg Declaration has not, to the best of my knowledge, disclosed his computer code, I cannot be entirely what he did to produce his Figures 18 and 19. However, the text of Bromberg Declaration refers generically to precinct "size," which I take to mean, the number of votes cast in the precinct.

[16] These returns are available at `https://recorder.maricopa.gov/media/ArizonaExportByPrecinct_110320.txt` (last accessed December 3, 2020).

Democratic vote share means, Joe Biden's vote share. In Figure 1's right panel, Democratic vote share for the United State Senate race means, Mark Kelly's vote share.

Figure 1: Democratic candidate support and turnout by precinct



**72**     Both panels of Figure 1 have superimposed linear regression lines to ease interpretation. These lines are sloped down, indicating that precincts in Maricopa County with greater voter turnout had lower Biden vote share (left panel) and lower Kelly vote share (right panel).

**73**     The key implication of Figure 1 is the similarly between its two panels. They are, evidently, virtually identical. This suggests that the relationship between turnout and Democratic vote share across Maricopa County precincts reflects established political preference in the county—not vote switching that affected the 2020 presidential contest.

**74**     More evidence to this effect is apparent in Figure 2, which plots Joe Biden and Mark Kelly vote shares against each other. Each point in the figure is again a precinct where the size of each

point is proportional to overall precinct turnout.

Figure 2: Joe Biden and Mark Kelly support rates by precinct



**75**      Figure 2 has a dashed 45-degree line superimposed on it.  Points *above* the line connote precincts where Mark Kelly's vote share was greater than Joe Biden's; points *below* the line connote precincts where Joe Biden's vote share was greater than Mark Kelly's; and, points on the line connote precincts where Joe Biden's vote share was equal to Mark Kelly's.

**76**      The points in Figure 2 show that precincts in Maricopa County where Joe Biden did well (upper right of the figure) are also precincts where Mark Kelly did well.  And, precincts in Maricopa County where Joe Biden did less well (lower left) are similarly precincts where Mark Kelly did not do well.  This clear regularity suggests that the relationship noted in the Bromberg Declaration between precinct turnout and Biden vote share is spurious and has nothing to do with voter fraud.  Rather, the distribution of precincts across the county is such that smaller ones (namely, those with lower turnout in the 2020 election) tended to be consistently Democratic.  There is noth-

ing anomalous about this correlation between political preferences and geography and nothing irregular.

# G   Allegations in the Bromberg Declaration of voter fraud beyond Arizona

**77**    Most of claims in the Bromberg Declaration do not directly concern Arizona, instead speaking to alleged voter fraud in Georgia (pp. 4-5), Pennsylvania (pp. 5-6) and Milwaukee, Wisconsin (pp. 6-8).

**78**    The number of fraudulent votes claimed in Bromberg Declaration is extensive. For example, the Declaration claims "that 105,639 fraudulent Biden ballots were added between Wednesday and Thursday of 11/05/2020 in Milwaukee alone" (p. 8). Total turnout in Milwaukee was 315,483 voters,[17] meaning that the Bromberg Declaration asserts that roughly one-third of Milwaukee's ballots were contaminated by fraud. There is nothing remotely close to a result like this in the literature on voter fraud that I have surveyed above.

**79**    None of what follows bears directly on the Bromberg Declaration's discussion of Maricopa County. However, the material below is nonetheless notable insofar as it shows that literally all of the claims in the Declaration about voter fraud—and not simply those concerning Arizona—do not follow from the analysis in the Declaration.

## G.1   A model of voting and voter fraud

**80**    The Bromberg Declaration offers what its author calls two models of candidate vote share. One model assumes that there is no voter fraud (see equation (2) in the Declaration) and the second

---

[17]"SUMMARY REPORT," *City of Milwaukee Election Commission*, December 6, 2020, `https://city.milwaukee.gov/election/ElectionInformation/ElectionResults` (last accessed December 4, 2020).

that there is a form of voter fraud in which a some votes are switched from one candidate to another (see equation (3)). Henceforth I refer to a singular model in the Bromberg Declaration, by which I mean both the no-fraud and fraud-based models mentioned in this paragraph.

**81**     Two key assumptions render the model in the Bromberg Declaration of no use in the study of voter fraud.

## G.2   An arbitrary assumption for the prior probability of fraud

**82**     Key to the technical exposition of the model in Bromberg Declaration is a parameter called $p_F$ that denotes what is called the "prior probability of fraud." Intuitively, this prior probability of fraud is the probability of fraud in a jurisdiction that one would have assumed before (i.e., *prior* to) an election.

**83**     The Bromberg Declaration assumes that $p_F = 0.01$, meaning that there is a one percent chance of vote switching in a jurisdiction (p. 3).

**84**     The Bromberg Declaration provides no explanation, no justification, and no citations for its assumption about the likelihood of fraud. The number 0.01 is simply invented.

