Roopali H. Desai (024295)
D. Andrew Gaona (028414)
Kristen Yost (034052)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, AZ  85004
T:  (602) 381-5478
rdesai@cblawyers.com
agaona@cblawyers.com
kyost@cblawyers.com

Justin A. Nelson (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
T:  (713) 651-9366
jnelson@susmangodfrey.com

Stephen E. Morrissey (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T:  (206) 516-3880
smorrissey@susmangodfrey.com

Stephen Shackelford (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
T:  (212) 336-8330
sshackelford@susmangodfrey.com

Davida Brook (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
T:  (310) 789-3100
dbrook@susmangodfrey.com

*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler Bowyer; Michael John Burke; Nancy Cottle; Jake Hoffman; Anthony Kern; Christopher M. King; James R. Lamon; Sam Moorhead; Robert Montgomery; Loraine Pellegrino; Greg Safsten; Salvatore Luke Scarmardo; Kelli Ward; and Michael Ward, <br><br> Plaintiffs, <br><br> v. <br><br> Doug Ducey, in his official capacity as Governor of the State of Arizona; and Katie Hobbs, in her official capacity as Arizona Secretary of State, <br><br> Defendants. | No. CV-20-02321-PHX-DJH <br><br><br> **DEFENDANT SECRETARY OF STATE KATIE HOBBS' COMBINED MOTION TO DISMISS AND OPPOSITION TO MOTION FOR TRO/PRELIMINARY INJUNCTION** |
| MARICOPA COUNTY BOARD OF SUPERVISORS; and ADRIAN FONTES, in his official capacity as Maricopa County Recorder, <br><br> Intervenors. | |

{00526133.1 }

## I.     INTRODUCTION

This case is the latest in a series of baseless attacks on the results of the 2020 election. The complaint spins together—*in part, literally through what purports to be an anonymous witness referred to only as "Spider"*[1]—the broad outlines of a supposed conspiracy that spanned the globe. Plaintiffs allege that this plan somehow originated in Venezuela more than a decade ago, over the years enlisted "rogue actors" from various "countries such as Serbia" and "foreign interference by Iran and China" [*id.* ¶¶ 13, 70, 74, 78], compromised voting machines and software in states across the country in this election [*id.* ¶¶ 60, 63-102], and was ultimately executed with the assistance of thousands of Democratic, Republican, and non-partisan election officials despite the presence of observers for both parties in numerous states across the country, including Arizona [*id.* ¶¶ 65-66].

The object of the dystopian fiction set forth in plaintiffs' complaint is to overturn the election results determined by the will of nearly 3.5 million Arizona voters.

> At stake, in some measure, is faith in our system of free and fair elections, a feature central to the enduring strength of our constitutional republic. It can be easy to blithely move on to the next case with a petition so obviously lacking, but this is sobering. The relief being sought by the petitioners is the most dramatic invocation of judicial power I have ever seen. Judicial acquiescence to such entreaties built on so flimsy a foundation would do indelible damage to every future election.

No. 2020AP1930-OA, *Wisconsin Voters Alliance v. Wisconsin Elections Commission* at *3 (Wis. Sup. Ct. Dec. 4, 2020) (Hagedorn, J.) (concurring and joined by a majority of Justices) (attached as Ex. A). Other courts have uniformly rejected similar baseless attacks.[2] This Court should do so as well.

---

[1] [Doc. 1 (Compl.), Ex. 12].

[2] *See generally Donald J. Trump for President, Inc. v. Boockvar*, No 4:20-CV-02078, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020), *aff'd*, No. 20-3371, ECF No. 91 (3d Cir. Nov. 27, 2020); *Bognet v. Sec'y of Commonwealth*, No. 20-3214, 2020 WL 6686120 (3d Cir. Nov. 13, 2020) (affirming denial of preliminary injunction against counting purported "illegal" absentee ballots on equal protection grounds); *Wood v. Raffensperger*, No. 1:20-cv-04561-SDG, ECF No. 54 (N.D. Ga. 2020) (rejecting motion to enjoin Georgia's certification of election results based on equal protection arguments similar to those made here).

*First*, plaintiffs' claims fall miles short of the standards under *Twombly* and *Iqbal*, let alone the heightened pleading standards of Fed. R. Civ. P. 9(b). *Second*, plaintiffs' claims must be brought in an **election contest**—a matter reserved exclusively for the jurisdiction of the Arizona state courts. *Third*, as voters with a generalized grievance regarding the election, plaintiffs lack standing. Recently, courts have rejected similar claims for lack of standing in Pennsylvania and Georgia. *Bognet v. Sec'y of the Commonwealth of Pa.*, -- F.3d --, 2020 WL 6686120, at *19 (3d Cir. Nov. 13, 2020); *Wood v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at *5 (N.D. Ga. Nov. 20, 2020). *Fourth*, plaintiffs' claims are barred by laches. *Finally*, this Court should abstain from adjudicating this matter in deference to ongoing state proceedings and respect for the Secretary's Eleventh Amendment immunity.

Even if plaintiffs' claims could somehow overcome these many procedural defects, they would just as assuredly fail on the merits for the reasons described below.[3] Because plaintiffs' claims lack merit, their motion for a temporary restraining order and for preliminary injunctive relief also fail. Moreover, the balance of hardships tips strongly against plaintiffs. Plaintiffs sat on their hands not just while the election was but for more than a month afterwards. Plaintiffs' requested relief would imperil Arizona's participation in the Electoral College and potentially disenfranchise nearly 3.4 million Arizonans, thereby rendering it impossible for the Secretary to fulfill her primary responsibility of operating an election that fulfills the will of Arizona voters, as she did. The Secretary respectfully requests that the Court dismiss plaintiffs' complaint and deny their motion for a temporary restraining order and preliminary injunctive.

## II.   BACKGROUND

### A.   Arizona's election was fair and secure by any measure.

In the face of a once-in-a-century pandemic and unprecedented misinformation, Arizona election officials successfully administered a free, fair, and secure election on

---

[3] A certificate of consultation required by Local Rule 12.1(c) is attached as Exhibit C.

