Sidney Powell (admitted pro hac vice)
Sidney Powell PC
Texas Bar No. 16209700
(517) 763-7499
Sidney@federalappeals.com

Alexander Michael del Rey Kolodin, AZ Bar No. 030826
Alexander.Kolodin@KolodinLaw.com
Christopher Viskovic, AZ Bar No. 035860[1]
CViskovic@KolodinLaw.com
**KOLODIN LAW GROUP PLLC**
3443 N. Central Ave. Ste. 1009
Phoenix, AZ  85012
Telephone: (602) 730-2985
Facsimile: (602) 801-2539

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler Bowyer, Michael John Burke, Nancy Cottle, Jake Hoffman, Anthony Kern, Christopher M. King, James R. Lamon, Sam Moorhead, Robert Montgomery, Loraine Pellegrino, Greg Safsten, Salvatore Luke Scarmardo, Kelli Ward and Michael Ward; | **Case No.**: 2:20-cv-02321-DJH |
| Plaintiffs; | **PLAINTIFFS' REPLY TO RESPONSES IN OPPOSITION TO MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF AND MEMORANDUM IN SUPPORT THEREOF** |
| v. | |
| Doug Ducey, in his official capacity as Governor of the State of Arizona, and Katie Hobbs, in her capacity as Secretary of State of the State of Arizona; | |
| Defendants; | |
| Maricopa County Board of Supervisors; and Adrian Fontes, in his official capacity as Maricopa County Recorder; | |
| Intervenors. | |

_____

[1] District of Arizona admission scheduled for 12/9/2020.

COMES NOW Plaintiffs, Tyler Bowyer, Michael John Burke, Nancy Cottle, Jake Hoffman, Anthony Kern, Christopher M. King, James R. Lamon, Sam Moorhead, Robert Montgomery, Loraine Pellegrino, Greg Safsten, Salvatore Luke Scarmardo, Kelli Ward, and Michael Ward, by and through their undersigned counsel, and file this Response, and Memorandum of Law In Support Thereof, to Defendants' and Intervenor-Defendants Response in Plaintiffs' November 29, 2020 Motion for Declaratory, Emergency and Permanent Injunctive Relief ("TRO Motion"). ECF No. 7.

Arizona is in the midst of an election-integrity crisis. Earlier this year, the Arizona Supreme Court had to step in to prevent Intervenor Maricopa County from conducting its primary election in an illegal and unconstitutional manner. *Ariz. Pub. Integrity All. v. Fontes*, No. CV-20-0253-AP/EL, 2020 Ariz. LEXIS 309, at *13 (Nov. 5, 2020) ("Because Plaintiffs have shown that the Recorder has acted unlawfully and exceeded his constitutional and statutory authority, they need not satisfy the standard for injunctive relief."). In another such matter, *Arizona v Fontes*, Intervenor Maricopa County's chief elections official had to be restrained from unlawfully mailing every registered voter a ballot, whether they had requested one or not.[2]  Before Defendants feign indignation at Plaintiffs' claims that they certified an election tainted by illegality, unconstitutionality, and illegal ballots as a fever-dream, they should soberly consider that our courts have already found such things to be all too real a problem in our state this election cycle. This Court can help Arizona do better, not by dismissing the problem, but by confronting it.

Despite this procedural history, Defendants seek to have Plaintiffs' claims dismissed out-of-hand as nothing more than a conspiracy theory. Hobbs' Motion to Dismiss and Opposition to TRO ("Hobbs Motion"), ECF No. 40 at 1:1-5. Plaintiffs, and those who share their concerns, know that their claims are bold. That is why two members of Arizona's

---

[2] *See State of Arizona ex rel Brnovich v. Fontes*, CV-20-0253-AP/EL, Temporary Restraining Order (Sup. Ct. Ariz. Mar. 13, 2020) ("*Fontes* TRO Order"), available at: https://www.azag.gov/sites/default/files/docs/press-releases/2020/motions/State_v_Fontes_TRO_Certified_Signed.pdf.

delegation to the United States Congress, Congressman Gossar and Congressman Biggs, have taken the unusual step of putting out statements urging this Court to give Plaintiffs' claims serious consideration and laying out their reasons for making that request. Congressman Gosar, in his formal letter writes, in part:

> Currently pending before the Court is Bowyer v. Ducey. We have seen various reports of irregularities, variances, statistical improbabilities, and unorthodox measures occurring in the general election for 2020. To date, in response to the numerous reports, we have received platitudes and condescension "assuring" us, and Arizona voters, that there was no fraud, or now they say that there was not enough fraud to matter. Indeed, those making the assurances, including the Secretary of State, the Maricopa County Board of Supervisors and others, have proffered no evidence that the election tabulation was not manipulated.
> There has been no thorough investigation, no forensic audit, no signature verification and really no substantive effort to rebut the many deficiencies reported on. There are the objective indicia of manipulation that include: down ballot races all going in favor of the Republicans (with the notable and expected loss of McSally). In counties that did not use Dominion software, the President easily won. There is no voter registration imbalance that would make Maricopa County the outlier.
> . . .
> If every vote counts, and if the right to free and fair elections is as important as we always say, then any such vote manipulation must be investigated thoroughly and remedied.
> . . .
> In a recent legislative hearing, evidence was presented of voter anomalies that supposedly occurred notwithstanding the mathematical improbability of such an occurrence.

**Exhibit 1**.[3]  Six additional members of Arizona's legislature, including the Arizona House of Representatives' Majority Leader and the Chair of its Elections Committee, have issued similar letters or declarations echoing these concerns and outlining their own investigative steps which led to them. **Exhibit 2**.

---

[3] This letter may be considered under FRE 803(8) and other applicable law.

Few could be more knowledgeable about the poor state of election integrity in Arizona than the members of Arizona's congressional delegation and state legislature who must operate in that system every day. Their concerns reflect the concerns of the scores of average Arizona voters who are their constituents. Plaintiffs' moving papers and supporting documentation, including the evidence submitted with this reply, show that over 400,000 votes counted in the presidential election must be set aside. This compels the conclusion that defendants' certification of the 2020 election which finding plurality of 10,457 was wrong. Those results must be de-certified.

## STATEMENT OF FACTS

The facts relevant to this Response are set forth in the December 1, 2020 Complaint ("Complaint"), ECF No. 1, filed in the above-captioned proceeding, and its accompanying exhibits, and the TRO Motion.

## DISCUSSION

Defendants and Defendant Intervenor's filings fail altogether to respond to Plaintiffs' fact and expert witness testimony presented in the Complaint. Instead, they have chosen to simply dismiss Plaintiffs' evidence and arguments as a piece of "dystopian fiction." ECF No. 40 at 1.  Nor have they presented any facts or witness testimony that could rebut Plaintiffs' factual allegations and witnesses.[4]   Accordingly, Plaintiffs' allegation and witness testimony remains unrebutted and unchallenged.

