Roopali H. Desai (024295)
D. Andrew Gaona (028414)
Kristen Yost (034052)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, AZ  85004
T:  (602) 381-5478
rdesai@cblawyers.com
agaona@cblawyers.com
kyost@cblawyers.com

Justin A. Nelson (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
T:  (713) 651-9366
jnelson@susmangodfrey.com

Stephen E. Morrissey (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
T:  (206) 516-3880
smorrissey@susmangodfrey.com

Stephen Shackelford (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
T:  (212) 336-8330
sshackelford@susmangodfrey.com

Davida Brook (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
T:  (310) 789-3100
dbrook@susmangodfrey.com

*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler Bowyer; Michael John Burke; Nancy Cottle; Jake Hoffman; Anthony Kern; Christopher M. King; James R. Lamon; Sam Moorhead; Robert Montgomery; Loraine Pellegrino; Greg Safsten; Salvatore Luke Scarmardo; Kelli Ward; and Michael Ward, <br><br> Plaintiffs, <br><br> v. <br><br> Doug Ducey, in his official capacity as Governor of the State of Arizona; and Katie Hobbs, in her official capacity as Arizona Secretary of State, <br><br> Defendants. <br><br> ——————————————— <br><br> MARICOPA COUNTY BOARD OF SUPERVISORS; and ADRIAN FONTES, in his official capacity as Maricopa County Recorder, <br><br> Intervenors. | No. CV-20-02321-PHX-DJH <br><br> **DEFENDANT SECRETARY OF STATE HOBBS' REPLY IN SUPPORT OF MOTION TO DISMISS** |

{00526067.1 }

1

## I.      Introduction

2          Plaintiffs' Response demonstrates the extreme disconnect between, on the one

3    hand, the profound and antidemocratic relief they are seeking, and on the other, their

4    failure on the facts and the law to support such extraordinary relief. Each of the arguments

5    below independently supports granting the Secretary's Motion to Dismiss. Together, they

6    demonstrate the frivolity of this Complaint and the tremendous damage it would cause to

7    free and fair elections.

8          *First*, Plaintiffs fail completely to respond on the plausibility of their arguments.

9    In the face of the Defendants' detailed arguments as to their failure to state a claim,

10   Plaintiffs do not even cite the federal standard. Instead, they cite to an Arizona state case

11   that only emphasizes why they should have brought a contest under Arizona law. They

12   do not attempt to argue how their Complaint satisfies Rule 9 or makes any coherent sense.

13   Instead, they repeat their same string of allegations about a wide-ranging global

14   conspiracy by thousands of election officials across the country that supposedly tricked

15   Arizona's accuracy testing. *Second*, Plaintiffs' claims are barred by laches. Plaintiffs

16   could have brought all these claims well before now. *Third*, Plaintiffs' claims are rooted

17   in state law and should have been brought as an election contest. The Arizona legislature

18   crafted procedures for resolving election disputes, certifying election results, and

19   contesting elections in specific venues and on a specific timeline. *Fourth*, Plaintiffs lack

20   standing. They assert only generalized grievances and do not even meaningfully engage

21   on their vote dilution claims. On the Election Clause claim, they fare no better. Their

22   status as electors performing only ministerial duties does not provide the requisite

23   standing. *Fifth*, the Eleventh Amendment bars these claims, which by Plaintiffs' own

24   admission stem from Arizona law. The Court should deny Plaintiffs' requested relief and

25   summarily dismiss this transparent effort to override the will of Arizona voters.[1]

26   _____

27   [1] The Secretary urges this Court to decide the Defendants' and Defendant Intervenor's
     Motions to Dismiss on their papers without argument, which will only provide Plaintiffs
28   with another platform to sow doubt in the election and perpetuate their unfounded claims.
     Indeed, Plaintiffs themselves indicated their willingness to forgo argument. [*See* Doc. 46]

## II.      Argument

### A. Plaintiffs' implausible claims are unsupported by their so-called "evidence" and do not satisfy the heightened pleading standard.

Shockingly, Plaintiffs devote *less than a page* of their response to the argument that their claims are utterly implausible. Doc. 44 at 23-24. Their brief makes no mention whatsoever of the Rule 12 plausibility standard under *Twombly* or *Iqbal,* and no attempt to argue they meet Fed. R. Civ. 9(b). Rather, Plaintiffs take aim at a strawman, arguing about the circumstances under which non-compliance with state statutes can invalidate a vote under Arizona pleading standards, and that they satisfy the standard for "ballot fraud" under *Miller v. Picacho Elementary Sch. Dist., No. 33*, 877 P.2d 277, 279 (Ariz. 1994)). This misses the point entirely. State-court pleading standards, of course, are simply irrelevant in federal court. Even more fundamentally, though, the Secretary's *Iqbal/Twombly* section was not based on some distinction between "technical" and more "substantive" violations of Arizona law.  Rather, the Secretary spent pages explaining all the many independent reasons why Plaintiffs' allegations were utterly implausible: the "expert" allegations were attributed to people with no relevant expertise, suffered from numerous fatal methodological flaws, and were untethered to any actual facts about the election in Arizona, while the inferences Plaintiffs ask the Court to draw from both the "expert" and "fact" allegations make no sense—and certainly are not plausible. *See* Doc. 40 at 13-18.  Plaintiffs responded to these detailed arguments with precisely nothing.

