| | |
|---|---|
| Roopali H. Desai (024295)<br>D. Andrew Gaona (028414)<br>Kristen Yost (034052)<br>**COPPERSMITH BROCKELMAN PLC**<br>2800 North Central Avenue, Suite 1900<br>Phoenix, AZ  85004<br>T:  (602) 381-5478<br>rdesai@cblawyers.com<br>agaona@cblawyers.com<br>kyost@cblawyers.com<br><br>Justin A. Nelson (admitted *pro hac vice*)<br>**SUSMAN GODFREY L.L.P.**<br>1000 Louisiana, Suite 5100<br>Houston, TX 77002-5096<br>T:  (713) 651-9366<br>jnelson@susmangodfrey.com | Stephen E. Morrissey (admitted *pro hac vice*)<br>**SUSMAN GODFREY L.L.P.**<br>1201 Third Avenue, Suite 3800<br>Seattle, WA 98101-3000<br>T:  (206) 516-3880<br>smorrissey@susmangodfrey.com<br><br>Stephen Shackelford (admitted *pro hac vice*)<br>**SUSMAN GODFREY L.L.P.**<br>1301 Avenue of the Americas, 32nd Floor<br>New York, NY 10019-6023<br>T:  (212) 336-8330<br>sshackelford@susmangodfrey.com<br><br>Davida Brook (admitted *pro hac vice*)<br>**SUSMAN GODFREY L.L.P.**<br>1900 Avenue of the Stars, Suite 1400<br>Los Angeles, CA 90067<br>T:  (310) 789-3100<br>dbrook@susmangodfrey.com |

*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler Bowyer; Michael John Burke; Nancy Cottle; Jake Hoffman; Anthony Kern; Christopher M. King; James R. Lamon; Sam Moorhead; Robert Montgomery; Loraine Pellegrino; Greg Safsten; Salvatore Luke Scarmardo; Kelli Ward; and Michael Ward,<br><br>    Plaintiffs,<br><br>v.<br><br>Doug Ducey, in his official capacity as Governor of the State of Arizona; and Katie Hobbs, in her official capacity as Arizona Secretary of State,<br><br>    Defendants. | No. CV-20-02321-PHX-DJH<br><br>**DEFENDANT SECRETARY OF STATE KATIE HOBBS'S MOTION TO EXCLUDE THE TESTIMONY AND REPORTS OF PLAINTIFFS' EXPERTS WILLIAM BRIGGS, BRIAN TEASLEY, RUSSELL JAMS RAMSLAND, JR., "SPIDER," MATTHEW BROMBERG, AND PHILLIP WALDRON** |
| Maricopa County Board of Supervisors; and Adrian Fontes, in his official capacity as Maricopa County Recorder,<br><br>    Intervenors. | |

{00526210.1 }

**INTRODUCTION**

In their effort to support baseless claims of a multi-national conspiracy to rig the presidential election in favor of Joseph R. Biden, Jr., Plaintiffs have disclosed six purported "experts" along with various declarations and reports.[1] But the individuals identified by Plaintiffs as experts are wildly unqualified and their "expert" opinions, such as they are, are unreliable and lacking in foundation. Indeed, these individuals range from a statistician who was apparently fired from the last academic institution where he worked, to an online marketing businessman, to an anonymous intelligence analyst who is referred to only as "Spider." Plaintiffs remarkably contend these experts' opinions, which they incorporate by reference in their complaint, are "compelling" and "conclusively establish" the drastic and unprecedented relief they seek—decertifying the certified election results in this State and ordering certification of President Trump as the winner of the election. The opinions in fact only confirm the claims are doomed to dismissal and that their requested preliminary relief should be denied. Other courts in Michigan and Georgia have found these same experts to provide no basis for advancing plaintiffs' claims, and this Court should reach the same conclusion. None of these experts' testimony justify relief that would disenfranchise 3.4 million Arizona voters, and indeed none even satisfy the *Daubert* standard for admissibility.

