# Exhibit 1

No. _____, Original

# In the Supreme Court of the United States

———————

STATE OF TEXAS,

*Plaintiff,*

v.

COMMONWEALTH OF PENNSYLVANIA, STATE OF
GEORGIA, STATE OF MICHIGAN, AND STATE OF
WISCONSIN,

*Defendants.*

———————

## MOTION FOR LEAVE TO FILE BILL OF COMPLAINT

———————

Ken Paxton\*
Attorney General of Texas

Brent Webster
First Assistant Attorney
General of Texas

Lawrence Joseph
Special Counsel to the
Attorney General of Texas

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
kenneth.paxton@oag.texas.gov
(512) 936-1414

\*        *Counsel of Record*

i

## **TABLE OF CONTENTS**

**Pages**

Motion for leave to File Bill of Complaint ................. 1

**No. \_\_\_\_\_, Original**

# In the Supreme Court of the United States
_____

**STATE OF TEXAS,**

*Plaintiff,*

v.

**COMMONWEALTH OF PENNSYLVANIA, STATE OF GEORGIA, STATE OF MICHIGAN, AND STATE OF WISCONSIN,**

*Defendants.*

_____

## MOTION FOR LEAVE TO FILE
## BILL OF COMPLAINT

Pursuant to 28 U.S.C. § 1251(a) and this Court's Rule 17, the State of Texas respectfully seeks leave to file the accompanying Bill of Complaint against the States of Georgia, Michigan, and Wisconsin and the Commonwealth of Pennsylvania (collectively, the "Defendant States") challenging their administration of the 2020 presidential election.

As set forth in the accompanying brief and complaint, the 2020 election suffered from significant and unconstitutional irregularities in the Defendant States:

- Non-legislative actors' purported amendments to States' duly enacted election laws, in violation of the Electors Clause's vesting State legislatures with plenary authority regarding the appointment of presidential electors.

- Intrastate differences in the treatment of voters, with more favorable allotted to voters – whether lawful or unlawful – in areas administered by local government under Democrat control and with populations with higher ratios of Democrat voters than other areas of Defendant States.

- The appearance of voting irregularities in the Defendant States that would be consistent with the unconstitutional relaxation of ballot-integrity protections in those States' election laws.

All these flaws – even the violations of *state* election law – violate one or more of the federal requirements for elections (*i.e.*, equal protection, due process, and the Electors Clause) and thus arise under federal law. *See Bush v Gore*, 531 U.S. 98, 113 (2000) ("significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question") (Rehnquist, C.J., concurring). Plaintiff State respectfully submits that the foregoing types of electoral irregularities exceed the hanging-chad saga of the 2000 election in their degree of departure from both state and federal law. Moreover, these flaws cumulatively preclude knowing who legitimately won the 2020 election and threaten to cloud all future elections.

Taken together, these flaws affect an outcome-determinative numbers of popular votes in a group of States that cast outcome-determinative numbers of electoral votes. This Court should grant leave to file the complaint and, ultimately, enjoin the use of unlawful election results without review and ratification by the Defendant States' legislatures and remand to the Defendant States' respective

legislatures to appoint Presidential Electors in a manner consistent with the Electors Clause and pursuant to 3 U.S.C. § 2.

December 7, 2020             Respectfully submitted,

                            Ken Paxton*
                            Attorney General of Texas

                            Brent Webster
                            First Assistant Attorney
                            General of Texas

                            Lawrence Joseph
                            Special Counsel to the
                            Attorney General of Texas

                            Office of the Attorney General
                            P.O. Box 12548 (MC 059)
                            Austin, TX 78711-2548
                            kenneth.paxton@oag.texas.gov
                            (512) 936-1414

                            *       Counsel of Record

No. _____, Original

_____

**In the Supreme Court of the United States**

_____

STATE OF TEXAS,

*Plaintiff,*

v.

COMMONWEALTH OF PENNSYLVANIA, STATE OF STATE OF GEORGIA, STATE OF MICHIGAN, AND STATE OF WISCONSIN,

*Defendants.*

_____

**BILL OF COMPLAINT**

_____

Ken Paxton*
Attorney General of Texas

Brent Webster
First Assistant Attorney
General of Texas

Lawrence Joseph
Special Counsel to the
Attorney General of Texas

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
kenneth.paxton@oag.texas.gov
(512) 936-1414

\*        Counsel of Record

i

## **TABLE OF CONTENTS**

**Pages**

Bill of Complaint ...................................................... 1

Nature of the Action................................................ 3

Jurisdiction and Venue ............................................ 8

Parties..................................................................... 10

Legal Background ................................................... 10

Facts....................................................................... 12

      Commonwealth of Pennsylvania...................... 14

      State of Georgia ................................................ 20

      State of Michigan .............................................. 23

      State of Wisconsin............................................. 29

Count I: Electors Clause ......................................... 36

Count II: Equal Protection...................................... 37

Count III: Due Process ............................................ 38

Prayer for Relief ..................................................... 39

1

"[T]hat form of government which is best contrived to secure an impartial and exact execution of the law, is the best of republics."

—John Adams

## BILL OF COMPLAINT

Our Country stands at an important crossroads. Either the Constitution matters and must be followed, even when some officials consider it inconvenient or out of date, or it is simply a piece of parchment on display at the National Archives. We ask the Court to choose the former.

Lawful elections are at the heart of our constitutional democracy. The public, and indeed the candidates themselves, have a compelling interest in ensuring that the selection of a President—any President—is legitimate. If that trust is lost, the American Experiment will founder. A dark cloud hangs over the 2020 Presidential election.

Here is what we know. Using the COVID-19 pandemic as a justification, government officials in the defendant states of Georgia, Michigan, and Wisconsin, and the Commonwealth of Pennsylvania (collectively, "Defendant States"), usurped their legislatures' authority and unconstitutionally revised their state's election statutes. They accomplished these statutory revisions through executive fiat or friendly lawsuits, thereby weakening ballot integrity. Finally, these same government officials flooded the Defendant States with millions of ballots to be sent through the mails, or placed in drop boxes, with little

2

or no chain of custody[1] and, at the same time, weakened the strongest security measures protecting the integrity of the vote—signature verification and witness requirements.

Presently, evidence of material illegality in the 2020 general elections held in Defendant States grows daily. And, to be sure, the two presidential candidates who have garnered the most votes have an interest in assuming the duties of the Office of President without a taint of impropriety threatening the perceived legitimacy of their election. However, 3 U.S.C. § 7 requires that presidential electors be appointed on December 14, 2020. That deadline, however, should not cement a potentially illegitimate election result in the middle of this storm—a storm that is of the Defendant States' own making by virtue of their own unconstitutional actions.

This Court is the only forum that can delay the deadline for the appointment of presidential electors under 3 U.S.C. §§ 5, 7. To safeguard public legitimacy at this unprecedented moment and restore public trust in the presidential election, this Court should extend the December 14, 2020 deadline for Defendant States' certification of presidential electors to allow these investigations to be completed. Should one of the two leading candidates receive an absolute majority of the presidential electors' votes to be cast on December 14, this would finalize the selection of our President. The only date that is mandated under

---

[1] *See* https://georgiastarnews.com/2020/12/05/dekalb-county-cannot-find-chain-of-custody-records-for-absentee-ballots-deposited-in-drop-boxes-it-has-not-been-determined-if-responsive-records-to-your-request-exist/

3

the Constitution, however, is January 20, 2021. U.S. CONST. amend. XX.

Against that background, the State of Texas ("Plaintiff State") brings this action against Defendant States based on the following allegations:

## NATURE OF THE ACTION

1.      Plaintiff State challenges Defendant States' administration of the 2020 election under the Electors Clause of Article II, Section 1, Clause 2, and the Fourteenth Amendment of the U.S. Constitution.

2.      This case presents a question of law: Did Defendant States violate the Electors Clause (or, in the alternative, the Fourteenth Amendment) by taking—or allowing—non-legislative actions to change the election rules that would govern the appointment of presidential electors?

3.      Those unconstitutional changes opened the door to election irregularities in various forms. Plaintiff State alleges that each of the Defendant States flagrantly violated constitutional rules governing the appointment of presidential electors. In doing so, seeds of deep distrust have been sown across the country. In the spirit of *Marbury v. Madison*, this Court's attention is profoundly needed to declare what the law is and to restore public trust in this election.

4.      As Justice Gorsuch observed recently, "Government is not free to disregard the [Constitution] in times of crisis. … Yet recently, during the COVID pandemic, certain States seem to have ignored these long-settled principles." *Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 592 U.S. ____ (2020) (Gorsuch, J., concurring). This case is no different.

4

5.     Each of Defendant States acted in a common pattern. State officials, sometimes through pending litigation (*e.g.*, settling "friendly" suits) and sometimes unilaterally by executive fiat, announced new rules for the conduct of the 2020 election that were inconsistent with existing state statutes defining what constitutes a lawful vote.

6.     Defendant States also failed to segregate ballots in a manner that would permit accurate analysis to determine which ballots were cast in conformity with the legislatively set rules and which were not. This is especially true of the mail-in ballots in these States. By waiving, lowering, and otherwise failing to follow the state statutory requirements for signature validation and other processes for ballot security, the entire body of such ballots is now constitutionally suspect and may not be legitimately used to determine allocation of the Defendant States' presidential electors.

7.     The rampant lawlessness arising out of Defendant States' unconstitutional acts is described in a number of currently pending lawsuits in Defendant States or in public view including:

- *Dozens of witnesses testifying under oath about*: the physical blocking and kicking out of Republican poll challengers; thousands of the same ballots run multiple times through tabulators; mysterious late night dumps of thousands of ballots at tabulation centers; illegally backdating thousands of ballots; signature verification procedures ignored; more

5

than 173,000 ballots in the Wayne County, MI center that cannot be tied to a registered voter;[2]

- *Videos of*: poll workers erupting in cheers as poll challengers are removed from vote counting centers; poll watchers being blocked from entering vote counting centers—despite even having a court order to enter; suitcases full of ballots being pulled out from underneath tables after poll watchers were told to leave.

- *Facts for which no independently verified reasonable explanation yet exists*: On October 1, 2020, in Pennsylvania a laptop and several USB drives, used to program Pennsylvania's Dominion voting machines, were mysteriously stolen from a warehouse in Philadelphia. The laptop and the USB drives were the *only* items taken, and potentially could be used to alter vote tallies; In Michigan, which also employed the same Dominion voting system, on November 4, 2020, Michigan election officials have admitted that a purported "glitch" caused 6,000 votes for President Trump to be wrongly switched to Democrat Candidate Biden. A flash drive containing tens of thousands of votes was left unattended in the Milwaukee tabulations center in the early morning hours of Nov. 4, 2020, without anyone aware it was not in a proper chain of custody.

---

[2]   All exhibits cited in this Complaint are in the Appendix to the Plaintiff State's forthcoming motion to expedite ("App. 1a-151a"). *See* Complaint (Doc. No. 1), *Donald J. Trump for President, Inc. v. Benson*, 1:20-cv-1083 (W.D. Mich. Nov. 11, 2020) at ¶¶ 26-55 & Doc. Nos. 1-2, 1-4.

6

8.     Nor was this Court immune from the blatant disregard for the rule of law. Pennsylvania itself played fast and loose with its promise to this Court. In a classic bait and switch, Pennsylvania used guidance from its Secretary of State to argue that this Court should not expedite review because the State would segregate potentially unlawful ballots. A court of law would reasonably rely on such a representation. Remarkably, before the ink was dry on the Court's 4-4 decision, Pennsylvania changed that guidance, breaking the State's promise to this Court. *Compare Republican Party of Pa. v. Boockvar*, No. 20-542, 2020 U.S. LEXIS 5188, at *5-6 (Oct. 28, 2020) ("we have been informed by the Pennsylvania Attorney General that the Secretary of the Commonwealth issued guidance today directing county boards of elections to segregate [late-arriving] ballots") (Alito, J., concurring) *with Republican Party v. Boockvar*, No. 20A84, 2020 U.S. LEXIS 5345, at *1 (Nov. 6, 2020) ("this Court was not informed that the guidance issued on October 28, which had an important bearing on the question whether to order special treatment of the ballots in question, had been modified") (Alito, J., Circuit Justice).

9.     Expert analysis using a commonly accepted statistical test further raises serious questions as to the integrity of this election.

10.    The probability of former Vice President Biden winning the popular vote in the four Defendant States—Georgia, Michigan, Pennsylvania, and Wisconsin—independently given President Trump's early lead in those States as of 3 a.m. on November 4, 2020, is less than one in a quadrillion, or 1 in 1,000,000,000,000,000. For former Vice President Biden to win these four States collectively, the odds of

7

that event happening decrease to less than one in a quadrillion to the fourth power (*i.e.*, 1 in 1,000,000,000,000,000[4]). *See* Decl. of Charles J. Cicchetti, Ph.D. ("Cicchetti Decl.") at ¶¶ 14-21, 30-31. *See* App. 4a-7a, 9a.

11.     The same less than one in a quadrillion statistical improbability of Mr. Biden winning the popular vote in the four Defendant States—Georgia, Michigan, Pennsylvania, and Wisconsin—independently exists when Mr. Biden's performance in each of those Defendant States is compared to former Secretary of State Hilary Clinton's performance in the 2016 general election and President Trump's performance in the 2016 and 2020 general elections. Again, the statistical improbability of Mr. Biden winning the popular vote in these **four** States collectively is 1 in 1,000,000,000,000,000[5]. *Id.* 10-13, 17-21, 30-31.

12.     Put simply, there is substantial reason to doubt the voting results in the Defendant States.

13.     By purporting to waive or otherwise modify the existing state law in a manner that was wholly *ultra vires* and not adopted by each state's legislature, Defendant States violated not only the Electors Clause, U.S. CONST. art. II, § 1, cl. 2, but also the Elections Clause, *id.* art. I, § 4 (to the extent that the Article I Elections Clause textually applies to the Article II process of selecting presidential electors).

14.     Plaintiff States and their voters are entitled to a presidential election in which the votes from each of the states are counted only if the ballots are cast and counted in a manner that complies with the pre-existing laws of each state. *See Anderson v. Celebrezze*, 460 U.S. 780, 795 (1983) ("for the

8

President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation."). Voters who cast lawful ballots cannot have their votes diminished by states that administered their 2020 presidential elections in a manner where it is impossible to distinguish a lawful ballot from an unlawful ballot.

15.     The number of absentee and mail-in ballots that have been handled unconstitutionally in Defendant States greatly exceeds the difference between the vote totals of the two candidates for President of the United States in each Defendant State.

16.     In addition to injunctive relief for this election, Plaintiff State seeks declaratory relief for all presidential elections in the future. This problem is clearly capable of repetition yet evading review. The integrity of our constitutional democracy requires that states conduct presidential elections in accordance with the rule of law and federal constitutional guarantees.

## JURISDICTION AND VENUE

17.     This Court has original and exclusive jurisdiction over this action because it is a "controvers[y] between two or more States" under Article III, § 2, cl. 2 of the U.S. Constitution and 28 U.S.C. § 1251(a) (2018).

18.     In a presidential election, "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Anderson*, 460 U.S. at 795. The constitutional failures of Defendant States injure Plaintiff States because "'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as

9

effectively as by wholly prohibiting the free exercise of the franchise.'" *Bush v. Gore*, 531 U.S. 98, 105 (2000) (quoting *Reynolds v. Sims*, 377 U. S. 533, 555 (1964)) (*Bush II*). In other words, Plaintiff State is acting to protect the interests of its respective citizens in the fair and constitutional conduct of elections used to appoint presidential electors.

19.    This Court's Article III decisions indicate that only a state can bring certain claims. *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (distinguishing citizen plaintiffs from citizen relators who sued in the name of a state); *cf. Massachusetts v. EPA,* 549 U.S. 497, 520 (2007) (courts owe states "special solicitude in standing analysis"). Moreover, redressability likely would undermine a suit against a single state officer or State because no one State's electoral votes will make a difference in the election outcome. This action against multiple State defendants is the only adequate remedy for Plaintiff States, and this Court is the only court that can accommodate such a suit.

20.    Individual state courts do not—and under the circumstance of contested elections in multiple states, *cannot*—offer an adequate remedy to resolve election disputes within the timeframe set by the Constitution to resolve such disputes and to appoint a President via the electoral college. No court—other than this Court—can redress constitutional injuries spanning multiple States with the sufficient number of states joined as defendants or respondents to make a difference in the Electoral College.

21.    This Court is the sole forum in which to exercise the jurisdictional basis for this action.

10

## PARTIES

22. Plaintiff is the State of Texas, which is a sovereign State of the United States.

23. Defendants are the Commonwealth of Pennsylvania and the States of Georgia, Michigan, and Wisconsin, which are sovereign States of the United States.

## LEGAL BACKGROUND

24. Under the Supremacy Clause, the "Constitution, and the laws of the United States which shall be made in pursuance thereof … shall be the supreme law of the land." U.S. CONST. Art. VI, cl. 2.

25. "The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college." *Bush II*, 531 U.S. at 104 (citing U.S. CONST. art. II, § 1).

26. State legislatures have plenary power to set the process for appointing presidential electors: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors." U.S. CONST. art. II, §1, cl. 2; *see also Bush II*, 531 U.S. at 104 ("[T]he state legislature's power to select the manner for appointing electors is *plenary*." (emphasis added)).

27. At the time of the Founding, most States did not appoint electors through popular statewide elections. In the first presidential election, six of the ten States that appointed electors did so by direct legislative appointment. *McPherson v. Blacker*, 146 U.S. 1, 29-30 (1892).

11

28.     In the second presidential election, nine of the fifteen States that appointed electors did so by direct legislative appointment. *Id.* at 30.

29.     In the third presidential election, nine of sixteen States that appointed electors did so by direct legislative appointment. *Id.* at 31. This practice persisted in lesser degrees through the Election of 1860. *Id.* at 32.

30.     Though "[h]istory has now favored the voter," *Bush II*, 531 U.S. at 104, "there is no doubt of the right of the legislature to resume the power [of appointing presidential electors] at any time, for *it can neither be taken away nor abdicated.*" *McPherson*, 146 U.S. at 35 (emphasis added); *cf.* 3 U.S.C. § 2 ("Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct.").

31.     Given the State legislatures' constitutional primacy in selecting presidential electors, the ability to set rules governing the casting of ballots and counting of votes cannot be usurped by other branches of state government.

32.     The Framers of the Constitution decided to select the President through the Electoral College "to afford as little opportunity as possible to tumult and disorder" and to place "every practicable obstacle [to] cabal, intrigue, and corruption," including "foreign powers" that might try to insinuate themselves into our elections. THE FEDERALIST NO. 68, at 410-11 (C. Rossiter, ed. 1961) (Madison, J.).

33.     Defendant States' applicable laws are set out under the facts for each Defendant State.

12

## FACTS

34.    The use of absentee and mail-in ballots skyrocketed in 2020, not only as a public-health response to the COVID-19 pandemic but also at the urging of mail-in voting's proponents, and most especially executive branch officials in Defendant States. According to the Pew Research Center, in the 2020 general election, a record number of votes—about 65 million—were cast via mail compared to 33.5 million mail-in ballots cast in the 2016 general election—an increase of more than 94 percent.

35.    In the wake of the contested 2000 election, the bipartisan Jimmy Carter-James Baker commission identified absentee ballots as "the largest source of potential voter fraud." BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005).

36.    Concern over the use of mail-in ballots is not novel to the modern era, Dustin Waters, *Mail-in Ballots Were Part of a Plot to Deny Lincoln Reelection in 1864*, WASH. POST (Aug. 22, 2020),[3] but it remains a *current* concern. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194-96 & n.11 (2008); *see also* Texas Office of the Attorney General, *AG Paxton Announces Joint Prosecution of Gregg County Organized Election Fraud in Mail-In Balloting Scheme* (Sept. 24, 2020); Harriet Alexander & Ariel Zilber, *Minneapolis police opens investigation into reports that Ilhan Omar's supporters illegally harvested Democrat ballots in Minnesota*, DAILY MAIL, Sept. 28, 2020.

---

[3]    https://www.washingtonpost.com/history/2020/08/22/mail-in-voting-civil-war-election-conspiracy-lincoln/

13

37.    Absentee and mail-in voting are the primary opportunities for unlawful ballots to be cast. As a result of expanded absentee and mail-in voting in Defendant States, combined with Defendant States' unconstitutional modification of statutory protections designed to ensure ballot integrity, Defendant States created a massive opportunity for fraud. In addition, the Defendant States have made it difficult or impossible to separate the constitutionally tainted mail-in ballots from all mail-in ballots.

38.    Rather than augment safeguards against illegal voting in anticipation of the millions of additional mail-in ballots flooding their States, Defendant States *all* materially weakened, or did away with, security measures, such as witness or signature verification procedures, required by their respective legislatures. Their legislatures established those commonsense safeguards to prevent—or at least reduce—fraudulent mail-in ballots.

39.    Significantly, in Defendant States, Democrat voters voted by mail at two to three times the rate of Republicans. Former Vice President Biden thus greatly benefited from this unconstitutional usurpation of legislative authority, and the weakening of legislative mandated ballot security measures.

40.    The outcome of the Electoral College vote is directly affected by the constitutional violations committed by Defendant States. Plaintiff State complied with the Constitution in the process of appointing presidential electors for President Trump. Defendant States violated the Constitution in the process of appointing presidential electors by unlawfully abrogating state election laws designed to

14

protect the integrity of the ballots and the electoral process, and those violations proximately caused the appointment of presidential electors for former Vice President Biden. Plaintiff State will therefore be injured if Defendant States' unlawfully certify these presidential electors.

**Commonwealth of Pennsylvania**

41.     Pennsylvania has 20 electoral votes, with a statewide vote tally currently estimated at 3,363,951 for President Trump and 3,445,548 for former Vice President Biden, a margin of 81,597 votes.

42.     The number of votes affected by the various constitutional violations exceeds the margin of votes separating the candidates.

43.     Pennsylvania's Secretary of State, Kathy Boockvar, without legislative approval, unilaterally abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in ballots. Pennsylvania's legislature has not ratified these changes, and the legislation did not include a severability clause.

44.     On August 7, 2020, the League of Women Voters of Pennsylvania and others filed a complaint against Secretary Boockvar and other local election officials, seeking "a declaratory judgment that Pennsylvania existing signature verification procedures for mail-in voting" were unlawful for a number of reasons. *League of Women Voters of Pennsylvania v. Boockvar*, No. 2:20-cv-03850-PBT, (E.D. Pa. Aug. 7, 2020).

45.     The Pennsylvania Department of State quickly settled with the plaintiffs, issuing revised guidance on September 11, 2020, stating in relevant part: "The Pennsylvania Election Code does not

15

authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections."

46. This guidance is contrary to Pennsylvania law. First, Pennsylvania Election Code mandates that, for non-disabled and non-military voters, all applications for an absentee or mail-in ballot "shall be signed by the applicant." 25 PA. STAT. §§ 3146.2(d) & 3150.12(c). Second, Pennsylvania's voter signature verification requirements are expressly set forth at 25 PA. STAT. 350(a.3)(1)-(2) and § 3146.8(g)(3)-(7).

47. The Pennsylvania Department of State's guidance unconstitutionally did away with Pennsylvania's statutory signature verification requirements. Approximately 70 percent of the requests for absentee ballots were from Democrats and 25 percent from Republicans. Thus, this unconstitutional abrogation of state election law greatly inured to former Vice President Biden's benefit.

