# EXHIBIT 1

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| **TYLER BOYER, MICHAEL JOHN BURKE, NANCY COTTLE, JAKE HOFMAN, ANTHONY KERN, CHRISTOPHER M. KING, JAMES R. LAMON, SAM MOREHEAD, ROBERT MONTGOMERY, LORAINE PELLEGRINO, GREG SAFSTEN, SALVATORE LUKE SCARMARDO, KELLI WARD and MICHAEL WARD,** | **CASE NO.  20:cv-2321** |

**Plaintiffs.**

**v.**

**DOUG DUCEY, in his official capacity as Governor of the State of Arizona, and KATIE HOBBS, in her capacity as the Arizona Secretary of State,**

**Defendants.**

---

**EXPERT RULE 26(A)(2)(B) EXPERT DISCLOSURES AND FACT WITNESSES**

---

COMES NOW Plaintiffs, Tyler Bowyer, Michael John Burke, Nancy Cottle, Jake Hoffman, Anthony Kern, Christopher M. King, James R. Lamon, Sam Moorhead, Robert Montgomery, Loraine Pellegrino, Greg Safsten, Salvatore Luke Scarmado, Kelli Ward, and Michael Ward, by and through their undersigned counsel, and file Expert and Fact Disclosure:

**Experts anticipated for the Evidentiary Hearing:**

    a.   William Briggs, is an expert witness that provided a declaration and statistical analysis for the present matter.  Attached is his expert report in the attached Declaration.  (See Complaint Exh. 2 and 2A-F).

        i.   Briggs' original expert report includes the only charts that he may refer to in live testimony.

        ii.   As stated in his expert report, the data relied on was created by Matt Braynard, and the topline reports of those data were attached as pdfs and submitted as part of his original report.

    b.   Dr. Briggs' rebuttal report in another case.  (See Exh. 1, attached hereto).

    c.   In his rebuttal report, Dr. Briggs states that his work is entirely pro bono.

    d.   Attached is Dr. Briggs' CV, which includes a publications list.  (See Exh.2F to the Complaint).

        a.   Dr. Briggs has submitted declaration in the Northern District of Georgia 20-cv-04809, ED Michigan 20-cv-13134, ED Wisconsin 20-cv-02321.

2.   Brian Teasley, is an expert witness that provided a declaration and statistical analysis for the present matter.

        a.   His expert report is attached as Exh. 4 to the Complaint.

    e.   Teasley's' original expert report, declaration includes the charts that he may refer to in live testimony.

    f.   Mr. Teasley is appearing entirely pro bono.

    g.   Attached is Brian Teasley's CV is attached as Exh. 2, hereto.

        a.   He has submitted declarations in the ED Michigan 20-cv-13134, ED Wisconsin 20-cv-02321.

3.   Russell James Ramsland, Jr.

      a.   Mr. Ramsland's report is attached to the Complaint as Ex. 17.

      b.   Mr. Ramsland's CV is attached hereto as EX. 3, hereto.

      c.   He has submitted declarations in the Northern District of Georgia 20-cv-04809; 20-cv-ED Michigan 20-cv-13134; ED Wisconsin 20-cv-0232.

4.  Spider, whose identity is currently redacted for security reasons:

      a.   His testimony will be based on his report currently attached to the Complaint as Exh. 12; and in the attached declarations, EX. 4.

      b.   He is appearing pro bono, has not published in the prior 10 years.

      c.   He has the following background:  Education: Texas A&M  associate degree in robotics and engineering; Associates  Degree ITT Tech, Texas in network systems; Experience:  US Army 305th Military Intelligence; US Army (other) US Intelligence Agencies; Freelance computer security consultant

      d.   He has submitted declarations in the Northern District of Georgia 20-cv-04809, ED Michigan 20-cv-13134, ED Wisconsin 20-cv-02321.

5.  Declaration of Matthew Bromberg Ph.D

      a.   Matt Bromberg's report is currently attached as a Declaration to the Complaint as Exh. 19, which includes his background and CV information;

      b.   He is appearing pro bono.

      c.   He has submitted declaration in the ED Michigan 20-cv-13134, ED Wisconsin 20-cv-02321.

6.  Phillip Waldron.  Mr. Waldron's background and the basis of his testimony is attached. Ex. 5. He is not getting paid for his appearance.

**Fact witnesses**

The following are fact witnesses that may be called at the hearing:

1.  <u>Anna Orth</u>:
    a.  Poll Observer
    b.  Pima County
    c.  520-979-8330
    d.  Anna Orth is anticipated testify to election violations she observed, including the

        disparate treatment of Republican observers deprived Republican voters of their

        rights to equal protection of the law and should nullify any presumption that

        election workers applied the law in a fair, impartial and objective manner.


2.  <u>Janese "Jan" Bryant</u>:
    a.  Poll Observer,
    b.  Maricopa County
    c.  208-859-3394
    d.  Janese Jan Bryant will testify to election violations she observed, including the

        disparate treatment of Republican observers deprived Republican voters of their

        rights to equal protection of the law and should nullify any presumption that

        election workers applied the law in a fair, impartial and objective manner.


3.  <u>Greg Wodynski</u>:
    a.  Digital Adjudication Observer
    b.  Maricopa County
    c.  480-828-9425
    d.  His declaration is attached to the Complaint as Exh. 22.

4.  <u>Les Minkas</u>:
    a.  Poll Observer
    b.  Maricopa County
    c.  847-927-0856

5.  <u>Diane Serra</u>:

4

    a. Poll Observer
    b. Maricopa County
    c. 602-402-5836

    d. Her Declaration is attached to the Compl., Ex. 5.

6. <u>Judith Burns</u>: Poll Observer,
    a. Maricopa County
    b. 810-923-5984
    c. Her Declaration is attached to the Compl. At Ex. 21.


7. <u>Kathleen Alvey</u>:
    a. Poll Observer
    b. Pima County
    c. 520-829-2117
    d. Kathleen Alvey is anticipated to testify to election violations she observed,

       including the disparate treatment of Republican observers deprived Republican

       voters of their rights to equal protection of the law and should nullify any

       presumption that election workers applied the law in a fair, impartial and

       objective manner.


8. <u> Linda Brickman</u>:
    a. Maricopa County,
    b. GOP Chair
    c. 602-330-9422
    d. Her Declaration is attached to the Complaint as Ex. 23.


9. <u>Mark Low</u>:
    a. Poll Observer,
    b. Maricopa County
    c. 480-363-1154
    d. His Declaration is attached to the Complaint as Ex. 20.


10. <u>Redacted Fact Witness, TM</u>:
    a. Redacted witness TM's Declaration is attached to the Complaint as Ex. 13.

    *See* Compl., Section I and Declarations attached thereto.

11.  Senator Kelly Townsend:
    a.  Senator in the AZ legislature
    b.  Maricopa County
    c.  kellyjtownsend@yahoo.com

    d.  Senator Townsend is anticipated to information related to election violations.

12.  Redacted - Venezuela Smartmatic Affidavit 11.116.2020, attached as Ex. 1 to the

Complaint.

13. Joe Oltmann, his Declaration is attached to the Complaint as Exh. 6.Anna Mercedes Diaz

Cardozo

14. Anna Mercedes Diaz Cardozo, her Affidavit is attached to the Complaint as Exh. 8.

15. Ronald Watkins, his Declaration is attached to the Complaint as Exh. 14.

16. Jane Doe.  (name redacted)  Will testify about illegal ballots being shipped around the

United States including to Arizona on or about before Nov. 3, 2020.

17. Ryan Hartwig.  Present at Phoenix airport and will testify about a suspicious airplane and

activity at Phoenix airport on or around Nov. 3, 2020.


Respectfully submitted, this 1st day of December 2020.


/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
forthcoming

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)
Brandon Johnson (D.C. Bar No. 491730)


2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission *pro hac vice*
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402


Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

7

# EXHIBIT 2

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

# Response to Stephen Ansolabehere's Comments Regarding Absentee Ballots Across Several States

William M. Briggs

December 3, 2020

## 1    Summary

The criticisms made by Stephen Ansolabehere in response to my original report on absentee ballots are not relevant, make simple errors in logic, and even, in part, work against him to show my original argument could be made even stronger.

Ansolabehere repeatedly charges that because I was brief in saying "I assume survey respondents are representative and the data is accurate" that therefore the respondents were not representative and the data not accurate. This is a silly error and a wholly unwarranted conclusion. Not only was this data entirely typical of phone surveys, and therefore the data having all the usual strengths and weaknesses of the genre, it was extraordinary in that calls with respondents were recorded. The designers of the survey evidently knew its quality would be attacked—and were prepared for it.

There were no fatal errors in the survey data or calculations, as the well-paid Ansolabehere falsely claims. (*Five hundred fifty* American dollars per hour for the many hours he spent on his comments? My work is entirely pro bono.) Instead, I took pains to put forward the most conservative case, interpreting the data in a way that actually reduced the number of troublesome ballots.

Although Ansolabehere made many mistakes, I thank him for the opportunity of allowing me to make a point I neglected to emphasize in my original presentation. This is the striking unity of results across several battleground states. The data shows either an amazing coincidence in accumulated troublesome ballots in just those places they were needed most for Biden, or the data shows something more interesting happened.

What follows are answers to specific criticisms.

## 2    Rebuttal

Ansolabehere pads his account with many extraneous words and arguments. I will be much briefer, while also answering every substantial criticism he made.

### 2.1    Error Definition

My original definition of errors were this:

**Error #1**: being recorded as sent an absentee ballot without requesting one.

**Error #2**: sending back an absentee ballot and having it recorded as not returned.

These followed directly from the survey design. The survey began by asking "Q1 - May I please speak to <lead on screen>?" If the person was available, they were asked "Q2 - Did you request an absentee ballot?"

Finally, if they said yes to that, respondents were asked "Q3 - Did you mail back that ballot?"

Ansolabehere finds ambiguity in these three simple questions via a wonderful display of specious argument, one he repeats in many places. He basically says that because the questions *could* have been

1

misinterpreted in the various ways he suggests, they therefore *were* misinterpreted by a sufficient number of respondents, thus rendering the survey useless.

My answer is that this is a dumb argument. He has no evidence misinterpretations were made in the way he suggests. He could have spent the same amount of (expensive) time and came up with reasons why the survey was *not* misinterpreted.

For instance, the election was in the news and people were riled. They therefore welcomed the chance to set the record straight, and to ensure their legal ballots were counted. They were thus even more honest than they normally would be with telephone pollsters.

Of course, I have no evidence this, or other similar stories, are true. Just as Ansolabehere has no evidence his charges are true. All we can do, then, is to treat this survey like we treat all surveys: analyze the data as it is presented.

## 2.2   Ambiguous Wording

I will give one specific example of Ansolabehere trying to discover ambiguity. They are all much the same. He says:

> The wording of Question 3 is also very problematic. First, it does not ascertain whether the ballot was mailed back in a timely manner so as to be included in the record of ballots cast. Some or possibly all of the cases in question are late ballots, and thus not necessarily included in the absentee vote record. Second, Question 3 asks whether someone voted. Survey questions asking whether someone voted are notoriously subject to social desirability biases that lead to inflation in the estimated number of voters.

Again, Ansolabehere uses the possibility of a thing as proof the thing existed. There no evidence, not one bit, that ballots were sent back late. Indeed, as all news reports indicate, especially in Pennsylvania, certain late ballots were warmly accepted.

His second point is the same: because people lie on surveys, therefore they lied here in sufficient number. Would Ansolabehere apply this same reasoning to his own words? It is clearly nonsense. If accepted, his argument would toss out *all* surveys about voting.

## 2.3   Response Rate

Ansolabehere charges "The survey has extremely low response rates." He must know that the response rate here was not atypical. That is, it was low like many telephone polls are. But low does not imply too low. He must know this. Further, the mathematical extrapolations I made accounted for the size of the data.

Perhaps because Ansolabehere is a specialist in government, he does not know that when samples are low the confidence we have in extrapolations is wider. I will give one example, using Georgia, though this works for data from any state.

The original estimates of Error #2 for Georgia were that between 31,559–38,866 ballots were sent back but recorded as not returned, a "plus or minus" window of 7,307 votes. If we suppose we had *double* the response rate on the survey, in the same proportions as the original, then the Error #2 estimate becomes 32,945–38,096, a window of 5,151 votes. The 95% prediction interval shrinks, as expected, as we become more confident.

It does not shrink by much, of course, showing the analysis method is robust. If instead we allow a full ten times the original response rate, the plus-or-minus window shrinks to 2,234 votes.

Response rate is not a problem, and has been fully accounted for.

## 2.4   Top line Number Interpretations

Ansolabehere produces a lot of quibbles about the survey numbers, and uses the possibility of different interpretations of the numbers to say my entire analysis can't be trusted.

2

It is true that differences can exist in interpreting the top line numbers. I was aware of this when I did the analysis, which is why I everywhere used conservative interpretations. If I instead use one of the interpretations Ansolabehere suggests, the case about troublesome votes is made is even stronger.

I will use Georgia again as an example, though this applies to all states.

Again, the first question asked to speak to the relevant person. In Georgia, 767 were recorded as "Reached target", and an additional 255 were recorded as "'What is this about?'/Uncertain [Go to Q2]." I summed these two numbers to reach a total of 1,022.

One quibble is that the 255 who were uncertain should not be used in the total. If not, the sample size is, of course, reduced to 767. Yet we still have 142 who said "No" when asked if they received an absentee ballot. The ratio 142/767 is larger than 142/1022, meaning it will look like even more errors were made (of type Error #1).

The original estimate of **Error #1** (being recorded as sent an absentee ballot without requesting one) for Georgia was the window of 16,938–22,771. If we reduce the sample to 767 by excluding the disputed 255, the new estimate is 22,481–30,042. It goes up in just the way we expect it to. This proves using the full 1,022 is the conservative choice.

Another way to interpret the top lines is to use all people who got to the point of Question 1. Ansolabehere disingenuously prefers this because it makes his case appear stronger.

Besides the two options to Question 1 already mentioned (reached target, uncertain), there were also "Refused" and "Hangup". I treated these as non-responses, which is the usual interpretation. A person who hangs up without responding is the same as the person who never answers, as far as the answering the question goes.

In the spirit of generosity, though, let's use all 1,175 who reached Question 1 (instead of the original 1,022), including the hangups and refusals. The window for Error #1 becomes 14,778–19,903. The window shrinks, as Ansolabehere desires. *But not by enough.* This is still a large and troublesome window. The same is true for each state investigated.

Even stronger, the window for Error #2, the more significant error, *does not change.* This is because the calculations for this window are conditional only on those who answered Question 2 and 3.

Lastly, Ansolabehere disputes whether the answers spouses or other household members gave should be allowed. I used them in the totals. Ansolabehere would exclude them. This is really a nitpicking point because the total of these answers were small.

Here is proof. Again, the original window for Error#2 in Georgia was 31,559–38,866. This was conditional on the 257 respondents or their spouses or household members who said they mailed a ballot back. If we remove the 17 spouses or household members, the window becomes 29,372–36,512. It shrinks a bit. But again, *not by enough.*

All comments made here hold for all states.

# 3   Conclusion

The doubts cast on my original analysis by Ansolabehere either fail simple tests of logic, or are so small as to make no practical difference in the conclusion.

All his logical errors can be dismissed. Suggesting, as he often does, that mistakes *can* be made or that ambiguity *might* exist in the survey, is not proof that either *does* exist. I could have spent an equal amount of (unremunerated in my case) time suggesting ways the survey was better than most political polls. For instance, people are aware now more than ever of the importance of this election and they took greater care with their answers. I did not do this in the original report because I, unlike Ansolabehere, know the true value of such speculations.

The various numerical quibbles Ansolabehere has with the survey numbers either strengthen my case, or they are so small as to make no practical difference. Even with his own difficult-to-justify assumptions, the analysis reveals there still exist very large numbers of troublesome ballots in each battleground state. There are enough suspicious ballots left, even using his numbers, that could have changed the outcome of the election.

Finally, I reemphasize the remarkable coincidence that the amount of troublesome ballots was important to the election outcome in each state.

# 4   Declaration of William M. Briggs, PhD

1. My name is William M. Briggs. I am over 18 years of age and am competent to testify in this action. All of the facts stated herein are true and based on my personal knowledge.

2. I received a Ph.D of Statistics from Cornell University in 2004.

3. I am currently a statistical consultant. I make this declaration in my personal capacity.

4. I have analyzed data regarding responses to questions relating to mail ballot requests, returns and related issues.

5. I attest to a reasonable degree of professional certainty that the resulting analysis are accurate.

I declare under the penalty of perjury that the foregoing is true and correct.

3 December 2020

William M. Briggs

# EXHIBIT 3

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

# Teasley

*Using Data to Improve Your Marketing*

## Personnel Profile: Brian Teasley

**Brian Teasley** has over thirty years of experience solving problems in various industries. His marketing experience includes work with numerous Fortune 100 companies.

Brian has worked for Sprint Integrated Marketing, Bronner, Slosberg and Humphrey (now Digitas/Publicis), and USWeb/CKS/marchFIRST. Before starting Teasley, Brian was SVP of Customer Analytics at Harmonic Communications (a Sequoia Capital Company) in San Francisco.

His projects include work for:

Philip Morris, BASF, Sandvik Special Metals, Delco Batteries, Rosemount Aerospace Engineering, FHP (California Healthcare), American Express, Business Week, Sears, Federal Express, AT&T (local, long distance, wireless, Universal card), IBM, Kodak, Enron, Braun, Cantel (Canadian Wireless), Mastercard, Walgreens, and Nabisco, the U.S. Navy, HP, Prudential, Daimler/Chrysler and others

He has taught Business Statistics and Decision Science courses in the MBA programs of Iowa State University, Baker University, and was a guest professor at American University.  He is a former adjunct faculty member at New York University (NYU).

He was awarded a U.S. patent - number: 20080774536 - for his "Location-based Information Delivery System for Pedestrian Use" and is the inventor of the world's first handheld GPS tour guide system.

He has a M.S. degree in Applied Statistics from Iowa State University and a BA in Mathematics and Statistics from St. Olaf College. He is also a member of Phi Beta Kappa.

# EXHIBIT 4

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

# Exhibit 3

**Source 1**

**Subject Matter Expert**
**Computer Security/Analyst**

Co-Founder/Executive of multiple technology focused companies in the areas of :

**Government - Federal/State Contracts**

Worked for one of the Top 10 GSA consulting companies as a software developer and software security contractor for a large government agency.

Contracted to a large government agency in visualization and processing real-time ground-based sensor data and management of radio packet modem communication systems.

Created a digital signature approval system for a large government agency.

Selected, tested, managed, trained and deployed a software tool for insider threat monitoring, identification and tracking in a large government agency.

**Co-Founder**

Cyber Security & Government Consulting and commercial technology provider concentrating on sensor data, mobile applications, video, security, and data processing.

A media company focused on generating insight into complex markets using live video, real-time alerts, in depth searching capabilities, and analysis.

An advertising agency and data analytics company that created a system to purchase, track, and optimize tv, radio and online advertising.

A robotics company focused on autonomous navigation in secure and dangerous environments.

A political tools consulting company focusing on communication, call to action systems, social outreach tools, and marketing services.  Provide real-time and historic election data with custom insight and metrics.

A clean energy technology consulting, advising, and solutions company focused on devices and data visualization.

**Executive**

Consulting company focused on creation of secure intranet and extranet portals for large telecom hardware manufacture, venture capital firms, and large state agencies.  And oversaw security audits and ISO certifications.

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

TYLER BOYER, MICHAEL JOHN
BURKE, NANCY COTTLE, JAKE
HOFMAN, ANTHONY KERN,                        CASE NO.
CHRISTOPHER M. KING, JAMES R.
LAMON, SAM MOREHEAD, ROBERT
MONTGOMERY, LORAINE
PELLEGRINO, GREG SAFSTEN,
SALVATORE LUKE SCARMARDO,
KELLI WARD and MICHAEL WARD,

              **Plaintiffs.**
                   **v.**

DOUG DUCEY, in his official capacity as
Governor of the State of Arizona, and
KATIE HOBBS, in her capacity as the
Arizona Secretary of State,

              **Defendants.**


## EXPERT RULE 26(A)(2)(B) EXPERT DISCLOSURES AND FACT WITNESSES

---

COMES NOW Plaintiffs, Tyler Bowyer, Michael John Burke, Nancy Cottle, Jake Hoffman, Anthony Kern, Christopher M. King, James R. Lamon, Sam Moorhead, Robert Montgomery, Loraine Pellegrino, Greg Safsten, Salvatore Luke Scarmado, Kelli Ward, and Michael Ward, by and through their undersigned counsel, and file Expert and Fact Disclosure:

After a general election and recount, Joe Biden has been declared the winner of Arizona's General Election for President by a difference of 10,457 votes. But the vote count certified by defendants on November 30, 2020 fails to recognize the votes are steeped in fraud.  Hundreds of thousands of votes counted toward Mr. Biden's final tally were the product of fraudulent, illegal, ineligible and outright fictitious ballots.  Plaintiffs support this claim through the evidence laid out in the Complaint which includes the following conclusions.

**Experts anticipated for the Evidentiary Hearing:**

a. William Briggs, is an expert witness that provided a declaration and statistical analysis for the present matter. Attached is his expert report in the attached Declaration. (See Complaint Exh. 2 and 2A-F).

   i. Briggs' original expert report includes the only charts that he may refer to in live testimony.

   ii. As stated in his expert report, the data relied on was created by Matt Braynard, and the topline reports of those data were attached as pdfs and submitted as part of his original report.

b. Dr. Briggs' rebuttal report, in this matter. (See Exh. 1, attached hereto).

c. In his rebuttal report, Dr. Briggs states that his work is entirely pro bono.

d. Attached is Dr. Briggs' CV, which includes a publications list. (See Exh.2F to the Complaint).

   a. Dr. Briggs has submitted declaration in the Northern District of Georgia 20-cv-04809, ED Michigan 20-cv-13134, ED Wisconsin 20-cv-02321.

2. Brian Teasley, is an expert witness that provided a declaration and statistical analysis for the present matter.

   a. His expert report is attached as Exh. 4 to the Complaint.

e. Teasley's' original expert report, declaration includes the charts that he may refer to in live testimony.

f. Mr. Teasley is appearing entirely pro bono.

g. Attached is Brian Teasley's CV is attached as Exh. 2, hereto.

a. He has submitted declarations in the ED Michigan 20-cv-13134, ED Wisconsin 20-cv-02321.

3. Russell James Ramsland, Jr.

   a. Mr. Ramsland's report is attached to the Complaint as Ex. 17.

   b. Mr. Ramsland's CV is attached hereto as EX. 3, hereto.

   c. He has submitted declarations related to the claims in the Northern District of Gerogia 20-cv-04809, ED Michigan 20-cv-13134, ED Wisconsin 20-cv-02321.

4. Spider, who's identity is currently redacted for security reasons:

a. His report is currently attached to the Complaint as Exh. 12. And in the attached in the attached declarations.

b. He is appearing pro bono.

c. He has the following background:  Education: Texas A&M  associate degree in robotics and engineering; Associates  Degree ITT Tech, Texas in network systems; Experience:  US Army 305th Military Intelligence; US Army (other) US Intelligence Agencies; Freelance computer security consultant

d. He has submitted declarations related to the claims herein in the Northern District of Gerogia 20-cv-04809, ED Michigan 20-cv-13134, ED Wisconsin 20-cv-02321.

5. Declaration of Matthew Bromberg Ph.D

a. Matt Bromberg's report is currently attached as a Declaration to the Complaint as Exh. 19, which includes his background and CV information;

b. He is appearing pro bono.

c. He has submitted declaration in the ED Michigan 20-cv-13134, ED Wisconsin 20-cv-02321.

## Fact witnesses

The following are fact witnesses:

1. <u>Anna Orth</u>:
   a. Poll Observer
   b. Pima County
   c. 520-979-8330
   d. Anna Orth is anticipated testify to election violations she observed, including the disparate treatment of Republican observers deprived Republican voters of their rights to equal protection of the law and should nullify any presumption that election workers applied the law in a fair, impartial and objective manner.

2. <u>Janese "Jan" Bryant</u>:
   a. Poll Observer,
   b. Maricopa County

    c.  208-859-3394

    d.  Janese Jan Bryant will testify to election violations she observed, including the disparate treatment of Republican observers deprived Republican voters of their rights to equal protection of the law and should nullify any presumption that election workers applied the law in a fair, impartial and objective manner.

3.  Greg Wodynski:
   a.  Digital Adjudication Observer
   b.  Maricopa County
   c.  480-828-9425
   d.  His declaration is attached to the Complaint as Exh. 22.

4.  Les Minkas:
   a.  Poll Observer
   b.  Maricopa County
   c.  847-927-0856

5.  Diane Serra:
   a.  Poll Observer
   b.  Maricopa County
   c.  602-402-5836

   d.  Her Declaration is attached to the Compl., Ex. 5.

6.  <u>Judith Burns</u>: Poll Observer,
   a.  Maricopa County
   b.  810-923-5984
   c.  Her Declaration is attached to the Compl. At Ex. 21.

7.  <u>Kathleen Alvey</u>:
   a.  Poll Observer
   b.  Pima County
   c.  520-829-2117
   d.  Kathleen Alvey is anticipated to testify to election violations she observed, including the disparate treatment of Republican observers deprived Republican voters of their rights to equal protection of the law and should nullify any presumption that election workers applied the law in a fair, impartial and objective manner.

8.   Linda Brickman:
   a.  Maricopa County,
   b.  GOP Chair
   c.  602-330-9422
   d.  Her Declaration is attached to the Complaint as Ex. 23.

9. <u>Mark Low</u>:
   a. Poll Observer,
   b. Maricopa County
   c. 480-363-1154
   d. His Declaration is attached to the Complaint as Ex. 20.


10. <u>Redacted Fact Witness, TM</u>:
   a. Redacted witness TM's Declaration is attached to the Complaint as Ex. 13.

   *See* Compl., Section I and Declarations attached thereto.

11. <u>Senator Kelly Townsend</u>:
   a. Senator in the AZ legislature
   b. Maricopa County
   c. [kellyjtownsend@yahoo.com](mailto:kellyjtownsend@yahoo.com)

   d. Senator Townsend is anticipated to information related to election violations.

12. Redacted - Venezuela Smartmatic Affidavit 11.116.2020, attached as Ex. 1 to the Complaint.

13. Joe Oltmann, his Declaration is attached to the Complaint as Exh. 6.Anna Mercedes Diaz Cardozo

14. Anna Mercedes Diaz Cardozo, her Affidavit is attached to the Complaint as Exh. 8.

15. Ronald Watkins, his Declaration is attached to the Complaint as Exh. 14.


Respectfully submitted, this 1st day of December 2020.


/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
forthcoming

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)
Brandon Johnson (D.C. Bar No. 491730)


2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission *pro hac vice*
Forthcoming

L. Lin Wood
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402


Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

**CERTIFICATE OF SERVICE**

This is to certify that I have on this day e-filed the foregoing Plaintiffs' Motion To File Affidavits Under Seal and For In Camera Review with the Clerk of Court using the CM/ECF system, and that I have delivered the filing to the Defendants by email and FedEx at the following addresses:

# SOURCE 4
## OPEN SOURCE INTELLIGENCE OFFICER – Allied Security Operations Group

**INTELLIGENCE ANALYST**

Trained intelligence analyst with over 10 years professional experience conducting civil and criminal investigations. Transform raw data into actionable intelligence by utilizing modern reporting tools and data visualization techniques. Leverage open/closed source intelligence to research, analyze and extract decision-useful information to create comprehensive behavior, reputation and threat assessments for individuals and entities.

**AREAS OF EXPERTISE**

| | |
|---|---|
| Open/Closed Source Intelligence | Intelligence Systems/Databases |
| Threat Assessments | Data Analysis and Visualization |
| Due Diligence Analysis and Reporting | Creating/Filing Court Exhibits |
| Criminal Investigations | Indexed/Non-Indexed Web Queries |

**PROFESSIONAL EXPERIENCE Previous to ASOG**

**The** *Akeeli Group, Houston1 TX*                                    September **2018-2019**
**SR, INTELLIGENCE ANALYST**

Provide extensive behavior, lifestyle and reputation assessments for corporate clients. Perform due diligence analysis and social link analysis using open source collection methodologies.

- Conduct in-depth investigations of individuals, and corporations using OSINT techniques, proprietary databases, analyst software, and data visualization software; Utilize link analysis to provide actionable intelligence analyses for clients.
- Develop and execute OSINT, digital vulnerability and cyber security training for C-suite executives.
- Domestic and global investigations that gather unique data going beyond traditional searches, exploiting metadata, postings that are tangential to the ultimate subject of inquiry and data sets not indexed by traditional search engines.
- Utilize intelligence sources include the deep web, dark web, social media sites, news organizations, proprietary databases, and private investigative databases.

*Social Surveillance, Houston, TX*                                    January 2017-Present
FOUNDER AND SR. INTELLIGENCE ANALYST

Launched a social media and investigative consultancy for professional sports franchises. Provide specialized investigations and training to meet the growing need for enhanced due diligence using Open Source Intelligence. Licensed training school #Y05219201 (TX); Licensed Private Investigator #00352311 (TX).

- Conduct in-depth investigations of individuals, corporations, and criminal enterprises using OSINT techniques, closed-source databases, and analyst software; Utilize link analysis software to provide actionable intelligence reports for clients; Licensed Investigation Agency.
- Develop and execute OSINT training courses and cyber security training for law enforcement, executive protection agencies, and business leaders.
- Consult for NFL teams on issues concerning security', privacy, and reputation management.
- Monitor and analyze a broad range of social media platforms for threats and/or changes in public sentiment pertaining

to events, organizations and/or high-profile individuals.

**_North central Texas Fusion Center, McKinney, TX_**                    July 2013-January 2014

**INTELLIGENCE ANALYST**

Served as an Intelligence Analyst and supported the Collin County Sheriff's Office Crimes Against Children Taskforce with investigation and prosecution of sex crimes and the planning and development of intelligence reports and products.

- Developed instructions, guides, and manuals in line with dissemination standards and methods dealing with conventional intelligence problems, questions, and situations.
- Evaluated and interpreted incoming intelligence reports and information related to terrorism, actual or potential threats against critical infrastructure, counterterrorism, counterintelligence, and other issues of strategic and tactical importance.
- Planned and conducted public meetings, briefings, and other activities in support of the Fusion Center to provide the dissemination of key intelligence information to federal and local law enforcement agencies.

*King County **Prosecutor's Office, Seattle, WA***

January 2006-August 2013

**LEGAL SPECIALIST**

Served as Legal Specialist III within the King County Prosecutor's Office, managed junior analysts as head of the Sexually Violent Predators division of Criminal Justice Internship at King County Prosecutor's Office.

- Led four staff interns with full responsibility for onboarding, managing and training and supervision of day-to-day work and execution of long-term projects
- Managed and analyzed confidential materials include victim data, surveillance, criminal histories, and police evidence; searched for and tracked witnesses, victims, and offenders across the nation
- Provided Investigative and trial support for nine attorneys and three paralegals, assembled briefs and exhibits for filings in County Court, Court of Appeals, State Superior Court and Federal Courts
- Developed presentation and facilitated training to over 500 employees on new electronic filing systems and implementation of new processes and procedures
- Collaborated with attorneys and paralegals in all phases of Sexually Violent Predator Commitment trial preparation, from initial investigation to final disposition .
- Drafted subpoenas, declarations and correspondence ensured compliance with Civil Rules of Procedure and Local Court Rules; scheduled dispositions, court reporters and testimony providers such as Expert Sex Offender Treatment Providers for availabilities
- Compiled thousands of pages of data and evidence (e.g. redacted, enhanced and edited surveillance video, interviews and phone calls) for relevant case and court file purposes
- Developed innovative ways to incorporate various media platforms such as video, phone, maps and analytic software for court exhibits and evidence

**EDUCATION**

**Master of Science (MS) - Justice, Administration and Leadership**

University of Texas, 2015

Cumulative GPA: 3.9/4.0

**Bachelor of Arts
(BA) - Criminal
Justice**
University of
Washington,
2007 Cumulative
GPA: 3.9/ 4.0

## Graduated with Honors, Dean's list (4 times)

**TECHNICAL SKILLS**

- Certifications (ICS 100, 200 and 700);
- Michael Bazzel Open Source Intelligence Systems Training Certificate.
- Thomson Reuters CLEAR investigative research and risk management software
- Transunion TLOxp investigative research and risk management software
- Maltego and Analyst Software Packages (Analyze intelligence and construct criminal cases);
- Open Source Intelligence Analysis (Locate targets and build suspect target packages from any location)
- Web-Based Applications (Facebook, LinkedIn, Twitter);
- Microsoft Office (Microsoft Word, PowerPoint, Excel, Outlook)

# EXHIBIT 5

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

# Exhibit 4

Declaration of NAME {redacted}.

Pursuant to 28 U.S.C Section 1746, I, **{redacted}**, make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

2. I was an electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence. I have extensive experience as a white hat hacker used by some of the top election specialists in the world. The methodologies I have employed represent industry standard cyber operation toolkits for digital forensics and OSINT, which are commonly used to certify connections between servers, network nodes and other digital properties and probe to network system vulnerabilities.

3. I am a US citizen and I reside at **{redacted}** location in the United States of America.

4. It can be seen using open source methodology that the SSL certificates from *.dominionvoting.com were registered on the 24th of July 2019. This SSL certificate were used multiple times from locations ranging from Canada, Serbia, and the United States. These images verify that Dominion systems were connected to foreign systems across the globe. Also seen is that the SSL certificate is used for the email server that was the same for the secure HTTP connections.

443.https.tls.certificate.parsed.fingerprint_sha256:
8f73a14d5f0fc10ebfa3086a99b9e7a550e822c71d762e627b73d12e5f1b8b9c



All share:

443.https.tls.certificate.parsed.fingerprint_sha256:
8f73a14d5f0fc10ebfa3086a99b9e7a550e822c71d762e627b73d12e5f1b8b9





Email ip address

206.223.168.94

Serbian ip address

82.117.198.54

Dominion site

204.132.219.214

Cloudflare link

104.18.91.9

Canadian ip address

206.223.190.85

Denver ip address

204.132.121.11

Page: 1/1 Results: 7 Time: 155ms

206.223.168.94 (webmail.dominionvoting.com)

BEANFIELD (21949) Toronto, Ontario, Canada
443/https
*.dominionvoting.com, dominionvoting.com

443.https.tls.certificate.parsed.fingerprint_sha256:
8f73a14d5f0fc10ebfa3086a99b9e7a550e822c71d762e627b73d12e5f1b8b9c

82.117.198.54

SERBIA-BROADBAND-AS Serbia BroadBand-Srpske Kablovske mreze d.o.o. (31042) Kac,
Vojvodina, Serbia
443/https
*.dominionvoting.com, dominionvoting.com

443.https.tls.certificate.parsed.fingerprint_sha256:
8f73a14d5f0fc10ebfa3086a99b9e7a550e822c71d762e627b73d12e5f1b8b9c

204.132.219.214

CENTURYLINK-US-LEGACY-QWEST (209) United States
443/https
*.dominionvoting.com, dominionvoting.com

443.https.tls.certificate.parsed.fingerprint_sha256:
8f73a14d5f0fc10ebfa3086a99b9e7a550e822c71d762e627b73d12e5f1b8b9c

104.18.91.9

CLOUDFLARENET (13335) United States
443/https, 80/http, 8080/http
Direct IP access not allowed | Cloudflare *.dominionvoting.com, dominionvoting.com

443.https.tls.certificate.parsed.fingerprint_sha256:
8f73a14d5f0fc10ebfa3086a99b9e7a550e822c71d762e627b73d12e5f1b8b9c

104.18.90.9

CLOUDFLARENET (13335) United States
443/https, 80/http, 8080/http
Direct IP access not allowed | Cloudflare *.dominionvoting.com, dominionvoting.com

443.https.tls.certificate.parsed.fingerprint_sha256:
8f73a14d5f0fc10ebfa3086a99b9e7a550e822c71d762e627b73d12e5f1b8b9c

206.223.190.85 (206-223-190-85.beanfield.net)

BEANFIELD (21949) Toronto, Ontario, Canada
22/ssh, 443/https
*.dominionvoting.com, dominionvoting.com

443.https.tls.certificate.parsed.fingerprint_sha256:
8f73a14d5f0fc10ebfa3086a99b9e7a550e822c71d762e627b73d12e5f1b8b9c

204.132.121.11 (204-132-121-11.dia.static.qwest.net)

CENTURYLINK-US-LEGACY-QWEST (209) Denver, Colorado, United States
21/ftp, 22/ssh, 443/https, 80/http
DVS Fileshare *.dominionvoting.com, dominionvoting.com

443.https.tls.certificate.parsed.fingerprint_sha256:
8f73a14d5f0fc10ebfa3086a99b9e7a550e822c71d762e627b73d12e5f1b8b9c

I declare under penalty of perjury that the forgoing is true and correct to the best of my

knowledge. Executed this November 23th, 2020.

Declaration of NAME {redacted}.
Pursuant to 28 U.S.C Section 1746, I, **{redacted}**, make the following declaration.

5.   I am over the age of 21 years and I am under no legal disability, which would prevent me
     from giving this declaration.

6.   I was an electronic intelligence analyst under 305th Military Intelligence with experience
     gathering SAM missile system electronic intelligence. I have extensive experience as a white
     hat hacker used by some of the top election specialists in the world. The methodologies I
     have employed represent industry standard cyber operation toolkits for digital forensics and
     OSINT, which are commonly used to certify connections between servers, network nodes
     and other digital properties and probe to network system vulnerabilities.

7.   I am a US citizen and I reside at **{redacted}** location in the United States of America.

8.   The following link analysis was gathered through open source methodologies and are easily
     verifiable.

9.   As Dominion and Smartmatic makes claims that they are not connected in any way, not only
     are they connected but their business registration was in the same building on a foreign island
     to obfuscate their business dealings.

https://offshoreleaks.icij.org/nodes/101732449

# DOMINION VOTING SYSTEMS INTERNATIONAL CORPORATION



Connected to **2 addresses**
Connected to **3 officers**

📅 Incorporated: 06-OCT-2009 ⓘ
🌐 Registered in: Barbados
📍 Linked countries: Barbados

👤 Data from: Paradise Papers - Barbados corporate registry
ⓘ Barbados corporate registry data is current through 2016
🔍 Search in opencorporates
💬 Got a tip? Help ICIJ investigate: contact us or leak to us securely



https://offshoreleaks.icij.org/nodes/101724285

# SMARTMATIC INTERNATIONAL CORPORATION

 

Connected to **1 address**
Connected to **13 officers**
Connected to **1 intermediary**

📅 Incorporated: 29-SEP-2004 ⓘ
📍 Registered in: Barbados
📍 Linked countries: Barbados

🔒 Data from: Paradise Papers - Barbados corporate registry
ⓘ Barbados corporate registry data is current through 2016
🔍 Search in opencorporates
💬 Got a tip? Help ICIJ investigate: contact us or leak to us securely

## ICIJ    OFFSHORE LEAKS DATABASE



I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this November 23th, 2020.

# Smartmatic SSL Certificate

Declaration of NAME {redacted}.

Pursuant to 28 U.S.C Section 1746, I, **{redacted}**, make the following declaration.

10. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

11. I was an electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence. I have extensive experience as a white hat hacker used by some of the top election specialists in the world. The methodologies I have employed represent industry standard cyber operation toolkits for digital forensics and OSINT, which are commonly used to certify connections between servers, network nodes and other digital properties and probe to network system vulnerabilities.

12. I am a US citizen and I reside at **{redacted}** location in the United States of America.

13. Researching Smartmatic's website and reading their public manuals about the reuse of SSL certificate's, I started to investigate Smartmatic's SSL certificates. Upon searching their website is currently behind Cloudflare yet using the same SSL certificate it made it easy to locate where Smartmatic's website was located. Smartmatic's website is in the Philippine's on their Election commission's server (Comelec.gov.ph).



https://censys.io/domain?q=smartmatic.com

**Censys**

🔍 Websites ⇅    smartmatic.com

**Quick Filters**

For all fields, see Data Definitions

**Protocol:**

  1  25/smtp

**Tag:**

  1  smtp

**Websites**

Page: 1/1   Results: 1   Time: 18ms

🏠 **comelec.gov.ph (172.67.165.108)**

⭐ 117,344    ⚙ 25/smtp



https://censys.io/domain/comelec.gov.ph

**Censys**     🔍 Websites ⇕     comelec.gov.ph

# comelec.gov.ph

🏠 **Summary**

**Basic Information**

| | |
|---:|:---|
| **Alexa Rank** | 117,344 |
| **Protocols** | 25/SMTP |
| **Tags** | SMTP |

## 443/HTTPS

🔍 DETAILS    ➜ GO

## 25/SMTP

**Banner Grab and StartTLS Initiation**     🔍 DETAILS

| | |
|---:|:---|
| **Banner** | 220 sulat.comelec.gov.ph ESMTP ready. |
| **EHLO** | 250-sulat.comelec.gov.ph Hello worker-04.sfj.censys-scanner.com [192.35.168.64] |
| | 250-SIZE 52428800 |
| | 250-8BITMIME |
| | 250-PIPELINING |
| | 250-STARTTLS |
| | 250 HELP |
| **STARTTLS** | 220 TLS go ahead |



**STARTTLS** 220 TLS go ahead

## TLS Handshake

|  |  |
|---|---|
| **Version** | TLSv1.2 |
| **Cipher Suite** | TLS_RSA_WITH_AES_128_CBC_SHA (0x002F) |

## Certificate Chain

**ea6217e8b940ce5d847dc3067767eaf9134034024c185978a77a3f58691c68fe**

C=ph, L=Manila, O=Comelec, CN=cntfw02

C=ph, L=Manila, O=Comelec, CN=Comelec WebAdmin CA, emailAddress=jesus.suarez@smartmatic.com





14. As can be seen in the images above the SSL certificate used was registered by the email address jesus.suarez@smartmatic.com on the 9th of April 2016.





| | |
|---|---|
| 25.smtp.starttls.tls.certificate.parsed.fingerprint_sha1 | 60dffa9506646ee1960426659a4c68b1fa2a72f5 |
| 25.smtp.starttls.tls.certificate.parsed.fingerprint_sha256 | ea6217e8b940ce5d847dc3067767eaf9134034024c185978a77a3f58691c68fe |
| 25.smtp.starttls.tls.certificate.parsed.issuer.common_name | Comelec WebAdmin CA |
| 25.smtp.starttls.tls.certificate.parsed.issuer.country | ph |
| 25.smtp.starttls.tls.certificate.parsed.issuer.email_address | jesus.suarez@smartmatic.com |
| 25.smtp.starttls.tls.certificate.parsed.issuer.locality | Manila |
| 25.smtp.starttls.tls.certificate.parsed.issuer.organization | Comelec |
| 25.smtp.starttls.tls.certificate.parsed.issuer_dn | C=ph, L=Manila, O=Comelec, CN=Comelec WebAdmin CA, emailAddress=jesus.suarez@smartmatic.com |
| 25.smtp.starttls.tls.certificate.parsed.names | cntfw02 |
| 25.smtp.starttls.tls.certificate.parsed.redacted | False |
| 25.smtp.starttls.tls.certificate.parsed.serial_number | 12281028647573638623 |
| 25.smtp.starttls.tls.certificate.parsed.signature.self_signed | False |
| 25.smtp.starttls.tls.certificate.parsed.signature.signature_algorithm.name | SHA256WithRSA |
| 25.smtp.starttls.tls.certificate.parsed.signature.signature_algorithm.oid | 1.2.840.113549.1.1.11 |
| 25.smtp.starttls.tls.certificate.parsed.signature.valid | False |
| 25.smtp.starttls.tls.certificate.parsed.signature.value | SCkKZPshLLkFkIzzlJ3wOn+ewPoSWCODv1IGHU2EdD5fZKQ7X+IdeWa8rl6h6u6jTxs2/6rN5bE5qJ5cTILnd Gr8w4shgXTzoJyFpbnQ+nhod8KRnoKdHCGeg9ucLJk0sp8i /RgPl/JP4HN8N5v6f7r682r8lSdN5CuTalMLJa9TuyebDUWeGX3GhWARdgOQlDYh8dV/4E/bp7+Vt+IoS /qvl0XZR6bB4wSV/2ErEtJlGnlSaMDEhcAk /NsQa2k9NPj8E4prRbJiEAMYwcdjiGoR5rQxLtvdpIiOmnuF2JDgLuf7qulyPHGFLadJ3i1d /qwWuHiQtLxvHVQQUwvxhw== |
| 25.smtp.starttls.tls.certificate.parsed.signature_algorithm.name | SHA256WithRSA |

| | |
|---|---|
| 25.smtp.starttls.tls.certificate.parsed.signature_algorithm.name | SHA256WithRSA |
| 25.smtp.starttls.tls.certificate.parsed.signature_algorithm.oid | 1.2.840.113549.1.1.11 |

| 25.smtp.starttls.tls.certificate.parsed.spki_subject_fingerprint | 0d8951ea3bd17cb530a077c61ba8d761cae184b46d9c187d886613e669fabec7 |
| 25.smtp.starttls.tls.certificate.parsed.subject.common_name | cntfw02 |
| 25.smtp.starttls.tls.certificate.parsed.subject.country | ph |
| 25.smtp.starttls.tls.certificate.parsed.subject.locality | Manila |
| 25.smtp.starttls.tls.certificate.parsed.subject.organization | Comelec |
| 25.smtp.starttls.tls.certificate.parsed.subject_dn | C=ph, L=Manila, O=Comelec, CN=cntfw02 |
| 25.smtp.starttls.tls.certificate.parsed.subject_key_info.fingerprint_sha256 | 4039e3117b53c6736957eab9ce578e88b0bf19b5cf5d6d5228107ac44d1e064f |
| 25.smtp.starttls.tls.certificate.parsed.subject_key_info.key_algorithm.name | RSA |
| 25.smtp.starttls.tls.certificate.parsed.subject_key_info.rsa_public_key.exponent | 65537 |
| 25.smtp.starttls.tls.certificate.parsed.subject_key_info.rsa_public_key.length | 2048 |
| 25.smtp.starttls.tls.certificate.parsed.subject_key_info.rsa_public_key.modulus | 2Y6qhrBskXsJXWUQ5r04j8ReFh1OlL548KrTelKr9F6H5HCJ72o4/HV9D6Wx9ToIdoKOCxn019YbOMQ7rW GKIZot5+VcHJ6QbKVPIMDPdFJ36XcQy2oAB9zt3A9yuREBWwuBuW1ctkVNKH+Jgau+tH1amO8ncaCFaZ FxYWCryITTrkVke/X4uX6uzT+4sNN9rso /0MIAyebVyG2zsk1bBfOQYu6AcE7LLjO6RXidMx5KUpXZGqykUlSgE5OijRWFcpnv8wWodn6FfoETXZ1YO wJbPeV0zJd3TffiwJCEcC7oyD4AyEVEVyAXgehOz44AEs3bcRuMdiejKzk4tG97uw== |
| 25.smtp.starttls.tls.certificate.parsed.tbs_fingerprint | ea91132986addf5da6e2c00954b27eaf6da981e17d39e74b4c8cf4aa6c673e44 |
| 25.smtp.starttls.tls.certificate.parsed.tbs_noct_fingerprint | ea91132986addf5da6e2c00954b27eaf6da981e17d39e74b4c8cf4aa6c673e44 |
| 25.smtp.starttls.tls.certificate.parsed.validation_level | unknown |
| 25.smtp.starttls.tls.certificate.parsed.validity.end | 2038-01-01T00:00:01Z |



| | |
|---|---|
| 25.smtp.starttls.tls.certificate.parsed.validity.length | 685711621 |
| 25.smtp.starttls.tls.certificate.parsed.validity.start | 2016-04-09T12:33:00Z |
| 25.smtp.starttls.tls.certificate.parsed.version | 3 |
| 25.smtp.starttls.tls.cipher_suite.id | 0x002F |
| 25.smtp.starttls.tls.cipher_suite.name | TLS_RSA_WITH_AES_128_CBC_SHA |
| 25.smtp.starttls.tls.ocsp_stapling | False |
| 25.smtp.starttls.tls.validation.browser_error | x509: certificate signed by unknown authority |
| 25.smtp.starttls.tls.validation.browser_trusted | False |
| 25.smtp.starttls.tls.version | TLSv1.2 |
| 443.https.dhe.support | False |
| 443.https.dhe_export.support | False |
| 443.https.rsa_export.support | False |
| alexa_rank | 117344 |
| domain | comelec.gov.ph |
| ports | 25 |
| protocols | 25/smtp |
| tags | smtp |
| updated_at | 2020-11-30T12:20:01+00:00 |



https://es.linkedin.com/in/jesusalbertosuarez

# Linked in

| People ▼ | Jesús Alberto | Suárez Méndez |

## Jesús Alberto Suárez Méndez

Senior Consultant at VISEO IBERIA

Alcorcón, Community of Madrid, Spain · 500+ connections

**Join to Connect**

VISEO IBERIA

Universidad de los Andes (VE)

🔗 Blog ↗

## About

DevOps SysAdmin and Information Security Professional with more than 20 years of experience. Specialized in Security and IT Management, IT Risk Assessment and Management, IT architecture, automated deployments on Linux environment and cloud using DevOps tools. Very interested in





**Master Information Security Specialist**
Smartmatic
Aug 2008 - Mar 2017 · 8 years 8 months

Caracas, Venezuela

Design, deployment, operation and support on security of network and infrastructure in Smartmatic projects. Provide Security Architecture based on Risk Assessment. Develop Business Continuity and Disaster Recovery Plan. Perform Vulnerability assessment, ethical hacking and penetration testing. Advisor on information security issues.



**Bancaribe**
9 years 11 months

**Security Specialist**
Aug 2003 - Aug 2008 · 5 years 1 month

Caracas, Venezuela

Planification and Management of Information Security System. Vulnerability and Risk Management. Leader of risk assessment and security evaluation team on Software Development Life Cicle projects. Advisor on information security issues and methodologies. Support on Incident Response Team.

**Information Security Administrator**
May 2001 - Aug 2003 · 2 years 4 months

Caracas, Venezuela

15. As seen from Jesus' LinkedIn profile, he was employed by Smartmatic as their Master Information Security Specialist from August 2008 – March 2017, within the time frame of the registered SSL certificate for Smartmatic and within Venezuela.

16. This evidence shows that Smartmatic was indeed connected to Venezuela as well as shows that their dealings with the Philippine's is still on-going as their website is in their election commission servers with matching and current SSL certificates.


I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this November 23th, 2020.

# EXHIBIT 6

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

Arizona State Legislature Holds Public Hearing on 2020 Election.mp4

The scanners to process ballots and upload. So basically it's a signal of a potential anomaly where we would want to go in and do forensic analysis on the ballots that were processed in those batches to analyze the way that these systems work is that you can run votes and run votes and run votes.

And if you get write in ballots or error ballots, it just accumulates them into a batch file. And there may be, you know, 2000, 3000, 4000, [00:00:30] 5000 votes in this batch file. And then the administrator or the tabulator can file and they they send it in and it records those votes in the user's manual. There's, you know, ways that it shows that the administrator can vote that batch, you know, 80 percent, 20 percent, 100 percent. However the the administrator chooses. And that basically is a tool to to allow them to move votes through the system faster.  [00:01:00]

So Arizona was was a little bit different. It had a pretty strong rise up right up at the front, the first part of voting day. Whereas the other states and I can show you those have a gradual increase in votes. And this may have been due to the fact that Arizona allowed early counting and tabulation so those batch files could have been dropped in right away.

But this injection spike at eight six [00:01:30] forty eight p.m. and this is adjusted from Zulu time. So this is one hundred and forty three thousand one hundred votes that were injected that was in excess of what the machines could have processed. The real reason that we believe that this spike was a little bit of an anomaly.

And I should show the email that was sent to the Arizona legislature forcer. [00:02:00]

Yes.

So this was an anonymous email that was sent to all members of the Arizona legislature. And it was also sent to DOJ, this individual sent the email, wanted to remain anonymous, but had enough [00:02:30] concern that he sent this to the criminal division at the U.S. Department of Justice. He did not want to be included in the investigation, but the information that they recorded was what we would like the opportunity to investigate on your behalf or a forensics team of your choosing.

That doesn't matter to us, but says that please be advised that Pima County recorder located a 240 Norristown Avenue, Tucson, Arizona, in [00:03:00] Pima County, Arizona, and the Democratic Party added fraud votes in the initial count to the vote by mail totals released at 8:00 p.m. on November 3rd, 2020. So this coincides with what we observed in the data analytics at that date, that that spike. We weren't aware of this until this email, until after the fact. So there were approximately 35000 fraud votes added to each Democratic candidates vote totals. Candidates impacted [00:03:30] include county, state and federal election candidates through the utilization of the automated ballot count machines and Pima County elections, which were not dominion, but they had the  same pretty much functionality.  My

understanding is that 35000 was embedded into each Democrat vote totals below where the meeting notes in a meeting I was invited to by the Democrat Party in Pima County, Arizona, on September 10th, 20 20 no phones or recording devices were allowed. A presentation was given, including detailed plans to embed [00:04:00] 35000 in a spread configured distribution to each Democrat candidates vote totals. When I ask how in the world that will 35000 votes be kept hidden from being discovered, it was stated that spread distribution will be embedded across the total registered voter range and will not exceed the registered vote count. And the 35000 was determined allowable for Pima County based on our county registered vote count. It was also stated that total voter turnout versus total registered voters [00:04:30] determine how many votes we can embed.

This embedding will auto adjust based on voter turnout. Because the embed votes are distributed sporadically, all embedded votes will not be found if audited because the embeds are in groups of approximately one thousand. This is so county report can declare an oversight issue or error as groups of 1000 is a normal and acceptable error. So if you believe that you're one vote counts for one vote, this is. Maricopa [00:05:00] County embed totals will be substantially higher than Pima due to imbeds being calculated based on the total number of registered voters. When I ask, has this ever been tested and how do we know it works? The response was, yes, this has been tested and has shown significant success in Arizona, judicial retention, elections since 2014, even undetectable, and post audit because no candidate will spend the kind of funds needed to audit and contact voters to verify votes and [00:05:30] the full potential of total registered voters, which is more than 500000 registered voters this year. Our Secretary of state has removed precinct level detail for election night releases so candidates can't see precinct overvotes. This is what I have for the meeting. Just thought I'd report this. Not sure if you can do anything since I was unable to have a recording device in the meeting. Again, we hope this individual would we come forward and issue this as an affidavit. But this [00:06:00] is significant.

And we also noted that the reporting numbers from Pima and Maricopa County merged Election Day votes with right. And votes with absentee ballots. So there's no way to in the publicly available data to pass those votes into into the segments. And I believe we noted in the piece of information that was provided view that Maricopa [00:06:30] County had a one point nine million mail in ballot request. So and those there was a Maricopa County official on videotape that did say that they did not validate the signatures on the right and ballots this year.

So that's a one point nine million vote fraud potential, even if it's zero point one percent of the vote. There's [00:07:00] a lot  of room for error.

Can we just review that quickly for one second so we get it right? Ladies and gentlemen, please. I know that you're passionate about this, but there are a lot of people in this world that want to hear this. And if we can't hear the witnesses over remarks, that deprives people of hearing the truth.

So what I take from your testimony, Colonel, is that 35000 votes were embedded [00:07:30] for each Democratic candidate in Pima County. Correct. That is that is the allegation of this email allegation by the gentleman who hasn't given us an affidavit. Correct. That they were distributed based on the voter turnout carefully so they wouldn't look suspicious. That's correct. And that's essentially what the Dominion Smartmatic. And that's that's essentially their modus operandi. Right, that that's there. They don't just put in 10000 [00:08:00] votes. They put it in  carefully.

So it's hard to detect. They move the algorithms around to different precincts until they get the, uh, the aggregate number that they want and need. And then they shift the algorithms to, uh, to other  precincts.

Did the Democratic candidates who got the benefit of those 35000 false votes include Biden and Harris?

According to this email, it was all local and federal races. [00:08:30]

So if that were true, then the result of the election is totally opposite the one that they're so anxious to certify, correct?

Yes, sir.

Now and again, this is what you said to every Arizona legislature, that now we don't know if the gentleman  is telling the truth or not. Correct.

But would it be possible if you had the machines in [00:09:00] Pima County to be able to see if there's evidence of this?

In order to do that, there would have to be a full forensic audit from the the USB that drives the voting to the PCMCIA, CIA cars, to the tabulators, to the rooters.

I'm just asking, could it be done if you if you had the will to do it? Yes, sir. If you wanted to find out if the vote in Pima County were honest or not, wouldn't you do it? Yes, sir. And without doing it, you really have no idea. That's [00:09:30] correct. And the machines you used in in Pima County are different. But are they that much more secure?

These systems, these they all have similar vulnerabilities. Our team focused on Dominion. The are our partner team focused on S.A.S., and they're they're very similar as far as vulnerabilities.

Now, did he say anything that suggests the same thing happened in Maricopa County?

This gentleman [00:10:00] appeared to be a an I.T. specialist in Pima County, so he only wrote allegedly to  what  he observed.

And do we have any knowledge that anyone from the state of Arizona attempted to look for him?

I believe the legislators, some of the legislators did try to to locate this gentleman.

Anybody from law enforcement.

Not [00:10:30] that I'm aware of, but again, I'm I'm not law enforcement, so I'm not sure, but even if you can't find him, you could determine the validity of this or maybe determine the validity of this by doing a forensic audit. Correct. There's a there's an available scientific tool that would tell you I mean, did Biden get 35000 phony votes?

That's correct, and it's not being utilized, [00:11:00] as far as you know, by the state of Arizona, Pima County, I believe that total vote total was less than less than a million and in Pima County, so it would it would be possible and feasible to do a full audit about audit. And I also was informed that your state, through the the Counterterrorism Information Center and the DPS here in Arizona, [00:11:30] do have the capability to analyze and validate ballots for INQ consistency. So if there were mass produced ballots in Maricopa County that were stuffed, your DPS, I've been informed, has the capability to analyze those ballots for paper consistency and inconsistency. So if there were mass produced ballots, you could determine that on your own.

Excuse me, Colonel. So I think what you're saying, and I'm going to repeat this back to you, [00:12:00] these might be preprinted ballots to simply move through the system. Is that what you're suggesting?

There are indications we have affidavits from Pennsylvania that there were ballots that were prepositioned in a bobtail trailer, a tractor trailer truck, and that these ballots were the thought was if this was a cache, that they could go and grab the amount of ballots they needed and take them to the specific tabulation centers. And [00:12:30] that's an affidavit that's from from our Pennsylvania, where currently a.

So repeat one more time the piece of information then I think people were shocked about because it is hard to believe. Did you say that a Pima County official said that they didn't validate any of the mail in votes?

That was Maricopa Maricopa. They didn't validate the signature. They didn't validate the signatures [00:13:00] on the mail in ballots.

And that's one point nine million. Correct. And do we know who that is? I would have to get the video. Well, could you get it for us? Oh, yes, sir. Now, you have to do it right now before the end of the year.

That would render every one of the one point nine million votes that absolutely never checked for fraud, deceit, mistake, and if their mailman votes, that can't be done. Now,  [00:13:30]

they've been separated from the envelope, correct? Would indicate. So those are basically one point nine million votes that are illegal votes or that had the potential to be illegal votes that weren't validated the signatures, what can we can we determine now if any of them are legal or illegal?

If the envelopes were separated from the ballots, there would be no way to tell. A ballot [00:14:00] for candidate, you could still go back and look at the envelopes to validate the signatures, but you wouldn't know what the ballot and that's the reason you're supposed to have an observer when you do that. That is that is part of the chain of custody procedures, I believe, in Arizona.

And when they talk about chain of custody, after they're talking about. Right. Correct. Because a lot of witnesses are going to talk about that . So let's just sum up a few of the things that you also found. Tell us about the green button in Maricopa County [00:14:30] on the machine. And there is one witness that's going to testify that all day she saw election officials constantly pressing the green button when somebody was vot ing.

So what what that was when the voter wasn't sure. And I believe this was also linked to another witness that's going to talk about with the differences in the pens and the sharpies that the Maricopa elections division in early voting, [00:15:00] they specified that only use ballpoint pens for voting. And on Election Day, they specified only use sharpies. And the idea is that as the bleed through on the ballot, as the scanners would cause an error and an error ballot by creating the error ballot, the election officials basically would slide those votes into a batch file that could be adjudicated by the election administrator or the operator. [00:15:30] And the green button was to say, OK, there's an error, but go ahead and push cast ballot. And it punches that into into an error file that can be adjudicated by the election administrator.

Now, you examined the voter database and your team did say or you examined the voter database, you and your team, those were actually some local Arizona folks that examined that. [00:16:00] So you took that from, I suppose, great data. Oh, I see. OK. He spoke directly to local investigators here. And you have here voter database discrepancies, 6000 voters at least entered into a database with no sex and default date of birth. And they're nonexistent in Lexis Nexis.

Correct. And I believe there will be a witness to to discuss that later this morning.

So [00:16:30] unless those can be those can be discovered, those votes would have to be would have to be eliminated.

Correct. And it was explained to me that the way that happens is that they you can register online for a driver's license at the same time, you can register for voter registration. But the driver's license doesn't require the same information as the voter rolls. And so those kind of go into a queue that the secretary of state would approve for the voter rolls over time.   But

[00:17:00] there appear to be 6000 voters there on the voter rolls and the voter database with no sex and a default date of birth.

So whenever they entered zero one zero one, you know, nineteen hundred or whatever that date was, they also discovered over 2000 votes that used a false address and address of a vacant lot. Correct.

You already told us about the 1915 487 mail in votes that [00:17:30] were not verified with regard to signature in Pima County. In Maricopa County. Correct. Also in Pima and Maricopa County, Republican poll watchers were very often forced to stay inside, outside and unable to view the vote process.

Correct.

Is there an estimate of the number of illegal immigrants that voted in in the election? Has anyone done an estimate [00:18:00] of that?

The American Immigration Council suggests that there are about three hundred thousand ineligible voters. And then the, uh, one of the local newspaper reported that there were another three hundred and.

12000, I believe, nine incarcerated felons and other illegal other ineligible voters as any attempt being made to  investigate that, to determine if they [00:18:30] can locate a sufficient number of illegal immigrants voting illegally, that would have a bearing on the outcome of the   election.

That would really be done by the, you know, the county  election.

But has it  been done or not? They're going to certify the vote apparently without doing it.

I'm not I'm not aware if it would be you'd have to be an idiot not to think that illegal aliens, immigrants voted. Right. It's very possible. How many are there in [00:19:00] Arizona? Approximately anybody's guess. But what's the lowest number?

Anybody help me with that and for the the local legislatures, five million, four million, I wish we knew, sir. I wish we knew.

Mr. Chairman, what's the lowest number we could  represent?

Mr. Chairman, my colleague, Representative Townsend, I have had several discussions [00:19:30] over the past few weeks about that number, and she could provide that to Mr. Giuliani.

Mr. Chairman.

Mr. Chairman, thank you. And Mr. Giuliani, Mayor Giuliani, I. I can't tell you how many people are in this state that are potentially can vote illegally as an illegal alien. But I can tell you that there is a way for them to vote under the federal only voter program, meaning that someone here illegally or a fake [00:20:00] name, anybody that can put together a voter registration card with a fake name or if they're not eligible to vote and are not in the Invid system here in Arizona when they register to vote. If they're not found in the MVD system, the DMV system, they're not there, then they're contacted to see, do you have a birth certificate? You  have anything to prove your citizenship. When they don't answer, then their name is relegated to the federal only voter list, which there's 36000 in the state of Arizona, [00:20:30] of people who can't prove their citizenship, can't prove they exist other than when they show up to Election Day. All they have to do is show their bank statements, their title to their car, anything you can reproduce on your own computer with your fake name on there or whatever. And until a bank statement and you get a ballot and you can vote for president and your congressperson and senator. So up to 36000 plus people in Arizona could potentially vote. And I do have the numbers of who [00:21:00] has voted in Maricopa County is 4100 of the true federal only and another 4000 that are out supposedly out of state. So those alone haven't been researched deeply enough to know does that name even exist as a person and are they here? Is that someone here who's here illegally or not? So we don't know upwards of 8000 people in Maricopa County alone who have cast a ballot who weren't able to.

Well, [00:21:30] that's pretty astonishing. So I will say I may be wrong, but let's say there were five million illegal aliens in Arizona. It is it's beyond credulity that a few hundred thousand didn't vote, particularly given Representative Townsend's explanation that there's an encouragement that goes on to have them  vote.

Now, every one of those votes would be an illegal [00:22:00] vote. Every one of those votes denies a lawful voter of their franchise just wiped it out. Has there been any attempt to try and investigate that after the election, even on a sample basis, like going to a district where there are a large number of possible illegal aliens and go back, check the names and see where their 5000 were there, 10000 [00:22:30] or 20000? Has there been even an attempt to do that? Sure. None that I'm aware of.

I mean, I think you can I can I speak to that mayor, please? Yes,   please.

So we put in two years ago, we put in an election integrity unit in the attorney general's office. And I've been on the phone with them, asking them, what are they going to be doing? How can they look into this? And they told us that they don't have the authority to go out and look for crime. They have to have it presented to [00:23:00] them so they can't go out and do an audit. They can't go out and and actively research this. I also was told the same thing by the Board of Supervisors, that they cannot perform an audit above and beyond what's already been done. That's in statutes. So all we're really left with that I'm aware of is having and as much as I appreciate this forum today and I'm very grateful for you, we need an actual committee hearing like on the chair of the elections committee. If we were to hold an actual committee hearing, we would have subpoena power [00:23:30] to go and look at the machines. So look at these

things, you know, and inspect them and get down to it so we can do an audit. We just need to conduct a committee hearing to give us that subpoena power to be able to do so.

Mr. Julian, so when when this vote is certified, if that's not done, there is no question, any reasonable person's mind that the vote totals contain large numbers of illegal votes. From [00:24:00] people who are not citizens of the United States, the question is how many? And the officials certifying have made no effort to find out the truth, which seems to me gives the state legislature a perfect reason to take over the conduct of this election because it's being conducted irresponsibly and unfairly. Why [00:24:30] and why and why doesn't your state legislature exercise its responsibility under the Constitution for.

Mr Giuliani, that that is the essential question that we are here to ask now any anything else, Colonel, you did a great job.

He's available for any more questions if you are done.

If [00:25:00] you're done, Mr Giuliani. We do have a number of questions from the panel members for you, sir. Good. Yes, sir. Right. The first thing I'd like to ask is you spoke on system capability. And I know that much has been made of the excoriation of the state of Texas on the Dominion equipment, software and all that. Can you provide just a very short comment on what [00:25:30] why they said not only are we not recommending as we're prohibiting the use of this equipment in our state of, in a nutshell, vulnerabilities that were issued, not  addressed or not  fixed.

There were too many system vulnerabilities.

Ok, and you also referenced a comment about OHS, and I'm struggling. Why did OHS say security for this election was the best? Did it ever been? Do [00:26:00] you have any insight into that?

And my experience in life, there's generally two factors for individual. I mean, it's either competence or commitment. So they were either incompetent or not committed to learning the truth at the senior level, operative level.

And does OHS know about the information that you've shared with us so that you're sharing with us in the process of this? Have you shared that with them [00:26:30] specifically and much more so beyond what you're saying here? You've gone into much greater depth?

Yeah, our ah, we have relationships with our local.

We have relations with our local OHS personnel in Texas, both the the intelligence agencies, um, when I started working on this project in August, I called them up, said, you guys have you guys have got to come out. Look at it. They [00:27:00] did. They spent an initial three hours

going through this data. Uh, at the end of that, one of them said, I think I need to go outside and throw up.

Besides that, did they do anything about it?

They had multiple follow ups. Um, they drove up to our Dallas counterpart team, received over 600 gigabytes [00:27:30] of data that had been accumulated over over time. Our team provided them over 200 gigabytes of confirmatory data. And they analyzed that, um, after they. After they analyzed, there was a scan, a passive scan done, they conducted a limited scan and determined that there were vulnerabilities. They held numerous [00:28:00] meetings with their folks, the cyber, the sister cyber side and the **INR,** which is the intelligence assessment division.

And I'm sorry, could you let the folks who were watching know what this is?

This is the the the agency in DHS is responsible for cyber infrastructure.

Ok, members, any other questions? Representative Besuki, one note that might be important. Members of the elections division [00:28:30] of SECV, I was told, would never attend the meetings or the briefings that were conducted internal to DHS on the material that we had presented. And I'm sorry, who is that that did not participate in the election security division with inside of DHS? OK, thank you. Represent BCG.

Thank you, Mr. Chairman. And thank you, Colonel. I just wanted to make sure I have this correct. So when we're talking about Mr. Crepe Krebs, is that correct? Correct. OK, he stated the [00:29:00] most secure election in history. He stated, we're not connected to the Internet. He stated, no votes leave this country. This is all things you've stated. He stated publicly. So he used his website. Right. So are you willing to say under oath that you have seen the connection to the Internet, you have seen it go off shore to Germany, Frankfurt? Are these things that you have personally seen and can say that is not true?

Our our white hat hackers? [00:29:30] Yes, they have that traffic in the packets, so.

Why would he why would he make that kind of comment? Do you  think?

Either not knowing, believing the myth, um, or not wanting.

The truth to be known.

Thank you, Senator. Really? Yes, thank you. Thank you, Mr.   Chairman.

Good morning, [00:30:00] Colonel. I've got a couple of questions on the Board of Supervisors during one of their hearings had said that that the techs for equipment that's by the way, the county doesn't own this equipment. It's leased by Dominion and Smartmatic. But is it irregular or is it S.O.P for the tech reps to be there during the election process?

Yeah, that that's been something we observed in Michigan, Pennsylvania, whether [00:30:30] they're full time committee  employees or  contractors.

There are Dominion employees that are there to run the equipment because the Board of Supervisors hearing they had they'd actually made comments that they actually provided them an office space with in the county for them to handle this stuff. My question is, a couple of weeks ago, they did a test just to show that how the system was secure. And he did it before and then after test. So everybody can see that [00:31:00] the Board of Supervisors and county elections that see this is this is not what you're hearing is false, obviously, or is it during that test is can they find the anomalies in there during that, that basically what I always call a dog and pony show that show up in one of these tests, in a forensic examination?

No, just see.

Come here. Look at this is how we certify the machines and calibrate the machine. Whatever [00:31:30] zeroed out this that obviously these Bhanot anomalies would not be showing up at that moment,  correct?

Correct. And it's our understanding that Dominion had a software update, at least in a couple of states. I'm not sure about Maricopa County, but like the day before the  election.

And bartone questions. I did have one question, thank you and Colonel, excellent information, you [00:32:00] described Web traffic increased during the elections as opposed to how do you measure the increase?

Um, are you talking just in in in on the Dominion Network? Yes. They just look at volume, volume of data that's moving through the  pipes.

And I'm not of our hacker team is that's they're the experts. I just kind of the big picture know how to dance. [00:32:30] But they do they do measure volume traffic. Matter of fact, on the Frankfurt server on Election Day, there was a German cybersecurity professor that was noting that the increase in traffic would you know, he related back to covid and said, you know, we haven't even hit our indoors winter season yet and we've hit the highest traffic. And he specifically noted that one of the reasons was the American elections was an exponential [00:33:00] increase.

I don't think it's an exponential, but I think it went from seven seven point something terabytes a second to 10 terabytes. So it went to a lot  of, you know, a pretty big increase.

Not an exponential, though, to my unqualified mind. I don't know exactly what that means, but it sounds big.

The volume jumped up pretty significantly on November 3rd and 4th to that particular server in the pipes. Thank you. Yes, ma'am.

So. So [00:33:30] essentially about 33, 34, 35 percent increase.

I would have to go back and look at the numbers.

But I mean, you're from seven to 10 ballpark. Yeah, that's big. I can't. Yeah. All right. Very good. Senator, go. Do you have any questions? Yeah. Thank you, Mr. Chair.

Colonel, he talking about the NGO system and that was you said Hugo Chavez. [00:34:00] He was a partial owner in that. Now, that's that's the beginning of  Dominion.

Um, NGOs was a separate company, but Dominion acquired Sequoia Systems that were spun off of Shugo. And they also acquired Premiere, which was spun off of Diebold, but they all have in common the Common Core of the common code really goes back to Shugo. [00:34:30] And that one or or chart that it put up there kind of showed the licensing agreements that go back and forth between Shugo and Dominion. So it's the the licensing for the for the software in the code.

So it still stems from the studio system. That's correct. So and then you're stating Dominion owns the data.

So does that mean when they see the vote count that they [00:35:00] own, that not the counties, the state, they process it, they retain it, it's in their backup servers?

So they have they have the votes themselves as well, when that's supposed to be property of the state, they've got they've got the data, they've got the voter voter data, voter    registrations.

And then you said Dominion sits on the board and Mr. Crap's. Is that right?

That [00:35:30] was on the, uh, the website there. When you say the board, what is the board? It was their Election Security Advisory Council, OK.

Thank you, sir. Thank you, Mr. Chairman.

Let's see, Representative Roberts, you're next. Thank you, Mr. Chairman. Colonel Walton, earlier you were talking about the methods via Internet and internal methods. As far as I [00:36:00] think you use the term, I forgot exactly how you said it. There was basically methods from the Internet and then also internally that there could be manipulation of votes. So my question is, is there. Do you have any knowledge of where the machines in Arizona connected to the Internet at any point in time? And if not, or if so, are there logs internally [00:36:30] in these machines that if we were to be able to subpoena these machines and demand them so they could be examined, could could we see all of those changes that were made?

So when you watch. CBS, CNN, any of the the mainstream media where they got the live updates, that data is passed live. I mean, it's it's as the votes are updated. So it's, [00:37:00] you know, nobody's. Getting on a plane and flying the hard drive to New York. I mean, it's uploaded and it's connected. So it's it is connected to to the Internet and whether it's locally, I mean, they can move votes with the cards, the voter cards, those can be preloaded and laptops with with the software that could be interdicted and upload fake votes is in the allegation from from Pima County, you know, in [00:37:30] batches of a thousand, they can scan blank ballots and then the administrator can allocate that batch of blank ballots to one candidate or another, either in 100 percent or any percentages that they they allocate in the, you know, according to the user's manual.

So to that point, just indulge me just a moment. Would you say that that is what we saw in the 2008 election with Governor Beven, where we actually saw on television [00:38:00] real time the movement of some 500 votes from one candidate to another?

I mean, it was so stark you saw them go down on one and up on the other. And the exact number, would that be a manifestation of what you're talking about?

So the the the working hypothesis from our counterparts on that, because they've worked out and watched it and they actually went to Kentucky to assist the team there. It was it that was a server level interdiction. So they went up to the server, downloaded a case case we [00:38:30] filed, change the votes and reloaded it.

Thank you, Robert.

So just to kind of tack on to what we were just discussing, it's my understanding because there was an article here in Arizona from the Arizona Daily Independent, there was a quote unquote, whistleblower that was talking about issues that they had observed. And so one of the things they were talking about was that the data from the machines was being moved via the hard drive. So what [00:39:00] you just described as far as the real time data being uploaded and all of that stuff, just for the layman, that same type of manipulation, whether you plug into an Ethernet cable or what have you or you're doing it on and a user interface, the same type of malfeasance could could be accomplished in that method as well.

And I think in looking at these systems, we identified, you know, almost a dozen ways that you could [00:39:30] inject or interdict to manipulate votes.

On that note, you said earlier that pretty much all of these machines have vulnerabilities. So is there any system out there that you're aware of that is worth exploring or do we just need to go back to the paper ballot?

There is a he developed a system with some capital infusions. It's a system called [00:40:00] votes votes and it's a block change type system. Again, it's when I first became aware of this, I

went and talked to some friends of mine who were bank presidents. And I said, OK, why can't we apply banking principles? Because if you want anything done right, you go talk to the money people.

That's that's that's supertaster stuff. And he said, oh, yeah, this is it. It's an app.

You can do it as an app with a tie it in with real I.D. and a block chain type solution or, you [00:40:30] know, the next generation solution. But there are systems and I believe the voting system is deployed right now, I believe and I know West Virginia is one that I remember reading on on the website.

Thank you, Senator Allen.

Any questions? Yes, thank you. Thank you, Mr. Chairman. Appreciate it. Thank you.

Here today, I'd like to go back to the Board of Supervisors [00:41:00] letter where they talk about certifying the Maricopa County election. And they have five points that they make for the reason why they call this a reliable election. And my concern is, of course, over the Dominion tabulation equipment. They said it was vetted by Bipartisan Equipment Certification Advisory Committee before the contract was finalized. And as required [00:41:30] by law, the committee tested the functionality and accuracy of tabulation equipment before it was used in any Arizona election. Well, after listening to your testimony, that does not give me any confidence because the machines, of course, can perform very accurately. It is after it's after the fact after the election starts, after the ballot is is starting to be put into the machine that that these problems start arising. So is [00:42:00] that accurate to say that that this does not should not give us confidence about this being a reliable election?

Ma'am, anything that is software based can be manipulated and changed with the click of a button or, you know, you got two USB drives, plug one in and you get one algorithm, you pull it out, you plug another one in, you get a different algorithm. And we also believe on the connectedness, these can be pushed down from the top [00:42:30] and shift it down. So think of it like a casino or a state lotto. Your whoever owns the eye in the sky, you can control the margins, and that's really, I think, what what we're looking  at.

Well, certainly from your testimony, I can see that. And I have one more question, if I could, Mr. Chairman.

I believe Senator Braley has it to that point of view. All right. Go ahead. Are you all right? Please proceed.

Well, [00:43:00] I was going to switch down to the one percent early ballots that they did, and I had a question about that. So, Sunny, if you have something to what I said before. Go ahead.

Thank you, Mr. Colonel. So basically what you're saying, for example, since the tax are already there on site during this process. So if a machine jams up and naturally they call the tech over there to go fix the unjam, they can literally without anybody noticing because they're the techie people, they can stick a thumb drive in there and upload, change the [00:43:30] numbers, manipulate whatever.

We there was an affidavit in in Pennsylvania from I think it was last week, a gentleman supervisor had a Ziploc bags full of USB drives, and they noted that he was inserting the USB drives into the machines at a much higher rate than would be necessary or that they had seen in the past. So, yes, you know, it's [00:44:00] OK.

So now I have it to that point. Forgive me, but what I think you're saying is that they have just created an electronic footprint. Either in the days to download that you're seeing real time that you'd be seeing some kind of a spike, or is there something that's captured on the machine that it's itself like a memory card that is resonant on the machine? Not that is actually talking to the hard [00:44:30] drive.

The the machines, for the most part at the voting machines are just run by, you know, removeable software and data cards to the cards that actually hold the votes. The the backup servers is really where the true story would would reside. As far as the upload download, the change, the the er warnings for the mismatch errors.

So would you be able to show [00:45:00] with specificity. A machine in Maricopa County going all the way across the pond. Inserting data into a server or would it be an aggregate of all the machines that were in Maricopa County, for example? Is it by individual tabulator or is it by the server here that collects? Can you help me understand that piece? Let me I'll [00:45:30] put that probably goes back to your headache graph.

I'm thinking schematic that shows.

The reason I ask the question is we're still looking for evidence and if that is in the evidence package, that's certainly something that we would want to know about. If we don't have it today, something that could be forwarded to the body [00:46:00] would be   great.

Uh, let me see if I can make this   bigger.

So this is the many voting, the high level, it's a block diagram of how everything's connected and I can print this off and provide it to you or whoever would do your your [00:46:30] audits. But it's kind of hard to.

Kind of hard to see when it's blown up, but you've got the ballot boxes, ballots taken out. This tracks all the way through the image gas central to ballot images. And this is really what's voted. The ballots are scanned into these image casters and there's an electronic image created. It goes into results files and then it goes into validation, adjudication,  auditing,

reporting and publishing and then to democracy [00:47:00] suite in Ms. The Democracy Suite servers, the database servers, the document management servers, and kind of shows you how this all goes out to to the world from from this whole system, election data. You know, this is kind of the top feed to all these servers.

But this is really it's it's a network. I mean, it's a computer. Company itself is not networked, it has to be.

So let me reframe the question, we probably [00:47:30] would not be able to identify any specific tabulation machine showing up on the server because it's all aggregated.

Yeah, it's it's these tabulation machines go through this process, but the results files.

So if  you work it  backwards from the server, you would be able to  go back to  a ballot   image.

An electronic ballot image. All right, thank you, Senator Allen. Yes, no question. [00:48:00]

Thank you, Mr. Chairman. The other thing in this letter by the Board of Supervisors was they commented again of what made this a reliable election, that the Election Day ballots from two percent of vote centers and one percent of early ballots as required by Arizona law. And it yielded a 100 percent match to the results produced by the tabulation equipment. So. That should give us, you [00:48:30] know, and all the counties do this, they do this hand count, this little audit of a small percent of the votes to see how it matches up to the machine. So could you explain how we shouldn't have confidence in that particular? How can they how can they make that match up to the machine then when they just arbitrarily pick out one percent? If they're if there's vote dumps that are happening and things that are happening throughout the process, I would just say [00:49:00] it's it's.

So we learned a long time ago, garbage in, garbage out. If you've got one point nine million votes that aren't, signatures are verified and they're just reading bubbled in, you know, ballot, then, yes, the ballot cards, when they run 1000 ballot cards through, are going to come out with a thousand so that, you know, that small batch would represent what those particular ballots say.

But there is again, there's [00:49:30] that's why there's a chain of custody requirements. That's one of the verification requirements at each step along the way. So if each one of those if one of those steps is broken, then the validity of the whole process is is in question. You know, you just don't know.

Right. Thank you. I think we're we're definitely, sir, in a new day when it comes to what is taking place across this country with voting. And we're going to have to probably really look at that. Thank you. Representative Townsend, do you have any questions? Thank you, Mr. [00:50:00] Chairman.

Colonel, I just have a quick follow up to some of the stuff we've been talking about as far as the security of the machines themselves. And as we know, like whether or not something happened or didn't happen, I'm most concerned with voter confidence. And if there's all these holes, then we're going to really deflate or collapse voter confidence. So I would like you to reassure me on one particular item in the tabulation room at the Mixtec here in Phoenix. In years past, [00:50:30] it was you had to have a special badge and only people that were certified to be in that room with the machines in the tabulation and all that were allowed in there this year. I was told yesterday we had teams of 25 adjudicators in that room, in the tabulation room with those machines. Would it have been possible for someone in that scenario to wander over to the machine and have a conversation and put in this thumb drive you're talking about? Or is it deeper than that or [00:51:00] something that's happened from remotely? Or how secure are these machines? Because we know that there's no chain of custody on the hard drives and on, you know, the machines we saw in a video left alone for almost a week in one of the voting centers, untended, unsecure. You know, how could somebody, a regular person with nefarious intentions, walk up and change this whole election by putting in a thumb drive and changing an algorithm? Is that something that could have happened?

Or we don't have to  worry about that either.  [00:51:30]

An individual that has knowledge of the systems and have to. You know, operate in the system could have an impact again from the server, but they could they could be sitting in Nigeria and, you know, as long as they got an Internet connection, they could get to that particular server. If they were had access to, you know, the data from the malware that's on the server, they could get the login and password from [00:52:00] a Pima County operator or a Maricopa County operator. So there are just so many places that they can be interdicted or penetrated. There's just there's just too many to. You know, to describe it, there's a lot of a lot of ways it could be interdicted, Mr. Chair and Colonel.

So I'm hearing you say is I can't be confident that a volunteer of a political party that, you know, the [00:52:30] entire recorder's office and the elections director could everyone could have been on the up and up. And this is the most secure election ever. But if one random volunteer with the right information were to be in the tabulation room, could have been breached the security of the of the machine. Correct. And therefore, we cannot stand here and say we are confident with that kind of access to these machines, machines left in buildings for a week. We cannot say with certainty that this is [00:53:00] a secure election and we have 100 percent confidence that nothing went  wrong.

And you just brought up that the chain of custody issue. And that's that's a critical vulnerability path so that the chain of custody was broken, then you really you really don't know. You can't you can't say with confidence that it was a fair.

Thank you, Mr. Chair. And, Colonel, last point, if you were in charge, would you want a recount? Would you want an audit? Would you want a do over? [00:53:30] What would you  do?

A forensic audit will tell you what was processed. But to the mayor's point earlier, as soon as those mail in ballots, which were one point nine million requested and I  think.

A good a good roughly return, if those signatures weren't verified, then, you know, you can count the same things over and over again. But, you know, it's you're starting with flawed. Results already [00:54:00] an audit, a full audit would be able to tell you if those were, you know, bad, bad ballots or preprinted ballots, you know, you could do a full forensic audit on the actual ballots. But once the envelopes are separated from the ballot on that many mail in ballots, it's it's it's almost it's almost impossible to go back without doing a forensic analysis of each ballot paper.

Ok, and Mr. Sharon, Colonel, do you have any [00:54:30] information about potential shipments of ballots to Arizona and other places from North Korea or something like do you have any information like that?

There were several affidavits that were provided to the legal teams. I don't have those affidavits with me now, but there were. Affidavits and suggestions, and I think more of those are in it processed to to obtain more affidavits on those processes.

Mr.  Mayor, thank you. Can [00:55:00] you tell us whether or not you have got the I don't know if you heard the question or do you have affidavits that counterfeit ballots were somehow shipped into Arizona?

All right, thank you, Representative Cook, any questions? Yes, yes, Mr. Chairman, thank you.

And I'll make it brief, but I do have some stuff that I'd like to say is that, Colonel, when I ran for office in 2016, I got a phone call one day that one of our county recorder's office [00:55:30] information had been breached and all of the voter information was for  sale on the Dark Web.

That was my first instance of being as a becoming representative about this hacking and computer stuff and was out  there. I just went through my third election as the  top  vote getter.

And I would like to say that I continuously have been tried to be hacked on my personal or ledger account or whatever is out there on the Internet. I later learned from people, [00:56:00] Colonel, that the reason why this is done out of the country and according to your graph, is that it is harder for us to track these people down and prosecute them when these computer anomalies and things happen from outside the country, inside our country and state. Would that be  true?

We would not have the legal jurisdiction to go seize or search a server outside of the U.S..

Thank you, [00:56:30] Colonel. And would this make sense that if you had a simple phone number and then you went on the Internet and then researched that phone number of where you received a text message and it was from Ukraine, would that not be a red flag that your

phone or information was trying to be attacked or infiltrated? Correct. It would be OK. So moving on to that. Colonel, what I've noticed is that about these voting machines and these plugged [00:57:00] in USB drives when in fact, when we watch across this great country of ours, in many states, we have very few amount of counties compared to other states. In here, you've got to target two counties if you notice that rule Arizona and rule Arizona legislators are up here and we're ready to go to work today. Our constituents demand it and we demand it as their representatives to work for them to solve these problems. But [00:57:30] but  what happens, Colonel, is that the same thing when we look at this country on a map and counties that vote for the President Trump versus counties that don't, it's the population of the masses. So I'm going to get to my point about Maricopa and Pima County. We all in Arizona, we call it the great state of Maricopa because Maricopa County has more legislators at the legislature than rule Arizona does. If we [00:58:00] add all of ours up, we still don't have the numbers to be an equal voice at the state legislature. But we have to work harder, which we can't. So if we look at Maricopa and Pima County, if I was going to now we're going to get down to vote centers, OK, targeted vote centers, Colonel, I wouldn't have to have a USB drive or to infiltrate every voting machine in every vote center in Maricopa in Pima County. Would I or would I just need to target [00:58:30] those individual voting centers in those two massive counties in the state to do what you are saying, to take votes and shift them over in those numbers? What do you understand what I'm asking?

I've seen analysis that boil down national elections to zip codes.

Oh, to just zip codes.

Mr. Chairman, I get fired up when I [00:59:00] get into this stuff because I read and hear everything that that these people have said, it has happened to me. And I just thank you again for your information, confirmation. But when I go back to the 2016 hacking, what I see is a pattern, Colonel, is that there is a plan, there is a larger plan, and it's not a conspiracy theory. And I'm not nuts. But if I wanted to engage in a plan in 2016, Colonel, would I not start hacking and getting the voter databases and information [00:59:30] projecting of why do we have what is the number two thousand or twelve hundred voters, I believe in Maricopa County registered that I believe have voted at a vacant lot. I mean, if I really wanted to go down the road, isn't that the way you would target it?

Yeah.

And again, it's you can interdict this in multiple levels and multiple methods. And I think that's what's happened.

It's a there's so much out there. And it's [01:00:00] it's to your point, you know, you're not a conspiracy theorist, but it's really hard. They've made it so hard for the public to understand it. And we call that in deception operations, ambiguity increasing.

Thank you, Mr. Chairman. Colonel, I have the last question is, and what concerns me over what I've read and seen is that could the data that you say could be traced back only to the scan ballot at this point? So it can't go back to the individual voting machines? Could [01:00:30] that be Bletch Bitz or whatever that stuff is? Could that be could could the tracks as long the longer we take to actually get the machines and check these things out, could there be time to erase that information and cover up? If there was a crime  or.

Misdeal, there could be another batch. Files will go back to the precinct and the machines on the tapes so you can track it all the way back to the machines in the precincts by the tapes. And it's what we showed in the Antrim County, those [01:01:00] those printouts on the on the precinct level so that you can go back.

But really, all that's necessary, there's not really a glitch, but it's just pulling the USB drive out of the out of the voting machine and the  tabulators.

So the the machines themselves, other than the servers, really don't have a lot of resident information. The tabulation machines here, they can have some stored images. But the [01:01:30] you know, where they you retain these you know, the federal election requirements require and I can't remember the U.S. code title. Forty six rings a bell, but the 22 month retention of federal elections records, it would be done in those the ballot images and, you know, electronic backups. So the data is retained. And, you know, you can do forensics on it as long as it's the actual the actual servers [01:02:00] and the actual machines.

Colonel, thank you for your time, your patriotism. And, Mr. Chairman, I yield any remaining time I may have.

Thank you. I believe Senator Going has one more question, and I just need to remind the panel time grows short . I think Mayor Giuliani has significant more witnesses and evidence that he'd like to have heard.

Thank you, Mr. Chairman. Colonel, I just want to get on come back to the Dominion situation [01:02:30] here where the where the backup servers. I'm sorry, where are the backup servers?

I am not exactly sure I can try to get that information provided to you and this company.

I think the mayor said they were a foreign company. The Canadian is out.

So we know we know there are sites in Toronto. Their offices are in Canada. So we know that we know that there were data there. [01:03:00] They also have servers in Serbia and other other places. But as far as knowing for sure where the data from Maricopa County went and resides, we don't know that. But they've got backup servers.

So an audit because we talked about that a little earlier. First off, would that find where the where the server is and where the information would be traced, tracing the flow of [01:03:30] the information? Yes, sir. The audit would do that. Right.

And but it also tell us whether or not it's true or not, that the one point nine million signatures were or were not verified. Right. So we would have an absolute no.

Colonel, could you get a little bit closer to the microphone? I'm getting a lot of people are saying I can't hear the guy talk.

Thank you to the adjudication of the signatures on the the ballots that would [01:04:00] be totally separate, wouldn't be necessarily a digital forensic process. But that audit would be, you know, have to be conducted at the county level and all those on all the envelopes.

So if we did an audit, we were able to do that. Tell me the things that could come out of that.

Well, if the signatures on the envelopes were invalid, you could necessarily [01:04:30] get a percentage of the votes that would be disqualified. But again, when when the ballots are separated from the envelopes, you know, you can't tell which ballot came from which envelope. So really, all that would tell you as a percentage of that, the percentage of those mailing or absentee ballots that were not legitimate.

So what would the what could the server tell us?

The server would basically tell [01:05:00] you all of the electronics of once the ballots are processed, the batches and the the images that that will tell you where all those goes. And it'll also tell you any changes to the software, any updates, algorithms that were in place. And that's all present at the at the code level. And that's really what these companies have balked at, providing access to the code because they said that that's their intellectual property and it's they've been successful at preventing folks from [01:05:30] analyzing the code.

So they're they're utilizing their their system for our elections.

But it's their property. And in counties and states have signed up for that.

Thank you, Senator Berling, final question. Yes, Mr. Chairman. And Colonel, just for clarity, not only can these machines be manipulated with a thumb drive and everything else, it [01:06:00] can be changed remotely outside the voting center.

That's that's correct. And there are references in the user's manual that show how they get to do that. Thank you, Mayor Giuliani.

Anything else with your witness, sir? No, I think all right. I think we covered everything. Thank you, sir. Do you have a next witness? I'm looking at the clock, and I know that we've got a time management issue with one of our witnesses.

Yes, I think we should call and a fourth, OK, because she has an [01:06:30] appointment and we'll call her first. OK, and then after that, Senator Colbeck, we need to make sure that we have him at the airport by one o'clock. All  right.

Thank you very much, Anna Horth. OK, OK. This is an author and a horse and a horse.

Anna [01:07:00] Horth. We'll check on her. And let's go back to. All right, Senator Colbeck.

Just so folks know that we've got folks in a separate room just so that we can bring them out and have some kind of order here, Senator Colbeck.

Thank [01:07:30] you, sir, if you would, could you please introduce yourself?

Yes, my name is on Michigan, former Michigan State Senator Patrick Holbeck, and appreciate the opportunity to speak with you. Mr. Chairman, the esteemed panel members for eight years, I was sitting on the other side of this testimony. I was where you were sitting. And hopefully I'll be able to provide that kind of a unique perspective and want to look out for in this   election.

If you'll excuse me, I'm going to try to get my presentation up here and get that going. Kick [01:08:00] it up.

The technology is great until you want to use it, it's more difficult when you can't  see.

Nice job on the resolution of the screen here. By the. OK, and just for background purposes, as [01:08:30] we're looking for to recognize my USB flash drive.

Here we go. Much better.

And [01:09:00] voila. OK, well, we still don't have it on the screen yet. There we go. All right, and if you if you would please put it in play mode so we can see. Right. Please proceed.

All right. Thank you very much. It was a perfect compliment, I think, to Colonel [01:09:30] Waldron's testimony here, because I kind of got a unique experience regarding this whole election process. First of all, I am a former Michigan state senator. I served on the Senate, Michigan Senate Elections and Government Reform Committee. I took those duties very seriously to the point of diagramming out all of our election process, some pretty good understanding of how elections are supposed to work from a book perspective. Um, but another perspective that's useful to this discussion [01:10:00] is that something that I couldn't do while I was running for office is actually I served as a poll challenger in Detroit at the ADA County Board for the Election Day from five p.m. through the next day into the evening of  the

following day on November 4th. So I was actually at the Detroit the county boards. He may have heard about all the things that happened there on the cardboard up on the windows. Yes, I was there. I was one of the people blocked from returning back into the Detroit Avy County Board [01:10:30] so I could resume my duties as poll challenger as a training our next batch of poll challengers as to what they need to look out for and what we had been seeing.

And coincidentally, by the way, that was when they were counting the military ballots, which just so you guys know, that's when they duplicate the ballots because the military ballots come out in a format that's different from those that can be read by these tabulators. And if you don't have a Republican and a Democrat watching that, it's right for malfeasance, [01:11:00] if you will. And that's exactly what happened. So along with that background, I'm actually a certified Microsoft small business specialist. In addition to being that I actually did cabling design the International Space Station. So I have no problem working with technology. So it's kind of a unique background. And, um, and just so happened that I was right there in the Detroit area accounting board on the night of the election. So I'm going to focus in on just highlight three areas of the diagram that Colonel Walton just showed you, because that's [01:11:30] important for everybody.

Understand, for people on the ground. These are the key piece of technology you talked about. Image can't control. That's the equipment that I witnessed out of the Detroit Accounting Board. It features a high speed scanner and a workstation associated with that. These were networked in turn with adjudicator machines, which anything that was rejected by the high speed scanner would go over to this adjudicator machine that was part of the absentee ballot counting suite, if you will, for Dominion.

In addition, they [01:12:00] had something that was called Local Data Center, where all the election officials would work from a central computer workstation with a series of laptops, et cetera, that that were connected to the rest of these computers won't get involved a little bit later here. But that image cast central area is one of the key pieces of our key systems, if you will, that are on the ground for the absentee ballots. In particular, if you're at an in-person polling location, you'll have the image cast precinct set [01:12:30] up. And that's on the right hand side of this diagram. Up on the top is kind of the local data center and the kind of the eye in the sky, the overarching look at what's going on with the election. And we'll get into that a little bit more detail later. And as you guys know, Dominion Voting Systems was used here in Arizona, in Maricopa County, and they were using some of the same equipment we were just talking about regarding cast precinct and also Mimecast Central that can do the scanner there. So [01:13:00] I. I said that I was in your position before. Right. So if I were in your position, these are kind of some of the key questions I would be asking in regards to all that we're hearing about this testimony regarding this election. No one was a chain of custody for the election. Artifacts broken up. Thank you very much, Senator elect Townsend, for bringing that up. That is a key term for everybody to understand. Chain of custody. And we're going over overrule diagram specifically where some of my comments are going to focus in on in that chain of custody.

All [01:13:30] right. And the key is to  hit the right area.

All right. And was there evidence of election fraud? There can be fraud that happens that may not even violate statute, but you know that the intent is there to defraud the election and they take advantage of loopholes that we had in the law. For example, in Detroit, we know that there was an ability for people to vote both at the poll and absentee. So some people's votes were more important than others. Was there evidence that election statutes were  violated? Yeah, [01:14:00] in Michigan, we have evidence to suggest that's exactly what happened. Was there evidence of foreign agents with the ability to manipulate the election data and third parties getting access to that data? We believe that we've seen evidence of that as well. But the other thing I need to ask is. Well, all right. What are we going to do about it if we see all this happening and what options do you have as legislators? All right, so let's go to this chain of custody and I could go into [01:14:30] a lot more detail on this chain of custody and all, but I'd like to simplify it into just four key artifacts, qualified voter file, i.e., who's registered to go off and vote in your st at e. Number two poll. But that's a precinct specific extract of the data from your qualified voter file. The ballot itself, pretty important  artifact, right? But then in the spirit of the old Stalin quote, it's not he who votes that counts. It's the one who counts the vote that counts. You got to look at the ballot tabulator and how the votes [01:15:00] are tallied. And that was my focus when I went to the Detroit Avy County Board. I was one of those folks that was not specifically assigned to any particular county and station. I was looking at the big picture and we'll go over what I found here in a sec.

First of all, everybody hopefully has seen the idea that there's been a lot  of voter anomalies. This is our first clue that something's happened. When you're on the ground, you can see all the things that are happening, you know, onesie, toussie style. He say, hey, wait a minute, that that envelope with bacteria or you [01:15:30] can see that they adjudicated something in favor of the Democrats or the Republican or something like that. That's easy to go off and see, but it's very difficult to see the big picture that comes out  afterwards with experts like Colonel Waldron. And in this case, we first started seeing issues when people were talking about benefits, law being violated. That's actually using criminal court cases to determine whether or not fraud existed. So that was a first indicator that some of the analysis we've seen flagged that that's not proof. I mean, it's getting them. It's telling you that it's [01:16:00] you've got something off here that you got to investigate. Then we've seen linear regression analyses and there's a lot of noise. And but it seemed to indicate a pattern of vote distribution that indicates some data manipulation. Then most recently, we have actually seen folks who believe that they've identified specifically what the algorithm that was used to switch some of the data. So some other things that were kind of odd and you don't see while you're necessarily on the ground, but in retrospect, you'll be able to get access [01:16:30] to it. This is actually documented as part of the affidavit that was submitted in a lawsuit that's put in Michigan by Sidney Pollen and in other states. And you guys have voted quite a bit. You guys are most of you already served in office. Right. Do you remember any of your votes being tabulated with a decimal point on the back of them?

I, I don't remember any of my eight year serving in the Michigan Senate, anything, any time where I actually had a decimal point after a vote tally.

So that would suggest that a partial person was voting.

Well, [01:17:00] sometimes, you know, there are people that tried to make you feel like a partial person when you serve. But no, that wasn't the case here. And so you guys have probably all heard about what I call the little switch, the Antrim County. We've heard testimony on that already today.

And some of the things that could possibly happen, getting into the possible technical reasons for that is maybe have an internal ballot bar, code switch on it where they have one bar code style or ballot style that's flagged. [01:17:30] And then when they associate a specific scan of a vote, they flip it over to a different bar code. So that may have the voters or the the candidates flipped in it. Something else is something called a rank rank choice voting algorithm. That's one of the modules inside of the Dominion Suite. And this is where you might see evidence of this is the only place that I know of. At least I can start putting infractions, fractions into your vote, because if you meet a certain vote threshold, it'll go off and switch that. It'll it'll [01:18:00] prioritize the votes for the second choice, if you will, and give them 10 percent of the first choice of whoever of the ten percent or whatever number you specify.

It'll actually get into the point of allocating percentage of the votes to one of the candidates. Another thing is data manipulation via remote access. And another thing to look at as you guys investigate what happened here didn't happen inside Arizona is take a look at your public accuracy test.

And there are people that this [01:18:30] is usually in Michigan, at least it's specified what the standards are for that by the secretary of state.

And if you don't run all the possible permutations of votes that might happen on a given ballot, you may leave gaps that can be exploited. And I would submit we're going to show one of the examples of where we believe one of those gaps is that you could maybe flip a vote from a certain candidate to a write in candidate and preload this with. Right. Can't write in candidates. And we think we have evidence [01:19:00] of that happening in Detroit.

So if you want to go off and check into this, one of the things you're going to need to do so. Yeah, yep. As look into a compact flash cards, event logs and paper vote tallies. So these are tabulated data card.

That's where the compact where that's where a lot of the election data would be wanted to look at. It's going to be located. So please make sure you get your hands on that. Then we talk about the big switch. Am I going to get a. A detail on this, suffice it to say, in Michigan, you know, our current vote [01:19:30] deficit for President Trump is being projected as 154 thousand one hundred eighty eight votes.

We got more than that that we can tie back to potential fraud. So in state of Michigan, I know a lot of people have written us off in this context. But I tell you, Michigan is in play because of what the level of fraud we've seen. So here's what our Detroit 80 county board looked like and essentially it was set up.

So there's 503 precincts in the city of Detroit. They put in 134. These image cast Central Station to all the way around. That's where the [01:20:00] poll books were located. And there are about two to five precincts per image cast, central unit. We had five poll workers per station. Overall, I would submit there's probably less than 10 Republican workers at the whole night sitting at those. And by law, we're supposed to have a Republican, a Democrat adjudicating ballot. Here's what I said, that I was looking at a big picture when I got in there. I was looking at the big picture. First question I asked was one of these chief election officials. His [01:20:30] name was Chris Thomas. I said who I worked with when I was serving in the Senate. I said, what? How are you going to protect the chain of custody around the tallies of the individual tabulators and and your report outs to the county and all points beyond that. So we talked about the idea of just getting reported out to New York Times. You can see it on CNN and all that kind of stuff. Show me how that chain of custody is protected. And this election official who is state elections director of Michigan for two decades [01:21:00] said, I don't know. Now, this is kind of important data point, don't you think so?

And I would imagine on the rest of the night I said, you know what? He finally acquiesced and said, Tell you what, I'll let you know.

And then finally, the last statement he had on it, because I was pretty persistent, was saying, you know, what am I going to tell you until after tomorrow? And I go, well, you know, the primary duty of a poll challenger is to make sure that the election process are executed effectively and efficiently and accurately and transparent manner. [01:21:30] He did not allow that to be done. Now I can see physical transfer data. I can watch when somebody moves a flash drive from a tabulator to a central station and I can go off and verify vote counts at that hand. I can't get inside wires to go off and trace electrons through the Internet cables that I saw a position. And that's the next point I want to highlight. And this is something important for you to understand. Here's how these were connected. A lot of these election officials will square up and down that none of these machines are connected to the Internet. And that's [01:22:00] based on propaganda being pushed by companies like Dominion Voting Systems. They will say that they have an air gap. They will say that they have firewalls in place. They have encryption in place. And I hope to demonstrate here that that doesn't mean a heck of a lot. And any hacker worth their salt knows that if one computer's connected the Internet, they're all connected to the Internet firewall or not. And so here's a diagram that I put together based on and this is literally midnight the next night before I forgot everything. I want to make sure I document everything that was there. [01:22:30]

I went through and physically traced all the cables from all the tabulators and adjudicators to the local data center at the big at the top. So it's that local data center that we have election

officials that did confirm that that was connected to the Internet, but they said none of the tabulated or anything else were connected to the Internet. I can show physical connection between those tabulator tabulator machines, Internet cables to routers or magnets, which is tough to tell from 12 feet  away.

But [01:23:00] it's a router type of device connected to all the other devices on this network. And as Colonel Walburn pointed out, it's designed to work as a network. And so all these tabulators were connected to one another, all the adjudicated or connected to one another. The local data center that they acknowledged was connected to the Internet were connected to these tabulators and adjudicators. So and so if that wasn't enough, we went around to all the different computers and observed on the bottom right hand corner of all the computers. I can't do this because it defaults in a certain [01:23:30] slide presentation mode. If you have laptops that are window enabled and you're connected to the Internet, you roll over that and you've got a Windows 10 device, roll your mouse cursor over on the bottom right hand corner, you'll see a land Internet connection icon and you roll over, it's going to pop up and say connected to the  Internet.

They wouldn't do that test for me to go off and demonstrate that. Yeah. So, guys, it's serious stuff. And I also want to highlight I took a snapshot of what the Wi-Fi connections were at that point in time. And one of them is called Avy, Underscore, [01:24:00] Connect.

I wonder what that was connecting part of their spec that they have in the contract with the state of Michigan that are supposed to be connected to Ethernet cables, and they even have cellular based modems that they can plug in to a lot of these items to transfer the data over the Internet. They've got to Dominion Tech Support Manual that's connected to the  Internet. There's no denying that this was network connected. And by the way, even if they say a. Wasn't connected to the Internet in the Detroit County, where I can [01:24:30] trace a physical connection that says that the system that was used to tabulate 170, 2000 plus votes in the state of Michigan with all network together. So even if it wasn't some guy sitting in an ice shanty in Antarctica connected to the Internet, that one guy in the city of Detroit that had access to all that information could modify the votes locally   there.

So why does it matter? Well, we already talked about these man in the middle attacks we talked about in the City Powell [01:25:00] lawsuit that's out there. There's additional exhibits that highlight that these passwords are available on the Internet. And when you have a man in the middle attack, you think you're getting the right data. You think you're talking to the right person. But, yeah, you're talking to an in-between guy. We also got nasty left a key under the mat. What I mean by that, all the specs on what files to look for, what their file size is, everything else, or the voting system is left up on the Internet for everybody to go off into. I went there myself. I could download this file, took that extract from it. You can find out everything [01:25:30] you need to go off, manipulators, a hacker.

And we've got Challenger observations on the ground that attest to each and every one of these. And I just want to highlight one of them, the poll worker observation that we actually   he

actually observed the fact that the printout of the tape said that there were a write in candidates on it. Yet when you actually hear your test in his affidavit that there were no write in ballots submitted, Senator Colbeck, we're out of time.

Yeah.

So thank you very much [01:26:00] for your testimony. We also appreciate the slide deck that you presented. And if you are willing, would you please distribute it that to the members of this panel? And I'm sure Mayor Giuliani would like to have it as well.

I will leave a comment for everyone. Any questions for this gentleman here or would you like to move on to north? We can move on to. All right. Thank you very much. Senator North, would you please come up to the witness stand?

I [01:26:30] guess at the table, not a stand, I was just corrected, the witness said.

Thank you for coming in. Thank you for having me.

Would you please give your name and Mayor closure's my name is Anna and I'm a resident and registered voter in Pima County. I [01:27:00] volunteered as a poll observer .

Can you get a little bit closer to my car? Thank you.

Again, my name is Anna and I'm a resident and registered voter in Pima County. I volunteered as a poll observer on October 16th, and then I signed up to work as a poll worker on November 3rd in a neighboring precinct.

Would [01:27:30] you like me to just give you an overview? Is that. Yes, please do.

Ok, well, I. I wrote in because I was aware of some irregularities that happened while I was a poll observer and some different activity that I just felt uncomfortable with on Election Day. So I'll go ahead and start with what happened on the [01:28:00] day that I was an observer. I was certified prior to that to be able to watch the two people that would be correcting the the problematic ballots, which I guess are called they were duplicates.

When I walked into the room, they said, I'm sorry, you're not you can't be in here. You're [01:28:30] going to go into the another room. So I had to walk back to the front desk. I was escorted from from that area back to this to one area where the ballots were being separated from their envelope. And I I was there were 30 to 32 people doing this and there were probably 14 to 17 tables that where [01:29:00] they are sent to people. And it was supposed to be a Democrat and a Republican. But not every table had a Democrat, but not every table had a Republican. So many of those tables had either a libertarian or some. There was one table with someone from the Green Party and then there were three or four tables that had a Pima County worker at the at each of those tables. And they worked there at the elections  office

[01:29:30] because when people came in from the building, they talked to them. And their conversations led me to believe things like, oh, did you leave your lunch? Did you bring lunch? And they said, no, it's over at in my office. I'm going to go get it later. And she was back in five minutes. So similar situation, conversations that went on with people who came in, with those with those workers.

I found it difficult for me to be able [01:30:00] to oversee 32 people and what they were doing. I was able to catch a few of the things that were mistakes or where ballots were just they were taking them out of the envelopes and putting them on in a pile. And their job in this particular building room was to watch, to make sure that the ballots were in [01:30:30] one direction and then they would double check the count of the ballot to the envelope due to, I imagine, to check it against the envelopes that came in.

Each table was given a bin to put these in, and these bins would then go to another area where they were being stacked up to be tabulated starting on October 22nd. [01:31:00] Many of these had mistakes or they were written in pencil. And the workers as I went around had questions. You know, is this a good ballot? Is this not I was told by the gentleman that ushered me out of the place where I was supposed to be and said, you aren't to talk to anyone. You do not communicate with them. If you have an issue or you see an issue, you need to go to the supervisor, which is at the front of the table [01:31:30] that burned the room. So as I saw things, as I went around to each table, I would go to the supervisor and I let her know.

You know, they don't know what to do with this this ballot pencil or whatever, and she'd say, no, it's fine, it's fine.

So as I went back to the tables where I saw these issues under my breath, I said, you need to go tell her, you need to go talk to them about this. And so [01:32:00] many of them said, what do I do with this ballot? It's in pencil. Oh, it's fine. It'll go through. Or it was some people wrote over their ballot, over the little oval circle where they were supposed to mark and. Those were put into a pile, a separate pile that would be called duplicates, those duplicates then went to another table and were then taken to the room where I had been ushered out of. And there was one person there [01:32:30] were supposed to be a second person. And I said, is there a Republican at that table? Because I said, is there a Democrat and a Republican? And he said, well, we hope so. They have to if they get here, but it'll just be, you know, just be me and hopefully a second person. So I as I saw these ballots along this area, that was that they marked as doop, which I understood to stand for duplicates that were going to be fixed. [01:33:00] They would then be taken to the table, to the room where I could see a glass. It was a glass wall between us and they were taken around to the other side to be dealt with. I didn't get to see that at that point. So when I left and the other person took over for me at one o'clock, I was there for five hours. I shared with her.

I said there's a lot of mistakes that are happening. They're just they're [01:33:30] not putting them in the order that they need to be in. So when they get folded, they become a duplicate because they can't be counted. The machine wasn't going to accept them. So it had to be then

taken out of the pile and put in to a duplicate. So when I left, the man who had ushered me out of the room, the first room. He came to get me at one o'clock and walked me straight over to the front desk and he said, I hope everything [01:34:00] went well. And I said, well, my concern is not necessarily where I was. It was hard for me to watch 32 people by myself. But more concerning is when these ballots were opened in the other room. And so to give you kind of a sense of how it worked as the ballots, however they were collected, were brought into an initial area of the office of the elections in Pima County. And in that room, [01:34:30] they were then the envelopes were then opened up and the signatures were checked.

So then they would go through a double door where they were then sent to the room that I was in, where there were as many people as I explained before trying to put them in in order, not necessarily of where they were from, but how they came in. So just let's just say there were maybe 200, 250 per box, I'm not sure. But they they came from different [01:35:00] zip codes, different areas. It was whatever was mailed in. And then those were then put aside to be counted after the 22nd. It was my concern was the amount of ballots that were considered to be problematic, that were then leaving the area that I was in, going to a room where there were only supposed to be two people and yet not even sure there was two people. So that was my experience as an observer [01:35:30] that I shared. I thought that was concerning. The other thing is when I came back to drop off my ballot, I had to drop it off outside and there was no longer a police officer. And we found out that it was because our mayor or not my I live in our valley.

But the Tucson mayor had asked had wasn't allowing a police officer in front of the office anymore because it was upsetting to [01:36:00] people to come and vote.

And so I asked the man so might have put my ballot out here and he said, yes. So I said, how can I be sure someone isn't going to come and take this big box? And he said, no, we're you know, we're watching it. And I said, Who's you? And it was him and an elderly woman who was about 85. I don't know. I'm sorry. Meaning that she was she looked fragile and I don't know how that could be protected, but I was a little concerned about that. It did make it in because [01:36:30] when I checked my ballot, it was counted. But another question is how how do we know who we voted for? That's a separate issue. But my point is, is that I don't know if my ballot actually has the the people that I voted for. And, you know, as I said, that's something separate from what I experienced there as an observer. I as a poll worker, I was assigned to be a provisional [01:37:00] ballot clerk, and that was on Election Day. And on that day, I had worked the primary in August. So I had an idea of who would come by, what the issues were. But this time we had so many more people who needed a provisional ballot than we had been allotted to have in this one precinct. So that was concerning. But the people [01:37:30] that came to me were I had so many people who said I didn't ask for a mail in ballot. My wife isn't listed as a as an early ballot person, but I am.

And that those are the kind of people that we had a lot of. But secondly, I had people who had just moved here from other states and most of them were from two apartment [01:38:00] complexes. It was it was concerning because as we counted them, we probably had over 40

people who were in one apartment complex with one address who had moved here from other states that I began to turn away a little. I'd say, I don't know. Within the hour we were so busy that I took a break and went outside and a gentleman with a yellow shirt said, [01:38:30] hi, I'm I'm with I'm with the Democratic Party. I'm here from California and I'm here at this precinct specifically. I came from a Phoenix in Maricopa County, a precinct there. And we're here to help turn. Arizona blue, and I don't know if we're just looking at me, he decided that he felt safe saying that to me, maybe he assumed [01:39:00] that I would be OK with that. I was shocked. And he and I said, oh, so what? He said, oh, I said, so what is what is your plan? What are you doing? And you said, well, I have lawyers on call to contact immediat ely. If you if they don't allow them to vote people to vote. And I said, well, there was a cutoff date and he said, no, every count, every vote should count. So that made me nervous, of course, [01:39:30] because I didn't know the law specifically and I didn't want to do   something.

That would cause a problem, so I thought and he said, oh, I've only had to turn away. Now, just a couple people were turned away and I was able to help.

One person to go back in. Well, that that was probably sent to me because I was the provisional ballot [01:40:00] clerk, so of course, that was somebody that I had to take care of. So I went back in and thought, well, this is unusual. I'm concerned that somebody outside is going to be calling an attorney on something that I did because I said no. I sent somebody away and said, I'm sorry. I mean, if you don't have any proof that you've lived here or proof of having registered, I. I can't I can't give you a ball ot. So [01:40:30] I called the recorder's office and explained this and she said, well, you have to let them. All votes will count, but it's on a case by case basis . So at that point then I had to call in to the recorder's office every at every single ballot. And you have to understand, we ran out of spaces. So, I mean, and we were at like 200. I'm sure you can check on this, to be sure. But we were over the amount of ballots we had. But [01:41:00] every time I called the recorder's office, they would ask me for their name and their their birth date of birt h. And when they would look that up, she the person on the phone would say, OK, well, you can go ahead and let them vote. And so I was trying to find a constant that I could go by so that we could speed up the process. I mean, is it is it if they've moved here and they have this and if they've moved here [01:41:30] in a certain date, what is it? And they would not give me any consent.

They just said, you just have to call for every case is different. So my concern and why I wrote in was that I had two people right after having a slew of people who came in from other states wanting to vote without having been registered and allowed to vote per the recorder's [01:42:00] office. I then had someone come in from Maricopa County and one from Pinal County. It just happened right after. And each of them, when I called in, they said, nope, you're going to have to have them go back to Maricopa County and the other will have to go back to Pinal. And I said, well, how is that that this person from Wisconsin and this person from Michigan and this person from Kentucky was able to do that, and she put me on hold for a second and then came back and said, well, it's just that [01:42:30] we have their records more accurately than we have for Maric opa. We just can't we don't have we're not able to process the Maricopa County ballot. So I had to send them away. But then as the other people were

coming through, it made me question why that was happening. So I. I asked them. Do you have information that will prove that you are a resident, that I can I [01:43:00] can verify that you are registered to vote here and they would pull out their card and it very clearly said that they were Republican. They had a voter card. So to to test this theory out, I called the recorder's office.

And ask them and they were denied, I had to deny them, and so I was in a frenzy trying to [01:43:30] take care of all of these people, but I found that the discrepancy between every.

Every vote counts, and only those that the recorder's office would allow was indicative.

Of how they chose who they wanted to, allowed to vote, and there was.

Consistency [01:44:00] in the.

Voter preference that they chose and that. Concerned me, because by the end of the night, which was at eight, 15. After [01:44:30] we counted all of the votes and they got put in the box and we were waiting for. Someone to come get them. I'm in the car and the.

The election was was already.

Outed for Arizona, which I found appalling. [01:45:00] First of all, after working 16 and a half hours, taking in votes, but. The experience really led me to believe that it was not there should have been a a system that we could have followed because I understood that registered voters [01:45:30] ended on a certain date and you couldn't come in and vote. But I was having to allow people to vote that literally had just moved here within two weeks, three weeks. And they were all from two different. Not all that, I take it back. There was a large majority, a large percentage of people who were had addresses from two apartment complexes. And the last thing is that I had a homeless man who came in with the with the registration [01:46:00] and a reason I know he's homeless because I said, where do you live? And he said he didn't speak English. And he said, I don't have a home. But when I was at a shelter, they registered me at the recorder's office. So when I called about it and they said, well, he was probably registered to be in this precinct. And I said, but he doesn't live here. And they go, well, it's anybody who was registered downtown can vote. And so I found that to be odd. And [01:46:30] last week for work, I was on the other side of town and I saw this gentleman on this side, sun, with his shopping cart.

And I.

I swung into the parking space and called him and just said, hi, can I talk to you? And when he saw me, she ran off. You know, who knows why? But my my point is, is these are the kind [01:47:00] of people that that had apparently permission to vote in a precinct that was literally 25 miles away because they had a voting card that was given to them from downtown, that it was a downtown precinct that allowed him to vote here. So my my point is, is that if somebody from Pinal County in Maricopa County can't vote, how is it that, in my view in this precinct, how is it that a homeless man from another area [01:47:30] of the town and also people from other

state were able to get permission to vote? And that was concerning to me, and that's why I'm here.

Mister, thank you very much. Mr. Giuliani, do you have any questions specific to this witness? Sure. Please proceed. Try just just to give you a marker on time. It's 12 or two.

So you were there for 16 and a half hours on Election Day. [01:48:00] Yeah, yes. Wow. And you were supposed to  work with the ballots that were being that were being examined.

I was working with the voters, the ballots of voters who were not able to walk into the precinct to vote normally on a ballots. So some of them came to me saying it says that I got an early ballot.

And I never got it. Others [01:48:30] said it says it doesn't even say that I'm on their.

It says that I've already voted or I'm not allowed to vote here. Those are the kind of. So these were ballots that had difficulties. Yes. And there were 20 or 30 to 35 people that were looking at those ballots that you had to observe. No, that was OK. I know. And I just described to you my experience as a poll worker on Election Day. Those 30 people that we mentioned earlier were. [01:49:00] But were when I was a poll observer on the 16th of October.

Or at the elections office in your county and you were unable to see what they were doing.

I thought it was a room as big as almost maybe.

It half the size of this banquet room, and I was an observer [01:49:30] watching.

And as far away as we are, I could walk behind them, I could walk behind them, but I couldn't walk behind 35 people at the same time. And what were they doing? They were taking them out of the envelope. They had already been they had been brought in from the recorder's office where that where the ballot had been opened, the envelope had been opened. And according to [01:50:00] what I was told, the signature had already been checked in another  room.

But you didn't see the signature?

No, I didn't get to see that they would take these out. And they what? Did you ask to see it? Yes. And I was not allowed. Yes.

So they said and I wasn't allowed to talk to anybody. But I as I said before, I could talk to the supervisor, these people who sat in each of these tables who [01:50:30] were representative of.

Mostly one party with Democrat Party, and they would take them out of the envelope and then put them in a pile and then separate the on the inside envelope in Arizona. We have an outsider both in the inside and then the ballot. Right. Right. So the ballot was then collected

from the bin. So each table would get in a bin and they would separate [01:51:00] them, put the ballots in in a pile, put the envelopes in a rubber band, put them to the side, and then mark that they had so.

Such and such amount of of regular ballots and such as?

Amount of duplicates, problematic ballots that then have to be taken to a  table.

And they would separate [01:51:30] those, take the duplicates, mark them, put them at a table which which were then taken to the original room where I had been ushered out of, not that I was not to put them in a room that you were excluded from the exam and. The signatures, yes, no, they started examining the signatures, then removed to this. Through and then from this room, they were then piled to then tabulator examination of the   signatures.

No, [01:52:00] not in this room. The only room there was nothing you observed no examination of signatures. And they refused to let you do that.

Right. I was only allowed to watch these people put these in piles. So when I was not sure.

So how many how many ballots do you think? Just a rough estimate. How many ballots? 1100. I 2000.

I would say each box had between 200 and 250 ballots. And I was there for five hours. And during that time that I was there, each table went [01:52:30] through six to seven to eight, depending on how fast they were and how many mistakes they made, because many times the ballots were clipped, were straight and they had to recount  them.

Or I would hear them say, so how do we how do we do that arithmetic?

All right. Well, let's see. Two hundred and fifty times eight. Somebody who's not nervous, maybe you can say 2000. That's per table. And there were about 16 to 17 tables of two people doing [01:53:00] this at the same time.

So. So as I best understand this, there were 2000 ballots on 17 tables. Yes. That you or anyone else might know have got you got a chance? No Republican got a chance to  observe that, as far as you  know.

Well, I was the only observer allowed.

I didn't at one time, so a gal took over for me at one o'clock when I left and I told her I'm exhausted. I [01:53:30] don't know how you can watch all 17, but stand behind one of the tables and you'll see that this particular table keeps folding them.

And tearing them and once that happens, it has to become a duplicate. And when this becomes a duplicate. It goes to that table and it goes to the room where we don't get to see what happens to that. So. You can't talk to them, but you can do this and tell them, look, that's that's that's Foldit or that's crooked or.  [01:54:00]

And I said, if you see one again that has pencil on it, the supervisor is saying, yes. She told me specifically that it could go through. I mean, told me that it it couldn't, but told them that it could. So I said there's some discrepancy in what she's telling me and what she's telling me. So, you know, just do your best to try to keep an eye on this particular cable is doing this. That particular cable when I [01:54:30] walk by is. Doing that, that one over there has a Pima County worker on it and she works here with them. And there's no Republican at that table, so it's it's it's very concerning and and so when I was ushered out, they came specifically.

Twice to me and said, please don't talk to anybody and. You cannot live on your own, make sure that [01:55:00] when it's time, what time you have to leave so we can walk you out when they walk me out, the gentleman said, I hope everything went  well.

And I said, well, I'm concerned because here they were. You know that my only concern is the handling of the ballots, which makes them ineligible to go through the machine correctly. But it's the room before me and the room after me that it's a concern I don't get to   see.

Let me just let me ask you about that. So certain number of ballots were now put aside as duplicates. [01:55:30] Yes. Duplicates means that they had a problem. Yes. That they have to be duplicated. Right. So, I mean, there were two ballots, right? That's duplicates can sound like two ballot. What I meant was there's something wrong with it and therefore we may have to duplicate. Yes. And that's the room that I was originally. And they were put aside, put aside. They were brought into another room and two  people. You were not allowed to go in? No, I was not allowed to go back there. So you you were cut off from that also? Yes, [01:56:00] I was. We were cut off from observing the problem  ballots.

Yes. I was specifically taken out of that room, ushered out and brought into this room, which really was just the room, as I explained. And how many how many could you estimate that is on each table would have an average of six. I would say maybe one sixteenth.

The [01:56:30] pile, so, you know, let's say an average of maybe 10 to 20 gallons, but by the time I left, there were these bins were filled. They would fill them, they would go correct them or whatever it is that they did and brought them  back.

Best estimate, I would say my guess would be close to in the time, the day that I was there, just five hours, maybe 2000 ballots, OK? Yes. [01:57:00]

And you had a sense. That when there was problems with ballots or.

Whether someone should vote or not, the choices that were being made were to allow people that appear to be voting for Biden and the Democrats to vote and declining those who appeared to be people [01:57:30] who might be voting for Trump.

Well, the Republicans well, yes, I began to get that sense after I saw that people from other states who weren't even registered in the state of Arizona were being allowed to to vote. I was given direction that I had to give them a provisional ballot because as they walked out, there was a gentleman out there who told me he was specifically there to make sure that every vote [01:58:00] voter who wanted to vote could vote. And so that was on Election Day, though, Mr. Giuliani. That's not on the observatory, the data on it and on that day that that happened. And then when I would get a voter who was from another county and had some indication sometimes they had a shirt that either said Trump on it or they they [01:58:30] showed me their voter card and and said, I you know, they gave me some indication that they were a Trump voter.

And I had to call on them like I did for every single person that came in to the recorder's office. And I was told to send them away. And so it was at that point that I started to see that there this isn't this isn't this can't be right. This can't be right. [01:59:00] So I tested this in and out. And then especially as you recognize that, yeah, and so when I said they all you all live at this apartment complex and you all live at this other one. And and they said, well, yeah, we have to, you know, we're all coming in to vote. And so I said, well, are you ready? How long have you lived here this year? The precinct here? Well, I've lived here. I've lived there. And they still were allowed to vote, many of them.

Were [01:59:30] not residents for more than a month, other people said they were registered in another state, but that they were here.

And and then, as I said, I think that the nail in the coffin for me was when this poor little old homeless man and I speak Spanish. So I spoke to him and said, you know, how are you here? And he said, I was told to come vote. I want to vote. And I said, OK, well, you know, do you wear.

Do [02:00:00] you live and he goes, well, I lived in a shelter downtown. Well, downtown is 15 miles from where I live, so I'm sure that's not his precinct. He should be voting.

So you thought there were about 2000 like this?

Roughly, I would say easily, just in the five hours that I was there on one specific day, and that was on a Friday. They were going to be counted. They were being collected to be tabulated.

Last question. The gentleman who said he was there [02:00:30] to turn Arizona blue.

Yes, that was he. What was his official position?

He had he had a sign of specter of some kind. No, he was an observer, a poll observer that was from California, from L.A. and in and on a break, I walked out there and and I said hello and just walking. And he said hi. And I said, What are you doing? And he said, Well, I'm a poll observer for the Democratic Party [02:01:00] and I'm here. I said, Oh, is he? Because the weather is hot here. It's not as hot  as it is at home. And I said, well, where are you from? And he said, I'm from California. And he said, what do you do here?

And he said, Well, I'm here specifically to help turn this precinct blue.

But this is one of our problem ones, and I said, oh, and as I said to the panel over here, I don't know why he felt comfortable telling me that, but he said, I [02:01:30] and I said, you came all the way from L.A. because no, actually, my precinct in Maricopa, where it was another one that we were we're focusing on and now I'm here.

What was he doing? Was he campaigning with you, encouraging people to vote for for Biden? What was the what activities did he take part in to turn Arizona?

Well, as I understood, because I was inside working his job [02:02:00] was to make sure that anybody who was turned away to vote, that he would have people he could call attorneys, in his words, because I I have a couple of attorneys that I'm connected to right now that if anybody is not allowed to vote, I can make sure that they're represented. And so anybody who was not  allowed to go in that polling place, I was the one that they would be talking to.

So, of course, that [02:02:30] was that was somewhat directed at me, since I'm the one who would say, no, you can't vote. So I don't know what else he was doing. But he said there was a group of them that were coming and they said there some time after you began doing that, he was there.

Well, we started at five o'clock in the morning just getting ready. So when I went out for my first break, I was maybe around 10 o'clock and he had been there and they were they I [02:03:00] I'm sorry. I don't remember what he had on his shirt, but they were they were very clear that they were they had T-shirts. They said that they match another person came in to take over for him and it  was a yellow shirt with something written on the  front.

Right. Well, thank you very much for your service and courage to testify. I just make one point, Mr. Chairman, of her testimony alone. And I see no reason why she isn't telling the truth. [02:03:30] By the way, she is under oath in the sense that she submitted an affidavit under penalty of perjury to what she just testified to. Thank you, sir. That 34000 vote on unobserved change in election is not just any one witness.

Sir, thank you very much. Thank you, members. I know, I know everybody wants to ask a question. We need. Well, [02:04:00] everybody has one. It is now 12, 15. I expect this hearing at the rate that we're going, we will be here until late into the night. Please be brief with your question, and I would appreciate it if there's no follow ups just so that we can have a lunch

break and kind of set the expectation for the folks who are here and get back at it and we'll try to make. The witnesses focus a little bit more. All right, thank you, Mr. Mayor.

Leo Suchi, [02:04:30] I'm sorry, Representative Suchi, your first and Mr. Birling.

Thank you, Mr. Chairman. Thank you for being here. Just a quick question about the voters that you said were coming in that were from. At a town or they just move there, whatever their reasoning was, did they have an Arizona?

With an address or anything to show you where they on the voter rolls or these, they were not on the voter rolls, they had out-of-state driver's licenses. I don't know why, but. Have [02:05:00] a either an electric bill or not.

Or some kind of a build that they showed me on their phone, showed me that they lived in this particular precinct with that I would call the the recorder's office and you would verify through them that they were indeed legal to vote. Right. And so then when I said, well, when did you move here? Well, I moved here on such and such a date. But you had to have registered, I think, in Arizona [02:05:30] by the 15th and then it was extended to the 22nd or the twenty or so it was. It was just questionable that they were still allowed to vote. But I had a longtime voter who wasn't allowed, who wasn't from another precinct, and yet someone could vote from another state.  Perfect.

Thank you, Senator Birling. Yes, sir. Thank you, ma'am. When the votes that needed to be duplicated, the ones that need to be corrected, when they went to the end of the room, did you notice anybody in there that was actually overseeing [02:06:00] that correction, a Republican or a Democrat?

No. As I mentioned before, that's the first room I went into. And he explained to me that he this is the  room where that would happen, but that I was not  allowed to be in there.

When you were in there before they sent you somewhere else, did you see a Republican and a Democrat observed he was only one. You know how he was registered. Do you know if he's registered Republican or Democrat?

I, I don't know, but I have an idea.

But that would be the bottom line is we'd [02:06:30] appreciate no speculation. Thank you very much. It's a violation of the law anyway, because you're supposed to have both. Well, thank you. All right, members, one question and then we're going to break for lunch, Representative Townsend.

Thank you, Mr. Chairman. And I just have a really quick question. We had our county recorder in Maricopa County instruct voters to cross out mistakes on their ballots for the November election. And we later had a judge say no, that was likely breaking the law. You can't do that.

We've [02:07:00] also heard from adjudicators saying that they had seen a full Republican ballot, but all the way down, but that President Trump's name was crossed out and. The other candidates was circled in, is it possible, in your opinion, in that other room that you weren't allowed to be in when there wasn't a second person watching the.

The adjudication. Were there pens allowed, were there were they would someone be able to cross [02:07:30] out one candidate and vote for someone else?

Well, again, I wasn't in their. Or to be able to say this accurately, but there's only, you know, can make an assumption if. If a room requires two people in an observer that a person by themselves. It's possible of course, it's possible that that's what happened, but those are the kind of ballots that I'd see that because [02:08:00] I was able to see the.

As it came through in this room, there was they were either all  for.

Gop or all for the Democratic Party, but one of the president, little Oval, had been marked off or no crossed, which makes it a problematic ballot [02:08:30] so that.

That would have to go into the other room that you're asking me about, and again, I wasn't in there to be able to speak accurately about what this person could or could have done or didn't do. And that, to me was the big problem in this whole issue. I I'm useless to be able to watch people just putting them in order. I should have had an observer watching.

Ok, thank you. All right. Sir, thank you very much for your [02:09:00] testimony. Ladies and gentlemen, here's how we're going to manage the lunch break as you leave. Please wait a minute before you walk out the door or you won't get back in as you're walking out the door, you'll be given an ar mband. And in order to come back in, you'll have to show that armband we are going to break. It's now 12, 22. We will be back here at one o'clock. It's going to be a short break. Thank you.

All [02:10:00] right, welcome, everybody. Again, this is live, as well as with Blake with Bright Side Broadcasting [02:10:30] Network. We are live on the ground here in Phoenix, Arizona, where Team Trump is doing their legal hearing regarding election irregularities in the state of Arizona. We've heard from three witnesses already, and it looks like we're going to be going late into the night. So we will be taking a lunch break and reconvening at 1:00. So don't go anywhere. We'll bring you the live coverage right back. But. Before we go anywhere, we have a couple things we just like to point out from what we've heard [02:11:00] already today. And I think our partners over at my pillow, we know that getting a restful night's sleep is crucial to waking up on the right side of the bed and with Christmas right around the corner. Now is the perfect time to stock up on all these products from a company with a Patriot owned company. Visit my pillow dotcom to stock up on all the guests for yourself and your loved ones. My pillow guarantees ultimate relaxation with a wide variety of items to choose from ranging. [02:11:30] From ultra plush towels, dog beds, mattress toppers and keys. The dream sheets and so much

more, including one of their biggest savings so far, which is the regular my pillows valued at sixty nine, ninety eight. If you use codas and you can get those right now for just 29, 98, a huge savings. Again, my pillow dotcom has hundreds of products to choose from. And if you use code [02:12:00] Arizpe and at checkout you can get up to 66 percent off your entire order. This is the perfect time to support a conservative company right before the holidays go out and get your shopping done. Now, you do not  want to  wait till it's too late.

That being said, I mean, what what do you. I think so far a lot has happened today, we've heard a lot  of information, there's there's been an awful lot of information  presented.

And I think that Mayor Giuliani's remarks at the beginning [02:12:30] about how there's a narrative out there that the election was the most secure ever. And I think he believe he said, please don't interrupt that narrative with the truth. And that's really, really what I think. I mean, I believe that we're in a situation where there's limited media coverage of this event, and it's not because of the information being provided isn't newsworthy. It's not because there aren't facts here that are being discovered or being given to the lawmakers of Arizona for consideration.

It's because they're [02:13:00] exactly other networks are perhaps just not feeling that there's a story here. And in fact, this would be the largest political. Story of this century and even last century, I mean, it's a scandal of immense proportions. If, in fact, voter fraud can be proven, they're not even looking for it, and I think that's that's disturbing, not in the slightest.

And we've been to Phoenix a lot. We know Fox five, [02:13:30] Phoenix is had all the rallies and I thought that we'd at least see them here today. But like you said, they don't even  care.

I mean, not even enough to give an ounce of oxygen to breathe on their nightly news routine. So it's it's shocking. It's upsetting, but. We honestly don't need them, what we have around 200000 watching alone on YouTube, so thank you to everyone. For tuning in, this should not be a polarizing topic, I think people on both sides of the [02:14:00] spectrum right now should be worried about election integrity hearing these. Witnesses, factually, it just doesn't make sense, Dominion Software is in Smartmatic.

Software Systems Huge, which is owned by Hugo Chavez and has been raised in so many corrupt Central and South American countries like Venezuela, I mean, that alone should tell you that's not something that we want to be utilizing here in the United States when it is our [02:14:30] election integrity, the presidential election of the United   States.

Something's got to give.

Yes, and both the army colonel and the former senator from Michigan presented pretty clear evidence that these servers were connected to the Internet, that they weren't air gap, they were not just, you know, not immune from tampering by some form of malicious actor who went on to gain access to those totals. So saying that it's the most secure election ever. I think

[02:15:00] that's been completely blown out of the water today. I think there's just no way that anybody can look at the. Data and look at the information and and hold that to be true, I think that that story should be dead in the water at this   point.

Yeah. With having the Ethernet cord connected to. The server, this does allow for Internet access and in turn it allows for communication.

Between these servers to the black, what do they call the [02:15:30] black box? No, no, no.

Dark deep web. Deep web. I mean, anyone anyone like he said, any hackers can get on and change this, so. Quote, I want to take away from that is that your Venmo account is more secure than your 2020 vote, and that is what a information warfare specialist said today.

Absolutely. I believe that, you know the compact. Flash cards that they are using to transfer [02:16:00] votes and just really it's really I don't. But just the fact that some of the media service run on Windows 10 alone is enough for me to speak. Really give pause to it, I mean, the fact that these things are so easily manipulated. By operators and then even one one operator with the correct permissions at a remote workstation through the network, as these machines are designed to work, has the ability to change totals, [02:16:30] is completely off putting. You know, Janet Ellis had a great quote, too. And that's that was that. We're not asking you to overturn an election. We're asking you to ensure that corruption does not stand. And I think that's the core of what all of these hearings are about, to educate the American public   that. This is the election took place, the results are there, but the results that we're looking at are fraudulent, are are at the very least beset by [02:17:00] the allegations and the possibility of fraud and the fingerprints of fraud. It's it's completely there and what she's tasking the lawmakers is to do is basically admit that you're not overturning an election, you're taking back your constitutional authority as a member of your state legislature to appoint the electors that you feel are appropriate for your state.

Thank you. And we are about to wrap it up here. Great commentary, Blake. But [02:17:30] to wrap it up here, we need to clear this room. But we do want to remind you guys that Rightside Broadcasting Network is almost entirely viewer funded, meaning we rely on your donations to go from rally to rally, hearing and hearing and to cover the White House and the march for Trump, which is currently going on today. So it's a bus tour covering twenty three cities in two weeks and we cover all of that. There's a lot going on right now. We're providing as much content as possible. So if you've enjoyed seeing a little bit of different avenues. Here at our then [02:18:00] keep those donations coming and we'll keep providing you some of the greatest coverage that we possibly can. There's a number of ways you can support us. The first one is by clicking that dollar sign in the bottom right hand corner of the YouTube Supachai. And the second way is via our website, whether you donate or not. Check out our website. That's W w w darris B network dot com forehead's donate the third way by sending a check and we love to read these letters that come with the checks and that is send those to our SBN at fifty and [02:18:30] 50. Opelika Road Suite six box three four for Auburn, Alabama, three six eight three zero moderators. Thank you for being here today and drop those addresses down below. We

are going to hop out of here for exactly thirty minutes and we will be right back. So don't go anywhere. This is the stream you want to stay on.

# EXHIBIT 7

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

# PHIL WALDRON

## PROFILE

Proven senior leader, with specific expertise in the federal operations, I conduct business development and strategic planning to achieve annual revenue goals in a tremendously complex, highly regulated, and rapidly changing field.  I have a unique background with extensive industry experience enabling identification of business opportunities from a customer's perspective.  I drive access through contracting, system-based electronic systems integration.  I work with matrixed teams to identify shared business goals and focus capabilities and resources on specific business needs.  I develop and build relationships with key internal and external decision-makers, including executives and Key Opinion Leaders to expand the level and scope of my influence to develop business-to-business opportunities. I have a proven track record of results-focused leadership and team building.  I have a current Military Retiree Identification and retain a Top Secret Clearance.

## EXPERIENCE

### COLONEL, UNITED STATES ARMY (Retired)

As a senior officer in the US Army Reserve, I was responsible for planning, coordinating, budgeting and executing Unconventional Warfare, Strategic Communications, Strategic Influence Operations, and Psychological Operations.  I enabled decision-making for senior civilian and military officials at the Under-Secretary and Four-Star level.  I gained extensive global operational experience working with a wide range of highly matrixed Inter-Agency Teams on problem solving and course of action development.  I also worked with coalition, host-nation, and tribal faction leadership to build ad-hoc organizations to enhance US and Allied Strategic Objectives.  I was specifically trained in Key Leader Engagement, Negotiation, and Cultural Adaptation, and worked alone or in small indigenous teams to engage with influential personalities.  I developed skills in analyzing all-source intelligence to identify opportunities, develop unique concepts for operational execution, and produce negotiated agreements.

**US Army Reserve Officer Apr 1997 to July 2016:\*\***
- Senior Officer assigned to the United States Northern Command as the Strategic Information Operations Planner. Also served in Joint and Interagency designated special mission units for specific named operations, NATO, CENTCOM, SOCOM, SOUTHCOM, AFRICOM and the Defense Clandestine Service – Special Operations Directorate
- Analyzed, planned, coordinated, and integrated the execution of unconventional and sensitive strategic operations, requiring Top Secret / Sensitive Compartmented Information (TS-SCI) Clearance and Polygraph
- Responsible for briefing high level US government officials on observations and recommendations for sensitive national security operations.
- Conducted risk management, developed and gained approvals for new concepts and capabilities, and evaluated the execution and effectiveness of sensitive and compartmented operations

**FEDERAL ACCOUNT DIRECTOR, PFIZER INC, Aug 2018 to May 2019: (Retired)**
- Responsible for Market Access, Pricing and Contracting initiatives in the Federal Business Channels: Dept. of Defense (DoD), Dept. of Veteran's Affairs (VA) and the Medicare Administrative Contractors (MACs)
- Work directly with senior leaders at VA PBM as well as the Defense Health Agency and Defense Logistics Agency to ensure formulary access for the BioSim Portfolio through value modeling and contracting.

- Served as a member of the Pfizer Colleague Council for the Veterans In Pfizer and the Veteran Recruiting Lead for Global Diversity and Inclusion Initiative

**BIOSIMILAR ACCOUNT MANAGER, PFIZER INC, Nov 2016 to Jul 2018:**
**BUSINESS MANAGER, PFIZER INC.  TEXAS, Sep 2000 to Nov 2016:**
**INSTITUTIONAL HEALTHCARE REPRESENTATIVE - POWERS RX, Dec 1996 to Sep 2000:**


**US Army Air Cavalry Officer, May 1986 to Apr 1997:\*\***
- Served as a commissioned Army Officer in the 17th US Cavalry stationed at Ft. Bragg, NC, the 9th US Cavalry at Ft. Wainwright AK, and the 21st US Cavalry at Ft. Hood, TX
- Led Air Cavalry Troop in the conduct of Attack, Reconnaissance, and Combat Surveillance
- One of a handful of officers selected for a second company level command as Brigade Headquarters and Headquarters Troop Commander

\*\* Awards and Decorations: Combat Action; Senior Army Aviator; Paratrooper; and Air Assault Badges. Defense Meritorious Service Medal, Army Meritorious Service Medal and Joint Meritorious Unit Award (Multiple) and many lesser awards and decorations.  Detailed Military Biography, Evaluation Reports, Awards and Decorations Available


**EDUCATION**

- BS in Biomedical Science, Texas A&M University – Graduate 1986.  Distinguished Military Graduate
- US Army Command and General Staff College, ILE, Graduate 2008
- US Army Information Operations Course, US Army Command and General Staff College, Honor Graduate 2008
- Masters of Business Administration, Jack Welch Management Institute, Strayer University – Graduate 2014
- Specific information on other DoD Training and Certifications available as required

# EXHIBIT 8

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

8  Tyler Bowyer; Michael John Burke; Nancy Cottle;          No. CV-20-02321-PHX-DJH
   Jake Hoffman; Anthony Kern; Christopher M.
9  King; James R. Lamon; Sam Moorhead; Robert
   Montgomery; Loraine Pellegrino; Greg Safsten;            **EXPERT REPORT OF**
10 Salvatore Luke Scarmardo; Kelli Ward; and                **PROFESSOR GARY KING**
   Michael Ward,
11
12                Plaintiffs,
13 v.
14 Doug Ducey, in his official capacity as Governor of
   the State of Arizona; and Katie Hobbs, in her
15 official capacity as Arizona Secretary of State,
16                Defendants.
17 ─────────────────────────────────────
   MARICOPA COUNTY BOARD OF
18 SUPERVISORS; and ADRIAN FONTES, in his
   official capacity as Maricopa County Recorder,
19
20                Intervenors.
   ─────────────────────────────────────
21

22        Pursuant to 28 U.S.C. § 1746, I hereby verify that the following statements are

23 true and correct to the best of my knowledge:

24 *Report of Gary King*

25 In this report, I evaluate evidence described and conclusions drawn in several Exhibits in this
26 case offered by the Plaintiffs. I conclude that the evidence is insufficient to support conclusions
   about election fraud. Throughout, the authors break the chain of evidence repeatedly – from the
27 2020 election, to the data analyzed, to the quantitative results presented, to the conclusions
28 drawn – and as such cannot be relied on. In addition, the Exhibits make many crucial

assumptions without justification, discussion, or even recognition – each of which can lead to substantial bias, which was unrecognized and uncorrected. The data analytic and statistical procedures used in the Exhibits for data providence, data analysis, replication information, and statistical analysis all violate professional standards and should be disregarded.

**Exhibit 2: "An Analysis of Surveys Regarding Absentee Ballots Across Several States" by William M. Briggs**

1. *Summary:* The conclusions of this Exhibit are not supported by the evidence provided. The lack of crucial information provided about the survey violates professional standards in this field and is insufficient to support the stated conclusions.

2. Proper survey research requires precise details about all of the following (among others), none of which appear in the Exhibit:

    a. A *probability sample*, which normally involves (a) an enumerated list of all members of the target population of interest and (b) a *known* random mechanism of selecting members of the population to be interviewed. (For example, we could have a list of all voters and sample selection conducted by random lottery, where each voter has an equal probability of selection.)

    b. Detailed information about the *entire chain of evidence* from the election we are studying to the quantitative information in the dataset to be analyzed to the numerical results.

    c. The *response rate*, including precisely how this rate was computed, and precise information about *how those who responded to the survey differed from those who refused* (which indicates how representative the survey respondents are and whether adjustments need to be made during statistical analysis).

    d. *Carefully worded and validated survey questions.* Surveys are well known to be highly sensitive to the specific questions asked (for example, using the word "baby" in a question about "attitudes toward abortion rights" can completely change respondent answers) and so best practices in the field requires pretesting, cognitive debriefing, and clear, measurable validation. Without these steps, we cannot know whether the answer a respondent gives reflects the specific views we seek to measure.

    e. *Detailed information about survey response biases.* Retrospective surveys, such as this, are well known to have substantial biases which must be studied, known, and corrected. This retrospective survey, in particular, was conducted while the President was claiming election fraud, and so we need to know whether supporters and opponents of the President responded to this survey ways that might bias the results toward their favored positions. Even in elections without this behavior, retrospective studies are well known to give incorrect answers to who each respondent voted for and whether they turned out to vote in the first place. (For one of many examples, more survey respondents typically report having voted than there were voters.) These and other types of biases can be

large, but correcting them is impossible if – as in the present Exhibit – they are not measured and reported, and proper statistical techniques are not used.

    f.  Statistical analysis methods must be developed to adjust for all the information in items a-e.  Applying simple means or counts to the data without adapting them to all of the above – as was done in the Exhibit – can yield highly misleading results.

    g.  Complete information must be provided about how the data was analyzed. The standard of information reporting (now used widely in the academic literature) is that it must be sufficiently detailed so that a third party would be able to replicate the results in the Exhibit without talking to the original author. See Gary King. 1995. "Replication, Replication." *PS: Political Science and Politics*, 28, Pp. 444-452. Copy at https://j.mp/2oSOXJL.

3.  The following two sentences is a summary of the information Exhibit 2 provides about its sampling procedures: "Survey data was collected from individuals in several states, sampling those who the states listed as not returning absentee ballots. The data was provided by Matt Braynard."

    a.  None of the terms in this sentence are defined.  We do not know what "survey data was collected", who collected it, how it was collected, etc.  The Exhibit does not say which "individuals" were surveyed or who was approached to answer a survey question.  The terms "several states" is not defined.  Where we can find "those who the states listed" is not reported.

    b.  Thus, this Exhibit excludes information *necessary* for making valid scientific inferences and drawing accurate conclusions. The Exhibit itself violates academic standards, and cannot be relied on for the purposes claimed.

4.  Exhibit 2A reports several undocumented and unexplained numerical tables apparently from the survey. If this is correct, the first table indicates that the survey researcher attempted to interview 81,704 people of which 684 completed the survey ("1-Completed Survey"), for a response rate of 0.008 (8 tenths of one percent), far below any professional standard for a modern survey.

5.  The Exhibit does not measure or discuss how representative these 684 people are of the target population and how the broader group was selected, and likely biases are not addressed, corrected, quantified, or even noted.

6.  To provide more information about the inadequacy of this report, I also list a few more specific examples from the report indicating undefined procedures, unprofessional methods, and unjustified analyses:

    a.  The Exhibit indicates that "The survey asked respondents whether they (a) had ever requested an absentee ballot". Unfortunately, the precise survey question was withheld, which is sufficient to reject any conclusions based on this question, but if we take the phrase literally it means a respondent could answer yes if they requested an absentee ballot in any election, including those prior to the 2020 Presidential election, which is obviously irrelevant to the present case.

b. The Exhibit reads: "If so, (b) whether they had in fact returned the ballot". The Exhibit needs to provide evidence that the respondent is interpreting the word "returned" in the same way as the Exhibit, which itself is not precisely defined. Does it mean mailed, dropped off, received, counted, or something else? Apparently small issues like this can greatly bias statistical conclusions if not known and adjusted.

c. The Exhibit says "I produce predictions…" but does not indicate how these predictions were made. No information is provided and so the claimed "errors" have no relevance for drawing conclusions, since they could easily be errors in the authors' predictions, computed with secretive procedures.

d. Almost regardless of how the predictions were produced from survey data, it is inconceivable that the author could reliably estimate what the Exhibit calls "Error #1, those who were recorded as receiving absentee ballots *without* requesting them" or "Error #2, those who returned absentee ballots but whose votes went missing". Methods do not exist that can do this without knowing considerably more than the Exhibit provided.

e. "The size of the errors were large" – No metrics were provided for the errors and so "large" is undefined.

f. The report also apparently references data about official records, such as the number of absentee ballots and the number returned. The report does not give the origin for this information. The chain of evidence for this information (just as with the survey) must be made available. With any break in the chain – and the links in the Exhibit are mostly missing – no reliable conclusions can be drawn from the data.

g. The report fails to explain how the quantitative tables that appear in the body of the report were constructed. As such, they cannot be interpreted and no reliable conclusions can be drawn from them.

h. The report fails to provide information about how the figures in the Appendix were constructed. As such, no conclusions can be drawn from them.

**Exhibit 4: Declaration of [redacted]**

1. *Summary:* The statistical methods used in this Exhibit do not represent best practice in current scholarship and can easily induce bias. The methods themselves are used incorrectly. No data is provided. Crucial information about how the analysis was performed was withheld. The conclusions in this Exhibit are not supported by the evidence provided.

2. The two statistical methods in this Exhibit are well known to be suboptimal and to induce bias in conclusions. Neither should be used for the task at hand.

   ○ The Exhibit is correct in claiming that the statistical analysis method in Item 7 (known as "CHAID") does not make *modeling* assumptions, but CHAID does make a host of *other* assumptions that are not defended, discussed, or even

listed; each can bias conclusions. For this reason, statisticians and data scientists mostly do not use CHAID any longer and have turned to more modern approaches.

- ■ The Exhibit provides no information about how this method was used, what assumptions were made, what the results look like, or how the results from the method generated its conclusions.

○ Matching is a popular method of statistical analysis, but current scholarship has shown that "propensity score matching" should not be used. This point was first described in this peer reviewed scholarly article: Gary King and Richard Nielsen. 2019. "Why Propensity Scores Should Not Be Used for Matching." *Political Analysis*, 27, 4. Copy at https://j.mp/2oTKhnd.

- ■ The Exhibit clearly violates best practices even in the use of this suboptimal method. It includes no diagnosis of whether the chosen propensity score model accomplished its narrow goal of reducing covariate balance. Often propensity scores makes imbalance worse, hence increasing bias relative to not using it at all, and so this checking is an essential step, without which no conclusions can be trusted.
- ■ The Exhibit also violates best practices by not providing any sensitivity analyses with alternative variables or alternative matching methods.

3. The Exhibit misrepresents the statistical concept of "p-values". No analysis described here can produce results that are a "statistical impossibility". Even "improbable" results are not "impossible": In other words, in the US voters are allowed to vote however they wish. Voters are sometimes predictable, but sometimes not. And even when they are predictable by some methods on average, individuals go their own way and vote on whatever basis they choose.

4. Item 10: the colors described in this Exhibit – for example, delineating which areas are used by Dominion voting machines – do not appear, as the report was scanned in black and white. This means that the central evidence claimed in this Exhibit does not appear in the Exhibit and cannot be regarded as admissible evidence in this case.

5. Item 16: This Exhibit misleadingly cherry picks only the *upper* bound of a 95% confidence interval without also mentioning the *lower* bound, which even under the Exhibit's assumptions are equally likely. In addition, even if the Exhibit's logic were correct, we would *expect* to see results outside the upper and lower bounds in 5% of elections like this one, making claims about "impossibility" incorrect.

6. Item 12: if voters are predictable, as claimed here, then prior voting behavior should be used as a predictor. This is standard practice in decades of scholarly literature, but it was ignored here, hence biasing the conclusions.

○ The data to do this would have been easy to include. Typically, the lagged vote share is the single best predictor of current vote share at the county level.

○ The national correlation at the county level between Trump's proportion of the vote in 2016 and 2020 is very high. This is a strong and reliable pattern across centuries of electoral data in thousands of elections; see Jonathan N. Katz, Gary

King, and Elizabeth Rosenblatt. 2020. "Theoretical Foundations and Empirical Evaluations of Partisan Fairness in District-Based Democracies." *American Political Science Review*, 114, 1, Pp. 164-178. Copy at https://j.mp/2BkgYTP

7. Item 14: The Exhibit provides no information about how the particular model used was chosen. If it is indeed the "best estimate", as claimed in the Exhibit, there must have been other models run. Yet, none of which were reported, again violating standard practice in the field.

8. In 10 swing states, pivotal in the election and the subject of litigation, President Trump won in 81% of the 351 counties that used Dominion and 79% of the counties that didn't; any statistical analyses -- parametric or non-parametric -- that contradict this empirical finding must provide sufficient justification that rejects this simple observation. No discussion of basic results such as these appear in the Exhibit. See for example https://wapo.st/36EOeEU.

**Exhibit 6: Statement of Joseph T. Oltmann**

1. This Exhibit claims to base conclusions on a statistical technique called "ARIMA", which is used to analyze *time series* data. Yet, no time series data is discussed in this Exhibit. No references to the underlying data appear. How this method was used is not discussed. No statistical results from this method are presented. None of ARIMA's considerable and consequential assumptions are considered or justified. No reliable conclusions can be drawn from this analysis.

**Exhibit 9: Declaration of Seth Keshel**

1. *Summary:* The conclusions of this Exhibit do not follow from the evidence provided, even assuming arguendo that the evidence is accurate.

2. For example, in Item 7: Just because Republicans outpace Democrats in post-primary registration rates does not, in and of itself, indicate that Trump would win in 2020. Voters are of course allowed to cast their ballots however they choose, including for candidates of another party if they wish. In fact, "split ticket voting" – where a person votes for different parties for different offices in the same election – has increased in many areas of the country in this election, as it has at different times throughout American history.

3. Item 11: Increases in Democratic votes in one county does not in and of itself indicate anything nefarious; voters are permitted to vote however they choose. The Exhibit also creates predictions in dubious ways, such as by choosing counties to compare to Maricopa on the basis of an arbitrary margin of votes. These counties may differ from Maricopa in myriad other ways, none of which are addressed in the Exhibit. The Exhibit's conclusion that the result is a "virtually impossible number" because the author's predictions were wrong does not follow from the evidence.

**Exhibit 19: Declaration of Matthew Bromberg**

1.  *Summary:* The assumptions of the model used in this Exhibit to draw conclusions do not apply to the 2020 election, or almost any other. Conclusions in this Exhibit are based on a set of theoretical and largely counterfactual assumptions, ones that have no bearing on the case at hand. As such, conclusions from this report are unsupported.

2.  The key assumption in this Exhibit is that "each person chooses their candidate independently". Political scientists have shown in hundreds of articles and books that voters do not flip coins to determine who to vote for (as the Binomial distribution the Exhibit uses assumes). In fact, few vote without any influence from the opinions of others around them. Much of the essence of politics is the collective expression of a population, which would not happen with each voter in a silo, isolated from all others. In fact, voters are routinely influenced by the campaign, the candidates, advertising, the media, and other voters. Assuming that none of these processes are operating – as the independence assumption in this Exhibit implies – turns the Exhibit into hypothetical discussion about nonexistent elections.

    a.  The fatal flaws in this line of reasoning, and the fact that these assumptions are "not warranted by the data", are well known in the statistical and political science literatures. For example, see: Andrew Gelman, Gary King, and John Boscardin. 1998. "Estimating the Probability of Events that Have Never Occurred: When Is Your Vote Decisive?" *Journal of the American Statistical Association*, 93, Pp. 1–9. Copy at https://j.mp/2ovXwOF

3.  The Exhibit relies on data that has no known providence: the chain of evidence from the election we are studying to the Exhibit is broken in multiple places and so cannot be relied on.

    a.  The website is a *wiki*, which means *anyone* can make edits without being identified: the site has no authentication, authorization, and even claimed identification by the data contributors, as email addresses and real names are not even required to deposit data. This is a wholly inadequate approach to providing supposedly empirical data. It cannot be relied on.

    b.  The wiki site makes its problems explicit by writing in bold: "**Warning: There may be some vandalism from those who are denying the reality of the fraud - we've been expecting this. Most of the damage has been cleaned up.**" The operators of the site, thus, break the chain of evidence further by not explaining what "cleaned up" means, providing any information about data providers, or by giving evidence that they are acting as neutral arbiters and curators of data, wherever it originated.

**Exhibits Plaintiffs Submitted Late**

I understand that plaintiffs disclosed additional expert opinions on the evening of December 5, 2020, well after the deadline for disclosing expert materials. I have not yet had

an opportunity to consider these materials but, if asked to do so, may offer additional opinions on these new expert reports if the Court allows them to be considered.

**Qualifications**

Detailed information about my qualifications, including my bio and cv, can be found at GaryKing.org.  My work on this report is pro bono.

I am the Albert J. Weatherhead III University Professor at Harvard University -- one of 25 with Harvard's most distinguished faculty title -- and Director of the Institute for Quantitative Social Science. I develop and apply empirical methods in many areas of social science, focusing on innovations that span the range from statistical theory to practical application. I have published widely in peer reviewed scholarly journals on elections, voting behavior, statistical analysis methods, political science, and social science.

I am an Elected Fellow in 8 honorary societies (National Academy of Sciences, American Statistical Association, American Association for the Advancement of Science, American Academy of Arts and Sciences, Society for Political Methodology, National Academy of Social Insurance, American Academy of Political and Social Science, and the Guggenheim Foundation) and have won more than 55 prizes and awards for my work. I was elected President of the Society for Political Methodology and Vice President of the American Political Science Association; have been a member of the Senior Editorial Board at *Science*, Visiting Fellow at Oxford, and have written more than 175 scholarly journal articles, 20 open source software packages, 15 patents, and 8 books.

My publications are widely cited in academic publications across scholarly fields and beyond academia. I was listed as the most cited political scientist of my cohort; among the group of "political scientists who have made the most important theoretical contributions" to the discipline "from its beginnings in the late-19th century to the present"; and on lists of the most highly cited researchers across the social sciences.

I have served on more than 30 editorial, nonprofit, and corporate boards; as founding editor of *The Political Methodologist*, and on the governing councils of the American Political Science Association, Inter-university Consortium for Political and Social Research, Society for Political Methodology, Midwest Political Science Association, Center for the Advanced Study in the Behavioral Sciences at Stanford, and the Institute for Data, Science, and Society at MIT.

With my coauthors, I developed the methods used by courts and parties to detect partisan gerrymandering. My "ecological inference" methods for inferring individual behavior from aggregate data are used in most jurisdictions in applying the Voting Rights Act to detect racial gerrymandering. I have consulted widely about these and other issues for both major political parties, the courts, and others.

I received a Ph.D. from the University of Wisconsin-Madison (1984). I then taught at NYU for three years before moving to Harvard in 1987.

Gary King, 6 December 2020

# Curriculum Vitae
# Gary King

September 6, 2020

| | | | | |
|---|---|---|---|---|
| **Contact** | **1** | Articles . . . . . . . . . . . . . . | 10 |
| **Education** | **1** | Software . . . . . . . . . . . . . . | 24 |
| **Positions** | **1** | Patents . . . . . . . . . . . . . . | 25 |
| **Honorary Societies** | **2** | Supreme Court Amici Briefs . . . | 26 |
| **Prizes, Honors, Awards** | **2** | **Companies Founded** | **27** |
| **Research Grants** | **6** | **Corporate and Nonprofit Boards** | **27** |
| **Writings** | **9** | **Conference Activities** | **30** |
| Books . . . . . . . . . . . . . . | 9 | **University Service Activities** | **31** |

## Contact

Institute for Quantitative Social Science
Harvard University
1737 Cambridge Street
Cambridge, Massachusetts 02138                    GaryKing.org

Direct: (617) 500-7570                             King@Harvard.edu
Assistant: (617) 495-9271                          king-assist@iq.harvard.edu

## Education

Ph.D., Political Science, University of Wisconsin, Madison, 1984.

M.A., Political Science, University of Wisconsin, Madison, 1981.

B.A., *Summa Cum Laude*; Highest Honors in Political Science;
State University of New York at New Paltz, 1980.

## Positions

Albert J. Weatherhead III University Professor, Harvard University, 2009 to the present.

David Florence Professor of Government, Harvard University, 2002 to 2009.

Professor of Government, Department of Government, Harvard University, 1990 to 2002.

John L. Loeb Associate Professor of the Social Sciences, Department of Government, Harvard University, 1989.

Associate Professor, Department of Government, Harvard University, 1987 to 1989.

Visiting Assistant Professor, Department of Political Science, University of Wisconsin, Madison, Summer 1985.

Assistant Professor, Department of Politics, New York University, September, 1984 to 1987.

# Honorary Societies

*Elected Member*, National Academy of Social Insurance, 2014.

*Elected Member*, National Academy of Sciences, 2010.

*Elected Fellow*, American Statistical Association, 2009.

*Elected Fellow*, Society for Political Methodology, 2008.

*Elected Fellow*, American Association for the Advancement of Science, 2004.

*Elected Fellow*, American Academy of Political and Social Science, 2004.

*Elected Fellow*, American Academy of Arts and Sciences, 1998.

*Guggenheim Fellow*, John Simon Guggenheim Memorial Foundation, 1994–1995.

# Prizes, Honors, Awards

*Gwilym Gibbon Research Fellow*, Nuffield College, Oxford University, 10/1/2019–9/30/2022.

*Excellence in Mentoring Award*, Society for Political Methodology, 2019.

*Robert H. Durr Award*, for "the best paper applying quantitative methods to a substantive problem" at the previous year's MPSA Conference, for "How to Measure Legislative District Compactness If You Only Know it When You See it," with Aaron Kaufman and Mayya Komisarchik, 2019.

*Miembro Vitalicio (Lifetime Member)*, Asociación Mexicana de Ciencias Políticas (Mexican Political Science Association), 2017.

*Best Paper Award*, Political Communication Division, International Communication Association, 2017, for "How the Chinese Government Fabricates Social Media Posts for Strategic Distraction, not Engaged Argument" with Margaret Roberts and Jennifer Pan.

*Dartmouth Ventures Entrepreneurship Competition, 2nd place*, for Thresher, with Rebecca Fair, 2015.

*Warren E. Miller Award for Meritorious Service to the Social Sciences*, Inter-University Consortium for Political and Social Research, 2015.

*Accelerator Award*, Harvard University, Office of Technology Development, for "Let Machines Score so Teachers can Teach," which became Perusall.com, with Eric Mazur, 2015.

*MPSA Kellogg/Notre Dame Award*, from the Midwest Political Science Association, for the best paper in Comparative Politics, 2014, for "Reverse Engineering Chinese Censorship through Randomized Experimentation and Participant Observation," with Margaret Roberts and Jennifer Pan.

*Statistical Software Award*, Society for Political Methodology, 2014, for Amelia II, by James Honaker, Gary King, and Matthew Blackwell.

*Highly Cited Researcher*, and listed in *World's Most Influential Scientific Minds*, Thompson-Reuters, 2014.

*Everett Mendelsohn Excellence in Mentoring Award*, Harvard Graduate Student Council, 2011.

*Elected Fellow*, American Political Science Association, Information Technology & Politics Section, 2011.

*Career Achievement Award*, Society for Political Methodology, 2010.

*Honorary Doctorate of Humane Letters*, State University of New York at New Paltz, 2010.

*New Hot Paper*, for the most-cited paper in Economics and Business in the last two months among papers published in the last year, for "Misunderstandings among Experimentalists and Observationalists about Causal Inference" by Kosuke Imai, Gary King, and Elizabeth A. Stuart, named by Thomson Reuters' ScienceWatch, 2009.

*Miller-Converse Lecturer*, Center for Political Studies, Institute for Social Research, University of Michigan, 2009.

*Warren Miller Prize* for the best article published in *Political Analysis*, for "Matching as Nonparametric Preprocessing for Reducing Model Dependence in Parametric Causal Inference" by Daniel E. Ho, Kosuke Imai, Gary King, and Elizabeth Stuart, awarded by the Society for Political Methodology and Oxford University Press in 2008.

*Fast Breaking Paper*, for the article with the largest percentage increase in citations among those in the top 1% of total citations across the social sciences in the last two years, for "Matching as Nonparametric Preprocessing for Reducing Model Dependence in Parametric Causal Inference" by Daniel E. Ho, Kosuke Imai, Gary King, and Elizabeth Stuart, named by Thomson Reuters' ScienceWatch, 2008.

*APSA (ITP Section) Best Instructional Political Science Website Award*, for Dataverse, by Gary King, Merce Crosas, and the Dataverse team, 2008.

Elected to the Nominating Committee for the American Association for the Advancement of Science, Section on Social, Economic, and Political Sciences, 2/20-2007–2/22/2010.

Named in 2006 to ISI's list of the "most highly cited researchers in the social sciences," Thomson Reuters.

*The McGraw-Hill Award* for the best journal article on law and courts written by a political scientist and published during the previous calendar year for "The Supreme Court During Crisis: How War Affects only Non-War Cases" by Lee Epstein, Daniel E. Ho, Gary King, and Jeffrey A. Segal, 2006.

*Law and Society Association Prize, Runner up*, to "recognize exceptional scholarship in the field of sociolegal studies for an article published in the previous two years," for "The Supreme Court During Crisis: How War Affects only Non-War Cases" by Lee Epstein, Daniel E. Ho, Gary King, and Jeffrey A. Segal, 2006.

*Best Instructional Innovation in the Social Sciences or Social History, Honorable Mention*, 2005 ICPSR Prize, for "Publication, Publication," by Gary King.

*Pi Sigma Alpha Award*, for the best paper delivered at the previous year's MWPSA Conference, for "The Supreme Court During Crisis: How War Affects only Non-War Cases" by Lee Epstein, Daniel E. Ho, Gary King, and Jeffrey A. Segal, 2005.

*Robert H. Durr Award*, for "the best paper applying quantitative methods to a substantive problem" at the previous year's MWPSA Conference, for "The Supreme Court During Crisis: How War Affects only Non-War Cases" by Lee Epstein, Daniel E. Ho, Gary King, and Jeffrey A. Segal, 2005.

*APSA Research Software Award*, for The Virtual Data Center, by Micah Altman, Gary King, and Sidney Verba, 2005.

*American Judicature Society Award, Honorable Mention*, for the best paper presented at the previous year's meetings of the American, Midwest, Northeastern, Southern, Southwest, or Western Political Science Associations, for "The Supreme Court During Crisis: How War Affects only Non-War Cases" by Lee Epstein, Daniel E. Ho, Gary King, and Jeffrey A. Segal, 2005.

*Elected Vice President*, American Political Science Association, for 2003–2004.

Listed in *American Political Scientists: A Dictionary* (2002), giving the "consensus group of 193 political scientists who have made the most important theoretical contributions" to the discipline "from its beginnings in the late-19th century to the present".

*ISI Emerging Research Front Article*, for authoring an article cited more often in the fields of Psychiatry and Psychology than any other, October, 2002 (for Gary King, James Honaker, Anne Joseph, and Kenneth Scheve's "Analyzing Incomplete Political Science Data: An Alternative Algorithm for Multiple Imputation," *American Political Science Review*), Thomson Reuters' ScienceWatch.

*Clifford C. Clogg Memorial Lecturer in Sociology and Statistics*, Pennsylvania State University, 2002.

*Vision Distinguished Lecturer*, Florida State University, 2001.

*Outstanding Statistical Application Award*, for the outstanding application of statistics in any substantive field, for "Not Asked and Not Answered: Multiple Imputation for Multiple Surveys," with Andrew Gelman and Chuanhai Liu, from the American Statistical Association, 2000.

*The Gosnell Prize*, for the best work in political methodology presented at any political science conference in the preceding year, for "Improving Quantitative Studies of International Conflict: A Conjecture," with Nathaniel Beck and Langche Zeng, 1999.

*The Okidata Best Research Software Award*, for "Clarify: Software for Interpreting and Presenting Statistical Results," with Michael Tomz and Jason Wittenberg, 1999, from the American Political Science Association.

*The Okidata Best Research Web Site Award*, for the Record of American Democracy project and the Harvard-MIT Data Center, 1999, from the American Political Science Association.

*Pi Sigma Alpha Award* for the best paper ("A Statistical Model for Multiparty Electoral Data" with Jonathan Katz) at the previous year's meetings of the Midwest Political Science Association, 1998.

*The Donald Campbell Award* for the "outstanding methodological innovator in public policy studies," from the Policy Studies Organization, 1997.

*The Gosnell Prize*, for the best work in political methodology presented at any political science conference in the preceding year, for the work published as *A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data* (Princeton University Press, 1997).

*Elected President*, Society for Political Methodology, 1997–1999.

*Alumnus of the Year*, State University of New York at New Paltz Alumni Association, 1997.

*The APSA Research Software Award* for "EzI: A(n Easy) Program for Ecological Inference" (with Kenneth Benoit) from the American Political Science Association, Computer Section, 1997.

*State University of New York Alumni Honor Roll* (an award created to honor alumni who demonstrate outstanding professional achievement and significant contributions to higher education and/or public service), from the Chancellor of the State University of New York, 1997.

*The Heinz Eulau Award*, for the best article published in the *American Political Science Review*, from the American Political Science Association, for "Enhancing Democracy Through Legislative Redistricting," (with Andrew Gelman) Vol. 88, No. 3 (September, 1994): Pp. 541–559.

*Elected Vice President*, Society for Political Methodology, 1995–1997.

*Visiting Fellow*, Nuffield College, Oxford University, Summer, 1994.

*The APSA Research Software Award* for "COUNT: A Program for Estimating Event Count and Duration Regressions," from the American Political Science Association, Computer Section, 1994.

*The Mills Award*, for the "outstanding contributor in the field of public policy under age 35," from the Policy Studies Organization, 1993.

*Pi Sigma Alpha Award* for the best paper ("Why Do U.S. Presidential Election Polls Vary So Much When the Vote is So Predictable?" with Andrew Gelman) at the previous year's meetings of the Midwest Political Science Association, 1993.

*The APSA Research Software Award* for "JudgeIt: A Program for Evaluating Electoral Systems and Redistricting Plans," (with Andrew Gelman), from the American Political Science Association, Computer Section, 1992.

*Curriculum Development Challenge Award*, "Undergraduate Research Participation in Political Science," New York University, 1987.

*Research Challenge Award*, "Public Opinion and Executive Behavior: Toward a New Presidency Research Agenda," New York University, 1986.

*University Fellowship*, University of Wisconsin-Madison, 1983–84.

# Research Grants

"OpenDP: An Open-Source Suite of Differential Privacy Tools," Alfred P. Sloan Foundation, Grant No. G-2019-12331, 07/01/2019–09/30/2020, with Salil Vadhan, Merce Crosas, and James Honaker, ($884,838).

"Citation++: Data Citation, Provenance, and Documentation," National Science Foundation, ACI-1448123, 1/01/2015–12/31/2017, With Margo Seltzer and Merce Crosas, ($300,000).

"Applying Theoretical Advances in Privacy to Computational Social Science Practice," Alfred P. Sloan Foundation, 5710003879, G-2014-13661 4/01/2015–9/30/2017 with Salil Vadham, Urs Gasser, Merce Crosas, and Micah Altman ($616,000).

"Preparing Social Science Research Infrastructure for the Potential Inversion of Its Largest Successes and Failures," Alfred P. Sloan Foundation, G-2015-14108, with Merce Crosas, 12/31/2015–5/31/2017, ($751,941).

"Alfred P. Sloan Fellowships: Toward the Creation of Interdisciplinary Fellowships in Data Science," Alfred P. Sloan Foundation, G-2015-20166009, with Richard McCullough, 1/01/2016–6/30/2018, ($124,994).

"RAPID: Measuring the Intent of Chinese Leaders through Censorship Behavior," National Science Foundation, SES-1500086, With Jennifer Pan and Margaret Roberts, 3/01/2015–2/29/2016 ($200,000).

"Causal Inference Methods for Estimating Long Term Health Effects of Air Quality Regulations," Health Effects Institute/Environmental Protection Agency, 4909-RFA11-1/12-3; CR-83467701, with Corwin Zigler et al., 5/01/2012–10/31/15, ($1,033,958).

"Statistically Defensible Comparison of Similar but Disparate Tests," Charles River Analytics Inc./Department of Defense SC1220801 EVIDENT; FA9550-13-C-0028, 2/15/2013–11/14/2013, with Wayne Thornton et al. ($75,000).

"A Bridge from Publishing Words to Publishing Data," Alfred P. Sloan Foundation, G-2014-13659, 1/1/2015–12/31/2017, with Merce Crosas, Tom Carsey, and Jonathan Crabtree ($845,000).

"Privacy for Social Science Research," National Science Foundation #CNS-1237235, 10/01/2012–9/30/2017, with Salil Vadhan, Edoardo Airoldi, Phillip Malone, Latanya Sweeney, ($5,992,707).

"BetterBirth: A Trial of the WHO Safe Childbirth Checklist Program," Gates Foundation #OPP1017378, 5/12/2011–4/28/2015, with Atul Gawande, Jonathan Spector, Stuart Lipsitz, Sue Goldie, and Stephen Resch, ($14,149,388).

"Center for Historical Information and Analysis (CHIA)," National Science Foundation #BCS-1244667, 1/1/13–12/31/2015, with Patrick Manning, ($91,600).

"DataBridge — A Sociometric System for Long-tail Science Data Collections," National Science Foundation #OCI-1247602, 11/1/2012–10/31/2016, with Arcot Rajasekar, Thomas Carsey, Hye-Chung Kum, Howard Lander, Sharlini Sankaran, Justin Zahn, ($463,263).

Disney Research Grant, 2012, ($35,000).

"Helping Journals to Upgrade Data Publication for Reusable Research," 2012-3-2, Alfred P. Sloan Foundation #219264, 6/1/2012–1/1/2015, with Micah Altman and John Willinsky ($1,058,994).

"Text Clustering," Amazon Web Services in Education Research Grant, 2011.

"Measuring, Understanding, and Responding to Covert Social Networks," Department of Defense, Multidisciplinary University Research Initiative (MURI) #W91INF-11-1-0036-DOD35CAP, 11/23/2010–11/22/2016 with Patrick Wolfe, Edo Airoldi, Mung Chiang, David Lazer, Devavrat Shah, and Burton Singer ($6,240,927).

Institute for Museum and Library Services, "Simple Verified Distributed Preservation: A Policy Based Archival Replication System for Libraries, Archives, and Museums using a Virtual Private LOCKSS," LG-05-09-0041-09, with Mark Abrahamson, Ken Bollen, and Nancy McGovern, 10/1/2009–9/30/2012 ($823,016).

National Science Foundation, CDI-Type II: Collaborative Research, "Bibliographic Knowledge Network," DMS-0835500, with James Pitman et al., 10/1/2008–9/30/2011 ($1,211,433).

Library of Congress, "Extension to the Digital Social Science Acquisitions and Preservation Partnership," with Myron Gutmann, Mark Abrahamson, and Ken Bollen, 2009-2010, ($274,832).

Library of Congress, "Extension to the Digital Social Science Acquisitions and Preservation Partnership," with Myron Gutmann, Mark Abrahamson, and Ken Bollen, 2007-2009, ($710,000).

Initiative for Innovative Computing, "GenePattern and the Dataverse Network," with Jill Mesirov, 9/1/2006–8/31/2008, ($250,000).

Time Sharing Experiments for the Social Sciences, "Priming to Increase the Information Content in Survey Responses," with Daniel Hopkins (survey time).

Library of Congress, "The Digital Social Science Acquisitions and Preservation Partnership," PA#NDP03-1, 9/1/2004-3/30/2010, with Myron Gutmann, Ken Bollen, David Weakliem, and Louise Richardson ($2,037,595).

Ministry of Health, Mexico, "Evaluation of the System for Social Protection in Health," 8/1/2004–12/31/2006, ($1,049,981).

National Institutes of Health, National Institute on Aging grant, "Software Development for Resolving Interpersonal Incomparability in Survey Research," Supp. to "Adapting Statistical Methods for Public Health Research," P01 AG17625-01 7/2003–8/2005 ($28,659).

Robert Wood Johnson Foundation, "Scholars in Health Policy Research Program," 9/2003–8/2007, with Nicholas Christakis and Joe Newhouse ($4,564,391).

World Health Organization, "Improved Methods of Demographic Forecasting," 9/2001–8/2003 ($90,000).

Swiss Peace Foundation grant, "International Relations Events Data and Methods Development," 9/2002-8/2003 (two research fellows).

Robert Wood Johnson Foundation planning grant, "Scholars in Health Policy Research Program," 9/2002–8/2003, with Nicholas Christakis, Jennifer Hochschild, and Joe Newhouse ($199,967).

National Science Foundation grant, "A Feasible Uniform Standard for Deep Citation of Social Science Data," grant SES-0112072, 9/1/2001–8/31/06, with Jim Alt and Micah Altman ($805,102).

Toyota Foundation, "Projecting International Conflict," 6/25/01–6/25/02 (a graduate research fellowship).

National Institutes of Health, National Institute on Aging grant, "The Global Burden of Disease in Aging Populations: Adapting Statistical Methods for Public Health Research," with Christopher J.L. Murray et al., grant 1 P01 AG17625-01, 9/30/2000–8/31/2005 ($8,656,009).

Weatherhead Initiative grant, "Military Conflict as a Public Health Perspective," Weatherhead Center for International Affairs, with Christopher J.L. Murray, 2000–2002 ($250,000).

World Health Organization and the National Institutes of Aging grant, "Forecasting Death by Age, Sex, Cause, and Country," 1998–2001 ($529,040).

Digital Library Initiative grant (sponsored by the National Science Foundation, Defense Advanced Research Projects Agency, National Library of Medicine, Library of Congress, National Endowment for the Humanities, and the National Aeronautics & Space Administration) for the "Virtual Data Center Project" with Micah Altman and Sidney Verba et al., grant IIS-9874747, 7/1/1999–6/31/2004 ($2,400,000).

National Science Foundation Grant, Co-PI, "Summer Meetings of the Society for Political Methodology," with Charles Franklin, SBR-9905798, ($68,976).

Intel Corporation, "Geospatial Liboratory Project," with Micah Altman, Susan Lee, Paul Bergen, David Cobb, Arlene Olivero, Thomas Parris, and William Wei, ($150,000).

ICPSR, Data Documentation Initiative Test, with Micah Altman, Michael McDonald, and Michael Ting, ($1,750).

National Partnership for Advanced Computational Infrastructure, supercomputer allocation grant for "Ecological Inference and Voting for the Nazis," with Ori Rosen and Martin Tanner, June 1998 to May 1999.

Centers for Disease Control and Prevention (Division of Diabetes Translation), 15 July 1998–14 July 1999, ($90,311).

Global Forum for Health Research grant, 1998–1999, ($10,000).

National Science Foundation Grant SBR-9729884, "Missing Information in Survey Research," 1 March 1998–28 February 2000 ($175,000).

National Science Foundation Grant SBR-9321212, "The Record of American Democracy, 1984-1990," 1 March 1994–31 August 1997, ($140,996).

Fairness for the 90s Foundation Grant, "The Record of American Democracy, 1984-1990." ($\approx$$3,500,000).

National Science Foundation Grant SBR-9223637, "Generalizing Multiple Imputation to Time Series Data, with Application to Survey Research and Evaluating Electoral Systems and Redistricting Plans," 1 August 1993–31 January 1996, (with Andrew Gelman), $70,000.

National Science Foundation Grant SES-89-09201, "Modeling Representation in District-Based Electoral Systems," 1 July 1989–31 December 1991 ($78,429).

National Science Foundation Grant, Co-PI, "Political Methodology Summer Workshops," 1 June 1990–1 January 1992 ($37,601, with John Jackson, Larry Bartels, Henry Brady, Stanley Feldman, and Gary King).

Smith Richardson Foundation Grant, "Representation and Gerrymandering in American Electoral Systems," 1 August 1989–1 September 1990 ($45,227).

National Science Foundation Grant, "Democratic Representation in District-Based Electoral Systems: A Stochastic Model of Legislative Redistricting," 1 February 1988–31 July 1989 ($37,000).

National Science Foundation, URP grant, Summer, 1979.

Citizen Participation in Government Foundation, 9/1979–5/1980.

# Writings (Books|Articles|Software|Patents|Court Briefs)

## Books

King, Gary; Kay Schlozman; and Norman Nie, eds., *The Future of Political Science: 100 Perspectives*, New York: Routledge Press, 2009.

Girosi, Federico and Gary King. *Demographic Forecasting*, Princeton: Princeton University Press, 2008.

King, Gary; Ori Rosen; and Martin A. Tanner, eds., *Ecological Inference: New Methodological Strategies*, New York: Cambridge University Press, 2004.

King, Gary. *A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data*, Princeton: Princeton University Press, 1997, (replication dataset: ICPSR s1132).

King, Gary; Robert O. Keohane; and Sidney Verba. *Designing Social Inquiry: Scientific Inference in Qualitative Research*. Princeton: Princeton University Press, 1994.

King, Gary. *Unifying Political Methodology: The Likelihood Theory of Statistical Inference*. Cambridge, England and New York: Cambridge University Press, 1989. Reprinted, Ann Arbor: University of Michigan Press, 1998.

King, Gary and Lyn Ragsdale. *The Elusive Executive: Discovering Statistical Patterns in the Presidency*. Washington, D.C.: Congressional Quarterly Press, 1988.

Brace, Paul; Christine Harrington; and Gary King. *The Presidency in American Politics*. New York and London: New York University Press, 1989. Paperback published in 1990.

## Articles

Allen, William E.; Han Altae-Tran; James Briggs; Xin Jin; Glen McGee; Andy Shi; Rumya Raghavan; Mireille Kamariza; Nicole Nova; Albert Pereta; Chris Danford; Amine Kamel; Patrik Gothe; Evrhet Milam; Jean Aurambault; Thorben Primke; Weijie Li; Josh Inkenbrandt; Tuan Huynh; Evan Chen; Christina Lee; Michael Croatto; Helen Bentley; Wendy Lu; Robert Murray; Mark Travassos; Brent A. Coull; John Openshaw; Casey S. Greene; Ophir Shalem; Gary King; Ryan Probasco; David R. Cheng; Ben Silbermann; Feng Zhang; and Xihong Lin. 8/26/2020, "Population-scale Longitudinal Mapping of COVID-19 Symptoms, Behaviour and Testing," *Nature Human Behavior*. Copy at https://j.mp/3h58z8j.

Wojcik, Stefan; Avleen Bijral; Richard Johnston; Juan Miguel Lavista; Gary King; Ryan Kennedy; Alessandro Vespignani; and David Lazer. Forthcoming. "Survey Data and Human Computation for Improved Flu Tracking," *Nature Communications*. Copy at https://j.mp/2X1Oj2U.

Segal, Eran; Feng Zhang; Xihong Lin; Gary King; Ophir Shalem; Smadar Shilo; William E. Allen; Yonatan H. Grad; Casey S. Greene; Faisal Alquaddoomi; Simon Anders; Ran Balicer; Tal Bauman; Ximena Bonilla; Gisel Booman; Andrew T. Chan; Ori Cohen; Silvano Coletti; Natalie Davidson; Yuval Dor; David A. Drew; Olivier Elemento; Georgina Evans; Phil Ewels; Joshua Gale; Amir Gavrieli; Benjamin Geiger; Iman Hajirasouliha; Roman Jerala; Andre Kahles; Olli Kallioniemi; Ayya Keshet; Gregory Landua; Tomer Meir; Aline Muller; Long H. Nguyen; Matej Oresic; Svetlana Ovchinnikova; Hedi Peterson; Jay Rajagopal; Gunnar Rätsch; Hagai Rossman; Johan Rung; Andrea Sboner; Alexandros Sigaras; Tim Spector; Ron Steinherz; Irene Stevens; Jaak Vilo; Paul Wilmes, and CCC (Coronavirus Census Collective). 8/2020. "Building an International Consortium for Tracking Coronavirus Health Status," *Nature Medicine*, Vol. 26, Pp. 1161–1165. Copy at https://j.mp/39ZbDPR.

Lazer, David M.J.; Alex Pentland; Duncan J. Watts; Sinan Aral; Susan Athey; Noshir Contractor; Deen Freelon; Sandra Gonzalez-Bailon; Gary King; Helen Margetts; Alondra Nelson; Matthew J. Salganik; Markus Strohmaier; Alessandro Vespignani; and Claudia Wagner. 8/28/2020. "Computational Social Science: Obstacles and Opportunities," *Science*, Vol. 369, Issue 6507, Pp. 1060–1062. Copy at https://j.mp/2YIuWdh.

Coker, Beau; Cynthia Rudin; and Gary King. Forthcoming. "A Theory of Statistical Inference for Ensuring the Robustness of Scientific Results," *Management Science*. Copy at https://j.mp/2HsaZAY.

Jerzak, Connor T.; Gary King; and Anton Strezhnev, Forthcoming, "An Improved Method of Automated Nonparametric Content Analysis for Social Science," *Political Analysis*, Copy at http://j.mp/2DyLYxL.

King, Gary; Shiro Kuriwaki; and Yon Soo Park, Forthcoming. "The 'Math Prefresher' and The Collective Future of Political Science Graduate Training," *PS: Political Science and Politics*, Copy at http://j.mp/3OUEjFy.

Katz, Jonathan N.; Gary King; and Elizabeth Rosenblatt, 2020. "Theoretical Foundations and Empirical Evaluations of Partisan Fairness in District-Based Democracies" *American Political Science Review*, Vol. 114, No. 1 (February): Pp. 164–178, Copy at http://j.mp/2BkgYTP.

King, Gary and Nathaniel Persily. Forthcoming. "A New Model for Industry-Academic Partnerships," *PS: Political Science and Politics.* Copy at `http://j.mp/2q1IQpH`.

King, Gary. Forthcoming. "So You're a Grad Student Now? Maybe You Should Do This," In *Sage Handbook of Research Methods in Political Science*, edited by Jr. Robert J. Franzese and Luigi Curini. London: Sage Publications. Copy at `http://j.mp/2LcFgoY`.

Jiang, Wenxin; Gary King; Allen Schmaltz; and Martin A. Tanner. Forthcoming. "Ecological Regression with Partial Identification," *Political Analysis.* Copy at `http://j.mp/2vh3O93`.

King, Gary and Richard Nielsen. Forthcoming. "Why Propensity Scores Should Not Be Used for Matching," *Political Analysis*, Copy at `http://j.mp/2ovYGsW`.

Imai, Kosuke; Gary King; and Carlos Velasco Rivera. Forthcoming, 2020. "Do Nonpartisan Programmatic Policies Have Partisan Electoral Effects? Evidence from Two Large Scale Experiments," *Journal of Politics*, Vol. 81, No. 2, April. Copy at `http://j.mp/2o3NZgO`.

Kaufman, Aaron; Gary King; and Mayya Komisarchik. Forthcoming. "How to Measure Legislative District Compactness If You Only Know it When You See It," *American Journal of Political Science.* Copy at `http://j.mp/2u9OWrG`.

Iacus, Stefano M.; Gary King; and Giuseppe Porro. 2019. "A Theory of Statistical Inference for Matching Methods in Causal Research," *Political Analysis*, Vol. 27, No. 1, Pp. 46-68. Copy at `http://j.mp/2GFVqkx`.

King, Gary. Forthcoming. "Edited transcript of a talk on Partisan Symmetry at the 'Redistricting and Representation Forum'," *Bulletin of the American Academy of Arts and Sciences*, Winter, Pp. 55-58. Copy at `http://j.mp/2hSaZyC`.

Miller, Kelly; Brian Lukoff; Gary King; and Eric Mazur. 2018. "Use of a Social Annotation Platform for Pre-Class Reading Assignments in a Flipped Introductory Physics Class," *Frontiers in Education*, Vol. 3, Article 8, Pp. 1-12. Copy at `http://j.mp/2Hhq7MV`. [Reprinted in Cassidy, R., Charles, E. S., Slotta, J. D., Lasry, N., eds. (2019). *Active Learning: Theoretical Perspectives, Empirical Studies and Design Profiles*, Lausanne: Frontiers Media. doi: 10.3389/978-2-88945-885-1.]

King, Gary and Robert X Browning. 12/26/2017. "How to conquer partisan gerrymandering," *Boston Globe* (Op-Ed), 292, 179, Pp. A10. Copy at `http://j.mp/2l6JZtC`

King, Gary; Benjamin Schneer; and Ariel White. 2017. "How the News Media Activate Public Expression and Influence National Agendas," *Science*, Vol. 358, Pp. 776–780. `http://GaryKing.org/media`.

King, Gary; Jennifer Pan; and Margaret E. Roberts. In press, 2017. "How the Chinese Government Fabricates Social Media Posts for Strategic Distraction, not Engaged Argument," *American Political Science Review*, 2017. `GaryKing.org/50c`. Reprinted in Greenhaven, eds., 2018. *Troll Factories-Russia's Web Brigades*, Greenhaven Publishing.

King, Gary; Patrick Lam; and Margaret E. Roberts. 2017. "Computer-Assisted Keyword and Document Set Discovery from Unstructured Text," *American Journal of Political Science*, Vol. 61, Issue 4, Pp. 971-988, `http://j.mp/1qdVqhx`

Schwab, Michail; Hendrik Strobelt; James Tompkin; Colin Fredericks; Connor Huff; Dana Higgins; Anton Strezhnev; Mayya Komisarchik; Gary King; and Hanspeter Pfister. In Press, 2017. "booc.io: An Education System with Hierarchical Concept Maps," *IEEE Transactions on Visualization and Computer Graphics*, PP(99).

Semrau, Katherine; Lisa R. Hirschhorn; Bhala Kodkany; Jonathan Spector; Danielle E. Tuller; Gary King; Stuart Lipsitz; Narender Sharma; Vinay P. Singh; Bharath Kumar; Neelam Dhingra-Kumar; Rebecca Firestone; Vishwajeet Kumar; Atul Gawande. In Press. "Effectiveness of the WHO Safe Childbirth Checklist Program in Reducing Severe Maternal, Fetal, and Newborn Harm: Study Protocol for a Matched-Pair, Cluster-Randomized Controlled Trial in Uttar Pradesh, India," *Trials*.

King, Gary; Christopher Lucas; and Richard Nielsen. In press, 2016. "The Balance-Sample Size Frontier in Matching Methods for Causal Inference," *American Journal of Political Science*, Copy at http://j.mp/1dRDMrE.

Gilbert, Daniel; Gary King; Stephen Pettigrew; and Timothy Wilson. 2016. "Comment on 'Estimating the Reproducibility of Psychological Science'," *Science*, 6277, 351: 1037a-1038a. Copy at http://j.mp/21LW9c8.

King, Gary. 2016. "Preface: Big Data is Not About the Data!," In *Computational Social Science: Discovery and Prediction*, edited by R. Michael Alvarez, Cambridge: Cambridge University Press, 2016. Copy at http://j.mp/1PP466V.

King, Gary. 2016. "The C-SPAN Archives as The Policymaking Record of American Representative Democracy: A Foreword," In *Exploring the C-SPAN Archives: Advancing the Research Agenda*, edited by Robert X Browning, West Lafayette, IN: Purdue University Press. Copy at http://j.mp/1PUq9No.

Crosas, Merce; Gary King; James Honaker; and Latanya Sweeney. 2015. "Automating Open Science for Big Data," *ANNALS of the American Academy of Political and Social Science*, 659, 1, Pp. 260-273, Copy at http://j.mp/2owJE6O

Kashin, Konstantin; Gary King; and Samir Soneji. 2015. "Systematic Bias and Nontransparency in US Social Security Administration Forecasts," *Journal of Economic Perspectives*, Vol. 29, No. 2 (Spring, 2015): Pp. 239–258, Copy at http://j.mp/1ITZ6Mw.

Kashin, Konstantin; Gary King; and Samir Soneji. 2015. "Explaining Systematic Bias and Nontransparency in US Social Security Administration Forecasts," *Political Analysis*, Vol. 23, No. 3 (Summer, 2015): Pp. 336–362, Copy at http://j.mp/1GStulL.

Patrinos, Aristides A. N.; Hannah Bayer; Paul W. Glimcher; Steven Koonin; Miyoung Chun; and Gary King. 3/19/2015. "Urban observatories: City data can inform decision theory," (correspondence) *Nature*, 519, Pp. 291. Copy at http://j.mp/2ovAjMu.

Blackwell, Matthew; James Honaker; and Gary King. "A Unified Approach to Measurement Error and Missing Data: Overview," *Sociological Methods and Research*, In press, Copy at http://j.mp/jqdj72.

Blackwell, Matthew; James Honaker; and Gary King. "A Unified Approach to Measurement Error and MissingData: Details and Extensions," *Sociological Methods and Research*, In press, Copy at http://j.mp/1iOvDUD.

King, Gary, and Margaret Roberts. "How Robust Standard Errors Expose Methodological Problems They Do Not Fix, and What to Do About It," *Political Analysis*, Vol. 23, No. 2 (2015): Pp. 159–179, Copy at http://j.mp/InK5jU.

King, Gary; Jennifer Pan; and Margaret Roberts. "Reverse Engineering Chinese Censorship: Randomized Experimentation and Participant Observation," *Science*, Vol. 345, Issue 6199 (22 August 2014): 1–10, Copy at http://j.mp/16Nvzge.

Lazer, David; Ryan Kennedy; Gary King; and Alessandro Vespignani. 2014. "The Parable of Google Flu: Traps in Big Data Analysis," *Science* Vol. 343, No. 14 (March, 2014): Pp. 1203–1205, Copy at http://j.mp/1ii4ETo

King, Gary. "Restructuring the Social Sciences: Reflections from Harvard's Institute for Quantitative Social Science," *PS: Political Science and Politics*, Vol. 47, No. 1 (2014): Pp. 165–172, Copy at http://j.mp/17Cobeu, reprinted in Kent Worcester, ed. *Navigating Political Science: Useful Readings from APSA Journals*, Washington, DC: American Political Science Association, 2018.

King, Gary; and Sen, Maya. "How Social Science Research Can Improve Teaching," *PS: Political Science and Politics*, Vol. 46, No. 3 (July, 2013): 671–679, Copy at http://j.mp/NFVja6

King, Gary; Jennifer Pan; and Molly Roberts. "How Censorship in China Allows Government Criticism but Silences Collective Expression," *American Political Science Review*, Vol. 107, No. 2 (May, 2013): 326-343, Copy at http://j.mp/LdVXqN.

King, Gary; and Maya Sen. "The Troubled Future of Colleges and Universities," *PS: Political Science and Politics*, Vol., 46, no. 1 (2013): Pp. 81–113, Copy at http://j.mp/U82gj2

Soneji, Samir; and Gary King. "Statistical Security for Social Security," *Demography* (2012), Vol. 49, No. 3: Pp. 1037-1060, copy at http://j.mp/oi27uz.

King, Gary, and Samir Soneji. "The Future of Death in America." *Demographic Research* Vol. 25, No. 1 (2011): Pp. 1–38, copy at http://j.mp/iXUpBv.

Iacus, Stefano M.; Gary King; and Giuseppe Porro. "Causal Inference Without Balance Checking: Coarsened Exact Matching." *Political Analysis* (2011), copy at http://j.mp/iUUwyH.

King, Gary; Richard Nielsen; and Aaron Wells. "Letter to the Editor on the Medicare Health Support Pilot Program' (by McCall and Cromwell)." *New England Journal of Medicine* 366, no. 7 (16 February 2012): 667, copy at http://j.mp/xECMXz.

Honaker, James; Gary King; and Matthew Blackwell. "Amelia II: A Program for Missing Data," *Journal of Statistical Software*, Vol. 45, No. 7 (December, 2011), http://www.jstatsoft.org/v45/i07/.

Goldstein, Edward; Benjamin J. Cowling; Allison E. Aiello; Saki Takahashi; Gary King; Ying Lu; and Marc Lipsitch. "Estimating Incidence Curves of Several Infections Using Symptom Surveillance Data," *PLoS ONE*, 6 (2011): e23380, copy at http://j.mp/rnFl0z.

Wand, Jonathan; Gary King; and Olivia Lau. "Anchors: Software for Anchoring Vignettes Data." *Journal of Statistical Software* 42 (2011): 1-25, copy at http://j.mp/m5tITE.

King, Gary; Richard Nielsen; Carter Coberley; James E. Pope; and Aaron Wells. "Avoiding Randomization Failure in Program Evaluation," *Population Health Management*, Vol., 14, No. 1 (2011): S11-S22.

King, Gary. "Ensuring the Data Rich Future of the Social Sciences," *Science*, Vol. 331 (11 February 2011): 719-721.

Grimmer, Justin and Gary King. "General Purpose Computer-Assisted Clustering and Conceptualization," *Proceedings of the National Academy of Sciences*, 3 February (2011). Reprinted in Robert J. Franzese Jr., ed., 1997, *Advances in Political Methodology*, Edward Elgar Publishing.

Iacus, Stefano M.; Gary King; and Giuseppe Porro. "Multivariate Matching Methods That are Monotonic Imbalance Bounding," *Journal of the American Statistical Association*, Vol. 106 (2011): Pp. 345–361.

King, Gary and Langche Zeng. "Inference in Case-Control Studies," in Shein-Chung Chow, ed., *Encyclopedia of Biopharmaceutical Statistics*, 3rd edition. New York: Marcel Dekker, 2010.

King, Gary; Ying Lu; and Kenji Shibuya. "Designing Verbal Autopsy Studies," *Population Health Metrics*, (2010) 8:19.

Stevens, Gretchen; Gary King; and Kenji Shibuya. "Deaths From Heart Failure: Using Coarsened Exact Matching to Correct Cause of Death Statistics," *Population Health Metrics*, 2010 Vol. 8, No. 6.

Blackwell, Matthew; Stefano M. Iacus; Gary King; and Giuseppe Porro, "cem: Coarsened Exact Matching in Stata," *The Stata Journal*, Vol. 9, No. 4 (2009): Pp. 524–546.

Honaker, James and Gary King, "What to do About Missing Values in Time Series Cross-Section Data," *American Journal of Political Science*, Vol. 54, No. 2 (April, 2010): Pp. 561–581.

Hopkins, Daniel and Gary King "Improving Anchoring Vignettes: Designing Surveys to Correct Interpersonal Incomparability," *Public Opinion Quarterly*, (2010): Pp. 1-22, doi:10.1093/poq/nfq011.

Imai, Kosuke; Gary King; and Clayton Nall. "Matched Pairs and the Future of Cluster-Randomized Experiments: A Rejoinder," *Statistical Science*, Vol. 24, No. 1 (2009): Pp. 64–72.

Hopkins, Daniel and Gary King. "A Method of Automated Nonparametric Content Analysis for Social Science," *American Journal of Political Science*, Vol. 54, No. 1 (January 2010): Pp. 229–247.

Stefano M. Iacus, Gary King, and Giuseppe Porro, "CEM: Software for Coarsened Exact Matching," *Journal of Statistical Software*, Vol. 30, Issue 9 (June 2009).

Gutmann, Myron P.; Mark Abrahamson; Margaret O. Adams; Micah Altman; Caroline Arms; Kenneth Bollen; Michael Carlson; Jonathan Crabtree; Darrell Donakowski; Gary King; Jaret Lyle; Marc Maynard; Amy Pienta; Richard Rockwell; Lois Timms-Ferrara;

and Copeland H. Young. "From Preserving the Past to Preserving the Future: The Data-PASS Project and the Challenges of Preserving Digital Social Science Data," *Library Trends*, Vol. 57, No. 3 (Winter, 2009): Pp. 315–337.

King, Gary; Emmanuela Gakidou; Kosuke Imai; Jason Lakin; Ryan T. Moore; Clayton Nall; Nirmala Ravishankar; Manett Vargas; Martha María Téllez-Rojo; Juan Eugenio Hernández Ávila; Mauricio Hernández Ávila; and Héctor Hernández Llamas. "Public Policy for the Poor? A Randomised Assessment of the Mexican Universal Health Insurance Program," *The Lancet*, Vol. 373 (25 April 2009): 1447–1454.

Lazer, David; Alex Pentland; Lada Adamic; Sinan Aral; Albert-László Barabási; Devon Brewer; Nicholas Christakis; Noshir Contractor; James Fowler; Myron Gutmann; Tony Jebara; Gary King; Michael Macy; Deb Roy; Marshall Van Alstyne, "Computational Social Science," *Science* Vol. 323, No. 5915 (6 February 2009): Pp. 721–723, copy at `http://j.mp/1AzJLs5`.

Abrahamson, Mark; Kenneth A. Bollen; Myron Gutmann; Gary King; Amy M. Pienta "Preserving Quantitative Research-Elicited Data for Longitudinal Analysis. New Developments in Archiving Survey Data in the U.S.," *Historical Social Research*, Vol. 34, No. 3 (Summer, 2009): 51–59, copy at `http://j.mp/kiI2TH`.

Imai, Kosuke; Gary King; and Clayton Nall. "The Essential Role of Pair Matching in Cluster-Randomized Experiments, with Application to the Mexican Universal Health Insurance Evaluation," [with discussion], *Statistical Science*, Vol. 24, No. 1 (2009): Pp. 29–53.

King, Gary and Langche Zeng. "Empirical versus Theoretical Claims about Extreme Counterfactuals: A Response," *Political Analysis*, Vol. 17 (2009): Pp. 107–112. [a response to a discussion of Gary King and Langche Zeng. "The Dangers of Extreme Counterfactuals," *Political Analysis*, Vol. 14, No. 2 (2006): Pp. 131-159.]

Murray, Megan and Gary King. "The Effects of International Monetary Fund Loans on Health Outcomes," *PLoS Medicine*, Vol. 5, No. 7 (2008), e162. [Reprinted in Azmal Hussain, ed., *Addressing Health Challenges: The Role of International Agencies*, ICFAI University Press, April, 2009.]

King, Gary. "The Changing Evidence Base of Social Science Research," in Gary King, Kay Schlozman, and Norman Nie, eds., *The Future of Political Science: 100 Perspectives* New York: Routledge Press, 2009.

King, Gary; Kay Schlozman; and Norman Nie. "An Introduction to the Future of Political Science," in Gary King, Kay Schlozman, and Norman Nie, eds., *The Future of Political Science: 100 Perspectives* New York: Routledge Press, 2009.

Imai, Kosuke; Gary King; and Olivia Lau. "Toward A Common Framework for Statistical Analysis and Development," *Journal of Computational and Graphical Statistics*, Vol. 17, No. 4 (2008): Pp. 892–913.

King, Gary; Ori Rosen; Martin Tanner; and Alexander F. Wagner, "Ordinary Economic Voting Behavior in the Extraordinary Election of Adolf Hitler," *Journal of Economic History*, Vol. 68, No. 4 (December, 2008): Pp. 951–996.

Ho, Daniel; Kosuke Imai; Gary King; Elizabeth Stuart. "MatchIt: Nonparametric Pre-processing for Parametric Causal Inference," *Journal of Statistical Software*, Vol. 42, No. 8 (2011).

King, Gary and Ying Lu. "Verbal Autopsy Methods with Multiple Causes," *Statistical Science*, Vol. 23, No. 1 (February, 2008), Pp. 78–91.

Imai, Kosuke; Gary King; and Elizabeth Stuart, "Misunderstandings among Experimentalists and Observationalists about Causal Inference," *Journal of the Royal Statistical Society, Series A*, Vol. 171, Part 2 (2008): Pp. 1-22.

King, Gary. "An Introduction to the Dataverse Network as an Infrastructure for Data Sharing," [with discussion] *Sociological Methods and Research*, Vol. 32, No. 2 (November, 2007): Pp. 173–199.

King, Gary; Emmanuela Gakidou; Nirmala Ravishankar; Ryan T. Moore; Jason Lakin; Manett Vargas; Martha María Téllez-Rojo; Juan Eugenio Hernández Ávila; Mauricio Hernández Ávila; and Héctor Hernández Llamas. "A 'Politically Robust' Experimental Design for Public Policy Evaluation, with Application to the Mexican Universal Health Insurance Program," *Journal of Policy Analysis and Management*, Vol. 26, Issue 3 (2007): Pp. 479–506.

Altman, Micah and Gary King. "A Proposed Standard for the Scholarly Citation of Quantitative Data," *D-Lib Magazine*, Vol. 13, No. 3/4 (March/April, 2007).

Ho, Daniel E.; Kosuke Imai; Gary King; and Elizabeth Stuart. "Matching as Nonparametric Preprocessing for Reducing Model Dependence in Parametric Causal Inference," *Political Analysis*, Vol. 15 (2007): Pp. 199-236.

King, Gary and Langche Zeng. "Detecting Model Dependence in Statistical Inference: A Response," *International Studies Quarterly*, Vol. 51 (March, 2007): Pp. 231–241.

King, Gary and Langche Zeng. "When Can History be Our Guide? The Pitfalls of Counterfactual Inference," [with discussion] *International Studies Quarterly*, Vol. 51 (March, 2007): Pp. 183–210.

Grofman, Bernard and Gary King. "The Future of Partisan Symmetry as a Judicial Test for Partisan Gerrymandering after LULAC v. Perry," *Election Law Journal*, Vol. 6, No. 1, (January, 2007), Pp. 2–35.

King, Gary and Jonathan Wand. "Comparing Incomparable Survey Responses: New Tools for Anchoring Vignettes," *Political Analysis*, Vol. 15, No. 1 (Winter, 2007): Pp. 46–66.

King, Gary; Ori Rosen; and Martin Tanner. "Ecological Inference," in Larry Blume and Steven N. Durlauf, eds., *The New Palgrave Dictionary of Economics*, 2nd edition, 2006. Copy at http://j.mp/2oxutdx.

Gakidou, Emmanuela and Gary King, "Death by Survey: Estimating Adult Mortality without Selection Bias from Sibling Survival Data" *Demography*, Vol. 43, No. 3 (August, 2006): Pp. 569–585. [Reprinted in W. Paul Vogt, ed., *Selecting Research Methods*, London: Sage Publications, 2008.]

Stoll, Heather; Gary King; and Langche Zeng, 2005. "WhatIf: Software for Evaluating Counterfactuals," *Journal of Statistical Software*, Vol. 15, Issue 4 (2005): Pp. 1–18,

abstract published in *Journal of Computational and Graphical Statistics*, Vol. 15, No. 1 (March 2006): P. 264.

Epstein, Lee; Daniel E. Ho; Gary King; and Jeffrey A. Segal "The Effect of War on the Supreme Court," in Samuel Kernell and Steven S. Smith, eds.(3rd ed). Principles and Practice in American Politics: Classic and Contemporary Readings. Washington, D.C.: Congressional Quarterly Press, 2006.

King, Gary and Langche Zeng. "The Dangers of Extreme Counterfactuals," *Political Analysis*, Vol. 14, No. 2 (2006): Pp. 131-159.

King, Gary. "Publication, Publication," *PS: Political Science and Politics*, Vol. XXXIX, No. 1 (January, 2006), 119–125.

Epstein, Lee; Daniel E. Ho; Gary King; and Jeffrey A. Segal, "The Supreme Court During Crisis: How War Affects only Non-War Cases," *New York University Law Review*, Vol. 80, No. 1 (April, 2005): 1-116.

King, Gary. "EI: A Program for Ecological Inference" *Journal of Statistical Software*, Vol. 11, Issue 7 (September, 2004): Pp. 1–41. Abstract published in *Journal of Computational and Graphical Statistics.*

King, Gary; Ori Rosen; and Martin Tanner. "Information in Ecological Inference: An Introduction" in King, Rosen, and Tanner, eds., *Ecological Inference: New Methodological Strategies*, New York: Cambridge University Press, 2004.

Imai, Kosuke and Gary King. "Did Illegally Counted Overseas Absentee Ballots Decide the 2000 U.S. Presidential Election?," *Perspectives on Politics*, Vol. 2, No. 3 (September, 2004): Pp. 537–549.

Gill, Jeff and Gary King. "What to do When Your Hessian is Not Invertible: Alternatives to Model Respecification in Nonlinear Estimation," *Sociological Methods and Research*, Vol. 33, No. 1 (2004): Pp. 54–87.

Gill, Jeff and Gary King. "Numerical Issues Involved in Inverting Hessian Matrices," Pp. 143–176 (Chapter 6) in Micah Altman, Jeff Gill, and Michael P. McDonald, eds., *Numerical Issues in Statistical Computing for the Social Scientist*, Hoboken, NJ: John Wiley and Sons, Inc., 2003.

King, Gary. "Finding New Information for Ecological Inference Models: A Comment on Jon Wakefield, 'Ecological Inference in $2 \times 2$ Tables'," *Journal of the Royal Statistical Society*, Series A, Vol. 167 (2004): P. 437.

Beck, Nathaniel; Gary King; and Langche Zeng. "Theory and Evidence in International Conflict: A Response to de Marchi, Gelpi, and Grynaviski," *American Political Science Review*, Vol. 98, No. 2 (May, 2004): Pp. 379–389. [A response to a discussion of Nathaniel Beck; Gary King; and Langche Zeng. "Improving Quantitative Studies of International Conflict: A Conjecture," *American Political Science Review*, Vol. 94, No. 1 (March, 2000): 21–36.]

King, Gary and Langche Zeng. "Inference in Case-Control Studies," in Shein-Chung Chow, ed., *Encyclopedia of Biopharmaceutical Statistics*, 2nd edition. New York: Marcel Dekker, 2004.

King, Gary; Christopher J.L. Murray; Joshua A. Salomon; and Ajay Tandon. "Enhancing the Validity and Cross-cultural Comparability of Measurement in Survey Research," *American Political Science Review*, Vol. 97, No. 4 (December, 2003), 567–584; reprinted, with printing errors corrected, Vol. 98, No. 1 (February, 2004): 191–207. [Reprinted in: (1) David J Bartholomew, ed., *Measurement*, Los Angeles: Sage Publications, 2006; (2) Susanne Pickel, Gert Pickel, Hans-Joachim Lauth, and Detlef Jahn. 2007 *Methoden der vergleichenden Politikwissenschaft. Neuere Entwicklungen und Anwendungen* (Methods of Comparative Political Science. Latest Developments and Applications), Wiesbaden: VS-Verlag; (3) W. Paul Vogt, ed., *Selecting Research Methods*, London: Sage Publications, 2008. (4) Robert J. Franzese, ed., *Quantitative Research in Political Science*, London: Sage Publications.]

Gelman, Andrew; Jonathan Katz; and Gary King. "Empirically Evaluating the Electoral College," Chapter 5, Pp. 75–88, in Ann N. Crigler, Marion R. Just, and Edward J. McCaffery, eds., *Rethinking the Vote: The Politics and Prospects of American Electoral Reform*, New York: Oxford University Press, 2004.

Epstein, Lee and Gary King. "Building An Infrastructure for Empirical Research in the Law" [with comments from four law school deans], *Journal of Legal Education*, Vol. 53, No. 311, (2003): Pp. 311–320.

Lowe, Will and Gary King. "Some Statistical Methods for Evaluating Information Extraction Systems," in K. Pastra, ed. *Proceedings of the Workshop on Evaluation Initiatives in Natural Language Processing. 10th Conference of the European Association for Computational Linguistics*, Budapest, Hungary (2003): Pp. 19–26.

King, Gary and Will Lowe. "An Automated Information Extraction Tool For International Conflict Data with Performance as Good as Human Coders: A Rare Events Evaluation Design" *International Organization*, Vol. 57, No. 03 (July, 2003): pp. 617–642.

King, Gary. "The Future of Replication," *International Studies Perspectives*, Vol. 4, No. 1 (February, 2003): Pp. 100–105. [in "Symposium on Replication in International Studies Research," following up on Gary King, "Replication, Replication" *PS: Political Science and Politics*, Vol. XXVIII, No. 3 (September, 1995): Pp. 443–499.]

Tomz, Michael; Gary King; and Langche Zeng. "ReLogit: Rare Events Logistic Regression," *Journal of Statistical Software*, Vol. 8, Issue 2 (2003): Pp. 1–27. Abstract published in *Journal of Computational and Graphical Statistics*, Vol. 12, No. 1 (March, 2003): 246–247.

Tomz, Michael; Jason Wittenberg; and Gary King. "CLARIFY: Software for Interpreting and Presenting Statistical Results," *Journal of Statistical Software*, Vol. 8, Issue 1 (2003): Pp. 1–30. Abstract published in *Journal of Computational and Graphical Statistics*, Vol. 12, No. 1 (March, 2003): 245–246.

Adolph, Christopher and Gary King, with Michael C. Herron and Kenneth W. Shotts. "A Consensus on Second Stage Analyses in Ecological Inference Models," *Political Analysis*, Vol. 11, No. 1 (Winter, 2003): Pp. 86–94.

Adolph, Christopher and Gary King. "Analyzing Second Stage Ecological Regressions," *Political Analysis*, Vol. 11, (Winter, 2003): Pp. 65–76.

Gakidou, Emmanuela and Gary King. "Measuring Total Health Inequality: Adding Individual Variation to Group-Level Differences" *BioMed Central: International Journal for Equity in Health*, Vol. 1, No. 3 (2002). [Reprinted in Christopher Murray and David B. Evans, eds., *Health Systems Performance Assessment: Debates, Methods, and Empiricism*, Geneva: World Health Organization, 2003, Chapter 35, Pp. 485–496.]

Gakidou, Emmanuela and Gary King. "Determinants of Inequality in Child Survival: Results from 39 Countries," 2003, in Christopher Murray and David B. Evans, eds., *Health Systems Performance Assessment: Debates, Methods, and Empiricism*, Geneva: World Health Organization, Chapter 36, Pp. 497–502.

King, Gary and Langche Zeng. "Estimating Risk and Rate Levels, Ratios, and Differences in Case-Control Studies," *Statistics in Medicine*, Vol. 21 (2002): Pp. 1409–1427.

King, Gary. "Isolating Spatial Autocorrelation, Aggregation Bias, and Distributional Violations in Ecological Inference," *Political Analysis*, Vol. 10, No. 3, (Summer, 2002): 298–300.

Murray, Christopher J.L.; Gary King; Alan D. Lopez; Niels Tomijima; and Etienne Krug, "Armed Conflict as a Public Health Problem," *BMJ*, Vol. 324, (9 February 2002): 346–349. (The *BMJ* was once called the *British Medical Journal*.)

King, Gary and Christopher J.L. Murray. "Rethinking Human Security," *Political Science Quarterly*, Vol. 116, No. 4 (Winter, 2002): 585–610.

Epstein, Lee and Gary King. "The Rules of Inference," with comments from six scholars and a rejoinder by us, "Empirical Research and The Goals of Legal Scholarship: A Response," *University of Chicago Law Review*, Vol. 69, No. 1 (Winter, 2002): Pp. 1–209. A Chinese translation is forthcoming in the *Journal of Legal Methods*, and a Portugese translation in the *Revista da Faculdade de Direito da UFRGS*.

Honaker, James; Gary King; and Jonathan N. Katz. "A Fast, Easy, and Efficient Estimator for Multiparty Electoral Data," *Political Analysis*, Vol. 10, No. 1, (Winter, 2002): 84–100.

King, Gary and Langche Zeng. "Improving Forecasts of State Failure," *World Politics*, Vol. 53, No. 4 (July, 2001): 623-58.

Rosen, Ori and Wenxin Jiang, Gary King, and Martin A. Tanner, "Bayesian and Frequentist Inference for Ecological Inference: The RxC Case," *Statistica Neerlandica*, Vol. 55, No. 2 (2001): Pp. 134–156.

Altman, Micah; Leonid Andreev; Mark Diggory; Gary King; Daniel L. Kiskis; Elizabeth Kolster; M. Krot; and Sidney Verba. "A Digital Library for the Dissemination and Replication of Quantitative Social Science Research: The Virtual Data Center," in *Social Science Computer Review*, Vol. 19, No. 4 (Winter, 2001): Pp. 458–470.

Altman, Micah; Leonid Andreev; Mark Diggory; Gary King; Daniel L. Kiskis; Elizabeth Kolster; M. Krot; and Sidney Verba. "An Introduction to the Virtual Data Center Project and Software," in *Proceedings of The First ACM+IEEE Joint Conference on Digital Libraries*, ACM Press (2001): Pp. 203–204.

King, Gary; James Honaker, Anne Joseph, and Kenneth Scheve. "Analyzing Incomplete Political Science Data: An Alternative Algorithm for Multiple Imputation," *American*

*Political Science Review*, Vol. 95, No. 1 (March, 2001): Pp. 49–69. [Reprinted in (1) Martin Bulmer, Patrick J Sturgis, and Nick Allum, eds., *The Secondary Analysis of Survey Data*, Vol. 2, Sage Publications, 2009. (2) Salvatore Babones, ed., *Fundamentals of Regression Modeling*, Los Angeles: Sage Publications. (3) Robert J. Franzese, ed., *Quantitative Research in Political Science*, London: Sage Publications.]

King, Gary and Langche Zeng. "Logistic Regression in Rare Events Data," *Political Analysis*, Vol. 9, No. 2 (Spring, 2001): Pp. 137–163.

King, Gary and Langche Zeng. "Explaining Rare Events in International Relations," *International Organization*, Vol. 55, No. 3 (Summer, 2001): Pp. 693–715.

King, Gary. "Proper Nouns and Methodological Propriety: Pooling Dyads in International Relations Data," [concluding comment in a symposium on the analysis of dyadic international conflict data], *International Organization*, Vol. 55, No. 2 (Fall, 2001): Pp. 497–507.

Alt, James E.; Gary King; and Curtis Signorino. "Aggregation Among Binary, Count, and Duration Models: Estimating the Same Quantities from Different Levels of Data," *Political Analysis*, Vol. 9, No. 1 (Winter, 2001): Pp. 21–44.

Beck, Nathaniel; Gary King; and Langche Zeng. "Improving Quantitative Studies of International Conflict: A Conjecture," *American Political Science Review*, Vol. 94, No. 1 (March, 2000): 21–36.

King, Gary; Michael Tomz; and Jason Wittenberg. "Making the Most of Statistical Analyses: Improving Interpretation and Presentation," *American Journal of Political Science*, Vol. 44, No. 2 (April, 2000): 341–355. (replication dataset: ICPSR 1255). [Reprinted in Jacqueline Scott and Yu Xie, eds., *Quantitative Social Science*, Vol. 3, Sage Publications, 2005.]

King, Gary. "Geography, Statistics, and Ecological Inference," *Annals of the Association of American Geographers*, Vol. 90, No. 3 (September, 2000): Pp. 601–606.[Response to a symposium on Gary King *A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data*, Princeton: Princeton University Press, 1997.]

Lewis, Jeffrey and Gary King, "No Evidence on Directional vs. Proximity Voting," *Political Analysis*, Vol. 8, No. 1 (August, 1999): Pp. 21–33.

Katz, Jonathan and Gary King. "A Statistical Model for Multiparty Electoral Data," *American Political Science Review*, Vol. 93, No. 1 (March, 1999): 15-32 (replication dataset: ICPSR 1190).

King, Gary; Ori Rosen; and Martin Tanner. "Binomial-Beta Hierarchical Models for Ecological Inference," *Sociological Methods and Research*, Vol. 28, No. 1 (August, 1999): 61–90.

King, Gary, "The Future of Ecological Inference Research: A Reply to Freedman et al.," *Journal of the American Statistical Association*, March, 1999.

King, Gary and Bradley Palmquist, "The Record of American Democracy, 1984–1990," *Sociological Methods and Research*, Vol. 26, No. 3 (February, 1998): 424–427; and *PS:*

*Political Science and Politics*, Vol. XXX, No. 4 (December, 1997): 746–747; and *ICPSR Bulletin*, Vol. XVIII, No. 4 (May, 1998): 1–3.

Gelman, Andrew; Gary King; and Chuanhai Liu. "Not Asked and Not Answered: Multiple Imputation for Multiple Surveys," *Journal of the American Statistical Association*, Vol. 93, No. 443 (September, 1999): Pp. 846–857. "Rejoinder," Pp. 869–874

King, Gary and Michael Laver. "Many Publications, but Still No Evidence," *Electoral Studies*, Vol. 18, No. 4, (December, 1999): Pp. 597–598.

Gelman, Andrew; Gary King; and John Boscardin. "Estimating the Probability of Events that Have Never Occurred: When Is Your Vote Decisive?" *Journal of the American Statistical Association*, Vol. 93, No. 441 (March, 1998): Pp. 1–9.

King, Gary. "Why Context Should Not Count," *Political Geography* Vol 15, No. 2 (February, 1996): Pp. 159–164.

Benoit, Kenneth and Gary King. "A Preview of EI and EzI: Programs for Ecological Inference," *Social Science Computer Review*, Vol. 14, No. 4 (Winter, 1996): Pp. 433–438.

Gelman, Andrew and Gary King. "Advantages of Conflictual Redistricting," Pp. 207–218 in Iain McLean and David Butler, eds., *Fixing the Boundary: Defining and Redefining Single-Member Electoral Districts*, Aldershot, England: Dartmouth Publishing Company, 1996.

King, Gary; John Bruce; and Andrew Gelman. "Racial Fairness in Legislative Redistricting," in Paul E. Peterson, ed., *Classifying by Race*, Princeton: Princeton University Press, 1996.

King, Gary and Curtis S. Signorino. "The Generalization in the Generalized Event Count Model, With Comments on Achen, Amato, and Londregan," [a response to three authors in a symposium on "Gary King's Generalized Event Count Model"] *Political Analysis*, Vol. 6 (1996): Pp. 225–252.

King, Gary. "Replication, Replication," *PS: Political Science and Politics*, with comments from nineteen authors and a response, "A Revised Proposal, Proposal," Vol. XXVIII, No. 3 (September, 1995): Pp. 443–499. [Reprinted in Martin Bulmer, Patrick J Sturgis, and Nick Allum, eds., *The Secondary Analysis of Survey Data*, Vol. 1, Sage Publications, 2009.]

King, Gary; Robert O. Keohane; and Sidney Verba. "The Importance of Research Design in Political Science," a response to five authors in the symposium "The Qualitative-Quantitative Disputation: Gary King, Robert O. Keohane, and Sidney Verba's *Designing Social Inquiry: Scientific Inference in Qualitiative Research*", in *American Political Science Review*, Vol. 89, No. 2 (June, 1995): Pp. 454–481

Gelman, Andrew and Gary King. "Enhancing Democracy Through Legislative Redistricting," *American Political Science Review*, Vol. 88, No. 3 (September, 1994): Pp. 541–559, (replication dataset: ICPSR s1101). [Parts reprinted in *California Policy Studies Brief*, a publication of the California Policy Seminar, Vol. 7, No. 5 (April, 1995).]

Voss, D. Steven; Andrew Gelman; and Gary King. "Pre-Election Survey Methodology: Details From Nine Polling Organizations, 1988 and 1992," *Public Opinion Quarterly*, Vol. 59 (1995): Pp. 98–132.

Gelman, Andrew and Gary King. "A Unified Method of Evaluating Electoral Systems and Redistricting Plans," *American Journal of Political Science*, Vol. 38, No. 2 (May, 1994): Pp. 514–554, (replication dataset: ICPSR s1054).

Alt, James E. and Gary King. "Transfers of Governmental Power: The Meaning of Time Dependence," *Comparative Political Studies*, Vol. 27, No. 2 (July, 1994): Pp. 190–210. (dataset: ICPSR s1115).

Winkelmann, Rainer; Curtis Signorino; and Gary King. "A Correction for an Underdispersed Event Count Probability Distribution," *Political Analysis*, (1995): Pp. 215–228.

Gelman, Andrew and Gary King. "Party Competition and Media Messages in U.S. Presidential Election Campaigns," in L. Sandy Maisel, ed., *The Parties Respond: Changes in the American Party System*, 2nd edition, Boulder, Colorado: Westview Press, 1994, Pp. 255-295.

Gelman, Andrew and Gary King. "Why Are American Presidential Election Campaign Polls So Variable When Votes are So Predictable?" *British Journal of Political Science*, Vol. 23, No. 1 (October, 1993): Pp. 409–451. [Reprinted in (1) Philip Seib, ed., *Political Communication*, Vol. 3, Sage Publications, 2007, and (2) Kai Arzheimer and Jocelyn Evans, eds., *Electoral Behaviour*, Vol. 3, Sage Publications, 2008.]

King, Gary; John M. Bruce; and Michael Gilligan. "The Science of Political Science Graduate Admissions," *PS: Political Science and Politics*, Vol. XXVI, No. 4, (December, 1993): Pp. 772–778.

King, Gary and Michael Laver. "On Party Platforms, Mandates, and Government Spending," *American Political Science Review*, Vol. 87, No. 3 (September, 1993): Pp. 744–750, (replication dataset: ICPSR s1109).

King, Gary. "The Methodology of Presidential Research," in George Edwards, III, John H. Kessel, and Bert A. Rockman, eds., *Researching the Presidency: Vital Questions, New Approaches*, Pittsburgh: University of Pittsburgh, 1993: Pp. 387–412.

King, Gary and Daniel J. Walsh. "Good Research and Bad Research: Extending Zimile's Criticism," *Early Childhood Research Quarterly*, Vol. 8, No. 3 (September, 1993): Pp. 397–401.

King, Gary. "'Truth' is Stranger than Prediction, More Questionable Than Causal Inference," *American Journal of Political Science*, Vol. 35, No. 4 (November, 1991): Pp. 1047–1053. [A response to a discussion of Gary King "How Not to Lie With Statistics: Avoiding Common Mistakes in Quantitative Political Science," *American Journal of Political Science*, Vol. 30, No. 3 (August, 1986): Pp. 666–687.]

King, Gary. "Constituency Service and Incumbency Advantage," *British Journal of Political Science*, Vol. 21, No. 1 (January, 1991): Pp. 119–128, (replication dataset: ICPSR s1108).

King, Gary. "On Political Methodology," *Political Analysis*, Vol. 2 (1991): Pp. 1–30. (replication dataset: ICPSR s1053).

King, Gary. "Stochastic Variation: A Comment on Lewis-Beck and Skalaban's 'The R-Square'," *Political Analysis*, Vol. 2 (1991): Pp. 185–200. [A response to a discussion of

Gary King "How Not to Lie With Statistics: Avoiding Common Mistakes in Quantitative Political Science," *American Journal of Political Science*, Vol. 30, No. 3 (August, 1986): Pp. 666–687.]

King, Gary and Andrew Gelman. "Systemic Consequences of Incumbency Advantage in the U.S. House," *American Journal of Political Science*, Vol. 35, No. 1 (February, 1991): Pp. 110–138, (dataset: ICPSR 06311).

King, Gary. "Calculating Standard Errors of Predicted Values based on Nonlinear Functional Forms," *The Political Methodologist*, Vol. 4, No. 2 (Fall, 1991).

Gelman, Andrew and Gary King. "Estimating Incumbency Advantage Without Bias," *American Journal of Political Science*, Vol. 34, No. 4 (November, 1990): Pp. 1142–1164, (dataset: ICPSR 06311).

King, Gary; James Alt; Nancy Burns; and Michael Laver. "A Unified Model of Cabinet Dissolution in Parliamentary Democracies," *American Journal of Political Science*, Vol. 34, No. 3 (August, 1990): Pp. 846–871; Errata Vol. 34, No. 4 (November, 1990): P. 1168. (replication dataset: ICPSR s1115).

Gelman, Andrew and Gary King. "Estimating the Electoral Consequences of Legislative Redistricting," *Journal of the American Statistical Association*, Vol. 85, No. 410 (June, 1990): Pp. 274–282.

King, Gary. "Electoral Responsiveness and Partisan Bias in Multiparty Democracies," *Legislative Studies Quarterly*, Vol. XV, No. 2 (May, 1990): Pp. 159–181.

Ansolabehere, Stephen and Gary King. "Measuring the Consequences of Delegate Selection Rules in Presidential Nominations," *Journal of Politics*, Vol. 52, No. 2 (May, 1990): Pp. 609–621.

King, Gary. "Representation Through Legislative Redistricting: A Stochastic Model," *American Journal of Political Science*, Vol. 33, No. 4 (November, 1989): Pp. 787–824.

King, Gary. "Event Count Models for International Relations: Generalizations and Applications," *International Studies Quarterly*, Vol. 33, No. 2 (June, 1989): Pp. 123–147.

King, Gary. "Variance Specification in Event Count Models: From Restrictive Assumptions to a Generalized Estimator," *American Journal of Political Science*, Vol. 33, No. 3 (August, 1989): Pp. 762–784.

King, Gary. "A Seemingly Unrelated Poisson Regression Model," *Sociological Methods and Research*, Vol. 17, No. 3 (February, 1989): Pp. 235–255.

Gelman, Andrew and Gary King. "Electoral Responsiveness in U.S. Congressional Elections, 1946–1986," abstract, *Proceedings of the Social Statistics Section, American Statistical Association*, 1989: P. 208.

King, Gary. "Statistical Models for Political Science Event Counts: Bias in Conventional Procedures and Evidence for The Exponential Poisson Regression Model," *American Journal of Political Science*, Vol. 32, No. 3 (August, 1988): Pp. 838–863.

King, Gary and Robert X Browning. "Democratic Representation and Partisan Bias in Congressional Elections," *American Political Science Review*, Vol. 81, No. 4 (December, 1987): 1252–1273.

King, Gary. "Presidential Appointments to the Supreme Court: Adding Systematic Explanation to Probabilistic Description," *American Politics Quarterly*, Vol. 15, No. 3 (July, 1987): Pp. 373–386.

Browning, Robert X and Gary King. "Seats, Votes, and Gerrymandering: Measuring Bias and Representation in Legislative Redistricting" *Law and Policy*, Vol. 9, No. 3 (July, 1987): Pp. 305–322.

King, Gary. "How Not to Lie With Statistics: Avoiding Common Mistakes in Quantitative Political Science," *American Journal of Political Science*, Vol. 30, No. 3 (August, 1986): Pp. 666–687. [Reprinted in Martin Bulmer, Patrick J Sturgis, and Nick Allum, eds., *The Secondary Analysis of Survey Data*, Vol. 3, Sage Publications, 2009.]

King, Gary. "The Significance of Roll Calls in Voting Bodies: A Model and Statistical Estimation," *Social Science Research*, Vol. 15 (June, 1986): Pp. 135–152.

King, Gary. "Political Parties and Foreign Policy: A Structuralist Approach," *Political Psychology*, Vol. 7., No. 1 (March, 1986): Pp. 83–101.

King, Gary and Richard Merelman. "The Development of Political Activists: A Model of Early Learning," *Social Science Quarterly*, Vol. 67, No. 3 (September, 1986): Pp. 473–490.

## Software

Jerzak, Connor T.; Gary King; and Anton Strezhnev. *Readme2: An R Package for Improved Automated Nonparametric Content Analysis for Social Science*, 2018–.

Kaufman, Aaron; Gary King; and Mayya Komisarchik. *Compactness: An R Package for Measuring Legislative District Compactness If You Only Know it When You See It* 2018–.

Gaboardi, Marco; James Honaker; Gary King; Jack Murtagh; Kobbi Nissim; Jonathan Ullman; and Salil Vadhan, *PSI (Ψ): A Private Data Sharing Interface*, 2016–.

King, Gary; Christopher Lucas; and Richard Nielsen, *Matching Frontier: R Package for Calculating the Balance-Sample Size Frontier*, 2014–,

Iacus, Stefano M.; Gary King; and Giuseppe Porro. *CEM: Coarsened Exact Matching*, 2008–.

Honaker, James; Gary King; and Matthew Blackwell. *Amelia II: A Program for Missing Data*, 2008–.

Gelman, Andrew; Gary King; and Andrew C. Thomas. *JudgeIt II: A Program for Evaluating Electoral Systems and Redistricting Plans*, 2008–.

Hopkins, Daniel; Gary King; Matthew Knowles; and Steven Melendez. *ReadMe: Software for Automated Content Analysis*, 2008–.

King, Gary and Ying Lu. *VA: Software for Analyzing Verbal Autopsy Data*, 2008–.

Girosi, Federico and Gary King. *YourCast: Time-Series Cross-Sectional Forecasting with Your Assumptions*, 2006–.

King, Gary; Merce Crosas; and the Dataverse team. *Dataverse*, 2006–.

Altman, Micah; Gary King; and Sidney Verba. Virtual Data Center Software, 1996–2005.

Ho, Daniel; Kosuke Imai; Gary King; and Elizabeth Stuart, *MatchIt: Nonparametric Preprocessing for Parametric Causal Inference*, 2004–.

Imai, Kosuke; Gary King; and Olivia Lau. *Zelig: Everyone's Statistical Software*, 2004–.

Wand, Jonathan, Gary King, and Olivia Lau. *Anchors: Software for Anchoring Vignettes Data*, 2002–.

Tomz, Michael; Gary King; and Langche Zeng. *ReLogit: Rare Events Logistic Regression*, 2000–2002.

Honaker, James; Anne Joseph; Gary King; Kenneth Scheve; and Naunihal Singh. *AMELIA: A Program for Missing Data*, versions 1998–2007.

Tomz, Michael; Jason Wittenberg; and Gary King. *CLARIFY: Software for Interpreting and Presenting Statistical Results*, Stata macros, versions 1998–2002.

King, Gary. *EI: A Program for Ecological Inference*, (Versions 1996–2003). Published as part of the Gauss Package by Aptech Systems, Kent, Washington, and as a stand-alone program called *EzI: A(n Easy) Program for Ecological Inference*, by Kenneth Benoit and Gary King.

Gelman, Andrew and Gary King. *JudgeIt: A Program for Evaluating Electoral Systems and Redistricting Plans*, Version 1.0, 2.0 (1992–2002), (ICPSR s1047).

King, Gary. *COUNT: A Program for Estimating Event Count and Duration Regressions*, Versions 1988–2002, published as a stand-alone program and as part of the Gauss Package by Aptech Systems, Kent, Washington.

King, Gary. *MAXLIK*, a set of Gauss programs, annotated for pedagogical purposes, to implement the maximum likelihood models in *Unifying Political Methodology: The Likelihood Theory of Statistical Inference*.

## Patents

King, Gary; Eric Mazur; Kelly Miller; and Brian Lukoff. "Instructional Support Platform for Interactive Learning Platforms," U.S Patent and Trademark Office, Patent No. US 10,692,391 B2, Issued 6/23/2020. Copy at `https://j.mp/30cyPab`.

King, Gary; Eric Mazur; Kelly Miller; and Brian Lukoff. "Instructional Support Platform for Interactive Learning Platforms," U.S Patent and Trademark Office, Patent No. US 10,438,498 B2, Issued 10/8/2019. Copy at `http://j.mp/32vmgWB`.

King, Gary; Brian Lukoff; and Eric Mazur. 2019. "Cluster Analysis of Participant Responses for Test Generation or Teaching," U.S. Patent and Trademark Office, Patent No. US 10,388,177 B2, Issued 8/20/2019. Copy at `http://j.mp/30wgvYC`.

King, Gary; and Patrick Lam; and Margaret Roberts. 2019. "Systems and Methods for Keyword Determination and Document Classification from Unstructured Text," U.S.

Patent and Trademark Office, Patent No. US 10,275,516 B2, Issued 4/30/2019. Copy at `http://j.mp/2Jz53pp`.

King, Gary; Eric Mazur; and Brian Lukoff. 2019. "Participant Grouping for Enhanced Interactive Experience," U.S. Patent and Trademark Office, Patent No. US 10,216,827 B2, Issued 2/26/2019. Copy at `http://j.mp/2tFYhVX`

King, Gary; Eric Mazur; Kelly Miller; and Brian Lukoff. 2019. "Stimulating Online Discussion in Interactive Learning Environments," U.S. Patent and Trademark Office, Patent No. US 10,192,456 B2, Issued 1/29/2019. Copy at `http://j.mp/2CQrIIT`.

King, Gary; Brian Lukoff; and Eric Mazur. 2018. "Management of Off-Task Time in a Participatory Environment," U.S. Patent and Trademark Office, Patent No. US 9,965,972 B2, Issued 5/8/2018. Copy at `http://j.mp/2I6IKEj`.

King, Gary and Justin Grimmer. 2016. "Method and Apparatus for Selecting Clusterings to Classify a Data Set." U.S. Patent and Trademark Office, Patent No. US 9,519,705 B2, Issued 12/13/2016. Copy at `http://j.mp/2hSsNnl`.

King, Gary; Brian Lukoff; and Eric Mazur. 2016. "Cross-Classroom and Cross-Institution Item Validation." U.S. Patent and Trademark Office, Patent No. US 9,508,266, Issued 11/29/2016. Copy at `http://j.mp/2gG9Dkk`.

Firat, Aykut; Mitchell Brooks; Christopher Bingham; Amac Herdagdelen; and Gary King. 2016. "Systems and methods for calculating category proportions," U.S. Patent and Trademark Office, Patent No. US 9,483,544, Issued 11/1/2016. Copy at `http://j.mp/2mqwX8f`.

King, Gary; Brian Lukoff; and Eric Mazur. 2015. "Participant Grouping For Enhanced Interactive Experience," U.S. Patent and Trademark Office, Patent No. US 9,219,998 B2, Issued 12/22/2015. Copy at `http://j.mp/2IEZJSV`.

King, Gary; Daniel Hopkins; and Ying Lu. 11/17/2015. "System for Estimating a Distribution of Message Content Categories in Source Data (2nd)," United States of America US 9,189,538 B2 (U.S Patent and Trademark Office). Copy at `http://j.mp/2CeNXs5`.

King, Gary; Brian Lukoff; and Eric Mazur. 2014. "Participant Grouping For Enhanced Interactive Experience," U.S. Patent and Trademark Office, Patent No. US 8,914,373 B2, Issued 12/16/2014. Copy at `http://j.mp/1EkBPSZ`.

King, Gary and Justin Grimmer. 2013. "Method and Apparatus for Selecting Clusterings to Classify A Predetermined Data Set," U.S. Patent and Trademark Office, Patent No. US 8,438,162 B2, Issued 5/7/2013, Copy at `http://j.mp/12cmMDZ`.

Hopkins, Daniel; Gary King; and Ying Lu. 2012. "System for Estimating a Distribution of Message Content Categories in Source Data," U.S. Patent and Trademark Office, Patent No. US 8,180,717 B2, Issued 5/15/2012, Copy at `http://j.mp/14SQsbp`.

## US Supreme Court Amici Briefs

Gerken, Heather K.; Jonathan N. Katz; Gary King; Larry J. Sabato; and Samuel S.-H. Wang. 2017. "Brief of Heather K. Gerken, Jonathan N. Katz, Gary King, Larry J. Sabato, and Samuel S.-H. Wang as Amici Curiae in Support of Appellees," Filed with the Supreme

Court of the United States in *Beverly R. Gill et al. v. William Whitford et al.* No. 16-1161. Copy at `http://j.mp/2iJAMZl`.

Imbens, Guido; Donald B Rubin; Gary King; Richard A Berk; Daniel E Ho; Kevin M Quinn; James D Greiner; Ian Ayres; Richard Brooks; Paul Oyer; and Richard Lempert. 2012. "Brief of Empirical Scholars as Amici Curiae," Filed with the Supreme Court of the United States in *Abigail Noel Fisher v. University of Texas at Austin, et al.* No. 11-345, Copy at `http://j.mp/2ox5MOU`.

Gary King, Bernard Grofman, Andrew Gelman, and Jonathan Katz. 2005. "Brief of Amici Curiae Professors Gary King, Bernard Grofman, Andrew Gelman, and Jonathan Katz in Support of Neither Party," Filed with the U.S. Supreme Court in *Jackson v. Perry*. Copy at `http://j.mp/2gw1W1R`.

# Companies Founded

OpenScholar (`TheOpenScholar.com`), founded by Jessica Drislane and Gary King, 2017–.

Perusall (`Perusall.com`), founded by Gary King, Brian Lukoff, Eric Mazur, and Kelly Miller, 2015–.

Thresher (`Thresher.io`), founded by Rebecca Fair and Gary King, 2015–.

Learning Catalytics (`LearningCatalytics.com`), founded by Gary King, Brian Lukoff, and Eric Mazur, 2011–2013, (acquired by Pearson).

Crimson Hexagon (`CrimsonHexagon.com`), founded by Candace Fleming and Gary King, 2007–2018, (merged with Brandwatch).

# Corporate and Nonprofit Boards

Co-founder and Co-chair, *Social Science One*, 2018–.

Board of Directors, *InMoment*, Inc., 2018–2019 (InMoment acquired; board disbanded).

Editorial Board Member, *Swiss Political Science Review*, 2017–.

Senior Editorial Board, *Science Magazine*, 2015–2016.

Editorial Board Member, *World Politics*, 2013–2019.

Board of Directors, *Center for Advanced Study in the Behavioral Sciences*, 9/1/2011–2020.

Board of Directors, *Crimson Hexagon*, Inc., Member 2007–2018. Chair, 2012–2018.

Board Observer, *Brandwatch*. 2018–.

Board of Directors, *Thresher*, LLC, Chair, 2015–.

Editorial Board Member, *Journal of Experimental Political Science*, 2013–.

Editorial Board Member, *GigaScience*, 2011–.

Editorial Board Member, *American Sociological Review*, 2010–2013.

Academic Review Board Member, *International Public Policy Review*, 2010–2011.

Member, Quantified Self Advisory Board, 2009–2013.

Editorial Board Member, *Environmental Economics*, March 2009–2012.

Editorial Board Member, *Statistics, Politics, and Policy*, 2009–.

Advisory Board Member, American Human Development Report, 2009.

Chair, Durr Award Committee, Midwest Political Science Association, 2008.

Scientific Oversight Group, Institute for Health Metrics and Evaluation, University of Washington, 2008–.

Advisory Board Member, *Political Methods: Quantitative Methods*, Social Science Research Network, 2007–.

Editorial Board Member, *American Political Science Review*, July 2007–.

Editorial Advisory Board, *The Annals*, American Academy of Political and Social Science, 2006–.

Editorial Board Member, *Journal of Information Technology and Politics*, 2006–.

Editorial Board Member, *Political Research Quarterly*, 2006–2011.

Editorial Board Member, *Concepts and Methods Working Paper Series* of the International Political Science Association, 2005–2007.

Steering Committee, ESRC Oxford University Spring School in Quantitative Methods of Social Research, 2002.

Editorial Board Member, *Population Health Metrics*, 2002–.

Editorial Board Member, *Evidence for Health Policy*, 2002–2005.

Editorial board member, *American Journal of Political Science*, 1988–1991, 2002–2009.

Member, U.S. National Committee on Data for Science and Technology (USNC/CODATA), National Research Council, 12/2001–6/2004.

Member, Privacy in the Information Age Committee, National Research Council (Computer Science and Telecommunications Board), 2/2002–.

Senior Science Advisor, World Health Organization, 1998–2003.

Editorial Board member, *New England Journal of Political Science*, 2005–.

Editorial Advisory Board member, *Encyclopedia of Social Measurement*, Academic Press.

Governing Council member, American Political Science Association, 1999–2001.

Governing Council member, Inter-university Consortium for Political and Social Research, 1998–2000. Chair, Director Search Comittee.

Executive Council member, Midwest Political Science Association, 1997–1999. Chair, Publications Committee.

Editorial Board member, *Encyclopedia of Public Health*, Academic Press.

Editorial Committee member, *Bulletin of the World Health Organization*, 1999–.

American Political Science Association liaison to the American Association for the Advancement of Science, Section K, 2002.

Editorial Board Member, *American Political Science Review*, 1995–2001.

Editorial Board member, *Sage Publications, Quantitative Applications in the Social Sciences, monograph series*, 1994–.

Chair, National Science Foundation, Committee of Visitors review panel for the political science program, 1994.

Editorial board member, *International Studies Quarterly*, 1994–2001.

Editorial board member, *Legislative Studies Quarterly*, 1993–1996.

National Science Foundation, political science panel member, 1991–1993.

Editorial board member, *American Politics Research* (formerly *American Politics Quarterly*), 1992–2010.

Editorial board member, *Journal of Politics*, 1991–1997.

Editorial board member, *Public Opinion Quarterly*, 1991–1995.

Editorial board member, *Journal of Conflict Resolution*, 1990–.

Editorial board member, *Sociological Methods and Research*, 1989–.

Editorial board member, *Political Analysis*, 1988–.

Founding Editor, *The Political Methodologist*, Newsletter of The Society for Political Methodology and the Methodology Section of The American Political Science Association, 1988–1990.

Program Committee Co-chair, Political Methodology Section and Organized Section Head of the Political Methodology Group, American Political Science Association annual meeting, 1990.

Member, Steering Committee, Presidency Research Group, American Political Science Association, 1989–1993.

Member, Richard F. Fenno, Jr. Prize Committee, Legislative Studies Section, American Political Science Association, 1990.

# Selected Conference Activities

*[Needs updating!]*

Invited Address, "The Dataverse Network," UseR! The R User Conference, Technische Universität Dortmund, Germany, 12-14 August 2008.

Keynote Address, "What to do about Biases in Survey Research," Association Française de Science Politique (French Political Science Association), Toulouse, France, September, 2007.

Invited Address, American Association for Public Opinion Research, Nashville, May, 2003.

Keynote address in methods, American Sociological Association, San Francisco, August, 1998.

Keynote Address in Political Geography, Association of American Geographers, Cambridge, Massachusetts, March 1998.

Short Courses (3-6 hours) offered on *A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data* at the American Political Science Association (August, 1997), the Boston Chapter of the American Statistical Association (November, 1997), the Inter-university Consortium for Political and Social Research (July 1998), and the Social Science History Association (November 1998).

"Not Asked and Not Answered: Multiple Imputation for Multiple Surveys," the *Journal of the American Statistical Association* (by Andrew Gelman, Gary King, and Chuanhai Liu), Applications Invited Discussion Paper at the American Statistical Association annual meetings in Dallas, Texas, August, 1998.

"Meet the Author: Gary King's *A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data*," panels at the annual meetings of the Midwest Political Science Association, 10–12 April 1997, and the American Political Science Association, 28–31 August 1997.

"Meet the Authors: King, Keohane, and Verba's *Designing Social Inquiry: Scientific Inference in Qualitative Research*," annual meetings of the American Political Science Association, 2–4 September 1994.

"The State of Political Methodology: Looking Back at Achen (1983), King (1990), and Bartels and Brady (1993)," at the annual meetings of the American Political Science Association, 2–5 September, 1993.

"Scientific Inference in Qualitative Research," (a roundtable on a draft version of Gary King, Robert Keohane, and Sidney Verba's *Designing Social Inquiry: Scientific Inference in Qualitative Research*) annual meetings of the American Political Science Association, Washington, D.C., 29 August–1 September, 1991.

"On Political Methodology," presented to a panel about this paper at the annual meetings of the American Political Science Association, Atlanta, 31 August to 3 September 1989.

"Maximum Likelihood: Costs and Benefits," (on *Unifying Political Methodology: The Likelihood Theory of Statistical Inference*) at the annual meetings of the Southern Political Science Association, Memphis, Tennessee, 2–4 November 1989.

# Selected University Service Activities

*[Needs updating!]*

University-Wide Social Sciences Advisory Committee (and Chair of the Infrastructure Committee), 2009–2011.

Social Sciences Priority Committee, 2008–2016.

FAS Priorities Committee, 2008–2009.

Director, Institute for Quantitative Social Science, 2005–.

Director, Center for Basic Research in the Social Sciences, 2004–2005.

Director, Harvard-MIT Data Ce nter, 1987–.

Visiting Committee Member, Harvard School of Public Health, 2003–2009.

Standing Committee on Higher Degrees in Health Policy, 1998–.

FAS Resources Committee, 1997–.

Knafel Center Planning Committee, 1997–2005.

Standing Committee on Information Technology, FAS, 1992–.

Chair, Joint Junior Faculty Recruitment Committee, Department of Government, 1997–98, 2003–04, 2004–05, 2005–06, 2006-07.

Chair, Information Technology Subcommittee on Libraries and Databases, 1996–97.

Faculty Council, Harvard University, Faculty of Arts and Sciences, 1992–94.

Placement Director, Department of Government, 1993–94, 1996–97.

Standing Committee on the College Library, FAS, 1993–94.

Steering Committee, Political Economy and Government Ph.D. program, FAS and JFK School of Government, Harvard, 1991–94.

Standing Committee on Research Policy, FAS, 1992–93.

Standing Committee for Undergraduate Education, FAS, 1992–93.

Chair, Political Methodology Recruitment Committee, 1993.

Chair (1991—93) and member (1989–91, 2001–02), Admissions Committee, Department of Government, Harvard.

Junior Faculty Recruitment Committee, Department of Government, Harvard, 1987–89, 1990–92.

Chair, James Phelps Stokes Lecture Committee, Department of Politics, NYU, 1986–87.

Fellowship, Evaluation, and Progress Committee, Department of Politics, NYU, 1986–87.

**Gary King** 32

Undergraduate Curriculum Committee, Department of Politics, NYU, 1986–87; completed review and revision of the entire undergraduate curriculum.

Methodology Field Head, Department of Politics, NYU, Fall, 1986.

Graduate Curriculum Committee, Department of Politics, NYU, 1985–86; completed review and revision of the entire graduate curriculum.

Admissions Committee, Department of Politics, NYU, 1985–86.

Faculty Adviser, Political Science Graduate Student Association, Department of Politics, NYU, 1985–86.

Computer Planning Committee, Faculty of Arts and Sciences, NYU, 1984–1987.

Lecture Committee, Department of Politics, NYU, 1984–85.

Politics Computing Advisory Committee, Department of Politics, NYU, 1984–85.

Social Science Computing Advisory Committee, NYU, 1985–1987.

# EXHIBIT 9

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

Exhibit 1

**Response to Report of Dr. William Briggs**

**Stephen Ansolabehere**

**December 4, 2020**

**Statement of Inquiry**

    1.  I have been asked to evaluate the report of Dr. William Briggs.  I am compensated at the rate of $550 an hour.

    2.  A brief summary of my high-level opinions and conclusions is below; however, overall, based on my review, I find the estimates and analyses in Dr. Briggs' report to be unreliable and the analysis not up to scientific standards of survey research, data science, or election analysis.  There are substantial errors in the design of the survey and errors and inconsistencies in the data used in the analysis that are of sufficient magnitude to invalidate any calculations or estimates based on these data.  The extremely low response rate, the high break off rate, and the inconsistencies in data spreadsheets lead me to conclude that the survey should not be assumed to be representative of the population studied, and the data should not be assumed to be accurate.  The interpretation of the data does not account for obvious and important features of absentee voting, including permanent absentee voters who do not need to request ballots to receive them, as well as late, rejected, invalid, and spoiled absentee ballots. The errors in design, analysis, and interpretation of the data are so massive that there is no foundation for drawing any conclusions or inferences from Dr. Briggs' report.

**Summary Assessment**

    3.  In his report, Dr. Briggs evaluates survey data that was provided to him by a third party and assumes that "the respondents [to the survey] are representative and the data are accurate."[1] There is no indication in his report that he conducted any analysis of the data or that those who provided the data to him did anything to verify its correctness and integrity.  Nor is

---

[1] William M. Briggs, "An Analysis of Surveys Regarding Absentee Ballots Across Several States," November 23, 2020, page 1.

there any showing that he or anyone else analyzed the quality of the survey or the representativeness of the sample on which he based his analysis. It is standard scientific practice in the field of survey research to give careful scrutiny to data before conducting any statistical analyses, including understanding the structure and wording of the survey questions, the sampling method and response rate, and the characteristics of the sample, such as demographic and behavioral indicators.

4. In his report, Dr. Briggs defines two types of purported errors. The first is that people received an absentee ballot even though, according to the survey, they did not request one (Alleged Error #1). The second is that people allegedly returned absentee ballots that election offices did not record (Alleged Error #2). These two alleged errors, Dr. Briggs asserts, combine to create a category of "troublesome ballots." The estimates of Alleged Error #1 and Alleged Error #2 that he presents are deeply flawed because of defects in the design of the survey, fatal data errors evident in the survey toplines, calculation errors, and errors in the interpretation of the data. It is my professional judgment that none of the estimates and projections in his report are valid.

5. The design of the survey contaminates the data and any estimates, rendering them invalid. Specifically, in Question 1 of the survey the surveyor asks to speak to a specific person. Some of the respondents are flagged as "Reached Target," while others are flagged as "Uncertain" or "What is this about?" Both groups of people (Reached Target and Uncertain) are then asked Question 2, "Did you request an absentee ballot?" This is a serious survey design error, because some or perhaps all of the people flagged as "Uncertain" are not the target of the interview. As a result, the structure of the very beginning of the survey allows people who were

not the target to be treated as if they were in the remaining questions. This leads to the contamination of all estimates.

6. The survey also suffers from ambiguously worded questions, which introduces measurement errors in any estimates. Question 2 asks respondents whether they <u>requested</u> an absentee ballot. The question does not follow up and clarify different ways that people obtain absentee ballots, especially, whether the voter did not need to request a ballot in order to receive one because they are permanent absentee voters. According to data reported by county election offices in the State of Arizona to the U.S. Election Assistance Commission, there were 2,545,198 million permanent absentee or early voters (PEVs) in the state out of 2,672,384 absentee voters in the 2018 election. The data are from 2018 because the 2020 data have not yet been reported. **In other words, 95 percent of all absentee voters in the state were automatically sent an absentee ballot without needing to request one for a specific election.** Dr. Briggs is apparently unaware of this critical fact, which completely undermines his analysis.

7. The wording of Question 3 also is very problematic. First, the survey does not ascertain whether a ballot was in fact received. According to figures from the U.S. Election Assistance Commission, there were 102,896 undeliverable absentee ballots. Neither Question 2 nor Question 3 screens out people who did not receive a ballot. Second, Question 3 does not ascertain whether the ballot was mailed back in a timely manner so as to be included in the record of ballots cast. Third, Question 3 asks whether someone voted. As is well known among political scientists and survey researchers, survey questions asking whether someone voted are subject to substantial social desirability biases that lead to inflation in the estimated number of voters.

8.   There are also errors and inconsistencies in the survey data.  Appended to Dr. Briggs' report is a series of tables, called Topline Tables ("toplines"), for the State of Arizona.  Toplines for other states are not disclosed.  The toplines provide the basic statistics about the survey reported for each question, as well as the questions themselves and the response categories for each question. There are errors in the spreadsheet of toplines indicating data inconsistencies. For example, in Arizona, there are more respondents to Question 2 than the survey instructions indicate should have been asked Question 2.  Generally, such errors indicate fundamental problems with the management of the survey and the databases generated by the survey.  It is standard practice in survey research and analysis of survey data to conduct integrity checks to ensure that there are not mistakes in the data.  The presence of substantial discrepancies in these topline tables, such as shown here, indicates flaws in the data.  Dr. Briggs' report makes no mention of these inconsistencies and errors and assumes that the underlying data are accurate. These errors and inconsistencies reveal that the data are not accurate.

9.   In addition, the survey has extremely low response rates.  Of the 518,560 absentee voters who were the target of the study, 2,489 were asked and 2,129 people (one-half of one percent) ultimately provided answers to Question 2.  High non-response rates generally create biases in survey because the samples are rarely representative of the population under study. Surveys with such a low response rate are not accepted in scientific publications, except on rare occasions and with proper analyses that ensure that the respondents are in fact representative. When researchers have low response rates, they must offer affirmative proof of representativeness or attempt to correct for biases.  Neither is done here.

11.   The interpretation of the data as evidence of "errors" and "troublesome ballots" fails to account for the rules and realities of absentee voting.  First, Dr. Briggs calls Alleged Error #1

absentee ballots that were received by voters but were not "requested." This interpretation fails to consider that 95 percent of absentee ballots sent by election offices are sent to permanent absentee voters, who receive ballots without requesting them. All five states in his report allow for permanent absentee voting for some or all registrants. Second, Dr. Briggs calls Alleged Error #2 ballots that were sent by voters but not recorded at the county election offices. This interpretation fails to account for late, undeliverable, rejected, and spoiled ballots. Most jurisdictions, for example, do not record late ballots in the tally of returned absentee ballots. The results in his analysis, if they are real, are likely the consequence of the normal practice of absentee voting.

## II. Qualifications

12. I am the Frank G. Thompson Professor of Government in the Department of Government at Harvard University in Cambridge, MA. Formerly, I was an Assistant Professor at the University of California, Los Angeles, and I was Professor of Political Science at the Massachusetts Institute of Technology, where I held the Elting Morison Chair and served as Associate Head of the Department of Political Science. I am the Principal Investigator of the Cooperative Congressional Election Study (CCES), a survey research consortium of over 250 faculty and student researchers at more than 50 universities, directed the Caltech/MIT Voting Technology Project from its inception in 2000 through 2004, and served on the Board of Overseers of the American National Election Study from 1999 to 2013. I am an election analyst for and consultant to CBS News' Election Night Decision Desk. I am a member of the American Academy of Arts and Sciences (inducted in 2007). My curriculum vitae is attached to this report as Appendix B.

5

13.  I have worked as a consultant to the Brennan Center in the case of *McConnell v. FEC*, 540 U.S. 93 (2003).  I have testified before the U.S. Senate Committee on Rules, the U.S. Senate Committee on Commerce, the U.S. House Committee on Science, Space, and Technology, the U.S. House Committee on House Administration, and the Congressional Black Caucus on matters of election administration in the United States.  I filed an amicus brief with Professors Nathaniel Persily and Charles Stewart on behalf of neither party to the U.S. Supreme Court in the case of *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009) and an amicus brief with Professor Nathaniel Persily and others in the case of *Evenwel v. Abbott*, 138 S. Ct. 1120 (2015).  I have served as a testifying expert for the Gonzales intervenors in *State of Texas v. United States* before the U.S. District Court in the District of Columbia (No. 1:11-cv-01303); the Rodriguez plaintiffs in *Perez v. Perry*, before the U.S. District Court in the Western District of Texas (No. 5:11-cv-00360); for the San Antonio Water District intervenor in *LULAC v. Edwards Aquifer Authority* in the U.S. District Court for the Western District of Texas, San Antonio Division (No. 5:12cv620-OLG); for the Department of Justice in *State of Texas v. Holder*, before the U.S. District Court in the District of Columbia (No. 1:12-cv-00128); for the Guy plaintiffs in *Guy v. Miller* in the U.S. District Court for Nevada (No. 11-OC-00042-1B); for the Florida Democratic Party in *In re Senate Joint Resolution of Legislative Apportionment* in the Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490); for the Romo plaintiffs in *Romo v. Detzner* in the Circuit Court of the Second Judicial Circuit in Florida (No. 2012 CA 412); for the Department of Justice in *Veasey v. Perry*, before the U.S. District  Court for the Southern District of Texas, Corpus Christi Division (No. 2:13cv00193); for the Harris plaintiffs in *Harris v. McCrory* in the U.S. District Court for the Middle District of North Carolina (No. 1:2013cv00949); for the Bethune-Hill plaintiffs in *Bethune-Hill  v. Virginia*

*State Board of Elections* in the U.S. District Court for the Eastern District of Virginia (No. 3: 2014cv00852); for the Fish plaintiffs in *Fish v. Kobach* in the U.S. District Court for the District of Kansas ( No. 2:16-cv-02105-JAR); and for intervenors in *Voto Latino, et al. v. Hobbs*, in the U.S. District Court for the District of Arizona (No. 2:19-cv-05685-DWL). I served as an expert witness and filed an affidavit in the North Carolina State Board of Elections hearings regarding absentee ballot fraud in the 2018 election for Congressional District 9 in North Carolina.

14. My areas of expertise include American government, with particular expertise in electoral politics, representation, and public opinion, as well as statistical methods in social sciences and survey research methods. I have authored numerous scholarly works on voting behavior and elections, the application of statistical methods in social sciences, legislative politics and representation, and distributive politics. This scholarship includes articles in such academic journals as the Journal of the Royal Statistical Society, American Political Science Review, American Economic Review, the American Journal of Political Science, Legislative Studies Quarterly, Quarterly Journal of Political Science, Electoral Studies, and Political Analysis. I have published articles on issues of election law in the Harvard Law Review, Texas Law Review, Columbia Law Review, New York University Annual Survey of Law, and Election Law Journal, for which I am a member of the editorial board. I am associate editor of the Harvard Data Science Review, and have served as associate editor of the Public Opinion Quarterly. I have coauthored three scholarly books on electoral politics in the United States, The End of Inequality: Baker v. Carr and the Transformation of American Politics, Going Negative: How Political Advertising Shrinks and Polarizes the Electorate, and The Media Game: American Politics in the Media Age. I am coauthor with Benjamin Ginsberg and Ken Shepsle of American Government: Power and Purpose.

7

## III.  Sources

15.  I have relied on the report of Dr. William Briggs in this case.

16.  I have relied on the Election Assistance Commission, "Election Administration and Voting Survey (EAVS)" for 2018:  https://www.eac.gov/research-and-data/studies-and-reports. I present data from 2018 because it is the most recent federal election for which data on absentee and permanent absentee voting is available.  The 2018 data are instructive about the magnitude of permanent absentee voters and the magnitude of unreturned, late, rejected, and spoiled absentee ballots.  The 2020 data are not yet reported.

17.  I have relied on the report of Mr. Matthew Braynard in a pending lawsuit in Fulton County, Georgia, Superior Court, *Wood v. Raffensperger*, 2020CV342959.

18.  I have relied on the report of Dr. William Briggs in *King v. Whitmer* in the District Court in the Eastern District of Michigan (No. 2:20-cv-13134).

## IV.  Findings

19.  In my professional judgment, there are fundamental flaws in the design of the survey design and the survey data on which Dr. Briggs relied.  These flaws created biases in the estimates and analyses that are sufficiently large to completely explain the results that Dr. Briggs presents as nothing more than errors in the data collection process.  Perhaps most troubling, the survey is likely highly unrepresentative because it has a response rate less than 1 percent; the survey data are contaminated by respondents who should not have been included in the survey, and the basic data in the Topline summaries of the data do not add up, indicating fatal flaws in the implementation of the survey.

8

20.  The interpretations of the estimates in the survey as errors and troublesome ballots fail to take into account the realities of absentee voting in the State of Arizona.  Almost all absentee voters in the State receive absentee ballots for each election without having to request ballots for that election because they are Permanent Absentee and Early Voters (PEVs).  In addition, there are large numbers of undeliverable and late absentee ballots, which are typically not recorded as received by the election offices.

## A.  Critique of Interpretation

### i.  The survey data and its interpretation do not account for PEVs.

21.  The analysis of Question 2 is used to estimate the number of people who received but did not request an absentee ballot.  Dr. Briggs calls this Alleged Error #1.

22.  The interpretation of these data as an error in balloting does not account for the presence of a large number of Permanent Absentee and Early Voters (PEVs) in Arizona, Michigan, Pennsylvania, and Wisconsin.   Georgia automatically mails ballots for voters who qualify for "rollover" ballots – people over 65, disabled, or in the military who sign up annually to have ballots automatically sent to them.  I consider rollover ballots to be a form of PEV, but the voter does need to sign up each year.

23.  PEVs are automatically sent their absentee ballots.  They do not need to request that a ballot be sent for a particular election.

24.  In the State of Arizona, nearly all absentee ballots sent are sent to PEVs.  In 2018, PEVs were 95 percent of absentee ballots sent by election offices to registered voters.   In other words, nearly all voters who received absentee ballots in the State did so without having to request that one be sent to them.

9

25. In the other states covered in Dr. Briggs' report, there are substantial numbers of PEVs. Table 1 presents data from the number of absentee ballots sent in 2018 and the number of permanent absentee ballots sent to voters in Arizona, Georgia (rollover absentee voters), Michigan, Pennsylvania, and Wisconsin. The number of permanent absentee ballots sent in Arizona, Michigan, and Wisconsin far exceeds the estimated Alleged Error #1 in the first table in Dr. Briggs' report. The EAC reports no data on permanent absentee ballots for Georgia in 2018. Those data cover 2018 and are presented to indicate the likely magnitude of PEVs in the states in 2020. Preliminary reports from some of these states show very high numbers of PEVs and rollover absentee voters. There were at least 582,000 "rollover" ballots in Georgia in 2020.[2]

26. Based on the toplines, Mr. Braynard's survey does not identify PEVS or distinguish them from other absentee voters.

| Table 1. Permanent Absentee Voters in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin in 2018 | | | |
|---|---|---|---|
| | Total Absentee Ballots Sent | Permanent Absentee Ballots Sent (i.e., ballots sent automatically without a specific ballot request) | Permanent Absentee Ballots as a Percent of Total |
| Arizona | 2,672,384 | 2,545,198 | 95.2% |
| Georgia | 281,490 | * | * |
| Michigan | 1,123,415 | 549,894 | 48.9% |
| Pennsylvania | 216,575 | 6,340 | 2.9% |
| Wisconsin | 168,788 | 54,113 | 32.1% |
| Source: U.S. Election Assistance Commission, Election Administration and Voting Survey, 2018. Note: * no data reported. | | | |

---

[2] Stephen Fowler, "Nearly 800,000 Georgians Have Already Requested Absentee Ballots for November" GA Today gpb.org, September 2, 2020. https://www.gpb.org/news/2020/09/02/nearly-800000-georgians-have-already-requested-absentee-ballots-for-november

### ii. The interpretation of Question 3 fails to account for the proper handling of late, invalid, and spoiled absentee ballots by Local Election Offices.

27. The analysis of Question 3 of Mr. Braynard's survey is used to estimate the number of people who stated that they returned an absentee ballot but for whom no vote was recorded. Dr. Briggs calls this Alleged Error #2.

28. The interpretation of such cases as errors does not account for absentee ballots that are in fact not received or counted by election officers because the ballots are not returned by the postal system, are returned late by the voter, are spoiled by the voter, or are rejected. Such ballots are the obvious explanation for the data observed. No effort in the survey or the analysis is made to ascertain the likelihood that a voter cast a late or invalid absentee ballot.

29. The number of absentee ballots that are not received or valid is substantial. Table 2 presents counts of rejected, late, undelivered, and voided absentee ballots in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin for 2018, the most recent federal election for which systematic data on absentee voting are available. An undeliverable absentee ballot is one that was returned to the election office as not being deliverable to the address on the voter registration lists. The final column presents the number of sent absentee ballots for which the status of a ballot sent by the election office to a voter was not received and its status is not known. These are likely ballots that simply were not returned by voters or were lost or delayed in the US Postal System. Delays in the postal system were a particular concern in 2020, as there were widespread reports of staffing problems during COVID for USPS, delays in mail delivery, and declines in the rate of on-time delivery.[3] Late, undelivered, rejected, and spoiled ballots are not counted

---

[3] Hailey Fuchs, "Some Regions Still Experience Slow Delivery of Mail Ballots," New York Times, November 3, 2020, Section A, Page 23. https://www.nytimes.com/2020/11/02/us/politics/mail-ballot-usps.html.

under law, and they are comparable in magnitude to the estimates of the Alleged Error #2 reported by Dr. Briggs for each state.

30. Arizona election officials reported to EAC a total of 2,515 late absentee ballots, 27,804 void or spoiled ballots, 8,567 rejected ballots, and 102,896 ballots that were undeliverable in the 2018 election. These figures are not definitive of the numbers for the 2020 election, which have not yet been reported. Rather, they are demonstrative of the fact that there are sound, documented administrative reasons that returned absentee ballots are not recorded as having been voted, especially tardiness, spoilage, and rejection for lack of signatures, valid envelopes, and the like.

| Table 2. Rejected, Undelivered, Voided, and Late Absentees in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin in 2018 | | | | | |
|---|---|---|---|---|---|
| | Rejected Absentee Ballots | Undeliverable Absentee Ballots | Spoiled/Voided Absentee Ballots | Late Absentee Ballots | Status Unknown |
| Arizona | 8,567 | 102,896 | 27,804 | 2,515 | 642,210 |
| Georgia | 7,512 | 2,322 | 252 | 3,525 | 36,255 |
| Michigan | 6,013 | 791 | 19,679 | 2,207 | 41,120 |
| Pennsylvania | 8,714 | * | * | 8,162 | 20,622 |
| Wisconsin | 2,517 | 1,718 | 2,794 | 1,445 | 12,407 |
| Source: EAC, EAVS 2018. Note: * no data reported. | | | | | |

## B. Critique of Survey Design

31. Dr. Briggs offers no assessment of the design of the survey that generated the data that he presents. Rather, he assumes that the data are accurate.

32. It is my understanding that Matthew Braynard designed and conducted these surveys. There is no report of the survey design, questionnaire, or response rates, beyond the information embedded in the topline table appended to Dr. Briggs' report.

12

### i. The survey has an unacceptably high non-response rate.

33.   The response rate to the survey is measured as the number of people who answered the first substantive question (Q2) in the survey divided by the number of people who the surveyor sought to contact. The response rate to the survey conducted by Mr. Braynard in the State of Arizona is one-half of one percent.  That is, of the 518,560 people who the survey research project set out to interview, 99.5 percent of them could not be contacted or refused to participate.  That is an extremely low response rate, and it creates substantial doubt about drawing any reliable inferences from the data.

34.   Dr. Briggs offered no calculation of a response rate to the surveys in his report.

35.   My calculation of the response rate is offered in Table 1.  For each phase of the survey, I calculate the percent of people originally sought to be studied who remain in the survey or are asked a given question.  The initial phase of the survey consists of matching phone numbers to the registration list and contacting those numbers.  The number of cases for which an interview could commence was 5,604, of the original 518,560 registration records (or 1 percent). These 5,604 cases consist of all records for which a message was left, there was an early hang up or refusal at some point during the survey (2,975), and cases that made it to the end of the survey (684).

36. Once the survey commences, there is first a screener question to determine whether the person interviewed should continue with the interview.  That is Question 1.  Question 2 is the first question of interest in Dr. Briggs' analysis.  It asks, "Did you request an Absentee Ballot in the State of  <state name>?"  People could answer "Yes", "No", some other answer, Refuse to answer, or Hang up.

37.  The response rate to the survey items of interest is the percent of people who were asked Question 2.  2,489 of the original 518,560 were asked Question 2, and 2,129 provided an answer to the question.  That is a response rate of 0.4 percent.

38. This is an extremely low response rate.  In most disciplines of study that I am familiar with, these would not be scientifically acceptable or reliable samples.  For example, I am associate editor of the *Harvard Data Sciences Review*, which broadly covers fields of statistics and data sciences, and specialty fields such as political science, public opinion, survey methodology, and economics. Papers with such high non-responses are rejected on their face for this publication as not plausibly valid studies.

39.  In my work as an expert witness for the Department of Justice, courts in which I have testified exclude as evidence phone surveys based on registration lists because they have response rates of 2 percent.  Specifically, in *Texas v. Holder*, Professor Daron Shaw offered evidence based on phone surveys of registration lists.  These surveys had response rates of 2 percent, and the court rejected the data because of serious questions about the representativeness of samples in which 98 percent of respondents could not be contacted or would not respond, and the effects of very low response rates on accuracy and reliability of estimates using surveys with very low response rates.  See *Texas v. Holder* in the United States District Court for the District of Columbia No. 12-cv-128 (see pages 30 and 31). In evaluating the surveys conducted by Mr. Maynard and reported by Dr. Briggs, I use the 2 percent threshold as a standard for an unacceptably low response rate.

40. Dr. Briggs' assumption that those who responded to the question are representative of the relevant population under study (i.e., the other 99 percent of people who could not or would not participate in the survey) is highly unlikely to be correct.  When surveys have high non-

14

response rates, it is standard practice to analyze information about the sample and the target population, such as demographic characteristics or behavioral and attitudinal statistics, to confirm that the assumption of representativeness of a sample can be maintained. When the response rates are very low, such an analysis is a necessity in order to determine whether there is any scientific value to the survey. No such analysis is offered here.

| Table 3. Phone Survey Targets, Attempts and Completes in Mr. Braynard's survey of Arizona registered voters for whom records show no returned ballots | | |
|---|---|---|
| | Number of Cases | Percent of Targets for Survey Remaining in the Survey Process |
| People the Survey Sought to Reach (all Unreturned Ballots) [Targets for Survey] | 518,560 | 100% |
| Data Loads (Phone Numbers Loaded into the Survey System) | 81,780 | 15.77% |
| | | |
| "Completes" | | |
| No Answer | 74,437 | |
| Numbers/Language | 1,663 | |
| VM Message Left | 1,945 | |
| Early Hang Up/Refused | 2,975 | |
| Q4 = 01* | 684 | |
| Subtotal: "Completes" | 5,604 | 1.08% |
| | | |
| Completes Eligible for Survey (Q5 or Early Hang Up/Refused) | 3,695 | 0.71% |
| Asked Q1 | 4,525 | 0.87% |
| Asked Q2 | 2,489 | 0.41% |
| Asked Q3 | 2,129 | 0.41% |
| Completed Entire Survey (Q5) | 684 | 0.13% |
| | | |
| Source: William Briggs' report<br><br>*Note: This number is as reported. In table for Q4, 678 cases are Q4 = 01, and 684 is the Sum of All Responses for Q5. | | |

### ii. The screening question improperly allows people to take the survey who should not.

41.   A second substantial flaw in the survey is that the design of the questionnaire allows people who are not affirmatively determined to be the correct person to take the survey.

42.   Past research has documented that phone surveys using registered voter lists are often answered by someone other than the person who was listed on the registered voter file. The two most common problems are that the wrong number was matched to the voter list and that someone other than the person the research sought to speak with answered the phone.  The latter occurs most often with landlines.[4]

43.   Question 1 (Q1) of the survey asks, "May I please speak to <lead on screen>?" "Lead on screen" is the name from the voter registration list that is linked to the phone number that the survey has dialed.  Responses to Q1 are listed as reached target, other/uncertain, refused, and hang up.  In the survey toplines for Arizona, the response categories for Question 1 do not specifically describe the branching.  I examined the toplines for other states as reported in the appendix to Dr. Briggs' report in *King v. Whitmer*.  The other states show that the second response category for Question 1 is assigned to Question 2.  For example, in the first table (Georgia), the responses are "Reached Target [Go to Q2]" and "[Go to Q2]," without further explanation.  Importantly, both those respondents classified as "Reached Target" and as "Uncertain" in Question 1 are instructed to "Go to Q2."

44.   This is an error in the branching design of the survey.  People who are not affirmatively identified as the correct person for the interview are allowed to answer the remaining questions in the survey.  For example, Reponses to Questions 2 and 3 show evidence

---

[4] Pew Research Center, "Comparing Survey Sampling Strategies:  Random-Digit Dialing vs. Voter Files," 2018. https://www.pewresearch.org/methods/2018/10/09/comparing-survey-sampling-strategies-random-digit-dial-vs-voter-files/,  see pages 25-26.

that spouses and other family members are asked Questions 2 and 3, even though they were not the person whose absentee voting records are in question.

45. A significant percent and number of respondents who are listed as not giving an affirmative answer to Question 1 are in fact kept in the survey and asked Question 2. In the Arizona survey, 335 respondents answered Uncertain, but were then asked Question 2. These 335 cases are 15.6 percent of cases who answered Question 1 and were then assigned to Question 2 (i.e., 335/(335+1,812)). These respondents enter the pool for Questions 2 and 3 and contaminate all estimates using these data.

46. Questions 2 and 3 exhibit evidence of these cases. The response categories labeled "Member" correspond to family members. Again, there is no codebook for deciphering the response categories. I relied on the toplines for other states in Dr. Briggs' report in *King v. Whitmer* to clarify these categories. Family members answering on behalf of someone indicates that the survey interviewers did not always speak with the specific person listed on the registration list. The number of family members listed is a small percentage of all of the cases with "Uncertainty" in the sample.

47. I inspected the toplines for other states and discovered similar errors in the branching in all of the states. People whose identity was not clearly identified in Question 1 are asked Question 2. At this point in the branching protocol, my conclusion is that the data are not an accurate reflection of the Target group (i.e., those people who are affirmatively identified as the person whose name appears on the registration list).

17

### iii.   Question 3 is subject to memory errors and social desirability bias.

48. Question 3 asks people whether they voted.  Specifically, it asks people who said that they requested an absentee ballot whether they returned an absentee ballot; that is, whether they voted that ballot.

49.  It has long been understood in political science that respondents to surveys over-report voting in elections.  Typically, the overstatement is approximately 10 to 20 percentage points.  That is, if 65 percent of people in a sample actually voted, the reported vote rates in surveys are usually around 75 to 85 percent.  The most commonly identified sorts of biases are memory errors and social desirability bias in questions asking people whether they voted.[5] When asked whether they voted or cast a ballot, people say "yes" either because they feel that is the socially acceptable answer or because they forgot whether they actually voted in a given election.  Questions that ask people whether they voted or cast a ballot will overstate voting and should not be taken on face value as ground truth.  The particular form of Question 3 is likely to lead to people saying that they voted a ballot when in fact they had not.

50. There are alternative ways to ask about voting in order to reduce social desirability bias.[6]  Those other ways of asking the question are in line with social science practice in research in order to avoid social desirability biases.  Question 3 should have been asked a different way so as to avoid over-reporting of voting.  As it is, it is of the form of survey question regarding voting that is well known to lead to over-reporting.

---

[5] See for example, Allyson L. Holbrook and Jon A. Krosnick, "Social Desirability Bias in Voter Turnout Reports: Test Using the Item Count Technique," *Public Opinion Quarterly* 74 (2010): 37-67. See also Stephen Ansolabehere and Eitan Hersh, "Validation:  What Big Data Reveal About Survey Misreporting and the Real Electorate," *Political Analysis* 20 (2012): 437-459
[6] See, for example, Holbrook and Krosnick, op cit., and Michael J. Hanmer, Antoine J. Banks, and Ismail K. White, "Experiments to Reduce the Over-Reporting of Voting:  A Pipeline to the Truth," *Political Analysis* 22 (2014):  130-141.

### C.  Critique of the Survey Databases and Data Analyses

51.  There are obvious data errors and inconsistencies revealed in the toplines that are appended to Dr. Briggs' report.  Dr. Briggs states that he assumes that "the data is accurate."  A routine analysis to check the consistency and integrity of data reported in the toplines is standard practice in the survey research field.  Such checks allow researchers to determine whether the survey data and spreadsheet program are producing sensible numbers and, thus, working correctly.  Failures in even a small number of integrity checks indicate problems with the survey systems and software, and raise deep concerns about data accuracy generally.  I routinely perform such checks on surveys that I conduct and supervise.  I have performed such a check, and it reveals that the data lack integrity.  They should not be assumed to be accurate.

52.  The data integrity checks that I implemented were of two sorts.  First, I added up the number of cases in each response category to verify that they sum to the number of cases reported for each question in the row labeled "Sum of Responses."  Second, I added up the number of cases at each phase of the survey that are indicated as cases to be asked the next question.  For example, I add up the cases in Question 1 that have the flag [Go to Q2] and then check whether that number equals the number of cases for Question 2 in "Sum of Responses."  I performed these integrity checks for the Arizona survey toplines appended to Dr. Briggs' report in this case and to the toplines for the surveys that Mr. Braynard conducted in other states and that are appended to Dr. Briggs' report in *King v. Whitmer*.

53.  The toplines for one of the surveys (Wisconsin) failed the first integrity check.  The response categories for Question 1 in that survey had 2,261 people listed as "A-Reached Target + B-What Is This About?/Uncertain" and 1,677 cases listed as "X=Refused."  These numbers sum to 3,938.  However, the number of cases that the survey system reported under "Sum of All

19

Responses" to Question 1 is 3,495.  There is a discrepancy of 443 cases that are unaccounted for at the outset of that survey.  This indicates to me an error in the program that generated the survey data.  This finding means none of the Wisconsin data should be assumed to be reliable and accurate.

54.  The integrity checks failed for the Arizona data when I performed the second sort of integrity check.  The accounting for the second sort of integrity check is presented in Table 4. The first panel of Table 4 (marked with lower case numerals) reproduces the accounting for "Completes" shown in the toplines appended to Dr. Briggs' report.  The second panel reports the number of cases in the Completes, including people who hung up or refused, that should have been asked Question 1 (denoted "A") and the number of cases who were asked Question 1 (denoted "B").  The third set of rows is the number of cases in Question 1 who were assigned to Question 2 (denoted "C") and the number of cases who were asked Question 2 (denoted "D"). The fourth set of rows is the number of cases in Question 2 who were assigned to Question 3 (denoted "E") and the number of cases who were asked Question 3 (denoted "F").

55.  The first integrity check in this table is whether the subtotal of Completes equals the number of cases in which calls reached a response (even if an answering machine or refusal). That is, do rows (i), (ii), and (iii) sum to row (iv)?  They do.  The difference between rows (i)+(ii)+(iii) and row (iv) is zero.

56.  The second integrity check in this table is whether the subtotal of Completes eligible for Question 1 equals the number of people asked Question 1.  That is, does Row A equal Row B?  They are not equal.  Row A minus Row B is -866, meaning there are 866 more respondents who were asked Question 2 than were indicated to be calls commenced in the survey.  I attempted to resolve this discrepancy by removing various categories, such as Refusals to

20

Question or Hang ups at the Complete stage.  I found no way to account for the excess number of cases who were asked Question 1 but were not accounted for in the Completes portion of the toplines.  These respondents mysteriously show up in the interviews and are not accounted for.

57.  The third integrity check in this table is whether the number of people who were assigned in Question 1 to [Go to Q2] equals the number of people who answered Question 2. That is, does Row C equal Row D?  They are not equal.  Row C minus Row D is -342, meaning there are 342 more respondents in Question 2 than were assigned to Question 2 at the Question 1 stage.  This is a second failure of the integrity checks.

58.  The fourth integrity check in this table is whether the number of people who were assigned in Question 2 to [Go to Q3] equals the number of people who answered Question 3. That is, does Row E equal Row F?  They are equal.  Row E and Row F equal 2,129 each.

59.  Inspection of the toplines for Arizona exposes failures of the integrity checks.  The number of cases affected by these failures is substantial:  1,208 (866+342).  To put these spreadsheet failures into perspective, the total number of cases in the survey that are listed as either Error #1 or Error #2 is 1,229 (i.e., 885 Question 2 = No and 344 Question 3 = Yes).  The presence of integrity check failures leads me to conclude that there are errors in either the program that generated the survey data or the spreadsheets and analysis used to analyze the data. The number of errors is of a sufficiently large magnitude that there can be no confidence in any estimates made using these data.

60.  I performed integrity checks for the other states using the toplines appended to Dr. Briggs' report in *King v. Whitmer*.  I found similar sorts of spreadsheet inconsistencies and failures in integrity checks in other states.

61. In my experience running, designing, and analyzing large scale surveys through the Cooperative Congressional Election Study and serving on the board of the American National Election Study, errors such as these usually have two sources. They are indicative of either: (i) errors in the program that that assigns questions to people, or (ii) errors in the program that generates the spreadsheet. Either sort of error is catastrophic for this analysis, and they render the estimates, projections, and inferences in Dr. Briggs' report entirely unreliable.

| Table 4. Data Integrity Checks for Mr. Braynard's survey of Arizona registered voters | | |
|---|---|---|
| | Number of Cases | Integrity Checks |
| "Completes" | | |
| (i) VM Message Left | 1,945 | |
| (ii) Early Hang Up/Refused | 2,975 | |
| (iii) Q4 = 01* | 684 | |
| (iv) Subtotal: "Completes" | 5,604 | (iv) – ((i) + (ii) + (iii)) = 0 |
| | | |
| A: Completes Eligible for Survey (Q5 or Early Hang Up/Refused) | 3,659 | |
| B: Asked Q1 (Sum of All Responses) | 4,525 | A – B = -866 |
| | | |
| C: Completed Q1 [Go to Q2]* | 2,147 | |
| D: Asked Q2 (Sum of All Responses) | 2,489 | C – D = -342 |
| | | |
| E: Offered a Response to Q2 (without hanging up or refusing) [Go to Q3] | 2,129 | |
| F: Asked Q3 (Sum of All Resonses) | 2,129 | E – F = 0 |
| | | |
| Source: William Briggs' report<br><br>* Based on Dr. Briggs' report in *Wood v. Raffensperger*, the survey branching in other states asks Question 2 of respondents who are identified as "Reached Target" or "Uncertain" in Question 1. I assume that the branching is the same in the Arizona survey. | | |

**D. Conclusion**

62. The estimates and projections presented by Dr. Briggs are based on survey data collected in Arizona and four other states (Georgia, Michigan, Pennsylvania, and Wisconsin). My overall assessment of these surveys is that they were not properly designed. Specifically, they have unacceptably low response rates, poorly designed questions that are known to over-report voting, and errors in assigning cases to questions that allow people who should not have been included in the survey to nonetheless answer the questions. These survey design and implementation failures mean that, in hundreds of cases, the wrong people are allowed to answer the surveys, and that the statistician must make implausible assumptions about the representativeness of a sample with a .4 percent response rate in order to extrapolate to a half million people. These survey design and implementation flaws are of sufficient magnitude and severity as to make the estimates completely unreliable and uninformative.

63. The data are not accurate. The Topline summaries of the survey data appended to Dr. Briggs' report reveal fatal accounting errors in the data. No sound estimates or inferences can be drawn based on these data. Dr. Briggs assumed at the outset that the respondents to the surveys are representative and the data are accurate. Neither assumption is correct.

64. The interpretation of the survey responses ignores the realities of absentee voting in the State of Arizona. In Arizona, 95 percent of people are permanent absentee and early voters and are sent a ballot automatically without requesting one for a given election. Dr. Briggs considers as errors all instances in which a voter who was sent an absentee ballot did not request one. These occurrences are not errors, but instead are the normal workings of Arizona's absentee voting system. Also, ballots that voters say they returned but are not recorded are not definitive evidence of "errors." Arizona also has a substantial number of absentee ballots that

are late, undeliverable, spoiled, or invalid.  The evidence presented is not evidence of errors in the election but of errors in the survey data presented by Dr. Briggs.

Signed at Boston, Massachusetts, on the date below.
Date:  December 3, 2020

_____
Stephen Ansolabehere

# STEPHEN DANIEL ANSOLABEHERE

**Department of Government**
**Harvard University**
**1737 Cambridge Street**
**Cambridge, MA 02138**
**sda@gov.harvard.edu**

## EDUCATION

| | | |
|---|---|---|
| Harvard University | Ph.D., Political Science | 1989 |
| University of Minnesota | B.A., Political Science | 1984 |
| | B.S., Economics | |

## PROFESSIONAL EXPERIENCE

### ACADEMIC POSITIONS

| | |
|---|---|
| 2016-present | Frank G. Thompson Professor of Government, Harvard University |
| 2008-present | Professor, Department of Government, Harvard University |
| 2015-present | Director, Center for American Politics, Harvard University |
| 1998-2009 | Elting Morison Professor, Department of Political Science, MIT (Associate Head, 2001-2005) |
| 1995-1998 | Associate Professor, Department of Political Science, MIT |
| 1993-1994 | National Fellow, The Hoover Institution |
| 1989-1993 | Assistant Professor, Department of Political Science, University of California, Los Angeles |

### FELLOWSHIPS AND HONORS

| | |
|---|---|
| American Academy of Arts and Sciences | 2007 |
| Carnegie Scholar | 2000-02 |
| National Fellow, The Hoover Institution | 1993-94 |
| Harry S. Truman Fellowship | 1982-86 |

1

# PUBLICATIONS

## Books

2019    *American Government*, 15th edition.  With Ted Lowi, Benjamin Ginsberg
and Kenneth Shepsle.  W.W. Norton.

2014    *Cheap and Clean:  How Americans Think About Energy in the Age of Global
Warming*.  With David Konisky.  MIT Press.
Recipient of the Donald K. Price book award.

2008    *The End of Inequality:  One Person, One Vote and the Transformation of
American Politics*.  With James M. Snyder, Jr.,  W. W. Norton.

1996    *Going Negative:  How Political Advertising Divides and Shrinks the American
Electorate*.   With Shanto Iyengar.  The Free Press.  Recipient of the Goldsmith
book award.

1993    *Media Game:  American Politics in the Television Age*.  With Roy Behr and
Shanto Iyengar.  Macmillan.

## Journal Articles

2021    "The CPS Voting and Registration Supplement Overstates Turnout" *Journal of
Politics* Forthcoming (with Bernard Fraga and Brian Schaffner)

2021    "Congressional Representation: Accountability from the Constituent's Perspective,"
*American Journal of Political Science* forthcoming (with Shiro Kuriwaki)

2020    "Proximity, NIMBYism, and Public Support for Energy Infrastructure"
*Public Opinion Quarterly* (with David Konisky and Sanya Carley)
https://doi.org/10.1093/poq/nfaa025

2020    "Understanding Exponential Growth Amid a Pandemic: An Internal Perspective,"
*Harvard Data Science Review* 2 (October) (with Ray Duch, Kevin DeLuca,
Alexander Podkul, Liberty Vittert)

2020    "Unilateral Action and Presidential Accountability,"  *Presidential Studies Quarterly*
50 (March):  129-145. (with Jon Rogowski)

2019    "Backyard Voices: How Sense of Place Shapes Views of Large-Scale Energy

2

Transmission Infrastructure" *Energy Research & Social Science* forthcoming(with Parrish Bergquist, Carley Sanya, and David Konisky)

2019    "Are All Electrons the Same? Evaluating support for local transmission lines through an experiment" *PLOS ONE* 14 (7): e0219066
(with Carley Sanya and David Konisky)
https://doi.org/10.1371/journal.pone.0219066

2018    "Learning from Recounts" Election Law Journal 17: 100-116 (with Barry C. Burden, Kenneth R. Mayer, and Charles Stewart III)
https://doi.org/10.1089/elj.2017.0440

2018    "Policy, Politics, and Public Attitudes Toward the Supreme Court" *American Politics Research* (with Ariel White and Nathaniel Persily).
https://doi.org/10.1177/1532673X18765189

2018    "Measuring Issue-Salience in Voters' Preferences" *Electoral Studies* (with Maria Socorro Puy) 51 (February): 103-114.

2018    "Divided Government and Significant Legislation:  A History of Congress," *Social Science History* (with Maxwell Palmer and Benjamin Schneer).42 (1).

2017    "ADGN:  An Algorithm for Record Linkage Using Address, Date of Birth Gender and Name," *Statistics and Public Policy* (with Eitan Hersh)

2017    "Identity Politics" (with Socorro Puy) *Public Choice*. 168:  1-19.
DOI 10.1007/s11127-016-0371-2

2016    "A 200-Year Statistical History of the Gerrymander" (with Maxwell Palmer) *The Ohio State University Law Journal*

2016    "Do Americans Prefer Co-Ethnic Representation?  The Impact of Race on House Incumbent Evaluations" (with Bernard Fraga) *Stanford University Law Review* 68:  1553-1594

2016    Revisiting Public Opinion on Voter Identification and Voter Fraud in an Era of Increasing Partisan Polarization" (with Nathaniel Persily) *Stanford Law Review* 68:  1455-1489

2015    "The Perils of Cherry Picking Low Frequency Events in Large Sample Surveys" (with Brian Schaffner and Samantha Luks) *Electoral Studies* 40 (December): 409-410.

2015    "Testing *Shaw v. Reno*: Do Majority-Minority Districts Cause Expressive Harms?" (with Nathaniel Persily) *New York University Law Review* 90

3

2015        "A Brief Yet Practical Guide to Reforming U.S. Voter Registration, *Election Law Journal*, (with Daron Shaw and Charles Stewart) 14: 26-31.

2015        "Waiting to Vote," *Election Law Journal*, (with Charles Stewart) 14: 47-53.

2014        "Mecro-economic Voting: Local Information and Micro-Perceptions of the Macro-Economy" (With Marc Meredith and Erik Snowberg), *Economics and Politics* 26 (November): 380-410.

2014        "Does Survey Mode Still Matter?" *Political Analysis* (with Brian Schaffner) 22: 285-303

2013        "Race, Gender, Age, and Voting" *Politics and Governance*, vol. 1, issue 2. (with Eitan Hersh)
            http://www.librelloph.com/politicsandgovernance/article/view/PaG-1.2.132

2013        "Regional Differences in Racially Polarized Voting: Implications for the Constitutionality of Section 5 of the Voting Rights Act" (with Nathaniel Persily and Charles Stewart) 126 *Harvard Law Review* F 205 (2013) http://www.harvardlawreview.org/issues/126/april13/forum_1005.php

2013        "Cooperative Survey Research" *Annual Review of Political Science* (with Douglas Rivers)

2013        "Social Sciences and the Alternative Energy Future" *Daedalus* (with Bob Fri)

2013        "The Effects of Redistricting on Incumbents," *Election Law Journal* (with James Snyder)

2012        "Asking About Numbers: How and Why" *Political Analysis* (with Erik Snowberg and Marc Meredith). doi:10.1093/pan/mps031

2012        "Movers, Stayers, and Registration" *Quarterly Journal of Political Science* (with Eitan Hersh and Ken Shepsle)

2012        "Validation:  What Big Data Reveals About Survey Misreporting and the Real Electorate" *Political Analysis* (with Eitan Hersh)

2012        "Arizona Free Enterprise v. Bennett and the Problem of Campaign Finance" *Supreme Court Review* 2011(1):39-79

2012        "The American Public's Energy Choice" *Daedalus* (with David Konisky)

2012        "Challenges for Technology Change" *Daedalus* (with Robert Fri)

4

2011    "When Parties Are Not Teams:  Party positions in single-member district and
        proportional representation systems"  *Economic Theory* 49 (March)
        DOI: 10.1007/s00199-011-0610-1  (with James M. Snyder Jr. and William
        Leblanc)

2011    "Profiling Originalism" *Columbia Law Review* (with Jamal Greene and Nathaniel
        Persily).

2010    "Partisanship, Public Opinion, and Redistricting" *Election Law Journal* (with
        Joshua Fougere and Nathaniel Persily).

2010    "Primary Elections and Party Polarization" *Quarterly Journal of Political Science*
        (with Shigeo Hirano, James Snyder, and Mark Hansen)

2010     "Constituents' Responses to Congressional Roll Call Voting," *American
        Journal of  Political Science*  (with Phil Jones)

2010     "Race, Region, and Vote Choice in the 2008 Election: Implications for
        the Future of the Voting Rights Act" *Harvard Law Review* April, 2010.  (with
        Nathaniel Persily, and Charles H. Stewart III)

2010    "Residential Mobility and the Cell Only Population," *Public Opinion Quarterly*
        (with Brian Schaffner)

2009     "Explaining Attitudes Toward Power Plant Location,"  *Public Opinion Quarterly*
        (with David Konisky)

2009    "Public risk perspectives on the geologic storage of carbon dioxide,"
        *International Journal of Greenhouse Gas Control* (with Gregory Singleton and
        Howard Herzog) 3(1):  100-107.

2008    "A Spatial Model of the Relationship Between Seats and Votes"  (with William
        Leblanc) *Mathematical and Computer Modeling* (November).

2008    "The Strength of Issues:  Using Multiple Measures to Gauge Preference Stability,
        Ideological Constraint, and Issue Voting"  (with Jonathan Rodden and James M.
        Snyder, Jr.)  *American Political Science Review* (May).

2008    "Access versus Integrity in Voter Identification Requirements."  *New York
        University Annual Survey of American Law,* vol 63.

2008    "Voter Fraud in the Eye of the Beholder" (with Nathaniel Persily) *Harvard Law
         Review* (May)

2007    "Incumbency Advantages in U. S. Primary Elections," (with John Mark Hansen,
        Shigeo Hirano, and James M. Snyder, Jr.)  *Electoral Studies* (September)

5

2007  "Television and the Incumbency Advantage" (with Erik C. Snowberg and James M. Snyder, Jr). *Legislative Studies Quarterly*.

2006  "The Political Orientation of Newspaper Endorsements" (with Rebecca Lessem and James M. Snyder, Jr.). *Quarterly Journal of Political Science* vol. 1, issue 3.

2006  "Voting Cues and the Incumbency Advantage: A Critical Test" (with Shigeo Hirano, James M. Snyder, Jr., and Michiko Ueda) *Quarterly Journal of Political Science* vol. 1, issue 2.

2006  "American Exceptionalism? Similarities and Differences in National Attitudes Toward Energy Policies and Global Warming" (with David Reiner, Howard Herzog, K. Itaoka, M. Odenberger, and Fillip Johanssen) *Environmental Science and Technology* (February 22, 2006), http://pubs3.acs.org/acs/journals/doilookup?in_doi=10.1021/es052010b

2006  "Purple America" (with Jonathan Rodden and James M. Snyder, Jr.) *Journal of Economic Perspectives* (Winter).

2005  "Did the Introduction of Voter Registration Decrease Turnout?" (with David Konisky). *Political Analysis*.

2005  "Statistical Bias in Newspaper Reporting: The Case of Campaign Finance" *Public Opinion Quarterly* (with James M. Snyder, Jr., and Erik Snowberg).

2005  "Studying Elections" *Policy Studies Journal* (with Charles H. Stewart III and R. Michael Alvarez).

2005  "Legislative Bargaining under Weighted Voting" *American Economic Review* (with James M. Snyder, Jr., and Michael Ting)

2005  "Voting Weights and Formateur Advantages in Coalition Formation: Evidence from Parliamentary Coalitions, 1946 to 2002" (with James M. Snyder, Jr., Aaron B. Strauss, and Michael M. Ting) *American Journal of Political Science*.

2005  "Reapportionment and Party Realignment in the American States" *Pennsylvania Law Review* (with James M. Snyder, Jr.)

2004  "Residual Votes Attributable to Voting Technologies" (with Charles Stewart) *Journal of Politics*

2004  "Using Term Limits to Estimate Incumbency Advantages When Office Holders Retire Strategically" (with James M. Snyder, Jr.). *Legislative Studies Quarterly* vol. 29, November 2004, pages 487-516.

2004        "Did Firms Profit From Soft Money?" (with James M. Snyder, Jr., and Michiko Ueda)  *Election Law Journal* vol. 3, April 2004.

2003        "Bargaining in Bicameral Legislatures" (with James M. Snyder, Jr. and Mike Ting)  *American Political Science Review,* August, 2003.

2003        "Why Is There So Little Money in U.S. Politics?" (with James M. Snyder, Jr.) *Journal of Economic Perspectives*, Winter, 2003.

2002        "Equal Votes, Equal Money:  Court-Ordered Redistricting and the Public Spending in the American States" (with Alan Gerber and James M. Snyder, Jr.) *American Political Science Review*, December, 2002.
            Paper awarded the Heinz Eulau award for the best paper in the American Political Science Review.

2002        "Are PAC Contributions and Lobbying Linked?" (with James M. Snyder, Jr. and Micky Tripathi) *Business and Politics* 4, no. 2.

2002        "The Incumbency Advantage in U.S. Elections:  An Analysis of State and Federal Offices, 1942-2000"  (with James Snyder)  *Election Law Journal,* 1, no. 3.

2001        "Voting Machines, Race, and Equal Protection."  *Election Law Journal*, vol. 1, no. 1

2001        "Models, assumptions, and model checking in ecological regressions" (with Andrew Gelman, David Park, Phillip Price, and Larraine Minnite) *Journal of the Royal Statistical Society,* series A, 164:  101-118.

2001        "The Effects of Party and Preferences on Congressional Roll Call Voting." (with James Snyder and Charles Stewart)  *Legislative Studies Quarterly* (forthcoming).
            Paper awarded the *Jewell-Lowenberg Award* for the best paper published on legislative politics in 2001.  Paper awarded the *Jack Walker Award* for the best paper published on party politics in 2001.

2001        "Candidate Positions in Congressional Elections," (with James Snyder and Charles Stewart). *American Journal of Political Science* 45 (November).

2000        "Old Voters, New Voters, and the Personal Vote," (with James Snyder and Charles Stewart) *American Journal of Political Science* 44 (February).

2000        "Soft Money, Hard Money, Strong Parties," (with James Snyder)  *Columbia Law Review* 100 (April):598 - 619.

2000        "Campaign War Chests and Congressional Elections," (with James Snyder)

*Business and Politics.* 2 (April): 9-34.

1999        "Replicating Experiments Using Surveys and Aggregate Data:  The Case of
            Negative Advertising."  (with Shanto Iyengar and Adam Simon)  *American
            Political Science Review* 93 (December).

1999        "Valence Politics and Equilibrium in Spatial Models," (with James Snyder),
            *Public Choice.*

1999        "Money and Institutional Power," (with James Snyder), *Texas Law Review* 77
            (June, 1999):  1673-1704.

1997        "Incumbency Advantage and the Persistence of Legislative Majorities," (with
            Alan Gerber), *Legislative Studies Quarterly* 22 (May 1997).

1996        "The Effects of Ballot Access Rules on U.S. House Elections," (with Alan
            Gerber), *Legislative Studies Quarterly* 21 (May 1996).

1994        "Riding the Wave and Issue Ownership: The Importance of Issues in Political
            Advertising and News," (with Shanto Iyengar) *Public Opinion Quarterly* 58:
            335-357.

1994        "Horseshoes and Horseraces:  Experimental Evidence of the Effects of Polls on
            Campaigns," (with Shanto Iyengar) *Political Communications* 11/4 (October-
            December):  413-429.

1994        "Does Attack Advertising Demobilize the Electorate?"  (with Shanto Iyengar),
            *American Political Science Review* 89 (December).

1994        "The Mismeasure of Campaign Spending:  Evidence from the 1990 U.S. House
            Elections," (with Alan Gerber) *Journal of Politics* 56 (September).

1993        "Poll Faulting," (with Thomas R. Belin) *Chance* 6 (Winter):  22-28.

1991        "The Vanishing Marginals and Electoral Responsiveness," (with David Brady and
            Morris Fiorina) *British Journal of Political Science* 22 (November):  21-38.

1991        "Mass Media and Elections:  An Overview," (with Roy Behr and Shanto Iyengar)
            *American Politics Quarterly* 19/1 (January):  109-139.

1990        "The Limits of Unraveling in Interest Groups," *Rationality and Society* 2:
            394-400.

1990        "Measuring the Consequences of Delegate Selection Rules in Presidential
            Nominations," (with Gary King) *Journal of Politics* 52:  609-621.

1989        "The Nature of Utility Functions in Mass Publics," (with Henry Brady) *American Political Science Review* 83: 143-164.

### *Special Reports and Policy Studies*

2010        *The Future of Nuclear Power*, Revised.

2006        *The Future of Coal.* MIT Press.  Continued reliance on coal as a primary power source will lead to very high concentrations of carbon dioxide in the atmosphere, resulting in global warming.  This cross-disciplinary study – drawing on faculty from Physics, Economics, Chemistry, Nuclear Engineering, and Political Science – develop a road map for technology research and development policy in order to address the challenges of carbon emissions from expanding use of coal for electricity and heating throughout the world.

2003        *The Future of Nuclear Power*.  MIT Press.  This cross-disciplinary study – drawing on faculty from Physics, Economics, Chemistry, Nuclear Engineering, and Political Science – examines the what contribution nuclear power can make to meet growing electricity demand, especially in a world with increasing carbon dioxide emissions from fossil fuel power plants.

2002        "Election Day Registration." A report prepared for DEMOS.  This report analyzes the possible effects of Proposition 52 in California based on the experiences of 6 states with election day registration.

2001        *Voting:  What Is, What Could Be.*  A report of the Caltech/MIT Voting Technology Project.  This report examines the voting system, especially technologies for casting and counting votes, registration systems, and polling place operations, in the United States.  It was widely used by state and national governments in formulating election  reforms following the 2000 election.

2001        "An Assessment of the Reliability of Voting Technologies."  A report of the Caltech/MIT Voting Technology Project.  This report provided the first nationwide assessment of voting equipment performance in the United States.  It was prepared for the Governor's Select Task Force on Election Reform in Florida.

### *Chapters in Edited Volumes*

2016        "Taking the Study of Public Opinion Online"  (with Brian Schaffner) *Oxford Handbook of Public Opinion*, R. Michael Alvarez, ed. Oxford University Press:  New York, NY.

2014        "Voter Registration:  The Process and Quality of Lists*" The Measure of*

9

*American Elections*, Barry Burden, ed..

2012    "Using Recounts to Measure the Accuracy of Vote Tabulations:  Evidence from New Hampshire Elections, 1946-2002" in Confirming Elections, R. Michael Alvarez, Lonna Atkeson, and Thad Hall, eds.  New York: Palgrave, Macmillan.

2010    "Dyadic Representation"  in Oxford Handbook on Congress, Eric Schickler, ed., Oxford University Press.

2008    "Voting Technology and Election Law" in *America Votes!,* Benjamin Griffith, editor, Washington, DC:  American Bar Association.

2007    "What Did the Direct Primary Do to Party Loyalty in Congress"  (with Shigeo Hirano and James M. Snyder Jr.) in *Process, Party and Policy Making: Further New Perspectives on the History of Congress*, David Brady and Matthew D. McCubbins (eds.), Stanford University Press, 2007.

2007    "Election Administration and Voting Rights" in *Renewal of the Voting Rights Act*, David Epstein and Sharyn O'Hallaran, eds.  Russell Sage Foundation.

2006    "The Decline of Competition in Primary Elections,"  (with John Mark Hansen, Shigeo Hirano, and James M. Snyder, Jr.) *The Marketplace of Democracy*, Michael P. McDonald and John Samples, eds.  Washington, DC:  Brookings.

2005    "Voters, Candidates and  Parties"  in *Handbook of Political Economy*, Barry Weingast and Donald Wittman, eds.  New York: Oxford University Press.

2003    "Baker v. Carr in Context, 1946 – 1964" (with Samuel Isaacharoff) in *Constitutional Cases in Contex*t, Michael Dorf, editor. New York: Foundation Press.

2002    "Corruption and the Growth of Campaign Spending"(with Alan Gerber and James Snyder).  *A User's Guide to Campaign Finance*, Jerry Lubenow, editor.  Rowman and Littlefield.

2001     "The Paradox of Minimal Effects," in Henry Brady and Richard Johnston, eds., *Do Campaigns Matter*?  University of Michigan Press.

2001     "Campaigns as Experiments," in Henry Brady and Richard Johnson, eds., Do *Campaigns Matter*?  University of Michigan Press.

2000     "Money and Office," (with James Snyder) in David Brady and John Cogan, eds., *Congressional Elections:  Continuity and Change*.  Stanford University Press.

1996    "The Science of Political Advertising," (with Shanto Iyengar) in *Political Persuasion and Attitude Change*, Richard Brody, Diana Mutz, and Paul

Sniderman, eds.  Ann Arbor, MI:  University of Michigan Press.

1995       "Evolving Perspectives on the Effects of Campaign Communication," in Philo Warburn, ed., *Research in Political Sociology*, vol. 7, JAI.

1995       "The Effectiveness of Campaign Advertising: It's All in the Context," (with Shanto Iyengar) in *Campaigns and Elections American Style*, Candice Nelson and James A. Thurber, eds.  Westview Press.

1993       "Information and Electoral Attitudes:  A Case of Judgment Under Uncertainty," (with Shanto Iyengar), in *Explorations in Political Psychology*, Shanto Iyengar and William McGuire, eds.  Durham:  Duke University Press.

## *Working Papers*

2009       "Sociotropic Voting and the Media" (with Marc Meredith and Erik Snowberg), American National Election Study Pilot Study Reports, John Aldrich editor.

2007       "Public Attitudes Toward America's Energy Options:  Report of the 2007 MIT Energy Survey" CEEPR Working Paper 07-002 and CANES working paper.

2006       "Constituents' Policy Perceptions and Approval of Members' of Congress"  CCES Working Paper 06-01 (with Phil Jones).

2004       "Using Recounts to Measure the Accuracy of Vote Tabulations:  Evidence from New Hampshire Elections, 1946 to 2002"  (with Andrew Reeves).

2002       "Evidence of Virtual Representation:  Reapportionment in California,"  (with Ruimin He and James M. Snyder).

1999       "Why did a majority of Californians vote to lower their own power?" (with James Snyder and Jonathan Woon).  Paper presented at the annual meeting of the American Political Science Association, Atlanta, GA, September, 1999.
Paper received the award for the best paper on Representation at the 1999 Annual Meeting  of the APSA.

1999       "Has Television Increased the Cost of Campaigns?" (with Alan Gerber and James Snyder).

1996       "Money, Elections, and Candidate Quality,"  (with James Snyder).

1996       "Party Platform Choice - Single- Member District and Party-List Systems,"(with James Snyder).

1995       "Messages Forgotten"  (with Shanto Iyengar).

1994  "Consumer Contributors and the Returns to Fundraising:  A Microeconomic Analysis," (with Alan Gerber), presented at the Annual Meeting of the American Political Science Association, September.

1992  "Biases in Ecological Regression," (with R. Douglas Rivers) August, (revised February 1994).  Presented at the Midwest Political Science Association Meetings, April 1994, Chicago, IL.

1992  "Using Aggregate Data to Correct Nonresponse and Misreporting in Surveys" (with R. Douglas Rivers).  Presented at the annual meeting of the Political Methodology Group, Cambridge, Massachusetts, July.

1991  "The Electoral Effects of Issues and Attacks in Campaign Advertising" (with Shanto Iyengar).  Presented at the Annual Meeting of the American Political Science Association, Washington, DC.

1991  "Television Advertising as Campaign Strategy:  Some Experimental Evidence" (with Shanto Iyengar).  Presented at the Annual Meeting of the American Association for Public Opinion Research, Phoenix.

1991  "Why Candidates Attack:  Effects of Televised Advertising in the 1990 California Gubernatorial Campaign," (with Shanto Iyengar).  Presented at the Annual Meeting of the Western Political Science Association, Seattle, March.

1990  "Winning is Easy, But It Sure Ain't Cheap."  Working Paper #90-4, Center for the American Politics and Public Policy, UCLA.  Presented at the Political Science Departments at Rochester University and the University of Chicago.

### *Research Grants*

1989-1990  Markle Foundation.  "A Study of the Effects of Advertising in the 1990 California Gubernatorial Campaign."  Amount: $50,000

1991-1993  Markle Foundation.  "An Experimental Study of the Effects of Campaign Advertising."  Amount: $150,000

1991-1993  NSF.  "An Experimental Study of the Effects of Advertising in the 1992 California Senate Electoral."  Amount: $100,000

1994-1995  MIT Provost Fund.  "Money in Elections:  A Study of the Effects of Money on Electoral Competition."  Amount: $40,000

1996-1997  National Science Foundation. "Campaign Finance and Political Representation."  Amount: $50,000

| | |
|---|---|
| 1997 | National Science Foundation. "Party Platforms: A Theoretical Investigation of Party Competition Through Platform Choice." Amount: $40,000 |
| 1997-1998 | National Science Foundation. "The Legislative Connection in Congressional Campaign Finance. Amount: $150,000 |
| 1999-2000 | MIT Provost Fund. "Districting and Representation." Amount: $20,000. |
| 1999-2002 | Sloan Foundation. "Congressional Staff Seminar." Amount: $156,000. |
| 2000-2001 | Carnegie Corporation. "The Caltech/MIT Voting Technology Project." Amount: $253,000. |
| 2001-2002 | Carnegie Corporation. "Dissemination of Voting Technology Information." Amount: $200,000. |
| 2003-2005 | National Science Foundation. "State Elections Data Project." Amount: $256,000. |
| 2003-2004 | Carnegie Corporation. "Internet Voting." Amount: $279,000. |
| 2003-2005 | Knight Foundation. "Accessibility and Security of Voting Systems." Amount: $450,000. |
| 2006-2008 | National Science Foundation, "Primary Election Data Project," $186,000 |
| 2008-2009 | Pew/JEHT. "Measuring Voting Problems in Primary Elections, A National Survey." Amount: $300,000 |
| 2008-2009 | Pew/JEHT. "Comprehensive Assessment of the Quality of Voter Registration Lists in the United States: A pilot study proposal" (with Alan Gerber). Amount: $100,000. |
| 2010-2011 | National Science Foundation, "Cooperative Congressional Election Study," $360,000 |
| 2010-2012 | Sloan Foundation, "Precinct-Level U. S. Election Data," $240,000. |
| 2012-2014 | National Science Foundation, "Cooperative Congressional Election Study, 2010-2012 Panel Study" $425,000 |
| 2012-2014 | National Science Foundation, "2012 Cooperative Congressional Election Study," $475,000 |
| 2014-2016 | National Science Foundation, "Cooperative Congressional Election Study, |

13

2010-2014 Panel Study" $510,000

2014-2016     National Science Foundation, "2014 Cooperative Congressional Election Study," $400,000

2016-2018     National Science Foundation, "2016 Cooperative Congressional Election Study," $485,000

2018-2020     National Science Foundation, "2018 Cooperative Congressional Election Study,"  $844,784.

2019-2022     National Science Foundation, RIDIR:  "Collaborative Research:  Analytic Tool for Poststratification and small-area estimation for survey data." $942,607

### *Professional Boards*

Editor, Cambridge University Press Book Series, Political Economy of Institutions and Decisions, 2006-2016

Member, Board of the Reuters International School of Journalism, Oxford University, 2007 to present.

Member, Academic Advisory Board, Electoral Integrity Project, 2012 to present.

Contributing Editor, *Boston Review*, The State of the Nation.

Member, Board of Overseers, American National Election Studies, 1999 - 2013.

Associate Editor, Public Opinion Quarterly, 2012 to 2013.

Editorial Board of Harvard Data Science Review, 2018 to present.
Editorial Board of American Journal of Political Science, 2005 to 2009.
Editorial Board of Legislative Studies Quarterly, 2005 to 2010.
Editorial Board of Public Opinion Quarterly, 2006 to present.
Editorial Board of the Election Law Journal, 2002 to present.
Editorial Board of the Harvard International Journal of Press/Politics, 1996 to 2008.
Editorial Board of Business and Politics, 2002 to 2008.
Scientific Advisory Board, Polimetrix, 2004 to 2006.

### *Special Projects and Task Forces*

Principal Investigator, Cooperative Congressional Election Study, 2005 – present.

CBS News Election Decision Desk, 2006-present

Co-Director, Caltech/MIT Voting Technology Project, 2000-2004.

Co-Organizer, MIT Seminar for Senior Congressional and Executive Staff, 1996-2007.

MIT Energy Innovation Study, 2009-2010.
MIT Energy Initiative, Steering Council, 2007-2008
MIT Coal Study, 2004-2006.
MIT Energy Research Council, 2005-2006.
MIT Nuclear Study, 2002-2004.
Harvard University Center on the Environment, Council, 2009-present

## Expert Witness, Consultation, and Testimony

| | |
|---|---|
| 2001 | Testimony on Election Administration, U. S. Senate Committee on Commerce. |
| 2001 | Testimony on Voting Equipment, U.S. House Committee on Science, Space, and Technology |
| 2001 | Testimony on Voting Equipment, U.S. House Committee on House Administration |
| 2001 | Testimony on Voting Equipment, Congressional Black Caucus |
| 2002-2003 | *McConnell v. FEC*, 540 U.S. 93 (2003), consultant to the Brennan Center. |
| 2009 | Amicus curiae brief with Professors Nathaniel Persily and Charles Stewart on behalf of neither party to the U.S. Supreme Court in the case of *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009). |
| 2009 | Testimony on Voter Registration, U. S. Senate Committee on Rules. |
| 2011-2015 | *Perez v. Perry*, U. S. District Court in the Western District of Texas (No. 5:11-cv-00360).   Exert witness on behalf of Rodriguez intervenors. |
| 2011-2013 | *State of Texas v. United States,* the U.S. District Court in the District of Columbia (No. 1:11-cv-01303), expert witness on behalf of the Gonzales intervenors. |
| 2012-2013 | *State of Texas v. Holder*, U.S. District Court in the District of Columbia (No. 1:12-cv-00128), expert witness on behalf of the United States. |
| 2011-2012 | *Guy v. Miller* in U.S. District Court for Nevada (No. 11-OC-00042-1B), expert witness on behalf of the Guy plaintiffs. |
| 2012 | *In re Senate Joint Resolution of Legislative Apportionment*,  Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490), consultant for the Florida Democratic Party. |
| 2012-2014 | *Romo v. Detzner*, Circuit Court of the Second Judicial Circuit in Florida (No. 2012 CA 412), expert witness on behalf of Romo plaintiffs. |
| 2013-2014 | *LULAC v. Edwards Aquifer Authority*, U.S. District Court for the Western District of Texas, San Antonio Division (No. 5:12cv620-OLG,), consultant and expert witness on behalf of the City of San Antonio and San Antonio Water District |
| 2013-2014 | *Veasey v. Perry*, U. S. District Court for the Southern District of Texas, Corpus |

15

|  | Christi Division (No. 2:13-cv-00193), consultant and expert witness on behalf of the United States Department of Justice. |
| 2013-2015 | *Harris v. McCrory,* U. S. District Court for the Middle District of North Carolina (No. 1:2013cv00949), consultant and expert witness on behalf of the Harris plaintiffs. (later named *Cooper v. Harris*) |
| 2014 | Amicus curiae brief, on behalf of neither party, Supreme Court of the United States, *Alabama Democratic Conference v. State of Alabama*. |
| 2014- 2016 | *Bethune-Hill v. Virginia State Board of Elections*, U. S. District Court for the Eastern District of Virginia (No. 3:2014cv00852), consultant and expert on behalf of the Bethune-Hill plaintiffs. |
| 2015 | Amicus curiae brief in support of Appellees, Supreme Court of the United States, *Evenwell v. Abbott* |
| 2016-2017 | *Perez v. Abbott*, U. S. District Court in the Western District of Texas (No. 5:11-cv-00360). Exert witness on behalf of Rodriguez intervenors. |
| 2017-2018 | Fish v. Kobach, U. S. District Court in the District of Kansas (No. 2:16-cv-02105-JAR). Expert witness of behalf of the Fish plaintiffs. |

# EXHIBIT 10

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

# Exhibit 2

**December 4, 2020**

*Bowyer v. Ducey,* **Case No. 2:20-cv-02321-DJH**

**United States District Court for the District of Arizona**

**Expert Report of Jonathan Rodden, PhD**

**737 Mayfield Avenue**
**Stanford, CA 94305**

_____
Jonathan Rodden, PhD

1

## I.    INTRODUCTION AND SUMMARY

Yesterday evening, December 3, 2020, I received three declarations, each of which makes rather strong claims to have demonstrated "anomalies" or "irregularities" in the results of the presidential election in Arizona on November 3, 2020. I have been asked by Counsel to assess the validity of their claims. Unfortunately, these reports do not meet basic standards for scientific inquiry. For the most part, they are not based on discernable logical arguments, and they are completely divorced from any existing social science literature. Without any citations to relevant scientific literature about statistics or elections, the authors identify common and easily explained patterns in the 2020 election results, and without explanation, assert that they are somehow "anomalous." Each of these reports lacks even a basic level of clarity or transparency about research methods that would be expected in a scientific communication. As detailed below, each of these reports is based on puzzling but serious mistakes and misunderstandings about how to analyze election data.

## II. QUALIFICATIONS

I am currently a tenured Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab ("the Lab")—a center for research and teaching with a focus on the analysis of geo-spatial

data in the social sciences. In my affiliation with the Lab, I am engaged in a variety of research projects involving large, fine-grained geo-spatial data sets including ballots and election results at the level of polling places, individual records of registered voters, census data, and survey responses. I am also a senior fellow at the Stanford Institute for Economic Policy Research and the Hoover Institution. Prior to my employment at Stanford, I was the Ford Professor of Political Science at the Massachusetts Institute of Technology. I received my Ph.D. from Yale University and my B.A. from the University of Michigan, Ann Arbor, both in political science. A copy of my current C.V. is included as an Appendix to this report.

      In my current academic work, I conduct research on the relationship between the patterns of political representation, geographic location of demographic and partisan groups, and the drawing of electoral districts. I have published papers using statistical methods to assess political geography, balloting, and representation in a variety of academic journals including *Statistics and Public Policy*, *Proceedings of the National Academy of Science*, *American Economic Review Papers and Proceedings*, the *Journal of Economic Perspectives*, the *Virginia Law Review*, the *American Journal of Political Science*, the *British Journal of Political Science*, the *Annual Review of Political Science*, and the *Journal of Politics.* One of these papers was recently selected by the American Political Science Association as the winner of the Michael Wallerstein Award for the best paper on political economy published

in the last year, and another received an award from the American Political Science Association section on social networks.

I have recently written a series of papers, along with my co-authors, using automated redistricting algorithms to assess partisan gerrymandering. This work has been published in the *Quarterly Journal of Political Science*, *Election Law Journal*, and *Political Analysis*, and it has been featured in more popular publications like the *Wall Street Journal*, the *New York Times*, and *Boston Review*. I have recently completed a book, published by *Basic Books* in June of 2019, on the relationship between political districts, the residential geography of social groups, and their political representation in the United States and other countries that use winner-take-all electoral districts. The book was reviewed in *The New York Times*, *The New York Review of Books*, *Wall Street Journal*, *The Economist*, and *The Atlantic*, among others.

I have expertise in the use of large data sets and geographic information systems (GIS), and conduct research and teaching in the area of applied statistics related to elections. My PhD students frequently take academic and private sector jobs as statisticians and data scientists. I frequently work with geo-coded voter files and other large administrative data sets, including in recent papers published in the *Annals of Internal Medicine* and *The New England Journal of Medicine.* I have developed a national data set of geo-coded precinct-level election results that has

4

been used extensively in policy-oriented research related to redistricting and representation.[1]

I have been accepted and testified as an expert witness in six recent election law cases: *Romo v. Detzner*, No. 2012-CA-000412 (Fla. Cir. Ct. 2012); *Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*, No. 4:2014-CV-02077 (E.D. Mo. 2014); *Lee v. Va. State Bd. of Elections*, No. 3:15-CV-00357 (E.D. Va. 2015); *Democratic Nat'l Committee et al. v. Hobbs et al.*, No. 16-1065-PHX-DLR (D. Ariz. 2016); *Bethune-Hill v. Virginia State Board of Elections*, No. 3:14-cv-00852-REP-AWA-BMK (E.D. Va. 2014); and *Jacobson et al. v. Lee*, No. 4:18-cv-00262 (N.D. Fla. 2018). I also worked with a coalition of academics to file Amicus Briefs in the Supreme Court in *Gill v. Whitford*, No. 16-1161, and *Rucho v. Common Cause*, No. 18-422. Much of the testimony in these cases had to do with geography, voting, ballots, and election administration. I am being compensated at the rate of $500/hour for my work in this case. My compensation is not dependent upon my conclusions in any way.

### III.    DATA SOURCES

I have collected county-level data on presidential elections for each year from 1974 to 2020 from the Arizona Secretary of State, along with yearly county-level data on registration by party in Arizona. I also consulted precinct-level election

---

[1] The dataset can be downloaded at http://projects.iq.harvard.edu/eda/home.

results from Maricopa and Pima counties. I created a national county-level dataset on election results using information assembled from county election administrators by the New York Times and Associated Press, along with demographic data from the 2014-2018 American Community Survey (ACS), as well as the September 2020 county-level unemployment rate from the Bureau of Labor Statistics, and as described in detail below, data on voting technologies used in each U.S. jurisdiction collected by Verified Voting. I have also collected yearly county-level population estimates for Arizona from the U.S. Census Department.

## IV.       DO "DOMINION" COUNTIES PRODUCE ANOMALOUS ELECTION RESULTS?

I received a report without a named author that purports to provide empirical analysis suggesting that Joseph Biden received higher vote shares in counties that use voting machines made by the manufacturer Dominion. The language of the report indicates that the author posits a *causal* relationship, whereby certain types of machines are responsible for boosting the Democratic vote share. The data, research design, and analysis are not adequately explained. To the extent the research is explained at all, the design and analyses are flawed in several crucial respects. First, the author relies on idiosyncratic, non-standard statistical techniques that are not suited for the analysis the author wishes to accomplish, and more importantly, the

author appears to rely on a correlation that is driven primarily by cross-state variation, and makes no effort to address a serious causal inference problem.

To demonstrate these problems and conduct a more appropriate analysis, I have created my own dataset of county-level votes from 2008 to 2020, merged with county demographic data from the 2014-2018 American Community Survey (ACS),[2] September 2020 county-level unemployment rate from the Bureau of Labor Statistics, and data on voting technologies used in each jurisdiction collected by Verified Voting.[3] Verified Voting is a "non-partisan organization focused exclusively on the critical role technology plays in election administration" that has developed "the most comprehensive publicly-accessible database of voting systems used around the country."[4] I accessed a dataset showing the various voting systems that were in place for each jurisdiction in 2012, 2016, and 2020.

The report mentions a Chi-Squared Automatic Interaction Detection approach, but provides no details about the analysis or the dataset, and provides no output. This is not a standard technique used in the analysis of election data, and the author provides no explanation of why this unusual approach was selected. The

---

[2] Demographic variables from the ACS include: the age distribution, sex distribution, percent Black, percent Latino, the percent of renters, median household income, percent of the county with a college degree, and percent under the poverty line.

[3] In preparing this this data set and conducting the analysis set forth in this section of the report, I received assitance from William Marble—a advanced PhD candidate in political science at Stanford University. Mr. Marble has worked with me in a similar capacity in the past and it is standard to utilize such assistants in my field of expertise.

[4] https://verifiedvoting.org/about/

author presents a scatterplot that seems to be based on a prediction from some kind of statistical model, but the author does not explain anything about the model. The author goes on to mention, in a single sentence, some type of matching analysis. The author provides no details about how the matching analysis was set up, which variables were used, whether the analysis relied on within-state or cross-state variation, and crucially, whether or not it was possible to achieve adequate balance on all of the selected matching variables.

For each of these approaches, the author breezily mentions having conducted some analysis without providing even the slightest details. The normal approach in a scientific communication would be to provide readers with details on what type of empirical model had been chosen and why, which variables were included, how the model performed, and so on. The author also typically provides output for readers to assess, and discusses a variety of robustness checks and sensitivity analyses, so that readers can form judgments about whether the results are sensible, credible, and meaningful.

Since the author provides very few hints about research design, analysis, or data, it is not possible to reconstruct the analysis. Nevertheless, since the relevant data are available, it is worthwhile to assess the author's claim that the introduction of certain types of voting technology, via some unspecified form of fraud, actually has a causal impact on vote shares. We would like to answer the following question:

if there are two counties that are otherwise identical in every respect, including their initial type of voting technology, and one switches from some other voting technology to Dominion and the other stays the same, does the switching county exhibit a change in voting behavior relative to the "control" county that stayed the same? In the ideal world, we would conduct an experiment, much like a drug trial, randomly assigning some counties but not others to either the "treatment condition"—the use of Dominion software—or the control condition—the maintenance of the existing system. By randomizing a sufficiently large number of counties to the treatment and control condition, a researcher would be able to anticipate that there are no systematic differences between the treatment and control counties. Above all, we would hope that this randomization would achieve a balance between the two groups, such that prior Democratic or Republican voting would be similar in the two groups, as would other correlates of voting behavior, such as income, race, and education. We would then be able to isolate any possible impact of voting equipment.

Unfortunately, this type of experiment is unavailable to us. Counties and states have adopted voting technology in a way that is far from random. Counties that adopted Dominion systems between 2016 and 2020 are quite different from those that did not. Counties that switched to Dominion systems between 2016 and 2020 have larger shares of female residents, Latino residents, and college-educated

residents, and have lower median incomes. All of these variables are correlated with political attitudes. Moreover, they are likely correlated with *unobservable* variables that also correlate with political attitudes and partisanship.

Even worse, it is clearly the case that Democratic counties have been more likely to adopt Dominion machines than Republican counties. This is demonstrated in Figure 1. The left-hand panel considers all counties in the country, and shows that counties won by Clinton in 2016 were far more likely than counties won by Trump to make use of Dominion technology in 2020. The right-hand panel focuses on counties that were not yet using Dominion technology in 2016, and shows that counties won by Clinton were significantly more likely than counties won by Trump to adopt Dominion technology.

**Figure 1: Voting Technology Use in 2020 by County Partisanship**



Seven states have adopted Dominion technology across all of their counties, and 20 states have not adopted Dominion technology in any of their counties. The former counties are predominately Democratic, and the latter lean Republican. This can be seen in Figure 2, which plots Hillary Clinton's 2016 statewide vote share on the horizontal axis, and the share of counties using Dominion software in 2020 on the vertical axis. It shows that Dominion software was mostly prominently in use in 2020 in states that were already relatively Democratic in 2016.

**Figure 2: Clinton 2016 Vote Share and 2020 Voting Technology**



By now it should be clear why the author of the report on Dominion software faces a vexing causal inference problem. If extremely Democratic counties in states like those in New England adopted a certain software in the past, and one examined

a contemporary correlation between voting behavior and the use of that technology, that correlation could not plausibly be interpreted as evidence that the technology *caused* the voting outcomes, even if one attempted to control for potential observable confounders like race and income. It is simply not plausible that Connecticut is more Democratic than Wyoming because of its voting technology.

### State Fixed Effects Model

The author ignores these complexities altogether, but unfortunately, there is no easy solution to this causal inference problem. At a minimum, we can try to draw inferences from *within* the states where there is variation across counties in voting technology, attempting to control for observable county-level confounders. This can be achieved by estimating a model with "fixed effects" for states. Inclusion of state-level fixed effects allows us to control for a variety of common factors within states that cause there to be a correlation in counties' outcomes within the same state. This does not "solve" the causal inference problem, but at least it allows for more valid comparisons. For this reason, inclusion of fixed effects is standard practice in social science research for this type of study.[5]

---

[5] For example, see Angrist, J., and Pischke, S., *Mostly Harmless Econometrics*. 2009. Princeton, NJ: Princeton University Press.

I estimate a county-level model in which the dependent variable is the 2020 Democratic vote share, and the main independent variable of interest is a binary variable indicating whether the state used Dominion technology in 2020. The model includes a set of demographic control variables, past election results, and state-level fixed effects. The full results are presented in Appendix Table A1. The coefficient capturing the impact of the use of Dominion technology is statistically indistinguishable from zero.

### *Placebo Test Using Bordering Counties*

In sum, when we rely on comparisons of counties within states, there is no evidence that election technology has an impact on vote shares. As mentioned, the author provides no regression output or details about the analysis, but he or she seems to have estimated some sort of regression model. The author makes no mention of having included fixed effects. As one can see in Figure 2 above, it is clear that a naïve empirical model without fixed effects for states would generate the illusion of a relationship between voting technology and election outcomes, simply because Democratic states have been somewhat more likely to purchase Dominion equipment.

A good way to see this is to conduct a "placebo" test in which we examine Biden's vote share in counties that *did not* use Dominion systems, but border a

13

county that *did* use Dominion. If there is an impact of voting software on election outcomes via fraud, it should most certainly not be detected in counties that border the Dominion counties but use some other election technology system. If we see that those counties have elevated Democratic vote shares mimicking the supposed "effect" of Dominion software—what is known as a "placebo" effect—we should be very skeptical about claims that use of the software is associated with increased Democratic voting. Rather, we would understand that the correlation reported by the report's author is driven by some features of the types of regions where Dominion software has been adopted—not the software itself.

The result of this analysis is shown in Appendix Table A2. It shows results of a linear regression of Biden vote share on an indicator variable for whether a county borders a Dominion county. This regression is estimated among counties that did not use Dominion systems, and includes a set of demographic control variables. It shows that Biden received a higher vote share, of about .86 of a percentage point, in counties that border a Dominion county than in those that do not. It would be implausible to claim that voting technology in bordering counties has a causal impact on Biden's vote share. A more plausible interpretation is that there are some common features of politics in the regions that have adopted the software, and the type of research design that appears to have been used in the report is likely to turn up spurious results.

14

### *Placebo Test Using Prior Election Results*

A research strategy designed to estimate the effect of one variable on another variable can be evaluated by its tendency to detect an effect when an effect *does* exist, and its tendency *not* to detect an effect when an effect *does not* exist. When a research design detects an effect when none exists, we say it returned a *false positive*. Designs with a high false positive rate are not very informative: an effect could be detected by the research design due to the existence of a real effect, or it could be a false positive.

We can make a further evaluation of the propensity of the research design the author appears to have used in his or her report to return false positives by seeing whether it detects that *future* events have an "effect" on *past* outcomes. Of course, this is logically impossible — we know that events happening in the future cannot affect past outcomes. Thus, any effect detected on past outcomes is necessarily a false positive.

In Appendix Table A3, I replicate the basic research design that I believe lies behind the claims in the report. It uses linear regression models, without state fixed effects, to predict Democratic vote share as a function of whether a county used Dominion voting technology in 2020, along with county-level demographic and economic control variables. Except, instead of predicting *2020* vote share, I predict

*2012* and *2016* vote share. I exclude counties that used Dominion systems at the time of the election being analyzed.

The results indicate that in 2012, in counties that did not use Dominion in 2012 but did use them in 2020, Obama received about 5 to 6 percentage points higher vote share, compared to counties that did not use Dominion machines in either 2012 or 2020. The next column shows a similar pattern for 2016. Future use of Dominion predicts higher Clinton vote share in 2016, even in counties that did not use Dominion in 2016.

These results are false positives: there is no logical way that future use of Dominion voting machines could have affected past outcomes. Instead, these results are due to the fact that counties that used Dominion voting systems in 2020 are politically different than counties that did not, even after controlling for demographic and economic variables. This test shows that the simple type of research design that was breezily described in the report is ill-equipped to detect differences in vote shares that are *caused* by use of particular voting systems. As such, the statistical analysis mentioned in the report provides no evidence of fraud due to use of Dominion voting machines.

## V. RAMSLAND REPORT

This report begins with some unsubstantiated claims about Antrim County, Michigan and Dallas County, Texas. These claims are difficult to understand, and

16

they do not seem to include any type of evidence. Next, Mr. Ramsland contends that turnout figures in Pima County and Maricopa County, Arizona are a "red flag," evidently because Mr. Ramsland believes they are too high. Without explanation or citations from the academic literature, he contends that any turnout number above 80 percent is suspicious.

Quite simply, high turnout is not a "red flag" indicating fraud. Turnout was high around the United States in the 2020 election. It was especially high in suburbs and rural areas. The numbers in Arizona are not atypical. In Figure 3 below, I present data on turnout in each presidential election over the last decade in Arizona as a whole, as well as in Maricopa and Pima counties.

**Figure 3: Turnout in Arizona as a Whole, and in Maricopa and Pima Counties**



Turnout was indeed higher in Arizona as a whole in 2020, reaching 79.9 percent. This was driven, of course, by Maricopa County, which accounts for the lion's share of the Arizona electorate. As can be seen in Figure 3, Pima County typically has higher turnout than Maricopa, or Arizona as a whole. Turnout in Pima County in 2020 was comparable to that in 2004. In short, there is nothing anomalous or suspicious about turnout in Arizona in 2020, or in the two counties mentioned by Mr. Ramsland.

He goes on to list a series of high-turnout suburban and rural precincts. Many of the rural precincts listed by Mr. Ramsland provided strong support to President Trump, while the suburban precincts were, for the most part, hotly contested but leaned toward Joseph Biden. A similar group of rural and suburban precincts with very high turnout can be found in every state around the United States. It is not clear what this might possibly have to do with election fraud.

Mr. Ramsland then goes on to claim that instead of counting votes in the traditional way, code was activated to use ranked choice voting to tally votes in Arizona's 2020 presidential election. From this discussion, it seems likely that Mr. Ramsland is not familiar with ranked choice voting. It involves a different type of ballot, in which voters rank their preferences among candidates. This type of ballot was not used in Arizona. Even if all of the ballots in Arizona were somehow counted or processed using ranked choice voting, but using ballots that only allowed voters

to select one candidate, the result would be the same. Ranked choice voting is a system where in the first round of counting, if one candidate has a majority, the process is over, and no votes are redistributed. If there were multiple candidates and voters' choices were ranked, there would then be a second round, where the lowest-ranked candidate would be dropped, and those voters who ranked that candidate first would then have their second-choice votes tallied. But clearly, nothing of the sort happened in Arizona. Jo Jorgensen, the Libertarian candidate, received a significant number of votes, as did candidates from other parties and write-in candidates.

Finally, Mr. Ramsland concludes with some ideas about votes being "injected" at various times during the counting process. It appears that while watching election returns as they were released by a polling firm called Edison Research, Mr. Ramsland became concerned that votes were reported in bunches throughout the evening. It is not clear how the timing of data releases by Edison Research might be related to election fraud.

## VI.    KESHEL REPORT

Like Mr. Ramsland, Mr. Keshel also takes issue with Arizona's election result. He characterizes the result as a "substantial deviance from statistical norms and results regarding voting patterns in Arizona" (paragraph 4). He does not explain what "statistical norms" he considers, and cites no literature about how one might

go about identifying such a thing. Mr. Keshel's concern, evidently, is that Mr. Biden's gains were too high. To the extent that he identifies a method of analysis, he appears to claim that if a party has won frequently in a geographic place in the past, as the Republican Party has in Maricopa County, it is suspicious if that party loses support. Evidently Mr. Keshel would be suspicious about a number of outcomes in U.S. election, including the increase in support for the Republican Party in the industrial Midwest in 2016, or the rather striking increase in votes for President Trump in several Hispanic counties in Florida and Texas in 2020. Especially in the presence of a controversial incumbent, changing political fortunes for a party in a particular geographic area are quite normal, and are not viewed by election analysts as evidence of fraud.

Another claim made by Mr. Keshel is that a party should show "proper progression in keeping with historic party registration trends" (paragraph 15). He does not explain his method for empirically measuring this "proper progression," but in Arizona, party registration numbers are not remotely useful for this purpose. Figure 4 helps explain why. It plots Democrats as a share of total registrants (in blue), as well as Republicans as a share of total registrants (in red).

**Figure 4: Party Registration Over Time in Maricopa County, AZ**



Democrats and Republicans are both falling dramatically as a share of total registrants, as increasing numbers of voters decline to register with one of the two major parties. But the two major parties continue to virtually monopolize votes for president and other offices. In other words, neither party is "in keeping with historic party registration trends." Much of the battle in Maricopa County is over the large number of voters who are not registered with either party.

In any case, as with turnout, it is difficult to characterize Arizona's 2020 election result, or that of Maricopa County in particular, as anomalous. Figure 5 simply plots Democratic and Republican votes over time in Maricopa County.

**Figure 5: Votes for Democratic and Republican Presidential Candidates Over Time, Maricopa County, AZ**



The rapid growth in votes cast for both parties is a function of Maricopa County's rapid growth, fueled by in-migration from other states. Cross-state migrants to places like Maricopa County are typically college-educated young people—a group that has in recent years become a core constituency of the Democratic Party. As a result, the most rapidly growing counties in the United States are also quickly becoming more Democratic.[6] As Maricopa County has become more educated and diverse, the growth in the blue line has caught up with the growth of the red line in Figure 5. Much of the gap had already been closed by 2016, and it is not surprising that, through the continuation of the trend of in-migration and strong turnout, the blue line finally surpassed the red line in 2020.

---

[6] Jonathan Rodden, 2019, *Why Cities Lose: The Deep Roots of the Urban-Rural Divide*. New York: Basic Books.

Finally, Mr. Keshel believes that Maricopa County is an outlier in the extent to which it has experienced the above-mentioned combination of increased population and increased Democratic voting. This is not the case. Let us examine other states where in-migration of educated young people to sprawling suburbs is changing the political complexion of the state: Texas, Georgia, and North Carolina.

In Figure 6, I plot the change in Trump vote margin from 2016 to 2020 on the vertical axis, so that a positive number indicates that Trump's performance *improved*, and a negative number indicates that it *declined*. On the horizontal axis is average yearly net in-migration, calculated by the census department, from the years 2010 to 2019. The observations are counties. I include identical graphs for Arizona, Texas, Georgia, and North Carolina—all states that have thriving, growing metro areas with strong labor markets and affordable suburbs that are attracting migrants from around the United States. Note that the only thing different about the graphs for each state is the horizontal axis. It goes all the way beyond 40,000 for Arizona. For Texas, the scale stops at 20,0000, and the other states at even lower values. If I did not allow the horizontal axis to vary for Arizona, it would be literally off the charts. This graph clarifies that the population growth of Maricopa County, driven by in-migration, is very unique. According to census estimates, Maricopa County gained 63,000 residents in 2019 alone.

23



**Figure 6: Net Migration and Change in Presidential Voting Behavior, 2016 to 2020, Counties of Arizona, Texas, Georgia, and North Carolina**



As we can see on the graph, in every one of these states, rapidly growing counties like Maricopa moved toward the Democratic presidential candidate from 2016 to 2020. Every single county that experienced substantial growth can be found in the lower right-hand corner of the graph for its state, where Biden out-performed Clinton—often by a wide margin. In fact, given its extreme level of growth, Maricopa is something of an outlier in that it did not swing *further* toward the Democratic presidential candidate. Note that most of the high-growth counties in Texas and Georgia moved further in a Democratic direction than did Maricopa.

24

It is also useful to note that Trump experienced large increases in vote share in many of the counties where population growth is either stagnant or where out-migration is occurring (on the left side of the graph). In some cases, these vote shifts are substantial. In fact, in order to make the data fit on the graphs, some of the declining, majority-Latino counties in Texas where Trump made extremely large gains had to be left off. If one adopts Mr. Keshel's faulty logic—whereby large vote gains are indicative of fraud—one would need to look at some of these declining rural counties, where in several states, the shift in voting was more dramatic than in the growing suburban counties. But to be clear, this argument is flawed: voting can and does shift among social groups in response to policies and behavior or incumbents as well as platforms of candidates.

In sum, Mr. Keshel has provided no evidence whatsoever that would be indicative, or even suggestive, of fraud in Arizona.

## VII.    CONCLUSION

In conclusion, these reports do not take a scientific approach to the questions they address. They are completely disconnected from the wealth of knowledge about elections and statistics that has been accumulated in the scholarly literature. They feature vague and illogical stories about "anomalies" that, upon basic confrontation with context, logic, and data, turn out not to be anomalies at all, but mere descriptions

of patterns of historical and contemporary election results that are already well known to scholars and pundits alike. They contain no evidence of fraud or irregularities in the election results of 2020 in Arizona or anywhere else.

# Appendix

## Table A1: Fixed Effects Model, County-Level Democratic Vote Share in 2020

|  | Dem vote share, 2020 |
| --- | --- |
| Dominion 2020 | 0.031 |
|  | (0.25) |
| Hart 2020 | -0.014 |
|  | (0.08) |
| female | -0.003 |
|  | (0.18) |
| Black | 0.022 |
|  | (2.57)* |
| Latino | -0.078 |
|  | (9.43)** |
| College | 0.086 |
|  | (7.31)** |
| Age 25-34 | 0.014 |
|  | (0.52) |
| Age 35-44 | 0.074 |
|  | (2.56)* |
| Age 45-54 | -0.028 |
|  | (0.85) |
| Age 55-64 | 0.123 |
|  | (4.16)** |
| Age 65 and over | -0.030 |
|  | (1.63) |
| Median income | -0.016 |
|  | (1.79) |
| Poverty rate | -0.003 |
|  | (0.16) |
| Unemployment rate | -0.140 |
|  | (3.73)** |
| Renter share | -0.011 |
|  | (0.88) |
| Share urban | 0.019 |
|  | (7.81)** |
| Log population density | 0.240 |
|  | (3.54)** |
| Dem. vote share 2016 | 1.047 |
|  | (51.38)** |
| Dem. vote share 2012 | -0.093 |
|  | (3.76)** |
| Dem. vote share 2008 | -0.026 |
|  | (1.43) |
| Constant | 0.465 |
|  | (0.26) |
| $R^2$ | 0.99 |

| $N$ | 3,110 |
|---|---|

* $p<0.05$; ** $p<0.01$

## Table A2: Border Placebo Analysis

|                          | Dem vote share, 2020 |
|--------------------------|----------------------|
| Dominion 2020            | 0.855*               |
|                          | (1.96)               |
| Hart 2020                | -3.860               |
|                          | (6.97)**             |
| female                   | 0.067                |
|                          | (0.60)               |
| Black                    | 0.389                |
|                          | (16.44)**            |
| Latino                   | 0.148                |
|                          | (5.00)**             |
| College                  | 0.746                |
|                          | (13.81)**            |
| Age 25-34                | -0.238               |
|                          | (1.53)               |
| Age 35-44                | -0.504               |
|                          | (3.03)**             |
| Age 45-54                | 0.060                |
|                          | (0.33)               |
| Age 55-64                | 0.738                |
|                          | (3.70)**             |
| Age 65 and over          | -0.231               |
|                          | (2.43)*              |
| Median income            | 0.156                |
|                          | (3.05)**             |
| Poverty rate             | 0.564                |
|                          | (5.58)**             |
| Unemployment rate        | 0.901                |
|                          | (6.10)**             |
| Renter share             | 0.274                |
|                          | (4.56)**             |
| Share urban              | 0.014                |
|                          | (1.04)               |
| Log population density   | 1.812                |
|                          | (7.04)**             |
| Constant                 | -25.082              |
|                          | (2.43)*              |
| $R^2$                    | 0.68                 |
| $N$                      | 1,846                |

* $p<0.05$; ** $p<0.01$

29

## Table A3: Previous Election Placebo Analysis

|  | 2012 Dem vote share | 2016 Dem vote share |
|---|---|---|
| 2020 Dominion | 5.605 | 3.310 |
|  | (1.241)** | (1.358)* |
| female | 0.400 | 0.198 |
|  | (0.131)** | (0.113) |
| Black | 0.352 | 0.466 |
|  | (0.024)** | (0.021)** |
| Latino | 0.143 | 0.258 |
|  | (0.034)** | (0.031)** |
| College | 0.331 | 0.660 |
|  | (0.061)** | (0.054)** |
| Age 25-34 | -0.411 | -0.254 |
|  | (0.177)* | (0.153) |
| Age 35-44 | -0.799 | -0.576 |
|  | (0.194)** | (0.168)** |
| Age 45-54 | 0.272 | 0.269 |
|  | (0.225) | (0.198) |
| Age 55-64 | 0.842 | 0.850 |
|  | (0.235)** | (0.206)** |
| Age 65 and over | -0.117 | -0.033 |
|  | (0.120) | (0.100) |
| Median income | 0.152 | 0.150 |
|  | (0.061)* | (0.050)** |
| Poverty rate | 0.656 | 0.671 |
|  | (0.108)** | (0.098)** |
| Renter share | 0.325 | 0.337 |
|  | (0.077)** | (0.068)** |
| Share urban | 0.008 | 0.006 |
|  | (0.016) | (0.013) |
| Log population density | 2.444 | 2.387 |
|  | (0.276)** | (0.246)** |
| Constant | -29.495 | -41.937 |
|  | (12.358)* | (10.381)** |
| $R^2$ | 0.39 | 0.61 |
| $N$ | 1,946 | 2,097 |

*$p<0.05$; ** $p<0.01$

# Jonathan Rodden

Stanford University
Department of Political Science
Encina Hall Central
616 Serra Street
Stanford, CA 94305

Phone:   (650) 723-5219
Fax:      (650) 723-1808
Email:   jrodden@stanford.edu

## Personal

Born on August 18. 1971, St. Louis, MO.

United States Citizen.

## Education

Ph.D. Political Science, Yale University, 2000.

Fulbright Scholar, University of Leipzig, Germany, 1993–1994.

B.A., Political Science, University of Michigan, 1993.

## Academic Positions

Professor, Department of Political Science, Stanford University, 2012–present.

Senior Fellow, Hoover Institution, Stanford University, 2012–present.

Senior Fellow, Stanford Institute for Economic Policy Research, 2020–present.

Director, Spatial Social Science Lab, Stanford University, 2012–present.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, 2010–2012.

Associate Professor, Department of Political Science, Stanford University, 2007–2012.

Fellow, Center for Advanced Study in the Behavioral Sciences, Palo Alto, CA, 2006–2007.

Ford Career Development Associate Professor of Political Science, MIT, 2003–2006.

Visiting Scholar, Center for Basic Research in the Social Sciences, Harvard University, 2004.

Assistant Professor of Political Science, MIT, 1999–2003.

Instructor, Department of Political Science and School of Management, Yale University, 1997–1999.

# Publications

*Books*

*Why Cities Lose: The Deep Roots of the Urban-Rural Divide.* Basic Books, 2019.

*Decentralized Governance and Accountability: Academic Research and the Future of Donor Programming.* Co-edited with Erik Wibbels, Cambridge University Press, 2019.

*Hamilton's Paradox: The Promise and Peril of Fiscal Federalism*, Cambridge University Press, 2006. Winner, Gregory Luebbert Award for Best Book in Comparative Politics, 2007.

*Fiscal Decentralization and the Challenge of Hard Budget Constraints*, MIT Press, 2003. Co-edited with Gunnar Eskeland and Jennie Litvack.

*Peer Reviewed Journal Articles*

Partisan Dislocation: A Precinct-Level Measure of Representation and Gerrymandering, 2020, *Political Analysis* forthcoming (with Daryl DeFord Nick Eubank).

Who is my Neighbor? The Spatial Efficiency of Partisanship, 2020, *Statistics and Public Policy* (with Nick Eubank).

Handgun Ownership and Suicide in California, 2020, *New England Journal of Medicine* 382:2220-2229 (with David M. Studdert, Yifan Zhang, Sonja A. Swanson, Lea Prince, Erin E. Holsinger, Matthew J. Spittal, Garen J. Wintemute, and Matthew Miller).

Viral Voting: Social Networks and Political Participation, 2020, *Quarterly Journal of Political Science* (with Nick Eubank, Guy Grossman, and Melina Platas).

It Takes a Village: Peer Effects and Externalities in Technology Adoption, 2020, *American Journal of Political Science* (with Romain Ferrali, Guy Grossman, and Melina Platas). Winner, 2020 Best Conference Paper Award, American Political Science Association Network Section.

Assembly of the LongSHOT Cohort: Public Record Linkage on a Grand Scale, 2019, *Injury Prevention* (with Yifan Zhang, Erin Holsinger, Lea Prince, Sonja Swanson, Matthew Miller, Garen Wintemute, and David Studdert).

Crowdsourcing Accountability: ICT for Service Delivery, 2018, *World Development* 112: 74-87 (with Guy Grossman and Melina Platas).

Geography, Uncertainty, and Polarization, 2018, *Political Science Research and Methods* doi:10.1017/psrm.2018.12 (with Nolan McCarty, Boris Shor, Chris Tausanovitch, and Chris Warshaw).

Handgun Acquisitions in California after Two Mass Shootings, 2017, *Annals of Internal Medicine* 166(10):698-706. (with David Studdert, Yifan Zhang, Rob Hyndman, and Garen Wintemute).

Cutting Through the Thicket: Redistricting Simulations and the Detection of Partisan Gerrymanders, 2015, *Election Law Journal* 14,4:1-15 (with Jowei Chen).

The Achilles Heel of Plurality Systems: Geography and Representation in Multi-Party Democracies, 2015, *American Journal of Political Science* 59,4: 789-805 (with Ernesto Calvo). Winner, Michael Wallerstein Award for best paper in political economy, American Political Science Association.

Why has U.S. Policy Uncertainty Risen Since 1960?, 2014, *American Economic Review: Papers and Proceedings* May 2014 (with Nicholas Bloom, Brandice Canes-Wrone, Scott Baker, and Steven Davis).

Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures, 2013, *Quarterly Journal of Political Science* 8: 239-269 (with Jowei Chen).

How Should We Measure District-Level Public Opinion on Individual Issues?, 2012, *Journal of Politics* 74, 1: 203-219 (with Chris Warshaw).

Representation and Redistribution in Federations, 2011, *Proceedings of the National Academy of Sciences* 108, 21:8601-8604 (with Tiberiu Dragu).

Dual Accountability and the Nationalization of Party Competition: Evidence from Four Federatons, 2011, *Party Politics* 17, 5: 629-653 (with Erik Wibbels).

The Geographic Distribution of Political Preferences, 2010, *Annual Review of Political Science* 13: 297–340.

Fiscal Decentralization and the Business Cycle: An Empirical Study of Seven Federations, 2009, *Economics and Politics* 22,1: 37–67 (with Erik Wibbels).

Getting into the Game: Legislative Bargaining, Distributive Politics, and EU Enlargement, 2009, *Public Finance and Management* 9, 4 (with Deniz Aksoy).

The Strength of Issues: Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting, 2008. *American Political Science Review* 102, 2: 215–232 (with Stephen Ansolabehere and James Snyder).

Does Religion Distract the Poor? Income and Issue Voting Around the World, 2008, *Comparative Political Studies* 41, 4: 437–476 (with Ana Lorena De La O).

Purple America, 2006, *Journal of Economic Perspectives* 20,2 (Spring): 97–118 (with Stephen Ansolabehere and James Snyder).

Economic Geography and Economic Voting: Evidence from the U.S. States, 2006, *British Journal of Political Science* 36, 3: 527–47 (with Michael Ebeid).

Distributive Politics in a Federation: Electoral Strategies, Legislative Bargaining, and Government Coalitions, 2004, *Dados* 47, 3 (with Marta Arretche, in Portuguese).

Comparative Federalism and Decentralization: On Meaning and Measurement, 2004, *Comparative Politics* 36, 4: 481-500. (Portuguese version, 2005, in *Revista de Sociologia e Politica* 25).

Reviving Leviathan: Fiscal Federalism and the Growth of Government, 2003, *International Organization* 57 (Fall), 695–729.

Beyond the Fiction of Federalism: Macroeconomic Management in Multi-tiered Systems, 2003, *World Politics* 54, 4 (July): 494–531 (with Erik Wibbels).

The Dilemma of Fiscal Federalism: Grants and Fiscal Performance around the World, 2002, *American Journal of Political Science* 46(3): 670–687.

Strength in Numbers: Representation and Redistribution in the European Union, 2002, *European Union Politics* 3, 2: 151–175.

Does Federalism Preserve Markets? *Virginia Law Review* 83, 7 (with Susan Rose-Ackerman). Spanish version, 1999, in *Quorum* 68.

## Working Papers

Federalism and Inter-regional Redistribution, Working Paper 2009/3, Institut d'Economia de Barcelona.

Representation and Regional Redistribution in Federations, Working Paper 2010/16, Institut d'Economia de Barcelona (with Tiberiu Dragu).

## Chapters in Books

Political Geography and Representation: A Case Study of Districting in Pennsylvania (with Thomas Weighill), forthcoming 2021.

Decentralized Rule and Revenue, 2019, in Jonathan Rodden and Erik Wibbels, eds., *Decentralized Governance and Accountability*, Cambridge University Press.

Geography and Gridlock in the United States, 2014, in Nathaniel Persily, ed. *Solutions to Political Polarization in America*, Cambridge University Press.

Can Market Discipline Survive in the U.S. Federation?, 2013, in Daniel Nadler and Paul Peterson, eds, *The Global Debt Crisis: Haunting U.S. and European Federalism*, Brookings Press.

Market Discipline and U.S. Federalism, 2012, in Peter Conti-Brown and David A. Skeel, Jr., eds, *When States Go Broke: The Origins, Context, and Solutions for the American States in Fiscal Crisis*, Cambridge University Press.

Federalism and Inter-Regional Redistribution, 2010, in Nuria Bosch, Marta Espasa, and Albert Sole Olle, eds., *The Political Economy of Inter-Regional Fiscal Flows*, Edward Elgar.

Back to the Future: Endogenous Institutions and Comparative Politics, 2009, in Mark Lichbach and Alan Zuckerman, eds., *Comparative Politics: Rationality, Culture, and Structure* (Second Edition), Cambridge University Press.

The Political Economy of Federalism, 2006, in Barry Weingast and Donald Wittman, eds., *Oxford Handbook of Political Economy*, Oxford University Press.

Fiscal Discipline in Federations: Germany and the EMU, 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

The Political Economy of Pro-cyclical Decentralised Finance (with Erik Wibbels), 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

Globalization and Fiscal Decentralization, (with Geoffrey Garrett), 2003, in Miles Kahler and David Lake, eds., *Governance in a Global Economy: Political Authority in Transition*, Princeton University Press: 87-109. (Updated version, 2007, in David Cameron, Gustav Ranis, and Annalisa Zinn, eds., *Globalization and Self-Determination: Is the Nation-State under Siege?* Routledge.)

Introduction and Overview (Chapter 1), 2003, in Rodden et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Soft Budget Constraints and German Federalism (Chapter 5), 2003, in Rodden, et al, *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Federalism and Bailouts in Brazil (Chapter 7), 2003, in Rodden, et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Lessons and Conclusions (Chapter 13), 2003, in Rodden et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

4

*Online Interactive Visualization*

Stanford Election Atlas, 2012 (collaboration with Stephen Ansolabehere at Harvard and Jim Herries at ESRI)

*Other Publications*

How America's Urban-Rural Divide has Shaped the Pandemic, 2020, *Foreign Affairs*, April 20, 2020.

An Evolutionary Path for the European Monetary Fund? A Comparative Perspective, 2017, Briefing paper for the Economic and Financial Affairs Committee of the European Parliament.

Representation and Regional Redistribution in Federations: A Research Report, 2009, in *World Report on Fiscal Federalism*, Institut d'Economia de Barcelona.

On the Migration of Fiscal Sovereignty, 2004, *PS: Political Science and Politics* July, 2004: 427–431.

Decentralization and the Challenge of Hard Budget Constraints, *PREM Note* 41, Poverty Reduction and Economic Management Unit, World Bank, Washington, D.C. (July).

Decentralization and Hard Budget Constraints, *APSA-CP* (Newsletter of the Organized Section in Comparative Politics, American Political Science Association) 11:1 (with Jennie Litvack).

Book Review of *The Government of Money* by Peter Johnson, *Comparative Political Studies 32,7: 897-900.*

# Fellowships and Honors

Fund for a Safer Future, Longitudinal Study of Handgun Ownership and Transfer (LongSHOT), GA004696, 2017-2018.

Stanford Institute for Innovation in Developing Economies, Innovation and Entrepreneurship research grant, 2015.

Michael Wallerstein Award for best paper in political economy, American Political Science Association, 2016.

Common Cause Gerrymandering Standard Writing Competition, 2015.

General support grant from the Hewlett Foundation for Spatial Social Science Lab, 2014.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2012.

Sloan Foundation, grant for assembly of geo-referenced precinct-level electoral data set (with Stephen Ansolabehere and James Snyder), 2009-2011.

Hoagland Award Fund for Innovations in Undergraduate Teaching, Stanford University, 2009.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, beginning Fall 2010.

Research Grant on Fiscal Federalism, Institut d'Economia de Barcelona, 2009.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2008.

United Postal Service Foundation grant for study of the spatial distribution of income in cities, 2008.

Gregory Luebbert Award for Best Book in Comparative Politics, 2007.

Fellow, Center for Advanced Study in the Behavioral Sciences, 2006-2007.

National Science Foundation grant for assembly of cross-national provincial-level dataset on elections, public finance, and government composition, 2003-2004 (with Erik Wibbels).

MIT Dean's Fund and School of Humanities, Arts, and Social Sciences Research Funds.

Funding from DAAD (German Academic Exchange Service), MIT, and Harvard EU Center to organize the conference, "European Fiscal Federalism in Comparative Perspective," held at Harvard University, November 4, 2000.

Canadian Studies Fellowship (Canadian Federal Government), 1996-1997.

Prize Teaching Fellowship, Yale University, 1998-1999.

Fulbright Grant, University of Leipzig, Germany, 1993-1994.

Michigan Association of Governing Boards Award, one of two top graduating students at the University of Michigan, 1993.

W. J. Bryan Prize, top graduating senior in political science department at the University of Michigan, 1993.

## Other Professional Activities

International Advisory Committee, Center for Metropolitan Studies, Sao Paulo, Brazil, 2006–2010.

Selection committee, Mancur Olson Prize awarded by the American Political Science Association Political Economy Section for the best dissertation in the field of political economy.

Selection committee, Gregory Luebbert Best Book Award.

Selection committee, William Anderson Prize, awarded by the American Political Science Association for the best dissertation in the field of federalism and intergovernmental relations.

## Courses

### Undergraduate

Politics, Economics, and Democracy

Introduction to Comparative Politics

Introduction to Political Science

Political Science Scope and Methods

Institutional Economics

Spatial Approaches to Social Science

### Graduate

Political Economy of Institutions

Federalism and Fiscal Decentralization

Politics and Geography

# Consulting

2017. Economic and Financial Affairs Committee of the European Parliament.

2016. Briefing paper for the World Bank on fiscal federalism in Brazil.

2013-2018: Principal Investigator, SMS for Better Governance (a collaborative project involving USAID, Social Impact, and UNICEF in Arua, Uganda).

2019: Written expert testimony in *McLemore, Holmes, Robinson, and Woullard v. Hosemann*, United States District Court, Mississippi.

2019: Expert witness in *Nancy Corola Jacobson v. Detzner*, United States District Court, Florida.

2018: Written expert testimony in *League of Women Voters of Florida v. Detzner* No. 4:18-cv-002510, United States District Court, Florida.

2018: Written expert testimony in *College Democrats of the University of Michigan, et al. v. Johnson, et al.*, United States District Court for the Eastern District of Michigan.

2017: Expert witness in *Bethune-Hill v. Virginia Board of Elections*, No. 3:14-CV-00852, United States District Court for the Eastern District of Virginia.

2017: Expert witness in *Arizona Democratic Party, et al. v. Reagan, et al.*, No. 2:16-CV-01065, United States District Court for Arizona.

2016: Expert witness in *Lee v. Virginia Board of Elections*, 3:15-cv-357, United States District Court for the Eastern District of Virginia, Richmond Division.

2016: Expert witness in *Missouri NAACP v. Ferguson-Florissant School District*, United States District Court for the Eastern District of Missouri, Eastern Division.

2014-2015: Written expert testimony in *League of Women Voters of Florida et al. v. Detzner, et al.*, 2012-CA-002842 in Florida Circuit Court, Leon County (Florida Senate redistricting case).

2013-2014: Expert witness in *Romo v Detzner*, 2012-CA-000412 in Florida Curcuit Court, Leon County (Florida Congressional redistricting case).

2011-2014: Consultation with investment groups and hedge funds on European debt crisis.

2011-2014: Lead Outcome Expert, Democracy and Governance, USAID and Social Impact.

2010: USAID, Review of USAID analysis of decentralization in Africa.

2006–2009: World Bank, Independent Evaluations Group. Undertook evaluations of World Bank decentralization and safety net programs.

2008–2011: International Monetary Fund Institute. Designed and taught course on fiscal federalism.

1998–2003: World Bank, Poverty Reduction and Economic Management Unit. Consultant for *World Development Report*, lecturer for training courses, participant in working group for assembly of decentralization data, director of multi-country study of fiscal discipline in decentralized countries, collaborator on review of subnational adjustment lending.

Last updated: October 19, 2020

# EXHIBIT 11

Defendant's Motion to Exclude Plaintiffs' Expert Witnesses

# Exhibit 3

# A   Overview

**1**     I have been engaged by Defendant-Intervenors' Counsel *Perkins Coie LLP* to write an expert report in the matter of *Bowyer et al. v. Ducey et al.* Counsel requested that I evaluate the contention in "Declaration of Matthew Bromberg Ph.D" (hereinafter, the Bromberg Declaration, dated December 1, 2020 and filed on December 2, 2020) that there was "vote switching" in Maricopa County, Arizona, in the 2020 presidential election that favored Democratic candidate for president Joe Biden at the expense of Republican candidate Donald Trump. Counsel requested as well that I offer a brief evaluation of the claims in the Bromberg Declaration about fraudulent votes cast in the 2020 presidential election beyond Arizona, namely, in Georgia, Pennsylvania, and Milwaukee, Wisconsin.

**2**     The 2020 General Election took place on November 3, 2020. In the race in Arizona for the office of President of the United States, the Arizona Secretary of State has certified that Democratic candidate Joe Biden received 1,672,143 votes and Republican candidate Donald Trump, 1,661,686 votes. This constitutes a margin of 10,457 votes.[1]

**3**     As of the writing of this expert report, Matthew Bromberg, the author of the Bromberg Declaration, has to the best of my knowledge disclosed neither the data not the computer code he used in the process of producing his declaration. I accordingly reserve the right to supplement this report in light of any disclosures that he puts forward in the future.

# B   Summary of conclusions

I.     The Bromberg Declaration offers no evidence of voter fraud—and in particular vote switching from Donald Trump to Joe Biden—in Maricopa County, Arizona during the 2020 presidential election.

---

[1]See "President of the United States," *Arizona Secretary of State*, available at `https://results.arizona.vote/#/featured/18/0` (last accessed December 4, 2020).

II.    There is no basis for the key theory in the Bromberg Declaration that voting precincts in Maricopa County with relatively few voters were more susceptible to voter fraud than precincts with greater numbers of voters. This theory does not appear in the literature on voter fraud and there is no evidence presented in the Bromberg Declaration in support of it. Lacking this theory, the Bromberg Declaration cannot say anything about voter fraud in Maricopa County in the 2020 election.

III.   The Bromberg Declaration misunderstands how in-person voters in Maricopa County cast their ballots in the 2020 election. In this election, the county used voting centers on Election Day. Each eligible voter in Maricopa County could use any of the county's 175 centers to cast an in-person ballot. Maricopa County's in-person voters in this election, that is, were *not* restricted to voting in the polling places associated with their precincts, of which there were 744. The total number of presidential votes cast by the voters who belong to any given precinct in Maricopa County thus has no implication for how many ballots were physically cast in it on November 3, 2020. Therefore, the theory putatively offered in the Bromberg Declaration about the susceptibility to voter fraud of Maricopa County precincts with relatively few voters is of absolutely no relevance to the 2020 presidential race in the county and in fact to any races contested in the 2020 election.

IV.    When voters in Maricopa County are aggregated at the precinct level (which ignores the matter of *where* these individuals cast their ballots in the 2020 election), the results of the presidential race bear strong similarity to the results of the race for a seat in the United States Senate. The precincts in which Joe Biden did well are also precincts in which Mark Kelly, Democratic candidate for Senate, did well, and vice versa. This implies that the pattern in Maricopa County precincts that was noted in the Bromberg Declaration—whereby precincts with smaller numbers of voters tended to have more Biden votes than Trump votes—reflects established political preferences in Maricopa County, not illegal vote switching.

V.     Voter fraud is rare in the United States. Nonetheless, the Bromberg Declaration presents

a model that purports to discover significant voter in Georgia, Pennsylvania, and Milwaukee, Wisconsin. The model assumes that when a ballot is counted is uncorrelated with the presidential vote on it. This is known not to be the case. Thus, the claims in the Bromberg Declaration about voter fraud beyond Arizona do not follow from the arguments made in it.

## C   Organization of this report

**4**     In the next section of this report, I present my qualifications.

**5**     I then summarize literature on voter fraud in American elections.

**6**     Next, I evaluate the analysis of Maricopa County presented in the Bromberg Declaration.

**7**     Finally, I briefly discuss claims about voter fraud made in the Bromberg Declaration that extend beyond Arizona.

## D   Qualifications

**8**     I am the William Clinton Story Remsen 1943 Professor of Government at Dartmouth College in Hanover, New Hampshire and from 2015 to 2020 was Chair of the Program in Quantitative Social Science. I have taught at Dartmouth since 2003 and previously was on the faculty of Northwestern University. I have served as a visiting professor at Harvard University (July 2008–January 2009), the University of Rochester (September 2006–December 2006), and the Hertie School of Governance in Berlin (August 2011–August 2012). I have also served as a visiting scholar at the Hertie School of Governance (August 2016–July 2017).

**9**     In January 1998, I received a doctorate in the field of Political Economy from the Graduate School of Business at Stanford University. I also have a master's degree in statistics from

Stanford University (June 1995), a master's degree in political science from the University of Dayton (August 1992), and a bachelor's degree in mathematics and economics from Carnegie-Mellon University (May 1989).

**10**     I have published many scholarly articles on election administration and American elections, three such articles in 2019 and two in 2018. Among other subjects, I have written on the effects of ballot formats, patterns in invalid votes, the availability of early voting, and polling place congestion. My articles rely on statistical analyses, and my ongoing research agenda focuses heavily on issues in election administration.

**11**     I have published over 20 articles in peer-reviewed political science journals, including in the field's top general journals (*American Political Science Review*, *American Journal of Political Science*, and *Journal of Politics*). I have published in specialty journals as well (*Election Law Journal*, *American Politics Research*, and *Legislative Studies Quarterly*).

**12**     I have published two articles on voter fraud in American elections. Cottrell, Herron and Westwood (2018) is a statistical study of the allegations made by Donald Trump about voter fraud in the period surrounding the 2016 General Election. It concludes that there is no evidence in support of these allegations. Herron (2019) is an analysis of allegations made after a 2018 election in North Carolina's 9th Congressional District. It concludes that patterns in absentee votes cast in this district were consistent with allegations of absentee ballot fraud.

**13**     I was a testifying expert for defendants in *Law et al. v. Whitmer et al.* (Case No.: 20 OC 00163 1B) and in *Jennings v. Elections Canvassing Commission of the state of Florida* (2006 WL 4404531 (Fla.Cir.Ct.)) and a testifying expert for plaintiffs in *Alliance for Retired American et al. v. Matthew Dunlap et al.* (DKT NO. CV-20-95), *Michigan Alliance for Retired Americans et al. v. Jocelyn Benson et al.* (Civil Action No. 2020-000108-MM), *League of Women Voters of New Hampshire et al. v. William M. Gardner et al.* (226-2017-CV-433), and *Veasey et al. v. Abbott et al.*

(265 F. Supp. 3d 684 (S.D. Tex. 2017)).  In addition, I have written expert reports in approximately 12 other cases relating to aspects of election law and election administration.

**14**     My written and oral testimony was credited by courts in their written opinions in *Law et al. v. Whitmer et al.*, *Donald J. Trump for President, Inc. v. Stephen Bullock et al.*  (Case No.: 6:20-cv-00066-DLC), *League of Women Voters of New Hampshire et al. v. William M. Gardner et al.*, and in *Veasey et al. v. Abbott et al.*.  My opinions and testimony have never been found by a court to be unreliable.

**15**     At the request of counsel working on the litigation "Investigation of Election Irregularities Affecting Counties Within the 9th Congressional District," I submitted a draft of a working paper on North Carolina's 9th Congressional District to the North Carolina State Board of Elections. As to the paper's comparison of absentee ballot candidate support rates in Bladen County, North Carolina, in 2018 to absentee ballot candidate support rates in other counties in North Carolina, in three other states, and in elections that dated back to 2012, the Board wrote, "We find this information credible."[2] My paper on North Carolina's 9th Congressional District appears in *Election Law Journal*, a peer-reviewed publication (Herron, 2019).

**16**     My *curriculum vitae* is attached as Appendix A.

**17**     I am being paid at a rate of $550/hour for work in this litigation.  My compensation is contingent neither on the results of the analyses described herein nor on the contents of this report.

# E     Voter fraud in the United States

**18**     To provide context for the breadth of the Bromberg Declaration's claims about fraud, I offer a definition of voter fraud and then review the extensive academic literature on this subject, which

---

[2]The Board's decision, which invalidated the 2018 election in the 9th Congressional District, can be found at `https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Congressional_District_9_Portal/Order_03132019.pdf` (last accessed November 13, 2020).

the Contest ignores.

## E.1   Defining voter fraud

**19**      The study of voter fraud in the United States is part of the field of election administration.

**20**      For the purposes of this report, I define an instance of voter fraud as *an intentional act of deception aimed at subverting electoral processes*.[3]  Instances of voter fraud can include, but are not necessarily limited to, the following behaviors:

*Absentee or mail ballot fraud*:  improperly acquiring and then submitting an absentee or mail ballot or ballots.

*Double voting*:  voting more than once in an election in which this is not permitted.

*Election official fraud*:  improper actions taken by election officials, actions intended to change validly cast votes, or actions taken to affect voter registration records.

*Non-citizen voting*:  participating in a federal election when one is not a citizen of the United States.

*Voter impersonation*:  voting in-person (as opposed to via mail) on an election day in someone else's name, either in the name of a properly registered voter or using the registration records of a fictional individual.

---

[3] The North Carolina State Board of Elections (NCSBE) is responsible for managing elections in North Carolina. Since 2015, it has published a breakdown of voting irregularities that raise questions about election integrity. Referring to instances of potential voter fraud in the 2016 General Election, the NCSBE wrote that, "[Voter] [f]raud, in most cases, is an intent crime that requires prosecutors to show that the voter knowingly committed a crime." See p. 7 of "Post-Election Audit Report," *North Carolina State Board of Elections*, April 21, 2017, available at `https://s3.amazonaws.com/dl.ncsbe.gov/sboe/Post-Election%20Audit%20Report_ 2016%20General%20Election/Post-Election_Audit_Report.pdf` (last accessed November 15, 2020).

**21**     The above types of voter fraud can in principle be combined.  A non-citizen of the United States could during the course of participating in a federal election impersonate a properly registered voter.  Or, an individual could vote twice in an election, once using the individual's own (and proper) registration and the second time using a fictional registration.

**22**     Moreover, each entry in the above list of behaviors should be understood as encompassing a broad range of behaviors.  An individual could, hypothetically, execute a double voting fraud by voting twice in one state.  Or, such an individual could, hypothetically, vote in more than one state.

**23**     This list above is neither exclusive nor exhaustive.

**24**     I list the above types of behaviors because they describe the sorts of actions that, based on my experience with academic literature on the subject, could in principle be characterized as voter fraud.  What a court in any state determines is illegal depends, however, on that state's particular laws.

**25**     It is my general understanding that, for an action to be denoted fraud, it must involve an intent to deceive.  In this report, I treat allegations of voter fraud as actual fraud even where I cannot determine if there was an intent to deceive.  To that extent that I do this, my report is over-inclusive with respect to instances of voter fraud and thus conservative.[4]

**26**     Elections are regulated affairs subject to state laws and potentially local laws as well.  A voter can behave in a way that is illegal in his or her state but not intentionally deceptive and thus not fraudulent.

---

[4]Fraudulent actions of voters or intended voters are similar to what the United States Election Assistance Commission (EAC) might call "acts of deception."  The EAC, a federal body established in the aftermath of the contested 2000 presidential election, published a report, "Election Crimes:  An Initial Review and Recommendations for Future Study," in December 2006, that categorizes in detail a variety of election-related crimes.  The report is available at `https://www.eac.gov/sites/default/files/eac_assets/1/6/Initial_Review_and_Recommendations_for_Further_Study.pdf` (last accessed November 22, 2020).

**27**     The examples of voter fraud I have offered above are hypothetical.  Later in this report I describe research that seeks to estimate the rates at which various forms of voter fraud have occurred in recent American elections.

**28**     In my experience, most scholars of American election administration broadly consider voter fraud to consist of fraudulent actions taken by voters themselves and not by the individuals who supervise elections.  Henceforth, when I refer to voter fraud, I mean actions involving voters or intended voters themselves. In contrast, when in this report a particular example of fraud is associated with an election official or a poll worker, I am explicit about this so that there is no confusion over the type of person, official or voter, who perpetrated an alleged fraud.

## E.2    Evidence of voter fraud in the United States

**29**     The literature on the prevalence of voter fraud in American elections incorporates a variety of research methodologies.  This exemplifies triangulation, wherein multiple research approaches are brought to bear on a single problem.  If voter fraud in the United States is widespread, one would expect at least one of the methodologies in the literature to have detected evidence of it.

**30**     One methodology used in the study of voter fraud systematically tracks cases of alleged voter fraud in media reports and in official government documents. Examples of this methodology are Minnite and Callahan (2003), Minnite (2007), Levitt (2007), Minnite (2010), and Levitt (2014).

**31**     These studies conclude that rates of voter fraud in American elections are very low.

**32**     An illustrative example from Levitt (2014) is as follows.  Between the years 2000 and 2014, during which Levitt estimates that over one billion ballots were cast across general and primary elections in the United States, there were approximately 31 documented "incidents" involving voter fraud.[5]  The ratio of 31 to one billion is minuscule.

---

[5]Levitt defines "incident" very broadly, and thus conservatively.  A voter fraud incident is not necessarily a conviction for voter fraud. Levitt writes: "Some of these 31 incidents have been thoroughly investigated (including some

**33**     Minnite (2010) is likewise instructive in its coverage of voter fraud cases at the federal level (Chapter 3) and its analyses (Chapter 4) of fraud in four states (California, Minnesota, New Hampshire, and Oregon), among other things.  As noted above, Oregon's elections are effectively all-mail operations.

**34**     Using data from the United States Department of Justice (DOJ), Minnite finds very little evidence of voter fraud.  A September 2014 report published by the United States Government Accountability Office similarly concluded that, "[T]here were no apparent cases of in-person voter impersonation charged by DOJ's Criminal Division or by U.S. Attorney's offices anywhere in the United States, from 2004 through July 3, 2014" (p. 70).[6]

**35**     With respect to California, which is the most populous state in the country, Minnite draws a variety of conclusions.  One is that state officials investigate claims of voter fraud when they present themselves. While perhaps not surprising, this conclusion implies that findings of a lack of fraud across California elections are meaningful and do not simply reflect state elections officials' lack of interest in voter fraud.

**36**     Minnite concludes as well that approximately one-third of fraud allegations in California in her period of study did not lead to charges because they lacked evidence or suspects could not be identified; a second third of these allegations were dropped because no legal violation was found or a suspect was determined to lack criminal intent; and, of allegations that produced legal violations, the majority did not lead to criminal penalties, and only one-third of individuals determined to have committed a violation were actually found guilty of a crime. The modal voter fraud Minnite identified in California was fraudulent registration—as opposed to fraudulent voting of any type, either in-person voting or absentee voting.

---

prosecutions). But many have not. Based on how other claims have turned out, I'd bet that some of the 31 will end up debunked: a problem with matching people from one big computer list to another, or a data entry error, or confusion between two different people with the same name, or someone signing in on the wrong line of a pollbook."

   [6]See "Issues Related to State Voter Identification Laws," *United States Government Accountability Office*, September 2014, available at `https://www.gao.gov/assets/670/665966.pdf` (last accessed November 15, 2020).

**37**     Minnite studied Oregon as well, which is notable insofar as this state relies heavily on mail-in ballots. Based on her analysis, Minnite concludes that, "The evidence of voter fraud since Oregon adopted vote-by-mail, however, is practically non existent."

**38**     Another methodology in the study of fraud involves surveying election officials.  In the aftermath of the 2016 General Election, Famighetti, Keith and Pérez (2017) "interviewed a total of 44 administrators representing 42 jurisdictions in 12 states" (p. 1), inquiring about the prevalence of non-citizen voting. Famighetti, Keith and Pérez write that 40 jurisdictions reported "no known incidents of noncitizen voting in 2016" (p. 1). Moreover, they state that,

> "In the jurisdictions we studied, very few noncitizens voted in the 2016 election. Across 42 jurisdictions, election officials who oversaw the tabulation of 23.5 million votes in the 2016 general election referred only an estimated 30 incidents of suspected noncitizen voting for further investigation or prosecution.  In other words, improper noncitizen votes accounted for 0.0001 percent of the 2016 votes in those jurisdictions" (p. 1).

**39**     The "30 incidents" noted above represent an upper bound on the number of times that noncitizen voter fraud was committed in the jurisdictions studied by Famighetti, Keith and Pérez. These incidents, according to the researchers, do not represent voter fraud convictions. They represent only referrals.

**40**     Famighetti, Keith and Pérez write as well that, "In California, Virginia and New Hampshire – the states where [United States President Donald] Trump claimed the problem of noncitizen voting was especially acute – no official we spoke with identified an incident of noncitizen voting in 2016" (p. 2).

**41**     The study of voter fraud by Famighetti, Keith and Pérez is notable because it focused solely on the 2016 General Election.  Compared to preceding elections, it is well known that

the 2016 election and its aftermath were awash in fraud allegations.  By focusing on such an election, Famighetti, Keith and Pérez's study biases itself toward finding evidence of voter fraud. Scientifically speaking, this is not what one would call a conservative bias; rather, the bias in Famighetti, Keith and Pérez's work pushes the study in the direction of finding evidence of a phenomenon of interest, here, voter fraud.  Despite this bias, the rate of potential voter fraud described by Famighetti, Keith and Pérez is very small.

**42**     Huefner et al. (2007) constitutes another example of a study that involved efforts to reach out to election officials.  This wide-ranging study details the electoral environments of five states (Illinois, Michigan, Minnesota, Ohio, and Wisconsin), and the authors write as follows:

> "On the whole, voting fraud is exceedingly rare.  Although allegations of voting fraud have been widely publicized in the media, most all of these have evaporated upon closer investigation" (p. 120).

**43**     Still another approach in the voter fraud literature uses statistical tools in efforts to determine if patterns in election returns and voting records are consistent with public claims about the prevalence of voter fraud (Christensen and Schultz, 2014; Goel et al., 2020).  Goel et al. is a study of double voting, and their analysis relies on an extensive database that contains approximately 104 million vote records.  The particular question of interest to Goel et al. is whether the records show evidence of duplicates, i.e., of people who voted more than once in the 2012 General Election. This question is complicated because, when one has a database of millions of individuals, there will with virtual certainty be many cases of people with the same names and birthdates.[7]

**44**     Goel et al. conclude that, "[D]ouble voting is not currently carried out in such a systematic way that it presents a threat to the integrity of American elections" (p. 467).  Goel et al.  conclude

---

[7]Such a duplicate name problem arose in the 2016 General Election in North Carolina. Four individuals in the state were accused of having voted illegally, only to be exonerated when it was discovered that they had the same names as incarcerated felons.  This example illustrates how innocuous coincidences can present themselves as voter fraud. See "Republicans claim 43 voters are ineligible felons.  Many of them aren't," *The News & Observer*, November 23, 2016, available at http://www.newsobserver.com/news/politics-government/election/article116789083.html (last accessed November 15, 2020).

as well that measurement error in official election data could explain "a significant portion, if not all" of the cases of double voting that they identify.

**45**     By "measurement error," Goel et al. are referring to inaccuracies in turnout records. These inaccuracies can be the result of human recording errors, for example, in which a voting jurisdiction's record of one individual is mistakenly associated with the record of another.

**46**     With two academics, I published an article on voter fraud in the 2016 General Election. This article—Cottrell, Herron and Westwood (2018)—appears in *Electoral Studies*, a peer-reviewed, academic journal that focuses on elections. The article assesses the voter fraud allegations promulgated by Donald Trump and individuals associated with him.

**47**     My co-authors and I twice described some of our results in *The Washington Post*.[8] The first time was on December 2, 2016, and the second, on February 28, 2017.

**48**     In our article, my colleagues and I used statistical techniques to search for evidence of three types of fraud. In particular, we looked for:

I.     Evidence of widespread non-citizen voter fraud across counties in the United States.

II.     Evidence that election officials in the United States conspired against Donald Trump.

III.     Evidence that the 2016 General Election in New Hampshire was contaminated by residents of Massachusetts who, allegedly, traveled north on November 8, 2016, in order to cast illegal votes.

_____

[8]Our short articles in *The Washington Post* are available at `https://www.washingtonpost.com/news/monkey-cage/wp/2016/12/02/we-checked-trumps-allegations-of-voter-fraud-we-found-no-evidence-at-all` and at `https://www.washingtonpost.com/news/monkey-cage/wp/2017/02/28/we-cant-find-any-evidence-of-voting-fraud-in-new-hampshire` (last accessed November 15, 2020).

**49** With respect to the first two points above, my co-authors and I uncovered no evidence of widespread non-citizen voter fraud and no evidence that election officials in the United States conspired against Trump. Our county-level consideration of three states mentioned post-election by Donald Trump—California, New Hampshire, and Virginia—also did not turn up evidence of widespread fraud (these states were also examined by the aforementioned Famighetti, Keith and Pérez (2017)). With respect to the third point above, my co-authors and I found no evidence of illegal voting in New Hampshire.

**50** My research project on voter fraud was initiated during the summer of 2016, months before the presidential election. My co-authors and I are cognizant of the fact that establishing a negative is challenging, and we do not argue that our failure to uncover evidence of fraud surrounding the 2016 General Election conclusively proves that there was not voter fraud in that election. Rather, what one can infer from my co-authored study on voter fraud is that its attempts to uncover evidence of widespread and systematic fraud were not successful.

**51** The literature on voter fraud reviewed here is peer-reviewed, in most cases in publicly accessible journals and books, and in some cases is available online. It incorporates a variety of different research designs and data sources. Despite these differences, the contributions to the literature share a common finding: voter fraud in American elections is rare.[9] While election scholars do not assert that the fraud rate in American elections is literally zero, no credible scholars working in this literature have concluded that voter fraud poses a threat to election integrity in the United States.

---

[9]One exception to the scholarly consensus about a lack of widespread voter fraud in the United States is Richman, Chattha and Earnest (2014), who derive estimates of non-citizen voting rates from the 2008 and 2010 waves of the Internet-based survey known as the Cooperative Congressional Election Study (CCES). Some CCES survey respondents indicated that, although they were non-citizens, they had voted in the 2008 General Election or in the 2010 Midterm Election.

Richman, Chattha and Earnest's (2014) claims about non-citizen voting would be dramatic if valid, and they would contradict effectively all of the studies on voter fraud discussed in this report. However, Ansolabehere, Luks and Schaffner (2015) show that it is virtually certain that Richman, Chattha and Earnest's results on non-citizen voting reflect survey measurement error, in particular, the incorrect classification of citizen CCES respondents as non-citizen respondents.

**52**      No evidence contradicting this finding was produced by a presidential commission on voter fraud established in the aftermath of the 2016 General Election and shut down on January 3, 2018. No official reports of widespread and systematic voter fraud have come to light based on the commission's work.[10]  Recently, Benjamin Ginsberg, a co-chair of the 2013 Presidential Commission on Election Administration, commented on the work of this commission, noting that, "[A]fter decades of looking for illegal voting, there's no proof of widespread fraud.  At most, there are isolated incidents – by both Democrats and Republicans."[11]

## E.3      Voter fraud and mail voting

**53**      There is no evidence that voter fraud rates associated with mail-in voting are systematically higher than voter fraud rates associated with other forms of voting and with other aspects of election administration.

**54**      Drawing on recent entries in a database of potential election irregularities developed by *The Heritage Foundation*, a study released by *The Brookings Institution* considers the prevalence of voter fraud specifically in the country's five all-mail states.[12]  The authors of this report identify 29 "fraudulent votes attempted by mail" out of 49,917,586 general election votes cast in the period under review.  The number 29 is approximately 0.000058 percent of 49,917,586.[13]

---

[10]On the origins and end of the presidential voter fraud commission, which offered no evidence that widespread fraud affected the 2016 General Election, see "Trump Closes Voter Fraud Panel That Bickered More Than It Revealed," *The New York Times*, January 4, 2018, available at `https://www.nytimes.com/2018/01/04/us/voting-fraud-commission.html` (last accessed November 15, 2020).

[11]For Mr. Ginsburg's comments on the lack of evidence about voter fraud in the United States, see "Republicans have insufficient evidence to call elections 'rigged' and 'fraudulent'," *The Washington Post*, September 8, 2020, available at `https://www.washingtonpost.com/opinions/2020/09/08/republicans-have-insufficient-evidence-call-elections-rigged-fraudulent/` (last accessed November 15, 2020).  The 2013 Presidential Commission on Election Administration, on which Mr. Ginsburg served, is described at `https://bipartisanpolicy.org/the-presidential-commission-on-election-administration/` (last accessed November 15, 2020).

[12]For the Heritage Foundation's database, see `https://www.heritage.org/voterfraud` (last accessed November 14, 2020).  My referencing this database should be not considered an endorsement of it.  I note it here because the database is the source for the cited *Brookings Institution* report.

[13]"Low rates of fraud in vote-by-mail states show the benefits outweigh the risks," *The Brookings Institution*, June 2, 2020, available at `https://www.brookings.edu/blog/fixgov/2020/06/02/low-rates-of-fraud-in-vote-by-mail-states-show-the-benefits-outweigh-the-risks/` (last accessed November 12, 2020).

14

# F   Allegations in the Bromberg Declaration of voter fraud in Maricopa County

**55**     The allegations in the Bromberg Declaration about Maricopa County appear on pp. 14-15, in the Declaration's section titled "Maricopa Precinct Analysis."

## F.1   Precinct size and support for Joe Biden

**56**     In its analysis of Maricopa County, the Bromberg Declaration contains two figures, both of which plot candidate vote shares (in percentages) against precinct size. These figures constitute the entirety of the Declaration's evidence of fraud in Maricopa County.  In particular, Figure 18 in the Bromberg Declaration plots the vote percentages of Joe Biden, Donald Trump, and third party presidential candidates against precinct size, and Figure 19 is similar except it focuses only on aggregate third party presidential candidates.

**57**     Based on its Figure 18, the Bromberg Declaration asserts that, "The Biden percentage is higher in the smaller precincts, primarily at the expense of Trump. . . " (p. 14). As shown below, I do not dispute this rough characterization.

**58**     The Bromberg Declaration goes on to posit that the existence of this relationship "suggest[s] vote switching" (p. 14) and refers to the relationship between precinct size and Biden support as "an anomaly."  By "vote switching," the Bromberg Declaration appears to mean a process in which legal votes for Donald Trump were switched to Joe Biden.  The Bromberg Declaration implicitly claims that this happened in Maricopa County precincts with relatively few voters.

## F.2   The Bromberg Declaration's theory about precinct size

**59**     The basis in the Bromberg Declaration for the claim that a relationship between precinct size and Biden support is evidence of vote switching can be found on p. 8: "But one could also

theorize the opportunity for cheaters to cheat in small precincts, where there may be less oversight." In other words, the Bromberg Declaration offers the theory that small precincts "may" have less oversight and that "cheaters" take advantage of this.

60      There is no evidence in Bromberg Declaration that Maricopa County precincts with fewer voters do in fact have less oversight; no evidence that election official staffing levels per voter are lower in smaller precincts than they are in larger precincts; no evidence that the physical layout of small precincts is different than the physical layout of large precincts; and in fact no evidence that small precincts in Maricopa County differ in any way whatsoever from the county's large precincts except for the fact that the former have fewer voters.

61      There is no evidence in the academic literature on voter fraud reviewed earlier in favor of the Bromberg Declaration's "theory" that small precincts are susceptible to voter fraud. Moreover, there are no citations in the Bromberg Declaration to peer-reviewed studies of the relationship between precinct size and voter fraud.

62      It is well known that the political affiliations of voters are not uniformly distributed across jurisdictions like counties. Some areas of counties (in particular, urban areas) have more Democratic voters, and other areas (those less urban), more Republican voters (e.g., Rodden, 2019). If precinct size measured by numbers of voters is correlated geographically with political preferences, this will induce a *spurious* relationship between precinct size and candidate vote shares within precincts. Spurious relationships are not evidence of voter fraud.

63      In its discussion of precinct size and the "theory" that small precincts are relatively prone to fraud, the Bromberg Declaration cites "An Electoral System in Crisis," a webpage dating to 2016 that claims to be an analysis of the Wisconsin recount that took place four years ago. The authors of this webpage argue that a relationship between precinct size and candidate vote totals indicates the presence of "irregularities" but provide no evidence at all in favor of this assertion outside of an

offhand comment that such a relationship is a "complete violation of the Law of Large Numbers."

64     This assertion is nonsensical. The Law of Large Numbers in its standard form is a result in probability theory which states that independent samples from a common population converge to true population parameters as the number of observations increases. It is not clear in the Wisconsin recount webpage what units are being sampled and whether these units are drawn from the same population. The webpage's invocation of the Law of Large Numbers does not make any sense. The webpage does not provide any calculation that support its "complete violation" allegation – just rhetoric.

65     In short, Bromberg Declaration asserts that a relationship between precinct size and Biden vote share is indicative of fraud, but there is no reason whatsoever to believe this and no evidence to support such a "theory."

## F.3     Whether small precincts are fraud-prone is irrelevant because Maricopa County used voting centers in the 2020 election

66     Regardless of whether there is any evidence behind it, the "theory" in the Bromberg Declaration about precinct size and voter fraud is applicable to the study of Maricopa County in the 2020 election only to the extent that in-person voters in the county actually voted in their precincts. In fact, they did not do this.

67     In the 2020 election, Maricopa County offered in-person voting at what are known as *voting centers*. A voting center is a location at which any eligible voter in the county may cast an in-person ballot. In particular, there were 175 voting centers in Maricopa County for the purposes of in-person voting during the 2020 General Election.[14]

---

[14]I downloaded the set of Maricopa County voting centers from `http://web.archive.org/web/20201104002036/https://recorder.maricopa.gov/pollingplacefiles/VotingSitesSchedule.xlsx` (last accessed December 4, 2020).

**68** The Maricopa County elections department informed the county's voters that, "There are **no** assigned locations" (bold in original) for voting in the 2020 election. See Appendix B, which displays text from the Maricopa County elections office webpage.

**69** Consequently, the author of the Bromberg Declaration has literally no idea where any of the ballots attributed to the county's precincts were actually cast. To make matters worse, the author appears not even to distinguish between in-person votes and ballots mailed in or submitted via drop boxes (and this distinction is in principle important insofar as the "theory" of voter fraud in the Bromberg Declaration that connects precinct size and fraud does not make sense when applied to votes not cast in-person).[15] In short, the number of votes associated with any given precinct in Maricopa County—and this is what is displayed in Figures 18 and 19 in the Bromberg Declaration—has no implications for how many ballots were actually cast in said precinct and thus, per the "theory" in the Bromberg Declaration, were ostensibly vulnerable to fraud.

**70** I downloaded precinct returns for the 2020 General Election from the Maricopa County elections department webpage.[16] There were 744 unique precinct names used in the 2020 election. Insofar as there were in this election 175 voting centers in Maricopa County, I know for certain that there is not a one-to-one match between the precincts and voting centers (not to mention the fact that the county's webpage was explicit that voters could cast in-person ballots in any voting center that they wished).

## F.4 Precinct size and support for Democratic candidates

**71** Figure 1 displays the relationship between precinct size (horizontal axis) and support for Democratic candidates (vertical axis). Each point in the figure denotes a single precinct in Maricopa County. The figure's left panel is for the United States presidential contest, and in this panel

[15] Because the author of Bromberg Declaration has not, to the best of my knowledge, disclosed his computer code, I cannot be entirely what he did to produce his Figures 18 and 19. However, the text of Bromberg Declaration refers generically to precinct "size," which I take to mean, the number of votes cast in the precinct.

[16] These returns are available at `https://recorder.maricopa.gov/media/ArizonaExportByPrecinct_110320.txt` (last accessed December 3, 2020).

Democratic vote share means, Joe Biden's vote share. In Figure 1's right panel, Democratic vote share for the United State Senate race means, Mark Kelly's vote share.

Figure 1: Democratic candidate support and turnout by precinct



**72**    Both panels of Figure 1 have superimposed linear regression lines to ease interpretation. These lines are sloped down, indicating that precincts in Maricopa County with greater voter turnout had lower Biden vote share (left panel) and lower Kelly vote share (right panel).

**73**    The key implication of Figure 1 is the similarly between its two panels. They are, evidently, virtually identical. This suggests that the relationship between turnout and Democratic vote share across Maricopa County precincts reflects established political preference in the county—not vote switching that affected the 2020 presidential contest.

**74**    More evidence to this effect is apparent in Figure 2, which plots Joe Biden and Mark Kelly vote shares against each other. Each point in the figure is again a precinct where the size of each

19

point is proportional to overall precinct turnout.

Figure 2: Joe Biden and Mark Kelly support rates by precinct



**75**     Figure 2 has a dashed 45-degree line superimposed on it.  Points *above* the line connote precincts where Mark Kelly's vote share was greater than Joe Biden's; points *below* the line connote precincts where Joe Biden's vote share was greater than Mark Kelly's; and, points on the line connote precincts where Joe Biden's vote share was equal to Mark Kelly's.

**76**     The points in Figure 2 show that precincts in Maricopa County where Joe Biden did well (upper right of the figure) are also precincts where Mark Kelly did well.  And, precincts in Maricopa County where Joe Biden did less well (lower left) are similarly precincts where Mark Kelly did not do well.  This clear regularity suggests that the relationship noted in the Bromberg Declaration between precinct turnout and Biden vote share is spurious and has nothing to do with voter fraud.  Rather, the distribution of precincts across the county is such that smaller ones (namely, those with lower turnout in the 2020 election) tended to be consistently Democratic.  There is noth-

ing anomalous about this correlation between political preferences and geography and nothing irregular.

# G  Allegations in the Bromberg Declaration of voter fraud beyond Arizona

**77**    Most of claims in the Bromberg Declaration do not directly concern Arizona, instead speaking to alleged voter fraud in Georgia (pp. 4-5), Pennsylvania (pp. 5-6) and Milwaukee, Wisconsin (pp. 6-8).

**78**    The number of fraudulent votes claimed in Bromberg Declaration is extensive. For example, the Declaration claims "that 105,639 fraudulent Biden ballots were added between Wednesday and Thursday of 11/05/2020 in Milwaukee alone" (p. 8). Total turnout in Milwaukee was 315,483 voters,[17] meaning that the Bromberg Declaration asserts that roughly one-third of Milwaukee's ballots were contaminated by fraud. There is nothing remotely close to a result like this in the literature on voter fraud that I have surveyed above.

**79**    None of what follows bears directly on the Bromberg Declaration's discussion of Maricopa County. However, the material below is nonetheless notable insofar as it shows that literally all of the claims in the Declaration about voter fraud—and not simply those concerning Arizona—do not follow from the analysis in the Declaration.

## G.1   A model of voting and voter fraud

**80**    The Bromberg Declaration offers what its author calls two models of candidate vote share. One model assumes that there is no voter fraud (see equation (2) in the Declaration) and the second

---

[17]"SUMMARY REPORT," *City of Milwaukee Election Commission*, December 6, 2020, `https://city.milwaukee.gov/election/ElectionInformation/ElectionResults` (last accessed December 4, 2020).

that there is a form of voter fraud in which a some votes are switched from one candidate to another (see equation (3)). Henceforth I refer to a singular model in the Bromberg Declaration, by which I mean both the no-fraud and fraud-based models mentioned in this paragraph.

**81**     Two key assumptions render the model in the Bromberg Declaration of no use in the study of voter fraud.

## G.2    An arbitrary assumption for the prior probability of fraud

**82**     Key to the technical exposition of the model in Bromberg Declaration is a parameter called $p_F$ that denotes what is called the "prior probability of fraud." Intuitively, this prior probability of fraud is the probability of fraud in a jurisdiction that one would have assumed before (i.e., *prior* to) an election.

**83**     The Bromberg Declaration assumes that $p_F = 0.01$, meaning that there is a one percent chance of vote switching in a jurisdiction (p. 3).

**84**     The Bromberg Declaration provides no explanation, no justification, and no citations for its assumption about the likelihood of fraud. The number 0.01 is simply invented.

**85**     Sometimes scholars must make assumptions in their research. However, it is incumbent on such researchers to explore the consequences of their assumptions and to see if their results depend on a particular assumption or are robust to alternative assumptions. No such robustness checks appear in the Bromberg Declaration. I cannot conduct any robustness checks because, to the best of my knowledge, no computer code associated with the Declaration has been disclosed. Thus, the arbitrariness of the prior fraud parameter in Bromberg Declaration undermines any value that the model could have had.

## G.3    Changes in candidate support among absentee ballots do not constitute

**86**     Underlying the model in Bromberg Declaration is the implicit assumption that there is no correlation between the timing of when a set of ballots was counted in November 2020 and the presidential votes on these ballots.  The model, when it encounters temporal changes in a jurisdiction's presidential candidate support (i.e., ten hours after polls closed on November 3, Joe Biden's support changes from 42 percent to 44 percent) attributes these changes to fraud.

**87**     Intuitively speaking, this is because the model does not allow for the possibility that ballot counting is not completed uniformly across a jurisdiction, like a state. For example, the model rules out (with the exception of fraud) the possibility that ballots counted in the immediate aftermath of an election are different than those counted 24 hours later.

**88**     This assumption is contrary to what is known about contemporary American elections. In particular, Foley (2013) and Foley and Stewart III (2020) document what they call a "blue shift" in which a state's presidential results shift in the days after an election in a Democratic direction. The Bromberg Declaration is written as if the blue shift phenomenon simply does not exist.

**89**     The 2020 election was historic in its heavy use of mail-in ballots.  However, Democrats were more likely to vote via mail than Republicans, and this was known well before November 3.[18]  Give that some states counted absentee ballots in the days after November 3 (in particular Pennsylvania), this feature of the 2020 election certainly exaggerated the blue shift compared to what one would have expected had ballots been case in 2020 like they were in 2016.[19]

**90**     Ignoring the issue regarding the technical assumption about the prior fraud parameter noted above, the results in the Bromberg Declaration about Georgia, Pennsylvania, and Milwaukee, Wis-

---

[18]See "Huge Absentee Vote in Key States Favors Democrats So Far," *The New York Times*, October 10, 2020, available at `https://www.nytimes.com/2020/10/10/us/politics/early-voting-swing-states.html` (last accessed December 4, 2020).

[19]On Pennsylvania, see "Why Pennsylvania is still counting votes after Election Day," *ABCNews*, November 3, 2020, available at `https://abcnews.go.com/Politics/pennsylvania-counting-votes-election-day/story?id=73993649` (last accessed December 4, 2020).

consin are not examples of fraud. They can be easily rationalized by the blue shift.

## G.4    Concluding thoughts about analyses beyond Arizona

**91**      Earlier I noted that the part of Bromberg Declaration that engages states other than Arizona does not bear directly on the claims made in this litigation.  Nonetheless, I have now explained that all the Declaration's claims about voter fraud rest on false assumptions, either an assumption about a "theory" relating precinct size and presidential vote share (no such theory exists) or an assumption that when a ballot is counted is orthogonal to the presidential vote on it (which is known not to be the case).

**92**      None of the claims in Bromberg Declaration about voter fraud—and not simply those concerning Arizona—follow from the arguments made in the Declaration.

# H    Conclusion

**93**      This report evaluates the contention in the Bromberg Declaration that there was voter fraud in Maricopa County, Arizona in the 2020 presidential election.

**94**      The contention relies on a "theory" that does not exist and a misunderstanding of how in-person voting proceeded in Maricopa County county this past November.  Namely, the Bromberg Declaration assumes that voters in the county cast in-person ballots in their precincts (of which there were 744), but in reality they did not, voting in-person in voting centers (of which there were 175).  This misunderstanding of how Maricopa County voters cast ballots is a fatal flaw to the Declaration's analysis of the county, which was already flawed based on its reliance on a non-existent theory.  In short, Bromberg Declaration contains no evidence whatsoever that there were any fraudulent ballots cast in Maricopa County in the 2020 General Election.

24

**95**     The Bromberg Declaration also contains no evidence whatsoever that there were any fraud-ulent ballots cast in Georgia, Pennsylvania, and the Milwaukee, Wisconsin.  Its claims of voter fraud in these locales rest on a faulty assumption that when a ballot is counted has no bearing on the presidential candidate supported on it.  In fact, it is known that ballots counted later in presiden-tial elections tend to be Democratic, and this fact undermines the Bromberg Declaration's analysis of Georgia, Pennsylvania, and Milwaukee, Wisconsin.

# References

Ansolabehere, Stephen, Samantha Luks and Brian F. Schaffner. 2015. "The perils of cherry picking low frequency events in large sample surveys." *Electoral Studies* 40:409–410.

Christensen, Ray and Thomas J. Schultz. 2014. "Identifying Election Fraud Using Orphan and Low Propensity Voters." *American Politics Research* 42(2):311–337.

Cottrell, David, Michael C. Herron and Sean J. Westwood. 2018. "An Exploration of Donald Trump's Allegations of Massive Voter Fraud in the 2016 General Election." *Electoral Studies* 51(1):123–142.

Famighetti, Christopher, Douglas Keith and Myrna Pérez. 2017. "NONCITIZEN VOTING: THE MISSING MILLIONS." Report published by the Brennan Center for Justice at *New York University School of Law*.

Foley, Edward B. 2013. "A big blue shift: Measuring an asymmetrically increasing margin of litigation." *Journal of Law and Politics* 24:501–544.

Foley, Edward B. and Charles Stewart III. 2020. "Explaining the Blue Shift in Election Canvassing." Unpublished working paper.
**URL:** *https://ssrn.com/abstract=3547734*

Goel, Sharad, Marc Meredith, Michael Morse and David Rothschild. 2020. "One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections." *American Political Science Review* 114(2):456–469.

Herron, Michael C. 2019. "Mail-In Absentee Ballot Anomalies in North Carolina's 9th Congressional District." *Election Law Journal* 18(3):191–213.

Huefner, Steven F., Daniel P. Tokaji, Edward B. Foley and Nathan A. Cemenska. 2007. "From Registration to Recounts: The Election Ecosystems of Five Midwestern States." Report published by *Election Law@Moritz*, The Ohio State University, Moritz College of Law.

Levitt, Justin. 2007. "The truth about voter fraud." Report published by the Brennan Center for Justice at *New York University School of Law*.

Levitt, Justin. 2014. "A comprehensive investigation of voter impersonation finds 31 credible incidents out of one billion ballots cast." *Washington Post*, August 6.
**URL:**
*https://www.washingtonpost.com/news/wonk/wp/2014/08/06/a-comprehensive-investigation-of-voter-impersonation-finds-31-credible-incidents-out-of-one-billion-ballots-cast*

Minnite, Lori and David Callahan. 2003. "Securing the Vote: An Analysis of Election Fraud." Report published by Demos.

Minnite, Lorraine. 2007. "Election Day Registration: A Study of Voter Fraud Allegations and Findings on Voter Roll Security." Report published by Demos.
**URL:** *http://www.demos.org/sites/default/files/publications/edr_fraud.pdf*

Minnite, Lorraine C. 2010. *The Myth of Voter Fraud*. Ithaca, NY: Cornell University.

Richman, Jesse T., Gulshan A. Chattha and David C. Earnest. 2014. "Do non-citizens vote in U.S. elections?" *Electoral Studies* 36:149–157.

Rodden, Jonathan. 2019. *Why Cities Lose: The Deep Roots of the Urban-Rural Political Divide*. New York, NY: Basic Books.

# A  *curriculum vitae* of Michael C. Herron

## Michael C. Herron

| | |
|---|---|
| Dartmouth College | Phone: +1 (603) 646-2693 |
| Department of Government | Mobile: +1 (603) 359-9731 |
| 6108 Silsby Hall | Email: michael.c.herron@dartmouth.edu |
| Hanover, NH 03755-3547 | Homepage: http://www.dartmouth.edu/~herron |

### Academic appointments

William Clinton Story Remsen 1943 Professor, Department of Government, Dartmouth College. July 2013–present.

Chair, Program in Quantitative Social Science, Dartmouth College. July 2015–June 2020.

Visiting Scholar, Hertie School of Governance, Berlin, Germany. August 2016–July 2017.

Chair, Program in Mathematics and Social Sciences, Dartmouth College. July 2014– June 2015.

Professor, Department of Government, Dartmouth College. July 2009–June 2013.

Visiting Professor of Applied Methods, Hertie School of Governance, Berlin, Germany. August 2011– August 2012.

Associate Professor, Department of Government, Dartmouth College. July 2004–June 2009.

Visiting Associate Professor, Department of Government, Harvard University. July 2008–January 2009.

Visiting Associate Professor, Wallis Institute of Political Economy, University of Rochester. September 2006–December 2006.

Visiting Assistant Professor, Department of Government, Dartmouth College. July 2003–June 2004.

Assistant Professor, Department of Political Science, Northwestern University. September 1997–June 2004.

Faculty Associate, Institute for Policy Research, Northwestern University. September 2002–June 2004.

### Education

PhD Business (Political Economics), Stanford University, January 1998.
*Dissertation*: Political Uncertainty and the Prices of Financial Assets
*Committee*: David Baron, Darrell Duffie, Douglas Rivers, and Barry Weingast

MS Statistics, Stanford University, June 1995.

MA Political Science, University of Dayton, August 1992.

BS Mathematics and Economics, with University Honors, Carnegie Mellon University, May 1989.

## Fellowships

Elizabeth R. and Robert A. Jeffe 1972 Fellowship, Dartmouth College. September 2010–June 2011.

Fulbright Scholar Program fellowship for research and teaching at the Heidelberg Center for American Studies, Heidelberg University, September 2009 - February 2010 (declined).

Post–doctoral Research Fellow, Center for Basic Research in the Social Sciences, Harvard University. September 2000–August 2001.

## Publications

*Journal articles*

"Postal Delivery Disruptions and the Fragility of Voting by Mail: Lessons from Maine" (with Daniel A. Smith). Forthcoming, *Research & Politics.*

"Voting lines, equal treatment, and early voting check-in times in Florida" (with David Cottrell and Daniel A. Smith). Forthcoming, *State Politics & Policy Quarterly,* and available at `https://journals.sagepub.com/doi/10.1177/1532440020943884`.

"Voting by Mail and Ballot Rejection: Lessons from Florida for Elections in the Age of the Coronavirus" (with Anna Baringer and Daniel A. Smith). *Election Law Journal* 19(3): 289-320. 2020.

"Early voting changes and voter turnout: North Carolina in the 2016 General Election" (with Hannah L. Walker and Daniel A. Smith). *Political Behavior* 41(4): 841-869. 2019.

"Mail-in absentee ballot anomalies in North Carolina's 9th Congressional District." *Election Law Journal* 18(3): 191-213. 2019.

"Relative age effects in American professional football" (with Jack F. Heneghan). *Journal of Quantitative Analysis in Sports* 15(3): 185-202. 2019.

"Mortality, Incarceration, and African-American Disenfranchisement in the Contemporary United States" (with David Cottrell, Javier M. Rodriguez, and Daniel A. Smith). *American Politics Research* 47(2): 195-237. 2019.

"Pedagogical Value of Polling Place Observation By Students" (with 31 co-authors). *PS: Political Science & Politics* 51(4): 831-847. 2018.

"All in the family: German twin finishing times in the 2016 women's Olympic marathon" (with David Cottrell). CHANCE 31(3): 20-28. 2018.

"An Exploration of Donald Trump's Allegations of Massive Voter Fraud in the 2016 General Election" (with David Cottrell and Sean J. Westwood). *Electoral Studies* 51(1): 123-142. 2018.

"Student Sorting and Implications for Grade Inflation (with Zachary D. Markovich). *Rationality and Society* 29(3): 355-386. 2017.

"Race, *Shelby County,* and the Voter Information Verification Act in North Carolina" (with Daniel A. Smith). *Florida State University Law Review* 43: 465-506. 2016.

"Precinct Resources and Voter Wait Times" (with Daniel A. Smith). *Electoral Studies* 42(2): 249-263. 2016.

"A Careful Look at Modern Case Selection Methods" (with Kevin M. Quinn). *Sociological Methods & Research* 45(3): 458-492. 2016.

"Precinct Closing and Wait Times in Florida during the 2012 General Election" (with Daniel A. Smith). *Election Law Journal* 14(3): 220-238. 2015.

"Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election" (with Daniel A. Smith). *Political Research Quarterly* 67(3): 646-665. 2014.

"The Effects of House Bill 1355 on Voter Registration in Florida" (with Daniel A. Smith). *State Politics & Policy Quarterly* 13(3): 279-305. 2013.

"Blacks, Hispanics, and Whites: A Study of Race-based Residual Vote Rates in Chicago." *American Politics Research* 41(2): 203-243. 2013.

"Alvin Greene? Who? How did he win the United States Senate nomination in South Carolina?" (with Joseph Bafumi, Seth J. Hill, and Jeffrey B. Lewis). *Election Law Journal* 11(4): 358-379. 2012.

"Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355" (with Daniel A. Smith). *Election Law Journal* 11(3): 331-347. 2012.

"Leapfrog Representation and Extremism: A Study of American Voters and their Members in Congress" (with Joseph Bafumi). *American Political Science Review* 104(3): 519-542. 2010.

"Economic Crisis, Iraq, and Race: A Study of the 2008 Presidential Election" (with Seth J. Hill and Jeffrey B. Lewis). *Election Law Journal* 9(1): 41-62. 2010

"Prejudice, Black Threat, and the Racist Voter in the 2008 Presidential Election" (with Joseph Bafumi). *Journal of Political Marketing* 8(4): 334-348. 2009.

"Voting Technology and the 2008 New Hampshire Primary" (with Walter R. Mebane, Jr., and Jonathan N. Wand). *William & Mary Bill of Rights Journal* 17(2): 351-374. 2008.

"Ballot Formats, Touchscreens, and Undervotes: A Study of the 2006 Midterm Elections in Florida" (with Laurin Frisina, James Honaker, and Jeffrey B. Lewis). *Election Law Journal* 7(1): 25-47. 2008.

"Gerrymanders and Theories of Lawmaking: A Study of Legislative Redistricting in Illinois" (with Alan E. Wiseman). *Journal of Politics* 70(1): 151-167. 2008.

"Estimating the Effect of Redistricting on Minority Substantive Representation" (with David Epstein, Sharyn O'Halloran, and David Park). *Journal of Law, Economics, and Organization* 23(2): 499-518. 2007.

"Did Ralph Nader Spoil Al Gore's Presidential Bid? A Ballot-Level Study of Green and Reform Party Voters in the 2000 Presidential Election" (with Jeffrey B. Lewis). *Quarterly Journal of Political Science* 2(3): 205-226. 2007.

"Assessing Partisan Bias in Voting Technology: The Case of the 2004 New Hampshire Recount" (with Jonathan N. Wand). *Electoral Studies* 26(2): 247-261. 2007.

"Term Limits and Pork" (with Kenneth W. Shotts). *Legislative Studies Quarterly* 31(3): 383-404. 2006.

"Black Candidates and Black Voters: Assessing the Impact of Candidate Race on Uncounted Vote Rates" (with Jasjeet S. Sekhon). *Journal of Politics* 67(1): 154–177. 2005.

"Government Redistribution in the Shadow of Legislative Elections: A Study of the Illinois Member Initiatives Grant Program" (with Brett A. Theodos). *Legislative Studies Quarterly* 24(2): 287–312. 2004.

"Studying Dynamics in Legislator Ideal Points: Scale Matters." *Political Analysis* 12(2): 182–190. 2004.

"Logical Inconsistency in EI-based Second Stage Regressions" (with Kenneth W. Shotts). *American Journal of Political Science* 48(1): 172–183. 2004.

"Overvoting and Representation: An examination of overvoted presidential ballots in Broward and Miami-Dade Counties" (with Jasjeet S. Sekhon). *Electoral Studies* 22: 21–47. 2003.

"Using Ecological Inference Point Estimates as Dependent Variables in Second Stage Linear Regressions" (with Kenneth W. Shotts). *Political Analysis* 11(1): 44–64. 2003.

"Cross-contamination in EI-R" (with Kenneth W. Shotts). *Political Analysis* 11(1): 77–85. 2003.

"A Consensus on Second Stage Analyses in Ecological Inference Models" (with Christopher Adolph, Gary King, and Kenneth W. Shotts). *Political Analysis* 11(1): 86–94. 2003.

"The Butterfly Did It: The Aberrant Vote for Buchanan in Palm Beach County, Florida" (with Jonathan N. Wand, Kenneth W. Shotts, Jasjeet S. Sekhon, Walter R. Mebane, Jr., and Henry E. Brady). *American Political Science Review* 95(4): 793–810. 2001.

"Interest Group Ratings and Regression Inconsistency." *Political Analysis* 9(3): 260–274. 2001.

"Leadership and Pandering: A Theory of Executive Policymaking" (with Brandice Canes–Wrone and Kenneth W. Shotts). *American Journal of Political Science* 45(3): 532–550. 2001.

"Law and Data: The Butterfly Ballot Episode" (with Henry E. Brady, Walter R. Mebane, Jr., Jasjeet S. Sekhon, Kenneth W. Shotts, and Jonathan N. Wand). *PS: Political Science & Politics* 34(1): 59–69. 2001.

"Cutpoint–Adjusted Interest Group Ratings." *Political Analysis* 8(4): 346–366. 2000.

"Estimating the Economic Impact of Political Party Competition in the 1992 British Election." *American Journal of Political Science* 44(2): 326–337. 2000.

"Artificial Extremism in Interest Group Ratings and the Preferences versus Party Debate." *Legislative Studies Quarterly* 24(4): 525–542. 1999.

"Post–Estimation Uncertainty in Limited Dependent Variable Models." *Political Analysis* 8(1): 83–98. 1999.

"Measurement of Political Effects in the United States Economy: A Study of the 1992 Presidential Election" (with James Lavin, Donald Cram, and Jay Silver). *Economics & Politics* 11(1): 51–81. 1999.

"The Influence of Family Regulation, Connection, and Psychological Autonomy on Six Measures of Adolescent Functions" (with Melissa R. Herman, Sanford M. Dornbusch, and Jerald R. Herting). *Journal of Adolescent Research* 12(1): 34–67. 1997.

## Book chapters

"Wait Times and Voter Confidence: A Study of the 2014 General Election in Miami-Dade County" (with Daniel A. Smith, Wendy Serra, and Joseph Bafumi). In *Races, Reforms, & Policy: Implications of the 2014 Midterm Elections*, Christopher J. Galdieri, Tauna S. Sisco, and Jennifer C. Lucas, eds. Akron, OH: University of Akron Press. 2017.

"A Dynamic Model of Multidimensional Collective Choice" (with David P. Baron). In *Computational Models in Political Economy*, Ken Kollman, John H. Miller, and Scott E. Page, eds. Cambridge, MA: The MIT Press. 2003.

"Law and Data: The Butterfly Ballot Episode" (with Henry E. Brady, Walter R. Mebane Jr., Jasjeet Singh Sekhon, Kenneth W. Shotts, and Jonathan Wand). In *The Longest Night: Polemics and Perspectives on Election 2000*, Arthur J. Jacobson and Michel Rosenfeld, eds. Berkeley: University of California Press. 2002.

## Book reviews

*The Timeline of Presidential Elections: How Campaigns Do (and Do Not) Matter*, Robert S. Erikson and Christopher Wlezien. *Political Science Quarterly* 128(3): 552-553. 2013.

*Voting Technology: The Not-So-Simple Act of Casting a Ballot*, Paul S. Herrnson, Richard G. Niemi, Michael J. Hanmer, Benjamin B. Bederson, and Frederick C. Conrad. *Review of Policy Research* 25(4): 379-380. 2008.

## Other publications

"In two political battlegrounds, thousands of mail-in ballots are on the verge of being rejected" (with Daniel A. Smith). *The Conversation*, October 23, 2020. Available at `https://theconversation.com/in-two-political-battlegrounds-thousands-of-mail-in-ballots-are-on-the-verge-of-being-rejected-148616`.

"Rejected mail ballots pile up in Florida" (with Daniel A. Smith). *Tampa Bay Times*, October 16, 2020. Available at `https://www.tampabay.com/opinion/2020/10/16/rejected-mail-ballots-pile-up-in-florida-column`.

"Minor postal delays could disenfranchise thousands of Florida vote-by-mail voters" (with Daniel A. Smith). *Tampa Bay Times*, August 14, 2020. Available at `https://www.tampabay.com/opinion/2020/08/14/minor-postal-delays-could-disenfranchise-thousands-of-florida-vote-by-mail-voters-column`.

"Want to know how many people have the coronavirus? Test randomly" (with Daniel N. Rockmore). *The Conversation*, April 13, 2020. Available at `https://theconversation.com/want-to-know-how-many-people-have-the-coronavirus-test-randomly-135784`.

"If more states start using Ohio's system, how many voters will be purged?" (with Daniel A. Smith). *The Washington Post*, Monkey Cage, June 17, 2018.

"Do we have a right not to vote? The Supreme Court suggests we don't" (with Daniel A. Smith). *New York Daily News*, June 12, 2018.

"Nearly 4 million black voters are missing. This is why" (with David Cottrell, Javier M. Rodriguez, and Daniel A. Smith). *The Washington Post*, Monkey Cage, April 11, 2018.

"We can't find any evidence of voting fraud in New Hampshire" (with David Cottrell and Sean Westwood). *The Washington Post*, Monkey Cage, February 28, 2017.

"We checked Trump's allegations of voter fraud. We found no evidence at all" (with David Cottrell and Sean Westwood). *The Washington Post*, Monkey Cage, December 2, 2016.

"High ballot rejection rates should worry Florida voters" (with Daniel A. Smith). *Tampa Bay Times*, October 28, 2012.

"Logistic Regression." *The Encyclopedia of Political Science*, George Thomas Kurian, James E. Alt, Simone Chambers, Geoffrey Garrett, Margaret Levi, and Paula D. McClain, eds., Washington, D.C.: CQ Press. 2010.

"Using XEmacs Macros to Process ASCII Data Files." *The Political Methodologist* 13(2): 13–18. 2005.

"Ohio 2004 Election: Turnout, Residual Votes and Votes in Precincts and Wards" (with Walter R. Mebane, Jr.), in "Democracy At Risk: The 2004 Election in Ohio," report published by the Democratic National Committee. 2005.

"Poisson Regression." *The Encyclopedia of Social Science Research Methods*, Alan Bryman, Michael Lewis-Beck, and Tim Futing Liao, eds. Thousand Oaks, CA: Sage Publications, 2003.

"Pork barrel race to the bottom" (with Brett A. Theodos). *Illinois Issues* 29(2): 22–23. 2003.

"Teaching Introductory Probability Theory." *The Political Methodologist* 10(2): 2–4. 2002.

"Ballot cost Gore thousands of votes" (with Henry E. Brady and Jonathan N. Wand). *The San Diego Union–Tribune*, p. G3, November 19, 2000.

## Work in progress

"Residual votes in the 2020 election in Georgia" (with David Cottrell, Felix E. Herron, and Daniel A. Smith).

"Vote-by-mail ballot rejection and experience with mail-in voting" (with David Cottrell and Daniel A. Smith).

"Did ballot design oust an incumbent senator? A study of the 2018 midterm election in Florida" (with Michael D. Martinez and Daniel A. Smith).

## Awards

Best Paper Award, State Politics and Policy Section, 2013 Annual Meeting of the American Political Science Association. *Getting Your Souls to the Polls: The Racial Impact of Reducing Early In-Person Voting in Florida* (with Daniel A. Smith).

## Grants

Committee for Scholarly Innovation and Advancement Awards, Dartmouth College, February, 2014. Project title: "The Dynamics of Voting Lines in Miami-Dade County." Financial support: $32,000.

The Rockefeller Center for Public Policy and the Social Sciences, Dartmouth College, May, 2006. Project title: "Large Scale Survey of Americans in Multiple Congressional Districts." Financial support: $8,500.

National Science Foundation, SES-041849, July, 2004. Project title: "A Ballot-Level Study of Intentional and Unintentional Abstention in Presidential Election Voting." Financial support: $65,749.

Nelson A. Rockefeller Center for the Social Sciences, Dartmouth College, January, 2004. Project title: "Intentional Invalid Votes in Leon County, Florida." Financial support: $1,115.

American Enterprise Institute, August, 1999. Project title: "Tenure in Office and Congressional Voting" (with Kenneth W. Shotts). Financial support: $182,500.

University Research Grants Committee, Northwestern University, February, 1999. Project Title: "Representation, Policy Uncertainty, and Divided Government." Financial support: $4,087.

Stanford University Graduate School of Business, 1997–1998 Academic Year. Dissertation Research Grant.

## Recent conference presentations

"Ballot design, voter intentions, and representation: A study of the 2018 midterm election in Florida," 2019 Annual Meeting of the American Political Science Association, Washington, DC.

"Ballot design, voter intentions, and representation: A study of the 2018 midterm election in Florida," Election Sciences, Reform, and Administration conference, 2019, University of Pennsylvania.

"Did ballot design oust an incumbent senator? A study of the 2018 midterm election in Florida," Congressional Elections & the Presidency: Politics in 2018, March 30, 2019, Saint Anselm College, Manchester NH.

"Estimating the Differential Effects of Purging Inactive Registered Voters," 2018 Annual Meeting of the American Political Science Association, Boston MA.

"Estimating the Differential Effects of Purging Inactive Registered Voters," Election Sciences, Reform, and Administration conference, 2018, University of Wisconsin-Madison.

Keynote address, "Mortality, Incarceration, and African-American Disenfranchisement," *Balancing the Scales: The United States in an Age of Inequality*, November 11, 2016, John F. Kennedy Institute, Freie Universität Berlin.

"Missing Black Men and Representation in American Political Institutions," 2016 Annual Meeting of the Midwest Political Science Association, Chicago, IL.

## Invited seminars

| | |
|---|---|
| University of Iowa, 1999 | University of Mannheim, 2011 |
| Boston University, 2000 | University of Heidelberg, 2011 |
| Dartmouth College, 2000 | University of Passau, 2012 |
| Harvard University, 2000 | University of Göttingen, 2012 |
| University of Minnesota, 2000 | Freie Universität Berlin, 2012 |
| University of Rochester, 2000 | Laval University, 2012 |
| University of Wisconsin, Madison, 2000 | University of Montreal, 2012 |
| Yale University, 2000 | Middlebury College, 2013 |
| Columbia University, 2001 | University of Illinois, Champaign, 2013 |
| University of California, Berkeley, 2002 | University of Illinois, Chicago, 2013 |
| University of Illinois, 2002 | University of Wisconsin, Madison, 2013 |
| Brown University, 2003 | Yale University, 2014 |
| Temple University, 2003 | University of Virginia, 2015 |
| University of Chicago, 2003 | University of California, San Diego, 2015 |
| New York University, 2004 | American University, 2015 |
| Princeton University, 2004 | Massachusetts Institute of Technology, 2015 |
| University of Michigan, 2005 | Princeton University, 2015 |
| George Washington University, 2006 | University of California, Los Angeles, 2016 |
| Emory University, 2006 | The Ohio State University, 2016 |
| Harvard University, 2007 | Freie Universität Berlin, 2016 |
| Loyola Law School, 2007 | Deutsch-Amerikanisches Institut, Nürnberg, 2017 |
| Columbia University, 2007 | Universität Bonn, 2018 |
| University of Chicago, 2007 | Freie Universität Berlin, 2018 |
| Yale University, 2007 | Northwestern University, 2018 |
| Stanford University, 2008 | University of Pittsburgh, 2019 |
| Columbia University, 2008 | University of Salzburg, 2019 |
| Northwestern University, 2008 | Universität Bonn, 2019 |
| Princeton University, 2008 | Freie Universität Berlin, 2019 |
| Duke University, 2009 | Humboldt University, 2019 |
| Hertie School of Governance, 2010 | University of North Carolina, Charlotte, 2019 |
| Emory University, 2010 | |

## Professional activities

Division Chair, Representation and Electoral Systems, 2017 Annual Meeting of the Midwest Political Science Association.

Associate Editor, *Research & Politics*. November, 2016–present.

Editorial Board, *American Politics Research*, September, 2015–present.

Editorial Board, *Political Analysis*, January, 2010–present.

Editorial Board, *USENIX Journal of Election Technology and Systems*, March 2013–June 2016.

Editorial Board, *American Political Science Review*, 2010–2012.

Editorial Board, *American Journal of Political Science*, 2006–2009.

"Race, Voting Procedures, and New Developments in Voting Rights," panel organized for the 2013 Annual Meeting of the Midwest Political Science Association.

Division Chair, Formal Theory, 2007 Annual Meeting of the American Political Science Association.

Co-editor, *The Political Methodologist*, Fall 2004–Spring 2006.

Publications Committee, Society for Political Methodology, 2005–2006, 2015–present.

## Dartmouth College activities

Chair, American Politics Search Committee, Department of Government, August 2018–March 2019.

Chair, Committee on Priorities, July 2015–June 2016.

Committee on Priorities, July 2013–June 2015, Fall 2019–present.

American politics search committee, Department of Government, August 2014–December 2014.

Research Computing Director search committee, October 2013–October 2014.

Senior Search Committee, Department of Government, 2013.

Research Computing Advisory Committee, Spring 2013.

Chair, American Politics Search Committee, Department of Government, 2012-2013.

Recruitment Planning Committee, Department of Government, 2010 and 2012-2013.

Committee on Standards, 2008-2010.

Task Force on Collaboration and Social Software, 2007-2008.

Biostatistics search committee, Dartmouth Medical School, 2006-2007.

Research Computing Oversight Committee, 2006.

Council on Computing, 2005-2007.

Clement Chair search committee, Department of Government, 2005-2006.

## Northwestern University activities

Program Committee, Mathematical Methods in the Social Sciences, 2001-2002.

American Politics Search Committee, Department of Political Science, 2000–2001, 2001-2002.

Formal Theory Search Committee, Department of Political Science, 1997–1998.

## Teaching interests

Statistical methods: introductory and applied statistics, research design, computing in R.

American politics: representation, election irregularities, election administration.

Political economy: game theory.

Michael C. Herron                                                    10

## Reviewer for

| | |
|---|---|
| *American Journal of Political Science* | *Political Behavior* |
| *American Political Science Review* | *Political Research Quarterly* |
| *American Politics Quarterly* | *Political Science Quarterly* |
| *American Politics Review* | *Political Science Research and Methods* |
| *British Journal of Political Science* | *Political Studies* |
| Cambridge University Press | *Politics & Gender* |
| Chapman & Hall | *Politics, Groups, and Identities* |
| *Congress & the Presidency* | *Polity* |
| *Du Bois Review* | Prentice Hall Higher Education Group |
| *Economics & Politics* | *Proceedings of the National Academy of Sciences* |
| *Election Law Journal* | *Public Administration* |
| *Electoral Studies* | *Public Choice* |
| *Emerging Markets Finance & Trade* | *Public Opinion Quarterly* |
| *Interest Groups & Advocacy* | *PS: Political Science and Politics* |
| *Int'l Journal of Environmental Research and Public Health* | *Quarterly Journal of Economics* |
| John Wiley & Sons, Inc. | *Quarterly Journal of Political Science* |
| *Journal of Legal Studies* | *Race and Social Problems* |
| *Journal of Money, Credit and Banking* | *Science Advances* |
| *Journal of Politics* | *The Social Science Journal* |
| *Journal of Public Economics* | *Social Science Quarterly* |
| *Journal of Race, Ethnicity, and Politics* | *Sociological Methods & Research* |
| *Journal of Theoretical Politics* | *The Sociological Quarterly* |
| *Journal of Women, Politics & Policy* | Springer |
| *Legislative Studies Quarterly* | *State Politics & Policy Quarterly* |
| The National Science Foundation | Time-Sharing Experiments for the Social Sciences |
| *Nonprofit Policy Forum* | The University of Michigan Press |
| *Perspectives on Politics* | W. W. Norton & Company |
| *Policy Studies Journal* | *World Politics* |
| *Political Analysis* | |

## Foreign language

German: C1 (telc Prüfung, Ausstellung July 27, 2017).

## Other employment

Intelligence Analyst and Military Officer, United States Air Force, Foreign Technology Division, Wright–Patterson Air Force Base, 1989–1992.

Last updated: December 4, 2020
http://www.dartmouth.edu/~herron/cv.pdf

# B   Maricopa County description of voting center

**96**     This appendix displays part of the Maricopa County elections department page that explains to eligible voters that they can vote in any voting center in the county. The source of this image is `http://web.archive.org/web/20201104002036/https://recorder.maricopa.gov/pollingplace/` (last accessed December 4, 2020).

<center>*** The remainder of this page intentionally left blank ***</center>



MENU

English Content (default.aspx)
Contenido Español (default_es.aspx)

# Where Do I Vote?

Election Day is Tuesday, November 3. There are **no** assigned locations. Maricopa County voters can drop off an early ballot or vote in person at any Vote Center. Visit BeBallotReady.Vote (http://web.archive.org/web/20201104002036/http://beballotready.vote/) to find out if you're registered, what's on your ballot and more. All Vote Centers in the list below are open from 6 a.m. – 7 p.m. on Election Day. If you have any questions please call us at (602) 506-1511.