UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Tyler Bowyer, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CV-20-2321-PHX-DJH |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | December 8, 2020 |
| Doug Ducey, in his official | ) | 9:21 a.m. |
| capacity as Governor of the | ) | |
| State of Arizona, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

VIDEO TELECONFERENCE - ORAL ARGUMENTS


Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2     For the Plaintiffs:

 3
               Sidney Powell PC
 4             By: JULIA Z. HALLER, ESQ.
                   EMILY P. NEWMAN, ESQ.
 5             2911 Turtle Creek Blvd., Suite 300
               Dallas, TX  75219
 6

 7
               Kolodin Law Group
 8             By: ALEXANDER MICHAEL KOLODIN, ESQ.
                   CHRISTOPHER VISKOVIC, ESQ.
 9             3443 North Central Avenue, Suite 911
               Phoenix, AZ  85012
10

11     For the Defendant Governor Ducey:

12             Snell & Wilmer
               By: BRETT WILLIAM JOHNSON, ESQ.
13                 COLIN PATRICK AHLER, ESQ.
               400 East Van Buren
14             Phoenix, AZ  85004

15

16             Office of the Governor
               By: ANNI LORI FOSTER, ESQ.
17             1700 West Washington Street
               Phoenix, AZ  85007
18

19

20     For the Defendant Secretary of State Hobbs:

21             Coppersmith Brockelman
               By: ROOPALI H. DESAI, ESQ.
22             2800 North Central Avenue, Suite 1900
               Phoenix, AZ  85004
23

24             Susman Godfrey
               By: JUSTIN A. NELSON, ESQ.
25             1000 Louisiana, Suite 5100
               Houston, TX  77002
```

UNITED STATES DISTRICT COURT

```
 1
 2              Susman Godfrey
                By: STEPHEN EDWARD MORRISSEY, ESQ.
 3              1201 3rd Avenue, Suite 3800
                Seattle, WA  98101
 4
 5              Susman Godfrey
                By: DAVIDA BROOK, ESQ.
 6              1901 Avenue of the Stars, Suite 950
                Los Angeles, CA  90067
 7
 8              Susman Godfrey
                By: STEPHEN LEE SHACKELFORD, JR., ESQ.
 9              1301 Avenue of the Americas, 32nd Floor
                New York, NY  10019
10
11
12   For the Intervenors Adrian Fontes and Maricopa County:
13              Maricopa County Attorney Civil Services Division
                BY: THOMAS LIDDY, ESQ.
14                  JOSEPH EUGENE LARUE, ESQ.
                    EMILY MAE CRAIGER, ESQ.
15                  JOSEPH I. VIGIL, ESQ.
                225 West Madison Street
16              PHOENIX, AZ  85003
17
18
19
20
21
22
23
24
25
```

```
 1                     P R O C E E D I N G S

 2          THE CLERK:  CV-20-02321, Tyler Bowyer versus Doug

 3   Ducey and others, on for oral argument.

 4          Counsel, please announce you presence for the record,

 5   with plaintiffs' counsel going first.

 6          MS. HALLER:  Julia Haller for plaintiffs' counsel, and

 7   I have Alex Kolodin, our local counsel, I'm sorry, Alex

 8   Kolodin, our local counsel, with us.  And I have Emily Newman

 9   on -- present on the line, but does not plan to speak.

