**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Tyler Bowyer, et al.,

            Plaintiffs,

v.

Doug Ducey, et al.,

            Defendants.

No. CV-20-02321-PHX-DJH

**ORDER**

       Plaintiffs bring their Complaint seeking injunctive relief from this Court, specifically, to "set aside the results of the 2020 General Election," because they claim the election process and results were "so riddled with fraud, illegality and statistical impossibility . . . that Arizona voters, courts and legislators cannot rely on or certify" its results. (Doc. 1 at 2). By any measure, the relief Plaintiffs seek is extraordinary. If granted, millions of Arizonans who exercised their individual right to vote in the 2020 General Election would be utterly disenfranchised. Such a request should then be accompanied by clear and conclusive facts to support the alleged "egregious range of conduct in Maricopa County and other Arizona counties . . . at the direction of Arizona state election officials." (*Id.*) Yet the Complaint's allegations are sorely wanting of relevant or reliable evidence, and Plaintiffs' invocation of this Court's limited jurisdiction is severely strained. Therefore, for the reasons stated herein, the Complaint shall be dismissed.

## I.    Background

       In Arizona, more than 3.4 million voters participated in the November 3, 2020,

General Election.  Thereafter, pursuant to A.R.S. § 16-602, several counties performed a hand count of sample ballots to test the tabulation equipment, and either no discrepancies were found or, if there were, they were "within the acceptable margin."[1]  Arizona law also requires the secretary of state, in the governor's presence, to certify the statewide canvas on the fourth Monday after a general election.  A.R.S. § 16-648.  On November 30, 2020, Secretary of State Katie Hobbs, in the presence of Governor Doug Ducey, certified the statewide canvas.  (Doc. 40 at 4).  The Canvas shows that former Vice President Joseph Biden prevailed over President Donald Trump by more than ten thousand votes.[2]  On that same day, Governor Ducey signed the Certificate of Ascertainment for Vice President Biden's presidential electors.  (Doc. 40 at 4).  The Certificate was then transmitted to the United States Archivist pursuant to the Electoral Count Act.  (*Id.*); s*ee also* 3 U.S.C. § 6.

In their Complaint and the accompanying Motion for Temporary Restraining Order ("TRO") filed on December 2, Plaintiffs "contest" the election and ask this Court to compel the Governor to "de-certify" these results. (Docs. 1 ¶ 145; 2 at 10).  The Complaint also requests that this Court grant a permanent injunction "enjoining Secretary Hobbs and Governor Ducey from transmitting the currently certified election results to the Electoral College," declare the election results unconstitutional, and seize all voting machines, equipment, software, and other election-related records and materials, including all ballots cast.[3]  (Doc. 1 at 51–52).  The Complaint claims to show "multifaceted schemes and artifices implemented by Defendants and their collaborators" to defraud the election.  (*Id.* at ¶ 3).  And these schemes allegedly resulted in "the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots."  (*Id.*)

---

[1] Ariz. Sec'y of State, *Summary of Hand Count Audits–2020 General Election* (Nov. 17, 2020), https://azsos.gov/election/2020-general-election-hand-count-results.

[2] Ariz.  Sec'y  of  State,  State  of  Arizona  Official  Canvass, https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf.

[3] Under 3 U.S.C. § 5, if a state enacts and applies procedures to decide election controversies before election day, and a decision regarding a contested election is made at least six days before the electors' meetings, then the decision is conclusive and will apply in counting the electoral votes.  That deadline, referred to as the "safe harbor" deadline, was December 8, 2020, as the Electoral College will meet on December 14, 2020.  *See* 3 U.S.C. § 7.

Of the fourteen named Plaintiffs, three are registered voters and GOP Chairs for various Arizona counties.  (*Id.* at ¶¶ 29–31).  The remaining eleven are Republican nominees for Arizona's presidential electors.  (*Id.* at ¶ 28).  One of the eleven, Dr. Kelli Ward, filed suit in state-court over allegations of fraud in this election.  *See Ward v. Jackson*, Case No. CV2020-015285, slip. op. (Ariz. Super. Ct. Dec. 4, 2020) (finding  no evidence of alleged fraud and dismissing claims of election misconduct); (Doc. 55-1).  In that case, on December 8, 2020, the Arizona Supreme Court affirmed the Maricopa County Superior Court's findings that there was no evidence of fraud or misconduct in Arizona's election.  (*Ward v. Jackson*, CV2020-015285 (Ariz. 2020); (Doc. 81-1).

Plaintiffs' Complaint contains four counts, three of which assert 42 U.S.C. § 1983 claims for violations of the Constitution's Elections and Electors Clauses, as well as the Fourteenth Amendment's Due Process and Equal Protection guarantees.  (Doc. 1 ¶¶ 103–34). The final count, which does not specify a cause of action, is for "Wide-Spread Ballot Fraud." (*Id.* at ¶¶ 135–41).

On December 3, the day after Plaintiffs filed their Complaint, the Court received a Motion to Intervene from the Arizona Democratic Party, which was subsequently denied.[4] (Docs. 26 and 69).  The Court also received a Motion to Intervene from the Maricopa County Board of Supervisors and Maricopa County Recorder Adrian Fontes, which was granted.  (Docs. 27 and 32).  The Court held a status conference on the same day, in which it scheduled a December 8 hearing on the TRO.  (Doc. 28).  By subsequent Order (Doc. 43), the Court converted that hearing to oral argument on the Motions to Dismiss filed on December 4.  (Docs. 36, 38, and 40).  Plaintiffs have filed their Response to the Motions (Doc. 44), and Defendants have filed their Replies.  (Docs. 53, 54, and 55).  On December 8, 2020, the Court held oral argument on the Motions to Dismiss and took this matter under advisement.  Being fully briefed on the matter, the Court now issues its ruling.

…

---

[4] The Arizona Democratic Party sought intervention under theories of permissive joinder. While the Court did not believe the Motion was inappropriate, the Court did not find their presence necessary to this lawsuit and therefore denied the Motion to Intervene.

## II.     Analysis

Given the import of the overarching subject—a United States Presidential Election—to the citizens of Arizona, and to the named Plaintiffs, the Court is compelled to make clear why it finds it inappropriate to reach the merits of Plaintiffs' Complaint and why it must grant the Motions to Dismiss this matter in its entirety.   The Court will endeavor to lay bare the independent reasons for its conclusions, including those related to Article III standing, abstention, laches, mootness, and the federal pleading standards, which govern its review.