**85**     Sometimes scholars must make assumptions in their research. However, it is incumbent on such researchers to explore the consequences of their assumptions and to see if their results depend on a particular assumption or are robust to alternative assumptions. No such robustness checks appear in the Bromberg Declaration. I cannot conduct any robustness checks because, to the best of my knowledge, no computer code associated with the Declaration has been disclosed. Thus, the arbitrariness of the prior fraud parameter in Bromberg Declaration undermines any value that the model could have had.

### G.3   Changes in candidate support among absentee ballots do not constitute

**86**      Underlying the model in Bromberg Declaration is the implicit assumption that there is no correlation between the timing of when a set of ballots was counted in November 2020 and the presidential votes on these ballots.  The model, when it encounters temporal changes in a jurisdiction's presidential candidate support (i.e., ten hours after polls closed on November 3, Joe Biden's support changes from 42 percent to 44 percent) attributes these changes to fraud.

**87**      Intuitively speaking, this is because the model does not allow for the possibility that ballot counting is not completed uniformly across a jurisdiction, like a state.  For example, the model rules out (with the exception of fraud) the possibility that ballots counted in the immediate aftermath of an election are different than those counted 24 hours later.

**88**      This assumption is contrary to what is known about contemporary American elections.  In particular, Foley (2013) and Foley and Stewart III (2020) document what they call a "blue shift" in which a state's presidential results shift in the days after an election in a Democratic direction. The Bromberg Declaration is written as if the blue shift phenomenon simply does not exist.

**89**      The 2020 election was historic in its heavy use of mail-in ballots.  However, Democrats were more likely to vote via mail than Republicans, and this was known well before November 3.[18]  Give that some states counted absentee ballots in the days after November 3 (in particular Pennsylvania), this feature of the 2020 election certainly exaggerated the blue shift compared to what one would have expected had ballots been case in 2020 like they were in 2016.[19]

**90**      Ignoring the issue regarding the technical assumption about the prior fraud parameter noted above, the results in the Bromberg Declaration about Georgia, Pennsylvania, and Milwaukee, Wis-

---

[18]See "Huge Absentee Vote in Key States Favors Democrats So Far," *The New York Times*, October 10, 2020, available at `https://www.nytimes.com/2020/10/10/us/politics/early-voting-swing-states.html` (last accessed December 4, 2020).

[19]On Pennsylvania, see "Why Pennsylvania is still counting votes after Election Day," *ABCNews*, November 3, 2020, available at `https://abcnews.go.com/Politics/pennsylvania-counting-votes-election-day/story?id=73993649` (last accessed December 4, 2020).

consin are not examples of fraud. They can be easily rationalized by the blue shift.

## G.4   Concluding thoughts about analyses beyond Arizona

**91**     Earlier I noted that the part of Bromberg Declaration that engages states other than Arizona does not bear directly on the claims made in this litigation.  Nonetheless, I have now explained that all the Declaration's claims about voter fraud rest on false assumptions, either an assumption about a "theory" relating precinct size and presidential vote share (no such theory exists) or an assumption that when a ballot is counted is orthogonal to the presidential vote on it (which is known not to be the case).

**92**     None of the claims in Bromberg Declaration about voter fraud—and not simply those concerning Arizona—follow from the arguments made in the Declaration.

# H     Conclusion

**93**     This report evaluates the contention in the Bromberg Declaration that there was voter fraud in Maricopa County, Arizona in the 2020 presidential election.

**94**     The contention relies on a "theory" that does not exist and a misunderstanding of how in-person voting proceeded in Maricopa County county this past November.  Namely, the Bromberg Declaration assumes that voters in the county cast in-person ballots in their precincts (of which there were 744), but in reality they did not, voting in-person in voting centers (of which there were 175).  This misunderstanding of how Maricopa County voters cast ballots is a fatal flaw to the Declaration's analysis of the county, which was already flawed based on its reliance on a non-existent theory.  In short, Bromberg Declaration contains no evidence whatsoever that there were any fraudulent ballots cast in Maricopa County in the 2020 General Election.

**95**      The Bromberg Declaration also contains no evidence whatsoever that there were any fraud-
ulent ballots cast in Georgia, Pennsylvania, and the Milwaukee, Wisconsin.  Its claims of voter
fraud in these locales rest on a faulty assumption that when a ballot is counted has no bearing on
the presidential candidate supported on it.  In fact, it is known that ballots counted later in presiden-
tial elections tend to be Democratic, and this fact undermines the Bromberg Declaration's analysis
of Georgia, Pennsylvania, and Milwaukee, Wisconsin.

# References

Ansolabehere, Stephen, Samantha Luks and Brian F. Schaffner. 2015. "The perils of cherry picking low frequency events in large sample surveys." *Electoral Studies* 40:409–410.

Christensen, Ray and Thomas J. Schultz. 2014. "Identifying Election Fraud Using Orphan and Low Propensity Voters." *American Politics Research* 42(2):311–337.