November 3. Over 3.4 million Arizonans—nearly 80% of eligible voters—exercised their right to vote. Turnout was at a record high across the state, and counties completed and passed post-election hand count audits and logic and accuracy testing.[4]

**B.    The Secretary of State and Governor canvassed the 2020 election and transmitted certificates of ascertainment.**

Consistent with their obligations under Arizona law, the Secretary of State and Governor certified the statewide canvass for the 2020 General Election in the presence of Attorney General Mark Brnovich and Chief Justice Robert Brutinel, on November 30, 2020. Ariz. Sec'y of State, 2020 General Election Canvass, https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf; *see also* A.R.S. § 16-648(A) (ordering certification of the statewide canvass "[o]n the fourth Monday following a general election"). The same day, the Governor signed and the Secretary of State attested to the certificate of ascertainment for the Biden presidential electors. Consistent with the Electoral Count Act, the State transmitted the certificate to the United States Archivist (and is now publicly available), and certificates of election were issued to the individual presidential electors. 3 U.S.C. § 6; National Archives, 2020 Electoral College Results, Arizona, https://www.archives.gov/files/electoral-college/2020/ascertainment-arizona.pdf.

**C.    Plaintiffs' attorneys have filed near-identical cases in 3 other states.**

Plaintiffs' complaint is the latest in a series of frivolous lawsuits with nearly identical allegations filed by Plaintiffs' counsel in states President-elect Biden won. *See Feehan v. Wis. Elections Comm'n*, No. 20-cv-1771-pp (E.D. Wis.); *King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich.); *Pearson v. Kemp*, No. 1:20-cv-04809-TCB (N.D. Ga.). All four lawsuits allege that thousands of elections officials somehow orchestrated a transnational conspiracy to steal an election by manufacturing votes and improperly

---

[4] Ariz. Sec'y of State, *State of Arizona Official Canvass*, at 1 (Nov. 24, 2020), https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf.; Ariz. Sec'y of State, *Summary of Hand Count Audits–2020 General Election* (Nov. 17, 2020), https://azsos.gov/election/2020-general-election-hand-count-results.

counting votes, supported by nary a shred of credible evidence. That these are little more than shotgun form lawsuits is evidenced by their apparent inability to keep their states straight. Here, for example, Plaintiffs' motion argues that the evidence shows "that Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the *Georgia* legislature." Doc. 2 (Pl.'s Mot. for TRO) at 6 (emphasis added).[5]

**D.    This case was filed on the heels of a strikingly similar election contest, brought mere days ago in state court by one of the named Plaintiffs.**

Just two days before filing this complaint seeking to "set aside the 2020 General Election results," one of the named Plaintiffs—Dr. Kelli Ward, Chair of the Arizona Republican Party—brought an elections contest in Maricopa County Superior Court. *Ward v. Jackson, et al.*, CV 2020-015285 (filed Sup. Ct. Maricopa Cty. Nov. 24, 2020) (attached as Ex. B).

The similarities between the two cases are numerous.  In her state-court elections contest, for example, Dr. Ward seeks to have the court (i) order "that the election [be] annulled and set aside," (ii) conclude "that the Trump Electors have the highest number of legal votes[,] and [(iii)] declare those persons elected."  *See* Ward Complaint at 9 (Prayer for Relief).  Similarly, Plaintiffs seek here that the election results be "annulled and set aside."  Doc. 1, ¶ 16.  The commonalities between these matters also extend to many specific factual allegations.  In her state-court elections contest, for example, Dr. Ward contends that "election officials completely failed and/or refused to allow legal observers to fully observe" proceedings.  *See Ward* Complaint ¶¶ 21-23, 26.  This, she claims, amounts to statutory "misconduct" that warrants a declaration "that the election is annulled and set aside." Ward Complaint ¶ 37. Similarly, here, Plaintiffs (including Dr. Ward) claim that election officials committed misconduct because they "acted and will

---

[5] *See also* Zach Montellaro and Kyle Cheney, *Pro-Trump Legal Crusade Peppered With Bizarre Blunders*, Politico, Dec. 3, 2020, https://www.politico.com/news/2020/12/03/sidney-powell-trump-election-lawsuit-442472.

continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process." Doc. 1 ¶¶ 15, 118, 120. And similarly, here, Plaintiffs seek as their first request "[a]n order directing Governor Ducey and Secretary Hobbs to de-certify the election results." *Id.* ¶¶ 145.1.

Earlier today, the Superior Court denied all relief requested by Dr. Ward. Prior to today's ruling, the Superior Court partially dismissed Dr. Ward's case on the record based on laches, to the extent she sought to raise an election contest on the basis of official misconduct for failure to permit observers to view election proceedings. In addition to this action, various other challenges to Arizona's General Election have failed in state court. *See, e.g., Aguilera, et al v. Fontes, et al.,* No. 2020-014083, (Maricopa Sup. Ct.); *Trump, et al. v. Hobbs, et al.,* No. 2020-014248, (Maricopa Sup. Ct); *Arizona Republican Party v. Fontes, et al.,* No. 2020-014553, Maricopa Sup. Ct.); *Aguilera, et al. v. Fontes, et al.,* No. 2020-014562 (Maricopa Sup. Ct.); *Ward v. Jackson, et al.,* No. 2020-015285, Maricopa Sup. Ct.).

## III.    ARGUMENT

### A.    Legal Standard

This Court must first assure itself that it has jurisdiction to hear the present controversy, by determining that Plaintiffs have standing. A case "brought by a plaintiff without … standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101 (1998)). In addition, the Court must determine whether Plaintiffs have "prudential standing"—that is, whether their claims "'fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health*, 654 F.3d 919, 932 (9th Cir. 2011) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 474 (1982)).

1        If the Court is satisfied that it has the power to hear the dispute, it may then evaluate

2    whether the factual allegations, taken as true, "nudge" the complaint "across the line from

3    conceivable," *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997

4    (9th Cir. 2014), to "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008);

5    *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   Allegations are not

6    plausible, however, where there exists an "obvious alternative explanation" for alleged

7    misconduct, *Capp v. Cty. of San Diego*, 940 F.3d 1046, 1055 (9th Cir. 2019) (quoting

8    *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567), based on "judicial experience and

9    common sense." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047,

10   1056 (9th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679). And where, as here, Plaintiffs state

11   claims sounding in fraud, a court must additionally find that the allegations meet the

12   "heightened" pleading standard" for fraud claims required by Rule 9(b), and that they

13   have been raised "with particularity." *Cafasso*, 637 F.3d at 1054-1055.