This brief will respond to, and dispose of, Defendants and Defendant-Intervenor Maricopa County's specious legal arguments for denial of Plaintiffs' TRO Motion on grounds of: (1) standing, (2) laches, (3) mootness, (4) Secretary Hobbs notice of supplemental authority, (5) the Eleventh Amendment, (6) exclusive state jurisdiction, (7)

---

[4] The closest that Defendants come to engaging the Plaintiffs' factual allegations or witnesses is Defendant Secretary Hobbs' claim that Plaintiffs have provided "***anonymous***" witness affidavits. ECF No. 40 at 22 n.10. This is incorrect. Plaintiffs filed redacted affidavits for these witnesses, and have submitted the unredacted versions under seal to this Court. *See* ECF Nos. 14-18.

state proceedings and issue preclusion, (8) abstention, and (9) applicable pleading standards for election fraud.

Plaintiffs will also respond to Defendant and Defendant Intervenor's claims that Plaintiffs have not met the requirements for injunctive relief, which are: (1) substantial likelihood of success on the merits, and in particular that Plaintiffs have adequately pled their Constitutional and statutory claims; (2) irreparable injury, (3) the balance of equities tips in their favor, and (4) the requested relief is in the public interest.

## I.    PRELIMINARY MATTERS

### A.    Plaintiffs Have Standing

Each Plaintiff is a registered Arizona voter, and Plaintiffs include all nominees of the Republican Party to be a Presidential Elector on behalf of the State of Arizona. See ECF No. 1, "Parties".

#### 1.    Plaintiff Electors Have Standing under Electors and Elections Clause.

Defendant Secretary Hobbs' arguments on standing rely on the Third Circuit's decision in *Bognet v. Sec'y of Commonwealth*, No. 20-2314, 2020 WL 6686120 (3d Cir. Nov. 13, 2020). *See* ECF No. 40 at 1 & 9; see also ECF No. 37 at 6-9.  There the court found that electors lacked standing based on the particularities of a Pennsylvania law that are not present here, but did not discuss the significance of State law provisions pursuant to which Presidential Electors are candidates for office.

Plaintiff Arizona Electors have standing for the same reason that the Eighth Circuit held that Minnesota Electors had standing in *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020).  The *Carson* court affirmed that Presidential Electors have both Article III and Prudential standing under the Electors and Elections Clauses, "was rooted heavily in the court's interpretation of Minnesota law." Defendants neglect to mention that the *Carson* court relied on provisions of Minnesota law treating electors as candidates for office are just like the corresponding provision of A.R.S. Title 16 because in both States an elector is a candidate for office nominated by a political party, and a vote cast for a party's candidate

for President and Vice-President is cast for that party's Electors. A.R.S. § 16-212(A)[5] The Carson court concluded that, "[b]ecause Minnesota law plainly treats presidential electors as candidate, we do, too." *Carson*, 978 F.3d at 1057.

In other words, a vote for President Trump and Vice-President Pence in Arizona is a vote for each of Plaintiff Republican electors, and just as in Minnesota, illegal conduct aimed at harming candidates for President similarly injures Presidential Electors. As such, Plaintiff Elector candidates "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *See also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).  Notably, Defendant and Defendant Intervenors have cited no Ninth Circuit or Arizona precedent in support of their position, nor have they shown any relevant similarity between Pennsylvania and Michigan law on election of electors.

> **2.** **Plaintiffs Have Standing for Equal Protection and Due Process Claims as Registered Voters on their Own Behalf and on Behalf Similarly Situated Voters for Republican Candidates.**

Defendant and Defendant-Intervenors misrepresent Plaintiffs' Equal Protection and Due Process claims, both in terms of substance and for standing purposes, insofar as they claim that Plaintiffs' claims are based solely on a theory of vote dilution, and therefore is

---

[5] *See also* A.R.S. § 16-344(A) ("The chairman of the state committee of a political party that is qualified for representation on an official party ballot at the primary election and accorded a column on the general election ballot shall appoint candidates for the office of presidential elector equal to the number of United States senators and representatives in Congress from this state"); A.R.S. § 16-212(A) ("On the first Tuesday after the first Monday in November, 1956, and quadrennially thereafter, **there shall be elected a number of presidential electors** equal to the number of United States senators and representatives in Congress from this state"); A.R.S. § 16-212(B) ("the presidential electors of this state shall cast their electoral college votes for the candidate for president and the candidate for vice president who jointly received the highest number of votes in this state as prescribed in the canvass.").

a "generalized grievance," rather than the concrete and particularized injury required for Article III standing.  *See* ECF No. 40 at 8-9.[6] This is incorrect.

Plaintiffs', on behalf of themselves and other similarly situated voters, allege, first, and with great particularity, that Defendants have both violated Arizona law and applied Arizona law to dilute the votes of Arizona Republican voters (or voters for Republican candidates) with illegal, ineligible, duplicate or fictitious that Defendants, in collaboration with public employees, Dominion and Democratic poll watchers and activists, have caused to be counted as votes for Democratic candidates. The fact and expert witness testimony describes and quantifies the myriad means by which the vote tally for Biden and other Democrats was illegally inflated in districts that were predominantly Democratic, including: double voting, dead voting, double counting of same vote, forgery of ballot and voter information, illegally completing or modifying ineligible ballots, ballot switching (Trump to Biden), changing dates or backdating absentee ballots, failure to match signatures, etc. *See* ECF No. 1, Section II and III. Thus, the vote dilution resulting from this systemic and illegal conduct did not affect all Arizona voters equally; it had the intent and effect of inflating the number of votes for Democratic candidates and reducing the number of votes for Trump and Republican candidates.

Further, Plaintiffs have presented evidence that, not were the votes of Plaintiffs and similarly-situated voters for Republican candidates diluted, but attempts were made to actively disenfranchise such voters to reduce their voting power, in clear violation of "one person, one vote."  *See generally Baker v. Carr*, 369 U.S. 186 (1962); *Reynolds v. Sims*, 377 U.S. 533 (1964).  There were several schemes to devalue Republican votes as detailed in the Complaint, including Republican ballots being destroyed or discarded, or "1 person,

---

[6] Defendant Governor Ducey also cites *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078, 2020 WL 6821992 (M.D. Penn. Nov. 21, 2020). *See* ECF at 8. This case addressed a number of theories for standing – associational, organizational, and standing of a political party based on harm to that party's candidates – that are not present here because each Plaintiff brings suit in their personal capacity as registered Arizona voters and 11 of the Plaintiffs as Presidential Electors.

0 votes," vote switching "1 person, -1 votes," (Dominion and election workers switching votes from Trump/Republican to Biden/Democrat), and Dominion algorithmic manipulation, or for Republicans, "1 person, 1/2 votes," and for Democrats, "1 person, 1.5 votes." *See e.g.*, ECF No. 1, Section II.C (ballot destruction/discarding) Ex. 2 (Dr. Briggs Testimony regarding potential ballot destruction), Ex. 17 (Ramsland testimony regarding additive algorithm), Section IV (multiple witnesses regarding Dominion vote manipulation).