Even if one were charitably to assume the "likelihood of success" portion of Plaintiffs' brief was also intended to demonstrate the plausibility of their claims, nothing in that part provides any basis for avoiding dismissal either. Simply saying that allegations are "compelling," Doc. 44 at 25, and asserting that "Defendants' actions disenfranchised Republicans," *id.* at 26, is not enough. Nor does the fact that the same unqualified expert, Dr. Briggs, has made the same sham claims in five states in any way buttress his opinions. *Id.* at 27. Plaintiffs cannot and do not dispute that the surveys on which Dr. Briggs bases his opinions and that Plaintiffs offer as grounds for casting aside hundreds of thousands

of votes and overturning the election are based entirely on a survey conducted by another person: Matt Braynard. Doc. 1-2. Plaintiffs offer zero evidence of Braynard's identity or qualifications (apart from a printout of four tweets from someone apparently named Matt Braynard, Doc. 1-9), let alone allege or offer any information regarding his experience and qualifications as to political surveys and quantitative methods, or any steps he took to ensure the reliability of his survey results.

And Plaintiffs offer nothing to support their core conspiracy theory that Dominion voting machines and software manipulated the election results *in Arizona*. Instead, Plaintiffs have merely taken the step of identifying one of their previously anonymous experts, Mr. Teasley, the author of the report included as Exhibit 4 to their Complaint. Doc. 1-11. Plaintiffs now offer another report from Teasley (this time belatedly served, nine hours *after* the court-ordered deadline for expert disclosures), in which he asserts that the results were higher for President-Elect Biden than he would have expected in counties using Dominion machines. Doc. 44-1 at 24-34. But Teasley provides none of the basic data and information required to validate his assumptions—he doesn't disclose what counties he studied, what data he used, how he determined those results were exceptionally high, or how his experience in cybersecurity somehow qualifies him to opine on election results. Apart from Teasley's inadmissible and unreliable opinions, Plaintiffs make no effort to connect the dots on their Dominion conspiracy theory that somehow links the late Hugo Chavez to Election Day 2020 in Arizona, nor do they plausibly explain how their assertion of "old fashioned vote stuffing" somehow caused Biden's lead in Arizona to *diminish* by tens of thousands of votes counted by those same machines during the several days following Election Day.

Plaintiffs' claims are even more implausible given that the election passed all of Arizona's statutorily-required post-election hand count audits and logic and accuracy testing. Doc. 40 at 3; *see* A.R.S. §§ 16-449, 16-602. Indeed, the Complaint recognizes this post-election logic and accuracy testing. Doc. 1 at ¶ 53. The only allegation in the Complaint to impugn the accuracy of this testing is based on one Declarant, Linda

Brickman, **who testified in the state court election contest regarding various alleged problems**, but whose testimony was not given any weight by the superior court in its ruling denying the contest. *See* Ex. A (Ruling in CV 2020-015285, Maricopa County, Dec. 4, 2020); *see also* recording of Dec. 4, 2020 hearing, part 2, *available at* https://superiorcourt.maricopa.gov/civil/2020-general-election-cases/. The Complaint cites Ms. Brickman for supposed issues regarding signature verification and alleged vote switching. Doc. 1 at ¶ 53. Those claims were rejected by the superior court. Ex. A at 8-9. Regardless, even accepted as true, it is but one example of inference after inference tied together with no sound connection—let alone one that states a claim.

Plaintiffs also now attempt to bolster their implausible claims by attaching letters from Congressmen Gosar and Biggs and six members of the Arizona legislature, which are dated December 5 and were presumably solicited for the purpose of attaching to Plaintiffs' Response. Doc. 44 at 2–3. In effect, Plaintiffs ask this Court to ignore the standards of *Twombly*, *Iqbal*, and Rule 9(b) because a handful of elected officials ask it to. In addition to being inappropriate, these letters further evince that Plaintiffs' case is built on nothing but falsehoods and conspiracies. Congressman Gosar's letter, for example, claims that evidence of anomalies was presented "in a recent legislative hearing." Doc. 44 at 3 (quoting Doc. 44-1 at 3). But there was no legislative hearing. A "hearing" in a hotel conference room with participation from a handful of state legislators is a press conference (or, as Arizona's House Speaker Rusty Bowers put it, an "unofficial public gathering"). *See* Ex. B at 1. In fact, despite repeated requests, Arizona's legislative leaders have refused to hold an *actual* legislative hearing on purported fraud; as Speaker Bowers described, proponents of these claims have "presented only theories, not proof." *Id.* Now, having failed to get the Republican-controlled legislature to do their bidding, Plaintiffs ask this Court to essentially appoint them as a private grand jury with free-ranging authority, conferring upon them the right to make a federal case out of whatever conspiracy theory they may dream up—no matter how implausible.

**B. Plaintiffs' claims are barred by laches.**

Plaintiffs argue (1) they could not have discovered the factual basis for any of their claims earlier than when they did, and (2) they could only have filed their action after vote-counting misconduct became apparent in the days following the election and particularly the statewide canvass. Doc. 44 at 9-10. Neither argument is persuasive for multiple independent reasons. *First*, many of plaintiffs' alleged injuries arose—and were ripe for challenge—as early as October, when counties began to tabulate early ballots and early voting was underway. *See, e.g.*, Doc. 1 ¶¶ 46-48 (taking issue with the process used to match signatures on absentee ballots during the election); *id.* ¶¶ 48-49 (criticizing the roles of poll watchers and poll referees); *id.* ¶¶ 118-120 (claiming violations of the right to be present and have observation and access to the electoral process "as secured by the Equal Protection Clause of the United States Constitution and Arizona law").