**I.   LEGAL STANDARD**

As a threshold matter, courts must ensure that a proposed expert has the requisite qualifications, based upon "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Courts may then only admit expert testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert

---

[1] Attached hereto as "Exhibit 1" is a true and correct copy of Plaintiffs' Expert Rule 26(a)(2)(B) Expert Disclosures and Fact Witnesses. Plaintiffs' disclosures refer to both filed and newly disclosed documents. For ease of reference, Defendant attaches hereto as "Exhibit 2" through "Exhibit 7" true and correct copies of the newly served documents.

has reliably applied the principles and methods to the facts of the case." *Id.* To be admissible, expert testimony must be both relevant and reliable. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

Even where the trial court is the fact-finder, there is no question that a "district court must perform a 'gatekeeping role' to ensure that the testimony is both 'relevant' and reliable.'" *United States v. Valencia-Lopez*, 971 F.3d 891, 897–98 (9th Cir. 2020) (alterations in original omitted); *see Beech Aircraft Corp. v. United States*, 51 F.3d 834, 842 (9th Cir. 1995) (holding expert opinion properly excluded from a bench trial).

When assessing reliability, courts consider "(1) whether the theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review, (3) whether the error rate is known and standards exist controlling the operation of the technique, and (4) whether the theory or technique has gained general acceptance." *Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir. 2007). Where expertise is "experience-based," there "is a strong argument that reliability becomes more, not less, important." *Valencia-Lopez*, 971 F.3d at 898. "The proponent of expert testimony bears the burden of showing that the proposed testimony is admissible under Rule 702." *Krause v. Cty. of Mohave*, 459 F. Supp. 3d 1258, 1264 (D. Ariz. 2020). "When a party . . . fails to carry this burden, their expert's opinions are not admissible." *Id.*

## II.    ARGUMENT

Plaintiffs cannot meet their burden to establish the admissibility of any of their six experts' proposed testimony. Courts have long held that the Federal Rules of Evidence prohibit "junk" science from entering the courtroom and the Federal Rules of Civil Procedure place additional procedural protections to keep out untrustworthy information cloaked in the mantle of "expert" testimony.

### A.    Plaintiffs' Experts are Unqualified, Unreliable, and Unhelpful.

Plaintiffs' experts are remarkably unqualified. Their "reports" lack any indicia of reliability. And their testimony will not be unhelpful to the finder of fact. Indeed, just this morning, the Eastern District of Michigan denied relief in a virtually identical case

brought by the same "National Counsel" as part of their campaign to overturn the election results determined by the will of voters around the country, questioning the post-election emergence of these so-called experts who came out of the woodwork to claim serious glitches and vulnerabilities in election machines and voting that allegedly occurred for years prior to the 2020 elections, given that such concerns (if legitimate) could have been raised much earlier. *See, e.g.*, Opinion Order Denying Relief, *King v. Whitmer*, No. 2:20-cv-13134-LVP-RSW, ECF No. 62 (E.D. Mich. Dec. 17, 2020), at 18.

### 1. William Briggs

Plaintiffs seek to have Dr. William M. Briggs (a self-proclaimed "Statistician to the Stars!," Compl. Exh. 2-F, at 1, Doc. 1-2) testify that there were a sufficient number of "troublesome" ballots, allegedly illegal votes counted and legal votes uncounted, to overturn Arizona's election returns.[2] Exh. 1 at 2. Briggs in turn states that his statistical analysis is based on survey data provided by an individual named Matt Braynard. Compl. Exh. 2, at 1, Doc. 1-2 ("Briggs Rep."). However, Briggs's analysis is unreliable because it rests on faulty data collected by a fatally flawed survey that fails to comport with professional survey research standards and because of the cavernous analytical gap between the data and his extrapolations. His analysis is also unhelpful to the trier of fact because he does not offer evidence of an actual change in the result of the election.

### a. Briggs's Statistical Analysis is Unreliable Because It Rests On a Faulty Foundation And Contains Unacceptable Analytical Gaps.

Numerous flaws in Briggs's statistical analysis render his report and testimony unreliable.

***The Braynard survey does not satisfy accepted survey principles***. A central flaw in Briggs's analysis is that it is based entirely on an unreliable survey conducted by

---

[2] Plaintiffs' disclosures fail to describe the scope of Briggs's proposed testimony, but Briggs's report includes information relating to multiple states. Defendant focuses only on issues relating to the Arizona analysis, since information pertaining to other states is irrelevant. But, to be sure, there are errors in Briggs's survey methodology and data analysis for the other states, as well.

someone else, Braynard, who has not disclosed the survey, its methodology, or his qualifications for conducting it.  Briggs admits that he only "assume[s] survey respondents are representative and the data is accurate." Briggs Rep., at 1, Doc. 1-2. Briggs never explains why it is reasonable for him to *assume* the data is accurate and the population is representative. "[T]he proffered expert must establish that reliable principles and methods underlie the particular conclusions offered," and failure to do so renders his opinions inadmissible. *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002). The core requirement for admissibility of survey results is that the survey is conducted "according to accepted principles." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (citation omitted).