48. In addition, in 2019, Pennsylvania's legislature enacted bipartisan election reforms, 2019 Pa. Legis. Serv. Act 2019-77, that set *inter alia* a deadline of 8:00 p.m. on election day for a county board of elections to receive a mail-in ballot. 25 PA. STAT. §§ 3146.6(c), 3150.16(c). Acting under a generally worded clause that "Elections shall be free and equal," PA. CONST. art. I, § 5, cl. 1, a 4-3 majority of Pennsylvania's Supreme Court in *Pa. Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020), extended that deadline to three days after Election Day and adopted a presumption that even *non-postmarked ballots* were presumptively timely.

16

49.    Pennsylvania's election law also requires that poll-watchers be granted access to the opening, counting, and recording of absentee ballots: "Watchers shall be permitted to be present when the envelopes containing official absentee ballots and mail-in ballots are opened and when such ballots are counted and recorded." 25 PA. STAT. § 3146.8(b). Local election officials in Philadelphia and Allegheny Counties decided not to follow 25 PA. STAT. § 3146.8(b) for the opening, counting, and recording of absentee and mail-in ballots.

50.    Prior to the election, Secretary Boockvar sent an email to local election officials urging them to provide opportunities for various persons—including political parties—to contact voters to "cure" defective mail-in ballots. This process clearly violated several provisions of the state election code.

- Section 3146.8(a) requires: "The county boards of election, upon receipt of official absentee ballots in sealed official absentee ballot envelopes as provided under this article and mail-in ballots as in sealed official mail-in ballot envelopes as provided under Article XIII-D,1 shall safely keep the ballots in sealed or locked containers until they are to be canvassed by the county board of elections."

- Section 3146.8(g)(1)(ii) provides that mail-in ballots shall be canvassed (if they are received by eight o'clock p.m. on election day) in the manner prescribed by this subsection.

- Section 3146.8(g)(1.1) provides that the first look at the ballots shall be "no earlier than seven o'clock a.m. on election day." And the hour for this "pre-canvas" must be publicly announced at least

17

48 hours in advance. Then the votes are counted on election day.

51.    By removing the ballots for examination prior to seven o'clock a.m. on election day, Secretary Boockvar created a system whereby local officials could review ballots without the proper announcements, observation, and security. This entire scheme, which was only followed in Democrat majority counties, was blatantly illegal in that it permitted the illegal removal of ballots from their locked containers prematurely.

52.    Statewide election officials and local election officials in Philadelphia and Allegheny Counties, aware of the historical Democrat advantage in those counties, violated Pennsylvania's election code and adopted the differential standards favoring voters in Philadelphia and Allegheny Counties with the intent to favor former Vice President Biden. *See* Verified Complaint (Doc. No. 1), *Donald J. Trump for President, Inc. v. Boockvar*, 4:20-cv-02078-MWB (M.D. Pa. Nov. 18, 2020) at ¶¶ 3-6, 9, 11, 100-143.

53.    Absentee and mail-in ballots in Pennsylvania were thus evaluated under an illegal standard regarding signature verification. It is now impossible to determine which ballots were properly cast and which ballots were not.

54.    The changed process allowing the curing of absentee and mail-in ballots in Allegheny and Philadelphia counties is a separate basis resulting in an unknown number of ballots being treated in an unconstitutional manner inconsistent with Pennsylvania statute. *Id.*

55.    In addition, a great number of ballots were received after the statutory deadline and yet

18

were counted by virtue of the fact that Pennsylvania did not segregate all ballots received after 8:00 pm on November 3, 2020. Boockvar's claim that only about 10,000 ballots were received after this deadline has no way of being proven since Pennsylvania broke its promise to the Court to segregate ballots and co-mingled perhaps tens, or even hundreds of thousands, of illegal late ballots.

56.    On December 4, 2020, fifteen members of the Pennsylvania House of Representatives led by Rep. Francis X. Ryan issued a report to Congressman Scott Perry (the "Ryan Report," App. 139a-144a) stating that "[t]he general election of 2020 in Pennsylvania was fraught with inconsistencies, documented irregularities and improprieties associated with mail-in balloting, pre-canvassing, and canvassing that the reliability of the mail-in votes in the Commonwealth of Pennsylvania is impossible to rely upon."

57.    The Ryan Report's findings are startling, including:

- Ballots with NO MAILED date. That total is 9,005.
- Ballots Returned on or BEFORE the Mailed Date. That total is 58,221.
- Ballots Returned one day after Mailed Date. That total is 51,200.

Id. 143a.

58.    These nonsensical numbers alone total 118,426 ballots and exceed Mr. Biden's margin of 81,660 votes over President Trump. But these discrepancies pale in comparison to the discrepancies in Pennsylvania's reported data concerning the

19

number of mail-in ballots distributed to the populace—now with no longer subject to legislated mandated signature verification requirements.

59.     The Ryan Report also states as follows:

[I]n a data file received on November 4, 2020, the Commonwealth's PA Open Data sites reported over 3.1 million mail in ballots sent out. The CSV file from the state on November 4 depicts 3.1 million mail in ballots sent out but on November 2, the information was provided that only 2.7 million ballots had been sent out. ***This discrepancy of approximately 400,000 ballots from November 2 to November 4 has not been explained***.

Id. at 143a-44a.  (Emphasis added).

60.     These stunning figures illustrate the out-of-control nature of Pennsylvania's mail-in balloting scheme.  Democrats submitted mail-in ballots at more than two times the rate of Republicans.  This number of constitutionally tainted ballots far exceeds the approximately 81,660 votes separating the candidates.

61.     This blatant disregard of statutory law renders all mail-in ballots constitutionally tainted and cannot form the basis for appointing or certifying Pennsylvania's presidential electors to the Electoral College.

62.     According to the U.S. Election Assistance Commission's report to Congress *Election Administration and Voting Survey: 2016 Comprehensive Report*, in 2016 Pennsylvania received 266,208 mail-in ballots; 2,534 of them were rejected (.95%). *Id.* at p. 24. However, in 2020, Pennsylvania received more than 10 times the number of mail-in ballots compared to 2016. As explained *supra*, this

20

much larger volume of mail-in ballots was treated in an unconstitutionally modified manner that included: (1) doing away with the Pennsylvania's signature verification requirements; (2) extending that deadline to three days after Election Day and adopting a presumption that even *non-postmarked ballots* were presumptively timely; and (3) blocking poll watchers in Philadelphia and Allegheny Counties in violation of State law.

63.    These non-legislative modifications to Pennsylvania's election rules appear to have generated an outcome-determinative number of unlawful ballots that were cast in Pennsylvania. Regardless of the number of such ballots, the non-legislative changes to the election rules violated the Electors Clause.

**State of Georgia**

64.    Georgia has 16 electoral votes, with a statewide vote tally currently estimated at 2,458,121 for President Trump and 2,472,098 for former Vice President Biden, a margin of approximately 12,670 votes.

65.    The number of votes affected by the various constitutional violations exceeds the margin of votes dividing the candidates.

66.    Georgia's Secretary of State, Brad Raffensperger, without legislative approval, unilaterally abrogated Georgia's statute governing the signature verification process for absentee ballots.

67.    O.C.G.A. § 21-2-386(a)(2) prohibits the opening of absentee ballots until after the polls open on Election Day: In April 2020, however, the State Election Board adopted Secretary of State Rule 183-1-14-0.9-.15, Processing Ballots Prior to Election Day.

21

That rule purports to authorize county election officials to begin processing absentee ballots up to three weeks before Election Day.

68.     Georgia law authorizes and requires a single registrar or clerk—after reviewing the outer envelope—to reject an absentee ballot if the voter failed to sign the required oath or to provide the required information, the signature appears invalid, or the required information does not conform with the information on file, or if the voter is otherwise found ineligible to vote. O.C.G.A. § 21-2-386(a)(1)(B)-(C).

69.     Georgia law provides absentee voters the chance to "cure a failure to sign the oath, an invalid signature, or missing information" on a ballot's outer envelope by the deadline for verifying provisional ballots (*i.e.*, three days after the election). O.C.G.A. §§ 21-2-386(a)(1)(C), 21-2-419(c)(2). To facilitate cures, Georgia law requires the relevant election official to notify the voter in writing: "The board of registrars or absentee ballot clerk shall promptly notify the elector of such rejection, a copy of which notification shall be retained in the files of the board of registrars or absentee ballot clerk for at least two years." O.C.G.A. § 21-2-386(a)(1)(B).

70.     On March 6, 2020, in *Democratic Party of Georgia v. Raffensperger*, No. 1:19-cv-5028-WMR (N.D. Ga.), Georgia's Secretary of State entered a Compromise Settlement Agreement and Release with the Democratic Party of Georgia (the "Settlement") to materially change the statutory requirements for reviewing signatures on absentee ballot envelopes to confirm the voter's identity by making it far more difficult to challenge defective signatures beyond the

22

express mandatory procedures set forth at GA. CODE §
21-2-386(a)(1)(B).

71.    Among other things, before a ballot could
be rejected, the Settlement required a registrar who
found a defective signature to now seek a review by
two other registrars, and only if a majority of the
registrars agreed that the signature was defective
could the ballot be rejected but not before all three
registrars' names were written on the ballot envelope
along with the reason for the rejection. These
cumbersome procedures are in direct conflict with
Georgia's statutory requirements, as is the
Settlement's requirement that notice be provided by
telephone (*i.e.*, not in writing) if a telephone number
is available. Finally, the Settlement purports to
require State election officials to consider issuing
guidance and training materials drafted by an expert
retained by the Democratic Party of Georgia.

72.    Georgia's legislature has not ratified
these material changes to statutory law mandated by
the Compromise Settlement Agreement and Release,
including altered signature verification requirements
and early opening of ballots. The relevant legislation
that was violated by Compromise Settlement
Agreement and Release did not include a severability
clause.

73.    This unconstitutional change in Georgia
law materially benefitted former Vice President
Biden. According to the Georgia Secretary of State's
office, former Vice President Biden had almost double
the number of absentee votes (65.32%) as President
Trump (34.68%). *See* Cicchetti Decl. at ¶ 25, App. 7a-
8a.

23

74. The effect of this unconstitutional change in Georgia election law, which made it more likely that ballots without matching signatures would be counted, had a material impact on the outcome of the election.

75. Specifically, there were 1,305,659 absentee mail-in ballots submitted in Georgia in 2020. There were 4,786 absentee ballots rejected in 2020. This is a rejection rate of .37%. In contrast, in 2016, the 2016 rejection rate was 6.42% with 13,677 absentee mail-in ballots being rejected out of 213,033 submitted, which more than *seventeen times greater* than in 2020. *See* Cicchetti Decl. at ¶ 24, App. 7a.

76. If the rejection rate of mailed-in absentee ballots remained the same in 2020 as it was in 2016, there would be 83,517 less tabulated ballots in 2020. The statewide split of absentee ballots was 34.68% for Trump and 65.2% for Biden. Rejecting at the higher 2016 rate with the 2020 split between Trump and Biden would decrease Trump votes by 28,965 and Biden votes by 54,552, which would be a net gain for Trump of 25,587 votes. This would be more than needed to overcome the Biden advantage of 12,670 votes, and Trump would win by 12,917 votes. *Id*. Regardless of the number of ballots affected, however, the non-legislative changes to the election rules violated the Electors Clause.

**State of Michigan**

77. Michigan has 16 electoral votes, with a statewide vote tally currently estimated at 2,650,695 for President Trump and 2,796,702 for former Vice President Biden, a margin of 146,007 votes. In Wayne County, Mr. Biden's margin (322,925 votes) significantly exceeds his statewide lead.

24

78.    The number of votes affected by the various constitutional violations exceeds the margin of votes dividing the candidates.

79.    Michigan's Secretary of State, Jocelyn Benson, without legislative approval, unilaterally abrogated Michigan election statutes related to absentee ballot applications and signature verification. Michigan's legislature has not ratified these changes, and its election laws do not include a severability clause.

80.    As amended in 2018, the Michigan Constitution provides all registered voters the right to request and vote by an absentee ballot without giving a reason. MICH. CONST. art. 2, § 4.

81.    On May 19, 2020, however, Secretary Benson announced that her office would send unsolicited absentee-voter ballot applications by mail to all 7.7 million registered Michigan voters prior to the primary and general elections. Although her office repeatedly encouraged voters to vote absentee because of the COVID-19 pandemic, it did not ensure that Michigan's election systems and procedures were adequate to ensure the accuracy and legality of the historic flood of mail-in votes. In fact, it did the opposite and did away with protections designed to deter voter fraud.

82.    Secretary Benson's flooding of Michigan with millions of absentee ballot applications prior to the 2020 general election violated M.C.L. § 168.759(3). That statute limits the procedures for requesting an absentee ballot to three specified ways:

> An application for an absent voter ballot under this section may be made in *any of the following ways*:
>
> (a) By a written request signed by the voter.

25

(b) On an absent voter ballot application form provided for that purpose by the clerk of the city or township.

(c) On a federal postcard application.

M.C.L. § 168.759(3) (emphasis added).

83.     The Michigan Legislature thus declined to include the Secretary of State as a means for distributing absentee ballot applications. *Id.* § 168.759(3)(b). Under the statute's plain language, the Legislature explicitly gave *only local clerks* the power to distribute absentee voter ballot applications. *Id.*

84.     Because the Legislature declined to explicitly include the Secretary of State as a vehicle for distributing absentee ballots applications, Secretary Benson lacked authority to distribute even a single absentee voter ballot application—much less the *millions* of absentee ballot applications Secretary Benson chose to flood across Michigan.

85.     Secretary Benson also violated Michigan law when she launched a program in June 2020 allowing absentee ballots to be requested online, *without* signature verification as expressly required under Michigan law. The Michigan Legislature did not approve or authorize Secretary Benson's unilateral actions.

86.     MCL § 168.759(4) states in relevant part: "An applicant for an absent voter ballot shall sign the application. Subject to section 761(2), a clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application."

87.     Further, MCL § 168.761(2) states in relevant part: "The qualified voter file must be used to determine the genuineness of a signature on an application for an absent voter ballot", and if "the

26

signatures do not agree sufficiently or [if] the signature is missing" the ballot must be rejected.

88. In 2016 only 587,618 Michigan voters requested absentee ballots. In stark contrast, in 2020, 3.2 million votes were cast by absentee ballot, about 57% of total votes cast – and more than *five times* the number of ballots *even requested* in 2016.

89. Secretary Benson's unconstitutional modifications of Michigan's election rules resulted in the distribution of millions of absentee ballot applications without verifying voter signatures as required by MCL §§ 168.759(4) and 168.761(2). This means that *millions* of absentee ballots were disseminated in violation of Michigan's statutory signature-verification requirements. Democrats in Michigan voted by mail at a ratio of approximately two to one compared to Republican voters. Thus, former Vice President Biden materially benefited from these unconstitutional changes to Michigan's election law.

90. Michigan also requires that poll watchers and inspectors have access to vote counting and canvassing. M.C.L. §§ 168.674-.675.

91. Local election officials in Wayne County made a conscious and express policy decision not to follow M.C.L. §§ 168.674-.675 for the opening, counting, and recording of absentee ballots.

92. Michigan also has strict signature verification requirements for absentee ballots, including that the Elections Department place a written statement or stamp on each ballot envelope where the voter signature is placed, indicating that the voter signature was in fact checked and verified

27

with the signature on file with the State. *See* MCL §
168.765a(6).

93.    However, Wayne County made the policy
decision to ignore Michigan's statutory signature-
verification requirements for absentee ballots. Former
Vice President Biden received approximately 587,074,
or 68%, of the votes cast there compared to President
Trump's receiving approximate 264,149, or 30.59%, of
the total vote. Thus, Mr. Biden materially benefited
from these unconstitutional changes to Michigan's
election law.

94.    Numerous poll challengers and an
Election Department employee whistleblower have
testified that the signature verification requirement
was ignored in Wayne County in a case currently
pending in the Michigan Supreme Court.[4] For
example, Jesse Jacob, a decades-long City of Detroit
employee assigned to work in the Elections Department for
the 2020 election testified that:

> Absentee ballots that were received in the mail would
> have the voter's signature on the envelope. While I
> was at the TCF Center, I was instructed not to look at
> any of the signatures on the absentee ballots, and I
> was instructed not to compare the signature on the
> absentee ballot with the signature on file.[5]

---

[4]    *Johnson v. Benson*, Petition for Extraordinary Writs &
Declaratory Relief filed Nov. 26, 2020 (Mich. Sup. Ct.) at ¶¶ 71,
138-39, App. 25a-51a.

[5] *Id.*, Affidavit of Jessy Jacob, Appendix 14 at ¶15, attached at
App. 34a-36a.

28

95.    The TCF was the only facility within Wayne County authorized to count ballots for the City of Detroit.

96.    These non-legislative modifications to Michigan's election statutes resulted in a number of constitutionally tainted votes that far exceeds the margin of voters separating the candidates in Michigan.

97.    Additional public information confirms the material adverse impact on the integrity of the vote in Wayne County caused by these unconstitutional changes to Michigan's election law. For example, the Wayne County Statement of Votes Report lists 174,384 absentee ballots out of 566,694 absentee ballots tabulated (about 30.8%) as counted without a registration number for precincts in the City of Detroit. *See* Cicchetti Decl. at ¶ 27, App. 8a. The number of votes not tied to a registered voter by itself exceeds Vice President Biden's margin of margin of 146,007 votes by more than 28,377 votes.

98.    The extra ballots cast most likely resulted from the phenomenon of Wayne County election workers running the same ballots through a tabulator multiple times, with Republican poll watchers obstructed or denied access, and election officials ignoring poll watchers' challenges, as documented by numerous declarations. App. 25a-51a.

99.    In addition, a member of the Wayne County Board of Canvassers ("Canvassers Board"), William Hartman, determined that 71% of Detroit's Absent Voter Counting Boards ("AVCBs") were unbalanced—*i.e.*, the number of people who checked in did not match the number of ballots cast—without explanation. *Id*. at ¶ 29.

29

100.   On November 17, 2020, the Canvassers Board deadlocked 2-2 over whether to certify the results of the presidential election based on numerous reports of fraud and unanswered material discrepancies in the county-wide election results. A few hours later, the Republican Board members reversed their decision and voted to certify the results after severe harassment, including threats of violence.

101.   The following day, the two Republican members of the Board *rescinded their votes* to certify the vote and signed affidavits alleging they were bullied and misled into approving election results and do not believe the votes should be certified until serious irregularities in Detroit votes are resolved. *See* Cicchetti Decl. at ¶ 29, App. 8a.

102.   Regardless of the number of votes that were affected by the unconstitutional modification of Michigan's election rules, the non-legislative changes to the election rules violated the Electors Clause.

**State of Wisconsin**

103.   Wisconsin has 10 electoral votes, with a statewide vote tally currently estimated at 1,610,151 for President Trump and 1,630,716 for former Vice President Biden (*i.e.*, a margin of 20,565 votes). In two counties, Milwaukee and Dane, Mr. Biden's margin (364,298 votes) significantly exceeds his statewide lead.

104.   In the 2016 general election some 146,932 mail-in ballots were returned in Wisconsin out of more than 3 million votes cast.[6] In stark contrast, 1,275,019 mail-in ballots, nearly a 900

---

[6]   Source:   U.S.   Elections   Project,   *available   at*: http://www.electproject.org/early_2016.

30

percent increase over 2016, were returned in the
November 3, 2020 election.[7]

105.   Wisconsin statutes guard against fraud
in absentee ballots: "[V]oting by absentee ballot is a
privilege exercised wholly outside the traditional
safeguards of the polling place. The legislature finds
that the privilege of voting by absentee ballot must be
carefully regulated to prevent the potential for fraud
or abuse[.]" WISC. STAT. § 6.84(1).

106.   In direct contravention of Wisconsin law,
leading up to the 2020 general election, the Wisconsin
Elections Commission ("WEC") and other local
officials   unconstitutionally   modified   Wisconsin
election laws—each time taking steps that weakened,
or did away with, established security procedures put
in place by the Wisconsin legislature to ensure
absentee ballot integrity.

107.   For example, the WEC undertook a
campaign to position hundreds of drop boxes to collect
absentee ballots—including the use of unmanned drop
boxes.[8]

108.   The mayors of Wisconsin's five largest
cities—Green Bay, Kenosha, Madison, Milwaukee,
and Racine, which all have Democrat majorities—
joined in this effort, and together, developed a plan
use purportedly "secure drop-boxes to facilitate return

---

[7]   Source:   U.S.   Elections   Project,   *available   at*:
https://electproject.github.io/Early-Vote-2020G/WI.html.

[8]   Wisconsin   Elections   Commission   Memoranda,   To:   All
Wisconsin Election Officials, Aug. 19, 2020, *available at*:
https://elections.wi.gov/sites/elections.wi.gov/files/2020-
08/Drop%20Box%20Final.pdf. at p. 3 of 4.

31

of absentee ballots." Wisconsin Safe Voting Plan 2020, at 4 (June 15, 2020).[9]

109.   It is alleged in an action recently filed in the United States District Court for the Eastern District of Wisconsin that over five hundred unmanned, illegal, absentee ballot drop boxes were used in the Presidential election in Wisconsin.[10]

110.   However, the use of *any* drop box, manned or unmanned, is directly prohibited by Wisconsin statute. The Wisconsin legislature specifically described in the Election Code "Alternate absentee ballot site[s]" and detailed the procedure by which the governing body of a municipality may designate a site or sites for the delivery of absentee ballots "other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election." Wis. Stat. 6.855(1).

111.   Any alternate absentee ballot site "shall be staffed by the municipal clerk or the executive director of the board of election commissioners, or employees of the clerk or the board of election commissioners." Wis. Stat. 6.855(3). Likewise, Wis.

---

[9]   Wisconsin Safe Voting Plan 2020 Submitted to the Center for Tech & Civic Life, June 15, 2020, by the Mayors of Madison, Milwaukee, Racine, Kenosha and Green Bay *available at*: https://www.techandciviclife.org/wp-content/uploads/2020/07/Approved-Wisconsin-Safe-Voting-Plan-2020.pdf.

[10]   *See* Complaint (Doc. No. 1), *Donald J. Trump, Candidate for President of the United States of America v. The Wisconsin Election Commission*, Case 2:20-cv-01785-BHL (E.D. Wisc. Dec. 2, 2020) (Wisconsin Trump Campaign Complaint") at ¶¶ 188-89.

32

Stat. 7.15(2m) provides, "[i]n a municipality in which the governing body has elected to an establish an alternate absentee ballot sit under s. 6.855, the municipal clerk shall operate such site as though it were his or her office for absentee ballot purposes and shall ensure that such site is adequately staffed."

112. Thus, the unmanned absentee ballot drop-off sites are prohibited by the Wisconsin Legislature as they do not comply with Wisconsin law expressly defining "[a]lternate absentee ballot site[s]". Wis. Stat. 6.855(1), (3).

113. In addition, the use of drop boxes for the collection of absentee ballots, positioned predominantly in Wisconsin's largest cities, is directly contrary to Wisconsin law providing that absentee ballots may only be "mailed by the elector, or delivered *in person* to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b)1 (emphasis added).