10          THE COURT:  All right.  Good morning.

11          MS. HALLER:  Good morning, Your Honor.

12          MR. NELSON:  Good morning.  Justin Nelson from Susman

13   Godfrey, representing the Secretary of the State Hobbs.

14          With me I have Pali Desai, from Coppersmith

15   Brockelman, Davida Brook, Stephen Shackelford, and Stephen

16   Morrissey from Susman Godfrey, all representing the Secretary.

17          In addition, for Governor Ducey, Brett Johnson and

18   Colin Ahler from Snell & Wilmer.  And for Maricopa County and

19   the Maricopa County Attorney, Emily Craiger, Thomas Liddy,

20   Joseph LaRue, and Joseph Vigil.

21          THE COURT:  I'm sorry, I lost you with the last name?

22          MR. NELSON:  Joseph Vigil was the last name I said for

23   Maricopa County.

24          THE COURT:  All right.  Thank you.

25          All right.  The Court has already issued a minute
```

1    entry directing the parties as to how much time each of you

2    have with respect to oral argument on the motion to dismiss,

3    and we can certainly give you an additional allotment of time,

4    if I have questions that take some of that time up.

5         I don't necessarily think all of the time needs to be

6    taken, because this matter is fully briefed.  I have read

7    everything that has been submitted so far.  And so if there are

8    critical points that you wish to make, please do so.

9         And I guess with respect to -- Ms. Haller, with

10   respect to plaintiffs, I want to just at the outset ask you to,

11   number one, clarify what, if any, significance today's date has

12   on your complaint as the safe harbor date, December 8th.

13        Secondly, I want to understand, because this was a

14   question that I asked at the status conference last week, I

15   want to understand the specific status of the named plaintiffs.

16        We were told that -- and we were told in the

17   responsive briefing that the distinction in the named

18   plaintiffs were that some were electors, others were registered

19   voters.

20        The complaint isn't clear with respect to whom is who,

21   and so I would like you to address that so that I have an idea

22   of who these individuals are.

23        And then thirdly, it is critical for you to address

24   the supplemental authority that was filed yesterday with

25   respect to Judge Warner's ruling in the state litigation.

1          So if you can touch upon those three things, in

2   addition to what oral presentment you are going to make, then

3   that would be for my benefit.  And so we can proceed now.

4          MS. HALLER:  Yes, Your Honor.

5          As to your first question on this safe harbor date,

6   yes, the date is significant.  It is the date all state

7   litigation should be at least filed for -- if not a better

8   word.  But it looks like all state litigation needs to be

9   handled by this date.  3 U.S.C. 5 makes that clear.

10          We also have an order from an Eastern District of

11   Wisconsin court where she laid out citations to that point, and

12   I did cite that or we did cite that order in our reply at --

13   bear with me, Your Honor.

14          We cited to that in our reply, the court's order from

15   Wisconsin, where she -- that court set forth that December 8th,

16   six days prior to the date of the college of electors scheduled

17   to meet.

18          And that safe harbor deadline is pursuant to 3 U.S.C.

19   5.  That statute provides that if a state has provided by laws

20   enacted prior to the date fixed for the appointment of the

21   electors, for its final determination of any controversy or

22   contest concerning the appointment of all or for any of the

23   electors of such state.

24          And that final determination has been made at least

25   six days before the time fixed for the meeting of electors.

1   That determination said -- that court, if it is made under the

2   state's law at least six days prior to the date -- to that

3   date -- shall be conclusive, and shall govern in the counting

4   of the electoral votes.

5           And so she -- her conclusion is, or that court's

6   conclusion is, it appears therefore that December 8th is a

7   critical date for resolution of any state court litigation

8   involving an aggrieved candidate who is contesting the outcome

9   of an election.

10          And that's at case 20-CV-1771 from the Eastern

11  District of Wisconsin on December 4th.  And we cited to it at

12  our reply brief at page 11.

13          THE COURT:  Thank you.

14          MS. HALLER:  As to Your Honor's second question -- or

15  should I wait?

16          THE COURT:  No, go forward, please.

17          MS. HALLER:  The plaintiffs are all presidential

18  electors that we have in this case.  So there are -- I am not

19  aware of any plaintiffs -- I know none of the plaintiffs are

20  simply -- I don't mean to say "simply," but aren't candidates.

21          MR. KOLODIN:  Your Honor, if I may clarify?  This is

22  Alexander Kolodin.  The plaintiffs who are presidential

23  electors are Mr. Kern, Mr. Safsten, Mr. Hoffman, Mr. Lamon,

24  Ms. Ward, Ms. Pellegrino, Mr. Ward, Ms. Cottle, Mr. Montgomery,

25  Mr. Moorhead and Mr. Bowyer.

1          I believe the remaining plaintiffs are county party

2     chairs to the Republican Party.  So we have President Trump's

3     full slate of presidential electors as plaintiffs in this

4     matter.

5          THE COURT:  Okay, thank you.

6          Ms. Haller, go forward.

7          MS. HALLER:  And as for the state litigation and the

8     status of it, as we -- to the extent the supplemental authority

9     cites to the Wood case, I think there's a misunderstanding of

10    what happened in the Wood litigation.

11         The Wood litigation was based on a voter, not a

12    candidate.  And what the court held in that litigation was that

13    there was no particular -- excuse me, particularized injury.

14         THE COURT:  Ms. Haller, I'm talking about the Arizona

15    State case, Ward v. -- yes, the Ward case.

16         MS. HALLER:  Yes, Your Honor.

17         THE COURT:  And the supplemental authority from

18    yesterday.

19         MS. HALLER:  So in the Ward case, on -- the plaintiffs

20    do not have privity even, or not the same parties as the

21    plaintiffs in our case, with the exception of the one plaintiff

22    Kelli Ward.

23         Kelli Ward's case yesterday went up to the Supreme

24    Court, I believe.  And in that case, there's -- we don't have

25    the identical issues, very simply, Your Honor.  The elements

1    under estoppel require that the disputed issue is identical.

2    That there is a resolution of the previous action.  That it was

3    fully litigated, and that the parties whom you seek to enforce

4    estoppel or issue jurisprudence against had a full and fair

5    opportunity to litigate.

6           We have, of course, 12 of 13 plaintiffs who have not

7    had that opportunity.  The one plaintiff who is litigating her

8    case is not litigating on the same issues.  While there are

9    some similar overlap in certain accounts, this case is based on

10   our suit against a governor and a secretary of state.

11          And why that distinction is so critical is the

12   governor -- we are seeking relief to decertify the election, to

13   invalidate the election, based on the governor's certification

14   and the secretary of state's role in that process.

15          That is very different from the contest statute,

16   pursuant to which plaintiff Ward in that case is seeking

17   relief.

18          She is seeking relief against very different parties,

19   making a different claim.  And, yes, she has allegations of

20   fraud, but the allegations of fraud we are presenting here

21   against the governor and the secretary of state are based on

22   concrete evidence of widespread voter fraud.

23          And the allegations in the complaint, for example, as

24   we pointed out in our reply, our complaint is over 100 pages,

25   plaintiff Kelli Ward's complaint is, I believe, under 20 pages,

1    and that's only to make a very rough showing, a very plain

2    showing, Your Honor, that they are very different allegations.

3             She does make certain fraud and constitutional claims,

4    but not against the governor, not against the secretary of

5    state, and not based on the certification and the widespread

6    fraud based on Dominion, based on the statistical evidence, in

7    addition to the individual accounts that we are put -- setting