### A.     Article III Standing

"To ensure that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (internal citations omitted).   Article III provides that federal courts may only exercise judicial power in the context of "cases" and "controversies."   U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).   For there to be a case or controversy, the plaintiff must have standing to sue. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("*Spokeo II*").   Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit."   *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."   *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341 (2006).   A suit brought by a plaintiff without Article III standing is not a "case or controversy," and an Article III federal court therefore lacks subject matter jurisdiction.   *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998).

"[A] plaintiff seeking relief in federal court must first demonstrate . . . a personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204 (1962), distinct from a "generally available grievance about government," *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per

curiam).  "That threshold requirement ensures that we act as judges, and do not engage in policymaking properly left to elected representatives."  *Gill*, 138 S. Ct. at 1923.  To establish standing, a plaintiff has the burden of clearly demonstrating that she has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo II*, 136 S. Ct. at 1547 (*quoting Warth*, 422 U.S. at 518); *accord Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting the party asserting jurisdiction bears the burden of establishing subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss).

To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo,* 136 S. Ct. at 1548 (*quoting Lujan,* 504 U.S. at 560).  "When we have used the adjective 'concrete, we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'"  *Id.*  The plaintiff must establish a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual way."  *Raines v. Byrd*, 521 U.S. 811, 819 (1997).  Moreover, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Where a plaintiff has not established the elements of standing, the case must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-matter jurisdiction.  A Rule 12(b)(1) challenge may be either facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In a facial attack, the court may dismiss a complaint when the allegations of and documents attached to the complaint are insufficient to confer subject-matter jurisdiction.  *See Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).  In this context, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir.

1996).  In contrast, when a court evaluates a factual challenge to jurisdiction, a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Safe Air for Everyone*, 373 F.3d at 1039 ("In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.").

### 1.    Elections and Electors Clause – Count One

Plaintiffs allege in Count One that Defendants violated the Elections and Electors Clauses and 28 U.S.C. § 1983 by, among other things, losing or destroying absentee ballots, and/or replacing those ballots with "blank ballots filled out by election workers, Dominion or other third parties" sending thousands of absentee ballots to someone besides the registered voter that "could have been filled out by anyone."  (Doc. 1 at 41).  Defendants argue that Plaintiffs do not have standing to assert such a claim.  (Doc. 40 at 8–9).

The Elections Clause of the United States Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]"  U.S. Const. art. I, § 4, cl. 1.  The Elections Clause authorizes the state governments to regulate federal elections held in the state, while Congress retains "exclusive control" to alter a state's regulations.  *Colegrove v. Green*, 328 U.S. 549, 554 (1946).  A separate provision, the "Electors Clause" of the Constitution, states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . . . ."  U.S. Const. art. II, § 1, cl. 2.[5]

Plaintiffs' Complaint alleges that Defendants violated the Elections Clause. However, the Complaint does not allege grounds for standing to assert this claim, nor does it distinguish between the status of the groups of Plaintiffs.  At oral argument, Plaintiffs'

---

[5] While the Electors Clause and Elections Clause are separate Constitutional provisions, they share "considerable similarity."  *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting).  These provisions are therefore often considered together.  *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 348–52 (3d Cir. 2020) (analyzing standing for Elections Clause and Electors Clause under the same test); *Wood v. Raffensperger*, 2020 WL 6817513, at *1 (N.D. Ga. Nov. 20, 2020) (same); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05 (1995) (holding that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).  Plaintiffs do not meaningfully distinguish between the two clauses in their Complaint or briefing.

1    counsel stated that eleven of the Plaintiffs were Republican Party nominees to be electors,

2    and the other three were county GOP Chairs.  As an initial matter, Plaintiffs' briefing does

3    not contain any arguments that the GOP Chairs have standing to assert this claim and the

4    Court will dismiss the claim as to the GOP Chairs outright.

5        Plaintiffs argue that the Plaintiff Electors should be considered "candidates," and

6    thus that they have standing under the Electors and Elections Clause pursuant to an Eighth

7    Circuit case, *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020).  (Doc. 44 at 5).  That case,

8    which is based on the operation of Minnesota state election law, allowed electors to bring

9    claims under the Elections Clause because electors were treated as candidates for office

10   under Minnesota law and thus would be injured by the governor's failure to seat them if

11   chosen as the state's electors.  *See Carson*, 978 F.3d at 1057.

12       Plaintiff Electors likewise assert that under Arizona law they should also be

13   considered "candidates."  (Doc. 44 at 5–6) (citing A.R.S. § 16-344).  However, the Electors

14   are not candidates for office as the term is generally understood.  Arizona law makes clear

15   that the duty of an Elector is to fulfill a ministerial function, which is extremely limited in

16   scope and duration, and that they have no discretion to deviate at all from the duties

17   imposed by the statute.  *See* A.R.S. § 16-212(C) ("After the secretary of state issues the

18   statewide canvass containing the results of a presidential election, the presidential electors

19   of this state ***shall cast their electoral college votes for the candidate for president and the***

20   ***candidate for vice president who jointly received the highest number of votes*** in this state

21   as prescribed in the canvass.") (emphasis added).  Arizona voters do not show up to vote

22   for any single Electors listed next to the presidential candidates' names; they vote for their

23   preferred presidential candidate.  By specifying that the electors "shall be enclosed in a

24   bracketed list" next to "the surname of the presidential candidate and vice-presidential

25   candidate," A.R.S. § 16-507(B) clarifies and distinguishes the Electors' ministerial status

26   from that of the presidential candidate running for office, the latter who unquestionably

27   suffers the discrete injury required for standing.[6]  Notably, the Republican candidate whose

28   ---
[6] A.R.S. § 16-507(B) in its entirety reads: "Presidential electors, which, shall be enclosed in a bracketed list and next to the bracketed list shall be printed in bold type the surname

name was on the ballot is not a plaintiff in this case.

Other circuit courts to reach the issue have cited the *Carson* decision with disapproval, noting that there was no precedent for expanding standing in the way that it did.[7]  *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 351 n.6 (3d Cir. 2020) ("Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* [*v. United States*, 564 U.S. 211 (2011)] to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. . . . The *Carson* court appears to have cited language from *Bond* without considering the context— specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.").  Indeed, as numerous other courts have held, where, as here, the injury alleged by plaintiffs is that defendants failed to follow the Elections Clause, the Supreme Court has stated that the "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance."  *Lance*, 549 U.S. at 442.