Cottrell, David, Michael C. Herron and Sean J. Westwood. 2018. "An Exploration of Donald Trump's Allegations of Massive Voter Fraud in the 2016 General Election." *Electoral Studies* 51(1):123–142.

Famighetti, Christopher, Douglas Keith and Myrna Pérez. 2017. "NONCITIZEN VOTING: THE MISSING MILLIONS." Report published by the Brennan Center for Justice at *New York University School of Law*.

Foley, Edward B. 2013. "A big blue shift: Measuring an asymmetrically increasing margin of litigation." *Journal of Law and Politics* 24:501–544.

Foley, Edward B. and Charles Stewart III. 2020. "Explaining the Blue Shift in Election Canvassing." Unpublished working paper.
   **URL:** *https://ssrn.com/abstract=3547734*

Goel, Sharad, Marc Meredith, Michael Morse and David Rothschild. 2020. "One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections." *American Political Science Review* 114(2):456–469.

Herron, Michael C. 2019. "Mail-In Absentee Ballot Anomalies in North Carolina's 9th Congressional District." *Election Law Journal* 18(3):191–213.

Huefner, Steven F., Daniel P. Tokaji, Edward B. Foley and Nathan A. Cemenska. 2007. "From Registration to Recounts: The Election Ecosystems of Five Midwestern States." Report published by *Election Law@Moritz*, The Ohio State University, Moritz College of Law.

Levitt, Justin. 2007. "The truth about voter fraud." Report published by the Brennan Center for Justice at *New York University School of Law*.

Levitt, Justin. 2014. "A comprehensive investigation of voter impersonation finds 31 credible incidents out of one billion ballots cast." *Washington Post*, August 6.
**URL:** *https://www.washingtonpost.com/news/wonk/wp/2014/08/06/a-comprehensive-investigation-of-voter-impersonation-finds-31-credible-incidents-out-of-one-billion-ballots-cast*

Minnite, Lori and David Callahan. 2003. "Securing the Vote: An Analysis of Election Fraud." Report published by Demos.

Minnite, Lorraine. 2007. "Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security." Report published by Demos.
**URL:** *http://www.demos.org/sites/default/files/publications/edr_fraud.pdf*

Minnite, Lorraine C. 2010. *The Myth of Voter Fraud*. Ithaca, NY: Cornell University.

Richman, Jesse T., Gulshan A. Chattha and David C. Earnest. 2014. "Do non-citizens vote in U.S. elections?" *Electoral Studies* 36:149–157.

Rodden, Jonathan. 2019. *Why Cities Lose: The Deep Roots of the Urban-Rural Political Divide*. New York, NY: Basic Books.

# A  *curriculum vitae* of Michael C. Herron

## Michael C. Herron

| | |
|---|---|
| Dartmouth College | Phone:     +1 (603) 646-2693 |
| Department of Government | Mobile:    +1 (603) 359-9731 |
| 6108 Silsby Hall | Email:     michael.c.herron@dartmouth.edu |
| Hanover, NH 03755-3547 | Homepage:  http://www.dartmouth.edu/˜herron |

### Academic appointments

William Clinton Story Remsen 1943 Professor, Department of Government, Dartmouth College.  July 2013–present.

Chair, Program in Quantitative Social Science, Dartmouth College. July 2015–June 2020.

Visiting Scholar, Hertie School of Governance, Berlin, Germany. August 2016–July 2017.

Chair, Program in Mathematics and Social Sciences, Dartmouth College. July 2014– June 2015.

Professor, Department of Government, Dartmouth College. July 2009–June 2013.

Visiting Professor of Applied Methods, Hertie School of Governance, Berlin, Germany. August 2011– August 2012.

Associate Professor, Department of Government, Dartmouth College. July 2004–June 2009.

Visiting Associate Professor, Department of Government, Harvard University. July 2008–January 2009.

Visiting Associate Professor, Wallis Institute of Political Economy, University of Rochester. September 2006–December 2006.

Visiting Assistant Professor, Department of Government, Dartmouth College. July 2003–June 2004.

Assistant Professor, Department of Political Science, Northwestern University. September 1997–June 2004.

Faculty Associate, Institute for Policy Research, Northwestern University. September 2002–June 2004.

### Education

PhD Business (Political Economics), Stanford University, January 1998.
*Dissertation*: Political Uncertainty and the Prices of Financial Assets
*Committee*: David Baron, Darrell Duffie, Douglas Rivers, and Barry Weingast

MS Statistics, Stanford University, June 1995.

MA Political Science, University of Dayton, August 1992.

BS Mathematics and Economics, with University Honors, Carnegie Mellon University, May 1989.

## Fellowships

Elizabeth R. and Robert A. Jeffe 1972 Fellowship, Dartmouth College. September 2010–June 2011.

Fulbright Scholar Program fellowship for research and teaching at the Heidelberg Center for American Studies, Heidelberg University, September 2009 - February 2010 (declined).