14       As discussed below, Plaintiffs fail to satisfy these standards.

15       **B.    The claims brought in this case must be brought in state court as part
16           of an elections contest.**

17       Plaintiffs' suit advances claims that, at bottom, must be brought in an elections

18   contest. And an elections contest in Arizona must be brought in state court, not federal

19   court. Indeed, Plaintiffs themselves acknowledge that the grounds for this lawsuit are

20   among the same grounds specifically envisioned by the Arizona elections contest statute:

21   alleged misconduct, illegal votes, offenses against the franchise, and erroneous counting.

22   Doc. 1, ¶ 15 (citing A.R.S. § 16-672). And Plaintiffs rely on both the remedies *and* the

23   timeline provided by the Arizona contest statute. *Id.* ¶¶ 16, 18; *see also id.* ¶ 123.

24   Plaintiffs' attempt to have it both ways—relying on Arizona's contest statute to their

25   benefit while simultaneously admitting that this is not actually an election contest (in

26   order to avoid state court)—should not be condoned by this Court.

27       Because of the "strong public policy favoring stability and finality of election

28   results," the Arizona Supreme Court requires that election contests be made in "strict

compliance" with the statutory requirements. *Donaghey v. Ariz. Attorney Gen.*, 584 P.2d 557, 559 (Ariz. 1978). Those requirements include A.R.S. § 16-672(B)'s mandate that contests be brought in state court.

To be clear: Plaintiffs are absolutely correct that this lawsuit is *not* an elections contest under Arizona law.  But that does not save them.  Plaintiffs are not allowed to circumvent Arizona's strict rules for bringing challenges to election results by filing a federal court lawsuit and calling it something different.  They must follow the law. Plaintiffs are forum shopping. That one Plaintiff here brought a state elections contest and lost is not an excuse to bring an action in federal court seeking the same remedy.

### C.   Plaintiffs lack Article III and prudential standing.

Plaintiffs' claims also fail for a further procedural reason that does not even require the Court to reach the merits: they lack standing, under both Article III of the U.S. Constitution and as a prudential matter. "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To establish standing, plaintiffs must show: (1) injury in fact; (2) a causal connection between their claim and the alleged injury; and (3) redressability of the claimed harm. *Barnum Timber Co. v. U.S. Env'l Prot. Agency*, 633 F.3d 894, 897 (9th Cir. 2011). As electors who voted in the recent election who can offer nothing but speculation and conjecture as to how the scheme they implausibly allege might have affected the outcome of the election, plaintiffs have no right to pursue a "generalized grievance" regarding the procedures or outcome of the recent election.

### 1.   Plaintiffs lack standing to pursue their Electors and Elections Clause Claim (Count 1).

Plaintiffs claim that defendants failed to follow Arizona law in certifying voting machines, verifying signatures, and restricting access to poll observers. Doc. 1, ¶¶ 43-53, 103-11. This is "precisely the kind of undifferentiated, generalized grievance about the

conduct of government that [courts] have refused to countenance in the past." *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

Plaintiffs do not gain standing by virtue of their roles as presidential electors. The role of a presidential elector under Arizona law is purely ministerial: electors "shall cast their electoral college votes for the candidate for president and the candidate for vice president who jointly received the highest number of votes in this state as prescribed in the canvass." A.R.S. § 16-221(B). The Arizona legislature has further determined that any elector who does not cast their vote in accordance with the results certified by the Secretary "is no longer eligible to hold the office of presidential elector and that office is deemed and declared vacant by operation of law." *Id.* § 16-221.C. Thus, there can be no claim that the State is depriving Plaintiffs of any individual right under the Electors and Elections Clause by failing to administer the election in the manner plaintiffs desire. Indeed, the Third Circuit recently held that plaintiffs—whether voters or candidates—have no private right of action at all under the Electors and Elections Clause. *Bognet*, 2020 WL 6686120, at *19 (3d Cir. Nov. 13, 2020).

Prudential standing leads to the same result. Under the prudential standing doctrine, even plaintiffs who can show some individual injury in fact—which Plaintiffs here cannot—may nonetheless "assert only a violation of [their] own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Here, Plaintiffs' claims rest entirely on the rights of *third parties*—the rights of non-parties whose votes allegedly were not counted, and the right of the presidential candidates to have Arizona's electors awarded to the candidate who received the highest number of votes. Plaintiffs themselves have not alleged and cannot claim to have suffered any individualized harm or violation of their own rights, and thus lack standing to pursue their claim.

> **2.  Plaintiffs' Equal Protection, Due Process, and "Widespread Fraud" Claims Likewise Fail for a Lack of Article III Standing (Counts II-IV).**

The standing principles that doom Plaintiffs' lead claim for violations of the Elections and Electors Clause also foreclose their claims in Counts II-IV for violations of the Equal

Protection Clause, the Due Process Clause, and "Widespread Fraud" (presumably in violation of Arizona common law, although the complaint is unclear on that point, among others). The common thread in each of these claims is that Plaintiffs' votes were diluted because Arizona counties counted some votes Plaintiffs contend were "illegal" and failed to count some votes Plaintiffs contend were "legal." But courts have rejected the notion that the generalized grievance of alleged vote dilution provides private plaintiffs like those here with a right of action. *Bognet*, 2020 WL 6686120, at *11 ("This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment."); *Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524 F.3d 892, 900 (8th Cir. 2008) (voters lacked standing to allege substantive due process claim regarding implementation of new election law where they failed to allege particularized injury); *Wood v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at *5 (N.D. Ga. Nov. 20, 2020) ("This is a textbook generalized grievance."); *Moore v. Cicosta*, No. 1:20-cv-911, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020) ("[T]he notion that a single person's vote will be less valuable as a result of unlawful or illegal ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing.").