Plaintiffs' injury is that the relative values of their particular votes were devalued, or eliminated altogether, and as such, it is not a "generalized grievance," ECF No. 40 at 7, as Defendant claims. Federal district courts have held that Arizona voters have standing in cases involving constitutional challenges to Arizona's absentee voting laws and implementation thereof that invalidated their votes. *See, e.g. Raetzel v. Parks/Bellemont Absentee Election Bd*, 762 F.Supp. 1354, 1356 (D. Az. 1990) ("plaintiffs suffered an actual, legally cognizable injury, in that they were not afforded notice or the opportunity to contest the loss of their vote."). *See also Ariz. Democratic Party v. Hobbs*, No. CV-20-01143-PHX-DLR, 2020 WL 5423898, at *5 (D. Az. Sept. 10, 2020) (political organization had standing to sue on behalf of its members, who had standing in individual capacity to challenge law that could invalidate their absentee ballots); *Mi Familia v. Hobbs*, No. CV-20-01903-PHX-SPL, 2020 WL 5904952 (D. Az. Oct. 5, 2020) (holding plaintiffs had standing in challenge to Arizona's voter registration deadline). Plaintiffs have thus met the requirements for standing: (1) the injuries of their rights under the Equal Protection and Due Process clauses that concrete and particularized for themselves, and similarly situated voters, whose votes have been devalued or disregarded altogether (2) that are actual or imminent and (3) are causally connected to Defendants conduct because the debasement of their votes is a direct and intended result of the conducts of the Defendants in certifying an election tainted by fraud and the public employee election workers they supervise. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

**B.    Laches**

Defendant Secretary Hobbs asserts that Plaintiffs' claims are barred by laches.  *See* ECF No. 40 at 9-13.  To establish laches a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself. Because the application of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible to resolution by summary judgment." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 976, (9th Cir. 2017) (*citing Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000) (per curiam) (citations omitted)(held that "[t]here is at least a genuine dispute of material fact as to whether any delay was unreasonable. Id. at 976).

Defendant Secretary instead relies on *Soules v. Kauians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988), ECF No. 40 at 10, a case with entirely different facts.  There, the Ninth Circuit held that plaintiff Equal Protection claim was barred by laches because they "knew the basis of their equal claim well in advance" of the election, months in advance in fact, *Soules*, 849 F.2d at 1181, and failed to provide any explanation for their failure to press their claim before the election. *Id.* at 1182. Yet the standard is that "[b]oth before and after the merger of law and equity in 1938, this Court has cautioned against invoking laches to bar legal relief. *Petrella v. MGM*, 572 U.S. 663, 667 (2014) (*citing e.g., Holmberg v. Armbrecht*, 327 U.S. 392, 395-396 (1946)).

Here, by contrast to Defendants' assertions, all of the unlawful conduct occurred during the course of the election and in the post-election vote counting, manipulation, and even fabrication.  Plaintiffs could not have known the basis of their claim, or presented evidence substantiating their claim, until after the election. Further, because Arizona election officials and other third parties involved did not announce or publicize their misconduct, and in fact prevented Republican poll watchers from observing the ballot counting and handling, it took Plaintiffs additional time post-election to gather the fact and expert witness testimony presented in the Complaint.  Had they filed before the election, as the Defendant Secretary asserts, it would have been dismissed as speculative--because the injuries asserted had not occurred--and on ripeness grounds.

1   Any "delay" in filing after Election Day is almost entirely due to Defendants failure
2   to promptly complete counting until weeks after November 3, 2020.  Arizona did not
3   complete counting at the same time it certified results, which was not until November 30,
4   2020, a mere two days before Plaintiffs filed their initial complaint on December 2, 2020.
5   Defendants cannot now assert the equitable affirmative defense of laches when there is no
6   unreasonable delay nor is there any genuine prejudice to the Defendants.

7   Finally, it is instructive that Arizona law provides that similar challenges in state
8   court are not ripe until an election has been certified and are timely if brought within 5 days
9   thereafter. A.R.S. § 16-673. This suit was brought during the early portion of this period.
10  Although Arizona law is not dispositive in this Court on the issue of latches, this Court
11  may look to it as persuasive authority as to the reasonableness of the date of filing.

12  **C.      Mootness**

13  Defendants' mootness argument is similarly without merit.  *See* ECF No. 38 at 4-5;
14  ECF No. 40 at 21.  This argument is based on the false premise that this Court cannot order
15  any of the relief requested in the Complaint or the TRO Motion. Article III mootness is
16  "the doctrine of standing set in a time frame: The requisite personal interest that must exist
17  at the commencement of the litigation (standing) must continue throughout its existence
18  (mootness)." *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1244, (9th Cir. 1999) (*citing*
19  *Arizonans For Official English v. Arizona*, 520 U.S. 43, 68, 117 S. Ct. 1055, 1069, 137 L.
20  Ed. 2d 170 (1997) (*quoting Henry Monaghan, Constitutional Adjudication: The Who and*
21  *When*, 82 Yale L.J. 1363, 1384 (1973)).

22  Without an immediate temporary injunction, electoral votes will be cast, electors
23  will be appointed, and this Court will lose any authority to provide relief to Plaintiffs.
24  There is no harm to Respondents by the potential relief fashioned by this Court. As recently
25  held by a court considering claims similar to those asserted here:

26

27          3 U.S.C §5 makes clear that the Safe Harbor does not expire until December
28          8, 2020, and the Electoral College does not vote for president and vice

- 10 -

president until December 14, 2020.  According to an October 22, 2020 white paper from the Congressional Research Service titled "The Electoral College: A 2020 Presidential Election Timeline," the electors will meet and vote on December 14, 2020. https://crsreports.congress.gov/product/pdf/IF/IF11641. December 8, 2020—six days prior to the date the College of Electors is scheduled to meet—is the "safe harbor" deadline under 3 U.S.C. §5. That statute provides that if a state has provided, "by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State," and that final determination has been made "at least six days before the time fixed for the meeting of the electors," that determination—if it is made *under the state's law* at least six days prior to the day the electors meet— "shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution . . . ."  It appears, therefore, that December 8 is a critical date for resolution of any state court litigation involving an aggrieved candidate who is contesting the outcome of an election.

*Feehan v. Wisconsin Board of Elections*, (Case No. 20-cv-1771) (E.D. Wis. 12/4/20) (December 4, 2020, Doc-29).

This Court can grant the primary relief requested by Plaintiffs – de-certification of Arizona's election results and an injunction prohibiting State Defendants from transmitting the results – as discussed in Section I.E. on abstention below.  There is also no question that this Court can order other types of declaratory and injunctive relief requested by Plaintiffs, in particular, impounding Dominion voting machines and software for inspection, nor have State Defendants claimed otherwise.