*Second*, nothing—not even the Arizona election contest law that Plaintiffs cite—requires that challenges to alleged errors in tabulation be saved until after the Secretary certifies the official statewide canvass. Even accepting Plaintiffs' allegations as true, their Complaint makes plain that their purported reasons to suspect the accuracy of the Dominion machines arose far in advance of the 2020 General Election. *See* Doc. 40 at 11; *see also* Doc. 1 ¶¶ 67-69. And counties released their results within days after polls closed on November 3, 2020. If, in fact, the returns were as suspect as Plaintiffs claim, they could have brought suit once individual counties began to certify their canvasses throughout mid-November. Plaintiffs have no good explanation for why they needed to wait until days after the Secretary and Governor certified the statewide canvass.

*Third*, there is a reason why Arizona sets strict procedural requirements and a very short window for filing and resolving election contests, and why federal law discourages these *post-hoc* challenges, "lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988); *see also Donaghey*, 584 P.2d at 559. Finality and stability are cornerstones of our democratic process. Congress has made clear that election disputes should be resolved quickly, and sets specified timeframes for the

Electoral College, starting on "the Tuesday next after the first Monday in November" through the meeting of the Electoral College in December through the meeting of Congress that occurs by statute on January 6. *See* 3 U.S.C. §§ 1-15. The Court should accordingly find that laches bars this suit.

**C. This Court should not condone Plaintiffs' unprecedented attempt to make an end-run around Arizona's election contest procedures.**

The Arizona legislature crafted procedures for resolving election disputes, certifying election results, and contesting elections in specific venues and on a strict timeline. A.R.S. § 16-672 *et seq*. These grounds include contesting an election "misconduct on the part of election boards or any members thereof" or any officer who participates in a state canvass, *id.* § 16-672(A), or "[o]n account of illegal votes," *id.* § 16-672(A)(4). Plaintiffs' suit attempts to circumvent those procedures and inappropriately invoke federal jurisdiction. Plaintiffs concede that their Complaint alleges "that Defendants have both violated *Arizona law* and applied *Arizona law* to dilute the votes of Arizona Republicans." Doc. 44 at 7 (emphasis added). This concession is fatal. They cannot attempt to create federal court jurisdiction even while conceding that they base their entire claim on "violat[ions]" and "appli[cations]" of Arizona law. The Arizona Supreme Court has rejected the idea that election contests may depart from the stringent statutory text—which allows contest claims in state court, not federal court. *Donaghey v. Ariz. Attorney Gen.*, 584 P.2d 557, 559 (Ariz. 1978).

Plaintiffs could have brought an election contest under Section 16-672. The remedy sought there, like the remedy sought here, is to undo the election. *Compare* Doc. 1 at 51-52 (Plaintiffs' Complaint here seeking to "de-certify the election results" *with* Doc. 40 Exh. B at 19 (Plaintiff Ward's state complaint seeking "[t]hat the Court declare the certificate of election of the Biden Electors is of no further legal force or effect, and that the election is annulled and set aside in accordance with A.R.S. § 16-676(B)). Indeed, Plaintiffs' own Complaint makes clear that it is about "specific violations of *Arizona* law." *See* Doc. 1 ¶ 21 (emphasis added); *see also id.* ¶¶ 46–53.

Even while attempting to press their argument that this case differs from an Arizona election contest, they simultaneously attempt to avail themselves of Arizona's contest statutes where it benefits them. They argue, for example, that rather than having to satisfy Rule 9(b), they need only satisfy the lower threshold of "ballot fraud" as set forth by Arizona law and the Arizona Supreme Court. Doc. 44 at 23-24. And incredibly, they point to the Arizona contest provision stating that Arizona election contests may only be brought in a 5-day window after the canvass. *See id.* at 10 (citing A.R.S. § 16-673).

Plaintiffs' allegations here are precisely the sorts of claims captured by the Arizona elections contest statute. They allege misconduct on the part of election officials and their claims depend entirely on the presence of "illegal votes." A.R.S. § 16-672(A)(4). Plaintiffs cite no authority for the proposition that they may bring Arizona law-based claims specifically covered by the Arizona contest statute under Arizona law-based pleading standards and seek Arizona law-based remedies in federal court.

And contrary to Plaintiffs' apparent contention in their response, *see* Doc. 44 at 6, it is *Plaintiffs'* burden to establish federal jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). This they have not done. Plaintiffs' allegations are ultimately state law claims repackaged as federal law claims. For example, Plaintiffs cite to the federal Voting Rights Act and the Help America Vote Act. *See* Doc. 44 at 14–15. But Plaintiffs do not allege a cause of action under either HAVA or the VRA, nor would they have standing to bring such a claim. *See also* Part II.D.

Federal jurisdiction is not available to circumvent the Arizona legislature's designated forum for challenging an election simply by bootstrapping concerns about the constitutional right to vote to any election-related cause of action. None of Plaintiffs' authorities help them. Doc. 44 at 15-16. They at most supply a string of citations to support non-controversial and high-level principles reaffirming that federal jurisdiction exists for distinguishable voting-rights claims, or the well-known fact that federal laws protect voting—none of which Plaintiffs advance here. Plaintiffs' Equal Protection claim, for example, alleges so-called "vote dilution" because of Defendants' purported failure

to "comply with the requirements of Arizona law," Doc. 1 ¶ 117 (emphasis added). But "vote dilution" is not a viable legal theory in this context, *see infra* Part II.D, and what Plaintiffs really take issue with is an alleged failure to follow state law, such as allowing greater access to the observation of ballot counting, *see* Doc. 1 ¶¶ 118, 120.