Here, Briggs cannot validate the principles underlying the survey upon which his opinions are based because he is not and does purport to be an expert in survey methodology.[3]  Moreover, there is zero indication that Briggs conducted any verification of Braynard's survey data or validated its correctness or integrity.  Briggs also fails to provide even basic information about the survey research conducted by Braynard that is needed to establish the survey's reliability.  Neither Plaintiffs nor Briggs offer anything whatsoever about Braynard's identity (other than a Twitter printout), qualifications, methodologies used in his surveys, whether those methodologies comported with the professional standards required for considering a survey reliable, the steps taken to ensure his samples were random and representative of the underlying population, or the steps taken to account for possible inaccuracies or falsehoods provided in survey responses.

As further described in the Report of Professor Gary King, Briggs's failure to provide information about Braynard's survey methodology violates the accepted

---

[3] Briggs also reports zero experience as an expert in elections or voting prior to the 2020 presidential election, he was fired from the last academic institution with which he was involved, and he appears often to self-publish his writings. *See* William Briggs, "I'm No Longer At Cornell," William M. Briggs: Statistician to the Stars, Apr. 22, 2017, https://wmbriggs.com/post/21473/ ("I got fired about a month ago."); Compl. Exh. 2-F at 2, Doc. 1-2.  Briggs's writings touch on, among other subjects, denying the severity of the Covid-19 pandemic, disputing climate change science, and attacking homosexuality.

professional standards in the field of survey research and renders the data insufficient to support the stated conclusions in Briggs's analysis. *See* Exh. 8, Report of Gary King.

Briggs's report lacks crucial information about the survey that is required to comport with accepted survey principles, including the following:

- ***a probability sample***, which enumerates a list of the members of the target population and identifies the known random mechanism of selecting members of the population to be interviewed, *id.* at ¶ 2.a;
- the ***entire chain of evidence*** from the election to the quantitative information in the dataset to the numerical results, *id.* at ¶ 2.b;
- an analysis of the survey ***response rate***, including how the rate was computed and how those who responded to the survey differed from those who refused (which goes to the survey's representativeness), *id.* at ¶ 2.c;
- assurance that the survey used carefully worded and ***validated survey questions***, *id.* at ¶2.d; and
- analysis about ***response bias***, a concern of particular importance in a retrospective survey, such as Braynard's, which examined the outcome of an election while the President was claiming election fraud, *id.* at ¶2.e.

As Professor King explains, not only should a researcher make sure to provide this information, but any statistical analysis must "adjust" for these factors, since simply applying "means or counts to the data without adapting them" to the above factors "can yield highly misleading results." *Id.* at ¶2.f. Complete information about how the data was analyzed must be provided with sufficient detail so that a third party would be able to replicate the results without talking to the original author. *Id.* at ¶2.g.

But here, there is zero evidence that Braynard's survey was conducted in accordance with accepted survey principles. Upon the current record, Braynard's methods (whatever they may have been) have not been tested, have not been subjected to peer review or publication, have an unknown potential error rate, and have not been established as accepted within the relevant scientific community. Therefore, Briggs's

report, which relies upon the Braynard survey, cannot withstand any scrutiny under *Daubert*. *See Cooper*, 510 F.3d at 880.

**_Briggs's report is riddled with analytical gaps_**. A second major problem with Briggs's testimony is that his report is riddled with analytical gaps. The survey upon which his analysis rests has numerous methodological flaws that Briggs fails to correct, as explained by Dr. Stephen Ansolabehere in the Response Report of Report of Stephen Ansolabehere. *See* Exh. 1 to Proposed Intervenor-Defendant's Response to Plaintiffs' Motion for Relief ("Ansolabehere Resp. Rep."), Doc. 37-1.[4] First, the survey upon which allowed individuals other than the survey "target," the individual whose ballots were marked as unreturned, to answer survey questions. *See* Ansolabehere Resp. Rep. at ¶¶ 41-47. This error contaminates the data and along with other errors is "of sufficient magnitude and severity as to make the estimates completely unreliable and uninformative." *Id.* at ¶ 62. Briggs fails to correct or account for this issue.