114. The fact that other methods of delivering absentee ballots, such as through unmanned drop boxes, are *not* permitted is underscored by Wis. Stat. § 6.87(6) which mandates that, "[a]ny ballot not mailed or delivered as provided in this subsection may not be counted." Likewise, Wis. Stat. § 6.84(2) underscores this point, providing that Wis. Stat. § 6.87(6) "shall be construed as mandatory." The provision continues—"Ballots cast in contravention of the procedures specified in those provisions may not be counted. *Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election*." Wis. Stat. § 6.84(2) (emphasis added).

115. These were not the only Wisconsin election laws that the WEC violated in the 2020

33

general election. The WEC and local election officials also took it upon themselves to encourage voters to unlawfully declare themselves "indefinitely confined"—which under Wisconsin law allows the voter to avoid security measures like signature verification and photo ID requirements.

116. Specifically, registering to vote by absentee ballot requires photo identification, except for those who register as "indefinitely confined" or "hospitalized." WISC. STAT. § 6.86(2)(a), (3)(a). Registering for indefinite confinement requires certifying confinement "because of age, physical illness or infirmity or [because the voter] is disabled for an indefinite period." *Id.* § 6.86(2)(a). Should indefinite confinement cease, the voter must notify the county clerk, *id.*, who must remove the voter from indefinite-confinement status. *Id.* § 6.86(2)(b).

117. Wisconsin election procedures for voting absentee based on indefinite confinement enable the voter to avoid the photo ID requirement and signature requirement. *Id.* § 6.86(1)(ag)/(3)(a)(2).

118. On March 25, 2020, in clear violation of Wisconsin law, Dane County Clerk Scott McDonnell and Milwaukee County Clerk George Christensen both issued guidance indicating that all voters should mark themselves as "indefinitely confined" because of the COVID-19 pandemic.

119. Believing this to be an attempt to circumvent Wisconsin's strict voter ID laws, the Republican Party of Wisconsin petitioned the Wisconsin Supreme Court to intervene. On March 31, 2020, the Wisconsin Supreme Court unanimously confirmed that the clerks' "advice was legally incorrect" and potentially dangerous because "voters

34

may be misled to exercise their right to vote in ways that are inconsistent with WISC. STAT. § 6.86(2)."

120.   On May 13, 2020, the Administrator of WEC issued a directive to the Wisconsin clerks prohibiting removal of voters from the registry for indefinite-confinement status if the voter is no longer "indefinitely confined."

121.   The WEC's directive violated Wisconsin law. Specifically, WISC. STAT. § 6.86(2)(a) specifically provides that "any [indefinitely confined] elector [who] is no longer indefinitely confined … shall so notify the municipal clerk." WISC. STAT. § 6.86(2)(b) further provides that the municipal clerk "shall remove the name of any other elector from the list upon request of the elector or upon receipt of reliable information that an elector no longer qualifies for the service."

122.   According to statistics kept by the WEC, nearly 216,000 voters said they were indefinitely confined in the 2020 election, nearly a fourfold increase from nearly 57,000 voters in 2016. In Dane and Milwaukee counties, more than 68,000 voters said they were indefinitely confined in 2020, a fourfold increase from the roughly 17,000 indefinitely confined voters in those counties in 2016.

123.   Under Wisconsin law, voting by absentee ballot also requires voters to complete a certification, including their address, and have the envelope witnessed by an adult who also must sign and indicate their address on the envelope. *See* WISC. STAT. § 6.87. The sole remedy to cure an "improperly completed certificate or [ballot] with no certificate" is for "the clerk [to] return the ballot to the elector[.]" *Id.* § 6.87(9). "If a certificate is missing the address of a

35

witness, the ballot *may not be counted*." *Id.* § 6.87(6d) (emphasis added).

124.   However, in a training video issued April 1, 2020, the Administrator of the City of Milwaukee Elections Commission unilaterally declared that a "witness address may be written in red and that is because we were able to locate the witnesses' address for the voter" to add an address missing from the certifications on absentee ballots. The Administrator's instruction violated WISC. STAT. § 6.87(6d). The WEC issued similar guidance on October 19, 2020, in violation of this statute as well.

125.   In the Wisconsin Trump Campaign Complaint, it is alleged, supported by the sworn affidavits of poll watchers, that canvas workers carried out this unlawful policy, and acting pursuant to this guidance, in Milwaukee used red-ink pens to alter the certificates on the absentee envelope and then cast and count the absentee ballot. These acts violated WISC. STAT. § 6.87(6d) ("If a certificate is missing the address of a witness, the ballot may not be counted"). *See also* WISC. STAT. § 6.87(9) ("If a municipal clerk receives an absentee ballot with an improperly completed certificate or with no certificate, the clerk may return the ballot to the elector . . . whenever time permits the elector to correct the defect and return the ballot within the period authorized.").

126.   Wisconsin's legislature has not ratified these changes, and its election laws do not include a severability clause.

127.   In addition, Ethan J. Pease, a box truck delivery driver subcontracted to the U.S. Postal Service ("USPS") to deliver truckloads of mail-in ballots to the sorting center in Madison, WI, testified

36

that USPS employees were backdating ballots received after November 3, 2020. Decl. of Ethan J. Pease at ¶¶ 3-13. Further, Pease testified how a senior USPS employee told him on November 4, 2020 that "[a]n order came down from the Wisconsin/Illinois Chapter of the Postal Service that 100,000 ballots were missing" and how the USPS dispatched employees to "find[] . . . the ballots." *Id*. ¶¶ 8-10. One hundred thousand ballots supposedly "found" after election day would far exceed former Vice President Biden margin of 20,565 votes over President Trump.

## COUNT I: ELECTORS CLAUSE

128. Plaintiff State repeats and re-alleges the allegations above, as if fully set forth herein.

129. The Electors Clause of Article II, Section 1, Clause 2, of the Constitution makes clear that only the legislatures of the States are permitted to determine the rules for appointing presidential electors. The pertinent rules here are the state election statutes, specifically those relevant to the presidential election.

130. Non-legislative actors lack authority to amend or nullify election statutes. *Bush II*, 531 U.S. at 104 (quoted *supra*).

131. Under *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985), conscious and express executive policies—even if unwritten—to nullify statutes or to abdicate statutory responsibilities are reviewable to the same extent as if the policies had been written or adopted. Thus, conscious and express actions by State or local election officials to nullify or ignore requirements of election statutes violate the Electors

37

Clause to the same extent as formal modifications by judicial officers or State executive officers.

132.    The actions set out in Paragraphs 41-128 constitute non-legislative changes to State election law by executive-branch State election officials, or by judicial officials, in Defendant States Pennsylvania, Georgia, Michigan, and Wisconsin, in violation of the Electors Clause.

133.    Electors appointed to Electoral College in violation of the Electors Clause cannot cast constitutionally valid votes for the office of President.

## COUNT II: EQUAL PROTECTION

134.    Plaintiff State repeats and re-alleges the allegations above, as if fully set forth herein.

135.    The Equal Protection Clause prohibits the use of differential standards in the treatment and tabulation of ballots within a State. *Bush II*, 531 U.S. at 107.

136.    The one-person, one-vote principle requires counting valid votes and not counting invalid votes. *Reynolds*, 377 U.S. at 554-55; *Bush II*, 531 U.S. at 103 ("the votes eligible for inclusion in the certification are the votes meeting the properly established legal requirements").

137.    The actions set out in Paragraphs 66-73 (Georgia), 80-93 (Michigan), 44-55 (Pennsylvania), and 106-24 (Wisconsin) created differential voting standards in Defendant States Pennsylvania, Georgia, Michigan, and Wisconsin in violation of the Equal Protection Clause.

138.    The actions set out in Paragraphs 66-73 (Georgia), 80-93 (Michigan), 44-55 (Pennsylvania), and 106-24 (Wisconsin) violated the one-person, one-

38

vote principle in Defendant States Pennsylvania, Georgia, Michigan, and Wisconsin.

139.   By the shared enterprise of the entire nation electing the President and Vice President, equal protection violations in one State can and do adversely affect and diminish the weight of votes cast in States that lawfully abide by the election structure set forth in the Constitution. Plaintiff State is therefore harmed by this unconstitutional conduct in violation of the Equal Protection or Due Process Clauses.

## COUNT III: DUE PROCESS

140.   Plaintiff State repeats and re-alleges the allegations above, as if fully set forth herein.

141.   When election practices reach "the point of patent and fundamental unfairness," the integrity of the election itself violates substantive due process. *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978); *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981); *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183-84 (11th Cir. 2008); *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 580-82 (11th Cir. 1995); *Roe v. State of Ala.*, 68 F.3d 404, 407 (11th Cir. 1995); *Marks v. Stinson*, 19 F. 3d 873, 878 (3rd Cir. 1994).

142.   Under this Court's precedents on procedural due process, not only intentional failure to follow election law as enacted by a State's legislature but also random and unauthorized acts by state election officials and their designees in local government can violate the Due Process Clause. *Parratt v. Taylor*, 451 U.S. 527, 537-41 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986); *Hudson v. Palmer*, 468 U.S. 517, 532 (1984).

39

The difference between intentional acts and random and unauthorized acts is the degree of pre-deprivation review.

143.   Defendant        States        acted unconstitutionally to lower their election standards—including to allow invalid ballots to be counted and valid ballots to not be counted—with the express intent to favor their candidate for President and to alter the outcome of the 2020 election. In many instances these actions occurred in areas having a history of election fraud.

144.   The actions set out in Paragraphs 66-73 (Georgia), 80-93 (Michigan), 44-55 (Pennsylvania), and   106-24   (Wisconsin)   constitute   intentional violations of State election law by State election officials and their designees in Defendant States Pennsylvania, Georgia, Michigan, and Wisconsin, in violation of the Due Process Clause.

## PRAYER FOR RELIEF

WHEREFORE,   Plaintiff  States   respectfully request that this Court issue the following relief:

A.   Declare   that   Defendant   States Pennsylvania, Georgia, Michigan, and Wisconsin administered  the  2020  presidential  election  in violation of the Electors Clause and the Fourteenth Amendment of the U.S. Constitution.

B.   Declare that any electoral college votes cast by such presidential electors appointed in Defendant States Pennsylvania, Georgia, Michigan, and Wisconsin are in violation of the Electors Clause and   the   Fourteenth   Amendment   of   the   U.S. Constitution and cannot be counted.

40

C.      Enjoin Defendant States' use of the 2020 election results for the Office of President to appoint presidential electors to the Electoral College.

D.      Enjoin Defendant States' use of the 2020 election results for the Office of President to appoint presidential electors to the Electoral College and authorize, pursuant to the Court's remedial authority, the Defendant States to conduct a special election to appoint presidential electors.

E.      If any of Defendant States have already appointed presidential electors to the Electoral College using the 2020 election results, direct such States' legislatures, pursuant to 3 U.S.C. § 2 and U.S. CONST. art. II, § 1, cl. 2, to appoint a new set of presidential electors in a manner that does not violate the Electors Clause and the Fourteenth Amendment, or to appoint no presidential electors at all.

F.      Enjoin the Defendant States from certifying presidential electors or otherwise meeting for purposes of the electoral college pursuant to 3 U.S.C. § 5, 3 U.S.C. § 7, or applicable law pending further order of this Court.

G.      Award costs to Plaintiff State.

H.      Grant such other relief as the Court deems just and proper.

41

December 7, 2020

Respectfully submitted,

Ken Paxton*
Attorney General of Texas

Brent Webster
First Assistant Attorney
General of Texas

Lawrence Joseph
Special Counsel to the
Attorney General of Texas

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
kenneth.paxton@oag.texas.gov
(512) 936-1414

*      Counsel of Record

i

**No. \_\_\_\_\_, Original**

# In the Supreme Court of the United States

———————

**STATE OF TEXAS,**

*Plaintiff,*

v.

**COMMONWEALTH OF PENNSYLVANIA, STATE OF STATE OF GEORGIA, STATE OF MICHIGAN, AND STATE OF WISCONSIN,**

*Defendants.*

———————

## BRIEF IN SUPPORT OF MOTION FOR LEAVE TO FILE BILL OF COMPLAINT

———————

Ken Paxton*
Attorney General of Texas

Brent Webster
First Assistant Attorney
General of Texas

Lawrence Joseph
Special Counsel to the
Attorney General of Texas

P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
kenneth.paxton@oag.texas.gov
(512) 936-1414

*Counsel of Record

ii

## **<u>TABLE OF CONTENTS</u>**

**Pages**

Table of Authorities....................................................... iv

Brief in Support of Motion for Leave to File ............. 1

Statement of the Case ................................................ 1

    Constitutional Background ................................ 4

    Non-Legislative Changes Made in Violation
        of the Electors Clause................................. 5

Standard of Review .................................................... 6

Argument.................................................................... 7

I.    This Court has jurisdiction over Plaintiff
      States' claims. ..................................................... 7

    A.   The claims fall within this Court's
        constitutional and statutory subject-
        matter jurisdiction........................................ 7

    B.   The claims arise under the Constitution...... 8

    C.   The claims raise a "case or controversy"
        between the States. ................................... 11

        1.   Plaintiff States suffer an injury in
            fact.   .................................................. 12

        2.   Defendant States caused the injuries. . 15

        3.   The requested relief would redress
            the injuries. .......................................... 15

    D.   This action is not moot and will not
        become moot................................................ 17

    E.   This matter is ripe for review. ................... 18

    F.   This action does not raise a non-
        justiciable political question. ...................... 19

    G.   No adequate alternate remedy or forum
        exists. .......................................................... 20

iii

II. This case presents constitutional questions of immense national consequence that warrant this Court's discretionary review. ..................... 22

    A. The 2020 election suffered from serious irregularities that constitutionally prohibit using the reported results............. 24

        1. Defendant States violated the Electors Clause by modifying their legislatures' election laws through non-legislative action. ........................... 25

        2. State and local administrator's systemic failure to follow State election qualifies as an unlawful amendment of State law. ...................... 28

        3. Defendant States' administration of the 2020 election violated the Fourteenth Amendment. ....................... 29

    B. A ruling on the 2020 election would preserve the Constitution and help prevent irregularities in future elections. ... 33

III. Review is not discretionary. ............................. 34

IV. This case warrants summary disposition or expedited briefing. ............................................ 34

Conclusion ........................................................... 35

iv

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........... 11

*Anderson v. United States*, 417 U.S. 211 (1974) . 4, 12

*Baer v. Meyer,* 728 F.2d 471 (10th Cir. 1984) .......... 29

*Baker v. Carr*, 369 U.S. 186 (1962) ......... 4, 12, 19-120

*Barr v. Chatman*, 397 F.2d 515 (7th Cir. 1968) ...... 29

*Bell v. Hood*, 327 U.S. 678 (1946) ............................ 10

*Brown v. O'Brien*, 469 F.2d 563 (D.C. Cir.) ............. 31

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................ 26

*Bush v. Gore*, 531 U.S. 98 (2000) ......................*passim*

*Bush v. Palm Beach Cty. Canvassing Bd.*, 531
 U.S. 70 (2000) ................................. 4, 10, 16, 21, 25

*California v. United States*, 457 U.S. 273 (1982) .... 35

*City of Boerne v. Flores,* 521 U.S. 507 (1997) .......... 16

*City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S.
 156 (1997) ............................................................. 9

*Coleman v. Miller*, 307 U.S. 433 (1939) .................. 14

*Cook v. Gralike*, 531 U.S. 510 (2001) ...................... 10

*Crawford v. Marion County Election Bd.,*
 553 U.S. 181 (2008) ............................................... 6

*DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332
 (2006) .................................................................. 15

*Dep't of Homeland Sec. v. New York*, 140 S. Ct.
 599 (2020) ............................................................ 27

*Duke Power Co. v. Carolina Envtl. Study Group,*
 *Inc.,* 438 U.S. 59 (1978) ...................................... 15

*Duncan v. Poythress*, 657 F.2d 691
 (5th Cir. 1981) ..................................................... 31

v

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ................ 12

*FEC v. Akins*, 524 U.S. 11 (1998) ............................ 17

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S.
    449 (2007) ............................................. 18

*Florida State Conference of N.A.A.C.P. v.
    Browning*, 522 F.3d 1153 (11th Cir. 2008)......... 31

*Foman v. Davis*, 371 U.S. 178 (1962) ........................ 7

*Foster v. Chatman*, 136 S.Ct. 1737 (2016)................. 8

*Fox Film Corp. v. Muller*, 296 U.S. 207 (1935) ......... 9

*Free Enter. Fund v. Pub. Co. Accounting
    Oversight Bd.*, 561 U.S. 477 (2010) ................... 27

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*,
    60 F.3d 770 (Fed. Cir. 1995) ............................. 19

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)............................................. 27

*Griffin v. Burns*, 570 F.2d 1065
    (1st Cir. 1978).................................................... 31

*Harris v. Conradi*, 675 F.2d 1212
    (11th Cir. 1982) ................................................. 29

*Heckler v. Chaney*, 470 U.S. 821 (1985)................... 28

*Hernandez v. Mesa*, 137 S.Ct. 2003 (2017)............... 7

*Hudson v. Palmer*, 468 U.S. 517 (1984)................... 32

*Hunter v. Hamilton Cty. Bd. of Elections*,
    635 F.3d 219 (6th Cir. 2011)......................... 23, 32

*Lance v. Coffman*, 549 U.S. 437 (2007) .................. 13

*Leser v. Garnett*, 258 U.S. 130 (1922) ..................... 21

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................. 11

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)............................................. 18

vi

*Marbury v. Madison,*
   5 U.S. (1 Cranch) 137 (1803) .............................. 23

*Marks v. Stinson,* 19 F. 3d 873
   (3rd Cir. 1994) ................................................... 31

*Maryland v. Louisiana,*
   451 U.S. 725 (1981) ............................................ 11

*Massachusetts v. Environmental Protection
   Agency,* 549 U.S. 497 (2007) .............................. 13

*McPherson v. Blacker,* 146 U.S. 1 (1892)..... 16, 21, 25

*Merrell Dow Pharm., Inc. v. Thompson,*
   478 U.S. 804 (1986) .............................................. 9

*Mesa v. California,* 489 U.S. 121 (1989)................... 8

*Mississippi v. Louisiana,* 506 U.S. 73 (1992) ........... 7

*Morton v. Ruiz,* 415 U.S. 199 (1974)................. 28-29

*Mostyn v. Fabrigas,* 98 Eng. Rep.
   1021 (K.B. 1774) ................................................ 34

*Nebraska v. Colorado,*
   136 S.Ct. 1034 (2016) ......................................... 34

*New Jersey v. New York,*
   345 U.S. 369 (1953) ............................................ 14

*New Mexico v. Colorado,*
   137 S.Ct. 2319 (2017) ......................................... 34

*Norman v. Reed,* 502 U.S. 279 (1992)..................... 18

*Parratt v. Taylor,* 451 U.S. 527 (1981) .............. 31-32

*Petrella v. MGM,* 572 U.S. 663 (2014) ................... 18

*Profitness Physical Therapy Ctr. v. Pro-
   Fit Orthopedic & Sports Physical Therapy
   P.C.,* 314 F.3d 62 (2d Cir. 2002) ........................ 19

*Purcell v. Gonzalez,* 549 U.S. 1 (2006)...... 5, 22, 27-28

vii

*Republican Party of Pa. v. Boockvar*,
No. 20-542, 2020 U.S. LEXIS 5188
(Oct. 28, 2020) .................................................... 26

*Reynolds v. Sims*, 377 U.S. 533
(1964) .............................................. 2, 4, 11, 15, 21

*Roe v. State of Ala. By & Through Evans*,
43 F.3d 574 (11th Cir. 1995).............................. 31

*Roe v. State of Ala.*, 68 F.3d 404
(11th Cir. 1995) .................................................. 31

*Roman Catholic Diocese of Brooklyn, New York
v. Cuomo*, 592 U.S. ___ (Nov. 25, 2020)........ 25, 31

*Rosario v. Rockefeller*, 410 U.S. 752 (1973)............. 25

*Service v. Dulles*, 354 U.S. 363 (1957) ..................... 29

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966)............................................. 25

*Steel Co. v. Citizens for a Better Env't.*,
523 U.S. 83 (1998).................................................. 7

*Tashjian v. Republican Party*,
479 U.S. 208 (1986)............................................. 24

*Texas v. United States*,
523 U.S. 296 (1998)............................................. 18

*United States Term Limits v. Thornton*,
514 U.S. 779 (1995)............................................. 21

*United States v. Nevada*,
412 U.S. 534 (1973)............................................. 20

*Wesberry v. Sanders*, 376 U.S. 1 (1964)......... 1, 12, 22

*What-A-Burger of Va., Inc. v. Whataburger, Inc.*,
357 F.3d 441 (4th Cir. 2004).............................. 19

*Wisconsin State Legis.*, No. 20A66, 2020 U.S.
LEXIS 5187 (Oct. 26, 2020) ................................ 27

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992)........... 23

viii

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................ 12

**Statutes**

U.S. CONST. art. I, § 4 ................................................ 3-4

U.S. CONST. art. I, § 4, cl. 1 ..................................... 3-4

U.S. CONST. art. II, § 1, cl. 2 ...........................*passim*

U.S. CONST. art. III .................................... 8, 11-13, 15

U.S. CONST. art. III, § 2 ......................................... 1, 7

U.S. CONST. art. V, cl. 3 ............................................ 13

U.S. CONST. amend. XII ............................................ 6

U.S. CONST. amend. XIV, § 1, cl. 3 ............ 4, 12, 29-30

U.S. CONST. amend. XIV, § 1, cl. 4 ............ 4, 12, 29-30

U.S. CONST. amend. XX, § 1 ...................................... 8

3 U.S.C. § 2 ................................................ 5, 8, 17, 25

3 U.S.C. § 5 .................................................................. 20

3 U.S.C. § 15 ........................................................... 8, 17

28 U.S.C. § 1251(a) ................................................ 7, 34

28 U.S.C. § 1331 ........................................................ 9

52 U.S.C. § 20501(b)(1)-(2) ........................................ 2

52 U.S.C. § 20501(b)(3)-(4) ........................................ 2

**Rules, Regulations and Orders**

S.Ct. Rule 17.2 ...................................................... 6, 8

S.Ct. Rule 17.3 ............................................................ 1

FED. R. CIV. P. 15(a)(1)(A) ........................................ 6

FED. R. CIV. P. 15(a)(1)(B) ........................................ 6

FED. R. CIV. P. 15(a)(2) ............................................. 6

**Other Authorities**

BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT
    OF THE COMMISSION ON FEDERAL ELECTION
    REFORM (Sept. 2005) ............................................ 5

ix

THE FEDERALIST NO. 57 (C. Rossiter, ed. 2003)
(J. Madison).........................................................26

Robert G. Natelson, *The Original Scope of the
Congressional Power to Regulate Elections*, 13
U. PA. J. CONST. L. 1 (2010) ...........................25-26

J. Story, 1 COMMENTARIES ON THE CONSTITUTION
OF THE UNITED STATES § 627 (3d ed. 1858) ........10

**No. \_\_\_\_\_, Original**

# In the Supreme Court of the United States

———————

**STATE OF TEXAS,**

*Plaintiff,*

v.

**COMMONWEALTH OF PENNSYLVANIA, STATE OF STATE OF GEORGIA, STATE OF MICHIGAN, AND STATE OF WISCONSIN,**

*Defendants.*

———————

## BRIEF IN SUPPORT OF
## MOTION FOR LEAVE TO FILE

Pursuant to S.Ct. Rule 17.3 and U.S. CONST. art. III, § 2, the State of Texas ("Plaintiff State") respectfully submits this brief in support of its Motion for Leave to File a Bill of Complaint against the Commonwealth of Pennsylvania and the States of Georgia, Michigan, and Wisconsin (collectively, "Defendant States").