8    forth.

9             THE COURT:  I guess the question that I have really

10   focuses on, for example, count two of your complaint related to

11   the 1983 claims include paragraphs related to inability to

12   actually observe or meaningfully observe the process and

13   handling.

14            I'm looking at specifically paragraphs 118 and 120 of

15   the complaint.  And in my view -- well, from what I understand,

16   Judge Warner threw those particular allegations out.

17            And my concern is that it is a generalized complaint

18   related to observation and access.  And so it's based on the

19   same sort of argument and evidence, isn't it?  I mean, how can

20   it be any different?

21            And certainly, at least with respect to this

22   litigation, if one of your named plaintiffs, Ms. Ward, filed

23   her litigation in the state court, it seemed -- and she had

24   evidence of that, it seems to me that those particular claims

25   are late filed here then.

1          MS. HALLER:  First of all, Your Honor, addressing your

2     last question first, the late filing isn't -- under Arizona

3     State Law 16 -- I have the citation.  Your Honor, 16-927, I

4     believe, under the contest statute, I shall say, under the

5     contest statute you filed your certificate -- you file your

6     claim within five days of the certification by the state, by

7     the governor or by the secretary of state, and you file that

8     after certification.

9          So under state -- if you were to bring this -- base

10    this case on state law, we are timely because we filed on

11    December 2nd.  The State certified on November 30th.  So we

12    were well within the five days after the certification of the

13    election.  There's nothing late.

14          There's been a number of cases dismissed exactly

15    because they were brought before certification.

16          As far as Ward's case goes, as far as the element Your

17    Honor is pointing to at paragraph 118, observation is one fact

18    that is part of a pattern of fraud that we are showing to show

19    widespread fraud.  In the same vein as Rule 404(b) operates,

20    where you have a pattern, showing an absence of mistake.

21          The fact is observation or the failure to be allowed

22    to substantively observe how the election occurred is one piece

23    of a pattern of evidence that we are bringing forward.  To us,

24    that is not a fundamental element to the entire -- to the

25    elements of the fraud that we are bringing.  That is one fact

1          included in our complaint, of course, among 118 other facts.

2                  But the fact is the failure to observe precedes

3          widespread fraud that we can show.  So we can show that the

4          actual fraud happened on election night, and that goes to the

5          point that we are not late.  Because when we learned of the

6          actual fraud in this case, is based on the spikes in the

7          election data feed on the night of November 3rd.

8                  And in our expert reports, we show that injections of

9          data happened at a certain point in time on November 3rd.  And

10         it's that reporting data feed that relates to our claim that

11         there is an algorithm that Dominion Voting Systems uses.

12                 And in that algorithm, the parameters of which only

13         Dominion Voting Systems and Scytl know, there is the algorithm

14         that presents.  And by their own user manual, they admit that

15         they use this algorithm to tabulate votes.

16                 And our claim is that they send this information to

17         Scytl, which is based in their servers offshore, not in this

18         country.  And when they send that information for tallying,

19         they then redistribute the votes and the algorithm is applied,

20         and they determine what are valid votes and what are not valid

21         votes in this transmission between their servers offshore from

22         this country.

23                 That violates election law on many levels because we

24         have law related to transparency, one ballot per person.  When

25         this algorithm occurs, it's based on points.

1        In the points that occur, what you have is votes

2   broken down from one vote to actually decimal points, which

3   reflects again the algorithm and spikes and the evidence that

4   we will set forth on the proof of how this algorithm operates

5   to make the determination and how the point in time is very

6   significant to that injection of votes.

7        The pattern --

8        THE COURT:  Well, let me just give you a little bit of

9   guidance here, Ms. Haller.  I know I gave you 20 minutes for

10  your argument.  You've answered a number of my questions.  I am

11  going to give you an additional five minutes.

12       So you have about 10 more minutes to argue your

13  position with respect to the motion to dismiss, and so I will

14  let you use the remainder of your time however you choose.  But

15  it seems to me you are trying to get into the merits of the

16  complaint, and I think at this juncture, I would like to

17  understand why your complaint should survive.

18       MS. HALLER:  Yes, Your Honor.  So are you asking me to

19  address why the complaint should survive?

20       THE COURT:  Well, if you would like to respond to the

21  motion to dismiss in whatever way you wish.

22       MS. HALLER:  Yes, Your Honor.  Okay.

23       So in a nutshell, the motion to dismiss are joined

24  with the motion to not allow -- you know, oppose the

25  preliminary injunction.  And we first submit that electors have

1    standing.  We want to point out that Bognet or Bognet, which

2    was cited to by defendant Hobbs specifically, but in that case,

3    they cite to the Third Circuit opinion, which I think is

4    significantly distinguishable from our case, and from Carson,

5    the Eighth Circuit Case that we cited to.

6          But we would point out that in Bognet, the Court found

7    that they were private citizens.  The one person who was not a

8    private citizen was a private citizen who had run for

9    candidacy.

10         In that situation, the court said, even a party who

11   meets Article III must rest his claim on its own right.  And

12   because he had failed to actually plead that the election would

13   have changed, he didn't have a particularized injury because he

14   didn't even plead an allegation that it would be altered.  And

15   the court did not go so far as to say he couldn't prove it, he

16   didn't even plead it.

17         The plaintiffs therein were denied because of the lack

18   of injury in fact because they were private citizens, and so

19   the injury was generalized, which the court found to show a

20   lack of standing.

21         The other case that's very relevant is the Ninth

22   Circuit case, which is Porter versus Jones, which we also cited

23   to, which is 319 F.3d 483, which also discusses standing and

24   makes clear that it gets in that case because the claim was

25   justiciable, as the court said.  And they really look instead

1     at, is there a particularized injury?

2             And the court set forth the standard that on a motion

3     to dismiss, the allegations of the plaintiff are to be accepted

4     as true.  And in that case, they explain in footnote 4 how

5     plaintiffs establish standing, in addition to the Carson case,

6     which is very particular to this case, because it's based on

7     presidential electors.  And in that case the Court found they

8     had Article III standing, in addition to Pullman standing.

9             The -- excuse me, Your Honor.  The case McPherson

10    versus Blacker, which is the Supreme Court case, and also the

11    Bush case, Bush v. Palm Beach County Canvassing Board,

12    531 U.S. 70, both explain that ensuring the final vote tally is

13    a particularized injury to electors.  Our claim is about the

14    vote tally, and that is what we saw, again, in the spike.

15            The reason I raise that spike on election night is

16    because that ties in to the other claims against us in the

17    motion to dismiss related to laches, related to lack of, you

18    know, pleading fraud, et cetera.

19            So I think that to understand the claim itself that

20    the plaintiffs are making in this case, is to understand that

21    it's three-part.  It's based first on individual accounts of