Elector Plaintiffs have not established they can personally bring suit, and therefore, they do not have standing to bring Count One.[8]  Therefore, the Court will dismiss Count

---

[7] *See also Carson,* 78 F.3d at 1063 (Kelly, J., dissenting) ("I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as 'candidates,' *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. *Id.* § 208.04 subdiv. 1 ('[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors.'). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.").

of the presidential candidate and vice-presidential candidate who is seeking election jointly with the presidential candidate shall be listed directly below the name of the presidential candidate. The indicator for the selection of the presidential and vice-presidential candidates shall be directly next to the surname of the presidential candidate, and one mark directly next to a presidential candidate's surname shall be counted as a vote for each elector in the bracketed list next to the presidential and vice-presidential candidates."

[8] The Court notes that Count One of the Complaint makes passing references to the "VRA and HAVA," (the Voting Rights Act and the Help America Vote Act of 2002) but does not bring any claims under these statutes.  (Doc. 1 ¶ 106).

One.

### 2.      Vote Dilution – Count Two

In Count Two, Plaintiffs allege Equal Protection violations based on Defendants' failure to comply with Arizona law by permitting "illegal votes," allowing "voting fraud and manipulation," and in preventing "actual observation and access to the elector process," which allegedly resulted in "the dilution of lawful votes . . . and the counting of unlawful votes." (Doc. 1 at 45).  Plaintiffs ask the Court to order that "no ballot processed by a counting board in Arizona can be included in the final vote tally unless a challenger [i]s allowed to meaningfully observe the process." (Doc 1 ¶ 120).  Absent from the Complaint is an allegation that Plaintiffs (or any registered Arizona voter for that matter) were deprived of their right to vote.  Instead, they bring baseless claims of "disparate treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny than another." (Doc. 1 ¶ 115).  They do not allege what "class" of voters were treated disparately.  Nor do the Elector Plaintiffs cite to any authority that they, as "elector delegates," are a class of protected voters.  Defendants contend that Plaintiffs do not have standing to assert these claims and point out that these allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed.  The Court agrees.

Here, Plaintiffs have not alleged a concrete harm that would allow the Court to find Article III Standing for their vote dilution claim.  As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud.  "Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently." *Bognet*, 980 F.3d at 355; *see also Rucho v. Common Cause*, –– U.S. ––––, 139 S. Ct. 2484, 2501 (2019) ("[V]ote dilution in the one-person, one-vote cases refers to the idea that each vote must carry equal weight.").  "This conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment.  Violation

of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim." *Bognet*, 980 F.3d at 355; *see also Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution."); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection claim where allegations of state's erroneous counting of votes cast by voters unqualified to participate).

Additionally, Plaintiffs cannot sustain their Equal Protection Clause claim on a vote dilution theory. *See Bognet*, 980 F.3d at 355 (rejecting Equal Protection theory and explaining "[t]his conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment"); *see also Shipley*, 947 F.3d at 1062 ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution") (internal citations omitted); *Am. Civil Rights Union v. Martinez-River*a, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (holding that allegations of "vote dilution" as a result of alleged voting process irregulates "[are] speculative and, as such, are more akin to a generalized grievance about the government than an injury in fact."); *Powell*, 436 F.2d at 88 (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary); *Snowden v. Hughes*, 321 U.S. 1, 11 (1944) ("It was not intended by the Fourteenth Amendment . . . that all matters formerly within the exclusive cognizance of the states should become matters of national concern.").

Setting aside that Plaintiffs' claims regarding the election are not viable vote dilution claims, Plaintiffs also have not requested relief that is redressable in a tailored way as is required. *See Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Therefore, even if Plaintiffs could somehow establish that

their vote dilution claim was more than a generalized grievance to the point of asserting an injury, Plaintiffs have not established that the Court can redress this grievance. To give Plaintiffs the relief they desire would disenfranchise the nearly 3.4 million Arizonans that voted in the 2020 General Election. Under Plaintiffs' theory of dilution, this would transform all of the alleged diluted votes from being "diluted" to being destroyed. As Plaintiffs raise "only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large," the Court finds that Plaintiffs' Count Two "does not state an Article III case or controversy." *See Lance*, 549 U.S. 437 at 439. Therefore, Plaintiffs do not have standing to bring suit in this forum.[9]

## B.    Abstention

Defendants also argue the Court should abstain from reaching Plaintiffs' claims based on their similarities with ongoing state court cases. Yesterday, the Arizona Supreme Court ruled on one such case—filed by Dr. Kelli Ward—seeking to "set aside the 2020 General Election results." *See Ward*, CV 2020-015285 (Ariz. 2020); (Doc. 81-1). That case was filed pursuant to A.R.S. § 16-672 and was also filed after Governor Ducey certified the election results on November 30, 2020. (Doc. 58-1 at 17). The *Ward* plaintiffs alleged an insufficient opportunity to observe election officials, an overcounting of mail-in ballots by not adequately comparing signatures on the ballot envelopes, and errors in the ballot duplication process. (*Id.* at 17–21). After an evidentiary hearing, the Maricopa County Superior Court issued a ruling on December 4, 2020, finding that there was no misconduct, fraud, or effect on the outcome of the election.[10] (*Id.*) This ruling was

---

[9] Having established that the Court does not have jurisdiction over Plaintiffs' Counts One through Three, the Court will decline to exercise supplemental jurisdiction over Count Four, which pleads no federal cause of action and is entirely based on alleged fraud under Arizona law.

[10] Judge Randall H. Warner of the Maricopa County Superior Court addressed Ward's allegations of election misconduct. First, Ward argued that there was an insufficient opportunity to observe the actions of election officials. The State Court dismissed that claim as untimely, holding that "[t]he observation procedures for the November general election were materially the same as for the August primary election, and any objection to

1    unanimously affirmed by an *en banc* panel of the Arizona Supreme Court on expedited

2    review.[11]

3           Here, Plaintiffs' Complaint similarly relies upon A.R.S. § 16-672 and its provisions

4    related to bringing suit for alleged election misconduct, including illegal votes and

5    erroneous counting.  (Doc. 1 at ¶ 15).  A.R.S. § 16-672 also provides that an elections

6    contest brought under this statute should be filed in the superior court of the county in

7    which the person contesting resides or in the superior court of Maricopa county.  A.R.S. §

8    16-672(B).  Plaintiffs aver that their claims seek federal action under federal statutes, and

9    therefore, their claims are distinguishable from the claims being litigated in the state court.