Post–doctoral Research Fellow, Center for Basic Research in the Social Sciences, Harvard University. September 2000–August 2001.

## Publications

*Journal articles*

"Postal Delivery Disruptions and the Fragility of Voting by Mail: Lessons from Maine" (with Daniel A. Smith). Forthcoming, *Research & Politics*.

"Voting lines, equal treatment, and early voting check-in times in Florida" (with David Cottrell and Daniel A. Smith). Forthcoming, *State Politics & Policy Quarterly*, and available at `https://journals.sagepub.com/doi/10.1177/1532440020943884`.

"Voting by Mail and Ballot Rejection: Lessons from Florida for Elections in the Age of the Coronavirus" (with Anna Baringer and Daniel A. Smith). *Election Law Journal* 19(3): 289-320. 2020.

"Early voting changes and voter turnout: North Carolina in the 2016 General Election" (with Hannah L. Walker and Daniel A. Smith). *Political Behavior* 41(4): 841-869. 2019.

"Mail-in absentee ballot anomalies in North Carolina's 9th Congressional District." *Election Law Journal* 18(3): 191-213. 2019.

"Relative age effects in American professional football" (with Jack F. Heneghan). *Journal of Quantitative Analysis in Sports* 15(3): 185-202. 2019.

"Mortality, Incarceration, and African-American Disenfranchisement in the Contemporary United States" (with David Cottrell, Javier M. Rodriguez, and Daniel A. Smith). *American Politics Research* 47(2): 195-237. 2019.

"Pedagogical Value of Polling Place Observation By Students" (with 31 co-authors). *PS: Political Science & Politics* 51(4): 831-847. 2018.

"All in the family: German twin finishing times in the 2016 women's Olympic marathon" (with David Cottrell). CHANCE 31(3): 20-28. 2018.

"An Exploration of Donald Trump's Allegations of Massive Voter Fraud in the 2016 General Election" (with David Cottrell and Sean J. Westwood). *Electoral Studies* 51(1): 123-142. 2018.

"Student Sorting and Implications for Grade Inflation (with Zachary D. Markovich). *Rationality and Society* 29(3): 355-386. 2017.

"Race, *Shelby County*, and the Voter Information Verification Act in North Carolina" (with Daniel A. Smith). *Florida State University Law Review* 43: 465-506. 2016.

"Precinct Resources and Voter Wait Times" (with Daniel A. Smith). *Electoral Studies* 42(2): 249-263. 2016.

"A Careful Look at Modern Case Selection Methods" (with Kevin M. Quinn). *Sociological Methods & Research* 45(3): 458-492. 2016.

"Precinct Closing and Wait Times in Florida during the 2012 General Election" (with Daniel A. Smith). *Election Law Journal* 14(3): 220-238. 2015.

"Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election" (with Daniel A. Smith). *Political Research Quarterly* 67(3): 646-665. 2014.

"The Effects of House Bill 1355 on Voter Registration in Florida" (with Daniel A. Smith). *State Politics & Policy Quarterly* 13(3): 279-305. 2013.

"Blacks, Hispanics, and Whites: A Study of Race-based Residual Vote Rates in Chicago." *American Politics Research* 41(2): 203-243. 2013.

"Alvin Greene? Who? How did he win the United States Senate nomination in South Carolina?" (with Joseph Bafumi, Seth J. Hill, and Jeffrey B. Lewis). *Election Law Journal* 11(4): 358-379. 2012.

"Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355" (with Daniel A. Smith). *Election Law Journal* 11(3): 331-347. 2012.

"Leapfrog Representation and Extremism: A Study of American Voters and their Members in Congress" (with Joseph Bafumi). *American Political Science Review* 104(3): 519-542. 2010.

"Economic Crisis, Iraq, and Race: A Study of the 2008 Presidential Election" (with Seth J. Hill and Jeffrey B. Lewis). *Election Law Journal* 9(1): 41-62. 2010

"Prejudice, Black Threat, and the Racist Voter in the 2008 Presidential Election" (with Joseph Bafumi). *Journal of Political Marketing* 8(4): 334-348. 2009.

"Voting Technology and the 2008 New Hampshire Primary" (with Walter R. Mebane, Jr., and Jonathan N. Wand). *William & Mary Bill of Rights Journal* 17(2): 351-374. 2008.

"Ballot Formats, Touchscreens, and Undervotes: A Study of the 2006 Midterm Elections in Florida" (with Laurin Frisina, James Honaker, and Jeffrey B. Lewis). *Election Law Journal* 7(1): 25-47. 2008.

"Gerrymanders and Theories of Lawmaking: A Study of Legislative Redistricting in Illinois" (with Alan E. Wiseman). *Journal of Politics* 70(1): 151-167. 2008.