There is a good reason for this standing principle that precludes private plaintiffs from challenging governmental action or inaction that impacts the public generally: otherwise, any enterprising conspiracy theorist with a Twitter following could run a GoFundMe campaign to challenge the results of an election. Basic principles of standing foreclose the notion that private plaintiffs such as those here can unilaterally choose to pursue the extraordinary measure of putting the results of a presidential election in the hands of the jury that would be responsible for adjudicating these claims if they somehow were to proceed to a trial on the merits.

**D.     Laches bars Plaintiffs' claims.**

Even if they have standing (they don't), the doctrine of laches bars Plaintiffs' claims because they have unreasonably delayed bringing their claims to the detriment of

1  not only the defendants, but also the millions of voters in Arizona who voted in this last

2  election. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001) ("To demonstrate

3  laches, the 'defendant must prove both an unreasonable delay by the plaintiff and

4  prejudice to itself.'").

5      In the election context, the Ninth Circuit has regularly dismissed claims brought

6  after elections based on laches, "lest the granting of post-election relief encourage

7  sandbagging on the part of wily plaintiffs." *Soules v. Kauaians for Nukolii Campaign*

8  *Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988). This is because of "the extremely disruptive

9  effect of election invalidation and the havoc it wreaks upon local political continuity." *Id.*

10  Thus, "if aggrieved parties, without adequate explanation, do not come forward *before*

11  the election, they will be barred from the equitable relief of overturning the results of the

12  election." *Id.* (emphasis added).

13      Even when plaintiffs bring *pre*-election claims, they must do so sufficiently before

14  the election. This Court has repeatedly dismissed pre-election claims based on laches

15  when plaintiffs did not promptly bring their claims upon discovery of those claims. *See,*

16  *e.g.*, *League of Women Voters of Arizona v. Reagan*, No. CV-18-02620-PHX-JAT, 2018

17  WL 4467891, at *8 (D. Ariz. Sept. 18, 2018) (dismissing a claim brought "less than three

18  months" before the election); *Arizona Libertarian Party v. Reagan*, 189 F. Supp. 3d 920,

19  921 (D. Ariz. 2016) (dismissing an election claim brought 18 days before the relevant

20  deadline); *Arizona Pub. Integrity All. Inc. v. Bennett*, No. CV-14-01044-PHX-NVW,

21  2014 WL 3715130, at *2 (D. Ariz. June 23, 2014) (dismissing an election claim brought

22  two weeks before the relevant deadline); *Arizona Minority Coal. for Fair Redistricting v.*

23  *Arizona Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887, 909 (D. Ariz. 2005)

24  (dismissing claim when plaintiffs had "ample opportunity" to bring the claim sooner).

25      Plaintiffs unreasonably delayed bringing their claims not only until after the

26  election, but almost a month after Election Day. This delay is manifestly unreasonable

27  and ample grounds for dismissal under Ninth Circuit precedent.

28

In Count II, which purports to state a claim under the Equal Protection Clause and 28 U.S.C. § 1983, Plaintiffs argue that Arizona election officials improperly violated their "right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution and Arizona law." Doc. 1, ¶¶ 118, 120. Paragraphs 43-53 of Plaintiffs' complaint also parade through a laundry list of grievances regarding alleged "Violations of Arizona Election Law," Doc. 1, ¶¶ 43-53, all of which are incorporated by reference in each of plaintiffs' claims. *Id.* ¶ 103, 112, 124, 135. The allegations focus on the process used to match signatures on absentee ballots during the election, *id.* ¶¶ 46-48, the role of poll watchers and poll referees during the election, *id.* ¶¶ 48-49, alleged "irregularities" in the operation of Dominion Voting Machines during the election, *id.* ¶¶ 50-52, and the certification of the Dominion machines, *id.* ¶ 53. As Plaintiffs acknowledge, nearly all of these practices were in place on or before Election Day, and even the one post-election practice Plaintiffs challenge, the recent recertification of post-election logic and accuracy test of Maricopa County's Dominion machines on November 18, *id.* ¶ 53, occurred almost three weeks ago.

Plaintiffs do not claim knowledge that *any* of these practices led to counting a single illegal vote or discounting a single legal vote in Arizona. And they provide no explanation why they are raising these issues now, ***more than a month after the election was completed***, when their own complaint reveals they were aware of their grievances on or before Election Day.

Specifically, Plaintiffs have known about Dominion voting machines for months. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002) (the delay is "measured from the time the plaintiff knew or should have known about its potential cause of action"). Throughout their Complaint, Plaintiffs allege that the Dominion machines perpetuated errors and fraud based on "publicly available evidence," (Doc. 1, ¶ 21), including that (1) in 2018, an expert witness testified about Dominion's vulnerabilities, (*see id.* ¶ 72-73); (2) on January 24, 2020, Texas opted not to use

1   Dominion due to the possibility of fraud, (*see id.* ¶ 67, Ex. 11); and (3) on October 22,

2   2020, the Northern District of Georgia issued an order as to Dominion voting machines,

3   (*see id.* ¶ 69). By Plaintiffs' own repeated admission, they have long been on notice of

4   these alleged irregularities.

5   Similarly, regarding any issues Plaintiffs take with their "right to be present and

6   have actual observation and access to the electoral process as secured by the Equal

7   Protection Clause of the United States Constitution and Arizona law," Doc. 1, ¶ 118, the

8   opportunity to observe the electoral process arose in October—when counties began to

9   tabulate early ballots—and continued through the canvass. *See, e.g.*, A.R.S. § 16-550(B);

10  Jessica Suerth, "Arizona Early Ballots in [the] 2020 Election Are Being Counted", *KGW8*

11  (Oct. 20, 2020).[6]

12  In sum, Plaintiffs have offered no justifiable explanation for their delay in pursuing

13  their claims. Nor could they. From the face of the Complaint, it is clear they were well

14  aware of many of these issues well before Election Day, and all the rest of them no later

15  than Election Day. Indeed, plaintiff Ward is the *Chair* of the Arizona Republican Party

16  and the *Plaintiff* in the separate, ongoing election contest proceeding in Arizona State

17  Court. Apart from their apparent tactical interest in scuttling the certified results of the

18  election in Arizona, plaintiffs simply have no defensible basis for their delay.