In any case, the Ninth Circuit has recognized that election cases fall within the "capable of repetition, yet evading review" exception to the mootness doctrine "because the inherently brief duration of an election is almost invariably too short to enable full

1   litigation on the merits." *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) (citations
2   omitted). "If such cases were rendered moot by the occurrence of an election," then the
3   unconstitutional actions of state officials like Secretary Hobbs "could never reach appellate
4   review." *Id.*

5           **D.      Defendant Secretary Hobbs' Notice of Supplemental Authority**

6           Defendant Secretary Hobbs attempts to salvage her standing argument with today's
7   notice of supplemental authority regarding the Eleventh Circuit's decision in *Wood v.*
8   *Raffensperger*, No. 20-14418 (D.C. Cir. Dec. 5, 2020), *see* ECF No. 40 & 40-1, but fails
9   to acknowledge three crucial distinctions between these cases. First, she conflates
10  Plaintiffs with one of their attorneys, who is not a plaintiff or party to this case. ECF No.
11  40 at 2.

12          Second, she fails to recognize that the Eleventh Circuit's decision in Wood supports
13  Plaintiffs' standing argument and refutes hers. The court dismissed Plaintiff Wood's claim
14  because he was not a candidate. "[I]f Wood were a political candidate," like the Plaintiffs
15  here, "harmed by the recount, he would satisfy this requirement because he could assert a
16  personal, distinct injury." ECF No. 40-1 at 10 (citations omitted).

17          Third, there are important differences between the particular relief sought in *Wood*
18  and those requested by Plaintiffs in the Complaint, and in the claims made. Unlike
19  Plaintiffs, Mr. Wood did not ask the district court to de-certify the election (instead asking
20  for a delay in certification), nor did he assert claims under the Elections and Electors
21  Clause. The *Wood* court held that Georgia's certification of results mooted Mr. Wood's
22  request to delay certification, so the court could not consider a request for de-certification
23  "made for the first time on appeal." *Id.* at 18. Plaintiffs made their request for de-
24  certification and other injunctive relief in the Complaint, Compl. at PP 142-145, and this
25  request is not mooted by Defendants' certification of the results. While the *Wood* court
26  found that the mootness exception for "capable of repetition yet evading review," discussed
27  above with respect to the Ninth Circuit opinion in *Porter*, was not applicable, their denial
28

was based on the specific "posture of [his] appeal" and the specific relief requested (delay of certification), which are not applicable to Plaintiffs' claims.

Further, Plaintiffs are not asserting a "garden variety" claim about election issues as the court found was the case in *Wood*.  The Complaint describes a massive and widespread voting fraud scheme that affected hundreds of thousands of votes in Arizona, as well as additional hundreds of thousands of votes in several other states.  The *Wood* court addressed a closed record of what had been submitted in the district court proceeding that did not consider all of the evidence that has been gathered and submitted to date by Plaintiffs in Arizona and separate Republican Elector candidates in other affected states.

In addition, unlike in *Wood*, Plaintiffs here are seeking declaratory relief.

### E.   Eleventh Amendment

Defendants assert that Plaintiffs' claims are barred by the Eleventh Amendment, but the cases address circumstances that are not present here. *See* ECF No. 38 at 5-6; ECF No. 40 at 19-21. While Governor Ducey's Eleventh Amendment defense appears to be limited to dismissal of the claims against the Governor himself, based on the purported "ministerial" nature of his duties, he acknowledges that under A.R.S. § 16-142(A)(1), Secretary Hobbs, "or the secretary's designee is [the] chief state election officer …"  ECF No. 40 at 6. Governor Ducey argues that in order to take advantage of the *Ex Parte Young* exception to the state's sovereign immunity, the state officer must have some connection to the enforcement of the act. Of course, the Governor is expressly given such a connection under federal law. Under 3 USC § 6, the Governor is required to communicate to the Archivist of the United States "under the seal of the State" the results of the final determination of any election "controversy of contest" "as soon as practicable after such determination." This is to be thereafter transmitted to Congress. *Id*. Complete relief therefore cannot be had without the Governor being subject to this Court's order. If, as the Governor claims, his act in transmitting the original certified results "cannot be undone" Ducey Resp. 4:19-20, there would be no reason for 3 USC § 6 to contain a provision allowing it to be undone.

Secretary Hobbs' argument is broader -- claiming that it bars Plaintiffs requested relief altogether -- but without merit.   The Eleventh Amendment bars claims for retrospective relief such as damages, but it permits claims for prospective and injunctive relief. In *Porter*, The Ninth Circuit squarely addressed the scope of this Eleventh Amendment bar with respect to a state's Secretary of State enforcement of state election laws, holding that the federal court can provide prospective injunctive relief and that it can "adjudicate the legality of past conduct," *i.e.,* it can provide a prospective remedy for past violations of state law.   *Porter*, 319 F.3d at 491.

This is precisely what the Plaintiffs request in the Complaint, namely, equitable and injunctive relief to prospectively enjoin the Defendants to take or not take actions that are within the scope of their statutory authority.  The Complaint requests that this Court  de-certify the election results; grant a permanent injunction "enjoining Secretary Hobbs and Governor Ducey from transmitting the currently certified election results to the Electoral College[,]"  (See ECF No. 1 ¶1); declare the election results unconstitutional, as well as to provide access to voting machines, software and other election-related records and materials.  ECF No. 1. PP 142-145.  Under *Porter*, the Eleventh Amendment is no bar to this Court granting the requested relief.

### F.    Exclusive State Jurisdiction

Defendant Secretary argues that "[s]econd, plaintiffs' claims must be brought in an election contest—a matter reserved exclusively for the jurisdiction of the Arizona state courts."  (See p. 3 of Doc-40). This completely ignores the fact that the states' authority to conduct federal elections in the first place derives from U.S. Constitution and Article I, § 4 and Article II, § 1 of the U.S. Constitution which grants plenary authority to state legislatures to enact laws that govern the conduct of elections.

This Court has subject matter jurisdiction under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for

President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932). The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P. "The right to vote is protected in more than the initial allocation of the franchise. As the Supreme Court has made clear, it has jurisdiction to address the right to vote, "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *See, e.g., Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665, 16 L. Ed. 2d 169, 86 S. Ct. 1079 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment"). It must be remembered that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (*Bush v. Gore*, 531 U.S. 98, 104-105, 121 S. Ct. 525, 530, 148 L. Ed. 2d 388, 398, (2000) (*citing Reynolds v. Sims*, 377 U.S. 533, 555, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964)).

To the extent the Complaint implicates Arizona statutory or constitutional law, jurisdiction remains appropriate under 28 U.S.C. § 1367. As a threshold matter, the supplemental jurisdiction statute, section 1367, says that district courts "shall have" jurisdiction over the non-federal claims forming part of the same case or controversy, ... if state law claims are asserted as part of the same case or controversy with a federal claim, the district court has discretion to exercise supplemental jurisdiction over the remaining state law claims and the mandatory remand provision of the procedure after removal statute does not apply. Under the plain language of the statutes, logically it cannot "appear[] that the district court lacks jurisdiction" under 1447(c) if it "shall have" jurisdiction under 1367. *Albingia Versicherungs A.G. v. Schenker Int'l Inc.*, 344 F.3d 931, 937-938, (9th Cir. 2003).