Apart from citing repeatedly and misleadingly to cases about true vote dilution— that is, cases about apportionment or redistricting—Plaintiffs' star authority for their argument that they need not bring their case as an election contest is Chief Justice Rehnquist's concurrence in *Bush v. Gore*. *See* Doc. 44 at 15 (citing 531 U.S. 98, 112–14 (2000)). That opinion, of course, is a non-controlling concurrence. But even the majority opinion in *Bush* expressly disclaimed application outside its specific facts, *id.* at 109, and those facts bear no resemblance to this case. Gore filed several election contests under Florida law, which ultimately led to the Florida Supreme Court ordering that one county conduct a large manual recount several days before the "safe harbor" deadline under 3 U.S.C. § 5. Id. at 101-03. *Bush v. Gore* was decided as an appeal from state-court decisions, not from federal court proceedings. It thus in no way supports Plaintiffs' argument that they can file directly in federal district court in violation of strict state election law procedures for challenging an election outcome Moreover, it is especially inappropriate to allow an end-run around the state court procedure here because a state court already has rejected a contest provision filed by one of the named Plaintiffs.  The state court rejected the very remedy Plaintiffs seek. Instead, it "confirm[ed] the election." Ex. A at 9. It found "no misconduct, no fraud, and no effect on the outcome of the election." *Id.* at 8. And it found that "the evidence did not prove illegal votes." *Id.*

Finally, if Plaintiffs are not required to avail themselves of Arizona's strict procedural and timing requirements for elections contests and instead may proceed in federal court, what's to stop other disappointed Republican voters or candidates from filing lawsuit after lawsuit until January 20 (if not beyond)? Such a result would further destabilize our democracy and undermine the will of Congress, the Arizona legislature and, above all, the will of Arizona's voters. *See also supra* Part II.B (laches).

**D. Plaintiffs lack standing to pursue their claims.**

Plaintiffs appear to concede that they do not have standing under the Electors/Elections Clause as private plaintiffs and instead argue they have standing because they are the appointed electors for President Trump and therefore have standing as candidates under *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020). Doc. 44 at 5. There, the Eighth Circuit held that presidential electors were definitively considered "candidates" under Minnesota law and thus had standing. *Id.* at 1057. But regardless of how Minnesota law treats electors, Arizona law makes clear that the presidential electors are ministerial even if on the ballot. Plaintiffs cite only one provision that contains both the terms "candidate" and "elector." *See* Doc. 44 at 6 (citing A.R.S. § 16-344(A)). That statute provides only that candidates for the office of presidential elector be appointed by state party representatives; *see also* A.R.S. § 16-212(C) (describing presidential electors as state officeholders who can be removed and replaced by appointment). Indeed, Arizona law specifies that the presidential electors are ministerial. The voter is voting for the Presidential candidate, whose name "shall be printed in bold type," and "one mark directly next to a presidential candidate's surname shall be counted as a vote for each elector in the bracketed list next to the presidential and vice-presidential candidates." *Id.* § 16-507(B). Notably, the Presidential candidate has not joined this action by his electors.

Even if plaintiffs were considered "candidates" under Arizona (they aren't), *Carson* is an outlier and distinguishable because it was about a state court's change of the legislature's requirement on absentee ballots whereas here, Defendants acted under law. The weight of federal authority holds that only state legislatures have standing to bring Electors/Elections Clause cases in cases like this. *See* Doc. 40 at 7-8 (citing *Bognet v. Sec'y of Commonwealth*, No. 20-2314, 2020 WL 6686120 (3d Cir. Nov. 13, 2020)); *Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668, at *2 (S.D. Tex. Nov. 2, 2020).[2]

---

[2] Plaintiffs cite *McPherson v. Blacker*, 146 U.S. 1 (1892) and *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) in passing and without further explication. Both are inapposite. *McPherson* involved Michigan electors who brought suit to challenge the

1    Indeed, in *Bognet*, the Third Circuit rejected standing even though a plaintiff was a
2    candidate for Congress. 2020 WL 6686120 at *4, *6-8.

3        With respect to standing for their remaining claims, Plaintiffs insist that theirs are
4    not generalized grievances because they challenge the dilution of Republican votes. Doc.
5    44 at 7-8. Aside from the fact that their allegations of a "scheme" to selectively
6    undercount votes of one political party are fantastical, they cannot find support for their
7    novel brand of vote-dilution claim in federal law.  Doc. 44 at 27.  The Supreme Court has
8    long considered vote dilution claims to "involve challenges to methods of electing
9    representatives—like redistricting or at-large districts—as having the effect of
10   diminishing minorities' voting strength."  *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d
11   989, 1011 (9th Cir. 2020), *cert. granted on other grounds sub nom. Arizona Republican
12   Party v. Democratic Nat'l Comm.*, No. 19-1258, 2020 WL 5847129 (U.S. Oct. 2, 2020)
13   (citation omitted). Plaintiffs' claims are not that. As the *Bognet* case discussed in the
14   Secretary's Motion to Dismiss (Doc. 40 at 9) held, Plaintiffs lack standing for these types
15   of vote dilution claims. 2020 WL 6686120, at *11. "Vote dilution in this context is a
16   paradigmatic generalized grievance that cannot support standing." *Wood v.
17   Raffensberger*, — F.3d —, 2020 WL 7094866, at *12 (11th Cir., Dec. 5, 2020).
18   Accordingly, they are left with nothing more than a grievance shared by other
19   disappointed voters, and so cannot bring suit here.

20   **E. The Eleventh Amendment bars Plaintiffs' request for prospective relief because their claims ultimately sound in state, not federal, law.**

22       The Secretary does not dispute that the Eleventh Amendment permits prospective
23   injunctive relief against state officials on the basis of *federal* law. But Plaintiffs ignore
24   the requisite latter part of that sentence. Where claims are based on *state* law, the Eleventh
25   Amendment bars all relief, "whether prospective or retroactive." *Pennhurst State Sch. &*

27   state's new method of choosing electors. It has nothing to do with standing to challenge
28   the *results* of a presidential election. And *Bush*, of course, was brought by the *presidential candidate* in the 2000 election, not an elector.