Second, Braynard's survey had an unacceptably low response rate. *Id.* at ¶¶ 33-40. Braynard was only able to reach 0.4% of the individuals he sought to interview. *Id.* at ¶ 37. Put another way, 99.6% of the individuals targeted by the survey did not respond. This is not an acceptable response rate, either in the academic field of survey methodology or in the litigation context. *Id.* at ¶¶ 38-39. Further compounding this issue, without information about the target population or the responding population, it is impossible to know whether the responding population is representative and therefore whether there is any scientific value to the survey. *Id.* at ¶ 40. Briggs fails to account for this flaw.

Third, Briggs's report fails to account for unremarkable reasons, such as late arriving ballots, missing or mismatched signature rejections, or spoiled or voided ballots, for why returned absentee ballots might not be recorded or counted. *See* Ansolabehere Resp. Rep. at ¶¶ 27-30. The failure to grapple with these obvious alternative causes renders Briggs's analysis unreliable. *United States v. Artero*, 121 F.3d 1256, 1262 (9th

---

[4] A true and correct copy of Ansolabehere's Report is attached hereto as "Exhibit 9."

Cir. 1997 (quoting *People Who Care v. Rockford Board of Education*, 111 F.3d 528, 537–538 (7th Cir. 1997)).

Briggs only further confirms the unreliability of his work in his Response Report, filed as Exhibit 3 to Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiff's Motion for Relief ("Briggs Resp. Rep."), Doc. 44-1.[5] For example, Briggs addresses response rate, but Briggs only provides the (non-responsive) response that if there had been double the response rate, then the prediction interval would shrink, and "we become more confident." Briggs Resp. Rep. at 2. Briggs **never explains how he has accounted for the extremely low response rate in his analysis**; he just says it is not a problem. But "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

### b. Briggs's testimony is otherwise unhelpful.

Briggs's report is not relevant to the question presented to the Court regarding the validity of the outcome of the election. Setting aside the problems with the data, Briggs does not opine regarding whether any particular alleged error resulted in a ballot for Biden that should have gone for Trump or how any error would or even could have changed the outcome of the election. His report should therefore be discarded for lack of relevance. *See* Fed. R. Evid. 702(a).

### 2. Brian Teasley

Plaintiffs offer a declaration by Brian Teasley and seek to have Teasley offer opinions on whether there are "abnormal patterns" of voting data favoring Biden in

---

[5] Plaintiffs filed Briggs's Response Report after the deadline for expert disclosures on December 5, 2020. They have not provided any indication that they intend for the response report to be affirmative evidence. The report is untimely and should not be considered within the Plaintiffs' affirmative disclosures.

counties that used Dominion Voting Systems machines, based on publicly available data on the 2020 presidential election. *See* Compl. Exh. 4, at ¶¶ 7, 16, Doc. 1-3.[6] Teasley's opinions should be excluded because they provide only a cursory explanation of his credentials, lacks foundation, and reflect serious errors in its methodology.

### a. Teasley is not qualified as an expert.

Teasley is a businessman who lacks the qualifications needed to offer expert opinion testimony on the impact, if any, on Arizona's 2020 presidential election from the use of certain voting machines. Teasley states that he holds a Bachelor of Science degree in Mathematics and a Master of Science degree in Statistics, he has conducted statistical analyses for various companies, and that he spent 15 days studying publicly available data on the 2020 presidential election. Compl. Exh. 4, at ¶¶ 3-5, Doc. 1-3.  However, he does not further describe his education, experience, or other credentials or explain how his prior work is similar to or relates to, if at all, the work he performed in this matter.  He does not appear to have any experience with Arizona elections or analyzing Arizona election data, nor with statistical methods appropriate for analyzing election data, or such specialized topics as detection of voting anomalies or county pairings based on census variables.  His professional background appears to be in online marketing optimization. This is patently insufficient to offer opinions on so important a topic as whether there are "abnormal results" caused by Dominion voting machines and that "[s]ome external force caused this anomaly" and swayed the results in Arizona's elections. *Id.* at ¶¶ 7, 9, 10. Courts routinely find that experts with such limited experience and knowledge in the particular field at issue are "glaringly inadequate." *See Jinro Am. Inc.*, 266 F.3d at 1005.