## STATEMENT OF THE CASE

Lawful elections are at the heart of our freedoms. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 10 (1964). Trust in the integrity of that process

2

is the glue that binds our citizenry and the States in this Union.

Elections face the competing goals of maximizing and counting *lawful* votes but minimizing and excluding *unlawful* ones. *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964); *Bush v. Gore*, 531 U.S. 98, 103 (2000) ("the votes eligible for inclusion in the certification are the votes meeting the properly established legal requirements") ("*Bush II*"); *compare* 52 U.S.C. § 20501(b)(1)-(2) (2018) *with id.* § 20501(b)(3)-(4). Moreover, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. Reviewing election results requires not only counting lawful votes but also eliminating unlawful ones.

It is an understatement to say that 2020 was not a good year. In addition to a divided and partisan national mood, the country faced the COVID-19 pandemic. Certain officials in Defendant States presented the pandemic as the justification for ignoring state laws regarding absentee and mail-in voting. Defendant States flooded their citizenry with tens of millions of ballot applications and ballots ignoring statutory controls as to how they were received, evaluated, and counted. Whether well intentioned or not, these unconstitutional and unlawful changes had the same *uniform effect*—they made the 2020 election less secure in Defendant States. Those changes were made in violation of relevant state laws and were made by non-legislative entities, without any consent by the state legislatures.

3

These unlawful acts thus directly violated the Constitution. U.S. CONST. art. I, § 4; *id.* art. II, § 1, cl. 2.

This case presents a question of law: Did Defendant States violate the Electors Clause by taking non-legislative actions to change the election rules that would govern the appointment of presidential electors? Each of these States flagrantly violated the statutes enacted by relevant State legislatures, thereby violating the Electors Clause of Article II, Section 1, Clause 2 of the Constitution. By these unlawful acts, Defendant States have not only tainted the integrity of their own citizens' votes, but their actions have also debased the votes of citizens in the States that remained loyal to the Constitution.

Elections for federal office must comport with federal constitutional standards, s*ee Bush II*, 531 U.S. at 103-105, and executive branch government officials cannot subvert these constitutional requirements, no matter their stated intent. For presidential elections, each State must appoint its electors to the electoral college in a manner that complies with the Constitution, specifically the Electors Clause requirement that only state *legislatures* may set the rules governing the appointment of electors and the elections upon which such appointment is based.[1]

---

[1]     Subject to override by Congress, state legislatures have the exclusive power to regulate the time, place, and manner for electing Members of Congress, *see* U.S. CONST. art. I, § 4, which is distinct from legislatures' exclusive and plenary authority on the appointment of presidential electors. When non-legislative actors purport to set state election law for presidential elections, they violate both the Elections Clause and the Electors Clause.

4

**Constitutional Background**

The right to vote is protected by the by the Equal Protection Clause and the Due Process Clause. U.S. CONST. amend. XIV, § 1, cl. 3-4. Because "the right to vote is personal," *Reynolds*, 377 U.S. at 561-62 (alterations omitted), "[e]very voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes debase or dilute the weight of each validly cast vote. *Bush II*, 531 U.S. at 105. The unequal treatment of votes within a state, and unequal standards for processing votes raise equal protection concerns. *Id.* Though *Bush II* did not involve an action between States, the concern that illegal votes can cancel out lawful votes does not stop at a State's boundary in the context of a Presidential election.

The Electors Clause requires that each State "shall appoint" its presidential electors "in such Manner as the *Legislature thereof* may direct." U.S. CONST. art. II, § 1, cl. 2 (emphasis added); *cf. id.* art. I, § 4, cl. 1 (similar for time, place, and manner of federal legislative elections). "[T]he state legislature's power to select the manner for appointing electors is *plenary*," *Bush II*, 531 U.S. at 104 (emphasis added), and sufficiently *federal* for this Court's review. *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) ("*Bush I*"). This textual feature of our Constitution was adopted to ensure the integrity of the presidential selection process: "Nothing was more

5

to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption." FEDERALIST NO. 68 (Alexander Hamilton). When a State conducts a popular election to appoint electors, the State must comply with all constitutional requirements. *Bush II*, 531 U.S. at 104. When a State fails to conduct a valid election—for any reason—"the electors may be appointed on a subsequent day in such a manner *as the legislature of such State may direct*." 3 U.S.C. § 2 (emphasis added).

## Non-Legislative Changes Made in Violation of the Electors Clause

As set forth in the Complaint, executive and judicial officials made significant changes to the legislatively defined election rules in Defendant States. *See* Compl. at ¶¶ 66-73 (Georgia), 80-93 (Michigan), 44-55 (Pennsylvania), 106-24 (Wisconsin). Taken together, these non-legislative changes did away with statutory ballot-security measures for absentee and mail-in ballots such as signature verification, witness requirements, and statutorily authorized secure ballot drop-off locations.

Citing the COVID-19 pandemic, Defendant States gutted the safeguards for absentee ballots through non-legislative actions, despite knowledge that absentee ballots are "the largest source of potential voter fraud," BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005) (hereinafter, "CARTER-BAKER"), which is magnified when absentee balloting is shorn of ballot-integrity measures such as signature verification, witness requirements, or outer-envelope protections, or when absentee ballots

6

are processed and tabulated without bipartisan observation by poll watchers.

Without Defendant States' combined 62 electoral votes, President Trump presumably has 232 electoral votes, and former Vice President Biden presumably has 244. Thus, Defendant States' presidential electors will determine the outcome of the election. Alternatively, if Defendant States are unable to certify 37 or more presidential electors, neither candidate will have a majority in the electoral college, in which case the election would devolve to the House of Representatives under the Twelfth Amendment.

Defendant States experienced serious voting irregularities. *See* Compl. at ¶¶ 75-76 (Georgia), 97-101 (Michigan), 55-60 (Pennsylvania), 122-28 (Wisconsin). At the time of this filing, Plaintiff State continues to investigate allegations of not only unlawful votes being counted but also fraud. Plaintiff State reserves the right to seek leave to amend the complaint as those investigations resolve. *See* S.Ct. Rule 17.2; Fed. R. Civ. P. 15(a)(1)(A)-(B), (a)(2). But even the *appearance* of fraud in a close election is poisonous to democratic principles: "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006); *Crawford v. Marion County Election Bd.,* 553 U.S. 181, 189 (2008) (States have an interest in preventing voter fraud and ensuring voter confidence)**.**

## **STANDARD OF REVIEW**

This Court considers two primary factors when it decides whether to grant a State leave to file a bill of complaint against another State: (1) "the nature of the

7

interest of the complaining State," and (2) "the availability of an alternative forum in which the issue tendered can be resolved." *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992) (internal quotations omitted) Because original proceedings in this Court follow the Federal Rules of Civil Procedure, S.Ct. Rule 17.2, the facts for purposes of a motion for leave to file are the well-pleaded facts alleged in the complaint. *Hernandez v. Mesa*, 137 S.Ct. 2003, 2005 (2017).

## ARGUMENT

## I. THIS COURT HAS JURISDICTION OVER PLAINTIFF STATE'S CLAIMS.

In order to grant leave to file, this Court first must assure itself of its jurisdiction, *Steel Co. v. Citizens for a Better Env't.,* 523 U.S. 83, 95 (1998); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (courts deny leave to file amended pleadings that would be futile). That standard is met here. Plaintiff State's fundamental rights and interests are at stake. This Court is the *only* venue that can protect Plaintiff State's electoral college votes from being cancelled by the unlawful and constitutionally tainted votes cast by electors appointed and certified by Defendant States.

### A. The claims fall within this Court's constitutional and statutory subject-matter jurisdiction.

The federal judicial power extends to "Controversies between two or more States." U.S. CONST. art. III, § 2, and Congress has placed the jurisdiction for such suits exclusively with the Supreme Court: "The Supreme Court shall have original *and exclusive* jurisdiction of all controversies between two or more States." 28 U.S.C. § 1251(a)

8

(emphasis added). This Court not only is a permissible court for hearing this action; it is the only court that can hear this action quickly enough to render relief sufficient to avoid constitutionally tainted votes in the electoral college and to place the appointment of Defendant States' electors before their legislatures pursuant to 3 U.S.C. § 2 in time for a vote in the House of Representatives on January 6, 2021. *See* 3 U.S.C. § 15. With that relief in place, the House can resolve the election on January 6, 2021, in time for the president to be selected by the constitutionally set date of January 20. U.S. CONST. amend. XX, § 1.

**B.  The claims arise under the Constitution.**

When States violate their own election laws, they may argue that these violations are insufficiently federal to allow review in this Court. *Cf. Foster v. Chatman*, 136 S.Ct. 1737, 1745-46 (2016) (this Court lacks jurisdiction to review state-court decisions that "rest[] on an adequate and independent state law ground"). That attempted evasion would fail for two reasons.

First, in the election context, a state-court remedy or a state executive's administrative action purporting to alter state election statutes implicates the Electors Clause. *See Bush II*, 531 U.S. at 105. Even a plausible federal-law defense to state action arises under federal law within the meaning of Article III. *Mesa v. California*, 489 U.S. 121, 136 (1989) (holding that "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes"). Constitutional arising-under jurisdiction exceeds statutory federal-question

9

jurisdiction of federal district courts,[2] and—indeed—we did not even have federal-question jurisdiction until 1875. *Merrell Dow Pharm.,* 478 U.S. at 807. Plaintiff States' Electoral Clause claims arise under the Constitution and so are *federal*, even if the only claim is that Defendant States violated their own state election statutes. Moreover, as is explained below, Defendant States' actions injure the interests of Plaintiff State in the appointment of electors to the electoral college in a manner that is inconsistent with the Constitution.

Given this federal-law basis against these state actions, the state actions are not "independent" of the federal constitutional requirements that provide this Court jurisdiction. *Fox Film Corp. v. Muller,* 296 U.S. 207, 210-11 (1935); *cf. City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 164 (1997) (noting that "even though state law creates a party's causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law" and collecting cases) (internal quotations and alterations omitted). Plaintiff State's claims therefore fall within this Court's jurisdiction.

Second, state election law is not purely a matter of state law because it applies "not only to elections to state offices, but also to the election of Presidential

---

[2]     The statute for federal officer removal at issue in *Mesa* omits the well-pleaded complaint rule, *id.*, which is a *statutory* restriction on federal question jurisdiction under 28 U.S.C. § 1331. *See Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 808 (1986).

10

electors," meaning that state law operates, in part, "by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Bush I*, 531 U.S. at 76. Logically, "any state authority to regulate election to [federal] offices could not precede their very creation by the Constitution," meaning that any "such power had to be delegated to, rather than reserved by, the States." *Cook v. Gralike*, 531 U.S. 510, 522 (2001) (internal quotations omitted). "It is no original prerogative of State power to appoint a representative, a senator, or President for the Union." J. Story, 1 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 627 (3d ed. 1858). For these reasons, any "significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush II*, 531 U.S. at 113 (Rehnquist, C.J., concurring).

Under these circumstances, this Court has the power both to review and to remedy a violation of the Constitution. Significantly, parties do not need winning hands to establish jurisdiction. Instead, jurisdiction exists when "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction," even if the right "will be defeated if they are given another." *Bell v. Hood*, 327 U.S. 678, 685 (1946). At least as to *jurisdiction*, a plaintiff need survive only the low threshold that "the alleged claim under the Constitution or federal statutes [not] … be immaterial and made solely for the purpose of obtaining jurisdiction or … wholly insubstantial and frivolous." *Id.* at 682. The bill of complaint meets that test.

11

### C. The claims raise a "case or controversy" between the States.

Like any other action, an original action must meet the Article III criteria for a case or controversy: "it must appear that the complaining State has suffered a wrong through the action of the other State, furnishing ground for judicial redress, or is asserting a right against the other State which is susceptible of judicial enforcement according to the accepted principles of the common law or equity systems of jurisprudence." *Maryland v. Louisiana*, 451 U.S. 725, 735-36 (1981) (internal quotations omitted). Plaintiff State has standing under those rules.[3]

With voting, "'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Bush II*, 531 U.S. at 105 (quoting *Reynolds*, 377 U.S. at 555). In presidential elections, "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Anderson v. Celebrezze*, 460 U.S. 780, 795 (1983). Thus, votes in Defendant States affect the votes in Plaintiff State, as set forth in more detail below.

---

[3]   At its constitutional minimum, standing doctrine measures the necessary effect on plaintiffs under a tripartite test: cognizable injury to the plaintiffs, causation by the challenged conduct, and redressable by a court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). The rules for standing in state-versus-state actions is the same as the rules in other actions under Article III. *See Maryland v. Louisiana*, 451 U.S. 725, 736 (1981).

12

### 1. <u>Plaintiff State suffers an injury in fact.</u>

The citizens of Plaintiff State have the right to demand that all other States abide by the constitutionally set rules in appointing presidential electors to the electoral college. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry*, 376 U.S. at 10; *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise of voting" is "a fundamental political right, because preservative of all rights"). "Every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted." *Anderson v. United States*, 417 U.S. at 227; *Baker*, 369 U.S. at 208. Put differently, "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction," *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), and—unlike the residency durations required in *Dunn*—the "jurisdiction" here is the entire United States. In short, the rights at issue are congeable under Article III.

Significantly, Plaintiff State presses its own form of voting-rights injury *as States*. As with the one-person, one-vote principle for congressional redistricting in *Wesberry*, the equality of the States arises from the structure of the Constitution, not from the Equal Protection or Due Process Clauses. *See Wesberry*, 376 U.S. at 7-8; *id.* n.10 (expressly not

13

reaching claims under Fourteenth Amendment). Whereas the House represents the People proportionally, the Senate represents the States. *See* U.S. CONST. art. V, cl. 3 ("no state, without its consent, shall be deprived of its equal suffrage in the Senate"). While Americans likely care more about who is elected President, the States have a distinct interest in who is elected *Vice President* and thus who can cast the tie-breaking vote in the Senate. Through that interest, States suffer an Article III injury when another State violates federal law to affect the outcome of a presidential election. This injury is particularly acute in 2020, where a Senate majority often will hang on the Vice President's tie-breaking vote because of the nearly equal—and, depending on the outcome of Georgia run-off elections in January, possibly *equal*—balance between political parties. Quite simply, it is vitally important to the States who becomes Vice President.

Because individual citizens may arguably suffer only a generalized grievance from Electors Clause violations, States have standing where their citizen voters would not, *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (distinguishing citizen plaintiffs from citizen relators who sued in the name of a state). In *Massachusetts v. Environmental Protection Agency*, 549 U.S. 497 (2007), this Court held that states seeking to protect their sovereign interests are "entitled to special solicitude in our standing analysis." *Id.* at 520. While *Massachusetts* arose in a different context—the same principles of federalism apply equally here to require special deference to the sovereign states on standing questions.

14

In addition to standing for their own injuries, States can assert *parens patriae* standing for their citizens who are presidential electors.[4] Like legislators, presidential electors assert "legislative injury" whenever allegedly improper actions deny them a working majority. *Coleman v. Miller*, 307 U.S. 433, 435 (1939). The electoral college is a zero-sum game. If Defendant States' unconstitutionally appointed electors vote for a presidential candidate opposed by the Plaintiff State's electors, that operates to defeat Plaintiff State's interests.[5] Indeed, even without an electoral college majority, presidential electors suffer the same voting-debasement injury as voters generally: "It must be remembered that 'the

---

[4]   "The '*parens patriae*' doctrine … is a recognition of the principle that the state, when a party to a suit involving a matter of sovereign interest, 'must be deemed to represent all its citizens.'" *New Jersey v. New York*, 345 U.S. 369, 372-73 (1953) (quoting *Kentucky v. Indiana*, 281 U.S. 163, 173 (1930)).

[5]   Because Plaintiff State appointed its electors consistent with the Constitution, they suffer injury if its electors are defeated by Defendant States' unconstitutionally appointed electors. This injury is all the more acute because Plaintiff State has taken steps to prevent fraud. For example, Texas does not allow no excuse vote by mail (Texas Election Code Sections 82.001-82.004); has strict signature verification procedures (Tex. Election Code §87.027(j); Early voting ballot boxes have two locks and different keys and other strict security measures (Tex. Election Code §§85.032(d) & 87.063); requires voter ID (House Comm. on Elections, Bill Analysis, Tex. H.B. 148, 83d R.S. (2013)); has witness requirements for assisting those in need (Tex. Election Code §§ 86.0052 & 86.0105), and does not allow ballot harvesting Tex. Election Code  86.006(f)(1-6). Unlike Defendant States, Plaintiff State neither weakened nor allowed the weakening of its ballot-integrity statutes by non-legislative means.

15

right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Bush II*, 531 U.S. at 105 (quoting *Reynolds v. Sims*, 377 U. S. 533, 555 (1964)) ("*Bush II*"). Finally, once Plaintiff State has standing to challenge Defendant States' unlawful actions, Plaintiff State may do so on any legal theory that undermines those actions. *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 78-81 (1978); *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 353 & n.5 (2006). Injuries to Plaintiff State's electors serve as an Article III basis for a *parens patriae* action.

### 2.  **Defendant States caused the injuries.**

Non-legislative officials in Defendant States either directly caused the challenged violations of the Electors Clause or, in the case of Georgia, acquiesced to them in settling a federal lawsuit. The Defendants thus caused the Plaintiff's injuries.

### 3.  **The requested relief would redress the injuries.**

This Court has authority to redress Plaintiff State's injuries, and the requested relief will do so.

First, while Defendant States are responsible for their elections, this Court has authority to enjoin reliance on *unconstitutional* elections:

> When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its funda- mental nature lies in the equal weight

16

accorded to each vote and the equal dignity owed to each voter.

*Bush II*, 531 U.S. at 104; *City of Boerne v. Flores,* 521 U.S. 507, 524 (1997) ("power to interpret the Constitution in a case or controversy remains in the Judiciary"). Plaintiff State does not ask this Court to decide who won the election; they only ask that the Court enjoin the clear violations of the Electors Clause of the Constitution.

Second, the relief that Plaintiff State requests— namely, remand to the State legislatures to allocate electors in a manner consistent with the Constitution—does not violate Defendant States' rights or exceed this Court's power. The power to select electors is a plenary power of the State legislatures, and this remains so, without regard to state law:

> This power is conferred upon the legislatures of the States by the Constitution of the United States, and cannot be taken from them or modified by their State constitutions…. Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated.

*McPherson v. Blacker*, 146 U.S. 1, 35 (1892) (internal quotations omitted); *accord Bush I*, 531 U.S. at 76-77; *Bush II*, 531 U.S at 104.

Third, uncertainty of how Defendant States' legislatures will allocate their electors is irrelevant to the question of redressability:

17

> If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case – even though the agency … might later, in the exercise of its lawful discretion, reach the same result for a different reason.

*FEC v. Akins*, 524 U.S. 11, 25 (1998). Defendant States' legislatures would remain free to exercise their plenary authority under the Electors Clause in any *constitutional* manner they wish. Under *Akins*, the simple act of reconsideration under lawful means is redress enough.

Fourth, the requested relief is consistent with federal election law: "Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct." 3 U.S.C. § 2. Regardless of the statutory deadlines for the electoral college to vote, this Court could enjoin reliance on the results from the constitutionally tainted November 3 election, remand the appointment of electors to Defendant States, and order Defendant States' legislatures to certify their electors in a manner consistent with the Constitution, which could be accomplished well in advance of the statutory deadline of January 6 for House to count the presidential electors' votes. 3 U.S.C. § 15.

### D.  This action is not moot and will not become moot.

None of the looming election deadlines are constitutional, and they all are within this Court's power to enjoin. Indeed, if this Court vacated a State's

18

appointment of presidential electors, those electors could not vote on December 14, 2020; if the Court vacated their vote after the fact, the House of Representatives could not count those votes on January 6, 2021. Moreover, any remedial action can be complete well before January 6, 2020. Indeed, even the swearing in of the next President on January 20, 2021, will not moot this case because review could outlast even the selection of the next President under "the 'capable of repetition, yet evading review' doctrine," which applies "in the context of election cases … when there are 'as applied' challenges as well as in the more typical case involving only facial attacks." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 463 (2007) (internal quotations omitted); *accord Norman v. Reed*, 502 U.S. 279, 287-88 (1992). Mootness is not, and will not become, an issue here.

**E.  This matter is ripe for review.**

Plaintiff State's claims are clearly ripe now, but they were not ripe before the election: "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotations and citations omitted). Prior to the election, there was no reason to know who would win the vote in any given State.

Ripeness also raises the question of laches, which Justice Blackmun called "precisely the opposite argument" from ripeness. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 915 n.16 (1990) (Blackmun, J., dissenting). Laches is an equitable defense against unreasonable delay in commencing suit. *Petrella v. MGM*, 572 U.S. 663, 667 (2014). This action was

19

neither unreasonably delayed nor is prejudicial to Defendant States.

Before the election, Plaintiff States had no ripe claim against a Defendant State:

> "One cannot be guilty of laches until his right ripens into one entitled to protection. For only then can his torpor be deemed inexcusable."

*What-A-Burger of Va., Inc. v. Whataburger, Inc.*, 357 F.3d 441, 449-50 (4th Cir. 2004) (quoting 5 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31: 19 (4th ed. 2003); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 777 (Fed. Cir. 1995) (same); *Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002) (same). Plaintiff State could not have brought this action before the election results. The extent of the county-level deviations from election statutes in Defendant States became evident well after the election. Neither ripeness nor laches presents a timing problem here.

### F.  This action does not raise a non-justiciable political question.

The "political questions doctrine" does not apply here. Under that doctrine, federal courts will decline to review issues that the Constitution delegates to one of the other branches—the "political branches"—of government. While picking electors involves political rights, the Supreme Court has ruled in a line of cases beginning with *Baker* that constitutional claims related to voting (other than claims brought under the Guaranty Clause) are justiciable in the federal courts. As the Court held in *Baker*, litigation over political rights is not the same as a political question:

20

We hold that this challenge to an apportionment presents no nonjusticiable "political question." The mere fact that the suit seeks protection of a political right does not mean it presents a political question. Such an objection "is little more than a play upon words."

*Baker*, 369 U.S. at 209. This is no political question; it is a constitutional one that this Court should answer.

### G. No adequate alternate remedy or forum exists.

In determining whether to hear a case under this Court's original jurisdiction, the Court has considered whether a plaintiff State "has another adequate forum in which to settle [its] claim." *United States v. Nevada*, 412 U.S. 534, 538 (1973). This equitable limit does not apply here because Plaintiff State cannot sue Defendant States in any other forum.

To the extent that Defendant States wish to avail themselves of 3 U.S.C. § 5's safe harbor, *Bush I*, 531 U.S. at 77-78, this action will not meaningfully stand in their way:

The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors. … There is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated[.]

*Bush II*, 531 U.S. at 104 (citations and internal quotations omitted).[6] Defendant States' legislature

---

[6]    Indeed, the Constitution also includes another backstop: "if no person have such majority [of electoral votes], then from the

21

will remain free under the Constitution to appoint electors or vote in any *constitutional* manner they wish. The only thing that they cannot do—and should not wish to do—is to rely on an allocation conducted in violation of the Constitution to determine the appointment of presidential electors.