22    seeing votes switched by the machines.  It's based also on

23    statistical evidence, and it's based on election law

24    violations.

25            And then number 4 -- or not 4, maybe number 1, it's

1   based on this Dominion Voting System and how it operates and

2   how it uses this algorithm.

3          And this is a very different claim, because this

4   widespread fraud is tied together through this picture.  And in

5   equal protection cases, as well as in other cases, we have seen

6   that a combination of individual anecdotal evidence, together

7   with statistical proof, is the standard to show when broader

8   remedial relief is justified.

9          And the fact that the court has repeatedly used

10  anecdotal evidence, combined with statistical evidence under

11  equal protection standards, that's very significant.

12         And that is cited to in 122 F.3d 895, Eleventh

13  Circuit, 1997, citing to Supreme Court case of Richmond versus

14  J.A. Croson, 488 U.S. 469.

15         The evidence of pattern of individual discriminatory

16  acts can, if supported by appropriate statistical proof -- the

17  court that a broader remedial measure is needed.

18         It is based on that argument that we come back to the

19  idea that we have equal protection law that's applicable to

20  voting cases.  As Your Honor knows, the right of suffrage can

21  be denied by a debasement or dilution of the weight of the

22  citizens' vote just as effectively as by wholly prohibiting the

23  free exercise of the franchise.  Reynolds, 377 U.S. 533 (1964)

24  with many cases that go beyond that.

25         In Anderson versus United States, 417 U.S. 211, again,

1    every voter in the federal election, whether he votes for a

2    candidate with little chance of winning or for one with little

3    chance of losing, has a right under the Constitution to have

4    his vote fairly counted.

5         Our plaintiffs have particularized injury as

6    presidential electors with the right to vote and have

7    Article III standing.

8         Now defendants -- I believe it is Secretary Hobbs,

9    focuses heavily on a case related to laches, and again argues

10   16-673, which is the state contest statute.  They rely on that

11   to say that we are late.  Well, that statute actually requires

12   that you file within five days of state certification, 11/30.

13        Nonetheless, as we have shown, or as we have submitted

14   with our papers and with our complaint, it is on election night

15   that the evidence of fraud is -- becomes actually visible and

16   is actual fraud that is pled in the case.

17        And to the point that the defendants make about 9(b),

18   Your Honor, that is not the standard for fraud in Arizona where

19   the Supreme Court of Arizona has held that election fraud,

20   election fraud, is based on being able to show that you would

21   have a likelihood of proving that the election had fraud.  And

22   for that case, we cite in our reply, Miller.  And -- Miller

23   versus Picacho, P-I-C-A-C-H-O, 179 Arizona 178, Supreme Court

24   (1994).

25        THE COURT:  What page is that on?

1          MS. HALLER:  Yes.  I'm sorry, Your Honor.  179 Arizona

2     178.

3          THE COURT:  What page of your reply is that on?

4          MS. HALLER:  Oh.

5          THE COURT:  If you recall?

6          MS. HALLER:  I think it is near the -- it is in our

7     complaint if it is not in our reply -- but I believe it's in

8     our reply.

9          THE COURT:  Well, in any event, you can move on.

10         MS. HALLER:  So as to the idea of mootness, this claim

11    is very much alive, Your Honor.  And the --

12         THE COURT:  Let me just ask you this question, and I

13    will give you an additional -- a couple of minutes to wrap up.

14         It seems to me that a couple of courts in the last

15    week or so, even within the last day, have asked the question

16    or resolved the question really for themselves about what the

17    continuing violation of federal law is that you are seeking to

18    enjoin.

19         Because in their view, already addressing the

20    question, the election results were already certified.  And so

21    the governor has already transmitted the same to the United

22    States Archivist, so why shouldn't this court follow those

23    courts that have already spoken on the issue?  What makes this

24    different?

25         MS. HALLER:  Well, Your Honor, we would also disagree

1   with the opinions in the courts Your Honor is, I believe,

2   referencing, because I think there's a misunderstanding.

3          We would never have a federal election law claim under

4   the theory that one had to follow only state law.  This Court

5   sits on supplemental jurisdiction as well as original

6   jurisdiction in this case, and it's very commonplace for this

7   Court to have cases come to it based on supplemental

8   jurisdiction.

9          In removal cases, for example.  And when cases come to

10  the court on removal cases, what the court does is keep the

11  state law claim next to the federal law claim, and there's even

12  Ninth Circuit cases that have held that where the state court

13  claim is the only thing to survive because the federal claim

14  got dismissed, they still held that the federal court has

15  jurisdiction.

16         And it's very critical to understand this Court's

17  supplemental jurisdiction as well as its original jurisdiction

18  in plaintiffs' case, where we have both Article III standing

19  for presidential electors and the fundamental, I think,

20  disconnect on the evidence in this case, which is what we

21  really need to show, is that we would have a substantial

22  likelihood of success.

23         And there's a presumption that there's irreparable

24  harm if we can show the substantial likelihood of success.  And

25  that goes back to our motion for preliminary injunction, which

1    is what we filed on December 2nd.

2           The plaintiffs' response -- excuse me, the defendants

3    responded with oppositions to those motions, as well as motions

4    to dismiss.  But what's fundamental to this case is that it's

5    injunctive relief that is requested.  And injunctive relief is

6    not full and final, so the whole idea that there's, you know, a

7    denial somewhere on issuing an injunction, is not precedential,

8    I would submit, because it is not a full hearing on the merits

9    or final -- or a final resolution.

10          But even so, if the idea is that this case rests on

11   election law, then we know that the Supreme Court has a number

12   of times and federal cases a number of times have addressed

13   voting rights cases or -- Bush v. Gore is the case that went up

14   after certification, and the U.S. Supreme Court heard it.

15          The U.S. Supreme Court did not say it's too late, you

16   know.  The challenge is that in election law, and courts have

17   explained this, there is a very short time that is being

18   recognized in current jurisprudence for plaintiffs to bring a

19   claim.

20          If you bring it preelection, then you are violating

21   the Pullman abstention.  If you bring it post election, people

22   want to submit that it's late, but we are two days after

23   certification.  We filed December 2nd.  They certified November

24   30th.  We went immediately -- and this is a complicated case,

25   as Your Honor knows from all of the filings.

1        So the challenge of putting all that evidence together

2   in that time period from when the evidence is really seen on

3   election night in the election feed, and this is a case where

4   they continued to count.

5        So it's not like election night, and then we knew that

6   the fraud -- or what signs of fraud we had at the time.  This

7   was a case where they continued to count.  And -- making our

8   case very much a live question as opposed to a moot question or

9   a case that -- raises the issues of laches.

10       THE COURT:  All right, Ms. Haller, your time is just

11   about up.  If you have one more point to make, I will let you

12   make it, and then we will hear from Mr. Nelson.

13       MS. HALLER:  Yes, Your Honor.  I would point out that

14   when it comes to Ward v. Jackson, as Your Honor had asked,

15   non-mutual offensive collateral estoppel or defensive

16   collateral estoppel is not shown here.

17       The issue of preclusion does not prevent a

18   determination because of not -- because of Idaho Potato,

19   425 F.3d 708, a Ninth Circuit (2005).