10   The Court disagrees.

11          Generally, a federal court has a duty to exercise the jurisdiction conferred by

12   Congress.  However, under certain circumstances, it is prudent for a federal court to abstain

13   from hearing a matter.  "Indeed, we have held that federal courts may decline to exercise

14   its jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum

15   would clearly serve an important countervailing interest."  *Quackenbush v. Allstate Ins.*

16

17   _____

     them should have been brought at a time when any legal deficiencies could have been
18   cured," and citing *Lubin v. Thomas*, 144 P.3d 510, 511 (Ariz. 2006) ("In the context of
     election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim
19   if a party's unreasonable delay prejudices the opposing party or the administration of
     justice.").  Second, Ward alleged that "election officials overcounted mail-in ballots by not
20   being sufficiently skeptical in their comparison of signatures on the mail-in
     envelope/affidavits with signatures on file."  The state court allowed Ward to examine a
21   sampling of mail-in ballots, and the court held that "[t]he evidence does not show that these
     affidavits are fraudulent, or that someone other than the voter signed them.  There is no
22   evidence that the manner in which signatures were reviewed was designed to benefit one
     candidate or another, or that there was any misconduct, impropriety, or violation of Arizona
23   law with respect to the review of mail-in ballots."  Lastly, Ward alleged errors with
     duplication of ballots.  The state court also allowed Ward to examine a sampling of
24   duplicate ballots and held that '[t]he duplication process prescribed by the Legislature
     necessarily requires manual action and human judgment, which entail a risk of human
25   error. Despite that, the duplication process for the presidential election was 99.45%
     accurate. And there is no evidence that the inaccuracies were intentional or part of a
26   fraudulent scheme. They were mistakes. And given both the small number of duplicate
     ballots and the low error rate, the evidence does not show any impact on the outcome."
27   The state court concluded by holding that "[t]he Court finds no misconduct, no fraud, and
     no effect on the outcome of the election."  *Ward*, CV 2020-015285 (Ariz. Super. Ct. Dec.
28   4, 2020); (Doc. 58-1).

     [11] "The Court concludes, unanimously, that the trial judge did not abuse his discretion in
     denying the request to continue the hearing and permit additional inspection of the ballots."
     *Ward*, CV 2020-015285, at *7 (Ariz. 2020); (Doc. 81-1).

1    *Co*., 517 U.S. 706, 716 (1996) (citing *County of Allegheny v. Frank Mashuda Co*., 360 U.S.

2    185, 189 (1959)).  Abstention may be "warranted by considerations of proper constitutional

3    adjudication, regard for federal-state relations, or wise judicial administration."  *Id*.

4    *Colorado River* abstention permits a federal court to abstain from exercising jurisdiction

5    over a matter in deference to a state court suit regarding similar claims and allegations.

6    *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 817

7    (1976).

8        The Ninth Circuit has enumerated an eight-part test for whether *Colorado River*

9    abstention is warranted, stressing that the factors are "not a mechanical checklist," with

10   some factors that "may not have any applicability to a case."  *Seneca Ins. Co., Inc. v.*

11   *Strange Land, Inc*., 862 F.3d 835, 841–42 (9th Cir. 2017).  The factors are: (1) which court

12   first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal

13   forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums

14   obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on

15   the merits; (6) whether the state court proceedings can adequately protect the rights of the

16   federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court

17   proceedings will resolve all issues before the federal court.  *Id*.

18       Factors two through seven all support abstaining from this case.[12]  To begin, this

19   federal forum is less convenient than the state forum, considering the state election law

20   violations alleged, the claims are brought against state actors, and the interplay of state

21   election law.  Moreover, the present suit reflects the very essence of "piecemeal litigation,"

22   with many of the same parties and attorneys litigating related matters in both forums.  As

23   to the primacy of cases, this case was the last filed case.  All of the state court litigation

24   filed related to the election preceded this action.  As to the nature of the claims, while

25   Plaintiffs bring their claims under federal laws, the crux of their arguments, and the statutes

26   upon which they rely, involve Arizona election law and the election procedures carried out

27   at the county and state level by state officials.  The state courts are adequately equipped to

28

---

[12] The Court finds that the first factor is not relevant to the facts alleged herein.

protect the rights of the named Plaintiffs, especially considering that Plaintiff Ward already pursued her grievances there.  Moreover, as Congress has conferred concurrent jurisdiction on state courts to adjudicate Section 1983 claims, there is no concern that the state is unable to adjudicate Plaintiffs' Section 1983 claims.  *Felder v. Casey*, 487 U.S. 131, 139 (1988).  Lastly, abstention would alleviate the necessity to consider whether this matter was filed in this Court as a form of forum shopping, especially considering that a number of other related state court lawsuits have already been disposed of.  The eighth factor is the only factor that weighs against abstention, as it does not appear that Plaintiffs' allegations of widespread fraud in relation to the tabulation systems and software were before the state court.  However, as discussed *infra*, the Court finds that claim lacks Rule 9(b) particularity and plausibility.

Moreover, when considering abstention, "proper constitutional adjudication, regard for federal-state relations, or wise judicial administration," also inform this Court.  *Quackenbush*, 517 U.S. at 716.  If the Court were to reach the merits of Plaintiffs' claims, it would be entirely possible today for it to reach a different legal determination, or the same conclusion but with a different analysis, than the Arizona Supreme Court reached in *Ward v. Jackson*.  The Court cannot think of a more troubling affront to "federal-state relations" than this.  *See Quackenbush*, 517 U.S. at 716.  Therefore, the Court finds that abstention of these parallel issues is appropriate and indeed necessary.

### C.    Eleventh Amendment

Defendants also argue that the Eleventh Amendment bars Plaintiffs' demands for relief because they, as state officials who have not consented to being sued, are immune from suit.  Further, they argue that no exception applies, that the relief Plaintiffs seek is not prospective, and that the claims are barred.

The Eleventh Amendment to the Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  Such immunity applies when a citizen brings a claim against their own state.  *See Hans v. Louisiana*, 134 U.S. 1, 19 (1890).  The immunity extends to "suit[s] against state officials when the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.*  "When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Id.* at 101.  "The general rule is that a suit is against the sovereign . . . if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963).

There are three recognized exceptions to the above: (1) Congress has abrogated the immunity within a federal statute; (2) the State has waived immunity and allowed individuals to sue it pursuant to specific state statutes; and (3) in "claims seeking *prospective* injunctive relief against state officials to remedy a state's *ongoing* violation of *federal* law." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123 (1908)) (emphasis added).