"Estimating the Effect of Redistricting on Minority Substantive Representation" (with David Epstein, Sharyn O'Halloran, and David Park). *Journal of Law, Economics, and Organization* 23(2): 499-518. 2007.

"Did Ralph Nader Spoil Al Gore's Presidential Bid? A Ballot-Level Study of Green and Reform Party Voters in the 2000 Presidential Election" (with Jeffrey B. Lewis). *Quarterly Journal of Political Science* 2(3): 205-226. 2007.

"Assessing Partisan Bias in Voting Technology: The Case of the 2004 New Hampshire Recount" (with Jonathan N. Wand). *Electoral Studies* 26(2): 247-261. 2007.

"Term Limits and Pork" (with Kenneth W. Shotts). *Legislative Studies Quarterly* 31(3): 383-404. 2006.

"Black Candidates and Black Voters: Assessing the Impact of Candidate Race on Uncounted Vote Rates" (with Jasjeet S. Sekhon). *Journal of Politics* 67(1): 154–177. 2005.

"Government Redistribution in the Shadow of Legislative Elections: A Study of the Illinois Member Initiatives Grant Program" (with Brett A. Theodos). *Legislative Studies Quarterly* 24(2): 287–312. 2004.

"Studying Dynamics in Legislator Ideal Points: Scale Matters." *Political Analysis* 12(2): 182–190. 2004.

"Logical Inconsistency in EI-based Second Stage Regressions" (with Kenneth W. Shotts). *American Journal of Political Science* 48(1): 172–183. 2004.

"Overvoting and Representation: An examination of overvoted presidential ballots in Broward and Miami-Dade Counties" (with Jasjeet S. Sekhon). *Electoral Studies* 22: 21–47. 2003.

"Using Ecological Inference Point Estimates as Dependent Variables in Second Stage Linear Regressions" (with Kenneth W. Shotts). *Political Analysis* 11(1): 44–64. 2003.

"Cross-contamination in EI-R" (with Kenneth W. Shotts). *Political Analysis* 11(1): 77–85. 2003.

"A Consensus on Second Stage Analyses in Ecological Inference Models" (with Christopher Adolph, Gary King, and Kenneth W. Shotts). *Political Analysis* 11(1): 86–94. 2003.

"The Butterfly Did It: The Aberrant Vote for Buchanan in Palm Beach County, Florida" (with Jonathan N. Wand, Kenneth W. Shotts, Jasjeet S. Sekhon, Walter R. Mebane, Jr., and Henry E. Brady). *American Political Science Review* 95(4): 793–810. 2001.

"Interest Group Ratings and Regression Inconsistency." *Political Analysis* 9(3): 260–274. 2001.

"Leadership and Pandering: A Theory of Executive Policymaking" (with Brandice Canes–Wrone and Kenneth W. Shotts). *American Journal of Political Science* 45(3): 532–550. 2001.

"Law and Data: The Butterfly Ballot Episode" (with Henry E. Brady, Walter R. Mebane, Jr., Jasjeet S. Sekhon, Kenneth W. Shotts, and Jonathan N. Wand). *PS: Political Science & Politics* 34(1): 59–69. 2001.

"Cutpoint–Adjusted Interest Group Ratings." *Political Analysis* 8(4): 346–366. 2000.

"Estimating the Economic Impact of Political Party Competition in the 1992 British Election." *American Journal of Political Science* 44(2): 326–337. 2000.

"Artificial Extremism in Interest Group Ratings and the Preferences versus Party Debate." *Legislative Studies Quarterly* 24(4): 525–542. 1999.

"Post–Estimation Uncertainty in Limited Dependent Variable Models." *Political Analysis* 8(1): 83–98. 1999.

"Measurement of Political Effects in the United States Economy: A Study of the 1992 Presidential Election" (with James Lavin, Donald Cram, and Jay Silver). *Economics & Politics* 11(1): 51–81. 1999.

"The Influence of Family Regulation, Connection, and Psychological Autonomy on Six Measures of Adolescent Functions" (with Melissa R. Herman, Sanford M. Dornbusch, and Jerald R. Herting). *Journal of Adolescent Research* 12(1): 34–67. 1997.

## Book chapters

"Wait Times and Voter Confidence: A Study of the 2014 General Election in Miami-Dade County" (with Daniel A. Smith, Wendy Serra, and Joseph Bafumi). In *Races, Reforms, & Policy: Implications of the 2014 Midterm Elections*, Christopher J. Galdieri, Tauna S. Sisco, and Jennifer C. Lucas, eds. Akron, OH: University of Akron Press. 2017.

"A Dynamic Model of Multidimensional Collective Choice" (with David P. Baron). In *Computational Models in Political Economy*, Ken Kollman, John H. Miller, and Scott E. Page, eds. Cambridge, MA: The MIT Press. 2003.