19  Nor can there be any doubt that plaintiffs' delay—if it somehow resulted in their

20  desired relief of decertifying the Arizona election results and awarding Arizona's electors

21  to the losing candidate instead of the winning candidate, as their proposed order asserts it

22  should—would prejudice both defendants and the nearly 3.4 million Arizonans who cast

23  their votes in the election. In assessing prejudice, courts in election cases consider

24  "prejudice to the courts, candidates, citizens who signed petitions, election officials, and

25  voters." *Reagan*, 189 F. Supp. 3d at 923 (*Sotomayor v. Burns*, 199 Ariz. 81, 13 P.3d

26  1198, 1200 (2000); *Mathieu v. Mahoney*, 174 Ariz. 456, 851 P.2d 81, 85 (1993)). As the

27

28  [6]   https://www.kgw.com/article/news/politics/elections/arizona-ballots-counted-2020-election-biden-trump-kelly-mcsally/75-96f7a64f-18d8-425d-91b0-c721f96fe6bb.

State's primary elections official, it is the Secretary's duty to ensure that elections are conducted in a manner that fulfills the will of Arizona voters. She did so, and plaintiffs should not be permitted to challenge that reality by asserting these bogus claims well after the election was completed. The Electoral College meets less than one week after the hearing on this motion, on December 14, 2020. Because of plaintiffs' delays, it is no longer feasible that this case could proceed through a trial on the merits and any related appeals before electors must cast their votes. Granting Plaintiffs' requested preliminary relief would thus effectively deprive defendants and Arizona voters of their right to defend against these claims on the merits, while rewarding plaintiffs for their tactical delay. Such a result would be untenable and cannot be squared with any conception of the doctrine of laches.

### E.    Plaintiffs' conspiracy theories fail to meet basic pleading standards.

Because Plaintiffs' claims fail on procedural grounds for lack of jurisdiction, based on the application of the doctrine of laches, and for lack of standing, the Court need not reach the merits to dismiss the case with prejudice and deny the TRO application and request for preliminary injunctive relief as moot. Nonetheless, should the Court address the merits, the substance of Plaintiffs' allegations provides even more reasons for dismissing all their claims with prejudice. Distilled to their essence, Plaintiffs' allegations underlying each of their claims are grounded on the following theories, each of which has fundamental and insurmountable flaws:

#### 1.    There Are No Plausible Allegations That Dominion Voting Systems Machines Were Hacked in Arizona.

Plaintiffs offer the affidavit of an anonymous witness who claims to have had ties to long-dead Venezuelan dictator Hugo Chavez,[7] and involvement in rigging elections in that country. Doc. 1, Ex. 1. Plaintiffs' lead (albeit anonymous) witness acknowledges

---

[7] Hugo Chavez died on March 5, 2013.  William Neuman, *Chavez Dies, Leaving Sharp Divisions in Venezuela*, N.Y. Times Mar. 6, 2013, *available at* https://www.nytimes.com/2013/03/06/world/americas/hugo-chavez-of-venezuela-dies.html.

having little knowledge of the electoral process in the United States: "I have not participated in any political process in the United States, have not supported any candidate for office in the United States, am not legally permitted to vote in the United States, and have never attempted to vote in the United States." *Id.* ¶ 3. The witness claims to have witnessed the creation and operation of a voting systems company called "Smartmatic," and claims this system was used to manipulate elections in favor of Chavez and his successor, Nicolas Maduro. *Id.* ¶¶ 7-19. The witness also claims this system was used to rig elections throughout Latin America. *Id.* ¶ 20. This witness further claims that descendants of this "Smartmatic" system are now "in the DNA" of voting software systems used in the United States, including Dominion Voting Systems, such that they could be exploited by unscrupulous persons seeking to manipulate election results. *Id.* ¶¶ 21-22.

According to this supposed anonymous witness, on Election Day, "vote counting was abruptly stopped in five states using Dominion software" when "Donald Trump was significantly ahead in the votes." *Id.* ¶ 26. Plaintiffs' anonymous lead witness continues by asserting that "during the wee hours of the morning … something significantly changed," such that "[w]hen the vote reporting resumed the very next morning there was a very pronounced change in favor of the opposing candidate, Joe Biden." *Id.*

This is a preposterous claim even in states where large batches of votes for President-Elect Biden were reported in the days after Election Day. ***But plaintiffs have no plausible basis for alleging this transpired in Arizona***. On election night, President-Elect Biden had a relatively substantial lead due to favorable results in early voting, and was declared the victor in the state by Fox News and the Associated Press. Erik Wemple, *Arizona Calls Vindicate Fox Decision Desk*, Wash. Post, Nov. 13, 2020, *available at* https://www.washingtonpost.com/opinions/2020/11/13/arizona-calls-vindicate-fox-news-decision-desk/. His lead *narrowed* in subsequent days due to President Trump's relatively favorable results among votes cast on Election Day, before the remaining networks called the election in President-Elect Biden's favor once it became clear the

margin exceeded 10,000 votes and was not subject to reasonable dispute. *Id.* The professed "alarm[]" plaintiffs' anonymous lead witness claims to have experienced with respect to the Arizona election results, Cmplt. Exh. 1 ¶ 26, is utterly nonsensical.

With that, Plaintiffs' allegations regarding Dominion Voting Systems machines in Arizona fall apart. While Plaintiffs allege that such machines (like all computers) *could be* hacked and manipulated, they make no plausible allegation that Dominion machines in Arizona *were* hacked and manipulated. And while Plaintiffs devote twenty-three pages of their complaint to allegations of *potential* vulnerabilities of Dominion machines and software, *id.* ¶¶ 63-101, and six pages to the antipathy of a single Dominion employee towards President Trump, *id.* ¶¶ 94-101, they offer no plausible connection whatsoever between these allegations and any impact on the results of the election in Arizona.

> ### 2.   Plaintiffs' Allegations Regarding "Unreturned Absentee Ballots" and Out-of-State Voters Provide No Basis for Overturning the Election Results.

The primary statistical theory underlying Plaintiffs' claim that there were a sufficient number of illegal votes counted and legal votes uncounted to overturn the results of the election is based on the analysis of two so-called experts, Dr. William M. Briggs (a self-proclaimed "Statistician to the Stars!," Cmplt. Exh. 2), who in turn states that his opinions are ***based entirely on survey data provided by someone named Matt Braynard***. Compl. Ex. 2, at 1.