Even in removal cases, the court explained, "Section 1447(c) does not mean that if a facially valid claim giving rise to federal jurisdiction is dismissed, then supplemental

jurisdiction is vitiated, and the case must be remanded. Once supplemental jurisdiction exists, it remains, subject to the discretionary provision for remand in section 1441. *Id*. at 938. Moreover, the Voting Rights Act, 52 U.S.C. §10101(e), further highlights federal jurisdiction to govern federal elections, which provides, in relevant part:

> … When used in the subsection, the word "vote" includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election.

Id.

Federal law also requires the states to maintain uniform voting standards. *See* Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481. Unlike the situation where a court is situated in diversity jurisdiction and deciding an entirely state-law matter, as presented in *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945), in this action this Court has "no duty … to approximate as closely as may be State law in order to vindicate without discrimination a right derived solely from a State." *Holmberg*, 327 U.S. at 395. Rather, the duty here is that "of federal courts, sitting as national courts throughout the country, to apply their own principles in enforcing an equitable right" created under the U.S. Constitution. *Id*.

### G.   State Proceedings & Issue Preclusion

Defendant Secretary Hobbs erroneously claims that the "Plaintiffs are barred from re-adjudicating their issues here under the doctrine of collateral estoppel, or issue preclusion," ECF No. 40 at 18, because, in her view, the issues in the Complaint were fully litigated in *Ward v Jackson, et al.*, CV 2020-015285 (filed Sup. Ct. Maricopa Cty. Nov. 24, 2020). ECF No. 40-2. As an initial matter: "Some litigants -- those who never appeared in a prior action -- may not be collaterally estopped without litigating the issue. They have

never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position." *Blonder-Tongue Labs. v. Univ. of Ill. Found.*, 402 U.S. 313, 329, 91 S. Ct. 1434, 1443, 28 L.Ed.2d 788, 800 (1971). There are fourteen plaintiffs in this action, only one of whom was a Plaintiff in Ward v Jackson (and there not in her capacity as nominee for presidential elector). At most, then, any preclusion argument would result merely in the dismissal of Plaintiff Ward but would not otherwise impact the adjudication of this case.

Further, issue preclusion applies "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 135 S.Ct 1293, 1303 (2015) (*quoting* Restatement (Second) of Judgments § 27, p. 250 (1980)).  Parsing this definition, a party asserting issue preclusion must show that each of the following four requirements have been met: (1) the disputed issue is identical to that in the previous action, (2) the issue was actually litigated in the previous action, (3) resolution of the issue was necessary to support a final judgment in the prior action, and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding.  *See Louisville Bedding Co. v. Perfect Fit Indus.*, 186 F. Supp. 2d 752, 753-754, 2001 U.S. Dist. LEXIS 9599 (*citing Graco Children's Products, Inc. v. Regalo International, LLC*, 77 F. Supp. 2d 660, 662 (E.D. Pa. 1999).  None of these elements are satisfied with respect to *Ward v. Jackson* and the instant Complaint.

Elections challenges under Arizona state law may not be brought before the canvas is completed, after which they must be brought within five days. A.R.S. § 16-673. Arizona completed its canvas on November 30, 2020.  *Id.*  To Counsel's knowledge, *Ward v Jackson* is the only Contest that had been brought in state court to challenge the results of

1   the presidential election as of the date and time this suit was filed.[7]  Other election-related

2   matters this cycle such as *Aguilera v. Fontes* and *Trump v. Hobbs* were brought prior to the

3   challenge period and Plaintiffs in those matters expressly acknowledged that the outcome

4   would not impact the results of the presidential election.[8]

5                    **1.      There is No Identity of Parties Between this Case and Ward v**

6                    **Jackson.**

7          This case is brought by fourteen distinct Plaintiffs representing the Arizona

8   Republican Party's entire slate of nominees for Presidential Elector and three county party

9   chairs. The sole Plaintiff in *Ward v Jackson* was Keli Ward, who filed it in her capacity as

10  a voter and not in her capacity as a presidential elector. Statement of Elections Contest ¶

11  4.[9]  No other Plaintiffs in this case were Plaintiffs in *Ward v Jackson* in any capacity. *Id*. p

12  1 [caption]. No Defendants in this case were Defendants in *Ward v Jackson* in any capacity.

13  *Id*.

14         To this point, the Ninth Circuit has determined that, a private defendant was also

15  precluded from using collateral estoppel to bar a claim involving nonmutual collateral

16  estoppel, and the court explained that, "[n]onmutual collateral estoppel refers to use of

17  collateral estoppel by a nonparty to a previous action to preclude a party to that action from

18  relitigating a previously determined issue in a subsequent lawsuit against the nonparty.

19  *Blonder-Tongue Lab. v. University of Illinois Found.*, 402 U.S. 313, 320-30, 28 L. Ed. 2d

20  788, 91 S. Ct. 1434 (1971). "Offensive" use of nonmutual collateral estoppel occurs when

21  a plaintiff seeks to prevent a defendant from relitigating an issue that the defendant

22  _____

23  [7] This Court may take judicial notice, based on the records of the Clerk of the Maricopa
    County Superior Court, that *Ward v. Jackson* is the only case brough within the statutory

24  time period for an election challenge in Maricopa County as of the date and time this suit
    was file. https://www.clerkofcourt.maricopa.gov/records/election-2020. FRE 201(b)(2).

25  *Ward v. Jackson* was assigned a case number prior to the commencement of Arizona's

26  challenge period because Plaintiff made a request for pre-litigation discovery.
    [8] *See e.g.,* Verified Complaint for a Special Action ¶ 1.4

27  https://www.clerkofcourt.maricopa.gov/Home/ShowDocument?id=1654 (*Aguilera v.
    Fontes*); Notice of Partial Mootness (*Trump v. Hobbs*).

28  [9] https://www.clerkofcourt.maricopa.gov/Home/ShowDocument?id=1836.

previously litigated unsuccessfully against a different party. *Mendoza*, 464 U.S. at 159 n.4. "Defensive" use of nonmutual collateral estoppel involves a defendant attempting to preclude a plaintiff from relitigating an issue that the plaintiff previously litigated unsuccessfully against a different party. *Id*.

The Ninth Circuit, therefore, found that "Mendoza's rationale applies with equal force to G&T's attempt to assert nonmutual defensive collateral estoppel against IPC (a state agency). *Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*, 425 F.3d 708, 714, (9th Cir. 2005) (citing *See Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 689-90 (9th Cir. 2004) (relying on *Mendoza's* reasoning to conclude, under Idaho state law preclusion principles, that nonmutual offensive collateral estoppel did not preclude a state agency from relitigating a legal issue that had previously been determined against the agency by a state court); *Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558, 1578-79 (11th Cir. 1985) (applying *Mendoza* to hold that nonmutual defensive collateral estoppel did not operate against a state government). We therefore hold that issue preclusion does not prevent IPC from challenging the district court's determination that the no-challenge clause of IPC's licensing agreement is unenforceable." *Id*.  Similarly, the Plaintiffs, who are all elected electors, should not be barred from challenging the issues herein, especially where they were also not the same identical issues.