1    *Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). That restriction applies even where, as

2    here, plaintiffs cloak their state-law claims in federal garb. Doc. 40 at 19–20 (citing cases).

3    As noted previously, Plaintiffs' own Complaint alleges "specific violations of *Arizona*

4    law." Doc. 1 ¶¶ 21, 46–53 (emphasis added). Their Elections and Electors Clause claim

5    is based on Defendants purportedly exercising electoral authority "in ways that conflict

6    with existing [state] legislation." Doc. 1 ¶ 106. Likewise, their Equal Protection Clause

7    hinges on Defendants' alleged failure to "enforce[] fairly and uniformly" Arizona's

8    election laws, claiming that because "Defendants failed to comply with the requirements

9    of *Arizona* law," their votes were diluted in violation of the Equal Protection Clause. Doc.

10   1 ¶ 116–17 (emphasis added). Count III alleges a Due Process Clause violation based on

11   so-called "vote dilution." This, too, has no actual basis in federal law, for much the same

12   reasons Plaintiffs lack standing for this claim. *See supra* at 11; Doc. 40 at 8. Plaintiffs'

13   reliance on *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003), is similarly unpersuasive.

14   That case involved violations of the First Amendment, not state law. In short, Plaintiffs

15   cannot escape the Eleventh Amendment's bar by simply slapping a "federal claim" label

16   on what are ultimately questions of state law.

17   **III.   Conclusion**

18          Plaintiffs seek to cast a cloud over the outcome of the 2020 election, and ask this

19   Court to facilitate their futile hunt for evidence supporting their sensational claim that

20   President-Elect Biden's victory resulted from a global conspiracy, rather than from a

21   straightforward counting of votes. Plaintiffs offer only a mix of speculation, inadmissible

22   evidence, and failed legal theories—not the plausible theories, federal claims, and Article

23   III standing required to bring this case in federal court. In short, they have supplied no

24   reason to question a single vote, let alone a sufficient number of votes to overturn the

25   results of the election. This Court should dismiss their brazen effort to undermine the

26   collective will of Arizona voters expressed through a fair, free, and secure election.

27          Respectfully submitted this 6th day of December, 2020.

28

**SUSMAN GODFREY L.L.P.**

By  s/ Justin A. Nelson
        Justin A. Nelson
        Stephen E. Morrissey
        Stephen Shackelford
        Davida Brook

**COPPERSMITH BROCKELMAN PLC**
        Roopali H. Desai
        D. Andrew Gaona
        Kristen Yost


*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*

INDEX OF EXHIBITS

| Exhibit | Description | Date |
|---------|-------------|------|
| A | Minute Order of the Superior Court of Arizona Maricopa County *Ward v. Constance Jackson, et al.,* Case No. CV2020-015285 | 12/04/2020 |
| B | News Release – Arizona House of Representatives Speaker Bowers Addresses Calls for the Legislature to Overturn 2020 Certified Election Results | 12/04/2020 |

# Exhibit A

Clerk of the Superior Court
*** Filed ***
12/4/2020 4:05 p.m.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-015285                                    12/04/2020


                                          CLERK OF THE COURT
HONORABLE RANDALL H. WARNER                      C. Ladden
                                                  Deputy


KELLI WARD                         DENNIS I WILENCHIK

v.

CONSTANCE JACKSON, et al.          SARAH R GONSKI


                                   ROOPALI HARDIN DESAI
                                   JOSEPH EUGENE LA RUE
                                   DAVID SPILSBURY
                                   ROY HERRERA
                                   DANIEL A ARELLANO
                                   COURT ADMIN-CIVIL-ARB DESK
                                   DOCKET-CIVIL-CCC
                                   JUDGE WARNER
                                   BRUCE SPIVA
                                   PERKINS COIE LLP
                                   700 THIRTEENTH STREET NW
                                   SUITE 600
                                   WASHINGTON DC  20005


MINUTE ENTRY


East Court Building – Courtroom 414

9:15 a.m. This is the time set for a continued Evidentiary Hearing on Plaintiff's anticipated election contest petition via GoToMeeting.


Docket Code 901                    Form V000A                    Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-015285                                    12/04/2020

    <u>The following parties/counsel are present virtually through GoToMeeting and/or</u>
<u>telephonically:</u>

- Plaintiff Kelli Ward is represented by counsel, John D. Wilenchik.

- Defendants Constance Jackson, Felicia Rotellini, Fred Yamashita, James McLaughlin, Jonathan Nez, Luis Alberto Heredia, Ned Norris, Regina Romero, Sandra D. Kennedy, Stephen Roe Lewis, and Steve Gallardo (collectively, the "Biden Elector Defendants") are represented by counsel, Sarah Gonski, Bruce Spiva (*pro hac vice*), Daniel Arellano, and Roy Herrera.

- Intervenors Adrian Fontes (in his official capacity as Maricopa County Recorder) and Maricopa County Board of Supervisors (collectively, "County Intervenors") and are represented by counsel, Thomas Liddy, Emily Craiger, and Joseph La Rue.

- Intervenor Katie Hobbs (in her official capacity as the Arizona Secretary of State) is represented by counsel, Rooplai Desai and Kristen Yost. State Election Director Sambo "Bo" Dul is also present.