### b. Teasley's report lacks foundation and is unreliable.

Even if the Court finds Teasley qualified, his declaration lacks any foundation and is otherwise unreliable.  Expert Dr. Jonathan Rodden, a Stanford professor who has

---

[6] Plaintiffs filed Teasley's Rebuttal Report after the deadline for expert disclosures on December 5, 2020.  They have not provided any indication that they intend for the rebuttal report to be affirmative evidence. The report is untimely and should not be considered within the Plaintiffs' affirmative disclosures.

published and testified regarding statistical methods to access political geography, balloting, and representation, among other topics, explains in his Report, filed as Exhibit 2 to Proposed Intervenor-Defendant's Response to Plaintiffs' Motion for Relief ("Rodden Rep."), Doc. 37-2,[7] that Teasley's report fails to comport with applicable standards in the field, and the design and analyses Teasley offers are flawed. *Id.* at 6.

First, Teasley "posits a causal relationship, whereby certain types of machines are responsible for boosting the Democratic vote share," but neither the data nor the research nor the design nor the analysis are adequately explained. Rodden Rep. at 6, Doc. 37-2. For example, the report refers to a Chi-Squared Automatic Interaction Detection approach, but fails to provide ***any*** details about "the analysis or the dataset, and provides no output." *Id.* at 7.

Rodden explains that Teasley's failure to provide details about the method of his analysis and the data he purports to have analyzed is a far departure from the standard techniques used in the field of election data analysis. Specifically, Teasley's approach
> is not a standard technique used in the analysis of election data, and the author provides no explanation of why this unusual approach was selected. The author presents a scatterplot that seems to be based on a prediction from some kind of statistical model, but the author does not explain anything about the model. The author goes on to mention, in a single sentence, some type of matching analysis. The author provides no details about how the matching analysis was set up, which variables were used, whether the analysis relied on within-state or cross-state variation, and crucially, whether or not it was possible to achieve adequate balance on all of the selected matching variables.

Rodden Rep. at 7-8.

Teasley's failure to explain how he went about reaching his conclusions and to point to any accepted scientific method within the election data field warrants exclusion of his opinion for lack of foundation and unreliability. *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422 (9th Cir. 1998) (affirming exclusion where there was no explanation how expert "went about reaching his conclusions" and not employed accepted methodologies).

---

[7] A true and correct copy of Rodden's Report is attached hereto as "Exhibit 10."

Indeed, because Teasley fails to provide any details whatsoever about the analysis he purports to have conducted, "it is not possible to reconstruct the analysis." Rodden Rep. at 8. This is yet another reason to exclude his opinion. *Cooper*, 510 F.3d at 880.

Plaintiffs now offer another report from Teasley (this time belatedly served nine hours after the court-ordered deadline for expert disclosures), in which he for the first time purports to provide the "results of the analysis" as Exhibit 4 to Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiff's Motion for Relief, ("Teasley Rebuttal Rep."), Doc. 44-1.[8] The results consist of two pages in an Appendix. *Id.* at 3-4.

But these so-called "results" are facially deficient. Teasley provides none of the basic data and information required to validate his assumptions—he doesn't disclose what counties he studied, what data he used, or how he determined those results were exceptionally high. Indeed, Teasley has not included any details to back up his most central conclusions (like the estimated number of votes affected in Arizona, Teasley Rep., at ¶ 16, or the estimated percentages of affected votes in Maricopa, AZ or nationally, *id.* at ¶ 15). Nor has Teasley provided any clarification about how he reached any numerical results. The Appendix simply raises more questions. What dataset did Teasley analyze? How did he match counties? What does "Other Dominion Voting Systems" refer to and what are the numbers in the table he provides? Teasley's complete failure to explain his methodology or provide sufficient data to ascertain his work's reliability precludes its admission. *Cooper*, 510 F.3d at 880.

Furthermore, as Rodden explains, Teasley's methodology, such as it is, wholly lacks reliability. For example, Teasley's report suffers from an obvious causal inference problem. As shown in Rodden's report, "Dominion software was most prominently in use in 2020 in states that were already relatively Democratic in 2016." Rodden Rep. at 11. Accordingly, "If extremely Democratic counties in states like those in New England

---

[8] Plaintiffs filed Teasley's Rebuttal Report after the deadline for expert disclosures on December 5, 2020. They have not provided any indication that they intend for the rebuttal report to be affirmative evidence. The report is untimely and should not be considered within the Plaintiffs' affirmative disclosures.