Moreover, if this Court agrees with Plaintiff State that Defendant States' appointment of presidential electors under the recently conducted elections would be unconstitutional, then the statutorily created safe harbor cannot be used as a justification for a violation of the Constitution. The safe-harbor framework created by statute would have to yield in order to ensure that the Constitution was not violated.

It is of no moment that Defendants' *state laws* may purport to tether state legislatures to popular votes. Those state limits on a state legislature's exercising federal constitutional functions cannot block action because the federal Constitution "transcends any limitations sought to be imposed by the people of a State" under this Court's precedents. *Leser v. Garnett*, 258 U.S. 130, 137 (1922); *see also Bush I*, 531 U.S. at 77; *United States Term Limits v. Thornton*, 514 U.S. 779, 805 (1995) ("the power to regulate the incidents of the federal system is not a reserved power of the States, but rather is delegated by the Constitution"). As this Court recognized in *McPherson v. Blacker*, the authority to choose presidential electors:

_____

persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot." U.S. CONST. amend. XII.

22

is conferred upon the legislatures of the states by the Constitution of the United States, and cannot be taken from them or modified by their state constitutions. ... *Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away or abdicated.*

146 U.S. 1, 35 (1892) (emphasis added) (internal quotations omitted). Defendant States would suffer no cognizable injury from this Court's enjoining their reliance on an unconstitutional vote.

## II. THIS CASE PRESENTS CONSTITUTIONAL QUESTIONS OF IMMENSE NATIONAL CONSEQUENCE THAT WARRANT THIS COURT'S DISCRETIONARY REVIEW.

Electoral integrity ensures the legitimacy of not just our governmental institutions, but the Republic itself. *See Wesberry*, 376 U.S. at 10. "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell,* 549 U.S. at 4. Against that backdrop, few cases could warrant this Court's review more than this one. In addition, the constitutionality of the process for selecting the President is of extreme national importance. If Defendant States are permitted to violate the requirements of the Constitution in the appointment of their electors, the resulting vote of the electoral college not only lacks constitutional legitimacy, but the Constitution itself will be forever sullied.

23

Though the Court claims "discretion when accepting original cases, even as to actions between States where [its] jurisdiction is exclusive," *Wyoming v. Oklahoma*, 502 U.S. 437, 450 (1992) (internal quotations omitted), this is not a case where the Court should apply that discretion "sparingly." *Id.* While Plaintiff State disputes that exercising this Court's original jurisdiction is discretionary, *see* Section III, *infra*, the clear unlawful abrogation of Defendant States' election laws designed to ensure election integrity by a few officials, and examples of material irregularities in the 2020 election cumulatively warrant this Court's exercising jurisdiction as this Court's "unsought responsibility to resolve the federal and constitutional issues the judicial system has been forced to confront." *Bush II*, 531 U.S. at 111; *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). While isolated irregularities could be "garden-variety" election irregularities that do not raise a federal question,[7] the closeness of the presidential election results, combined with the unconstitutional setting-aside of state election laws by non-legislative actors call both the result and the process into question.

---

[7] "To be sure, 'garden variety election irregularities' may not present facts sufficient to offend the Constitution's guarantee of due process[.]" *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 232 (6th Cir. 2011) (quoting *Griffin*, 570 F.2d at 1077-79)).

24

### A. The 2020 election suffered from serious irregularities that constitutionally prohibit using the reported results.

Defendant States' administration of the 2020 election violated several constitutional requirements and, thus, violated the rights that Plaintiff State seeks to protect. "When the state legislature vests the right to vote for President in its people, the *right to vote as the legislature has prescribed is fundamental*; and one source of *its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter*." *Bush II*, 531 U.S. at 104.[8] Even a State legislature vested with authority to regulate election procedures lacks authority to "abridg[e …] fundamental rights, such as the right to vote." *Tashjian v. Republican Party*, 479 U.S. 208, 217 (1986). As demonstrated in this section, Defendant States' administration of the 2020 election violated the Electors Clause, which renders invalid any appointment of electors based upon those election results, unless the relevant State legislatures review and modify or expressly ratify those results as sufficient to determine the appointment of electors. For example, even without fraud or nefarious intent, a mail-in vote not subjected to the State legislature's ballot-integrity measures cannot be counted.

It does not matter that a judicial or executive officer sought to bypass that screening in response to the COVID pandemic: the choice was not theirs to

---

[8]   The right to vote is "a fundamental political right, because preservative of all rights." *Reynolds*, 377 U.S. at 561-62 (internal quotations omitted).

25

make. "Government is not free to disregard the [the Constitution] in times of crisis." *Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 592 U.S. ___ (Nov. 25, 2020) (Gorsuch, J., concurring). With all unlawful votes discounted, the election result is an open question that this Court must address. Under 3 U.S.C. § 2, the State legislatures may answer the question, but the question must be asked here.

1. **Defendant States violated the Electors Clause by modifying their legislatures' election laws through non-legislative action.**

The Electors Clause grants authority to *state legislatures* under both horizontal and vertical separation of powers. It provides authority to each State—not to federal actors—the authority to dictate the manner of selecting presidential electors. And within each State, it explicitly allocates that authority to a single branch of State government: to the "Legislature thereof." U.S. CONST. art. II, § 1, cl. 2. State legislatures' primacy *vis-à-vis* non-legislative actors—whether State or federal—is even more significant than congressional primacy *vis-à-vis* State legislatures.

The State legislatures' authority is plenary. *Bush II*, 531 U.S. at 104. It "cannot be taken from them or modified" even through "their state constitutions." *McPherson*, 146 U.S. at 35; *Bush I*, 531 U.S at 76-77; *Bush II*, 531 U.S at 104. The Framers allocated election authority to State legislatures as the branch closest—and most accountable—to the People. *See, e.g.*, Robert G. Natelson, *The Original Scope of the Congressional Power to Regulate Elections*, 13 U. PA.

26

J. CONST. L. 1, 31 (2010) (collecting Founding-era documents); *cf.* THE FEDERALIST NO. 57, at 350 (C. Rossiter, ed. 2003) (J. Madison) ("House of Representatives is so constituted as to support in its members a habitual recollection of their dependence on the people"). Thus, only the State legislatures are permitted to create or modify the respective State's rules for the appointment of presidential electors. U.S. CONST. art. II, § 1, cl. 2.

"[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (interior quotations omitted). Thus, for example, deadlines are necessary, even if some votes sent via absentee ballot do not arrive timely. *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973). Even more importantly in this pandemic year with expanded mail-in voting, ballot-integrity measures— *e.g.*, witness requirements, signature verification, and the like—are an essential component of any legislative expansion of mail-in voting. *See* CARTER-BAKER, at 46 (absentee ballots are "the largest source of potential voter fraud"). Though it may be tempting to permit a breakdown of the constitutional order in the face of a global pandemic, the rule of law demands otherwise.

Specifically, because the Electors Clause makes clear that state legislative authority is exclusive, non-legislative actors lack authority to *amend* statutes. *Republican Party of Pa. v. Boockvar*, No. 20-542, 2020 U.S. LEXIS 5188, at *4 (Oct. 28, 2020) ("there is a strong likelihood that the State Supreme Court

27

decision violates the Federal Constitution") (Alito, J., concurring); *Wisconsin State Legis.*, No. 20A66, 2020 U.S. LEXIS 5187, at \*11-14 (Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay); *cf. Grayned v. City of Rockford,* 408 U.S. 104, 110 (1972) ("it is not within our power to construe and narrow state laws"); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 509-10 (2010) ("editorial freedom … [to "blue-pencil" statutes] belongs to the Legislature, not the Judiciary"). That said, courts can enjoin elections or even enforcement of *unconstitutional* election laws, but they cannot rewrite the law in federal presidential elections.

For example, if a state court enjoins or modifies ballot-integrity measures adopted to allow absentee or mail-in voting, that invalidates ballots cast under the relaxed standard unless the legislature has—prior to the election—ratified the new procedure. Without pre-election legislative ratification, results based on the treatment and tabulation of votes done in violation of state law cannot be used to appoint presidential electors.

Elections must be lawful contests, but they should not be mere *litigation contests* where the side with the most lawyers wins. As with the explosion of nation-wide injunctions, the explosion of challenges to State election law for partisan advantage in the lead-up to the 2020 election "is not normal." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of stay). Nor is it healthy. Under the "*Purcell* principle," federal courts generally avoid enjoining state election laws in the period close to an election. *Purcell*, 549 U.S. at 4-5 (citing "voter

28

confusion and consequent incentive to remain away from the polls"). *Purcell* raises valid concerns about confusion in the run-up to elections, but judicial election-related injunctions also raise *post-election* concerns. For example, if a state court enjoins ballot-integrity measures adopted to secure absentee or mail-in voting, that invalidates ballots cast under the relaxed standard unless the State legislature has had time to ratify the new procedure. Without either pre-election legislative ratification or a severability clause in the legislation that created the rules for absentee voting by mail, the state court's actions operate to violate the Electors Clause.

### 2. State and local administrator's systemic failure to follow State election qualifies as an unlawful amendment of State law.

When non-legislative state and local executive actors engage in systemic or intentional failure to comply with their State's duly enacted election laws, they adopt by executive fiat a *de facto* equivalent of an impermissible amendment of State election law by an executive or judicial officer. *See* Section II.A.1, *supra*. This Court recognizes an executive's "consciously and expressly adopt[ing] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities" as another form of reviewable final action, even if the policy is not a written policy. *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985) (interior quotations omitted); *accord id.* at 839 (Brennan, J., concurring). Without a *bona fide* amendment to State election law *by the legislature*, executive officers must follow state law. *Cf. Morton v.*

29

*Ruiz*, 415 U.S. 199, 235 (1974); *Service v. Dulles*, 354 U.S. 363, 388-89 (1957). The wrinkle here is that the non-legislative actors lack the authority under the federal Constitution to enact a *bona fide* amendment, regardless of whatever COVID-related emergency power they may have.

This form of executive nullification of state law by statewide, county, or city officers is a variant of impermissible amendment by a non-legislative actor. *See* Section II.A.1, *supra*. Such nullification is always unconstitutional, but it is especially egregious when it eliminates legislative safeguards for election integrity (*e.g.*, signature and witness requirements for absentee ballots, poll watchers[9]). Systemic failure by statewide, county, or city election officials to follow State election law is no more permissible than formal amendments by an executive or judicial actor.

**3.**  **Defendant States' administration of the 2020 election violated the Fourteenth Amendment.**

In each of Defendant States, important rules governing the sending, receipt, validity, and counting of ballots were modified in a manner that varied from county to county. These variations from county to county violated the Equal Protection Clause, as this

---

[9]   Poll watchers are "prophylactic measures designed to prevent election fraud," *Harris v. Conradi,* 675 F.2d 1212, 1216 n.10 (11th Cir. 1982), and "to insure against tampering with the voting process." *Baer v. Meyer,* 728 F.2d 471, 476 (10th Cir. 1984). For example, poll monitors reported that 199 Chicago voters cast 300 party-line Democratic votes, as well as three party-line Republican votes in one election. *Barr v. Chatman,* 397 F.2d 515, 515-16 & n.3 (7th Cir. 1968).

30

Court explained at length in *Bush II*. Each vote must be treated equally. "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush II*, 531 U.S. at 104. The Equal Protection Clause demands uniform "statewide standards for determining what is a legal vote." *Id.* at 110.

Differential intrastate voting standards are "hostile to the one man, one vote basis of our representative government." *Bush II*, 531 U.S. at 107 (internal quotations omitted). These variations from county to county also appear to have operated to affect the election result. For example, the obstruction of poll-watcher requirements that occurred in Michigan's Wayne County may have contributed to the unusually high number of more than 173,000 votes which are not tied to a registered voter and that 71 percent of the precincts are out of balance with no explanation. Compl. ¶ 97.

Regardless of whether the modification of legal standards in some counties in Defendant States tilted the election outcome in those States, it is clear that the standards for determining what is a legal vote varied greatly from county to county. That constitutes a clear violation of the Equal Protection Clause; and it calls into question the constitutionality of any Electors appointed by Defendant States based on such an unconstitutional election.

The Fourteenth Amendment's due process clause protects the fundamental right to vote against "[t]he

31

disenfranchisement of a state electorate." *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981). Weakening or eliminating signature-validating requirements, then restricting poll watchers also undermines the 2020 election's integrity—especially as practiced in urban centers with histories of electoral fraud—also violates substantive due process. *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) ("violation of the due process clause may be indicated" if "election process itself reaches the point of patent and fundamental unfairness"); *see also Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183-84 (11th Cir. 2008); *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 580-82 (11th Cir. 1995); *Roe v. State of Ala.*, 68 F.3d 404, 407 (11th Cir. 1995); *Marks v. Stinson*, 19 F. 3d 873, 878 (3rd Cir. 1994). Defendant States made concerted efforts to weaken or nullify their legislatures' ballot-integrity measures for the unprecedented deluge of mail-in ballots, citing the COVID-19 pandemic as a rationale. But "Government is not free to disregard the [the Constitution] in times of crisis." *Roman Catholic Diocese of Brooklyn*, 592 U.S. at ___ (Gorsuch, J., concurring).

Similarly, failing to follow procedural require-ments for amending election standards violates procedural due process. *Brown v. O'Brien*, 469 F.2d 563, 567 (D.C. Cir.), *vacated as moot*, 409 U.S. 816 (1972). Under this Court's precedents on procedural due process, not only intentional failure to follow election law as enacted by a State's legislature but also random and unauthorized acts by state election officials and their designees in local government can violate the Due Process Clause. *Parratt v. Taylor*, 451

32

U.S. 527, 537-41 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986); *Hudson v. Palmer*, 468 U.S. 517, 532 (1984). Here, the violations all were intentional, even if done for the reason of addressing the COVID-19 pandemic.

While Plaintiff State disputes that exercising this Court's original jurisdiction is discretionary, *see* Section III, *infra*, the clear unlawful abrogation of Defendant States' election laws designed to ensure election integrity by a few officials, and examples of material irregularities in the 2020 election cumulatively warrant exercising jurisdiction. Although isolated irregularities could be "garden-variety" election disputes that do not raise a federal question,[10] the closeness of election results in swing states combines with unprecedented expansion in the use of fraud-prone mail-in ballots—millions of which were also mailed out—and received and counted—without verification—often in violation of express state laws by non-legislative actors, *see* Sections II.A.1-II.A.2, *supra*, call both the result and the process into question. For an office as important as the presidency, these clear violations of the Constitution, coupled with a reasonable inference of unconstit-utional ballots being cast in numbers that far exceed the margin of former Vice President Biden's vote tally over President Trump demands the attention of this Court.

---

[10]   "To be sure, 'garden variety election irregularities' may not present facts sufficient to offend the Constitution's guarantee of due process[.]" *Hunter*, 635 F.3d at 232 (quoting *Griffin*, 570 F.2d at 1077-79)).

33

While investigations into allegations of unlawful votes being counted and fraud continue, even the appearance of fraud in a close election would justify exercising the Court's discretion to grant the motion for leave to file. Regardless, Defendant States' violations of the Constitution would warrant this Court's review, even if no election fraud had resulted.

**B.   A ruling on the 2020 election would preserve the Constitution and help prevent irregularities in future elections.**

In addition to ensuring that the 2020 presidential election is resolved in a manner consistent with the Constitution, this Court must review the violations that occurred in Defendant States to enable Congress and State legislatures to avoid future chaos and constitutional violations. Unless this Court acts to review this presidential election, these unconstitutional and unilateral violations of state election laws will continue in the future.

Regardless of how the 2020 election resolves and whatever this Court does with respect to the 2020 election, it is imperative for our system of government that elections follow the clear constitutional mandates for all future elections. Just as this Court in *Bush II* provided constitutional guidance to all states regarding the equal treatment of ballots from county to county in 2000, this Court should now provide a clear statement that non-legislative modification of rules governing presidential elections violate the Electors Clause. Such a ruling will discourage in the future the kind of non-legislative election modifications that proliferated in 2020.

34

## III. REVIEW IS NOT DISCRETIONARY.

Although this Court's original jurisdiction precedents would justify the Court's hearing this matter under the Court's discretion, *see* Section II, *supra*, Plaintiff State respectfully submits that the Court's review is not discretionary. To the contrary, the plain text of § 1251(a) provides *exclusive* jurisdiction, not discretionary jurisdiction. *See* 28 U.S.C. § 1251(a). In addition, no other remedy exists for these interstate challenges, *see* Section I.G, *supra*, and *some* court must have jurisdiction for these weighty issues. *See Mostyn v. Fabrigas*, 98 Eng. Rep. 1021, 1028 (K.B. 1774) ("if there is no other mode of trial, that alone will give the King's courts a jurisdiction"). As individual Justices have concluded, the issue "bears reconsideration." *Nebraska v. Colorado*, 136 S.Ct. 1034, 1035 (2016) (Thomas, J., dissenting, joined by Alito, J.); *accord New Mexico v. Colorado*, 137 S.Ct. 2319 (2017) (Thomas, J., dissenting) (same). Plaintiff State respectfully submits that that reconsideration would be warranted to the extent that the Court does not elect to hear this matter in its discretion.

## IV. THIS CASE WARRANTS SUMMARY DISPOSITION OR EXPEDITED BRIEFING.

The issues presented here are neither fact-bound nor complex, and their vital importance urgently needs a resolution. Plaintiff State will move this Court for expedited consideration but also suggest that this case is a prime candidate for summary disposition because the material facts—namely, that the COVID-19 pandemic prompted non-legislative actors to unlawfully modify Defendant States' election laws, and carry out an election in violation of basic voter

35

integrity statutes—are not in serious dispute. *California v. United States*, 457 U.S. 273, 278 (1982); *South Carolina v. Katzenbach*, 383 U.S. 301, 307 (1966). This case presents a pure and straightforward question of law that requires neither finding additional facts nor briefing beyond the threshold issues presented here.

## **CONCLUSION**

Leave to file the Bill of Complaint should be granted.

December 7, 2020            Respectfully submitted,

                            Ken Paxton*
                            Attorney General of Texas

                            Brent Webster
                            First Assistant Attorney
                            General of Texas

                            Lawrence Joseph
                            Special Counsel to the
                            Attorney General of Texas

                            Office of the Attorney General
                            P.O. Box 12548 (MC 059)
                            Austin, TX 78711-2548
                            kenneth.paxton@oag.texas.gov
                            (512) 936-1414

                            *      Counsel of Record

No. 20A_____, Original

# In the Supreme Court of the United States

---

STATE OF TEXAS,
*Plaintiff*,

v.

COMMONWEALTH OF PENNSYLVANIA, STATE OF GEORGIA,
STATE OF MICHIGAN, AND STATE OF WISCONSIN,
*Defendants.*

---

**MOTION FOR EXPEDITED CONSIDERATION OF THE
MOTION FOR LEAVE TO FILE A BILL OF COMPLAINT AND
FOR EXPEDITION OF ANY PLENARY CONSIDERATION OF
THE MATTER ON THE PLEADINGS IF PLAINTIFFS'
FORTHCOMING MOTION FOR INTERIM RELIEF IS NOT
GRANTED**

The State of Texas ("Plaintiff State") hereby moves, pursuant to Supreme Court Rule 21, for expedited consideration of the motion for leave to file a bill of complaint, filed today, in an original action on the administration of the 2020 presidential election by defendants Commonwealth of Pennsylvania, *et al.* (collectively, "Defendant States"). The relevant statutory deadlines for the defendants' action based on unconstitutional election results are imminent: (a) December 8 is the safe harbor for certifying presidential electors, 3 U.S.C. § 5; (b) the electoral college votes on December 14, 3 U.S.C. § 7; and (c) the House of Representatives counts votes on January 6, 3 U.S.C. § 15. Absent some form of relief, the defendants will appoint electors based on unconstitutional and deeply uncertain election results, and the House will count those votes on January 6, tainting the election and the future of free elections.

1

Expedited consideration of the motion for leave to file the bill of complaint is needed to enable the Court to resolve this original action before the applicable statutory deadlines, as well as the constitutional deadline of January 20, 2021, for the next presidential term to commence. U.S. CONST. amend. XX, § 1, cl. 1. Texas respectfully requests that the Court order Defendant States to respond to the motion for leave to file by December 9. Texas waives the waiting period for reply briefs under this Court's Rule 17.5, so that the Court could consider the case on an expedited basis at its December 11 conference.

Working in tandem with the merits briefing schedule proposed here, Texas also will move for interim relief in the form of a temporary restraining order, preliminary injunction, stay, and administrative stay to enjoin Defendant States from certifying their presidential electors or having them vote in the electoral college. *See* S.Ct. Rule 17.2 ("The form of pleadings and motions prescribed by the Federal Rules of Civil Procedure is followed."); *cf.* S.Ct. Rule 23 (stays in this Court). Texas also asked in their motion for leave to file that the Court summarily resolve this matter at that threshold stage. Any relief that the Court grants under those two alternate motions would inform the expedited briefing needed on the merits.

Enjoining or staying Defendant States' appointment of electors would be an especially appropriate and efficient way to ensure that the eventual appointment and vote of such electors reflects a constitutional and accurate tally of lawful votes and otherwise complies with the applicable constitutional and statutory requirements in time for the House to act on January 6. Accordingly, Texas respectfully requests

expedition of this original action on one or more of these related motions. The degree of expedition required depends, in part, on whether Congress reschedules the day set for presidential electors to vote and the day set for the House to count the votes. *See* 3 U.S.C. §§ 7, 15; U.S. Const. art. II, §1m cl. 4.

## STATEMENT

Like much else in 2020, the 2020 election was compromised by the COVID-19 pandemic. Even without Defendant States' challenged actions here, the election nationwide saw a massive increase in fraud-prone voting by mail. *See* BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005) (absentee ballots are "the largest source of potential voter fraud"). Combined with that increase, the election in Defendant States was also compromised by numerous changes to the State legislatures' duly enacted election statutes by non-legislative actors—including both "friendly" suits settled in courts and executive fiats via guidance to election officials—in ways that undermined state statutory ballot-integrity protections such as signature and witness requirements for casting ballots and poll-watcher requirements for counting them. State legislatures have plenary authority to set the method for selecting presidential electors, *Bush v. Gore*, 531 U.S. 98, 104 (2000) ("*Bush II*"), and "significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Id.* at 113 (Rehnquist, C.J., concurring); *accord Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) ("*Bush I*").

Plaintiff State has not had the benefit of formal discovery prior to submitting this original action. Nonetheless, Plaintiff State has uncovered substantial evidence

discussed below that raises serious doubts as to the integrity of the election processes in Defendant States. Although new information continues to come to light on a daily basis, as documented in the accompanying Appendix ("App."), the voting irregularities that resulted from Defendant States' unconstitutional actions include the following:

- Jesse Jacob, a decades-long City of Detroit employee assigned to work in the Elections Department for the 2020 election testified (App. 34a-36a) that she was "instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file" in direct contravention of MCL § 168.765a(6), which requires all signatures on ballots be verified.