20       Previously litigated defensive use of

21   non-collateral -- non-mutual collateral estoppel is addressed

22   in Mendoza, 464 U.S. at 159.  I would just point those two

23   cases out to Your Honor.

24       What's very significant in our case is evidence that

25   we have 5,790 votes that were done by people outside of the

1    jurisdiction.  We can show 86,000 ballots that were returned

2    and they were disenfranchised, where the votes were not

3    accepted.  86,000 and 5,000.  And then we can show an

4    additional 219,000 of unlawfully mailed ballots.

5        The difference in Arizona between the President and

6    Mr. Biden is well below that.  So we do have the ability to

7    show that there is a substantial likelihood that we will be

8    successful on the merits of this case.

9        And we will have testimony from the affidavits that we

10   have submitted, but we have a significant amount of evidence to

11   put forward.  We have Ph.D. statisticians, mathematicians.  We

12   have computer science, cyber forensics.  We have evidence of

13   the fact that there was a significant tampering with the tally

14   of the election, specifically November 3rd.

15       THE COURT:  What declaration points me to that

16   significant tampering with the tally?  What is the declaration

17   attached to your complaint that attests to that?

18       MS. HALLER:  Yes, Your Honor.  Exhibit 13 would be the

19   first one that I would point you to.  I would also point you

20   to -- bear with me, Your Honor -- 17 -- or wait.  No, not 17.

21       I would point Your Honor to 19, to plaintiffs'

22   complaint, which I believe is the same number in our actual

23   submission.  But it's Exhibit 19, exhibit 13 of TM.  She is --

24   and then Exhibit 12, and Exhibit 7.

25       And then, Your Honor, I would also point you to our

1   exhibits which relate to the senators' letter in 2019.  It was

2   Senators Warren, Klobuchar, Wyden, who wrote about the concerns

3   they had with the lack of security over Dominion Voting

4   Systems, and they wrote that letter in 2019, and we attached

5   that to our complaint, and it is in our exhibit binder.

6        But it makes clear the concerns over Dominion Voting

7   Systems, as does Congresswoman Maloney's letter, that predates

8   that back in 2006, where she dug into the connections Dominion

9   Voting Systems had with Smartmatic.

10       We raise those points that these questions have been

11  out there and people have been trying to investigate this.  And

12  we only see its brazen actual fraud take place on this election

13  because we can see in the numbers and our mathematicians can

14  see in the numbers and in the data feeds.

15       The evidence is also buttressed by the actual

16  out-of-state voter evidence that we submit, which is also

17  buttressed by the individual accounts where they testify in

18  their sworn affidavits that they saw votes switched.

19       So the combination of that evidence is the standard,

20  and it is very serious evidence, and we would point to the

21  studies, like the Apple study we include on ballot --

22       THE COURT:  I am going to stop you here, because I

23  have read these affidavits, and so let me hear from Mr. Nelson.

24       MR. NELSON:  Thank you, Your Honor, and may it please

25  the Court, and I want to directly answer a number of questions

1    that this Court raised.

2          Let me first clarify that I am here not just to

3    present on behalf of Secretary Hobbs, but also on behalf of

4    Governor Ducey and Maricopa County.

5          Although they represent different parts of government

6    and indeed are members of different political parties, they

7    stand united in defending a free and fair election, and they

8    would be here defending the outcome of this election,

9    regardless of who had prevailed in the election.

10          As other courts have recognized, plaintiffs' suit is

11    an attack on democracy.  Worse, they are using the federal

12    court system in an attempt to undermine the rule of law and

13    obtain breathtaking, startling, and unprecedented relief to

14    overturn the will of the people.  This Court should grant the

15    motion to dismiss.

16          First, this Court asked about the safe harbor date and

17    the significance of today.  Of course we do think that this

18    Court should resolve this matter expeditiously, but this case

19    has no bearing on the safe harbor clause.

20          Your Honor, may I share my screen?

21          THE COURT:  I'm sorry?

22          MR. NELSON:  May I share a presentation with you?

23          THE COURT:  Wait.  I am conferring with my courtroom

24    deputy to make sure we have the capacity to do what you are

25    asking.

1          THE CLERK:  It is going to appear on the television.

2          THE COURT:  All right, yes.

3          MR. NELSON:  Thank you, Your Honor.

4          As Your Honor can see, what happened first and why we

5   are here is that on November 30th, Governor Ducey and Secretary

6   Hobbs performed their ministerial duties under Arizona law to

7   canvass.  With Secretary Hobbs canvassing in the presence of

8   Governor Ducey and Attorney General Brnovich.

9          Governor Ducey and Secretary Hobbs then signed the

10  Certificate of Ascertainment attesting to the results of that

11  canvass.

12         This end result was months, if not years, in the

13  making.  In the midst of an epidemic, all levels of Arizona

14  government worked together to conduct a safe and secure

15  election that protected the foundational right to our

16  democracy, the right to vote.

17         After the election, however, this country has seen a

18  proliferation of suits attempting to challenge the results.

19         Plaintiffs' counsel here has brought this nearly

20  identical suit in four states, including Arizona.  All of these

21  cases were filed weeks after the election in an attempt to

22  overturn the result.

23         Just yesterday, the Michigan court dismissed on a

24  variety of grounds, all applicable here too.  Those plaintiffs

25  also were presidential electors.  It summarized that the

1  plaintiffs seek relief that is stunning in its scope and

2  breathtaking in its reach.  The Court declines to grant

3  plaintiffs this relief.

4         Likewise yesterday morning, in minute order after a

5  hearing and an opinion from the bench, a Georgia court granted

6  the motion to dismiss these claims.

7         And although the transcript is not public yet, these

8  are the publicly reported statements that the court made.

9         The relief that the plaintiffs seek, this Court cannot

10  grant.  They ask the court to order the Secretary of State to

11  decertify the election results as if such a mechanism even

12  exists, and I find that it does not.

13         Federal courts don't entertain contests about vote

14  counting misconduct post election.

15         In their complaint, the Court said, Plaintiffs

16  essentially ask the Court for perhaps the most extraordinary

17  relief ever sought in any federal court in connection with an

18  election.  They want this Court to substitute its judgment for

19  that of two and a half million Georgia voters who voted for Joe

20  Biden, and this I am unwilling to do.

21         And the court also said, like the Michigan court, that

22  the plaintiffs waited too late to file suit.

23         There is a breathtaking scope of relief here, Your

24  Honor.  They are seeking to overturn an election.  The

25  Wisconsin court, Justice Hagedorn in the Wisconsin Supreme

1    Court analyzing very similar -- factual allegations stated that
2    at stake, in some measure, is faith in our system of free and
3    fair elections, a feature central to the enduring strength of
4    our constitutional republic.  It can be easy to blithely move
5    on to the next case with a petition so obviously lacking, but
6    this is sobering.  The relief being sought by the petitioners
7    is the most dramatic invocation of judicial power I have ever
8    seen.  Judicial acquiescence to such entreaties built on so
9    flimsy a foundation would do indelible damage to every future
10   election.
11        This court should dismiss for numerous grounds.
12   First, this complaint is about Arizona law.  It is the
13   exclusive remedy here.
14        This Court asked a number of questions about this.  It
15   is not just what the Court cited from the complaint.  This is
16   from the introductory part of the complaint, paragraphs 15 and