None of these exceptions are present here.  As for Plaintiffs' 42 U.S.C. § 1983 claims, Congress did not abrogate the states' immunity from suit in the enacting language of Section 1983, and therefore, the Eleventh Amendment bars those claims.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989) (holding that Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties").  Plaintiffs provided no argument or authority that the state has explicitly waived its immunity for elections challenges.  Therefore, the second exception does not apply.  As for the remaining claims, the Court must determine whether Plaintiffs are seeking prospective relief to cure an ongoing violation of federal law.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645

1    (2002) (internal citations omitted).   However, where the claims are state law claims,

2    masked as federal law claims, *Ex parte Young* is inapplicable and the Eleventh Amendment

3    clearly bars the suit.   *See Massey v. Coon*, 865 F.2d 264 (9th Cir. 1989) (affirming dismissal

4    where "on its face the complaint states a claim under the due process and equal protection

5    clauses of the Constitution, [but] these constitutional claims are entirely based on the

6    failure of defendants to conform to state law"); *see also Pennhurst*, 465 U.S. at 90 ("[W]hen

7    a plaintiff alleges that a state official has violated state law" and "when a federal court

8    instructs state officials on how to conform their conduct to state law, this conflicts directly

9    with the principles of federalism that underlie the Eleventh Amendment.").   This is true

10   whether the relief requested is "prospective or retroactive" in nature.   *Pennhurst*, 465 U.S.

11   at 106.

12          Here, Plaintiffs face a number of difficulties in their attempt to pierce Defendants'

13   sovereign immunity.   Defendants argue that all of Plaintiffs' allegations are actually state

14   law allegations masked under federal law.   Defendants point to numerous instances in

15   Plaintiffs' Complaint where Arizona state election law is relied on, including their catch-

16   all fraud claims, which are entirely based on state law.   The Eleventh Amendment clearly

17   bars such claims.   *See Pennhurst*, 465 U.S. at 106 ("On the contrary, it is difficult to think

18   of a greater intrusion on state sovereignty than when a federal court instructs state officials

19   on how to conform their conduct to state law.").

20          However, even assuming that Plaintiffs established that their claims are indeed

21   independent federal claims, it is unclear what *ongoing* violation of federal law is being

22   asserted.   Plaintiffs allege Due Process and Equal Protection claims, along with a catch-all

23   fraud claim, that arise from Defendants' alleged failure to follow Arizona state election

24   laws.   (Doc. 1 at ¶¶ 106–120).   These numerous alleged violations—related to alleged

25   issues with signature verification, ballot duplication, and poll observation—concern past

26   conduct.[13]   The relief requested—compelling the Governor to decertify the election—

27   _____

28   [13] These include objections regarding poll watchers' ability to observe ballot counting,
     issues related to the manner and process by which Arizona election officials matched
     signatures on absentee ballots (Doc. 1 at ¶¶ 46–48); issues related to the process and role
     assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49);

1   similarly seeks to alter past conduct.  Plaintiffs have not identified an ongoing violation to

2   enjoin.   In short, "Plaintiffs are seeking to undo what has already occurred, as their

3   requested relief reflects."  *See King v. Whitmer*, 2020 WL 7134198, at *5 (E.D. Mich. Dec.

4   7, 2020).

5        The Eleventh Amendment bars the injunctive relief sought.

6        **D.    Laches**

7        Defendants also argue that the doctrine of laches bars Plaintiffs' claims.  Laches

8   will bar a claim when the party asserting it shows the plaintiff unreasonably delayed in

9   filing the action and the delay caused prejudice to the defendant or the administration of

10  justice.  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951–52 (9th Cir. 2001) (noting that

11  laches requires a "defendant [] prove both an unreasonable delay by the plaintiff and

12  prejudice to itself").  Laches can bar untimely claims for relief in election cases, even when

13  the claims are framed as constitutional challenges.  *Soules v. Kauaians for Nukolii

14  Campaign Comm.*, 849 F.2d 1176, 1181 (9th Cir. 1988); *U.S. v. Clintwood Elkhorn Min.

15  Co.*, 553 U.S. 1, 9 (2008) ("[A] 'constitutional claim can become time-barred just as any

16  other claim can.'") (*quoting Block v. North Dakota ex rel. Board of Univ. and School

17  Lands*, 461 U.S. 273, 292 (1983)).

18       Plaintiffs filed their Complaint and request for TRO seeking to "de-certify" the

19  election results on December 2, 2020, nearly a month after the General Election on

20  November 3, 2020.  Plaintiffs conclusively argue that they waited this long because they

21  "could not have known the basis of their claim, or presented evidence substantiating their

22  claim, until after the election."  (Doc. 44 at 9).  They further state that, because "Arizona

23  election officials and other third parties did not announce or publicize their misconduct,

24  and in fact prevented Republican poll watchers from observing the ballot counting and

25  handling, it took Plaintiffs additional time post-election to gather the fact and expert

26  witness testimony presented in the Complaint."  (*Id.*)  During oral argument, Plaintiffs'

27  counsel repeatedly stated that the alleged fraud related to the Dominion voting machines

28  "irregularities" with the voting machines (*Id.* at ¶¶ 50–52); and certification of the
    Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

1    was not known until election night, when their experts noted a "blip" in their reporting data

2    that showed an increase in votes for Joe Biden around 8:00 p.m.  Plaintiffs also argue that

3    A.R.S. §16-673 supports the timeliness of their Complaint because it requires an elector to

4    file a challenge to the election in state court within five days of certification of the election.

5        Plaintiffs' Complaint includes a hodge-podge of alleged misconduct by Arizona

6    elections officials, occurring on various dates over the past weeks, months, and even years.

7    In addition to the objections regarding poll watchers' inability to observe ballot counting

8    and handling, Plaintiffs also object to the manner and process by which Arizona election

9    officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role

10   assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49);

11   to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52);

12   and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

13       The affidavits or declarations upon which Plaintiffs rely clearly shows that the basis

14   for each of these claims was either known well before Election Day or soon thereafter, and

15   thus cannot be excused by a lack of knowledge nor an inability to substantiate their claims

16   through December 2.  For example, Plaintiffs' Complaint cites to documents showing that

17   Plaintiffs were in possession of information about suspected irregularities with the

18   Dominion voting machines as early as 2018.  (*Id.* at ¶¶ 21, 69, 71–73) (referencing

19   "publicly available evidence (including judicial and administrative proceedings)" that

20   discuss concerns with security flaws in Dominion voting machines dating back to 2018);

21   (Doc. 1-10 at 19, Ex. 20, Declaration of Mark Paul Law dated November 24, 2020

22   (describing his concerns over Maricopa County Dominion voting machine security and

23   observations while poll watching on October 25, 2020 and November 1, 2020); *id.* at 30,

24   Ex. 22, Declaration of Gregory Wodynski dated November 23, 2020 (describing his

25   concerns over Maricopa County Dominion voting machine security and his perception that

26   "Bruce," a Dominion employee, could manually manipulate voter data files while poll

27   watching on October 24, 2020 and November 1, 2020).