"Law and Data: The Butterfly Ballot Episode" (with Henry E. Brady, Walter R. Mebane Jr., Jasjeet Singh Sekhon, Kenneth W. Shotts, and Jonathan Wand). In *The Longest Night: Polemics and Perspectives on Election 2000*, Arthur J. Jacobson and Michel Rosenfeld, eds. Berkeley: University of California Press. 2002.

## Book reviews

*The Timeline of Presidential Elections: How Campaigns Do (and Do Not) Matter*, Robert S. Erikson and Christopher Wlezien. *Political Science Quarterly* 128(3): 552-553. 2013.

*Voting Technology: The Not-So-Simple Act of Casting a Ballot*, Paul S. Herrnson, Richard G. Niemi, Michael J. Hanmer, Benjamin B. Bederson, and Frederick C. Conrad. *Review of Policy Research* 25(4): 379-380. 2008.

## Other publications

"In two political battlegrounds, thousands of mail-in ballots are on the verge of being rejected" (with Daniel A. Smith). *The Conversation*, October 23, 2020. Available at `https://theconversation.com/in-two-political-battlegrounds-thousands-of-mail-in-ballots-are-on-the-verge-of-being-rejected-148616`.

"Rejected mail ballots pile up in Florida" (with Daniel A. Smith). *Tampa Bay Times*, October 16, 2020. Available at `https://www.tampabay.com/opinion/2020/10/16/rejected-mail-ballots-pile-up-in-florida-column`.

"Minor postal delays could disenfranchise thousands of Florida vote-by-mail voters" (with Daniel A. Smith). *Tampa Bay Times*, August 14, 2020. Available at `https://www.tampabay.com/opinion/2020/08/14/minor-postal-delays-could-disenfranchise-thousands-of-florida-vote-by-mail-voters-column`.

"Want to know how many people have the coronavirus? Test randomly" (with Daniel N. Rockmore). *The Conversation*, April 13, 2020. Available at `https://theconversation.com/want-to-know-how-many-people-have-the-coronavirus-test-randomly-135784`.

"If more states start using Ohio's system, how many voters will be purged?" (with Daniel A. Smith). *The Washington Post*, Monkey Cage, June 17, 2018.

"Do we have a right not to vote? The Supreme Court suggests we don't" (with Daniel A. Smith). *New York Daily News*, June 12, 2018.

"Nearly 4 million black voters are missing. This is why" (with David Cottrell, Javier M. Rodriguez, and Daniel A. Smith). *The Washington Post*, Monkey Cage, April 11, 2018.

"We can't find any evidence of voting fraud in New Hampshire" (with David Cottrell and Sean Westwood). *The Washington Post*, Monkey Cage, February 28, 2017.

"We checked Trump's allegations of voter fraud. We found no evidence at all" (with David Cottrell and Sean Westwood). *The Washington Post*, Monkey Cage, December 2, 2016.

"High ballot rejection rates should worry Florida voters" (with Daniel A. Smith). *Tampa Bay Times*, October 28, 2012.

"Logistic Regression." *The Encyclopedia of Political Science*, George Thomas Kurian, James E. Alt, Simone Chambers, Geoffrey Garrett, Margaret Levi, and Paula D. McClain, eds., Washington, D.C.: CQ Press. 2010.

"Using XEmacs Macros to Process ASCII Data Files." *The Political Methodologist* 13(2): 13–18. 2005.

"Ohio 2004 Election: Turnout, Residual Votes and Votes in Precincts and Wards" (with Walter R. Mebane, Jr.), in "Democracy At Risk: The 2004 Election in Ohio," report published by the Democratic National Committee. 2005.

"Poisson Regression." *The Encyclopedia of Social Science Research Methods*, Alan Bryman, Michael Lewis-Beck, and Tim Futing Liao, eds. Thousand Oaks, CA: Sage Publications, 2003.

"Pork barrel race to the bottom" (with Brett A. Theodos). *Illinois Issues* 29(2): 22–23. 2003.

"Teaching Introductory Probability Theory." *The Political Methodologist* 10(2): 2–4. 2002.

"Ballot cost Gore thousands of votes" (with Henry E. Brady and Jonathan N. Wand). *The San Diego Union–Tribune*, p. G3, November 19, 2000.

## Work in progress

"Residual votes in the 2020 election in Georgia" (with David Cottrell, Felix E. Herron, and Daniel A. Smith).

"Vote-by-mail ballot rejection and experience with mail-in voting" (with David Cottrell and Daniel A. Smith).

"Did ballot design oust an incumbent senator? A study of the 2018 midterm election in Florida" (with Michael D. Martinez and Daniel A. Smith).

## Awards

Best Paper Award, State Politics and Policy Section, 2013 Annual Meeting of the American Political Science Association. *Getting Your Souls to the Polls: The Racial Impact of Reducing Early In-Person Voting in Florida* (with Daniel A. Smith).

## Grants

Committee for Scholarly Innovation and Advancement Awards, Dartmouth College, February, 2014. Project title: "The Dynamics of Voting Lines in Miami-Dade County." Financial support: $32,000.