But who is Matt Braynard? Exhibit 3 to the complaint consists of a series of ***printouts of Twitter posts*** from *someone* named Matt Braynard. Otherwise, neither plaintiffs nor Dr. Briggs offer anything whatsoever about Braynard's identify, qualifications, the methodologies used in his surveys, whether those methodologies comported with the standards required for considering a survey reliable, the steps taken to ensure his samples were random and representative of the underlying population, or the steps taken to account for possible inaccuracies or falsehoods provided in survey responses. Dr. Briggs does not even cite any basis for his assumption that there were 518,860 "unreturned absentee ballots" in Arizona. *Id.* at 1.

The single-page printout of Arizona-specific data appended to Dr. Briggs' report (which, presumably, was among the "data provided by Matt Braynard") further undermines the plausibility of Dr. Briggs' assertions. Cmplt, Exh. 2A. This page indicates that survey respondents were asked whether they requested an absentee ballot "*in Arizona*," and that the 35.56% of respondents who answered "no" were deemed to have received a ballot without requesting one—even though an Arizona voter who requested an absentee ballot while attending school out-of-state or living on a military base abroad would have properly answered "no" to the question as posed. From the results of this fatally poorly drafted survey, Dr. Briggs even more inexplicably leaps to the conclusion that 35.56% of the "unreturned absentee ballots" in Arizona should be invalidated, that more than 208,333-229,937 ballots were "troublesome," and that the results of the election should be overturned. Exh. 1 at 1; Cmplt. ¶¶ 54-55. Simply describing Briggs' "analysis" demonstrates its utter nonsense and implausibility.

Dr. Briggs' so-called "Error 2," upon which he asserts that somewhere between 78,714 and 94,975 votes of Arizonans should be invalidated, bears no closer relationship to plausible reality. Cmplt. ¶ 56 & Exh. 2. These figures are based on respondents to Mr. Braynard's surveys who were listed (in some undisclosed data set derived from some undisclosed data source, but put that aside) as having an "unreturned absentee ballot," but who responded "yes" when asked whether they had mailed their ballot. Dr. Briggs does nothing to account for various reasons a person may have answered "yes"—perhaps they dropped their ballot in drop box or voted in-person absentee, and answered "yes" even though such ballots were not counted in whatever database Mr. Braynard used as "returned by mail"; maybe they answered "yes" because they mailed back their ballot, but did not do it in a timely fashion such that it would be properly counted; or conceivably some of these respondents to this survey conducted on November 15-17, 2002, *two weeks after the election*, lied or misremembered. Nor does Dr. Briggs even suggest there is any reason to believe these ballots predominantly favored Trump rather than Biden. Yet, plaintiffs implausibly assert this "analysis" serves as a basis for overturning the election.

Plaintiffs' assertion that the Court could plausibly conclude that 5,790 absentee votes were "illegal" based on voters filing notices of change of address in advance of the election is equally ridiculous. Again, this assertion is based solely on a ***Twitter post*** by someone named Matt Braynard—for whom Plaintiffs offer no evidence of any qualifications or methodologies or anything else. Plaintiffs completely disregard the fact that voters may change their mailing address for reasons wholly consistent with their right to continue voting in Arizona—*e.g.,* a 19 year old from Pima County attending college out of state may have elected to retain their Arizona residence in voting status, while receiving their personal mail at school; similarly, a service member from Maricopa County may have been transferred from one deployment to another, while properly remaining an Arizona voter throughout. Plaintiffs make no allegation that could provide a plausible basis for concluding ***a single one*** of the address changes they characterize as "illegal votes" was in fact "illegal."

### 3.     Plaintiffs' Allegations Regarding "Statistical Impossibilities" Provide No Basis for Overturning the Election Results.

Plaintiffs further ask the Court to cast aside ***more than 160,000 votes*** of Arizonans, and thereby reverse the results of the election as determined by the will of nearly 3.4 million voters, based on what they describe as "historically unprecedented" turnout levels and "statistically significant" results favoring President-Elect Biden in unspecified counties using Dominion Voting Machines. Cmplt. ¶ 19 D-E. One of plaintiffs' so-called experts, Russell Ramsland, asserts there was "an improbable, and possibly impossible spike in processed votes" in Maricopa and Pima Counties at 8:46 p.m. on November 3, 2020. Cmplt. ¶ 60 & Exh. 17. Mr. Ramsland's affidavit indicates he has a business and technical background that includes experience with election systems, but he does not profess to have any expertise in political science, election operations and logistics, the timing of election returns, or the manner in which ballots are processed in the State of Arizona. *Id.* Ex. 17. He apparently was wholly ignorant of (or omitted) the fact that Arizona begins processing early ballots before the election, such that the results of early

ballots in Pima and Maricopa Counties shortly after the polls closed was unsurprising. Mr. Ramsland's speculation that these results were the product of a multi-national conspiracy, rather than the counting of validly cast ballots, is utterly implausible. And while Plaintiffs submit affidavits from other witnesses who profess their surprise at the election results, none of them offers any plausible basis for questioning the election results.

> **4.    Plaintiffs' Allegations Regarding Alleged Violations of Arizona Election Laws Provide No Basis for Overturning the Election.**

Finally, plaintiffs allege various violations of Arizona election law at the county level in connection with the administration of the Arizona election. Cmplt. ¶¶ 46-52. Plaintiffs do not allege that the *Secretary* was responsible for any of these alleged violations, as would be required to hold her responsible for "widespread fraud" (Count IV), or as individually responsible for the constitutional violations alleged in counts I-III. Nor do Plaintiffs allege any of these alleged violations resulted in counting a sufficient number of illegal votes or discounting a sufficient number of legal votes to call into question the results of the election.

In short, even if accepted as true solely for purposes of considering a motion to dismiss, the allegations of Plaintiffs' complaint do not provide any plausible basis for the relief they seek, *i.e.,* overturning the results of the 2020 presidential election in Arizona.