### 2. This Case Pleads Entirely Different Causes of Action from Ward v. Jackson.

*Ward v. Jackson* raises only one cause of action, an elections contest under A.R.S. § 16-673. Statement of Elections Contest 5:22-23.  This case raises causes of action for violations of 42 U.S.C. § 1983, the Fourteenth Amendment to the US Constitution, and Election Fraud. Complaint 41:14-50:26.

### 3. Unlike Ward v Jackson, this Case is Part of National Litigation Concerning a Pattern of Similar Problems Nationwide and Raises Far Broader Factual Questions.

The Statement of Elections Contest (i.e. Complaint) filed in *Ward v. Jackson* was only nine pages long, including the caption. Statement of Elections Contest *passim*. As such, it necessarily concerned a much narrower universe of facts than the Complaint in this matter, which is over five-times as long. The trial court summarized Plaintiff's claims as follows:

> Plaintiff alleges misconduct in three respects. First is that insufficient opportunity was given to observe the actions of election officials.
> . . .
> Second, Plaintiff alleges that election officials overcounted mail-in ballots by not being sufficiently skeptical in their comparison of signatures on the mail-in envelope/affidavits with signatures on file.
> . . .Third, Plaintiff alleges errors in the duplication of ballots.[10]

December 4, 2020 Minute Entry Order (*Ward v Jackson*) p 6-8.[11]

Furthermore, the factual universe in *Ward v. Jackson* seems to have been constrained to Maricopa County and to not involve issues from anywhere else in the state, let alone on a national level. Statement of Elections Contest 2:22-5:21.

Here, in contrast, Plaintiffs' primary factual contention is that the results of the election that Defendants certified are tainted by the two categories of fraud which, taken together, would be sufficient to change the result of the presidential election in Arizona. Complaint ¶ 20.

The first is that the electronic voting systems used in both Maricopa and Pima county were intentionally manipulated to give false totals. See e.g. Complaint ¶¶ 19(D, E), 66.  The second is that various categories of illegal votes appear to have been counted and various categories of legal votes appear to be left uncounted. Particularly:

---

[10] Plaintiffs' counsel briefly mentioned reports of "vote flipping" within the context of this factual contention but chalked up reports of it to the software being "highly inaccurate[,]" Statement of Elections Contest ¶ 27, not to it being part of a larger pattern of election fraud as Plaintiffs here have claimed.

[11] https://www.clerkofcourt.maricopa.gov/Home/ShowDocument?id=1930.

• Unreturned mail ballots unlawfully ordered by third parties (average for Dr. Briggs Error #1): 219,135.

• Returned ballots that were deemed unreturned by the state (average for Dr. Briggs Error #2): 86,845.

• Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

Complaint ¶ 19.

Further, Plaintiffs here have alleged that this is a part of a wider, national, pattern. *See e.g.* Complaint ¶¶ 67-75. As Defendants have correctly noted, similar suits have been brought in federal court in other states by Plaintiffs' national counsel. Once these cases have worked their way through various circuit courts, a petition for review can be expected to be made to the US Supreme Court. A federal court is the right venue to adjudicate such claims due to both the national scope of the claims as well as for the sake of consistency. *See also* A.R.S. § 16-672(B) (election challenge "may" (not must) be brought in Superior Court).

### 4. A third-party seeking to raise similar issues to the ones before this court was denied leave to intervene in Ward v Jackson.

Members of the Arizona Election Integrity Association ("AEIA") sought leave to intervene in *Ward v. Jackson*. [Proposed] Pleading in Intervention 2:2-5 (*Ward v. Jackson*).[12] As Plaintiffs do here, the AEIA sought to raise the issues of the unlawful ordering of ballots by third-parties, returned ballots not counted, and votes by out of state persons. *Id*. 3:21-4:18. However, the motion to intervene was denied as being filed too late in the litigation for its scope to be expended to this degree. December 3, 2020 Minute Entry Order p 3.[13]

Of equal importance is the fact that the isolated claims in State court do not appear to present evidence demonstrating that a sufficient number of illegal ballots were counted

---

[12] https://www.clerkofcourt.maricopa.gov/Home/ShowDocument?id=1890.
[13] https://www.clerkofcourt.maricopa.gov/Home/ShowDocument?id=1928.

to affect the result of the 2020 General Election. The fact and expert witnesses presented in the Complaint do. The Complaint alleges and provides supporting evidence that the number of illegal votes is potentially multiples of Biden's 10,457 margin in Arizona, particularly:

- Unreturned mail ballots unlawfully ordered by third parties (average for Dr. Briggs Error #1): 219,135
- Returned ballots that were deemed unreturned by the state (average for Dr. Briggs Error #2): 86,845
- Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.
- "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima County precincts: 100,724.
- And Plaintiffs can show Mr. Biden received a statistically significant Advantage, based on fraud, from the use of Dominion Machines in a nationwide Study, which conservatively estimates Biden's advantage at 62,282 Votes.

*See generally* Compl., Section II. No State case has been adjudicated with supporting documentary and testimonial evidence like what has been submitted here, which is more than sufficient to change the result of the election.

### H.   Abstention

Defendant Secretary Hobbs drops a footnote asserting that this Court "should abstain from hearing the case on federalism and comity grounds." ECF No. 40 at 19 n.8 (*citing Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727-30 (1996)). The abstention request is cursory, so it is difficult for Plaintiffs to determine what Secretary Hobbs' argument is and to respond.

Accordingly, Plaintiffs would note that the case cited is inapposite. The standard for federal abstention in the voting rights and state election law context, *Harman v. Forssenius*, 380 U.S. 528, 534, (1965) is not favorable to their cause. In *Harman*, the Supreme Court rejected the Defendant state's argument that federal courts should dismiss

voting rights claims based on federal abstention, emphasizing that abstention may be appropriate where "the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law," and "deference to state court adjudication only be made where the issue of state law is uncertain." *Harman*, 380 U.S. at 534 (citations omitted).  But if state law in question "is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," then "it is the duty of the federal court to exercise its properly invoked jurisdiction." *Id*. (citation omitted). Here, the complaint rests on federal constitutional claims based on the Electors Clause and the Equal Protection Clause. These claims are not dependent in any way on an interpretation of Arizona state law.

## II.      The Complaint Satisfies the Applicable Pleading Standard under Arizona Law and the Federal Rules of Civil Procedure

Defendant Intervenor's assertion that Plaintiffs' Complaint must be dismissed pursuant to Federal Rule of Civil Procedure 9(b), ECF No. 36 at 2-6, is incorrect because it misstates the standard for ballot fraud under controlling Arizona Supreme Court precedent. In *Miller v. Picacho Elementary Sch. Dist. No. 33*, 179 Ariz. 178, 180, 877 P.2d 277, 279, (S. Ct.1994), the Supreme Court of Arizona explained that election fraud occurs where there are "non-technical" violations of election law that affected the result of the election: "We therefore hold that a showing of fraud is not a necessary condition to invalidate absentee balloting. It is sufficient that an express non-technical statute was violated, and ballots cast in violation of the statute affected the election." *Id*. The *Miller* Court went on to explain:

> If a statute expressly provides that non-compliance invalidates the vote, then the vote is invalid. If the statute does not have such a provision, non-compliance may or may not invalidate the vote depending on its effect. In the context of this case, affect the result, or at least render it uncertain, means ballots procured in violation of a non-technical statute in sufficient numbers to alter the outcome of the election.