    Counsel for Biden Elector Defendants addresses the court as to the court's ruling denying any Rule 50 motion practice after the conclusion of Plaintiff's case. Discussion is held thereon and counsel for Biden Elector Defendants states his position on the record. The court affirms its prior ruling denying the request for any Rule 50 motion practice.

    A record of the proceedings is made digitally in lieu of a court reporter.

    Biden Elector Defendants' Case:

    Linton Mohammed is sworn and testifies.

    Biden Elector Defendants' exhibit 16 is received in evidence.

    Linton Mohammed is excused.

    Biden Elector Defendants rest.

    Intervenor Secretary of State's Case:

    Sambo "Bo" Dul is sworn and testifies.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-015285                                    12/04/2020

Intervenor Secretary of State's exhibit 32 is received in evidence.

Sambo "Bo" Dul is excused.

Intervenor Secretary of State rests.

**LET THE RECORD REFLECT** that the court notes its prior acquaintance with County Intervenors' witness, Reynaldo Valenzuela, due to election matters while serving previously as the civil presiding judge.

County Intervenors' Case:

Reynaldo Valenzuela is sworn and testifies.

County Intervenors' exhibit 29 is received in evidence.

10:31 a.m. The court stands at recess.

10:41 a.m. Court reconvenes with the parties and respective counsel present.

A record of the proceedings is made digitally in lieu of a court reporter.

Reynaldo Valenzuela continues to testify.

County Intervenors' exhibit 30 is received on evidence.

Reynaldo Venezuela is excused.

Scott Jarrett is recalled and testifies further.

Scott Jarrett is excused.

County Intervenors rest.

Plaintiff's Rebuttal:

Liesl Emerson is sworn and testifies.

Liesl Emerson is excused.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-015285                                              12/04/2020

Plaintiff rests.

11:30 a.m. The court stands at recess.

11:36 a.m. Court reconvenes with the parties and respective counsel present.

A record of the proceedings is made digitally in lieu of a court reporter.

Closing arguments are presented.

Based on the testimony and evidence presented,

**IT IS ORDERED** taking this matter under advisement with a written ruling to be issued as a "**LATER**:" to this minute entry.

Pursuant to the orders entered, and there being no further need to retain the exhibits not offered in evidence in the custody of the Clerk of Court,

**LET THE RECORD FURTHER REFLECT** counsel indicate on the record that the courtroom clerk may dispose of Plaintiff's exhibits 2 through 13 and 15; County Intervenors' exhibit 21; and Intervenor Secretary of State's exhibits 33 and 34 not offered or received in evidence.

12:22 p.m. Matter concludes.

**LATER:**

Based on the evidence presented, the Court makes the following findings, conclusions, and orders. For reasons that follow, the relief requested in the Petition is denied.

1.   **Background.**

On November 30, 2020, Governor Ducey certified the results of Arizona's 2020 general election, and the Biden/Harris ticket was declared the winner of Arizona's 11 electoral votes. The same day, Plaintiff filed this election challenge under A.R.S. § 16-672. In order to permit this matter to be heard and appealed (if necessary) to the Arizona Supreme Court before the Electoral College meets on December 14, 2020, the Court held an accelerated evidentiary hearing on December 3 and 4, 2020.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-015285                                              12/04/2020

**2.**      **The Burden Of Proof In An Election Contest.**

A.R.S. § 16-672 specifies five grounds on which an election may be contested, three of which are alleged here:

> A. Any elector of the state may contest the election of any person declared elected to a state office, or declared nominated to a state office at a primary election, or the declared result of an initiated or referred measure, or a proposal to amend the Constitution of Arizona, or other question or proposal submitted to vote of the people, upon any of the following grounds:
>
> 1. For misconduct on the part of election boards or any members thereof in any of the counties of the state, or on the part of any officer making or participating in a canvass for a state election.
>
> . . .
>
> 4. On account of illegal votes.
>
> 5. That by reason of erroneous count of votes the person declared elected or the initiative or referred measure, or proposal to amend the constitution, or other question or proposal submitted, which has been declared carried, did not in fact receive the highest number of votes for the office or a sufficient number of votes to carry the measure, amendment, question or proposal.

A.R.S. § 16-672(A)(1). Arizona law provides two remedies for a successful election contest. One is setting aside the election. A.R.S. § 16-676(B). The other is to declare the other candidate the winner if "it appears that a person other than the contestee has the highest number of legal votes." A.R.S. § 16-676(C).

The Plaintiff in an election contest has a high burden of proof and the actions of election officials are presumed to be free from fraud and misconduct. *See Hunt v. Campbell*, 19 Ariz. 254, 268, 169 P. 596, 602 (1917) ("the returns of the election officers are prima facie correct and free from the imputation of fraud"); *Moore v. City of Page*, 148 Ariz. 151, 156, 713 P.2d 813, 818 (App. 1986) ("One who contests an election has the burden of proving that if illegal votes were cast the illegal votes were sufficient to change the outcome of the election."). A plaintiff alleging misconduct must prove that the misconduct rose to the level of fraud, or that the result would have been different had proper procedures been used. *Moore*, 148 Ariz. at 159, 713 P.2d

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-015285                                                12/04/2020

at 821. "[H]onest mistakes or mere omissions on the part of the election officers, or irregularities in directory matters, even though gross, if not fraudulent, will not void an election, unless they affect the result, or at least render it uncertain." *Findley v. Sorenson*, 35 Ariz. 265, 269, 276 P. 843, 844 (1929).