{00526210.1}                                   -10-

adopted a certain software in the past, and one examined a contemporary correlation between voting behavior and the use of that technology, that correlation could not plausibly be interpreted as evidence that the technology *caused* the voting outcomes . . . ." *Id.* at 11-12. Teasley's failure to employ the standard practices in the applicable social science field and reliance upon a false causal inference nullify the value of his opinion and demonstrate its lack of reliability. As such, the Court should not admit his testimony.

### 3. Russell James Ramsland, Jr.

Russell James Ramsland, Jr. offers opinions that the use of certain voting machines influenced the outcome of the 2020 presidential election in Arizona and specifically opines that 100,724 votes must be thrown out. *See* Ramsland Decl., Compl. Exh. 17 at ¶ 14, Doc. 1-9. Ramsland's report should be excluded because Ramsland is not qualified as an expert and fails to disclose the information relied on and the methodology he (or others) utilized to reach his conclusions. His opinions are not reliable.

First, Ramsland is neither a statistician nor a computer scientist. Rather, he is a businessman who lacks the qualifications necessary to offer expert opinion testimony on the impact, if any, on the 2020 presidential election from the use of certain voting machines. *See id.* at ¶¶ 1-2. In his declaration, Ramsland admits his lack of relevant knowledge, education, and experience, stating that he "relied on [his employer's] experts and resources," noting that his employer "provides a range of security services" and employs a "wide variety of cyber and cyber forensic analysts." *Id.* at ¶ 2. However, Ramsland does not disclose who these unidentified "experts" are, which of them were utilized, the sources of data they relied upon, the manner in which they performed whatever work they did, and in what way Ramsland, in turn, relied on them.[9]

---

[9] Plaintiffs' disclosures state that "Mr. Ramsland's CV is attached hereto as Ex. 3." Exhibit 3 provided by Plaintiffs contains unidentified materials. One page states "Source 1" and another states "Source 4" at the top of the page. It is unclear if any of the pages are Ramsland's CV. Attached hereto please find a copy of this document, marked as "Exhibit 4."

{00526210.1}                                    -11-

Instead, Ramsland parrots analyses from other unidentified individuals who he claims possess expertise that he does not. This alone is more than sufficient to exclude his report. *See Clear-View Techs., Inc. v. Rasnick*, No. 13-CV-02744-BLF, 2015 WL 3509384, at *5 (N.D. Cal. June 3, 2015) ("It is axiomatic that an expert, 'however well credentialed, is not permitted to be the mouthpiece of a scientist in a different specialty.'").

Even if Ramsland were qualified (and he is not), his report is inadmissible because it fails to disclose the data or methodology that he (or others) used, as well as the bases for his (or other's) analyses and conclusions. *Hermanek*, 289 F.3d at 1094 ("the court must assure that the methods are adequately explained"). Indeed, Ramsland's report does not disclose his data sources, the statistical analyses conducted, margins of error, or virtually anything that might suggest serious scholarly or expert analysis.[10]

Furthermore, to the extent any methodology can be discerned from the scant information in his report, that methodology is unreliable and lacking in foundation, and his proffered opinions are therefore inadmissible. *See* Fed. R. Evid. 702. For example, Ramsland points to high voter turn-out in certain areas as a "red flag" indicative of election fraud. Ramsland Decl., at ¶ 13. But as Rodden points out, Ramsland's report fails to offer any explanation or citation to academic literature to suggest that turnout above 80% is somehow suspicious. Quite to the contrary, turnout in Arizona and in the counties Ramsland identifies in 2020 are consistent with turnout in prior election cycles over the past two decades. *See* Rodden Rep. at 17, Doc. 37-2. Likewise, Ramsland points to what he calls an improbable or impossible "spike in processed votes." Ramsland Dec., at ¶ 16. However, he fails to explain why the processing of votes is impossible or why the timing of data releases is at all probative of election fraud. *See* Rodden Rep. at 19.

---

[10] Ramsland also devotes half of his report to unsubstantiated claims about Antrim County, Michigan and Dallas County, Texas that have no bearing on the administration of Arizona's elections. Ramsland's suggestion that similar issues could or might occur in Arizona are nothing more than rank speculation. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) ("speculative testimony is inherently unreliable").