- Ethan J. Pease, a box truck delivery driver subcontracted to the U.S. Postal Service ("USPS") to deliver truckloads of mail-in ballots to the sorting center in Madison, WI, testified that USPS employees were backdating ballots received after November 3, 2020. Decl. of Ethan J. Pease at ¶¶ 3-13. (App. 149a-51a). Further, Pease testified how a senior USPA employee told him on November 4, 2020 that "An order came down from the Wisconsin/Illinois Chapter of the Postal Service that 100,000 ballots" and how the USPSA dispatched employees to "find[] … the ballots."  ¶¶ 8-10.  One hundred thousand ballots "found" after election day far exceeds former Vice President Biden margin of 20,565 votes over President Trump.

- On August 7, 2020, the League of Women Voters of Pennsylvania and others filed a complaint against Secretary Boockvar and other local election officials, seeking "a declaratory judgment that Pennsylvania existing signature verification procedures for mail-in voting" were unlawful for a number of reasons, *League of Women Voters of Pennsylvania v. Boockvar*, No. 2:20-cv-03850-PBT, (E.D. Pa. Aug. 7, 2020), which the Pennsylvania defendants quickly settled resulting in guidance (App. 109a-114a)[1] issued on September 11, 2020, stating in relevant part: "The Pennsylvania Election Code does not authorize the county board of elections to set aside returned absentee or mail-in ballots based solely on signature analysis by the county board of elections." App. 113a.

- Acting under a generally worded clause that "Elections shall be free and equal," PA. CONST. art. I, §5, cl. 1, a 4-3 majority of Pennsylvania's Supreme Court in *Pa. Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020), extended the statutory deadline for mail-in ballots from Election Day to three days after Election Day and adopted a presumption that even *non-postmarked ballots* were presumptively timely. In addition, a great number of ballots were received after the statutory deadline. Because Pennsylvania misled this Court

---

[1]     Although the materials cited here are a complaint, that complaint is verified (*i.e.*, declared under penalty of perjury), App. 75a, which is evidence for purposes of a motion for summary judgment. *Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992) ("allegations in [the] verified complaint should have been considered on the motion for summary judgment as if in a new affidavit").

about segregating the late-arriving ballots and instead commingled those ballots, it is now impossible to verify Pennsylvania's claim about the number of ballots affected.

- Contrary to Pennsylvania election law on providing poll-watchers access to the opening, counting, and recording of absentee ballots, local election officials in Philadelphia and Allegheny Counties decided not to follow 25 PA. STAT. § 3146.8(b). App. 127a-28a.

- Prior to the election, Secretary Boockvar sent an email to local election officials urging them to provide opportunities for various persons—including political parties—to contact voters to "cure" defective mail-in ballots. This process clearly violated several provisions of the state election code. App. 122a-24a. By removing the ballots for examination prior to seven o'clock a.m. on election day, Secretary Boockvar created a system whereby local officials could review ballots without the proper announcements, observation, and security. This entire scheme, which was only followed in Democrat majority counties, was blatantly illegal in that it permitted the illegal removal of ballots from their locked containers prematurely. App. 122a-24a.

- On December 4, 2020, fifteen members of the Pennsylvania House of Representatives issued a report (App. 139a-45a) to Congressman Scott Perry stating that "[t]he general election of 2020 in Pennsylvania was fraught with … documented irregularities and improprieties associated with mail-in balloting … [and] that the reliability of the mail-in votes in the Commonwealth

of Pennsylvania is impossible to rely upon." The report detailed, *inter alia*, that more than 118,426 mail-in votes either had no mail date, were returned *before* they were mailed, or returned one day after the mail date. The Report also stated that, based on government reported data, the number of mail-in ballots *sent* by November 2, 2020 (2.7 million) somehow ballooned by 400,000, to 3.1 million on November 4, 2020, without explanation.

- On March 6, 2020, in *Democratic Party of Georgia v. Raffensperger*, No. 1:19-cv-5028-WMR (N.D. Ga.), Georgia's Secretary of State entered a Compromise Settlement Agreement and Release (App. 19a-24a) with the Democratic Party of Georgia (the "Settlement") to materially change the statutory requirements for reviewing signatures on absentee ballot envelopes to confirm the voter's identity by making it far more difficult to challenge defective signatures beyond the express mandatory procedures set forth at GA. CODE § 21-2-386(a)(1)(B), which is particularly disturbing because the legislature allowed persons *other than the voter* to apply for an absentee ballot, GA. CODE § 21-2-381(a)(1)(C), which means that the legislature likely was relying heavily on the signature-verification on ballots under GA. CODE § 21-2-386.

- Numerous poll challengers and an Election Department employee whistleblower have testified that the signature verification requirement was ignored in Wayne County in a case currently pending in the Michigan Supreme Court. App. 25a-51a.

- The probability of former Vice President Biden winning the popular vote in the four Defendant States—Georgia, Michigan, Pennsylvania, and Wisconsin—independently given President Trump's early lead in those States as of 3 a.m. on November 4, 2020, is less than one in a quadrillion, or 1 in 1,000,000,000,000,000. For former Vice President Biden to win these four States collectively, the odds of that event happening decrease to less than one in a quadrillion to the fourth power (*i.e.*, 1 in 1,000,000,000,000,000[4]). *See* Decl. of Charles J. Cicchetti, Ph.D. ("Cicchetti Decl.") at ¶¶ 14-21, 30-31 (App. 4a-7a, 9a).

- The same less than one in a quadrillion statistical improbability of Mr. Biden winning the popular vote in the four Defendant States—Georgia, Michigan, Pennsylvania, and Wisconsin—independently exists when Mr. Biden's performance in each of those Defendant States is compared to former Secretary of State Hilary Clinton's performance in the 2016 general election and President Trump's performance in the 2016 and 2020 general elections. Again, the statistical improbability of Mr. Biden winning the popular vote in these **four** States collectively is 1 in 1,000,000,000,000,000[5]. *Id.* 10-13, 17-21, 30-31 (App. 3a-7a, 9a).

- Georgia's unconstitutional abrogation of the express mandatory procedures for challenging defective signatures on ballots set forth at GA. CODE § 21-2-386(a)(1)(B) resulted in far more ballots with unmatching signatures being counted in the 2020 election than if the statute had been properly applied. The

2016 rejection rate was more than *seventeen times greater* than in 2020. *See* Cicchetti Decl. at ¶ 24 (App. 7a). As a consequence, applying the rejection rate in 2016, which applied the mandatory procedures, to the ballots received in 2020 would result in a net gain for President Trump of 25,587 votes. This would be more than needed to overcome the Biden advantage of 12,670 votes, and Trump would win by 12,917 votes. *See* App. 8a.

- The two Republican members of the Board *rescinded their votes* to certify the vote in Wayne County, and signed affidavits alleging they were bullied and misled into approving election results and do not believe the votes should be certified until serious irregularities in Detroit votes are resolved. *See* Cicchetti Decl. at ¶ 29 (App. 8a).

- The Wayne County Statement of Votes Report lists 174,384 absentee ballots out of 566,694 absentee ballots tabulated (about 30.8%) as counted without a registration number for precincts in the City of Detroit. *See* Cicchetti Decl. at ¶ 27 (App. 8a). The number of votes not tied to a registered voter by itself exceeds Vice President Biden's margin of margin of 146,007 votes by more than 28,377 votes. The extra ballots cast most likely resulted from the phenomenon of Wayne County election workers running the same ballots through a tabulator multiple times, with Republican poll watchers obstructed or denied access, and election officials ignoring poll watchers' challenges, as documented by numerous declarations. App. 25a-51a.

As a net result of these challenges, the close election result in Defendant States—on

which the presidential election turns—is indeterminate. Put another way, Defendant States' unconstitutional actions affect outcome-determinative numbers of popular votes, that in turn affect outcome-determinative numbers of electoral votes.

To remedy Texas's claims and remove the cloud over the results of the 2020 election, expedited review and interim relief are required. December 8, 2020 is a statutory safe harbor for States to appoint presidential electors, and by statute the electoral college votes on December 14. *See* 3 U.S.C. §§ 7, 15. In a contemporaneous filing, Texas asks this Court to vacate or enjoin—either permanently, preliminarily, or administratively—Defendant States from certifying their electors and participating in the electoral college vote. As permanent relief, Texas asks this Court to remand the allocation of electors to the legislatures of Defendant States pursuant to the statutory and constitutional backstop for this scenario: "Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct." 3 U.S.C. § 2 (emphasis added); U.S. CONST. art. II, § 1, cl. 2.

Significantly, State legislatures retain the authority to appoint electors under the federal Electors Clause, even if state laws or constitutions provide otherwise. *McPherson v. Blacker*, 146 U.S. 1, 35 (1892); *accord Bush I*, 531 U.S. at 76-77; *Bush II*, 531 U.S at 104. For its part, Congress could move the December 14 date set for the electoral college's vote, as it has done before when faced with contested elections. Ch. 37, 19 Stat. 227 (1877). Alternatively, the electoral college could vote on December 14

without Defendant States' electors, with the presidential election going to the House of Representatives under the Twelfth Amendment if no candidate wins the required 270-vote majority.

What cannot happen, constitutionally, is what Defendant States appear to want (namely, the electoral college to proceed based on the unconstitutional election in Defendant States):

> When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter.

*Bush II*, 531 U.S. at 104. Proceeding under the unconstitutional election is not an option.

Pursuant to 28 U.S.C. 1251(a), Plaintiff State has filed a motion for leave to file a bill of complaint today. As set forth in the complaint and outlined above, all Defendant States ran their 2020 election process in noncompliance with the ballot-integrity requirements of their State legislature's election statutes, generally using the COVID-19 pandemic as a pretext or rationale for doing so. In so doing, Defendant States disenfranchised not only their own voters, but also the voters of all other States: "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Anderson v. Celebrezze*, 460 U.S. 780, 795 (1983).

## <u>ARGUMENT</u>

The Constitution vests plenary authority over the appointing of presidential electors with State legislatures. *McPherson*, 146 U.S. at 35; *Bush I*, 531 U.S. at 76-77; *Bush II*, 531 U.S at 104. While State legislatures need not proceed by popular

vote, the Constitution requires protecting the fundamental right to vote when State legislatures decide to proceed via elections. *Bush II*, 531 U.S. at 104. On the issue of the constitutionality of an election, moreover, the Judiciary has the final say: "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *Bush II*, 531 U.S. at 104. For its part, Congress has the ability to set the time for the electoral college to vote. U.S. CONST. art. II, § 1, cl. 3. To proceed constitutionally with the 2020 election, all three actors potentially have a role, given the complications posed by Defendant States' unconstitutional actions.

With this year's election on November 3, and the electoral college's vote set by statute for December 14, 3 U.S.C. § 7, Congress has not allowed much time to investigate irregularities like those in Defendant States before the electoral college is statutorily set to act. But the time constraints are not constitutional in nature— the Constitution's only time-related provision is that the President's term ends on January 20, U.S. CONST. amend. XX, § 1, cl. 1—and Congress has both the obvious authority and even a history of moving the date of the electoral college's vote when election irregularities require it.

Expedited consideration of this matter is warranted by the seriousness of the issues raised here, not only for the results of the 2020 presidential election but also for the implications for our constitutional democracy going forward. If this Court does not halt the Defendant States' participation in the electoral college's vote on December 14, a grave cloud will hang over not only the presidency but also the

Republic.

With ordinary briefing, Defendant States would not need to respond for 60 days, S.Ct. Rule 17.5, which is after the next presidential term commences on January 20, 2021. Accordingly, this Court should adopt an expedited briefing schedule on the motion for leave to file the bill of complaint, as well as the contemporaneously filed motion for interim relief, including an administrative stay or temporary restraining order pending further order of the Court. If this Court declines to resolve this original action summarily, the Court should adopt an expedited briefing schedule for plenary consideration, allowing the Court to resolve this matter before the relevant deadline passes. The contours of that schedule depend on whether the Court grants interim relief. Texas respectfully proposes two alternate schedules.

If the Court has not yet granted administrative relief, Texas proposes that the Court order Defendant States to respond to the motion for leave to file a bill of complaint and motion for interim relief by December 9. *See* S.Ct. Rule 17.2 (adopting Federal Rules of Civil Procedure); FED. R. CIV. P. 65; *cf.* S.Ct. Rule 23 (stays). Texas waives the waiting period for reply briefs under this Court's Rule 17.5 and would reply by December 10, which would allow the Court to consider this case on an expedited basis at its December 11 Conference.

With respect to the merits if the Court neither grants the requested interim relief nor summarily resolves this matter in response to the motion for leave to file the bill of complaint, thus requiring briefing of the merits, Texas respectfully proposes

the following schedule for briefing and argument:

| | |
|---|---|
| December 8, 2020 | Plaintiffs' opening brief |
| December 8, 2020 | *Amicus* briefs in support of plaintiffs or of neither party |
| December 9, 2020 | Defendants' response brief(s) |
| December 9, 2020 | *Amicus* briefs in support of defendants |
| December 10, 2020 | Plaintiffs' reply brief(s) to each response brief |
| December 11, 2020 | Oral argument, if needed |

If the Court grants an administrative stay or other interim relief, but does not summarily resolve this matter in response to the motion for leave to file the bill of complaint, Texas respectfully proposes the following schedule for briefing and argument on the merits:

| | |
|---|---|
| December 11, 2020 | Plaintiffs' opening brief |
| December 11, 2020 | *Amicus* briefs in support of plaintiffs or of neither party |
| December 17, 2020 | Defendants' response brief(s) |
| December 17, 2020 | *Amicus* briefs in support of defendants |
| December 22, 2020 | Plaintiffs' reply brief(s) to each response brief |
| December 2020 | Oral argument, if needed |

In the event that Congress moves the date for the electoral college and the House to vote or count votes, then the parties could propose an alternate schedule. If any motions to intervene are granted by the applicable deadline, intervenors would file by the applicable deadline as plaintiffs-intervenors or defendants-intervenors, with any still-pending intervenor filings considered as *amicus* briefs unless such

prospective intervenors file or seek leave to file an *amicus* brief in lieu of their still-pending intervenor filings.

## <u>CONCLUSION</u>

Texas respectfully requests that the Court expedite consideration of its motion for leave to file a bill of complaint based on the proposed schedule and, if the Court neither stays nor summarily resolves the matter and thus sets the case for plenary consideration, that the Court expedite briefing and oral argument based on the proposed schedule.

Dated: December 7, 2020

Respectfully submitted,

/s/ Ken Paxton
_____
Ken Paxton*
Attorney General of Texas

Brent Webster
First Assistant Attorney General of Texas

Lawrence Joseph
Special Counsel to the Attorney General of Texas

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
kenneth.paxton@oag.texas.gov
(512) 936-1414

*       Counsel of Record

*Counsel for Plaintiffs*

## <u>CERTIFICATE AS TO FORM</u>

Pursuant to Sup. Ct. Rules 22 and 33, I certify that the foregoing motion are proportionately spaced, has a typeface of Century Schoolbook, 12 points, and contains 15 pages (and 3,550 words), excluding this Certificate as to Form, the Table of Contents, and the Certificate of Service.

Dated: December 7, 2020                    Respectfully submitted,


/s/ Ken Paxton

Ken Paxton
    *Counsel of Record*
Attorney General of Texas
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
Kenneth.paxton@oag.texas.gov
(512) 936-1414

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on this 7th day of December 2020, in addition to filing the foregoing document via the Court's electronic filing system, one true and correct copy of the foregoing document was served by Federal Express, with a PDF courtesy copy served via electronic mail on the following counsel and parties:

[Brian Kemp
Office of the Governor
206 Washington Street
Suite 203, State Capitol
Atlanta, GA 30334
Tel: (404) 656-1776
Email: governorsoffice@michigan.gov

Christopher M. Carr
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334
Tel: (404) 458-3600
Email: ccarr@law.ga.gov

Gretchen Whitmer
Office of the Governor
P.O. Box 30013
Lansing, MI 48909
Tel: 517-373-3400
Email: governorsoffice@michigan.gov

Dana Nessel
G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30212
Lansing, MI 48909
Tel: 517-373-1110
Email: dnessel@michigan.gov

Anthony S. Evers
Office of the Governor
115 East, State Capitol
Madison WI 53702
Tel: (414) 227-4344
Email: EversInfo@wisconsin.gov

Joshua L. Kaul
Wisconsin Department of Justice
17 West Main Street, P.O. Box 7857
Madison, WI 53707-7857
Tel: (608) 287-4202
Email: kauljl@doj.state.wi.us

Tom Wolf
Office of the Governor
508 Main Capitol Building
Harrisburg, PA 17120
Tel: 717-787-2500
Email: govcorrespcrm@pa.gov

Josh Shapiro
Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
Tel.: 717.787.3391
Email: jshapiro@attorneygeneral.gov

Executed December 7, 2020, at Washington, DC,


/s/ Lawrence J. Joseph
Lawrence J. Joseph

No. _____, Original

## In the Supreme Court of the United States

_____

STATE OF TEXAS,

*Plaintiff,*

v.

COMMONWEALTH OF PENNSYLVANIA, STATE OF GEORGIA, STATE OF MICHIGAN, AND STATE OF WISCONSIN,

*Defendants.*

_____

## MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER OR, ALTERNATIVELY, FOR STAY AND ADMINISTRATIVE STAY

_____

Ken Paxton*
Attorney General of Texas

Brent Webster
First Assistant Attorney
General of Texas

Lawrence Joseph
Special Counsel to the
Attorney General of Texas

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
kenneth.paxton@oag.texas.gov
(512) 936-1414

\*          *Counsel of Record*

i

## **<u>TABLE OF CONTENTS</u>**

**Pages**

Table of Authorities....................................................iii

Motion for Preliminary Injunction and
   Temporary Restraining Order or,
   Alternatively, for Stay and Administrative
   Stay...........................................................................1

Statement of the Case ...............................................2

   Constitutional Background ................................4

   Defendant States' Violations of Electors
      Clause ...........................................................5

   Factual Background..........................................5

Standard of Review ...................................................6

Argument...................................................................7

I.   This Court is likely to exercise its discretion
     to hear this case. ...............................................7

II.  The Plaintiff State is likely to prevail.................8

   A.   This Court has jurisdiction over Plaintiff
        State's claims...............................................9

        1.   The claims fall within this Court's
             constitutional and statutory subject-
             matter jurisdiction. ...............................9

        2.   The claims arise under the
             Constitution..........................................10

        3.   The claims raise a "case or
             controversy" between the States. .........12

        4.   Plaintiff State has prudential
             standing.................................................19

        5.   This action is not moot and will not
             become moot. ........................................21

        6.   This matter is ripe for review...............21

ii

7.   This action does not raise a non-justiciable political question. ................ 23

8.   No adequate alternate remedy or forum exists. .......................................... 23

B.   The Plaintiff State is likely to prevail on the merits. ..................................................... 26

1.   Defendant States violated the Electors Clause by modifying their legislatures' election laws through non-legislative action. ............................ 26

2.   State and local administrator's systemic failure to follow State election qualifies as an unlawful amendment of State law. ........................ 30

III. The other *Winter-Hollingsworth* factors warrant interim relief. ........................................ 31

A.   Plaintiff State will suffer irreparable harm if the Defendant States' unconstitutional electors vote in the electoral college. ............................................ 32

B.   The Defendant States would not suffer cognizable irreparable harm, and the balance of equities tips to the Plaintiff State. ........................................................... 32

C.   The public interest favors interim relief. ... 33

IV. Alternatively, this case warrants summary disposition. ......................................................... 34

Conclusion .............................................................. 35

iii

## <u>TABLE OF AUTHORITIES</u>

**Pages**

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........... 13

*Anderson v. United States*, 417 U.S. 211 (1974) ..... 14

*Arizona Sect'y of State's Office v. Feldman*, 137
    S.Ct. 446 (2016) ..................................................... 6

*Ass'n of Data Processing Serv. Org., Inc. v. Camp*,
    397 U.S. 150 (1970) ............................................. 19

*Baer v. Meyer,* 728 F.2d 471 (10th Cir. 1984) ......... 31

*Baker v. Carr*, 369 U.S. 186 (1962) .............. 14, 23, 28

*Barr v. Chatman,* 397 F.2d 515 (7th Cir. 1968) ...... 31

*Bell v. Hood*, 327 U.S. 678 (1946) ............................ 12

*Bognet v. Sec'y Pa.*, No. 20-3214, 2020 U.S. App.
    LEXIS 35639 (3d Cir. Nov. 13, 2020) ................ 20

*Brushaber v. Union Pac. R. Co.*,
    240 U.S. 1 (1916) ................................................. 31

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................ 28

*California v. Texas*, 459 U.S. 1067 (1982) ................ 6

*Caplin & Drysdale v. United States*,
    491 U.S. 617 (1989) ............................................. 14

*City of Boerne v. Flores,* 521 U.S. 507 (1997) .......... 17

*City of Chicago v. Int'l Coll. of Surgeons*,
    522 U.S. 156 (1997) ............................................. 11

*Coleman v. Miller*, 307 U.S. 433 (1939) ................... 16

*Cook v. Gralike*, 531 U.S. 510 (2001) ............ 11-12, 31

*Democratic Nat'l Comm. v. Wisconsin State
    Legis.*, No. 20A66, 2020 U.S. LEXIS 5187
    (Oct. 26, 2020) ...................................................... 6

*Dep't of Homeland Sec. v. New York*, 140 S. Ct.
    599 (2020) ............................................................ 29

iv

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ................ 14

*FEC v. Akins*, 524 U.S. 11 (1998) ............................ 18

*FEC v. Wisconsin Right to Life, Inc.*,
   551 U.S. 449 (2007) ............................................. 21

*Foman v. Davis*, 371 U.S. 178 (1962) ........................ 9

*Foster v. Chatman*, 136 S.Ct. 1737 (2016) ............... 10

*Fox Film Corp. v. Muller*, 296 U.S. 207 (1935) ....... 11

*Frank v. Walker,* 135 S.Ct. 7 (2014) .......................... 6

*Free Enter. Fund v. Pub. Co. Accounting
   Oversight Bd.*, 561 U.S. 477 (2010) .................... 28

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60
   F.3d 770 (Fed. Cir. 1995) .................................... 22

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ............................................. 28

*Harris v. Conradi,* 675 F.2d 1212
   (11th Cir. 1982) ................................................... 31

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................... 30

*Hollingsworth v. Perry*, 558 U.S. 183 (2010) .... 7-8, 31

*Hunter v. Hamilton Cty. Bd. of Elections*, 635
   F.3d 219 (6th Cir. 2011) ...................................... 34

*Husted v. Ohio State Conf. of the NAACP*, 135
   S.Ct. 42 (2014) ...................................................... 6

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ...... 30

*Kentucky v. Indiana*, 281 U.S. 163 (1930) .............. 15

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ............... 19

*Lance v. Coffman*, 549 U.S. 437 (2007) .................. 15

*League of Women Voters of the United States v.
   Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................... 33

*Leser v. Garnett*, 258 U.S. 130 (1922) ..................... 25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555
   (1992) ................................................................... 13

v

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) . 22

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) 34

*Maryland v. Louisiana*, 451 U.S. 725 (1981) .......... 13

*Massachusetts v. Environmental Protection Agency*, 549 U.S. 497 (2007) ........................ 15, 20

*McPherson v. Blacker*, 146 U.S. 1 (1892)..... 18, 25, 27

*Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804 (1986) ........................................................... 10

*Morton v. Ruiz*, 415 U.S. 199 (1974)........................ 30

*Mostyn v. Fabrigas*, 98 Eng. Rep. 1021 (K.B. 1774) .................................................................... 8