17   16.  The factual basis of the complaint, they say, would also
18   support an election contest under Arizona law.
19        Paragraph 16, the relief sought is in accord with
20   Arizona law.
21        In their complaint, part one and what they base their
22   entire complaint on is, quote, violations of Arizona election
23   law.
24        The claims here belong in an election contest.  In
25   fact, it is almost as if they originally intended their

1    complaint to be a contest under Arizona law.

2         This is what they say, plaintiffs contest the results

3    because it is fundamentally corrupted by fraud.  That's

4    paragraph 141.

5         Their election clause claim appears to be about

6    violations of Arizona law.  The Governor and the Secretary are

7    acting under the law passed by the legislature.  That's why

8    they canvassed, certified, together.  So their claim fails just

9    by describing it.  They are alleging violations of Arizona law.

10   That's a state claim.

11        And in fact, in their proposed relief of the Electors

12   Clause Claim, this is what they asked the Court to order and

13   why.  Arizona's failed system of signature verification --

14   paragraph 145, number 5, Arizona's failed system of signature

15   verification violates the Electors and Elections Clause by

16   working a de facto abolition of the signature verification

17   requirement.

18        Those claims, in fact, were brought in the state court

19   action filed by Kelli Ward as a contest proceeding.  And of

20   course she is also named as a plaintiff in this case as well.

21        The grounds for relief, what they seek again is

22   exactly the same as the state case.  This is from their

23   contest.

24        The Court should declare the certificate of election

25   of the Biden electors has no further force or effect and the

1    election is annulled.

2          Here is the relief here, plaintiffs seek an emergency

3    order instructing defendants to decertify the results of the

4    election of the office of President.  The relief they seek is

5    virtually identical.  It is overturn the election and undo the

6    certification.

7          This federal court proceeding, however, is not a

8    contest under Arizona law.  Arizona has established a detailed

9    and strict procedure for challenging election results.

10   Plaintiffs are trying to use this court as an end-run around

11   this system.

12         If allowed, it would signal that courts are willing to

13   entertain such drastic remedies, and no election would ever be

14   safe and would be over when the votes were counted.

15         To quote the Third Circuit's recent opinion in the

16   Trump case decided right after Thanksgiving, "Voters, not

17   lawyers, choose the president."

18         And this is, Your Honor, what the state court held in

19   Ward versus Jackson.  "The court finds no misconduct, no fraud,

20   and no effect on the outcome of the election.  The evidence

21   does not show illegal votes.  The evidence does not show an

22   erroneous vote count.  It is further ordered as required by

23   Arizona 16-676(B) confirming the election."

24         Now, there is collateral estoppel here.  We have the

25   same plaintiffs and the same defendants.  Plaintiff Ward is not

1    just plaintiff, an elector, she is chair of the Arizona

2    Republican Party.  And actually, under Arizona law, Section

3    16-344(A) appoints the electors and the other plaintiffs in

4    this case.  The other elector plaintiffs are in privity with

5    Ward and had the opportunity to participate in the contest.

6         Next is the Eleventh Amendment.  Under Pennhurst, the

7    Eleventh Amendment bars relief against state officials based

8    upon state law, even when styled as federal claims.

9         Neither Governor Ducey nor Secretary Hobbs should have

10   been named as a party to the complaint here.  Indeed, more

11   generally, Governor Ducey is not involved in election

12   administration, and the claims are nonsensical against him.

13        Pennhurst applies to state claims, even if styled as

14   federal ones.  And even if plaintiff satisfied Pennhurst, they

15   failed for two more reasons.

16        First, there is no connection under Ex Parte Young

17   between defendants and the factual allegations.  Second,

18   allegations of general oversight are insufficient.

19        Next, this Court should dismiss for standing.

20   Plaintiffs lack standing to sue under the Elections and

21   Electors Clause.  That is the King opinion from Michigan just

22   yesterday, the Bognet case from the Third Circuit.

23        Their other counts, counts 2 through 4, are for

24   vote dilution.  They admit they are -- this is paragraph 117,

25   diluting the ballots, and they say that the right to vote is

1   infringed if a vote is canceled or diluted.

2          But as the Wood case filed on December 5th stated,

3   vote dilution in this context is, quote, a paradigmatic

4   generalized grievance that cannot support standing.

5          There's also no traceability or redressability here to

6   justify standing.  There's no traceability because neither

7   plaintiffs' conspiracy allegations nor allegations of state law

8   violations are traceable to either Governor (sic) Hobbs or

9   secretary -- excuse me, Governor Ducey or Secretary Hobbs.

10          No redressability because the federal court has no

11   power to order a decertification.

12          Under mootness the claims also fail.  The claims are

13   moot.  The ministerial task of canvassing and certification

14   have occurred.  A federal court cannot simply undo them.  Any

15   claim to undo or decertify belongs in state court under state

16   law.

17          As the Wood case stated, the Court cannot turn the

18   clock back and create a world in which the 2020 election

19   results are not certified.

20          On laches, they bar plaintiffs' claims here.  As the

21   Soules case stated in the Ninth Circuit, laches is appropriate

22   lest the granting of post-election relief encourage sandbagging

23   on the part of wily plaintiffs and the extremely disruptive

24   effect of election invalidation and the havoc it wreaks upon

25   local political continuity.

1    The King case from Michigan likewise stated,

2    plaintiffs waited too long to knock on the Court's door; so too

3    the Georgia case yesterday as well.

4    Plaintiffs have known about these for months.  Even

5    the post-election allegations have been known for weeks, and

6    their excuse, even you just heard it right now, is that there's

7    a contest provision and so therefore it is timely based upon

8    Stale law contest provisions.

9    For abstention, Pullman abstention applies.  First,

10   the conduct of elections is a quintessential state activity.

11   Second, adjudication can be avoided by the resolution of the

12   state issues.  And third, plaintiffs' argument depends on a

13   decidedly uncertain assertion that Arizona law requires

14   invalidation of ballots in these circumstances.

15   Finally, the pleading standards under Rule 9 and

16   Rule 12 require a dismissal.  They allege an utterly

17   implausible fraud.  This is the nature of their action.  The

18   first sentence, "A massive election fraud and a scheme."

19   In second paragraph, "to defraud."

20   The claims are simply not plausible.  Even if we

21   engage in this implausible fiction that these allegations are

22   true, there is still no tie to Arizona.

23   You heard plaintiffs' counsel talk about these

24   exhibits, these confidential witnesses.  Spider, the

25   confidential witness as well.  Literally what they say, from

1    Venezuela, to rogue actors, countries such as Serbia, foreign

2    interference by Iran and China to compromise voting machines,

3    to compromise software, to thousands of election officials

4    around the country.  But even still, the problem is, they don't

5    tie these back to Arizona.

6         So even if you assume that these are true allegations

7    and are totally plausible, there's still no plausible tie to

8    Arizona itself.

9         But the allegations are not plausible.  Iqbal requires

10   dismissal where the well pleaded facts do not permit the court

11   to infer more than the mere possibility of misconduct.

12        Plaintiffs do not attempt to show the connection

13   between fraud and any change of vote.

14        Their supposed experts have no expertise and their

15   opinions have fatal methodological flaws that should this Court