28       Plaintiffs also include documents showing that the facts underlying their allegations

of ballot counting and verification misconduct occurred weeks before Election Day. Canvassing in Arizona began in October, and the poll watcher declarations and affidavits attached to the Complaint object to the signature verification and ballot process during this time. (*See* Doc. 1-3 at 7, Ex. 5) (containing unsigned Declaration dated October 25, 2020 from poll watcher objecting to "NO EFFECTIVE oversight" in signature verification rooms); *id.* at 9, Ex. 5A (document listing poll watcher objections made on 10/7/20, 10/23/20, 10/24/20, 10/29/20); (Doc. 1-10 at 25, Ex. 21) (containing a Declaration of poll watcher Judith Burns dated November 16, 2020 and noting her objections in observing the signature verification and ballot processing on October 17, 2020 and October 21, 2020). In a statement from Ms. Linda Brickman, the First Vice-Chair of the Maricopa County Republican Committee, she represents that she had ongoing concerns regarding the signature verification for early and mail-in ballots during her time as an elections worker "from 10/19/20 to 11/11/20" (Doc. 1-10 at 38, Ex. 23) and had objections to the Logic and Accuracy Certification of the Dominion voting systems that occurred on November 18, 2020. (*Id.* at 35). Indeed, at least one Plaintiff has already raised some of these complaints in state court.[14] *Ward*, CV2020-015285 (Super. Ct. of Ariz. Dec. 4, 2020) (dismissing the Petition with prejudice); (Doc. 58-1 at 14, Ex. B). Dr. Ward clearly knew the basis of her claim before December 2, 2020 but offers no reasonable explanation for the delay in bringing this suit in federal court. When contesting an election, any delay is prejudicial, but waiting until a month after Election Day and two days after certification of the election is inexcusable. *See Kelly v. Penn.*, 2020 WL 7018314, at *1 (Pa. Nov. 28, 2020) ("Petitioners failed to act with due diligence in presenting the instant claim" when they waited until November 21 to sue to invalidate Pennsylvania's election); *Kistner v. Simon*, No. A20-1486, slip op. at 3–4 (Minn. Dec. 4, 2020); *see also, e.g., Ariz. Libertarian Party*

---

[14] As she does here, Ms. Ward's state court action claimed that poll watchers were given insufficient opportunity to observe the actions of election officials. Notably, the state court judge found this claim barred by the doctrine of laches, as Ms. Ward had failed to assert it during a time when it could have been corrected. (Doc. 1-10 at 19 ("The observation procedures for the November general election were materially the same as for the August primary election, and any objection to them should have been brought at a time when any legal deficiencies could have been cured.").

*v. Reagan*, 189 F. Supp. 3d 920, 922–23 (D. Ariz. 2016).

The Court does not find that the Arizona state election challenge deadline excuses delay on Plaintiffs' part in these circumstances. *See* A.R.S. §16-673. As noted above, the facts underlying the suspected irregularities complained of were either known to Plaintiffs prior to Election Day or soon thereafter. Although Arizona electors may have a deadline by which to file election contests in Arizona state court, Plaintiffs here opted to file their federal constitutional challenges in federal court. The exhibits to the Complaint confirm that the events complained of occurred on or before Election Day. Accordingly, the Court rejects Plaintiffs' self-serving statement that they did not know the basis for their claims before December 2, 2020. The documents they submit with their Complaint plainly shows the contrary is true, and the delay—which has resulted in a rush by this Court and Defendants to resolve these issues before the Electoral College meeting deadline of December 14, 2020—is unreasonable.

The second part of the laches test—prejudice—is also unquestionably met. First, the prejudice to the Defendants and the nearly 3.4 million Arizonans who voted in the 2020 General Election would be extreme, and entirely unprecedented, if Plaintiff were allowed to have their claims heard at this late date. *SW Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented."). As an Eastern District of Michigan Court stated in a nearly identical case, "[the prejudice] is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak." *King*, 2020 WL 7134198, at *7.

Second, the challenges that Plaintiffs assert quite simply could have been made weeks ago, when the Court would have had more time to reflect and resolve the issues. "Unreasonable delay can prejudice the administration of justice by compelling the court to steamroll through . . . delicate legal issues in order to meet election deadlines." *Arizona*

*Libertarian Party*, 189 F. Supp. 3d at 923 (quotation marks and citations omitted). Plaintiffs offer no reasonable explanation why their claims were brought in federal court at this late date. Their delay and the resulting prejudice bars their claims by laches.

### E. Mootness

Defendants also argue that this case is moot. (Docs. 38 at 5; 40 at 22). The Court agrees. "Mootness is a jurisdictional issue, and 'federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists.'" *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) (quoting *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir. 1999)). In addition, a case is moot when a party cannot obtain relief for its claim. *Id.*; *see also Ruvalcaba v. City of L.A.*, 167 F.3d 514, 521 (9th Cir. 1999).

Plaintiffs request an injunction that (a) enjoins Governor Ducey from transmitting the certified results, (b) orders Defendants to "de-certify" the election results, (c) nullifies votes tabulated by uncertified machines, (d) declares that illegal ballot fraud occurred in violation of the Electors and Elections Clauses and the Fourteenth Amendment's Due Process and Equal Protections Clauses, (e) mandates a manual recount or statistical sampling of all mail-in and absentee ballots, and (f) allows Plaintiffs to seize and inspect voting hardware and software as well as security camera recordings "of all rooms used in Maricopa County" from November 3 to 4. (Doc. 1 at ¶ 145).

Obviously, the Court cannot enjoin the transmission of the certified results because they have already been transmitted. (Doc. 40 at 4). Plaintiffs' counsel orally argued that Defendants had the power to de-certify the election under 3 U.S.C. § 6. Nothing in that statute authorizes this Court to de-certify the results. The manner provided to contest elections under Arizona law requires election contest claims to be brought, "in the superior court of the county in which the person contesting resides or in the superior court of Maricopa County." A.R.S. § 16-672. Therefore, if de-certification were possible, it would only be possible through an action brought in Arizona superior court. In other words, this Court has no power to de-certify the results. But even assuming the Court were able to grant the extraordinary relief requested, ordering Governor Ducey to de-certify the

1    election, such relief would necessarily run afoul of 3 U.S.C. § 6 by ignoring Arizona law.