The Rockefeller Center for Public Policy and the Social Sciences, Dartmouth College, May, 2006. Project title: "Large Scale Survey of Americans in Multiple Congressional Districts." Financial support: $8,500.

National Science Foundation, SES-041849, July, 2004. Project title: "A Ballot-Level Study of Intentional and Unintentional Abstention in Presidential Election Voting." Financial support: $65,749.

Nelson A. Rockefeller Center for the Social Sciences, Dartmouth College, January, 2004. Project title: "Intentional Invalid Votes in Leon County, Florida." Financial support: $1,115.

American Enterprise Institute, August, 1999. Project title: "Tenure in Office and Congressional Voting" (with Kenneth W. Shotts). Financial support: $182,500.

University Research Grants Committee, Northwestern University, February, 1999. Project Title: "Representation, Policy Uncertainty, and Divided Government." Financial support: $4,087.

Stanford University Graduate School of Business, 1997–1998 Academic Year. Dissertation Research Grant.

*Michael C. Herron* 7

## Recent conference presentations

"Ballot design, voter intentions, and representation: A study of the 2018 midterm election in Florida," 2019 Annual Meeting of the American Political Science Association, Washington, DC.

"Ballot design, voter intentions, and representation: A study of the 2018 midterm election in Florida," Election Sciences, Reform, and Administration conference, 2019, University of Pennsylvania.

"Did ballot design oust an incumbent senator?  A study of the 2018 midterm election in Florida," Congressional Elections & the Presidency:  Politics in 2018, March 30, 2019, Saint Anselm College, Manchester NH.

"Estimating the Differential Effects of Purging Inactive Registered Voters," 2018 Annual Meeting of the American Political Science Association, Boston MA.

"Estimating the Differential Effects of Purging Inactive Registered Voters," Election Sciences, Reform, and Administration conference, 2018, University of Wisconsin-Madison.

Keynote address, "Mortality, Incarceration, and African-American Disenfranchisement," *Balancing the Scales: The United States in an Age of Inequality*, November 11, 2016, John F. Kennedy Institute, Freie Universität Berlin.

"Missing Black Men and Representation in American Political Institutions," 2016 Annual Meeting of the Midwest Political Science Association, Chicago, IL.

## Invited seminars

| | |
|---|---|
| University of Iowa, 1999 | University of Mannheim, 2011 |
| Boston University, 2000 | University of Heidelberg, 2011 |
| Dartmouth College, 2000 | University of Passau, 2012 |
| Harvard University, 2000 | University of Göttingen, 2012 |
| University of Minnesota, 2000 | Freie Universität Berlin, 2012 |
| University of Rochester, 2000 | Laval University, 2012 |
| University of Wisconsin, Madison, 2000 | University of Montreal, 2012 |
| Yale University, 2000 | Middlebury College, 2013 |
| Columbia University, 2001 | University of Illinois, Champaign, 2013 |
| University of California, Berkeley, 2002 | University of Illinois, Chicago, 2013 |
| University of Illinois, 2002 | University of Wisconsin, Madison, 2013 |
| Brown University, 2003 | Yale University, 2014 |
| Temple University, 2003 | University of Virginia, 2015 |
| University of Chicago, 2003 | University of California, San Diego, 2015 |
| New York University, 2004 | American University, 2015 |
| Princeton University, 2004 | Massachusetts Institute of Technology, 2015 |
| University of Michigan, 2005 | Princeton University, 2015 |
| George Washington University, 2006 | University of California, Los Angeles, 2016 |
| Emory University, 2006 | The Ohio State University, 2016 |
| Harvard University, 2007 | Freie Universität Berlin, 2016 |
| Loyola Law School, 2007 | Deutsch-Amerikanisches Institut, Nürnberg, 2017 |
| Columbia University, 2007 | Universität Bonn, 2018 |
| University of Chicago, 2007 | Freie Universität Berlin, 2018 |
| Yale University, 2007 | Northwestern University, 2018 |
| Stanford University, 2008 | University of Pittsburgh, 2019 |
| Columbia University, 2008 | University of Salzburg, 2019 |
| Northwestern University, 2008 | Universität Bonn, 2019 |
| Princeton University, 2008 | Freie Universität Berlin, 2019 |
| Duke University, 2009 | Humboldt University, 2019 |
| Hertie School of Governance, 2010 | University of North Carolina, Charlotte, 2019 |
| Emory University, 2010 | |

## Professional activities

Division Chair, Representation and Electoral Systems, 2017 Annual Meeting of the Midwest Political Science Association.

Associate Editor, *Research & Politics*. November, 2016–present.

Editorial Board, *American Politics Research*, September, 2015–present.

Editorial Board, *Political Analysis*, January, 2010–present.

Editorial Board, *USENIX Journal of Election Technology and Systems*, March 2013–June 2016.

Editorial Board, *American Political Science Review*, 2010–2012.