**F.    The Court Should Dismiss This Case on Preclusion Principles.**

Plaintiffs are barred from re-adjudicating their issues here under the doctrine of collateral estoppel, or issue preclusion.  Issue preclusion "applies when an issue was [1] actually litigated in a previous proceeding, there was [2] a full and fair opportunity to litigate the issue, [3] resolution of the issue was essential to the decision, a [4] valid and final decision on the merits was entered, and there is [5] common identity of the parties."  *Ludwig v. Arizona by & through Brnovich*, 790 F. App'x 849, 851 (9th Cir. 2019) (quoting *Hullett v. Cousin*, 63 P.3d 1029, 1034 (Ariz. 2003)).

1    All of these requirements are satisfied here.  As discussed, at issue in the Maricopa

2    County Superior Court elections contest was whether election officials engaged in

3    misconduct warranting that the election be annulled and set aside for failure to allow legal

4    observers to "fully observe" proceedings.  *See* Ward Complaint ¶¶ 21-23, 26, 37; *see also*

5    *Ward v. Jackson*, Proposed Findings of Fact and Conclusions of Law ¶ 11.  Plaintiffs raise

6    this same issue in their complaint.  Compl. ¶¶ 15, 118, 120.  The Maricopa County

7    Superior Court clearly denied relief on this theory on the record during an evidentiary

8    hearing, after briefing and argument.   Under Arizona law, "a party precluded from

9    litigating an issue … is also precluded from doing so with another, provided there was

10   full and fair opportunity to litigate the issue in the first action." *Gilbert v. Ben-Asher,* 900

11   F.2d 1407, 1410 (9th Cir. 1990); see also *Campbell v. SZL Properties, Ltd.*, 62 P.3d 966,

12   968 (Ariz. Ct. App. 2003) (holding that if "the first four elements of collateral estoppel

13   are present, Arizona permits defensive … use of the doctrine").  Having fully availed

14   herself of the opportunity to litigate her "misconduct" claim in state court—and lost—Dr.

15   Ward cannot join with her fellow presidential electors in this suit to obtain a second bite

16   at the apple.[8]

17   **G.    The Eleventh Amendment Bars Plaintiffs' claims.**

18   Plaintiffs' claims face yet another insurmountable hurdle: the Eleventh

19   Amendment. As the Supreme Court held in *Pennhurst State School & Hospital v.*

20   *Halderman*, the Eleventh Amendment bars federal courts from granting "relief against

21   state officials on the basis of state law, whether prospective or retroactive." 465 U.S. 89,

22   106 (1984). This bar applies even where plaintiffs disguise their state law claims as

23   federal          causes          of          action.      *See,      e.g.,          Massey v. Coon*, No. 87-

---

[8] If the Court declines to dismiss the case outright on the grounds that the claims raised
by Plaintiffs can only be brought in state court in an election contest it should, at the very
least, abstain from hearing the case on federalism and comity grounds and dismiss on that
basis.  *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727–30 (1996) (affirming the
power of federal courts to dismiss under abstention doctrines absent a mandatory duty to
award relief).  Plaintiffs ask for an unprecedented intrusion into state sovereignty by a
federal court.  Under the *Burford, Colorado River*, and *Pullman* doctrines of abstention,
Plaintiffs' claims should be resolved in a state forum.

3768, 1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (affirming dismissal where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, [but] these constitutional claims are entirely based on the failure of defendants to conform to state law"); *Balsam v. Sec'y of New Jersey*, 607 F. App'x 177, 183 (3d Cir. 2015) (applying bar to state law claims "premised on violations of the federal Constitution"); *Thompson v. Alabama*, No. 2:16-CV-783-WKW, 2017 WL 3223915, at *8 (M.D. Ala. July 28, 2017) (bar applies where federal constitutional claims rest on failure to enforce state law, as "[t]he true nature of this 'remedy' sounds in state law").

Try though they might to disguise their claims as federal causes of action, Plaintiffs cannot escape the Eleventh Amendment. Count IV, for example, is captioned merely as "Wide-Spread Ballot Fraud." But even a cursory review of Count IV's allegations makes clear that this count stems from violations of *Arizona* law, not federal constitutional or statutory law. Plaintiffs allege that certification must be enjoined because "there were intentional violations of multiple provisions of *Arizona* law," Cmplt. ¶ 141, and (mis)cite to an Arizona Supreme Court decision about *Arizona* remedies for violations of *Arizona* election statutes, Cmplt. ¶ 138. Plaintiffs' other counts fare little better. Count II claims violations of the Equal Protection Clause—but those violations are premised on a failure to comply with *state* elections law, such as the right to observe. Cmplt. ¶ 118. And, perplexingly, Count II again relies on the ability to contest elections under Arizona law. Compl. ¶ 123. Count I alleges that Defendants violated the Elections and Electors Clauses by somehow exercising their powers in a way that "conflict[s] with existing legislation" enacted by the Arizona legislature—again hinging on whether *state* law was violated. Compl. ¶ 106.[9] And Count III alleges a Due Process Clause violation premised on a failure to comply with Arizona law on ballot security and transport and the resulting "dilution" of Plaintiffs' votes. Cmplt. ¶ 132 (citing A.R.S. § 16-608). The relief Plaintiffs

---

[9] Count I, in what appears to be a botched cut-and-paste job, also cites to several provisions of the VRA and HAVA, but does not allege violations of either statute. *See* Cmplt. ¶ 106(i–iv).

1   seek thus "conflicts directly with the principles of federalism that underlie the Eleventh

2   Amendment." *Pennhurst*, 465 U.S. at 106.

3         **H.**    **Plaintiffs' Requested TRO and Preliminary Injunction Should be**

4                 **Denied as Moot and In Any Event Are Without Merit.**

5         Plaintiffs' requested TRO and motion for preliminary injunctive relief should be

6   denied for the same reasons the motion to dismiss should be granted, as well as on

7   separate and independent grounds that the Court need only consider if the motion to

8   dismiss is denied. As this Court has ruled, "'the standard for issuing

9   a temporary restraining order is identical to that for issuing a preliminary

10  injunction.'" *Compass Bank v. Lovell,* No. CV-16-00538-PHX-DJH, 2016 WL 8738244,

11  at *4 (D. Ariz. Apr. 8, 2016) (quoting *Taylor-Failor v. Cty. of Hawaii*, 90 F. Supp. 3d

12  1095, 1098 (D. Haw. 2015)). In *any* case, a TRO and request for preliminary injunction

13  is "'an extraordinary remedy never awarded as a matter of right.'" *Id.* (quoting *Winter v.*

14  *Natural Res. Defense Council*, 555 U.S. 7, 24 (2008)). That is all the more so here, where

15  Plaintiffs seek this to employ this always-extraordinary remedy to obtain sweeping and

16  unprecedented relief that would overturn the results of the Arizona election, award the

17  state's electors to the certified loser of the election instead of the winner, and thereby

18  disenfranchise nearly 3.4 million Arizona voters.