*Id.* (internal citations and quotation omitted).  Like the violations at issue in *Miller*, Plaintiffs' are not alleging "mere technical violations," *id.*, but rather "substantive irregularities" and systematic violations of procedural safeguards designed to prevent "fraud" and "ballot tampering," and like in *Miller*, "[t]hese tactics achieved the desired result--they turned the election around" for Biden.  *Id.* Plaintiffs' Complaint alleges serious violations of Arizona state law, as well as the U.S. Constitution and federal laws, as part of a larger scheme of election fraud that affected the result.  And, it sets forth these allegations in great detail with substantial expert and fact affidavit support (which would support a FRCP 9(b) analysis even if that standard were applied).  As such, Plaintiffs' Complaint meets the applicable pleading requirements under Arizona law and the Federal Rules of Civil Procedure.

### III.    Plaintiffs are Entitled to Injunctive Relief

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Feldman v. Az. Sec. of State's Office*, 208 F.Supp.3d 1074, 1081 (D. Ariz. 2016) (*citing Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)).  Alternatively, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two Winter factors are satisfied," *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (*quoting Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)), i.e., if the injunctive relief is in the public interest and failure to grant would result in irreparable harm to the plaintiff.

All elements are met here, under either standard.  Defendant and Defendant Intervenor responses have not shown otherwise.

Of course, as an initial matter, "[w]hen the acts sought to be enjoined have been declared unlawful or clearly are against the public interest, plaintiff need show neither

1    irreparable injury nor a balance of hardship in his favor." *Ariz. Pub. Integrity All. v. Fontes*,

2    No. CV-20-0253-AP/EL, 2020 Ariz. LEXIS 309, at *13-14 (Nov. 5, 2020) (quoting 11

3    Wright & Miller, Federal Practice & Proc. ¶ 2948 (3d ed. 1998)) (internal quotation marks

4    omitted); *See also Current-Jacks Fork Canoe Rental Ass'n v. Clark*, 603 F. Supp. 421, 427

5    (E.D. Mo. 1985) (stating that "[i]n actions to enjoin continued violations of federal statutes,

6    once a movant establishes the likelihood of prevailing on the merits, irreparable harm to

7    the public is presumed."). Certifying election results tainted by election fraud and failing

8    to retract such a certification is clearly unlawful and against the public interest. Hence,

9    Plaintiffs discuss irreparable hardship and the public interest only in the alternative.

10   **A.    Plaintiffs have a substantial likelihood of success on the merits.**

11   Through detailed fact and expert testimony including documentary evidence

12   contained in the Complaint and its exhibits, Plaintiffs have  made a compelling showing

13   that Defendants' intentional actions jeopardized the rights of Arizona citizens to select their

14   leaders under the process set out by the Arizona Legislature through the commission of

15   election frauds that violated laws, including multiple provisions of the Arizona election

16   laws.  These acts also violated the Equal Protection and Due Process Clauses of the United

17   States Constitution. U.S. Const. Amend XIV.

18   Defendants and Defendant-Intervenors misrepresent Plaintiffs' constitutional

19   claims.  Plaintiffs allege both vote dilution and voter disenfranchisement, both of which

20   are claims under the Equal Protection and Due Process Clause, due to the actions of

21   Defendants in collusion with public employees and voting systems like Dominion.  The

22   Complaint describes in great detail the actions taken to dilute the votes of Republican

23   voters through counting and even manufacturing hundreds of thousands of illegal,

24   ineligible, duplicative or outright fraudulent ballots.

25   While the U.S. Constitution itself accords no right to vote for presidential electors,

26   "[w]hen the state legislature vests the right to vote for President in its people, the right to

27   vote as the legislature has prescribed is fundamental; and one source of its fundamental

28   nature lies in the equal weight accorded to each vote and the equal dignity owed to each

voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (emphasis added).  The evidence shows not only that Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the Arizona Legislature, but that those in collaboration with Dominion and other third parties fraudulently and illegally manipulated the vote count to make certain the election of Joe Biden as President of the United States.  This conduct violated Plaintiffs' constitutional equal protection and due process rights as well their rights under the Arizona election laws.  ARS §§ 16-101, et seq.

But Defendants' actions also disenfranchised Republican voters in violation of the U.S. Constitution's "one person, one vote" requirement by certifying an election where the following occurred:

• Republican Ballot Destruction: "1 Person, 0 Votes."  Fact and witness expert testimony alleges and provides strong evidence that tens or even hundreds of thousands of Republican votes were destroyed, thus completely disenfranchising that voter.

• Republican Vote Switching: "1 Person, -1 Votes."  Plaintiffs' fact and expert witnesses further alleged and provided supporting evidence that in many cases, Trump/Republican votes were switched or counted as Biden/Democrat votes.  Here, the Republican voter was not only disenfranchised by not having his vote counted for his chosen candidates, but the constitutional injury is compounded by adding his or her vote to the candidates he or she opposes.

• Dominion Algorithmic Manipulation: For Republicans, "1 Person, 0.5 Votes," while for Democrats "1 Person, 1.5 Votes.  Plaintiffs presented evidence in the Complaint regarding Dominion's algorithmic manipulation of ballot tabulation, such that Republican voters in a given geographic region, received less weight per person, than Democratic voters in the same or other geographic regions.  See ECF No. 6, Ex. 104.  This unequal treatment is the 21st century of the evil that the Supreme Court sought to remedy in the apportionment cases beginning with Baker v. Carr, 369 U.S. 186 (1962), and Reynolds v. Sims, 377 U.S. 533 (1964).  Further, Dominion  appears to have done so in collusion with State actors, so this form of discrimination is under color of law.

This Court should consider the totality of the circumstances in evaluating Plaintiffs' constitutional and voting rights claims, *see, e.g., Chisom v. Roemer*, 111 S.Ct 2354, 2368 (1991), and thus the cumulative effect of the Defendants' voter dilution, disenfranchisement, fraud and manipulation, in addition to the effects of specific practices. Taken together, these various forms of unlawful and unconstitutional conduct destroyed or shifted tens or hundreds of thousands of Trump votes, and illegally added tens or hundreds of thousands of Biden votes, changing the result of the election, and effectively disenfranchising the majority of Arizona voters.  And this is not the first time that Defendant and Defendant Intervenor have enabled attempts to "vote ballots that are not lawfully authorized."  *See Fontes* TRO Order at 2 (enjoining Defendant Intervenor Maricopa County attempt to send absentee ballots to voters that have not requested them).  Dr. Briggs' testimony demonstrates that Defendant and Defendant Intervenor likely violated Arizona law and the express terms of the *Fontes* TRO Order.