These standards derive, in large part, from Arizona's constitutional commitment to separation of powers. Ariz. Const. Art. 3. The State Legislature enacts the statutes that set the rules for conducting elections. The Executive Branch, including the Secretary of State and county election officials, determine how to implement those legislative directives. These decisions are made by balancing policy considerations, including the need to protect against fraud and illegal voting, the need to preserve citizens' legitimate right to vote, public resource considerations, and—in 2020—the need to protect election workers' health. It is not the Court's role to second-guess these decisions. And for the Court to nullify an election that State election officials have declared valid is an extraordinary act to be undertaken only in extraordinary circumstances.

**3.       The Evidence Does Not Show Fraud Or Misconduct.**

A.R.S. § 16-672(A)(1) permits an election contest "[f]or misconduct on the part of election boards or any members thereof in any of the counties of the state, or on the part of any officer making or participating in a canvass for a state election." Plaintiff alleges misconduct in three respects. First is that insufficient opportunity was given to observe the actions of election officials. The Court previously dismissed that claim as untimely. *See Lubin v. Thomas*, 213 Ariz. 496, 497, 144 P.3d 510, 511 (2006) ("In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice."). The observation procedures for the November general election were materially the same as for the August primary election, and any objection to them should have been brought at a time when any legal deficiencies could have been cured.

Second, Plaintiff alleges that election officials overcounted mail-in ballots by not being sufficiently skeptical in their comparison of signatures on the mail-in envelope/affidavits with signatures on file. Under Arizona law, voters who vote by mail submit their ballot inside an envelope that is also an affidavit signed by the voter. Election officials review all mail-in envelope/affidavits to compare the signature on them with the signature in voter registration records. If the official is "satisfied that the signatures correspond," the unopened envelope is held until the time for counting votes. If not, officials attempt to contact the voter to validate the ballot. A.R.S. § 16-550(A).

This legislatively-prescribed process is elaborated on in the Secretary of State's Election Procedures Manual. The signature comparison is just one part of the verification process. Other

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-015285                                    12/04/2020

safeguards include the fact that mail-in ballots are mailed to the voter's address as listed in voter registration records, and that voters can put their phone number on the envelope/affidavit, which allows election officials to compare that number to the phone number on file from voter registration records or prior ballots.

Maricopa County election officials followed this process faithfully in 2020. Approximately 1.9 million mail-in ballots were cast and, of these, approximately 20,000 were identified that required contacting the voter. Of those, only 587 ultimately could not be validated.

The Court ordered that counsel and their forensic document examiners could review 100 randomly selected envelope/affidavits to do a signature comparison. These were envelope/affidavits as to which election officials had found a signature match, so the ballots were long ago removed and tabulated. Because voter names are on the envelope/affidavits, the Court ordered them sealed. But because the ballots were separated from the envelope/affidavits, there is no way to know how any particular voter voted. The secrecy of their votes was preserved.

Two forensic document examiners testified, one for Plaintiff and one for Defendants. The process forensic document examiners use to testify in court for purposes of criminal guilt or civil liability is much different from the review Arizona election law requires. A document examiner might take hours on a single signature to be able to provide a professional opinion to the required degree of certainty.

Of the 100 envelope/affidavits reviewed, Plaintiff's forensic document examiner found 6 signatures to be "inconclusive," meaning she could not testify that the signature on the envelope/affidavit matched the signature on file. She found no sign of forgery or simulation as to any of these ballots.

Defendants' expert testified that 11 of the 100 envelopes were inconclusive, mostly because there were insufficient specimens to which to compare them. He too found no sign of forgery or simulation, and found no basis for rejecting any of the signatures.

These ballots were admitted at trial and the Court heard testimony about them and reviewed them. None of them shows an abuse of discretion on the part of the reviewer. Every one of them listed a phone number that matched a phone number already on file, either through voter registration records or from a prior ballot. The evidence does not show that these affidavits are fraudulent, or that someone other than the voter signed them. There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-015285                                             12/04/2020

Third, Plaintiff alleges errors in the duplication of ballots. Arizona law requires election officials to duplicate a ballot under a number of circumstances. One is where the voter is overseas and submits a ballot under UOCAVA, the Uniformed And Overseas Citizens Absentee Voting Act. Another is where the ballot is damaged or otherwise cannot be machine-tabulated. When a duplicate is necessary, a bipartisan board creates a duplicate ballot based on the original. A.R.S. § 16-621(A). In 2020, Maricopa County had 27,869 duplicate ballots out of more than 2 million total ballots. The vast majority of these were either mail-in ballots or UOCAVA ballots. 999 of them came from polling places.

The Court ordered that counsel could review 100 duplicate ballots. Maricopa County voluntarily made another 1,526 duplicate ballots available for review. These ballots do not identify the voter so, again, there is no way to know how any individual voter voted. Of the 1,626 ballots reviewed, 9 had an error in the duplication of the vote for president.

Plaintiff called a number of witnesses who observed the duplication process as credentialed election observers. There was credible testimony that they saw errors in which the duplicated ballot did not accurately reflect the voter's apparent intent as reflected on the original ballot. This testimony is corroborated by the review of the 1,626 duplicate ballots in this case, and it confirms both that there were mistakes in the duplication process, and that the mistakes were few. When mistakes were brought to the attention of election workers, they were fixed.

The duplication process prescribed by the Legislature necessarily requires manual action and human judgment, which entail a risk of human error. Despite that, the duplication process for the presidential election was 99.45% accurate. And there is no evidence that the inaccuracies were intentional or part of a fraudulent scheme. They were mistakes. And given both the small number of duplicate ballots and the low error rate, the evidence does not show any impact on the outcome.

The Court finds no misconduct, no fraud, and no effect on the outcome of the election.