Ramsland's failure to provide or even describe the methodology underlying his opinions as well as the lack of reliability in the methodology that can be ascertained from his report mandate exclusion of Ramsland's testimony.[11]

### 4. "Spider"

Plaintiffs have disclosed two reports, Exhibit 12 to their Complaint and a new exhibit attached to their disclosures as Exhibit 4, for an individual whose name is redacted but referred to by Plaintiffs as "Spider." *See* Compl. Exh. 12, Doc. 1-5 ("Spider Decl. A"); *see* Exh. 5, Exhibit 4 to Plaintiffs' Witness Disclosures ("Spider Decl. B"). Spider claims to be an "electronic intelligence analyst . . . with experience gathering SAM missile system electronic intelligence" and "extensive experience as a white hat hacker used by some of the top election specialists in the world." *See* Exh. 5, ¶ 2. Other than claiming to work for "top election specialists," Spider does not disclose whether s/he has any experience with election administration or the companies, software, and machines used by states to conduct elections. Because Spider is not named, it is impossible to verify or even research what Spider's credentials may be. On the record before the Court, Spider cannot qualify as an expert given his/her lack of relevant education, training, experience, knowledge, and skill. *See Jinro Am. Inc.*, 266 F.3d at 1006.

Spider's declarations should also be disregarded because they rely on nothing more than speculation and s/he uses no discernable methodology in reaching his/her conclusions. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) ("speculative testimony is inherently unreliable"). Following a dizzying array of screenshots, Spider comes to the conclusion that "Dominion Voter Systems and Edison

---

[11] In plain contravention of the Court's order requiring that "Plaintiffs shall provide full and complete witness disclosures by Saturday, December 5, 2020, at 12:00 PM," Plaintiffs' untimely filed a new and previously undisclosed report of Russell J. Ramsland, Jr., as an exhibit to their reply brief. *See* Exh. 5 to Plaintiffs' Reply to Defendant's Response in Opposition to Plaintiff's Motion for Relief, Doc. 44-1. All expert reports not timely served should not be considered. *See* Fed. R. Civ. P. 37(c)(1). In any event, the untimely report only multiplies the gaps in Ramsland's methodology, by inserting additional unfounded analysis and unexplained extrapolations.

Research" were "accessible" and "certainly compromised by rogue actors," such as Iran and China, and that Dominion and Edison Research "intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020."  Spider. Decl. A, at ¶ 21, Doc. 1-5.  Spider's second declaration (which actually appears to contain multiple declarations) does nothing more: providing a hodge-podge of IP addresses allegedly showing that "SSL certificates" for Dominion were connected to foreign systems; including purported screenshots from a site called "offshoreleaks.icij.org"; averring that Smartmatic's website is in the Philippines; and including additional screenshots.  Exh. 5, Spider Decl. B.

Spider appears to have applied no methodology other than a series of online and other searches in reaching a conclusion that rests entirely on speculation.  *Cooper*, 510 F.3d at 880.  Spider's declarations should not be considered.

### 5.   Matthew Bromberg

Plaintiffs offer a declaration by Matthew Bromberg who purports to offer opinions about statistical anomalies allegedly supportive of voter fraud.  Compl. Exh. 19, Doc. 1-10 ("Bromberg Decl.").

To the extent Bromberg's declaration refers to other states and cities outside of the state of Arizona, Plaintiffs have not established the relevance of this information (and cannot do so) to questions presented in this case regarding Arizona's electoral system. Bromberg's opinions about other locations is therefore unhelpful to the trier of fact. "Irrelevant evidence is not admissible."  Fed. R. Evid. 401.

The sole contention Bromberg raises concerning Arizona is that some sort of data supports the idea that vote switching occurred in Maricopa, AZ.  *See* Bromberg Decl., ¶ 7. Bromberg points to voting precincts in Maricopa County with relatively few voters and suggests that those precincts were more susceptible to voter fraud.  But as Professor Michael C. Herron explains in his expert report, Bromberg's declaration is unreliable and

lacks foundation.  *See* Exh. 3 to Proposed Intervenor-Defendant's Response to Plaintiffs' Motion for Relief, Doc. 37-3 ("Herron Rep.").[12]

First, Bromberg's theory is novel and untested and "does not appear in the literature on voter fraud," and lacks any evidentiary basis from Bromberg's declaration. *See* Herron Rep., at 2.  Second, Bromberg's opinion rests on the faulty assumption that Maricopa voters were restricted to certain precincts.  That assumption is untrue because, as explained by Herron, every "eligible voter in Maricopa County could use any of the county's 175 centers to cast an in-person ballot," such that voters "were *not* restricted to voting in the polling places associated with their precincts."  *See id.*  Accordingly Bromberg's theory is baseless and unreliable and should be excluded.  *See Jinro Am. Inc.*, 266 F.3d at 1006.