*Nebraska v. Colorado*, 136 S.Ct. 1034 (2016)............ 7

*New Jersey v. New York*, 345 U.S. 369 (1953)......... 15

*New Mexico v. Colorado*, 137 S.Ct. 2319 (2017)........ 7

*Norman v. Reed*, 502 U.S. 279 (1992)..................... 21

*North Carolina v. Covington*, 138 S.Ct. 974 (2018).............................................. 6

*North Carolina v. League of Women Voters*, 135 S.Ct. 6 (2014)....................................................... 6

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ................... 8

*Petrella v. MGM*, 572 U.S. 663 (2014) ..................... 22

*Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62 (2d Cir. 2002) ................................... 22

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205 (2020) .............................. 6

*Republican Party of Pa. v. Boockvar*, No. 20-542, 2020 U.S. LEXIS 5188 (Oct. 28, 2020)

*Republican Party v. Boockvar*, No. 20A54, 2020 U.S. LEXIS 5181 (Oct. 19, 2020) ......................... 7

*Reynolds v. Sims*, 377 U.S. 533 (1964) ............... 2, 13

vi

*Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 592 U.S. ___ (Nov. 25, 2020) ................ 26

*Rosario v. Rockefeller*, 410 U.S. 752 (1973)............. 28

*Service v. Dulles*, 354 U.S. 363 (1957) ..................... 30

*Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83 (1998) ............................................................... 9

*Texas v. United States*, 523 U.S. 296 (1998)

*United States Term Limits v. Thornton*, 514 U.S. 779, 805 (1995) .................................................... 21

*United States v. Louisiana*, 351 U.S. 978 (1956) ...... 6

*United States v. Nevada*, 412 U.S. 534 (1973) ........ 24

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) . 33

*Wesberry v. Sanders*, 376 U.S. 1 (1964)... 2, 14, 20, 33

*What-A-Burger of Va., Inc. v. Whataburger, Inc.*, 357 F.3d 441 (4th Cir. 2004).............................. 22

*Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7 (2008)................................................. 22

*Wisconsin State Legis.*, No. 20A66, 2020 U.S. LEXIS 5187 (Oct. 26, 2020) ........................... 8, 28

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............... 14

**Statutes**

U.S. CONST. art. I, § 4.............................................3-4

U.S. CONST. art. II, § 1, cl. 2.............................*passim*

U.S. CONST. art. III............................. 10-13, 16, 19-20

U.S. CONST. art. III, § 2........................................... 9

U.S. CONST. art. V, cl. 3........................................... 14

U.S. CONST. amend. XII ......................................... 24

U.S. CONST. amend. XX, § 1 ................................... 10

3 U.S.C. § 2 ....................................5, 9, 19, 26, 32, 35

3 U.S.C. § 5 ...................................................... 9, 24

vii

3 U.S.C. § 7 .................................................... 9

3 U.S.C. § 15 ............................................. 9, 19

28 U.S.C. § 1251(a) ............................... 7, 9

28 U.S.C. § 1331 ..................................... 10

52 U.S.C. § 20501(b)(1)-(2) ....................... 2

52 U.S.C. § 20501(b)(3)-(4) ....................... 2

**Rules, Regulations and Orders**

S.Ct. Rule 17.2 ....................................... 2, 6

S.Ct. Rule 17.5 ........................................ 34

S.Ct. Rule 21 ............................................. 1

S.Ct. Rule 23 ............................................. 1

Fed. R. Civ. P. 65 ...................................... 1

FED. R. CIV. P. 65(a)(2) ........................... 34

**Other Authorities**

BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT
OF THE COMMISSION ON FEDERAL ELECTION
REFORM (Sept. 2005) ............................. 5

FEDERALIST NO. 57 (James Madisn) ...................... 27

FEDERALIST NO. 68 (Alexander Hamilton) ............... 4

Robert G. Natelson, *The Original Scope of the
Congressional Power to Regulate Elections*, 13
U. PA. J. CONST. L. 1 (2010) ............................. 27

J. Story, 1 COMMENTARIES ON THE CONSTITUTION
OF THE UNITED STATES § 627 (3d ed. 1858) .. 12, 31

No. _____, Original

# In the Supreme Court of the United States

_____

STATE OF TEXAS,

*Plaintiff,*

v.

COMMONWEALTH OF PENNSYLVANIA, STATE OF GEORGIA, STATE OF MICHIGAN, AND STATE OF WISCONSIN,

*Defendants.*

_____

## MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER OR, ALTERNATIVELY, FOR STAY AND ADMINISTRATIVE STAY

Pursuant to S.Ct. Rules 21, 23, and 17.2 and pursuant to FED. R. CIV. P. 65, the State of Texas ("Plaintiff State") respectfully moves this Court to enter an administrative stay and temporary restraining order ("TRO") to enjoin the States of Georgia, Michigan, and Wisconsin and the Commonwealth of Pennsylvania (collectively, the "Defendant States") and all of their agents, officers, presidential electors, and others acting in concert from taking action to certify presidential electors or to have such electors take any official action—including without limitation participating in the electoral college or voting for a presidential candidate—until further order of this Court, and to preliminarily enjoin

2

and to stay such actions pending the final resolution
of this action on the merits.

### STATEMENT OF THE CASE

Lawful elections are the heart of our freedoms.
"No right is more precious in a free country than that
of having a voice in the election of those who make the
laws under which, as good citizens, we must live.
Other rights, even the most basic, are illusory if the
right to vote is undermined." *Wesberry v. Sanders*, 376
U.S. 1, 10 (1964). Trust in the integrity of that process
is the glue that binds our citizenry and the States in
this Union.

Elections face the competing goals of maximizing
and counting *lawful* votes but minimizing and
excluding *unlawful* ones. *Reynolds v. Sims*, 377 U.S.
533, 554-55 (1964); *Bush v. Gore*, 531 U.S. 98, 103
(2000) ("the votes eligible for inclusion in the
certification are the votes meeting the properly
established legal requirements") ("*Bush II*"); *compare*
52 U.S.C. § 20501(b)(1)-(2) (2018) *with id.*
§ 20501(b)(3)-(4). Moreover, "the right of suffrage can
be denied by a debasement or dilution of the weight of
a citizen's vote just as effectively as by wholly
prohibiting the free exercise of the franchise."
*Reynolds*, 377 U.S. at 555. Reviewing election results
requires not only counting lawful votes but also
eliminating unlawful ones.

 It is an understatement to say that 2020 was not
a good year. In addition to a divided and partisan
national mood, the country faced the COVID-19
pandemic.  Certain officials in the Defendant States
presented the pandemic as the justification for
ignoring state laws regarding absentee and mail-in

3

voting. The Defendant States flooded their citizenry with tens of millions of ballot applications and ballots in derogation of statutory controls as to how they are lawfully received, evaluated, and counted. Whether well intentioned or not, these unconstitutional acts had the same *uniform effect*—they made the 2020 election less secure in the Defendant States. Those changes are inconsistent with relevant state laws and were made by non-legislative entities, without any consent by the state legislatures. The acts of these officials thus directly violated the Constitution. U.S. CONST. art. I, § 4; *id.* art. II, § 1, cl. 2.

This case presents a question of law: Did the Defendant States violate the Electors Clause by taking non-legislative actions to change the election rules that would govern the appointment of presidential electors? These non-legislative changes to the Defendant States' election laws facilitated the casting and counting of ballots in violation of state law, which, in turn, violated the Electors Clause of Article II, Section 1, Clause 2 of the U.S. Constitution. By these unlawful acts, the Defendant States have not only tainted the integrity of their own citizens' vote, but their actions have also debased the votes of citizens in Plaintiff State and other States that remained loyal to the Constitution.

Elections for federal office must comport with federal constitutional standards, *see Bush II*, 531 U.S. at 103-05, and executive branch government officials cannot subvert these constitutional requirements, no matter their stated intent. For presidential elections, each State must appoint its Electors to the electoral college in a manner that complies with the

4

Constitution, specifically the Electors Clause requirement that only state *legislatures* may set the rules governing the appointment of electors and the elections upon which such appointment is based.[1]

## Constitutional Background

The Electors Clause requires that each State "shall appoint" its Presidential Electors "in such Manner as the *Legislature thereof* may direct." U.S. CONST. art. II, § 1, cl. 2 (emphasis added); *cf. id.* art. I, § 4 (similar for time, place, and manner of federal legislative elections). "[T]he state legislature's power to select the manner for appointing electors is *plenary*," *Bush II*, 531 U.S. at 104 (emphasis added), and sufficiently *federal* for this Court's review. *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) ("*Bush I*"). This textual feature of our Constitution was adopted to ensure the integrity of the presidential selection process: "Nothing was more to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption." FEDERALIST NO. 68 (Alexander Hamilton). When a State conducts a popular election to appoint electors, the State must comply with all constitutional requirements. *Bush II*, 531 U.S. at 104. When a State fails to conduct a valid election—for any reason—"the electors may be appointed on a subsequent day in such

---

[1]    Subject to override by Congress, State legislatures have the exclusive power to regulate the time, place, and manner for electing Members of Congress, *see* U.S. CONST. art. I, § 4, which is distinct from legislatures' exclusive and plenary authority on the appointment of presidential electors. When non-legislative actors purport to set State election law for presidential elections, they violate both the Elections Clause and the Electors Clause.

5

a manner *as the legislature of such State may direct*."
3 U.S.C. § 2 (emphasis added).

**Defendant States' Violations of Electors Clause**

As set forth in the Complaint, executive and
judicial officials made significant changes to the
legislatively defined election laws in the Defendant
States. *See* Compl. at ¶¶ 29-134. Taken together,
these non-legislative changes did away with statutory
ballot-security measures for absentee and mail-in
ballots such as signature verification, witness
requirements, and statutorily authorized secure
ballot drop-off locations.

Citing the COVID-19 pandemic, Defendant States
gutted the safeguards for absentee ballots through
non-legislative actions, despite knowledge that
absentee ballots are "the largest source of potential
voter fraud," BUILDING CONFIDENCE IN U.S.
ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL
ELECTION REFORM, at 46 (Sept. 2005) (hereinafter,
"CARTER-BAKER"), which is magnified when absentee
balloting is shorn of ballot-integrity measures such as
signature verification, witness requirements, or
outer-envelope protections, or when absentee ballots
are processed and tabulated without bipartisan
observation by poll watchers.

**Factual Background**

Without Defendant States' combined 72 electoral
votes, President Trump presumably has 232 electoral
votes, and former Vice President Biden presumably
has 234. Thus, Defendant States' electors will
determine the outcome of the election. Alternatively,
if Defendant States are unable to certify 37 or more
electors, neither candidate will have a majority in the

6

Electoral College, in which case the election would devolve to the U.S. House of Representatives under the Twelfth Amendment to the U.S. Constitution.

## **STANDARD OF REVIEW**

Original actions follow the motions practice of the Federal Rules of Civil Procedure. S.Ct. 17.2. Plaintiffs can obtain preliminary injunctions in original actions. *See California v. Texas*, 459 U.S. 1067 (1982) ("[m]otion of plaintiff for issuance of a preliminary injunction granted"); *United States v. Louisiana*, 351 U.S. 978 (1956) (enjoining named state officers "and others acting with them … from prosecuting any other case or cases involving the controversy before this Court until further order of the Court"). Similarly, a moving party can seek a stay pending appeal under this Court's Rule 23.[2]

Plaintiffs who seek interim relief under Federal Rule 65 must establish that they likely will succeed on the merits and likely will suffer irreparable harm without interim relief, that the balance of equities between their harm in the absence of interim relief and the defendants' harm from interim relief favors the movants, and that the public interest favors interim relief. *Winter v. Natural Resources Def. Council, Inc.,* 555 U.S. 7, 20 (2008). To obtain a stay pending appeal under this Court's Rule 23, the applicant must meet a similar test:

---

[2]    *See, e.g., Frank v. Walker,* 135 S.Ct. 7 (2014); *Husted v. Ohio State Conf. of the NAACP,* 135 S.Ct. 42 (2014); *North Carolina v. League of Women Voters,* 135 S.Ct. 6 (2014); *Arizona Sect'y of State's Office v. Feldman*, 137 S.Ct. 446 (2016); *North Carolina v. Covington*, 138 S.Ct. 974 (2018); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205 (2020).

7

(1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial of a stay. In close cases the Circuit Justice or the Court will balance the equities and weigh the relative harms to the applicant and to the respondent.

*Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010).

## ARGUMENT

## I.   THIS COURT IS LIKELY TO EXERCISE ITS DISCRETION TO HEAR THIS CASE.

Although Plaintiff State disputes that this Court has discretion to decide not to hear this case instituted by a sovereign State, *see* 28 U.S.C. § 1251(a) (this Court's jurisdiction is exclusive for actions between States); *Nebraska v. Colorado*, 136 S.Ct. 1034, 1035 (2016) (Thomas, J., dissenting, joined by Alito, J.); *accord New Mexico v. Colorado*, 137 S.Ct. 2319 (2017) (Thomas, J., dissenting), this Court is nonetheless likely to exercise its discretion to hear this case for two reasons, which is analogous to the first *Hollingsworth* factor for a stay.

First, in the analogous case of *Republican Party v. Boockvar*, No. 20A54, 2020 U.S. LEXIS 5181 (Oct. 19, 2020), four justices voted to stay a decision by the Pennsylvania Supreme Court that worked an example of the type of non-legislative revision to State election law that the Plaintiff State challenges here. In addition, since then, a new Associate Justice joined the Court, and the Chief Justice indicated a rationale

8

for voting against a stay in *Democratic Nat'l Comm. v. Wisconsin State Legis.*, No. 20A66, 2020 U.S. LEXIS 5187, at *1 (Oct. 26, 2020) (Roberts, C.J., concurring in denial of application to vacate stay) that either does not apply to original actions or that was wrong for the reasons set forth in Section II.A.2, *supra* (non-legislative amendment of State election statutes poses a question that arises under the federal Constitution, see *Bush II*, 531 U.S. at 113 (Rehnquist, C.J., concurring).

Second, this Court has repeatedly acknowledged the "uniquely important national interest" in elections for president and the rules for them. *Bush II*, 531 U.S. at 112 (interior quotations omitted); *see also Oregon v. Mitchell*, 400 U.S. 112 (1970) (original jurisdiction in voting-rights cases). Few cases on this Court's docket will be as important to our future as this case.

Third, no other remedy or forum exists for a State to challenge multiple States' maladministration of a presidential election, *see* Section II.A.8, *infra*, and *some* court must have jurisdiction for these fundamental issues about the viability of our democracy: "if there is no other mode of trial, that alone will give the King's courts a jurisdiction." *Mostyn v. Fabrigas*, 98 Eng. Rep. 1021, 1028 (K.B. 1774) (Lord Mansfield).

## II.  THE PLAINTIFF STATE IS LIKELY TO PREVAIL.

Under the *Winter-Hollingsworth* test, the plaintiff's likelihood of prevailing is the primary factor to assess the need for interim relief. Here, the Plaintiff State will prevail because this Court has jurisdiction and the Plaintiff State's merit case is likely to prevail.

9

## A. This Court has jurisdiction over Plaintiff State's claims

In order to grant leave to file, this Court first must assure itself of its jurisdiction, *Steel Co. v. Citizens for a Better Env't.,* 523 U.S. 83, 95 (1998); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (courts deny leave to file amended pleadings that would be futile). That standard is met here. The Plaintiff State's fundamental rights and interests are at stake. This Court is the *only* venue that can protect the Plaintiff State's Electoral College votes from being cancelled by the unlawful and constitutionally tainted votes cast by Electors appointed by the Defendant States.

### 1. <u>The claims fall within this Court's constitutional and statutory subject-matter jurisdiction.</u>

The federal judicial power extends to "Controversies between two or more States." U.S. CONST. art. III, § 2, and Congress has placed the jurisdiction for such suits exclusively with the Supreme Court: "The Supreme Court shall have original *and exclusive* jurisdiction of all controversies between two or more States." 28 U.S.C. § 1251(a) (emphasis added). This Court not only is a permissible court for hearing this action; it is the only court that can hear this action quickly enough to render relief sufficient to avoid constitutionally tainted votes in the Electoral College and to place the appointment and certification of the Defendant States' presidential electors before their legislatures pursuant to 3 U.S.C. §§ 2, 5, and 7 in time for a vote in the House of Representatives on January 6, 2021. *See* 3 U.S.C. § 15. With that relief in place, the House can resolve the

10

election on January 6, 2021, in time for the President to be selected by the constitutionally set date of January 20. U.S. CONST. amend. XX, § 1.

## 2. <u>The claims arise under the Constitution.</u>

When States violate their own election laws, they may argue that these violations are insufficiently federal to allow review in this Court. *Cf. Foster v. Chatman*, 136 S.Ct. 1737, 1745-46 (2016) (this Court lacks jurisdiction to review state-court decisions that "rest[] on an adequate and independent state law ground"). That attempted evasion would fail for two reasons.

First, in the election context, a state-court remedy or a state executive's administrative action purporting to alter state election statutes implicates the Electors Clause. *See Bush II*, 531 U.S. at 105. Even a plausible federal-law defense to state action arises under federal law within the meaning of Article III. *Mesa v. California*, 489 U.S. 121, 136 (1989) (holding that "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes"). Constitutional arising-under jurisdiction exceeds statutory federal-question jurisdiction of federal district courts,[3] and—indeed—we did not even have federal-question jurisdiction until 1875. *Merrell Dow Pharm.,* 478 U.S. at 807. The

---

[3]   The statute for federal-officer removal at issue in *Mesa* omits the well-pleaded complaint rule, *id.*, which is a *statutory* restriction on federal-question jurisdiction under 28 U.S.C. § 1331. *See Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 808 (1986).

11

Plaintiff State's Electoral Clause claims arise under the Constitution and so are *federal*, even if the only claim is that the Defendant States violated their own state election statutes. Moreover, as is explained below, the Defendant States' actions injure the interests of Plaintiff State in the appointment and certification of presidential electors to the Electoral College.

Given this federal-law basis against these state actions, the state actions are not "independent" of the federal constitutional requirements that provide this Court jurisdiction. *Fox Film Corp. v. Muller*, 296 U.S. 207, 210-11 (1935); *cf. City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997) (noting that "even though state law creates a party's causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law" and collecting cases) (internal quotations and alterations omitted). Plaintiff State's claims therefore fall within this Court's arising-under jurisdiction.

Second, state election law is not purely a matter of state law because it applies "not only to elections to state offices, but also to the election of Presidential electors," meaning that state law operates, in part, "by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Bush I*, 531 U.S. at 76. Logically, "any state authority to regulate election to [federal] offices could not precede their very creation by the Constitution," meaning that any "such power had to be delegated to, rather than reserved by, the States." *Cook v. Gralike*, 531 U.S.

12

510, 522 (2001) (internal quotations omitted). "It is no original prerogative of State power to appoint a representative, a senator, or President for the Union." J. Story, 1 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 627 (3d ed. 1858). For these reasons, any "significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush II*, 531 U.S. at 113 (Rehnquist, C.J., concurring).

Under these circumstances, this Court has the power both to review and to remedy a violation of the Constitution. Significantly, parties do not need winning hands to establish jurisdiction. Instead, jurisdiction exists when "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction," even if the right "will be defeated if they are given another." *Bell v. Hood*, 327 U.S. 678, 685 (1946). At least as to *jurisdiction*, a plaintiff need survive only the low threshold that "the alleged claim under the Constitution or federal statutes [not] … be immaterial and made solely for the purpose of obtaining jurisdiction or … wholly insubstantial and frivolous." *Id.* at 682. The Bill of Complaint meets that test.

### 3.  The claims raise a "case or controversy" between the States.

Like any other action, an original action must meet the Article III criteria for a case or controversy: "it must appear that the complaining State has suffered a wrong through the action of the other State, furnishing ground for judicial redress, or is asserting a right against the other State which is susceptible of

13

judicial enforcement according to the accepted principles of the common law or equity systems of jurisprudence." *Maryland v. Louisiana*, 451 U.S. 725, 735-36 (1981) (internal quotations omitted). Plaintiff State has standing under those rules.[4]

With voting, "'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Bush II*, 531 U.S. at 105 (quoting *Reynolds*, 377 U.S. at 555). In presidential elections, "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Anderson v. Celebrezze*, 460 U.S. 780, 795 (1983). Thus, votes in the Defendant States affect the votes in the Plaintiff State, as set forth in more detail below.

a.  **Plaintiff State suffers an injury in fact.**

The citizens of Plaintiff State have the right to demand that all other States abide by the constitutionally set rules in appointing Presidential Electors to the Electoral College.  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights,

---

[4]   At its constitutional minimum, standing doctrine measures the necessary effect on plaintiffs under a tripartite test: cognizable injury to the plaintiffs, causation by the challenged conduct, and redressable by a court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). The rules for standing in state-versus-state actions is the same as the rules in other actions under Article III. *See Maryland v. Louisiana*, 451 U.S. 725, 736 (1981).

14

even the most basic, are illusory if the right to vote is undermined." *Wesberry*, 376 U.S. at 10; *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise of voting" is "a fundamental political right, because preservative of all rights"). "Every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *Baker v. Carr*, 369 U.S. 186, 208 (1962). Put differently, "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction," *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), and—unlike the residency durations required in *Dunn*—the "jurisdiction" here is the entire United States. In short, the rights at issue are cognizable under Article III.

Significantly, Plaintiff State presses its own form of voting-rights injury *as a State*. As with the one-person, one-vote principle for congressional redistricting in *Wesberry*, the equality of the States arises from the structure of the Constitution, not from the Equal Protection or Due Process Clauses. *See Wesberry*, 376 U.S. at 7-8; *id.* n.10 (expressly not reaching claims under Fourteenth Amendment). Whereas the House represents the People proportionally, the Senate represents the States. *See* U.S. CONST. art. V, cl. 3 ("no state, without its consent, shall be deprived of its equal suffrage in the Senate"). While Americans likely care more about who is elected President, the States have a distinct interest in who is elected *Vice President* and thus who can cast the tie-

15

breaking vote in the Senate. Through that interest, Plaintiff State suffers an Article III injury when another State violates federal law to affect the outcome of a presidential election. This injury is particularly acute in 2020, where a Senate majority often will hang on the Vice President's tie-breaking vote because of the nearly equal—and, depending on the outcome of Georgia run-off elections in January, possibly *equal*—balance between political parties. Quite simply, it is vitally important to the States who becomes Vice President.

Because individual citizens may arguably suffer only a generalized grievance from Electors Clause violations, Plaintiff State has standing where its citizen voters would not, *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (distinguishing citizen plaintiffs from citizen relators who sued in the name of a state). In *Massachusetts v. Environmental Protection Agency*, 549 U.S. 497 (2007), this Court held that states seeking to protect their sovereign interests are "entitled to special solicitude in our standing analysis." *Id.* at 520. While *Massachusetts* arose in a different context—the same principles of federalism apply equally here to require special deference to the sovereign states on standing questions.

In addition to standing for their own injuries, States can assert *parens patriae* standing for their citizens who are Presidential Electors.[5] Like

---

[5]   "The '*parens patriae*' doctrine … is a recognition of the principle that the state, when a party to a suit involving a matter of sovereign interest, 'must be deemed to represent all its citizens.'" *New Jersey v. New York*, 345 U.S. 369, 372-73 (1953) (quoting *Kentucky v. Indiana*, 281 U.S. 163, 173 (1930)).