16   allow the hearing to proceed, there are motions pending with

17   respect to that.  But even at this pleading stage, this Court

18   may consider, for purposes of plausibility.

19        And you just heard plaintiffs' counsel again say that

20   their claims are justified under the pleadings standards, not

21   under the federal standard, but based upon state law.

22        On the left is the Maricopa County courthouse.  On the

23   right is this courthouse.  They say nothing about Rule 12.  And

24   they say that Rule 9(b) doesn't apply based upon state law.

25   That is what they say in response in the case that Your Honor

1    asked plaintiffs' counsel about.  It is a state law case.

2         The state pleadings standard does not apply in federal

3    court, yet all plaintiffs offer in their response is a citation

4    that respond to Rule 9(b) to an Arizona Supreme Court opinion.

5         And the claims are not plausible based upon what we

6    know from the judicial record.  Plausibility is especially

7    unlikely here, and this was in the state court proceedings,

8    part of the Ward proceedings.  Given the verification

9    procedures under Arizona law, like the hand audit that found no

10   discrepancies.

11        Plaintiffs also cannot satisfy Rule 9(b).  Rule 9(b)

12   requires particularized allegations of the circumstances

13   constituting fraud.  Plaintiffs do not mention any fact to

14   support their fraud claims.  There are no firsthand allegations

15   of fraud, and their expert reports are wildly implausible,

16   fatally flawed, and even still couched in uncertainty.

17        And finally, I want to end where we started.  Our

18   democracy depends on free and fair elections.  These cases --

19   this case is an attempt to undermine our confidence in the

20   system with no basis in law or fact.

21        As Justice Hagedorn said, "Judicial acquiescence to

22   such entreaties built on so flimsy a foundation would do

23   indelible damage to every election."

24        Arizona conducted its election fairly.  This Court

25   should grant the motion and not allow such a frivolous suit to

1  continue in plaintiffs' attempt to undermine the will of the

2  Arizona people.

3          Thank you, Your Honor.

4          THE COURT:  Thank you.  And plaintiffs' counsel can

5  have the last rebuttal.

6          Ms. Haller.

7          MS. HALLER:  Thank you, Your Honor.

8          I would just respond to defendant's argument that the

9  Governor or the Secretary of State are not just ministerial in

10  this regard.  3 U.S.C. 6 makes clear that they have the ability

11  to decertify.

12          This is an election integrity issue that we have in

13  this complaint.  This should not be partisan.  And what shows

14  how nonpartisan this issue should be, the House passed a bill

15  HR-2722 last year -- I mean, actually in 2019.  And it is at

16  Congress.gov and we've attached it.

17          What that bill makes clear is voting machines should

18  not be connected to the Internet, and we should have separate

19  paper ballots.  And the House passed that bill, and we also

20  have the senators' concerns, which we included.

21          The point is that this is an election integrity issue.

22  And this evidence needs to be read very carefully, because it

23  is about a very big question, and we do not bring it lightly.

24          We have collected affidavits, sworn statements from

25  both fact witnesses and professionals.  The statisticians, the

1   cyber experts, but we also have a whistleblower fact witness

2   that knows that this technology was used, and she claims how it

3   was used, and we have put this evidence together, which -- some

4   of which may not come out at the hearing, but the bottom line

5   is, the relief requested is what is appropriate.

6           We can show with a substantial -- we can show, period,

7   that the evidence is there that we have over 86,000 unlawfully

8   accepted votes in this state.

9           We can show that that brings -- in addition that there

10  are additional votes in question, and that bring this into a

11  place where it cannot go forward as it stands.

12          We are not saying, change the election.  We are saying

13  Arizona needs to invalidate and take a good look at what

14  happened here rather than go forward with this certification.

15          Arizona has a difference of 10,000 votes

16  approximately, and it came after election night.  And if you

17  look at the data and the feeds, you will see the spikes that

18   -- where these votes injected in a totally unnatural way that

19  presents with an algorithm, which was a predetermined computer

20  fact.  And to get into that evidence, the machines operate

21  offshore, not in this country.  The entire idea of elections

22  are that they are local.  That is the crux of oppositions

23  claims against us.

24          This is a local matter.  It is not for the federal

25  court.  It is not for, you know, Congress, despite the fact

1    that Congress enacted HAVA.  Congress enacted the Voting Rights

2    Act.

3              The federal court has stepped in so many times to make

4    sure that states do not arbitrarily deny the voters rights, and

5    it is the federal government that sits in that position with

6    its courts, inside of these states, to do exactly that.

7              Because when you sue the governor in a state court, or

8    when you sue the secretary of state in the state court, you

9    have the option to come to federal court for the very reason

10   that it would make things very complicated for a judge in state

11   court to have to address a claim against a sitting governor.

12             And while this Court sits in the state -- and that

13   16-627 is a "may" statute.  It is not a "must" or a "shall"

14   statute. it is a statute -- the contest statute is a "may"

15   statute.  It "may" be brought in Maricopa County.  It "may" be

16   filed as a contest.  It is not "shall."

17             And to preclude this Court's jurisdiction when this

18   Court always has federal jurisdiction over fundamental rights

19   of voters, of individuals who are disenfranchised of people

20   with specific standing for presidential electors -- very

21   specific identifiable injury not to be able to vote.

22             Those individuals have the standing and the

23   meritorious claim that can be shown with a substantial

24   likelihood on the merits to show that that widespread fraud

25   occurred in this case, and the evidence really comes about at

1    the time of the election.

2            We responded as fast as one can respond when you are

3    talking about serious litigation, when you are talking about a

4    very heavy question for the Court, one that should be

5    nonpartisan.  We did it within three days -- or two days.

6            Your Honor, November 30th was the certification.

7    December 2nd was the suit brought with 100 pages -- over 118 or

8    130 paragraphs, with over 20 affidavits and other evidence

9    attached, was put together to bring this very heavy question to

10   this Court, to weigh this evidence, to accept the allegations,

11   to understand that there is a fundamental issue at the heart of

12   this country when a state goes forward as if it's ministerial

13   to validate a state's vote.

14           If the Governor isn't the one who takes a good look at

15   how this voting happens, or the Secretary of State, then who

16   does it?  The entire point of an elected official with the

17   federal statute setting forth his duties, is that he take that

18   role very seriously, that he takes it with the greatest due

19   diligence, and that he take the steps that are necessary to

20   understand what happened in this election.

21           And that is a question of election integrity that is

22   made clear in HR-2722, because the Dominion voting machines

23   does not spit out paper ballots that are the same as the paper

24   votes that were put into them.  They come out with a QFR code

25   on them.  They are not the same sheet that the voter puts in.

1          And as a result, there are several questions in this

2     voting system that need to be questioned and examined and

3     looked at, based on the very clear evidence of the injections

4     and the spikes on the evening of November 3rd.

5          And we can show show those spikes happened in the four

6     or five other states at about the same time.  And we have

7     experts.  If you look at Dr. Briggs' report, he puts the