2    In this instance, the Court cannot allow Plaintiffs to circumvent both federal and Arizona

3    law.

4        Because this Court cannot de-certify the results, it would be meaningless to grant

5    Plaintiffs any of the remaining relief they seek.  *See Wood v. Raffensperger*, 2020 WL

6    7094866, at *6 (11th Cir. Dec. 5, 2020) ("[I]t is not possible for us to delay certification

7    nor meaningful to order a new recount when the results are already final and certified.");

8    *King*, 2020 WL 7134198, at *5 n.3 ("[T]he evidence Plaintiffs seek to gather by inspecting

9    voting machines and software and security camera footage only would be useful if an

10   avenue remained open for them to challenge the election results.").  Plaintiffs' claims are

11   moot.

12       ## F.    Failure to State a Claim

13       "A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b)[15]

14   for failure to plead with particularity is the functional equivalent of a motion to dismiss

15   under Rule 12(b)(6) for failure to state a claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

16   1097, 1107 (9th Cir. 2003).  In a Rule 12(b)(6) context, courts must consider all well-

17   pleaded factual allegations as true and interpret them in the light most favorable to the

18   plaintiff.  *Schlegal v. Wells Fargo Bank, NA,* 720 F.3d 1204, 1207 (9th Cir. 2013).

19   Dismissal is proper when there is either (1) a lack of a cognizable legal theory or (2)

20   insufficient facts to support a cognizable legal claim.  *Conservation Force v. Salazar*, 646

21   F.3d 1240, 1242 (9th Cir. 2011), *cert. denied, Blasquez v. Salazar*, 565 U.S. 1261 (2012).

22       When pleading allegations concerning fraudulent conduct, Rule 9(b) requires

23   something more than Rule 8: particularity.  *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009);

24

25   [15] Although Plaintiffs strenuously argue that they can bring their Arizona election law-
     based claims in federal court because of the presence of federal allegations, they also boldly
26   assert in their Reply that they need not follow the heightened pleading standard of Federal
     Rule of Civil Procedure 9(b) in pleading their fraud claims with particularity, because the
27   federal rules are somehow abrogated by "controlling Arizona Supreme Court precedent.[15]"
     (Doc. 44 at 23).  Plaintiffs cannot have it both ways.  Plaintiffs have not provided any
28   authority that a state court decision can alter the pleading requirements in federal court
     established by United States Supreme Court precedent and the Federal Rules of Civil
     Procedure.

*see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "This particularity requirement demands a higher degree of notice than that required for other claims. The claim must identify who, what, where, when, and how." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

Moreover, "claims of fraud or mistake . . . must, in addition to pleading with particularity, also plead plausible allegations. That is, the pleading must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the misconduct alleged." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal citations omitted). Indeed, "Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also 'to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.'" *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (citing *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996)).

Establishing the plausibility of a complaint's allegations is a two-step process that is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. 679. First, a court must "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. Then, assuming the truth only of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id*.; *see also Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (identifying the two-step process for evaluating pleadings). Although a plaintiff's specific factual allegations may be consistent with a plaintiff's claim, a district court must assess whether there are other "more likely explanations" for a defendant's conduct such that a plaintiff's claims cannot cross the line "'from conceivable to plausible.'" *Iqbal*, 556 U.S. at 680

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard represents a balance between Rule 8's roots in relatively liberal notice pleading and the need to prevent "a plaintiff with a largely groundless claim" from "'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of settlement value.'"  *Twombly*, 550 U.S. at 557–58 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

Advancing several different theories, Plaintiffs allege that Arizona's Secretary of State and Governor conspired with various domestic and international actors to manipulate Arizona's 2020 General Election results allowing Joseph Biden to defeat Donald Trump in the presidential race.  The allegations they put forth to support their claims of fraud fail in their particularity and plausibility.  Plaintiffs append over three hundred pages of attachments, which are only impressive for their volume.  The various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections.  Because the Complaint is grounded in these fraud allegations, the Complaint shall be dismissed.  *Vess*, 317 F.3d at 1107 ("When an entire complaint, or an entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the heightened pleadings requirements of Rule 9(b), a district court may dismiss the complaint or claim.").

Plaintiffs first "describe specific violations of Arizona law" to support their fraud claims.[16]  In doing so, they attach declarations from poll watchers that observed election officials during the November General Election.  (Doc. 1 ¶¶ 46–53).  As Intervenor-Defendant Maricopa County points out, these are the only declarants offered by Plaintiffs with first-hand observation of the election administration.  (Doc. 36 at 4).  But these four declarants do not allege fraud at all.  (*See* Doc. 1-10 at 18–24).  Instead, they raise objections to the manner and process by which Arizona election officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role assigned to poll

---

[16] Plaintiffs' often scattershot pleadings allege that "Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the ***Georgia legislature***."  (Doc 2 at 6) (emphasis added).  Plaintiffs also nonsensically include references to Wisconsin state statutes.  (Doc. 1 at 33).

referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52); and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53). These objections to the manner in which Arizona officials administered the election cannot serve to overturn the results of the 2020 presidential election in Arizona because they fail to present evidence that supports the underlying fraud claim. At most, these are the type of "garden variety election irregularities" federal courts are "not equipped nor empowered to supervise . . . ." *Griffin v. Burns*, 570 F.2d 1065, 1076, 1077 (1st Cir. 1978) ("If every election irregularity or contested vote involved a federal violation, the court would be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitioners, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law.").

Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona. As an initial matter, none of Plaintiffs' witnesses identify Defendants as committing the alleged fraud, or state what their participation in the alleged fraudulent scheme was. Instead, they allege that, absentee ballots "*could have* been filled out by anyone and then submitted in the name of another voter," "*could be* filled in by third parties to shift the election to Joe Biden," or that ballots were destroyed or replaced "with blank ballots filled out by election workers, Dominion or other third parties." (Doc. 1 ¶¶ 54–58) (emphasis added). These innuendoes fail to meet Rule 9(b) standards. But perhaps more concerning to the Court is that the "expert reports" reach implausible conclusions, often because they are derived from wholly unreliable sources.

Plaintiffs' expert Mr. William Briggs ("Briggs"), for example, concludes that "troublesome" errors by Arizona election officials "involving unreturned mail-in ballots []ary indicative of voter fraud" and that the election should consequently be overturned. (Doc. 1 at ¶ 54). Briggs relies on data provided by an unknown person named "Matt Braynard," a person who may or may not have tweeted a "Residency Analysis of ABS/EV Voters" on his Twitter account on November 20, 2020 (Doc. 1-2 at 14, Ex. 2); (*Id.* at 52,

- 25 -

Ex. 3).  Apart from a screenshot of Mr. Braynard's tweets that day, Plaintiffs offer nothing further about Mr. Braynard's identity, qualifications, or methodologies used in conducting his telephone "survey."  But according to the Briggs' report, Mr. Braynard conducted his survey of unknown size and to unknown persons in Georgia, Michigan, Wisconsin, Arizona, and Pennsylvania regarding absentee ballots, and his "findings" were conveyed to Mr. Briggs.  (*Id.*)  In concluding that there were "clearly a large number of troublesome ballots in each state," Mr. Briggs assumed Mr. Braynard's "survery [sic] respondents [were] representative and the data [was] accurate." (*Id.*)   This cavalier approach to establishing that hundreds of thousands of Arizona votes were somehow cast in error is itself troublesome.  The sheer unreliability of the information underlying Mr. Briggs' "analysis" of Mr. Braynard's "data" cannot plausibly serve as a basis to overturn a presidential election, much less support plausible fraud claims against these Defendants.

The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election.  Plaintiffs are clearly concerned about the vulnerabilities of voting machines used in some counties across Arizona and in other states.  They cite sources that attest to knowledge of "well-known" vulnerabilities, have included letters from concerned citizens, Arizona elected officials, and United States senators.  Plaintiffs even attach an affidavit of an anonymous witness with connections to the late Venezuelan dictator Hugo Chavez claiming to be privy as to how officials in Venezuela rigged their elections with the help of a voting systems company whose software "DNA" is now used in voting machines in the United States.  (Doc. 1-1, Ex. 1).  These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election.  Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have." (Doc. 1 ¶¶ 8, 53, 55, 57, 60, 66, 77, 88, 91, 108, 109, 122).  To lend support to this theory, Plaintiffs offer expert Russell Ramsland, Jr., who asserts there was "an improbable, and *possibly impossible* spike in processed votes" in Maricopa and Pima Counties at 8:46 p.m.

on November 3, 2020.  (Doc. 1 ¶ 60); (Doc. 1-9, Ex. 17) (emphasis added).  He suggests that this spike "could easily be explained" by presuming that Dominion "pre-load[ed] batches of blank ballots in files such as Write-Ins or other adjudication-type files then casting them almost all for Biden using the Override Procedure . . . ." (Doc. 1-9 at 9, Ex. 17).  This scenario is conceivable.  However, Defendant Hobbs points to a much more likely plausible explanation: because Arizona begins processing early ballots before the election, the spike represented a normal accounting of the early ballot totals from Maricopa and Pima Counties, which were reported shortly after in-person voting closed.  (Doc. 40 at 17–18).  Thus, the Court finds that while this "spike" *could* be explained by an illicit hacking of voting machinery in Arizona, the spike is "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed" reporting of early ballot tabulation in those counties.  *See Iqbal*, 556 U.S. at 680.  Plaintiffs have not moved the needle for their fraud theory from conceivable to plausible, which they must do to state a claim under Federal pleading standards.  *Id.*

Because Plaintiffs have failed to plead their fraud claims with particularity and because the Complaint is grounded in these claims, it must be dismissed.[17]

## G.    Motion for TRO and Preliminary Injunction

There are multiple independent grounds upon which to dismiss Plaintiffs' Complaint.  Accordingly, it is not necessary to reach the merits of Plaintiffs' requests for a temporary restraining order and preliminary injunction and the Court will therefore only briefly addresses those Motions here.

"The standard for issuing a temporary restraining order is identical to that for issuing a preliminary injunction."  *Taylor-Failor v. Cty of Hawaii*, 90 F. Supp. 3d 1095, 1098 (D. Haw. 2015).  Under normal circumstances, both are extraordinary and drastic remedies,

---

[17] Throughout their pleadings, Plaintiffs allege that there were "spikes" of votes for Joe Biden that occurred in Arizona, which also occurred in other states that certified the election for Joe Biden, including Georgia, Wisconsin, Michigan, and Pennsylvania. Regardless of whether these "spikes" shifting the vote majorities from President Trump to Vice President Biden occurred in other states, Plaintiffs have presented nothing to support the claim that these same "spikes" occurred in Arizona, where Biden never trailed Trump in the vote tally.

and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted).  A plaintiff seeking a temporary restraining order or preliminary injunction must show that (1) he or she is likely to succeed on the merits, (2) is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his or her favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.

Plaintiffs simply cannot establish they have a likelihood of success on their claims. Plaintiffs face serious jurisdictional impediments in bringing their claims to federal court at the eleventh hour.  These insurmountable legal hurdles are exacerbated by insufficiently plead allegations of fraud, rendered implausible by the multiple inadmissible affidavits, declarations, and expert reports upon which their Complaint relies.

Furthermore, granting Plaintiffs the injunctive relief they seek would greatly harm the public interest.  As stated by Defendant Hobbs, "the requested relief would cause enormous harm to Arizonans, supplanting the will of nearly 3.4 million voters reflected in the certified election results and potentially imperiling Arizona's participation in the Electoral College.  It would be more difficult to envision a case in which the balance of hardships would tip more strongly against a plaintiff."  (Doc. 40 at 24).  The Court agrees. The significant weight of these two *Winters* factors requires that the Court deny Plaintiffs' requests for injunctive relief. [18]

### III.   Conclusion

Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them.  Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court.  They

---

[18] The Court will vacate the hearing on Plaintiffs' TRO and Request for Preliminary Injunction scheduled for December 10, 2020.

most certainly cannot be the basis for upending Arizona's 2020 General Election.  The Court is left with no alternative but to dismiss this matter in its entirety.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Governor Doug Ducey, Secretary of State Katie Hobbs, and Intervenor Defendants Maricopa County Board of Supervisors and Adrian Fontes' Motions to Dismiss the Complaint (Docs. 36, 38, and 40) are **GRANTED** for the reasons stated herein.

**IT IS FURTHER ORDERED** that all remaining pending motions (Docs. 14, 62, 65 and 66) are **denied as moot,** and the hearing on Plaintiffs' TRO and Preliminary Injunction set for December 10, 2020 is **vacated**.

**IT IS FINALLY ORDERED** that this matter is dismissed, and the Clerk of Court is kindly directed to terminate this action.

Dated this 9th day of December, 2020.

Honorable Diane J. Humetewa
United States District Judge

- 29 -