Editorial Board, *American Journal of Political Science*, 2006–2009.

"Race, Voting Procedures, and New Developments in Voting Rights," panel organized for the 2013 Annual Meeting of the Midwest Political Science Association.

Division Chair, Formal Theory, 2007 Annual Meeting of the American Political Science Association.

Co-editor, *The Political Methodologist*, Fall 2004–Spring 2006.

Publications Committee, Society for Political Methodology, 2005–2006, 2015–present.

## Dartmouth College activities

Chair, American Politics Search Committee, Department of Government, August 2018–March 2019.

Chair, Committee on Priorities, July 2015–June 2016.

Committee on Priorities, July 2013–June 2015, Fall 2019–present.

American politics search committee, Department of Government, August 2014–December 2014.

Research Computing Director search committee, October 2013–October 2014.

Senior Search Committee, Department of Government, 2013.

Research Computing Advisory Committee, Spring 2013.

Chair, American Politics Search Committee, Department of Government, 2012-2013.

Recruitment Planning Committee, Department of Government, 2010 and 2012-2013.

Committee on Standards, 2008-2010.

Task Force on Collaboration and Social Software, 2007-2008.

Biostatistics search committee, Dartmouth Medical School, 2006-2007.

Research Computing Oversight Committee, 2006.

Council on Computing, 2005-2007.

Clement Chair search committee, Department of Government, 2005-2006.

## Northwestern University activities

Program Committee, Mathematical Methods in the Social Sciences, 2001-2002.

American Politics Search Committee, Department of Political Science, 2000–2001, 2001-2002.

Formal Theory Search Committee, Department of Political Science, 1997–1998.

## Teaching interests

Statistical methods: introductory and applied statistics, research design, computing in R.

American politics: representation, election irregularities, election administration.

Political economy: game theory.

## Reviewer for

| | |
|---|---|
| *American Journal of Political Science* | *Political Behavior* |
| *American Political Science Review* | *Political Research Quarterly* |
| *American Politics Quarterly* | *Political Science Quarterly* |
| *American Politics Review* | *Political Science Research and Methods* |
| *British Journal of Political Science* | *Political Studies* |
| Cambridge University Press | *Politics & Gender* |
| Chapman & Hall | *Politics, Groups, and Identities* |
| *Congress & the Presidency* | *Polity* |
| *Du Bois Review* | Prentice Hall Higher Education Group |
| *Economics & Politics* | *Proceedings of the National Academy of Sciences* |
| *Election Law Journal* | *Public Administration* |
| *Electoral Studies* | *Public Choice* |
| *Emerging Markets Finance & Trade* | *Public Opinion Quarterly* |
| *Interest Groups & Advocacy* | *PS: Political Science and Politics* |
| *Int'l Journal of Environmental Research and Public Health* | *Quarterly Journal of Economics* |
| John Wiley & Sons, Inc. | *Quarterly Journal of Political Science* |
| *Journal of Legal Studies* | *Race and Social Problems* |
| *Journal of Money, Credit and Banking* | *Science Advances* |
| *Journal of Politics* | *The Social Science Journal* |
| *Journal of Public Economics* | *Social Science Quarterly* |
| *Journal of Race, Ethnicity, and Politics* | *Sociological Methods & Research* |
| *Journal of Theoretical Politics* | *The Sociological Quarterly* |
| *Journal of Women, Politics & Policy* | Springer |
| *Legislative Studies Quarterly* | *State Politics & Policy Quarterly* |
| The National Science Foundation | Time-Sharing Experiments for the Social Sciences |
| *Nonprofit Policy Forum* | The University of Michigan Press |
| *Perspectives on Politics* | W. W. Norton & Company |
| *Policy Studies Journal* | *World Politics* |
| *Political Analysis* | |

## Foreign language

German: C1 (telc Prüfung, Ausstellung July 27, 2017).

## Other employment

Intelligence Analyst and Military Officer, United States Air Force, Foreign Technology Division, Wright–Patterson Air Force Base, 1989–1992.

# B   Maricopa County description of voting center

**96**      This appendix displays part of the Maricopa County elections department page that explains to eligible voters that they can vote in any voting center in the county. The source of this image is `http://web.archive.org/web/20201104002036/https://recorder.maricopa.gov/pollingplace/` (last accessed December 4, 2020).

*** The remainder of this page intentionally left blank ***



English Content (default.aspx)
Contenido Español (default_es.aspx)

## Where Do I Vote?

Election Day is Tuesday, November 3. There are **no** assigned locations. Maricopa County voters can drop off an early ballot or vote in person at any Vote Center. Visit BeBallotReady.Vote (http://web.archive.org/web/20201104002036/http://beballotready.vote/) to find out if you're registered, what's on your ballot and more. All Vote Centers in the list below are open from 6 a.m. – 7 p.m. on Election Day. If you have any questions please call us at (602) 506-1511.