19        "'To obtain a preliminary injunction, a party must show that 'he is likely to succeed

20  on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

21  relief, that the balance of equities tips in his favor, and that an injunction is in the public

22  interest.'" *Id.* (*quoting Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir.

23  2014)). *Id.* Plaintiffs fail to make any of the required showings.

24        **1.**    **Plaintiffs' Claims Have No Likelihood of Success.**

25        Here, Plaintiffs have *no* likelihood of success on their claims—as discussed above,

26  the claims should be dismissed. But even if any of Plaintiffs' claims were adequately

27  alleged, Plaintiffs have not put forward any evidence to suggest they could ever prove (let

28  alone *likely* prove) their claim that the election results in Arizona were the product of a

1   multi-national and multi-state conspiracy—rather than the validly cast votes of

2   Arizonans.

3          The legal deficiencies in and facial implausibility of Plaintiffs' claims is further

4   compounded by their evidentiary failures. Plaintiffs ask the Court to grant their requested

5   relief based on ***anonymous*** affidavits. But anonymous affidavits are inadmissible and

6   may not be considered by the Court, as 28 U.S.C § 1746 requires a statement verified "***by***

7   ***the person"*** making it. Having not even identified any persons who may have provided

8   several of the affidavits supporting their claims, Plaintiffs cannot rely on their purported

9   testimony. *See* Cmplt, Exhs. 1 (anonymous declaration relating to Smartmatic voting

10  machines and Venezuela), 4 (anonymous declaration from purported statistician), and 12

11  (anonymous affidavit from someone identified only as "Spider").

12         Plaintiffs also have submitted a series of purported "expert reports" that, their

13  complaint alleges, serve as "conclusive evidence" that the results of the presidential

14  election in the State of Arizona should be overturned. Cmplt., Exhs. 2-2.F (Briggs), 3

15  (Braynard),[10] 4 (anonymous statistician), 9 (Keshel), 12 (Spider) and 17 (Ramsland).

16  *None* of these purported "reports" meets the minimal requirements for an expert report

17  that may be considered under Fed. R. Civ. P. 26(a)(2). Plaintiffs have not provided the

18  data and information considered in forming their opinions as required by Rule 26, or

19  disclosed the terms of any funding they may be receiving in connection with their

20  opinions as required by Rule 26.

21         This evidentiary failure is starkly illustrated by Dr. Briggs, who has submitted a

22  four-page report that Plaintiffs offer in support of their challenge to more than 300,000

23  Arizona votes. But Dr. Briggs simply makes calculations that, he states, are based entirely

24  on "survey data" that "was provided by Matt Braynard." Cmplt, Exh. 2 at 1. Mr. Braynard,

25

26  [10] The disclosure regarding purported expert Matt Braynard consists entirely of a printout
    of four Tweets, accompanied with what appears to be a typewritten transcription of a fifth
27  Tweet. Cmplt, Exh. 3. There is no disclosure of Mr. Braynard's curriculum vitae,
    qualifications, experience, opinions, methodologies, data and materials considered,
28  sources of any funding received in connection with his expert services.

1   however, has not offered his own expert report, and Dr. Briggs has disclosed nothing
2   whatsoever about Mr. Braynard's survey—he has not identified the methodologies that
3   were used, shown that he and other persons who conducted his survey had the
4   qualifications and experience required to conduct a survey in accordance with those
5   methodologies, or disclosed the data that was used in and produced by this supposed
6   survey. The report plaintiffs have submitted from Dr. Briggs thus, on its face, has no
7   conceivable evidentiary value. And Plaintiffs' other experts likewise have failed to
8   provide the basic data and information needed to assess their opinions and whether they
9   are of any potential evidentiary value.

10                    **2.      Plaintiffs' Requested Relief Would Result in Enormous**
11                             **Prejudice to Arizona Voters.**

12          Any consideration of the relative harm and prejudice that would result from
13   Plaintiffs' requested relief also must lead to denial of their motion. Because Plaintiffs
14   waited until more than a month after the November election to pursue their claims their
15   proclaimed emergency is of their own making. Moreover, denial of their requested relief
16   would, at most, result in the potential dilution of these Plaintiffs' votes. As discussed
17   above, a claimed generalized grievance of "vote dilution" is not even a cognizable
18   individual injury that confers standing. *Bognet*, 2020 WL 668120, at \*11-14 *Wood v.*
19   *Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at \*5 (N.D. Ga. Nov. 20, 2020).
20   By contrast, the requested relief would cause enormous harm to Arizonans, supplanting
21   the will of nearly 3.4 million voters reflected in the certified election results and
22   potentially imperiling Arizona's participation in the Electoral College. It would be
23   difficult to envision a case in which the balance of hardships would tip more strongly
24   against a plaintiff.

25   **IV.    CONCLUSION**

26          Plaintiffs seek unprecedented relief: ***overturning a presidential election and***
27   ***disenfranchising nearly 3.4 million Arizona voters***—and doing so through a proposed
28   TRO and preliminary injunction no less. They do so based on anonymous affiants, facially

unqualified so-called experts, and an implausible claimed conspiracy.  For the reasons stated herein, the Court should dismiss plaintiffs' application for TRO and motion for preliminary injunctive relief, and award the Secretary her attorneys' fees and other appropriate relief.

Respectfully submitted this 4th day of December, 2020.

**SUSMAN GODFREY L.L.P.**

By  *s/ Justin A. Nelson*
       Justin A. Nelson
       Stephen E. Morrissey
       Stephen Shackelford
       Davida Brook

**COPPERSMITH BROCKELMAN PLC**
       Roopali H. Desai
       D. Andrew Gaona
       Kristen Yost

*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*