While Plaintiffs allege several categories of traditional "voting fraud", Plaintiffs have also alleged new forms of voting dilution and disenfranchisement made possible by new technology.  The potential for voter fraud inherent in electronic voting was increased as a direct result of  Defendants' and Defendant-Intervenors' decision to transform traditional in-person paper voting – for which there are significant protections from fraud in place – to near universal absentee voting with electronic tabulation – while at the same time eliminating through legislation or litigation – and when that failed by refusing to enforce – traditional protections against voting fraud (voter ID, signature matching, witness and address requirements, etc.).

Thus, while Plaintiffs' claims include novel elements due to changes in technology and voting practices, that does not nullify the Constitution or Plaintiffs' rights thereunder. Defendants and Defendant-Intervenors have certified an election tainted by likely the most wide-ranging and comprehensive mechanism to facilitate voting fraud yet devised, integrating new technology with old fashioned urban machine corruption and

skullduggery. The fact that this scheme is novel does not make it legal or prevent this Court from fashioning appropriate injunctive relief to protect Plaintiffs' rights.

William Briggs provides a rebuttal to Stephen Ansolabehere that fully defends and even strengthens his findings of widespread voter fraud regarding tens of thousands of mail in ballots that failed to arrive and others ordered by third parties.  While specific matters are discussed in the rebuttal, what cannot be ignored is the added confidence that results when this pattern of this fraud is repeated across all five of the swing states where the analysis was performed, Georgia, Michigan, Pennsylvania, Arizona and Wisconsin.  To see statistical significance found repeatedly -- in fact, five times in a row, should put any doubts to rest.

Teasley also provides a rebuttal to Jonathan Rodden, a PhD in political science, and fully defends his model that found statistical significance in the advantage that Biden gained from Dominion machines relative to all others in a nationwide analysis.  This argument was soundly defended as Rodden failed to apply any meaningful evaluation and made numerous basic errors in terms of inferring cause from correlation.

Further, as set forth in the rebuttal report of Russell Ramsland, attached hereto, **Ex. 5**, none of Defendants criticisms have any merit.

### B.    The Plaintiffs will suffer Irreparable Harm.

Plaintiffs will suffer an irreparable harm due to the Defendants' myriad violations of Plaintiffs' rights under the U.S. Constitution, and Arizona Election Code, and Defendant and Defendant Intervenors have not shown otherwise.

In this Response, Plaintiffs have refuted and rebutted their arguments in detail, in particular, regarding standing, equitable defenses, and jurisdictional claims, as well as establishing their substantial likelihood of success. Having disposed of those arguments, and shown a substantial likelihood of success, this Court should presume that the requirement to show irreparable injury has been satisfied.

"It is well established that the deprivation of constitutional rights," such as violations of the Fourteenth Amendment rights to Equal Protection and Due Process,

1
2
3
4
5
6
7
8
9
10
11
12
13

"'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (*quoting Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (where plaintiff had proven a probability of success on the merits, the threatened loss of First Amendment freedoms "unquestionably constitutes irreparable injury"); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."). Moreover, courts have specifically held that infringement on the fundamental right to vote constitutes irreparable injury. *See Ariz. Democratic Party v. Ariz. Republican Party*, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016) (*citing Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012) ("A restriction on the fundamental right to vote ... constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (holding that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon")."

14    ### C.    The Balance of Equities & The Public Interest

15
16

Defendant and Defendant Intervenors make a few half-hearted attempts on this element but add nothing new or that merits a response.

17
18
19
20
21
22
23
24
25
26

The remaining two factors – the balance of the equities and the public interest – are frequently analyzed together, *see, e.g., Arizona Dream Act Coal. v. Brewer*, 818 F.3d 901, 920 (9th Cir. 2016), and both factors tip in favor Plaintiffs. Granting Plaintiffs' primary request for injunctive relief, enjoining certification of the 2020 General Election results, or requiring Defendants to de-certify the results, would not only not impose a burden on Defendants, but would instead relieve Defendants of the obligation to take any further affirmative action. The result would be to place the decision regarding certification and the selection of Presidential Electors back into the hands of the Arizona State Legislature, which is the ultimate decision maker under the Elections and Electors Clause of the U.S. Constitution.

27
28

Conversely, permitting Defendants' certification of an election so tainted by fraud and unlawful conduct would impose a certain and irreparable injury not only on Plaintiff,

but would also irreparably harm the public interest insofar as it would undermine "[c]onfidence in the integrity of our electoral processes," which "is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 127 S.Ct. 5, 7 (2006) (per curiam).

In this regard, Plaintiffs would highlight a recent Eleventh Circuit decision addressed a claim in 2018 related to Georgia's voting system and Dominion Voting Systems that bears on the likelihood of Plaintiffs' success on the merits and the balance of harms in the absence of injunctive relief:

In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related Curling case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted. *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1294-1295, (11th Cir. 2018).

### D.    Plaintiffs Reiterate Their Request for Emergency Injunctive Relief Prior to December 14, 2020.

Plaintiffs urge this Court to grant the emergency injunctive relief requested in the TRO motion immediately, and in no event, later than December 10, 2020.  In this regard, Plaintiffs bring to this Court's attention the December 4, 2020 order in *William Feehan v. Wisconsin Elections Commission, et al.*, Case No. 20-cv-1771-pp (E.D. Wis. Dec. 4, 2020) ("Feehan"). The Plaintiffs in Feehan raised largely identical federal claims as those presented in the current in this Complaint,   and they requested an expedited briefing schedule, as "time was of the essence because the College of Electors was schedule to meet December 8," which "is the 'safe harbor' deadline under 3 U.S.C. § 5."  Id. at 7.

Of relevance here, the Feehan court held that, while December 8, 2020 is a critical date for resolution of any state court litigation," or state law claims, it is not the deadline

for federal courts. Feehan at 8.  The applicable date for resolution of federal claims is December 14, 2020, the date on which the electors meet and vote.  *Id.*  The court then set a "less truncated" briefing schedule in light of the additional time.  Accordingly, Plaintiffs request that this Court grant the TRO Motion not later than December 10, 2020.

**IV.    Relief Requested**

Plaintiffs seek a de-certification of Arizona's election results. They also seek stay in the delivery of the certified results to the Electoral College to preserve the status quo while this case proceeds, as well that the voting machines be impounded and made available, and other equitable relief, on an emergency basis.

Respectfully submitted this 5th day of December, 2020

/s Sidney Powell
Sidney Powell PC
Texas Bar No. 16209700

Alexander Kolodin
Kolodin Law Group PLLC
AZ Bar No. 030826

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

3443 N. Central Ave Ste 1009
Phoenix, AZ 85012

*Application for admission pro hac vice
forthcoming

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)
Brandon Johnson (D.C. Bar No. 491730)

2911 Turtle Creek Blvd. Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice Forthcoming

L. Lin Wood (Georgia Bar No. 774588)
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler (New York Bar No. 2657120)
Howard Kleinhendler Esquire
369 Lexington Ave. 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

1
2
3
4
5
6
7
8
9
10

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 5th, 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

By: */s/ Chris Viskovic*