4.      **The Evidence Does Not Show Illegal Votes.**

A.R.S. § 16-672(A)(2) permits an election contest "[o]n account of illegal votes." Based on the facts found above, the evidence did not prove illegal votes, much less enough to affect the outcome of the election. As a matter of law, mistakes in the duplication of ballots that do not affect the outcome of the election do not satisfy the burden of proof under Section 16-672(A)(2).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2020-015285                                          12/04/2020

**5.      The Evidence Does Not Show An Erroneous Vote Count.**

A.R.S. § 16-672(A)(5) permits an election contest on the ground that, "by reason of erroneous count of votes" the candidate certified as the winner "did not in fact receive the highest number of votes." Plaintiff has not proven that the Biden/Harris ticket did not receive the highest number of votes.

**6.      Orders.**

Based on the foregoing,

**IT IS ORDERED** denying the relief requested in the Petition.

**IT IS FURTHER ORDERED** denying the request to continue the hearing and permit additional inspection of ballots.

**IT IS FURTHER ORDERED**, as required by A.R.S. § 16-676(B), confirming the election.

**IT IS FURTHER ORDERED** that any request for costs and/or attorneys' fees be filed, and a form of final judgment be lodged, no later than January 5, 2020. If none of these is filed or lodged, the Court will issue a minute entry with Rule 54(c) language dismissing all remaining claims.

The Court finds no just reason for delay and enters this partial final judgment under Ariz. R. Civ. P. 54(b). The Court makes this finding for purposes of permitting an immediate appeal to the Arizona Supreme Court.


/ s / RANDALL H. WARNER
_____
JUDGE OF THE SUPERIOR COURT

# Exhibit B



# NEWS RELEASE

**Arizona House of Representatives**
**Speaker of the House Rusty Bowers (R-25)**
1700 West Washington ● Phoenix, Arizona ● 85007

---

**Friday, December 4, 2020**
**FOR IMMEDIATE RELEASE**

## Speaker Bowers Addresses Calls for the Legislature to Overturn 2020 Certified Election Results

**STATE CAPITOL, PHOENIX** – Arizona House Speaker Rusty Bowers today made the following statement:

This week, Rudy Giuliani, Jenna Ellis, and others representing President Donald Trump came to Arizona with a breathtaking request:  that the Arizona Legislature overturn the certified results of last month's election and deliver the state's electoral college votes to President Trump.  The rule of law forbids us to do that.

Mr. Giuliani and Ms. Ellis made their case here at least twice—on Monday, at an unofficial public gathering hosted by a small group of legislators; and again on Tuesday, during a closed-door meeting at the State Capitol with Republican leaders from both chambers of the Legislature.  Both times, the Trump team made claims that the election was tainted by fraud but presented only theories, not proof.  U.S. Attorney General William P. Barr said on Tuesday that he, too, has "not seen fraud on a scale that could have effected a different outcome of the election."

Even if such evidence existed, the Arizona Legislature simply couldn't do what is being asked.  Under our state's constitution, the Legislature can act only when it is in session, and the Legislature could call itself into a special session only with the support of a bipartisan supermajority of its members.

That won't materialize, but even if did, the Legislature couldn't provide the recourse the President's team seeks.  The U.S. Constitution authorizes each state to appoint presidential electors "in such Manner as the Legislature thereof may direct."  For decades, Arizona law has required that the voters elect the state's electors on Election Day—this year, on November 3rd.  And under a law the Republican-led Legislature passed just three years ago, the state's electors are required to cast their votes for the candidates who received the most votes in the official statewide election canvass.  Enacted after the 2016 presidential election, in which President Trump won the electoral college but not the popular vote, the law was aimed at ensuring that Arizona's electors would remain faithful to the vote of the people.

Our state's canvass was completed on Monday, and Joe Biden and Kamala Harris received the most votes, so those are the candidates whom the state's presidential electors must vote for. Nothing in the U.S. Constitution or the decisions of the U.S. Supreme Court even suggests that the Arizona Legislature could retroactively appoint different electors who would cast their ballots for

1

different candidates.  The Trump legal team has cited *McPherson v. Blacker* (1892), to claim that the legislature can "resume the power [to appoint electors] at any time."  And it is true that the Arizona Legislature could alter the method of appointing electors prospectively.  But it cannot undo the election of electors whom the voters already voted for.  As the Supreme Court made clear in *Bush v. Gore* (2000), "[w]hen the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental."

No election is perfect, and if there were evidence of illegal votes or an improper count, then Arizona law provides a process to contest the election: a lawsuit under state law.  But the law does not authorize the Legislature to reverse the results of an election.

As a conservative Republican, I don't like the results of the presidential election.  I voted for President Trump and worked hard to reelect him.  But I cannot and will not entertain a suggestion that we violate current law to change the outcome of a certified election.

I and my fellow legislators swore an oath to support the U.S. Constitution and the constitution and laws of the state of Arizona.  It would violate that oath, the basic principles of republican government, and the rule of law if we attempted to nullify the people's vote based on unsupported theories of fraud.  Under the laws that we wrote and voted upon, Arizona voters choose who wins, and our system requires that their choice be respected.

Forty years ago next month, President Ronald Reagan reminded us that while the "orderly transfer of authority" is a "commonplace occurrence" for Americans, "[i]n the eyes of many in the world, this every-4-year ceremony we accept as normal is nothing less than a miracle."  Now, Americans are being reminded once again never to take for granted what President Reagan correctly described as "the continuity which is the bulwark of our Republic."

###

**CONTACT:**
Andrew Wilder
Director of Communications
Republican Majority Caucus
(602) 926-5299
awilder@azleg.gov