### 6. Phillip Waldron

Plaintiffs list Col. Phillip Waldron as an expert but fail to identify or describe his testimony.  Instead, they simply attach what appears to be Waldron's CV and a document titled "Arizona State Legislature Holds Public Hearing on 2020 Election.mp4."  *See* Exh. 6, Waldron CV; Exh. 7, Arizona State Legislature Public Hearing mp4,   It is possible that Exhibit 6 is a transcript of a public hearing.  But the text on the page begins without any identification of a speaker, location, or date.  *See* Exh. 6, at 1.

Plaintiffs' failure to identify Waldron's proposed testimony alone requires exclusion.  "Bald conclusions, brief statements of ultimate conclusions with no explanation of the basis and reasons therefore, or reports omitting a statement of how the facts support the conclusions do not satisfy Rule 26(a)(2)(B)." *Izzo v. Wal-Mart Stores, Inc.*, No. 2:15-CV-01142-JAD-NJK, 2016 WL 593532, at *2 (D. Nev. Feb. 11, 2016) (citations omitted).  Exclusion of expert testimony "is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

---

[12] A true and correct copy of Herron's Report is attached hereto as "Exhibit 11."

But even on its own terms, the disclosure makes it pure guesswork what Plaintiffs intend to offer Waldron to testify about and therefore impossible to access Waldron's qualifications and the reliability of his expert testimony. On the record before the Court, Waldron cannot qualify as an expert in anything. *See Jinro Am. Inc.*, 266 F.3d at 1006.

**B.   Plaintiffs' Export Reports Should be Excluded for Failure to Comply with Federal Rule of Procedure 26(a)(2)(B).**

Under Rule 26(a)(2) of the Federal Rules of Civil Procedure, parties are required to make certain disclosures relating to expert testimony and reports. First, parties are required to disclose "the identity of any witness it may use at trial" to present expert evidence. Fed. R. Civ. P. 26(a)(2)(A). The expert must provide a report containing "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B). "Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti*, 259 F.3d at 1106.

Here, Plaintiffs' expert disclosures related to their six so-called experts failed to comply with the requirements of Federal Rule 26 and should therefore be excluded under Rule 37(c)(1). "Bald conclusions, brief statements of ultimate conclusions with no explanation of the basis and reasons therefore, or reports omitting a statement of how the facts support the conclusions do not satisfy Rule 26(a)(2)(B)." *Izzo*, 2016 WL 593532,

at *2.[13]  Exclusion is the only appropriate remedy here *Ferreira v. Arpaio*, No. CV-15-01845-PHX-JAT, 2017 WL 5496135, at *1 (D. Ariz. Nov. 16, 2017) (citations omitted).[14]

### III.  CONCLUSION

Plaintiffs' proposed expert testimony and reports are based on anonymous affiants, facially unqualified so-called experts, and an implausible claimed conspiracy unsupported by reliable methods.  Plaintiffs' disclosures also flunk every requirement of Rule 26(a)(2) of the Federal Rules of Civil Procedure.  For the reasons stated herein, the Court should exclude the testimony and reports of Plaintiffs' six experts.

Respectfully submitted this 7th day of December, 2020.

**COPPERSMITH BROCKELMAN PLC**
By  s/ Roopali H. Desai
   Roopali H. Desai
   D. Andrew Gaona
   Kristen Yost

**SUSMAN GODFREY L.L.P.**
   Justin A. Nelson
   Stephen E. Morrissey
   Stephen Shackelford
   Davida Brook

*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*

---

[13] Furthermore, to the extent Plaintiffs purport to untimely re-designate any expert witness as a fact witness, Defendant objects to the improper disclosure.  Fed. R. Civ. P. 26(a)(2)(b), 37(c)(1).  Moreover, the six witnesses lack of personal knowledge about voting in Arizona.  *See* Fed. R. Evid. 602.  Their testimony should also be excluded as prejudicial, misleading, and a waste of time.  *See* Fed. R. Evid. 403.

[14] Under L.R.Civ. 7.2(l), counsel certifies that Defendant met and conferred with Plaintiffs in good faith on December 7, 2020, in an effort to resolve these issues; the parties were unable to resolve the dispute. During the conference, Defendant gave notice of her intent to file this Motion.