16

legislators, Presidential Electors assert "legislative injury" whenever allegedly improper actions deny them a working majority. *Coleman v. Miller*, 307 U.S. 433, 435 (1939). The Electoral College is a zero-sum game. If the Defendant States' unconstitutionally appointed Electors vote for a presidential candidate opposed by the Plaintiff State's presidential electors, that operates to defeat the Plaintiff State's interests.[6] Indeed, even without an electoral college majority, presidential electors suffer the same voting-debasement injury as voters generally: "It must be remembered that 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Bush II*, 531 U.S. at 105 (quoting *Reynold*, 377 U.S. at 555). Those injuries to electors serve as an Article III basis for a *parens patriae* action by their States.

### b.  <u>The Defendant States caused the injuries.</u>

Non-legislative officials in the Defendant States either directly caused the challenged violations of the Electors Clause or, in the case of Georgia, acquiesced to them in settling a federal lawsuit. The Defendants thus caused the Plaintiff's injuries.

---

[6]  Because Plaintiff State appointed its presidential electors fully consistent with the Constitution, it suffers injury if its presidential electors are defeated by the Defendant States' unconstitutionally appointed presidential electors. This injury is all the more acute because Plaintiff State has taken steps to prevent fraud. Unlike the Defendant States, the Plaintiff State neither weakened nor allowed the weakening of its ballot-integrity statutes by non-legislative means.

17

### c. __The requested relief would redress the injuries.__

This Court has authority to redress the Plaintiff State's injuries, and the requested relief will do so.

First, while the Defendant States are responsible for their elections, this Court has authority to enjoin reliance on *unconstitutional* elections:

> When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter.

*Bush II*, 531 U.S. at 104; *City of Boerne v. Flores,* 521 U.S. 507, 524 (1997) ("power to interpret the Constitution in a case or controversy remains in the Judiciary"). The Plaintiff State does not ask this Court to decide who won the election; they only ask that the Court enjoin the clear violations of the Electors Clause of the Constitution.

Second, the relief that the Plaintiff State requests—namely, remand to the State legislatures to allocate presidential electors in a manner consistent with the Constitution—does not violate the Defendant States' rights or exceed this Court's power. The power to select presidential electors is a plenary power of the legislatures, and this remains so, without regard to state law:

> This power is conferred upon the legislatures of the States by the Constitution of the United States, and cannot be taken from them or modified by their State constitutions....

18

> Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated.

*McPherson v. Blacker*, 146 U.S. 1, 35 (1892) (internal quotations omitted); *accord Bush I*, 531 U.S. at 76-77; *Bush II*, 531 U.S at 104.

Third, uncertainty of how the Defendant States' legislatures will allocate their electors is irrelevant to the question of redressability:

> If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case – even though the agency … might later, in the exercise of its lawful discretion, reach the same result for a different reason.

*FEC v. Akins*, 524 U.S. 11, 25 (1998). The Defendant States' legislatures would remain free to exercise their plenary authority under the Electors Clause in any *constitutional* manner they wish. For example, they may review the presidential election results in their State and determine that winner would be the same, notwithstanding the violations of state law in the conduct of the election.  Or they may appoint the Electors themselves, either appointing all for one presidential candidate or dividing the State's Electors and appointing some for one candidate and some for another candidate. Or they may take any number of actions that would be consistent with the Constitution.   Under *Akins*, the simple act of

19

reconsideration under lawful means is redress enough.

Fourth, the requested relief is consistent with federal election law: "Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct." 3 U.S.C. § 2. Regardless of the statutory deadlines for the Electoral College to vote, this Court could enjoin reliance on the results from the constitutionally tainted November 3 election, remand the appointment of Electors to the Defendant States, and order the Defendant States' legislatures to certify their Electors in a manner consistent with the Constitution, which could be accomplished well in advance of the statutory deadline of January 6 for the House to count the presidential electors' votes. 3 U.S.C. § 15.

### 4.   Plaintiff State has prudential standing.

Beyond the constitutional baseline, standing doctrine also poses prudential limits like the zone-of-interests test, *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970), and the need for those seeking to assert absent third parties' rights to have their own Article III standing and a close relationship with the absent third parties, whom a sufficient "hindrance" keeps from asserting their rights. *Kowalski v. Tesmer*, 543 U.S. 125, 128-30 (2004). Prudential doctrines pose no barrier here.

First, the injuries asserted here are "arguably within the zone of interests to be protected or

20

regulated by the … constitutional guarantee in question." *Camp*, 397 U.S. at 153. The Court has relied on the structure of the Constitution to provide the one-person, one-vote standard, *Wesberry*, 376 U.S. at 7-8 & n.10, and this case is no different. The structure of the Electoral College provides that each State is allocated a certain number of presidential electors depending upon that State's representation in Congress and that each State must abide by constitutional requirements in the appointment of its Electors. When the elections in one State violate those requirements in a presidential election, the interests of the citizens in other States are harmed.

Second, even if *parens patriae* standing were not available, States have their own injury, a close relationship with their citizens, and citizens may arguable lack standing to assert injuries under the Electors Clause. *See, e.g.*, *Bognet v. Sec'y Pa.*, No. 20-3214, 2020 U.S. App. LEXIS 35639, at *18-26 (3d Cir. Nov. 13, 2020). States, by contrast, have standing to assert such injuries. *Lance*, 549 U.S. at 442 (distinguishing citizen plaintiffs who suffer a generalized grievance from citizen relators who sued in the name of a state); *cf. Massachusetts,* 549 U.S. at 520 (federal courts owe "special solicitude in standing analysis"). Moreover, anything beyond Article III is merely prudential. *Caplin & Drysdale v. United States*, 491 U.S. 617, 623 n.3 (1989). Thus, States also have third-party standing to assert their citizens' injuries.

21

### 5.  <u>This action is not moot and will not become moot.</u>

None of the looming election deadlines are constitutional, and they all are within this Court's power to enjoin. Indeed, if this Court vacated a State's appointment or certification of presidential electors, those Electors could not vote on December 14, 2020; if the Court vacated their vote after the fact, the House of Representatives could not count those votes on January 6, 2021.  There would be ample time for the Defendant States' legislatures to appoint new presidential electors in a manner consistent with the Constitution.  Any remedial action can be complete well before January 6, 2020. Indeed, even the swearing in of the next President on January 20, 2021, will not moot this case because review could outlast even the selection of the next President under "the 'capable of repetition, yet evading review' doctrine," which applies "in the context of election cases … when there are 'as applied' challenges as well as in the more typical case involving only facial attacks." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 463 (2007) (internal quotations omitted); *accord Norman v. Reed*, 502 U.S. 279, 287-88 (1992). Mootness is not, and will not become, an issue here.

### 6.  <u>This matter is ripe for review.</u>

The Plaintiff State's claims are clearly ripe now, but they were not ripe before the election: "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotations and

22

citations omitted).[7] Prior to the election, there was no reason to know who would win the vote in any given State.

Ripeness also raises the question of laches, which Justice Blackmun called "precisely the opposite argument" from ripeness. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 915 n.16 (1990) (Blackmun, J., dissenting). Laches is an equitable defense against unreasonable delay in commencing suit. *Petrella v. MGM*, 572 U.S. 663, 667 (2014). This action was neither unreasonably delayed nor is prejudicial to the Defendant States.

Before the election, the Plaintiff State had no ripe claim against a Defendant State:

> "One cannot be guilty of laches until his right ripens into one entitled to protection. For only then can his torpor be deemed inexcusable."

*What-A-Burger of Va., Inc. v. Whataburger, Inc.*, 357 F.3d 441, 449-50 (4th Cir. 2004) (quoting 5 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31: 19 (4th ed. 2003); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 777 (Fed. Cir. 1995) (same); *Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002) (same). The Plaintiff State could not have brought this action before the election results. Nor did the full extent of the county-level deviations from election statutes in the Defendant

---

[7]    It is less clear whether this matter became ripe on or soon after election night when the networks "called" the election for Mr. Biden or significantly later when enough States certified their vote totals to give him 270-plus anticipated votes in the electoral college.

23

States become evident until days after the election. Moreover, a State may reasonably assess the status of litigation commenced by candidates to the presidential election prior to commencing its own litigation. Neither ripeness nor laches presents a timing problem here.

### 7. <u>This action does not raise a non-justiciable political question.</u>

The "political questions doctrine" does not apply here. Under that doctrine, federal courts will decline to review issues that the Constitution delegates to one of the other branches—the "political branches"—of government. While appointing presidential electors involves political rights, this Court has ruled in a line of cases beginning with *Baker* that constitutional claims related to voting (other than claims brought under the Guaranty Clause of Article IV, §4) are justiciable in the federal courts. As the Court held in *Baker*, litigation over political rights is not the same as a political question:

> We hold that this challenge to an apportionment presents no nonjusticiable "political question." The mere fact that the suit seeks protection of a political right does not mean it presents a political question. Such an objection "is little more than a play upon words."

*Baker*, 369 U.S. at 209. This is no political question; it is a constitutional one that this Court should answer.

### 8. <u>No adequate alternate remedy or forum exists.</u>

In determining whether to hear a case under this Court's original jurisdiction, the Court has considered

24

whether a plaintiff State "has another adequate forum in which to settle [its] claim." *United States v. Nevada*, 412 U.S. 534, 538 (1973). This equitable limit does not apply here because Plaintiff State cannot sue Defendant States in any other forum.

To the extent that Defendant States wish to avail themselves of 3 U.S.C. § 5's safe harbor, *Bush I*, 531 U.S. at 77-78, this action will not meaningfully stand in their way:

> The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors. … There is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated[.]

*Bush II*, 531 U.S. at 104 (citations and internal quotations omitted).[8] The Defendant States' legislature will remain free under the Constitution to appoint electors or vote in any *constitutional* manner they wish. The only thing that they cannot do—and should not wish to do—is to rely on an allocation conducted in violation of the Constitution to determine the appointment of presidential electors.

Moreover, if this Court agrees with the Plaintiff State that the Defendant States' appointment of presidential electors under the recently conducted elections would be unconstitutional, then the statutorily created safe harbor cannot be used as a

---

8    Indeed, the Constitution also includes another backstop: "if no person have such majority [of electoral votes], then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot." U.S. CONST. amend. XII.

25

justification for a violation of the Constitution. The safe-harbor framework created by statute would have to yield in order to ensure that the Constitution was not violated.

It is of no moment that Defendants' *state laws* may purport to tether state legislatures to popular votes. Those state limits on a state legislature's exercising federal constitutional functions cannot block action because the U.S. Constitution "transcends any limitations sought to be imposed by the people of a State" under this Court's precedents. *Leser v. Garnett*, 258 U.S. 130, 137 (1922); *see also Bush I*, 531 U.S. at 77; *United States Term Limits v. Thornton*, 514 U.S. 779, 805 (1995) ("the power to regulate the incidents of the federal system is not a reserved power of the States, but rather is delegated by the Constitution"). As this Court recognized in *McPherson v. Blacker*, the authority to choose presidential electors:

> is conferred upon the legislatures of the states by the Constitution of the United States, and cannot be taken from them or modified by their state constitutions. ... *Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away or abdicated.*

146 U.S. 1, 35 (1892) (emphasis added) (internal quotations omitted). The Defendant States would suffer no cognizable injury from this Court's enjoining their reliance on an unconstitutional vote.

26

### B. The Plaintiff State is likely to prevail on the merits.

For interim relief, the most important factor is the likelihood of movants' prevailing. *Winter*, 555 U.S. at 20. The Defendant States' administration of the 2020 election violated the Electors Clause, which renders invalid any appointment of presidential electors based upon those election results. For example, even without fraud or nefarious intent, a mail-in vote not subjected to the State legislature's ballot-integrity measures cannot be counted. It does not matter that a judicial or executive officer sought to bypass that screening in response to the COVID pandemic: the choice was not theirs to make. "Government is not free to disregard the [the Constitution] in times of crisis." *Roman Catholic Diocese of Brooklyn, New York v. Cuomo*, 592 U.S. ___ (Nov. 25, 2020) (Gorsuch, J., concurring). With all unlawful votes discounted, the election result is an open question that this Court must address. Under 3 U.S.C. § 2, the State legislatures may answer the question, but the question must be asked here.

### 1. <u>Defendant States violated the Electors Clause by modifying their legislatures' election laws through non-legislative action.</u>

The Electors Clause grants authority to *State Legislatures* under both horizontal and vertical separation of powers. It provides authority to each State—not to federal actors—the authority to dictate the manner of selecting presidential electors. And within each State, it explicitly allocates that authority to a single branch of State government: to the

27

"Legislature thereof." U.S. Const. Art. II, § 1, cl. 2. State legislatures' primacy *vis-à-vis* non-legislative actors—whether State or federal—is even more significant than congressional primacy *vis-à-vis* State legislatures.

The State legislatures' authority is plenary. *Bush II*, 531 U.S. at 104. It "cannot be taken from them or modified" even through "their state constitutions." *McPherson*, 146 U.S. at 35; *Bush I*, 531 U.S at 76-77; *Bush II*, 531 U.S at 104. The Framers allocated election authority to State legislatures as the branch closest—and most accountable—to the People. *See*, *e.g.*, Robert G. Natelson, *The Original Scope of the Congressional Power to Regulate Elections*, 13 U. PA. J. CONST. L. 1, 31 (2010) (collecting Founding-era documents); *cf.* THE FEDERALIST NO. 57, at 350 (C. Rossiter, ed. 2003) (Madison, J.) ("House of Representatives is so constituted as to support in its members an habitual recollection of their dependence on the people"). Thus, only the State legislatures are permitted to create or modify the respective State's rules for the appointment of presidential electors. U.S. CONST. art. II, § 1, cl. 2.

Regulating election procedures is necessary both to avoid chaos and to ensure fairness:

> Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.

28

*Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (interior quotations omitted). Thus, for example, deadlines are necessary to avoid chaos, even if some votes sent via absentee ballot do not arrive timely. *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973). Even more importantly in this pandemic year with expanded mail-in voting, ballot-integrity measures—*e.g.*, witness requirements, signature verification, and the like—are an essential component of any legislative expansion of mail-in voting. *See* CARTER-BAKER, at 46 (absentee ballots are "the largest source of potential voter fraud"). Though it may be tempting to permit a breakdown of the constitutional order in the face of a global pandemic, the rule of law demands otherwise.

Specifically, because the Electors Clause makes clear that state legislative authority is exclusive, non-legislative actors lack authority to *amend* statutes. *Republican Party of Pa. v. Boockvar*, No. 20-542, 2020 U.S. LEXIS 5188, at *4 (Oct. 28, 2020) ("there is a strong likelihood that the State Supreme Court decision violates the Federal Constitution") (Alito, J., concurring); *Wisconsin State Legis.*, No. 20A66, 2020 U.S. LEXIS 5187, at *11-14 (Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application to vacate stay); *cf. Grayned v. City of Rockford,* 408 U.S. 104, 110 (1972) ("it is not within our power to construe and narrow state laws"); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 509-10 (2010) ("editorial freedom … [to "blue-pencil" statutes] belongs to the Legislature, not the Judiciary"). That said, courts can enjoin elections or even enforcement of *unconstitutional* election laws, but they cannot rewrite the law in federal presidential elections.

29

For example, if a state court enjoins or modifies ballot-integrity measures adopted to allow absentee or mail-in voting, that invalidates ballots cast under the relaxed standard unless the legislature has—prior to the election—ratified the new procedure. Without pre-election legislative ratification, results based on the treatment and tabulation of votes done in violation of state law cannot be used to appoint presidential electors.

Elections must be lawful contests, but they should not be mere *litigation contests* where the side with the most lawyers wins. As with the explosion of nation-wide injunctions, the explosion of challenges to State election law for partisan advantage in the lead-up to the 2020 election "is not normal." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of stay). Nor is it healthy. Under the "*Purcell* principle," federal courts generally avoid enjoining state election laws in the period close to an election. *Purcell*, 549 U.S. at 4-5 (citing "voter confusion and consequent incentive to remain away from the polls"). *Purcell* raises valid concerns about confusion in the run-up to elections, but judicial election-related injunctions also raise *post-election* concerns. For example, if a state court enjoins ballot-integrity measures adopted to secure absentee or mail-in voting, that invalidates ballots cast under the relaxed standard unless the State legislature has had time to ratify the new procedure. Without either pre-election legislative ratification or a severability clause in the legislation that created the rules for absentee voting by mail, the state court's actions operate to violate the Electors Clause.

30

### 2. __State and local administrator's systemic failure to follow State election law qualifies as an unlawful amendment of State law.__

When non-legislative state and local executive actors engage in systemic or intentional failure to comply with their State's duly enacted election laws, they adopt by executive fiat a *de facto* equivalent of an impermissible amendment of State election law by an executive or judicial officer. *See* Section II.B.1, *supra*. This Court recognizes an executive's "consciously and expressly adopt[ing] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities" as another form of reviewable final action, even if the policy is not a written policy. *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985) (interior quotations omitted); *accord id.* at 839 (Brennan, J., concurring). Without a *bona fide* amendment to State election law *by the legislature*, executive officers must follow state law. *Cf. Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *Service v. Dulles*, 354 U.S. 363, 388-89 (1957). The wrinkle here is that the non-legislative actors lack the authority under the federal Constitution to enact a *bona fide* amendment, regardless of whatever COVID-related emergency power they may have.[9]

---

[9] To advance the principles enunciated in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (concerning state police power to enforce compulsory vaccination laws), as authority for non-legislative state actors re-writing state election statutes—in direct conflict with the Electors Clause—is a nonstarter. Clearly, "the Constitution does not conflict with itself by conferring, upon the one hand, a … power, and taking the same power away, on the other, by the limitations of the due process clause."

31

This form of executive nullification of State law by statewide, county, or city officers is a variant of impermissible amendment by a non-legislative actor. *See* Section II.B.1, *supra*. Such nullification is always unconstitutional, but it is especially egregious when it eliminates legislative safeguards for election integrity (*e.g.*, signature and witness requirements for absentee ballots, poll watchers[10]). Systemic failure by statewide, county, or city election officials to follow State election law is no more permissible than formal amendments by an executive or judicial actor.

## III. THE OTHER *WINTER-HOLLINGSWORTH* FACTORS WARRANT INTERIM RELIEF.

Although Plaintiff State's likelihood of prevailing would alone justify granting interim relief, relief is also warranted by the other *Winter-Hollingsworth* factors.

---

*Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 24 (1916). In other words, the States' reserved police power does not abrogate the Constitution's express Electors Clause. *See also Cook v. Gralike*, 531 U.S. at 522 (election authority is delegated to States, not reserved by them); *accord* Story, 1 COMMENTARIES § 627.

[10]   Poll watchers are "prophylactic measures designed to prevent election fraud," *Harris v. Conradi,* 675 F.2d 1212, 1216 n.10 (11th Cir. 1982), and "to insure against tampering with the voting process." *Baer v. Meyer,* 728 F.2d 471, 476 (10th Cir. 1984). For example, poll monitors reported that 199 Chicago voters cast 300 party-line Democratic votes, as well as three party-line Republican votes in one election. *Barr v. Chatman,* 397 F.2d 515, 515-16 & n.3 (7th Cir. 1968).

32

**A. Plaintiff State will suffer irreparable harm if the Defendant States' unconstitutional presidential electors vote in the Electoral College.**

Allowing the unconstitutional election results in Defendant States to proceed would irreparably harm Plaintiff State and the Republic both by denying representation in the presidency and in the Senate in the near term and by permanently sowing distrust in federal elections. This Court has found such threats to constitute irreparable harm on numerous occasions. *See* note 2, *supra* (collecting cases). The stakes in this case are too high to ignore.

**B. The balance of equities tips to the Plaintiff State.**

All State parties represent citizens who voted in the 2020 presidential election. Because of their unconstitutional actions, Defendant States represent some citizens who cast ballots not in compliance with the Electors Clause. It does not disenfranchise anyone to require the State legislatures to attempt to resolve this matter as 3 U.S.C. § 2, the Electors Clause, and even the Twelfth Amendment provide. By contrast, it would irreparably harm Plaintiff State if the Court denied interim relief.

In addition to ensuring that the 2020 presidential election is resolved in a manner consistent with the Constitution, this Court must review the violations that occurred in the Defendant States to enable Congress and State legislatures to avoid future chaos and constitutional violations. Unless this Court acts to review this presidential election, these

33

unconstitutional and unilateral violations of state election laws will continue in the future.

### C.  The public interest favors interim relief.

The last *Winter* factor is the public interest. When parties dispute the lawfulness of government action, the public interest collapses into the merits. *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003); *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). If the Court agrees with Plaintiff State that non-legislative actors lack authority to amend state statutes for selecting presidential electors, the public interest requires interim relief. Withholding relief would leave a taint over the election, disenfranchise voters, and lead to still more electoral legerdemain in future elections.

Electoral integrity ensures the legitimacy of not just our governmental institutions, but the Republic itself. *See Wesberry*, 376 U.S. at 10. "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell,* 549 U.S. at 4. Against that backdrop, few cases could warrant this Court's review more than this extraordinary case arising from a presidential election. In addition, the constitutionality of the process for selecting the President is of extreme national importance. If the Defendant States are permitted to violate the requirements of the Constitution in the appointment of their presidential electors, the resulting vote of the Electoral College not only lacks constitutional legitimacy, but the Constitution itself will be forever sullied.

34

The nation needs this Court's clarity: "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). While isolated irregularities could be "garden-variety" election irregularities that do not raise a federal question,[11] the unconstitutional setting-aside of state election statutes by non-legislative actors calls both the result and the process into question, requiring this Court's "unsought responsibility to resolve the federal and constitutional issues the judicial system has been forced to confront." *Bush II*, 531 U.S. at 111. The public interest requires this Court's action.

## IV. ALTERNATIVELY, THIS CASE WARRANTS SUMMARY DISPOSITION.

In lieu of granting interim relief, this Court could simply reach the merits summarily. *Cf.* FED. R. CIV. P. 65(a)(2); S.Ct. Rule 17.5. Two things are clear from the evidence presented at this initial phase: (1) non-legislative actors modified the Defendant States' election statutes; and (2) the resulting uncertainty casts doubt on the lawful winner. Those two facts are enough to decide the merits of the Electors Clause claim. The Court should thus vacate the Defendant States' appointment and impending certifications of presidential electors and remand to their State legislatures to allocate presidential electors via any constitutional means that does not rely on 2020

---

[11]   "To be sure, 'garden variety election irregularities' may not present facts sufficient to offend the Constitution's guarantee of due process[.]" *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 232 (6th Cir. 2011) (quoting *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)).

35

election results that includes votes cast in violation of State election statutes in place on Election Day.

## **CONCLUSION**

This Court should first administratively stay or temporarily restrain the Defendant States from voting in the electoral college until further order of this Court and then issue a preliminary injunction or stay against their doing so until the conclusion of this case on the merits. Alternatively, the Court should reach the merits, vacate the Defendant States' elector certifications from the unconstitutional 2020 election results, and remand to the Defendant States' legislatures pursuant to 3 U.S.C. § 2 to appoint electors.

December 7, 2020         Respectfully submitted,

Ken Paxton*
Attorney General of Texas

Brent Webster
First Assistant Attorney
General of Texas

Lawrence Joseph
Special Counsel to the Attorney
General of Texas

36

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
kenneth.paxton@oag.texas.gov
(512) 936-1414

\*        *Counsel of Record*