8     evidence together from five states in a row where it is

9     reflected, five states in a row, that -- the statistical

10    significance is there to show a disparity of votes that were

11    unlawfully obtained in the nearly 100,000 or more in each of

12    those five states.

13         We can show it in Michigan.  We can show it in

14    Wisconsin.  We can show it in Georgia.  And we can show it in

15    Arizona.

16         And the evidence shows, in the filings, and in the

17    affidavits.  And for a Court to believe it doesn't have the

18    authority or the jurisdiction to sit over such an important

19    question, where would the plaintiffs really go for such relief

20    when the fundamental right to vote is recognized in this

21    country to sit?

22         At B&B Hardware, 135 Supreme Court 1293, addresses the

23    idea of actually litigated.  And this idea of collateral

24    estoppel, which does not apply because someone made a similar

25    claim or someone raised a similar allegation.

1          The fact is the parties are different.  The claims are

2     different, and the full and final litigation only has happened

3     in cases that are completely not similar.

4          So in the litigation yesterday in Georgia, that is a

5     completely separate case.  That is not precedential on this

6     case.  And it is not full and final, from what I understand.

7          The case -- Lin Wood's case is not this case, and he

8     was a private individual, not a candidate in any way.  And in

9     the Kelli Ward case, that case is not final.  It's in a

10    different court now in Arizona, and that case does not make the

11    same allegations we make, nor are the parties identical.

12         And again, B&B Hardware, 135 Supreme Court 1293, is a

13    2015 case.  It is the Supreme Court speaking in 2015 to the

14    issues of issue preclusion and claim preclusion, and makes

15    clear that you need to be the party who actually litigated and

16    that you had the opportunity for a full and fair opportunity to

17    be heard, and the issue has to be identical.  They use the word

18    "identical."  They emphasize the word "identical."

19         It is 135 Supreme Court 1293 (2015).  It has been made

20    clear in Porter versus Jones in the Ninth Circuit, 319 F.3d

21    483, in a case where plaintiffs brought up an election that

22    happened in 2000, and the case was in 2003.  And the Court said

23    it wasn't moot or late under laches.

24         The Court said the Eleventh Amendment did not apply.

25    And in that case, the Court made clear that the declaratory

1     relief sought in that case, that the Secretary of State was

2     sued in their individual capacity, and as such, that was

3     upheld.  And that's a very important point, because we sued

4     this Secretary of State and this Governor in their official

5     capacity.  And that was a very -- and Eleventh Amendment most

6     certainly does not bar even a case where they were sued in

7     their individual capacity.

8            The individual accounts, the statistical evidence

9     election law violations, need to be understood in this picture

10    together, because it is a pattern.  It is not one incident on

11    one particular moment that everything -- although we can

12    specifically show the fraud at -- after 8:00 p.m.  It is in our

13    chart with the exact time in two different exhibits we

14    submitted.

15           Ramsland's affidavit, and then we have a fact witness

16    affidavit TM, which is Exhibit 15.  They both show where the

17    spike occurs in what should be a natural progression in a data

18    feed, and suddenly it is like this (indicating).

19           And before the spike occurred, we also know they went

20    off line, and so something is happening.  And it happened

21    systematically over five states.

22           And the statisticians look at this state in particular

23    and can show the significant evidence, but they can also

24    compare it to the other states.

25           And we respectfully request, Your Honor, that you take

1    this case as seriously as we have brought it, as seriously as

2    our opposition opposes it.  And we are grateful for the

3    consideration.  Thank you.

4          THE COURT:  Thank you.  And apparently I jumped the

5    gun, Mr. Nelson.  It was your motion.  I will give you an

6    opportunity for a surrebuttal, if you will.

7          MR. NELSON:  Your Honor, unless this court has any

8    questions, we will rest on our papers and our prior argument.

9          THE COURT:  All right.  It is fully briefed.  The

10   intervenors have also submitted their motions as well.  And as

11   I have mentioned to the parties, I have read the entirety of

12   the briefing, as well as the declarations.  And so I will do my

13   level best to issue an order shortly.

14         And so I appreciate the diligence of the parties in

15   getting this briefed so quickly, and I ask for your patience as

16   I weed through all of these fairly complex issues and very

17   important issues to both parties as well as the citizenry of

18   Arizona.

19         Mr. Nelson, you had your hand up.

20         MR. NELSON:  I did, Your Honor.  There is a logistical

21   and jurisdictional point.  As the Court is aware, there's

22   currently a hearing that this court has scheduled for Thursday.

23   That will require a significant amount of work to get up to

24   speed and to get parties and witnesses ready for that.

25         We do not believe that the hearing should take place

1    while the motion is pending.  As my colleagues inform me who

2    are currently in a status conference in Wisconsin on this very

3    identical case, the Court has delayed the evidentiary hearing

4    until after a ruling on the motion to dismiss on the ground

5    that before there can be any evidentiary hearing, the Court

6    needs to make sure that it has jurisdiction under Article III,

7    and that the plaintiffs have proper standing and all of the

8    other reasons about why a Court should or should not have

9    jurisdiction here.

10             And especially given the tremendous amount of work,

11   the rulings that will be required and -- from the parties and

12   from the Court, we would suggest that the hearing be scheduled

13   until a time that -- after the Court has ruled on the motion to

14   dismiss, should such a hearing be necessary.

15             THE COURT:  Well, I understand, Mr. Nelson, your

16   concern.  And when I say, I am asking for your patience in

17   issuing the order, it is an important order to the Court, to

18   the parties, as I mentioned.

19             But I intend to do that no later than tomorrow

20   afternoon at the very latest.  I do that because, as you recall

21   at the status conference, the plaintiffs were adamant that some

22   decision be made by December 14th, the day of the meeting of

23   the electors.  That was one of the operative dates that I think

24   the parties agreed to.

25             So I am going to keep the hearing on the calendar.

1    You will be advised whether or not it will go forward,

2    hopefully by again, no later than tomorrow afternoon.

3         And I think -- although the Court did not grant the

4    plaintiffs' motion with respect to moving the hearing up to

5    today, this afternoon, if you would, they did have a legitimate

6    concern about, depending on how this Court rules, whether or

7    not they would have sufficient time to appeal a ruling.  And so

8    I have all of that in mind, and therefore, I am going to work

9    extra hard to make sure that the parties are aware of what my

10   decision is.

11        Again, I will try my level best to get that ruling out

12   by tomorrow afternoon at the very latest.  And so as lawyers

13   know, you have to continue to prepare your case, and so I trust

14   that you will.

15        And so if there's nothing further, then this matter is

16   adjourned.

17        Thank you, Counsel.

18        MR. NELSON:  Thank you.

19        MS. HALLER:  Thank you.

20        (Proceedings conclude at 10:36 a.m.)

21

22

23

24

25

1            C E R T I F I C A T E

2

3         I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6         I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10    was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 8th day of December,

12    2020.

13

14                                  s/Elva Cruz-Lauer
                                Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT